ORIGINAL

1   GREEN & NOBLIN, P.C.
2   Robert S. Green
    700 Larkspur Landing Circle, Suite 275
3   Larkspur, California 94939
4   Tel: (415) 477-6700
    Fax: (415) 477-6710
5   -and-
6   4500 East Pacific Coast Highway
    Fourth Floor
7   Long Beach, California 90804
8   Tel: (562) 391-2487
    rsg@classcounsel.com
9   *Liaison Counsel for Plaintiffs*

10
11  William B. Federman (admitted *pro hac vice*)
    FEDERMAN & SHERWOOD
12  10205 N. Pennsylvania Ave.
    Oklahoma City, OK 73120
13  Telephone:  405-235-1560
14  Facsimile:  405-239-2112
    wbf@federmanlaw.com
15  *Lead Counsel for Plaintiffs*

16
17              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
18
    DAVID M. LORITZ, Individually        Master File Case No.
19  and on Behalf of All Others          2:13-cv-02607-SVW-E
    Similarly Situated,
20                                        Consolidated Case Nos.
                                          2:13-cv-03194-SVW-E and
21            Plaintiff,                  2:13-cv-03991-SVW-E
22       v.                               <u>CLASS ACTION</u>
23
    EXIDE TECHNOLOGIES, et al.,           CONSOLIDATED COMPLAINT
24                                        FOR VIOLATIONS OF THE
              Defendants.                 FEDERAL SECURITIES LAWS
25
26                                        DEMAND FOR JURY TRIAL
27
28

FILED
CLERK U.S. DISTRICT COURT
SEP - 9 2013
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

RECEIVED BUT NOT FILED
CLERK, U.S. DISTRICT COURT
SEP - 9 2013
CENTRAL DISTRICT OF CALIFORNIA
BY              DEPUTY

1

## **TABLE OF CONTENTS**

2

I.      NATURE OF THE ACTION ................................................................................1

II.     JURISDICTION AND VENUE .....................................................................7

III.    PARTIES ..................................................................................................8

IV.    SUBSTANTIVE ALLEGATIONS ..........................................................12

      A.      Descriptions of Confidential Informants ................................12

      B.      Exide's Previous Environmental Problems Prompted Increased Scrutiny from Environmental Regulatory Agencies .............................15

      C.      Exide's Non-Compliant Stormwater Piping System ...............17

      D.      Exide's Consistent Non-Compliance with Air Emissions Standards ......30

      E.      Exide's Increasing Liquidity Problems And Failed Restructuring And Cost Reduction Efforts ..............................................44

      F.      The Company's Ongoing Liquidity Problems Prevented Exide from Maintaining Environmental Compliance ...............................49

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN VIOLATION OF THE SECURITIES ACT .........................................63

      A.      Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolonia, Ferguson, O'Higgins and Pileggi Negligence .........................70

VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS UNDER THE EXCHANGE ACT ..............................................................71

      A.      Additional Scienter Allegations ...........................................145

           1.      Environmental Issues Went Up the Chain to Defendants ...........145

           2.      The Importance of the Vernon Facility to Exide ..........................158

VII.   THE TRUTH EMERGES ........................................................................160

VIII.   NO SAFE HARBOR ..............................................................................163

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCRTINE ................................................................164

X.      LOSS CAUSATION ................................................................................166

XI.    CLASS ALLEGATIONS ........................................................................169

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

Lead Plaintiffs James Cassella and Sandra Weitsman, Plaintiff James Close and Plaintiff Kevin Grace ("Plaintiffs") individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Exide Technologies ("Exide" or the "Company"), publicly available records of the Department of Toxic Substances Control of the State of California ("DTSC") and the South Coast Air Quality Management District of the State of California ("AQMD"), transcripts from administrative hearings, filings in Exide's bankruptcy proceeding, as well as media reports about the Company, conference call transcripts and interviews with confidential informants.[1] Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.   This is a securities class action on behalf of all purchasers of the common stock of Exide between June 1, 2011 and May 24, 2013, inclusive (the "Class

---

[1] Plaintiffs are still waiting on documents requested from the South Coast Air Quality Management District. Additionally, further relevant testimony is scheduled to be given as part of the administrative hearings held before the State of California Environmental Protection Agency.

1

Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and on behalf of purchasers of Exide's $8^{5/8}$% senior secured notes due 2018 traceable to its Form S-4/A effective August 12, 2011 seeking remedies under §§11 and 15 of the Securities Act of 1933; and on behalf of purchasers of Exide's $8^{5/8}$% senior secured notes due 2018 during the period August 8, 2011 through May 24, 2013 seeking remedies under §§10(b) and 20(a) of the Exchange Act. Defendants include Exide, James R. Bolch ("Bolch"), Phillip A. Damaska ("Damaska"), R. Paul Hirt ("Hirt"), Louis E. Martinez ("Martinez"), John P. Reilly ("Reilly"), Herbert F. Aspbury ("Aspbury"), Michael R. D'Appolonia ("D'Appolonia"), David S. Ferguson ("Ferguson"), John O'Higgins ("O'Higgins"), and Dominic J. Pileggi ("Pileggi").

2.      Defendant Exide was incorporated in Delaware on November 23, 1966 and is headquartered in Milton, Georgia. It operates in 89 countries, producing, recycling and distributing lead-acid batteries. Its global transportation and industrial energy groups provide a range of stored electrical energy products and services for industrial and transportation applications.

3.      Exide operates in 89 countries, producing, recycling and distributing lead-acid batteries.  Among the various activities of the Company, Exide operated eight battery recycling facilities worldwide, including a recycling facility in Vernon, California, located approximately four miles due south of downtown Los Angeles.

According to Exide, the Vernon facility recycles between 20,000 and 40,000 batteries per day.[2] The Vernon facility produces approximately 120,000 tons of lead annually.

4.      On March 22, 2013, the Vernon recycling facility was cited by AQMD as posing a greater cancer risk to residents of Southern California than any of the more than 450 facilities the agency has regulated in the 25-year history of AQMD's monitoring of toxic air contaminants.  In fact, spokesman for AQMD, Sam Atwood, summarily put the Vernon facility's violations into perspective by explaining that in his experience with the AQMD there has been "nothing close to this...never."

5.      Moreover, Defendants had known since at least August 2012, and on information and belief had known throughout the Class Period, that Exide's Vernon facility created toxic waste that ran off  into Los Angeles area groundwater. Indeed, the toxic waste — which includes lead — seeps into the Los Angeles river itself. Indeed, Exide's relationship with California state environmental agencies — particularly DTSC and the AQMD — was growing increasingly tense, as these agencies became aware of the scope of the Vernon facility's pollution and repeatedly unsuccessfully sought to have Exide address it.

6.      Despite receiving ever more drastic and heated requests from California environmental agencies, Exide declined to inform investors of the environmental violations or of risk that the Vernon facility could be shut down. Indeed, though Exide

---

[2] *See* the declaration of Joseph Preuth, Exide's Vice President of Recycling Operations and Operational Excellence, filed with the Superior Court of the State of California, County of Los Angeles (the "Preuth Declaration") at 2.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          MASTER FILE NO. 2:13-cv-02607-SVW-E

told investors that it maintained a reserve for the cost of addressing environmental problems "where such costs are probable and reasonably estimable," Exide never told investors that it was in constant contact with California environmental agencies concerning the Vernon facility nor did Exide even informed investors that it had established reserves to address liabilities arising from the Vernon facility (despite discussing reserves for other facilities).  In fact, Exide may not even have established such reserves for the Vernon facility.

7.      Defendants were themselves informed of problems at the Vernon plant. Over a dozen former confidential informants that were Exide employees have reported on the unusual lengths Exide went through to ensure that Exide's management was informed of all material developments. Among these confidential informants is Exide's six-year former Vice President of Global Environmental Health and Safety (CI 15) who reports that Exide's CEO, CFO, and Corporate Controller all received reports of the environmental law violations at each of the Company's facilities.

8.      Following the AQMD's citation, on April 3, 2013, Los Angeles City Council members held a public hearing asking the government to press charges against the Company to correct the health risk posed by the Company's environmental contamination.   On April 4, 2013, the *Los Angeles Times* published an article discussing the April 3, 2013 public hearing held by Los Angeles City Council members, wherein officials with AQMD testified before the committee about the risks posed by Exide's Vernon facility. According to the *LA Times* article, AQMD officials

became aware of the surprisingly high levels of arsenic emissions from Exide in late 2010. Indeed, based on Exide's own representations to California regulatory agencies, health risk assessment testing from October 2010 indicated that the arsenic emission rate was 7.59E-02 lb/hr, which was far in excess of previous levels. AQMD officials explained that it took AQMD two years to determine where in the Vernon plant the dangerous emissions were coming from and to quantify the risk to people and the environment.

9. Also on April 4, 2013, news source *Debtwire.com* published a report that Exide had hired financial advisory firm Lazard Ltd. and the law firm of Akin Gump LLP, both bankruptcy experts, to advise on its financial restructuring after prior restructuring efforts stalled.

10. In response to these adverse disclosures, the price of Exide's shares fell $1.24 per share to close at $1.37 per share (a 46% drop), on April 4, 2013, before trading in the stock was halted.

11. On April 25, 2013, before the market opened, Exide issued a press release announcing that the Company had received an order dated April 24, 2013 from DTSC requiring the Company to suspend operations at its Vernon facility, alleging that Exide's underground storm water system was not in compliance with California requirements and that Exide's furnace emissions were not meeting applicable DTSC health risk standards.

12.     In response to this news, Exide's shares closed at $1.02 per share on April 25, 2013, compared to the closing price of $1.34 on April 24, 2013 — a drop of 24%, on heavy trading volume.

13.     On May 24, 2013, news source *Debtwire.com* reported that Exide was in talks with bankers to arrange a debtor in possession ("DIP") loan that was expected to be around $200 million to fund the Company through Chapter 11 bankruptcy proceedings.

14.     In response to this news, Exide's shares closed at $0.45 per share on May 24, 2013, compared to the day's opening price of $0.78 — a drop of 42%, on heavy trading volume.

15.     A press release issued by *Consumer Watchdog*, a California consumer advocacy organization that, among other things, investigates corporate misbehavior, sheds further light upon the hazardous conditions at the Vernon facility and Defendants' knowledge of same.  According to the May 30, 2013 press release:

> A letter sent earlier this month to DTSC Director Debbie Raphael from DTSC Senior Hazardous Substances Engineering Geologist Philip Chandler makes clear that top staff resisted internal recommendations to do what was necessary to ensure long-term safety at the plant. The letter says:
>
> • DTSC "has conveniently ignored for years" lead, arsenic and other heavy metal emissions that were permitted by air regulators but accumulated to hazardous waste levels on the ground.
>
> • *Exide's own arsenic emissions source tests in 2010 and 2012, showed a significant spike in emissions over tests in 2006 and 2008.*

*"DTSC had the ability to evaluate the change in emissions risk years before it issued this order" suspending the plant's operations.*

\*\*\*

The Exide facility emitted hazardous waste for years under a permit from the South Coast Air Quality Management District. This waste had a history of depositing and accumulating on the ground and roofs around the site.

\*\*\*

Though DTSC regulators in Southern California pushed the company to investigate and clean up, higher ups deferred taking corrective action in favor of issuing a final permit to the company that never materialized. *"While lead and arsenic were piling up, soaking into the groundwater, and also flowing into the Los Angeles River, Exide and its negligent operations were falling through the regulatory cracks,"* said *[Consumer Watchdog spokeswomen, Liza] Tucker. "And top DTSC managers refused to force the company, which is a polluter on a national scale, into compliance."*

(emphasis added).

## II.   JURISDICTION AND VENUE

16.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C §§77k and 77l) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v (a)) and Section 27 of the Exchange Act (15 U.S.C. 78aa), and 28 U.S.C. §§ 1331.

18.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act, and 28 U.S.C. § 1391.  Acts and transactions giving rise to the violations of law complained of occurred in this district.  The Company's recycling facility in Vernon, California that exposed residents to potentially fatal levels of arsenic lies within this district, and many of the relevant witnesses and facts are within the jurisdiction of this district.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.   PARTIES

20.     Lead Plaintiffs James Cassella ("Cassella") and Sandra Weitsman ("Weitsman") purchased Exide common stock during the Class Period as set forth in the Certifications previously filed with the Court, and incorporated herein by reference, and suffered damages.

21.     Plaintiff James Close ("Close") purchased Exide common stock during the Class Period as set forth in the Certification attached hereto, and incorporated herein by reference, and suffered damages thereon.

22.     Plaintiff Kevin Grace  ("Grace") purchased Exide's $8^{5/8}$ senior secured notes during the Class Period and traceable to the Company's August 12, 2011 Amended Registration Statement on Form S-4A and Prospectus on Form 424B, as set

forth in the Certification attached hereto, and incorporated herein by reference, and suffered damages thereon.

23.     Exide is organized under the laws of the State of Delaware and headquartered in Milton, GA. During the Class Period, Exide had millions of shares of common stock outstanding, which shares traded in an efficient market on NASDAQ under the ticker symbol "XIDE." Exide was followed by many stock analysts and stock rating agencies and was constantly in communication with the markets and investors in quarterly conference calls and frequent presentations to investors and analysts. Exide also filed periodic public reports with the SEC, and regularly issued press releases to the financial press.[3]

24.     Defendant Bolch has served as Exide's President and Chief Executive Officer ("CEO") since July 2010. Defendant Bolch signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K. Bolch also certified the Company's Form 10-Ks and 10-Qs pursuant to the Sarbanes-Oxley Act.

25.     Defendant Damaska has served as Exide's Executive Vice-President and Chief Financial Officer ("CFO") since April 2008. Prior to that time, Defendant Damaska held Senior Vice-President and Controller positions at the Company. Defendant Damaska signed the Company's 2011 Form 10-K, the Company's Registration Statement, the Company's 2012 Form 10-K, and the Company's Form

_____

[3] Exide is not named as a Defendant due to the fact that Exide filed for Chapter 11 bankruptcy on June 10, 2013.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          MASTER FILE NO. 2:13-cv-02607-SVW-E

10-Qs. Damaska also certified the Company's Form 10-Ks and 10-Qs pursuant to the Sarbanes-Oxley Act.

26. Defendant Hirt has served as President of Exide America since November 2011.

27. Defendant Martinez has served as Vice President, Corporate Controller, and Chief Accounting Officer since March 2008. Prior to that time, Defendant Martinez had served as the Company's Assistant Corporate Controller since May 2005. Defendant Martinez signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

28. Defendant Reilly has served as Chairman of Exide's Board of Directors (the "Board") since May 2004. Defendant Reilly signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

29. Defendant Aspbury has served as a member of Exide's Board since August 2006. Defendant Aspbury signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

30. Defendant D'Appolonia has served as a member of Exide's Board since May 2004. Defendant D'Appolonia signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

31. Defendant Ferguson has served as a member of Exide's Board since August 2005. Defendant Ferguson signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

10

32.   Defendant O'Higgins has served as a member of Exide's Board since 2010.  Defendant O'Higgins signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

33.   Defendant Pileggi has served as a member of Exide's Board since May 2004.  Defendant Pileggi signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

34.   Defendants Bolch, Damaska, Hirt, Martinez, Reilly, Aspbury, D'Appolonia, Ferguson, O'Higgins, and Pileggi are sometimes referred to herein collectively as "Defendants" or the "Individual Defendants."

35.   During the Class Period, the Individual Defendants possessed the power and authority to control the contents of Exide's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false or misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   <u>Descriptions of Confidential Informants</u>

36.   <u>Confidential Informant 1 ("CI 1")</u> – CI 1 was an industrial engineer at Exide from 1979 to 2010 who worked out of corporate headquarters and traveled to different Exide facilities to check on manufacturing issues and ensure procedures were being followed correctly.

37.   <u>Confidential Informant 2 ("CI 2")</u> – CI 2 worked as a project engineer at the Vernon facility from 2012 to June 2013.

38.   <u>Confidential Informant 3 ("CI 3")</u> – CI 3 was the manager of Exide's distribution center in Fresno, California from 2009 to January 2013.

39.   <u>Confidential Informant 4 ("CI 4")</u> – CI 4 was Exide's Vice President, Operations - Transportation North America from 2006 to 2011, the operating segment that included the Vernon facility.

40.   <u>Confidential Informant 5 ("CI 5")</u> – CI 5 was the manager of Environmental Health and Safety at an Exide plant in Bristol, Tennessee from July 2011 to February 2012.

41.   <u>Confidential Informant 6 ("CI 6")</u> – CI 6 was the Environmental Health and Safety (EHS) manager at Exide's Columbus, Georgia facility, which had a battery recycling plant similar to the one at Vernon, California from the late 1990s to 2005.

42.   <u>Confidential Informant 7 ("CI 7")</u> – CI 7 was a refinery operator at Exide's Vernon, California facility from March 2013 to the end of April 2013.

43. <u>Confidential Informant 8 ("CI 8")</u> – CI 8 was the Environmental Health and Safety (EHS) manager at Exide's distribution center in Reading, Pennsylvania from 1981 to 2010, when CI 8 went to work at Exide's Lancaster, Pennsylvania distribution center until 2012.  CI 8 reported to Exide's Director of EHS, Fred Ganster, and sometimes to Ganster's superior, Mark Cummings, the Vice President of Global EHS.

44. <u>Confidential Informant 9 ("CI 9")</u> - CI 9 was the environmental manager at Exide's Muncie, Indiana plant from January 2012 to March 2013.  CI 9 reported to the plant manager, Bob Saurer, and also directly to Fred Ganster, Exide's Director of Environmental Health and Safety (EHS).

45. <u>Confidential Informant 10 ("CI 10")</u> - CI 10 was a bag house[4] operator at Exide's Reading, Pennsylvania plant from 1994 to May 10, 2013.

46. <u>Confidential Informant 11 ("CI 11")</u> - CI 11 was the environmental systems manager at Exide's Vernon plant from September 2009 to April 2013.

47. <u>Confidential Informant 12 ("CI 12")</u> - CI 12 is a project manager for the DTSC and is overseeing corrective action at Exide's Vernon plant.

48. <u>Confidential Informant 13 ("CI 13")</u> - CI 13 is the assistant deputy executive officer at AQMD.

49. <u>Confidential Informant 14 ("CI 14")</u> – CI 14 was Regional Finance Manager in the North-Central Region for Exide from 1989 to March 2011.

---

[4] A bag house is a device intended to prevent environmental pollution.

50. <u>Confidential Informant 15 ("CI 15")</u> – CI 15 was the Vice President of Global Environmental Health and Safety at Exide from July 2005 to March 2011.

51. <u>Confidential Informant 16 ("CI 16")</u> – CI 16 was the plant accountant at Exide's Bristol, Tennessee facility from June 2010 to March 2012.

52. <u>Confidential Informant 17 ("CI 17")</u> – CI 17 is Program Supervisor at AQMD who worked closely with Exide regarding its health risk assessments.

53. <u>Confidential Informant 18 ("CI 18")</u> – CI 18 was a Senior Hazardous Substances Engineering Geologist at DTSC.  CI 18 assisted DTSC in overseeing the Vernon facility's compliance since before the facility was owned by Exide to the present.

54. <u>Confidential Informant 19 ("CI 19")</u> – CI 19 was Senior Director, Technical Accounting and SEC Reporting at Exide from October 2005 to May 2013.

55. <u>Confidential Informant 20 ("CI 20")</u> – CI 20 was the EHS Manager at the Columbus, Georgia plant from August 2004 to December 2012.

56. <u>Confidential Informant 21 ("CI 21")</u> – CI 21 was a Regional Finance Manager in the South-Central region for Exide from July 2006 to September 2011.

57. <u>Confidential Informant 22 ("CI 22")</u> – CI 22 was the Accounts Payable Clerk at Exide's Vernon facility from September 2008 to July 2010, when CI 11's contract was not renewed for budgetary reasons.

58. <u>Confidential Informant 23 ("CI 23")</u> – CI 23 is a project manager at DTSC who is overseeing the Vernon facility.

**B.    Exide's Previous Environmental Problems Prompted Increased Scrutiny from Environmental Regulatory Agencies**

59.    Exide's Vernon facility has had a history of environmental issues.   In recent years, these problems have caused environmental regulatory agencies to increase their scrutiny of the Vernon facility in order to effectuate environmental compliance.

60.    In 2009, DTSC and AQMD discovered considerable deposits of lead near the Vernon facility and that the readings of the lead levels were "well above" the required levels, according to CI 18 (a Senior Hazardous Substances Engineering Geologist at DTSC).  In response to the high lead levels, DTSC ordered an emergency clean-up.  CI 18 recalled that one roof near Vernon was cleaned, and that when the cleaning was completed, it amounted to over 600 lbs. of toxic material.   Also in response, DTSC requested that Exide perform repeat sampling of surrounding locations to determine how much lead was accumulating over a period of time, CI 18 explained.    CI 12 (a project manager at DTSC) similarly explained that due to previous discoveries of serious lead contamination at the Vernon facility, DTSC has required Exide to prepare an extensive plan to do more monitoring and testing for historical and current pollutants in the air, water and soil.  This plan, called a Resource Conservation and Recovery Act Facility Investigation ("RFI") Workplan, must be approved by DTSC.  CI 12 is overseeing this process and preparation of the Workplan and sends all correspondence about the Workplan to Fred Ganster, Exide's Director of

Global Environmental Health and Safety, who reports to the Company's CEO, Defendant Bolch. Once the Workplan is approved, DTSC will also require Exide to submit for approval a Corrective Measures Study, which will detail the cleanup that will be done at the site as well as the upgrades at the facility to address contamination issues, according to CI 12. Moreover, as discussed further herein, Exide's elevated lead emissions caused AQMD to require the Vernon facility to provide a new, more extensive health risk assessment in 2010.

61. CI 18 explained that DTSC worked alongside AQMD regarding the elevated lead emissions. CI 18 recalled that AQMD was "shocked" by the lead levels discovered near the Vernon facility. CI 18 said that AQMD met with Exide on a regular basis following the discovered elevated lead emissions. According to CI 18, "South Coast [AQMD] is very proactive in terms of getting people into compliance." CI 18 explained that AQMD, in particular Mike Haynes (an air quality inspector for AQMD), was probably at the Vernon facility on a weekly basis, sometimes multiple times a week. Moreover, following the discovery of large deposits of lead at the Vernon facility, in November 2010, AQMD adopted Rule 1420.1 – Emissions Standards for Lead from Large Lead-Acid Battery Recycling Facilities. According to AQMD literature, this "adopted rule imposed on Exide has even more stringent monitoring, operating and reporting requirements in order to meet the new lowered federal emissions standards for lead. Rule 1420.1 requires total facility enclosure, additional air monitoring and sampling, annual source testing, and additional

housekeeping measures." Indeed, Rule 1420.1 requires that battery recycling facilities must maintain a 30-day rolling average concentration of lead that does not exceed 0.150 ug/m3.

62. Regulatory scrutiny of the Vernon facility was only further exacerbated when Exide submitted an application for a permanent operating permit with the DTSC. CI 12, project manager for the DTSC who is overseeing corrective action at Exide's Vernon plant, explained that Exide's Vernon facility is operating under an Interim Status Document, which is an interim operating permit under the federal Resource Conservation and Recovery Act ("RCRA"). *CI 12 said that the Vernon facility is one of only "a few" out of the thousands of hazardous waste facilities in California that still has not obtained the permanent permit.*

63. According to CI 12, in 2010, Exide was required by DTSC to submit a new Part B application for a permanent permit. CI 12 explained that the Part B application process has required Exide to submit numerous reports and assessments about the Vernon plant, including the facility's current conditions report, plans for cleaning up existing and future contaminants, pollution monitoring plans, plans for upgrading environmental equipment and proof of adequate financial coverage of shut down costs, among other things. Currently, that application is under review by DTSC.

C. **Exide's Non-Compliant Stormwater Piping System**

64. The 3,500 feet long stormwater piping system at Exide is a series of catch basins, connected with underground pipes that capture water from the facility wash-

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS     MASTER FILE NO. 2:13-cv-02607-SVW-E

1   down activities and rain.  Exide continuously introduces water to the piping system

2   under its daily wash-down operations.  These waters and stormwater runoff contain

3

4   toxic (*i.e.* hazardous) metals (sludge) that are released into the environment from

5   Exide's battery smelting operations.  The piping system acts as a conveyance system

6   carrying contaminated water from the catch basin to the Unit 46 Pump Sump, which is

7

8   one of the operational hazardous waste management units at the Vernon facility.

9         65.    As explained by Rizgar Ghazi, Branch Chief of the Office of Permitting

10   of the DTSC, in his June 25, 2013 declaration filed with the Superior Court of the

11

12   State of California, County of Los Angeles (the "Ghazi Declaration"), "Exide's

13   stormwater piping system is appurtenant to, attached to and connects to devices that

14   are hazardous waste management units for purposes of D.T.S.C. reporting."  Indeed,

15

16   "the catch basins and the pipes are considered ancillary equipment to the Unit 46

17   Pump Sump and thus the hazardous waste standards in Chapter 6.5 [of the California

18   Health and Safety Code, Division 20] apply to them."  *Id.* at 2.

19

20         66.    In the pipes and in the catch basins, settlement of the toxic metals occurs

21   and maintenance of such ancillary equipment is needed to ensure proper management

22   of the toxic metals.  The collected water in the Unit 46 Pump Sump is pumped

23

24   through a series of settling tanks and then is pumped to the wastewater treatment

25   plant. The wastewater treatment plant is considered an Interim Status Unit that

26   requires a permit from DTSC. The wastewater treatment plant generates toxic sludge

27

28   when it removes most of the toxic metals from the waters. Before these waters can be

18

discharged to the Publicly Owned Treatment Works (POTW) sewer system, they must be below specified levels for several toxic constituents.

67.     According to Rizgar Ghazi in his declaration, "as part of DTSC's review of Exide's 2010 application for a hazardous waste facility permit (a "Part B" permit, named after that section in RCRA), DTSC requested that Exide include the underground storm water piping as ancillary equipment to Unit 46 associated with the Part B application." *Id.* at 3.

68.     On March 21, 2011, the State of California's Department of Toxic Substances Control ("DTSC") issued Exide's Vernon facility with its First Notice of Deficiency for Exide's Part B application, citing several deficiencies including hazardous conditions that did not comply with the State of California requirements for toxic substance storage.   Specifically, the Notice of Deficiency noted that "groundwater has been contaminated due to releases from undetermined sources at Exide" and requested that Exide propose groundwater monitoring, in accordance with California Code of Regulations ("CCR"), Article 6.  The Notice of Deficiency further required Exide to "identify all pertinent surface/subsurface features."

69.     According to a June 30, 2011 letter from DTSC to Exide, DTSC had asked Exide for samples from the stormwater drains that indicated whether the drains contained hazardous contaminants, but this request had been ignored by Exide in its September 29, 2010 *Summary Report for Initial Cleaning and Recommendations for Additional Interim Measures, Exide Technologies Off-site Areas.*"  For example, the

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        MASTER FILE NO. 2:13-cv-02607-SVW-E

DTSC letter stated, "DTSC recognizes that Exide departed significantly from the approved workplan. . . . Several conditions of approval have been totally ignored, e.g. recontamination verification and storm drain inlet sampling." As noted in the letter, the "work performed was based on the February 23, 2009 '*2009 Interim Measures Work Plan*,' prepared by Advanced Geoservices, that was approved by DTSC with conditions on July 9, 2009. This was an emergency cleanup required of Exide Technologies (Exide) to address the discovery of off-site airborne/deposition of lead particulates emitted as a result of Exide's lead recycling/recovery operation in areas where the public was subject to exposure."

70. According to Ghazi, who testified as part of the administrative hearing held before the State of California Environmental Protection Agency DTSC (the "Administrative Hearing")[5], Todd Wallbom a geologist with the DTSC visited the Vernon facility in October 2011 and attempted to take several samples from the sump. Vol. 2 at 29. Wallbom was only able to take samples from one sump because the others were welded shut. *Id*. at 29-30. ***Ghazi said that the sampling indicated hazardous waste levels for lead, arsenic and cadmium.*** *Id*. at 31

71. According to CI 23 (project manager at DTSC), DTSC required Exide to submit a pipe system inspection report as part of the Company's permit application process. Without it, CI 23 said, DTSC would not approve the permit. In January 2012, Exide incorporated the catch basins and underground stormwater piping system

---

[5] The purpose of the Administrative Hearing was to determine whether the Vernon facility would be allowed to reopen.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS   MASTER FILE NO. 2:13-cv-02607-SVW-E

as ancillary equipment to the Unit 46 Pump Sump.  Exide was required to provide an assessment of Unit 46 Pump Sump and its ancillary equipment to determine compliance with the California Code of Regulations, title 22, Division 4.5, Chapter 15 requirements.

72.   On June 11, 2012, Exide submitted a schedule to survey and clean the pipes and assess the integrity of the pipes. Assessment work began in July 2012 and terminated in December 2012, as reported in the March 5, 2013 Storm Sewer Inspection Report prepared by Advanced GeoServices (the "Inspection Report"). Ghazi, Branch Chief of the Office of Permitting of the DTSC, testified as part of the Administrative Hearing that in June/July 2012 Exide attempted to pressure wash the sediments from the pipe but was unable to complete the process and, therefore, it attempted to video log the pipes.  Transcript Vol. 2 at 17-20.

73.   On July 18, 2012, DTSC submitted its Technical Review of Area of Interest Technical Memorandum ("Technical Review") to Exide.  In the Technical Review, DTSC discussed several deficiencies in the Area of Interest Technical Memorandum ("TM") Exide had submitted on May 24, 2012.   Among the deficiencies in Exide's TM, DTSC explained that Exide failed to discuss the status of the underground piping including piping that had been identified as "compromised." *See* Technical Review at 10-11.  Moreover, the Technical Review emphasized the need for Exide to ensure that the soil did not contain contaminants as a result of the

deteriorating pipes and put Exide on notice of soil samples containing hazardous amounts of lead:

> *A significant number of underground drains, piping, and catch basins occur on the facility. See also our General Comment No. 3, above, on the broken underground drain in the West Yard.   The catch Basin/Drain System was constructed post-1980 and is located in areas of heavy traffic and adjacent to HWMUs that had either no containment or containment that was demonstrably impaired.* Surface drainage directed to catch basins would have had experienced the releases.  In addition, the airborne emissions that continue to this day also wash into these catch basins.  *DTSC recently obtained a sample from one catch basin that was in excess of 180,000 mg/kg of lead.*
>
> *It is imperative to determine the soil contamination situation underneath and adjacent to the existing drains and catch basins.* As noted earlier in General Comment No. 3, particular attention should be paid to compromised sections of drains, as well as catch basins. Presence of significant contamination should necessitate efforts to assure that these devices could not release infiltrating fluids that would mobilize the older contamination from pre-1980 operations and practices.

*Id.* at 14 (emphasis added).

74.    On August 2, 2012, DTSC presented Exide with a Second Notice of Deficiency for Exide's Part B application, again citing "major deficiencies" in the Vernon facility's "groundwater monitoring and/or clean closure criteria," which still were not in compliance with California requirements.  Specifically, the Second Notice of Deficiency explained that the "*[t]he tank assessments do not comply with section 6624.192(I)(7) and 6624.192(k)1) with regard to any underground piping.  No leak testing data was presented*." (emphasis added). The Second Notice of Deficiency

further stated: "Please note that this is the second notice of deficiency. A third notice of deficiency is grounds for denying the permit according to California Code of Regulations, section 66271.2(d)." According to CI 23 (a project manager at DTSC), such language was unusually harsh, and DTSC would not usually be so abrupt as to threaten to deny the permit. "I have not seen that sort of statement before," CI 23 explained. According to CI 23, the statement indicated that the DTSC was in need of pressuring Exide to take steps the Company was resisting.

75. An August 28, 2012 memorandum prepared by DTSC identified hazardous levels of lead and zinc in the Vernon facility's stormwater pipes:

> *Sampling performed by the City of Vernon Health Department (the City) on December 12, 2011, in a storm drain located near the corner of Indiana Street and Bandini Boulevard found elevated levels of lead and zinc in storm water exceeding nearly 10x the TMDL WLAs [Total Maximum Daily Load Waste Load Allocations].* This storm drain eventually discharges to the LA River.
>
> Lead was detected in storm water sampled from this drain at 618 ug/L (TMDL WLA=62 ug/L) and zinc was detected at 377 ug/L (TMDL WLA=159 ug/L). Antimony was not one of the inorganics analyzed by the City. This sampling was performed approximately two months after Exide collected samples in the LA River, or during the wet season. *The City data strongly suggests lead-loading from Exide to the surrounding storm drains, and potentially the LA River.* Therefore, we recommend that several sample locations be included in Exide's SWMRP, placed upstream and downstream of the drain outfall(s) in the LA River.

*Id.* at 4 (emphasis added).

76. On March 5, 2013, Exide received the Inspection Report from Advanced GeoServices on behalf of Exide. As explained in the Ghazi Declaration, the

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        MASTER FILE NO. 2:13-cv-02607-SVW-E

Inspection Report was not delivered to DTSC until "eight (8) months after the inspections were started." *Id.* at 3. The Inspection Report included a copy of the inspection videos. CI 12, project manager at DTSC, recalled that CI 12 first saw the videos of the pipe inspections in March 2013. CI 12 said that CI 12 immediately saw that some of the pipes were breached, and that it was a serious problem. Asked to characterize the severity of the pipe problems at Vernon, CI 12 responded, "It's serious enough that we thought it was an imminent danger" and warranted a shut down. CI 12 said that discussions began right away about how to address the issue, including plans to shut down the Vernon plant. CI 23 provided similar descriptions of DTSC's reaction to the inspection videos: "As soon as [the pipe inspection report] was reviewed, DTSC determined something was going on," explaining that DTSC inspectors had sampled the sediments taken from the sumps feeding the pipelines and had determined that "hazardous waste was in the sumps and pipes."

77. The Rizgar Declaration summarized the findings of the Inspection Report as follows:

> **West Yard Piping Inspection:** The Inspection Report indicates that approximately 526 lineal feet of the West Yard piping contained a significant amount of sediment and required extensive cleaning using high pressure water before [Video] inspection could be completed. *The technician's observation of the pipes indicated that segments of the pipes had either scaling, fraying, splitting, cracking and/or sagging.* Video logs and assessment for certain parts of the pipes were not provided due to obstructions and conditions of the pipes.

> **North Yard Piping Inspection:** The Inspection Report indicates the approximately 2,175 lineal feet of North Yard piping

24

contained a significant amount of sediment and required extensive cleaning using high pressure water before [Video] inspection could be completed. *The technician's observation of the pipes indicated that segments of the pipes had either damage, collapsed, scaling, and/or fraying*. Most of the pipes in the North Yard were not video recorded or assessed due to obstruction.

**South Yard Piping inspection:** The Inspection Report indicates that approximately 680 lineal feet of South Yard piping contained a significant amount of sediment and required extensive cleaning using high pressure water before [Video] inspection could be completed. The technician's observation of the condition of the pipes is minimal or was not provided.

*The Inspection Report, and associated videos and photographs reveal an accumulation of semi-solid materials (also known in the industry as mud) generally throughout the piping system that is highly likely to contain elevated levels of hazardous waste, based on how Exide uses the piping system. The documentation shows several areas within the pipelines with failed structural integrity (breaches), and lack of cured-in-place' fiberglass slip lining that was reportedly applied in the 1990s. The videos show the slip linings are scaling, fraying, or nonexistent. Additionally, the sewer system does not include required secondary containment. No leak testing data was presented and, based upon the physical condition of the pipes, as evidenced in the Inspection Report, the existing breaches would cause the ancillary equipment to fail any leak test.*

*Additionally, the Inspection Report proposes a replacement/abandonment schedule that spans over four (4) years. This would not resolve the requirement and the need to contain future releases into the environment until the new system is installed.*

*Based on information in Exide['s] permit application submittals and reports, the existing pipes have been in service for over thirty years, and are long past their service life. In the mid-to-late 1990s, GNB, Exide's predecessor, attempted to lengthen the service life by slip lining' the piping system after less than fifteen years of operation. It has been over fifteen years since the pipes*

*were last repaired and as indicated in the Inspection Report and the videos, the pipes show wear and tear and are in no condition to convey hazardous wastes through the system. In addition, many segments of the pipes were never assessed due to damage and obstructions.*

*Based on my review of the report and video excerpts, and knowledge of Exide's system, I believe that the degraded and compromised physical condition of the piping system presents a continuous threat of releases to the environment of hazardous waste-containing water, and actually causes such releases on a regular basis.* Furthermore, these hazardous waste releases to the environment present a serious threat of additional soil and groundwater underlying the facility, which is already contaminated. *Groundwater in the area underlying the facility is already above maximum contaminant levels for drinking water, thereby increasing the urgency with which any sources of contamination must be curtailed and remediated to minimize further deleterious impacts to the state's drinking water supplies.*

*Id.* at 4-5 (emphasis added).

78.    Ghazi, Branch Chief of the Office of Permitting of the DTSC, further testified during the Administrative Hearing that a report prepared on behalf of Exide dated February 20, 2013 "indicates there is contamination in most of the wells at Exide, including lead, antimony.  The findings of the report and the results of the monitoring sampling that was done indicate there is contamination in most of the wells, including compounds, antimony, lead, sulfates."  Transcript Vol. 2 at 56-57. Ghazi's declaration provides further detail and explains that *"[o]n two occasions (October 4, 2011 and July 27, 2012), DTSC collected sediment samples within the ancillary equipment for the Unit 46 Pump Sump piping system at the Exide Vernon facility.  The results for lead were found to be up to 150 times above hazardous*

*levels. **Cadmium and Antimony were also found above hazardous waste levels in the same catch basins.*** *Id.* at 3 (emphasis added).

79.     Based on the state of the stormwater piping, repairs alone could not bring the stormwater management system into compliance.  Indeed, according to the Inspection Report, the Vernon facility's stormwater management piping would need to be ***removed and replaced***.  *See id.* at 5-2 and 5-3. As explained in the Inspection Report, "DTSC has indicated that stormwater piping and structures must be double-lined with leak detection. . . . Given spatial constraints at the ground surface and the extent of damage and solids in existing piping, slip-lining the existing piping in most areas is not feasible." *Id.* at 5-3.

80.     CI 23 (DTSC's project manager overseeing the Vernon plant) is currently working with Exide on the Company's plans to upgrade the pipe system. CI 23 estimated that the cost to replace the pipes will likely be several million dollars.

81.     According to CI 12 (project manager for DTSC), ***Exide "knew they had to replace these pipes" back in 2012***, CI 12 said. "That was a given. These pipes in general are not compliant with [regulations]. They need to be constructed with certain materials."  CI 12 said because the piping system was installed so long ago it was not done according to current hazardous waste guidelines.  In order to be in compliance with regulations, the Part B permitting approval would have required that the piping system be upgraded.  "Our permit itself would have already said replace these pipes," CI 12 said.

82.   CI 23 (another DTSC project manager overseeing the Vernon plant) similarly explained that RCRA required replacement of the pipes. *CI 23 explained that under Exide's ISD requirements and as discussed in documents between DTSC and Exide dating back to 2006, Exide was mandated to install secondary containment and leak detection around any underground pipes that collect or convey hazardous waste or completely replace all underground piping at the site.* According to CI 23, Exide represented that the underground piping system did not contain hazardous waste and therefore Exide did not need to upgrade the piping system.  CI 23 explained that DTSC disagreed with Exide's contention and believed that the underground system was connected to the hazardous waste storage and treatment tank system.  According to CI 23, discussions between Exide and DTSC continued on this issue until Exide agreed in late 2011 that it would submit a description of the pipeline system as part of its permanent permit application process. CI 23 also emphasized that Exide's consultants acknowledge that the pipes are out of compliance with permit regulations.   Indeed, the Inspection Report states: *"As a condition of the RCRA permit, Exide will be required to upgrade the existing storm water drainage system (pipes and structures) to provide dual containment* because the sediment that accumulates within the storm water collection system can contain hazardous concentrations of lead and other inorganic constituents."   *Id.* at 1-1 (emphasis added).

83.    In truth, Exide had "been undergoing ground water investigation for 16 to 18 years," as noted by Jeffrey Parker, an attorney for Exide, in statements made during the Administrative Hearing.  Ghazi expounded on that:

> Contaminations -- ground water monitoring has been occurring for as the gentleman from Exide mentioned it has occurred -- has been existent in the ground water wells for quite a while.
>
> They have been monitoring the wells for a while.  That there is contamination of lead, arsenic, and antimony as I've mentioned earlier that have -- varying times have different concentrations.  Sometimes they increase and sometimes they decrease.  ***However, they have been consistently above M.C.L.'s.***

Transcript Vol. 2 at 61-62 (emphasis added).

84.    Ghazi added: "Exide in the monitoring wells detected concentrations of metal above M.C.L.s in the Perch zone" Id. at 63.

85.    According to Ghazi:

> The basis we made the decision was based on our findings of the March 5th report from Exide, the storm sewer pipes and indicating that the pipes are degraded.
>
> There is breaches and, lacks slip lining, lacks secondary containment, lacks detection system and an ability for Exide to do a pressure testing of the pipes that indicates that the pipes are continuously -- that the contamination within the pipes continuously released to the environment and our findings that contamination on the ground water wells indicate similar contamination that's found at Exide and in the ground water.
>
> That based on those findings, we believe that Exide continuously will increase its concentration in the contamination in the soil and subsurface and eventually the ground water.

Transcript Vol. 2 at 68-69.

86.    Ghazi stated that some of the wells indicated levels above the M.C.L.s. He added:

> M.C.L.'s are regulatory numbers that we use to be protective of the ground water, since we -- the water of California is considered -- in this case, the ground water underneath Exide is considered a beneficial use and can be used for drinking water.
>
> And contamination are above M.C.L.'s requiring a state action to Exide to immediate [sic] that over time, sometime in the future or now.

Transcript Vol. 2 at 71.

**D.    Exide's Consistent Non-Compliance with Air Emissions Standards**

87.    Throughout the Class Period, Exide struggled to maintain compliance with environmental standards. Indeed, over the past four years, the AQMD has inspected the Vernon facility at least 277 times.

88.    According to CI 13 (the assistant deputy executive officer at AQMD), AQMD administers a Toxic Hot Spot program, which requires polluting facilities like Exide's Vernon plant to submit a report every four years of their toxic emissions. If the emissions could pose a risk to human health, AQMD requires the facility to conduct a Human Health Risk Assessment ("HRA"). CI 13, who oversaw this process at the Vernon plant, said the facility has had previous problems with lead, which prompted AQMD to ask Exide to conduct a HRA. "In 2010, they did a whole series of tests," CI 13 said. "The source tests were very extensive and expensive."

89.    Indeed, Russell Kemp (Exide's environmental consultant) testified that in the summer of 2010 AQMD required Exide to prepare a new health risk assessment

with the new approach of direct testing for metals other than lead.[6]  Transcript Vol. 3 at 45.  Kemp explained that the tests were different in that AQMD required "[s]pecific testing on all of the stacks for the full suite of metals; additional testing for more organic compound emissions on more stacks; really, a full and comprehensive testing program to cover the breadth of potential air toxins for subsequent feeding into a health risk assessment."  Kemp explained that the testing was conducted in October 2010 and that the results were known in 2011.

90.     *According to CI 13 (the assistant deputy executive officer at AQMD), the 2010 test results showed extremely high levels of arsenic.*  CI 17 (Program Supervisor at AQMD) similarly explained that *AQMD was "shocked" by the levels of arsenic found in the 2010 source tests and that the 2010 tests revealed much higher arsenic levels than in previous years.*  In truth, the arsenic levels detected in October 2010 were more than 96% higher than the arsenic results from 2008.[7]  Indeed, according to Russell Kemp, an environmental consultant for Exide, the arsenic emissions were "*approximately on the order of 100 times higher.*"  Transcript Vol. 3 at 157.  Kemp confirmed that this was a significant increase.  *Id.* at 154.

91.     In June 2011, the Company reported the results to AQMD with the "submittal of the formal test report," as explained in Exide's Verified Petition for Writ

---

[6] Russell Kemp provided testimony before the Administrative Hearing.

[7] The information was obtained from a February 27, 2013 PowerPoint presentation prepared by Exide. Slides from the presentation were used as exhibits in the Administrative Hearing held in June 2013.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        MASTER FILE NO. 2:13-cv-02607-SVW-E

1    of Mandate and Complaint for Injunctive Relief & Declaratory Relief filed in the

2    Superior Court of the State of California County of Los Angeles, Central District (the

3

4    "Petition"). According to CI 17 (Program Supervisor at AQMD), Exide attributed the

5    extremely high arsenic levels to a process abnormality at the time of testing and

6    requested that Exide be allowed to re-conduct its source tests and to replace its 2010

7

8    results with results received from a second set of source tests. CI 13 (assistant deputy

9    executive officer at AQMD) similarly explained that Exide represented that the results

10   "were not indicative of normal operating conditions." CI 13 explained that "[o]ur

11

12   [AQMD's] response was: 'You have to show they weren't indicative.'"

13       92.    Russell Kemp (Exide's environmental consultant) testified that a draft

14   Health Risk Assessment was provided to AQMD in 2011, using the 2010 source test

15

16   results to AQMD. CI 17 recalled that Exide performed health risk assessments based

17   on the 2010 results. While CI 17 could not remember the exact health risk, CI 17 said

18   that the health risk results based on the 2010 tests were higher than the 25 in one

19

20   million threshold that required a facility to submit a risk reduction plan. Indeed, a

21   presentation prepared by Exide in 2013 shows that the 2010 test results indicated a

22   cancer risk of 58 in one million.[8]

23

24       93.    Exide's representations in its Petition, show that in response to the

25   October 2010 source tests that revealed "elevated arsenic levels," Exide conducted an

26

27   _____

28   [8] The information was obtained from a February 27, 2013 PowerPoint presentation prepared by
     Exide. Slides from the presentation were used as exhibits in the Administrative Hearing held in June
     2013.

investigation to determine "why arsenic emission rates from the Hard Lead Stack had increased." Kemp's testimony provides further information, as follows:

> Q.     Did Exide try to figure out why there had been this increase in arsenic emissions over the measured 2008 A.Q.M.D. testing?
>
> A.     Yes. There was quite a lot of sample work to do. The results from the laboratory from the testing in late 2010 came in in 2011, and the effort focused on trying to determine the source of the cause.
>
> ***
>
> ... Not only were the arsenic emissions from the hard lead stack higher than expected, but emissions of organic toxics from the hard lead stack were higher than we would expect.
>
> And that gave us a sort of tell-tale signature that the hard lead stack was picking up some of the combustion process gases themselves that should be going a different direction.
>
> So that led us to look at that, and the blockage was discovered.
>
> Q.     Okay. So let me see if I understand correctly.
>
> When trying to figure out the source of the increased arsenic emissions, you noticed that some other character -- some other emissions characteristic of the hard lead stack had increased also; is that right?
>
> A.     Well, actually, we noticed that the degree of organic emission from the hard lead stack were not what we would have expected from a system that is just supposed to be picking up dust generated at the charging points -- metal-bearing dust.
>
> And that lead us to conclude that some of the direct combustion process gases were making their way to this ancillary ventilation system.
>
> ***

The obstruction was cleared, and the facility also then instituted a new -- an enhanced inspection and operating practice of looking into that duct more frequently, I believe on a weekly basis, and clearing any build-up so that any build-up would not reach the point of an obstruction that would change the pressure valves.

Ms. Bothwell: objection, your honor.

Can we determine when this occurred, time frame we're talking about now, when this obstruction was cleared?

The witness: November of 2011.

By Mr. O'Neil:

Q.     So once the obstruction was removed, was there additional testing performed to see if it had had an effect on the arsenic emissions?

A.     Yes.   There was further testing conducted in 2012 to determine the degree to which emissions had been reduced.

94.     Indeed, Exide conducted a new round of tests on its stack emissions in 2012, which showed lower numbers for arsenic, and provided those test results to AQMD in the summer of 2012.  "They [the new arsenic emissions numbers] were different but in the same order of magnitude," CI 13 said.  However, according to CI 13, Exide was unable to prove to AQMD that the 2010 numbers were not indicative of normal operations, nor was Exide able to prove to AQMD that the 2012 numbers were indicative of normal operations.   CI 17 similarly explained that AQMD was not entirely satisfied with the source tests conducted in 2012, to the extent that Exide could not prove that the 2012 tests' results provided a more accurate measure of Exide's arsenic emissions.  According to CI 17 and CI 13, because AQMD questioned the accuracy of the 2012 source test results, AQMD had discussions with Exide in late

2012 about whether Exide could use the 2012 numbers instead of the 2010 numbers, and an agreement was reached to average the two numbers for use in the HRA. Kemp's testimony provides further insight and explains that even with the reduced emissions levels, the 2012 test results indicated a cancer risk on the order of 100 in one million and would require a risk reduction plan:

> *Q.  Mr. Kemp, before the break, you had mentioned an August 2012 meeting with the A.Q.M.D.  Do you remember that?*
>
> *A.  I believe so.  We met with them in August of last year.*
>
> *Q.  All right.  What was the purpose of that meeting?*
>
> *A.  We met at the A.Q.M.D. offices to go over the results of the 2012 stack testing and the implications from a risk-calculation perspective of those 2012 testing results.*
>
> Q.  Was anyone from the D.T.S.C. present at that meeting?
>
> A.  Yes.  Shukla Roy-Semmen.  She's a toxicologist at the department.  She joined us at the A.Q.M.D. offices for that meeting.
>
> ***
>
> *Q.  What did you tell Ms. Semmen and the other people there in terms of the miscalculations in the August 2012 meeting?*
>
> *A.  That while the 2012 test results were 70 percent improved from the 2010 stack test results, the remaining risk would still be well above the A.Q.M.D.'s action risk level and we would have to be completing a risk assessment and head towards the risk reduction program.*
>
> Q.  Do you recall what numbers you were talking about in terms of cancer risk at that point?
>
> A.  We were more focused about discussing the calculated risk from the 2012 second set of tests.  *On the order of a hundred and a million.  In that range.  Well above the 25.*  I don't

recall the exact number because, subsequently, we moved right into dealing with the average of the two.

Q.    Okay. So you talked about if you were allowed to use just the new test data with the unobstructed exhaust system?

A.    Yes.

Q.    The level would be around a hundred or somewhere over a hundred; is that right?

A.    *I don't recall if it was just over or just under.  Well above the 25.*

Q.    And the discussion also centered around whether you would be allowed to use that data; right?

A.    Yes.  There was a discussion about -- I don't think there was a debate at that point about whether we could use that data, but how.

The preference would be, from our perspective, to use the 2012 data exclusively in the final risk assessment because it was the most recent data and the most representative of the conditions of the facility after the removal of the obstruction and the implementation of the enhanced inspection program.

Q.    Okay. But the A.Q.M.D. -- what was the A.Q.M.D.'s response to that?

A.    A couple months after that meeting -- a couple of months after the August meeting, their direction came to us: "We've considered it.  We won't let you just replace the prior data with the new data.  Instead, we want the final health risk assessment done on the basis of the average of the 2010 and 2012 tests."

Q.    So is that what Environ did on behalf of Exide?

A.    Yes.  At that point, we proceeded to produce the document that is Exhibit Z [the January 2013 Health Risk Assessment].

95.    In response to DTSC's questioning, Kemp further testified:

A.    I believe I testified about a meeting in August, at which time we

36

1    discussed testing that was conducted in 2012, not 2011.

2    Q.    *Okay. And at that time you said that the facility understood*
3          *that they needed to do a reduction plan; is that correct?*

4    A.    *Yes.*

5    Q.    And at that time -- was A.Q.M.D. at this meeting?

6    A.    This meeting was held as A.Q.M.D.'s offices and A.Q.M.D.
7          was present.

8    Q.    Correct. And I believe you mention that had Shukla Roy-
9          Semmen was there; right?

10   A.    Correct.

11   Q.    At that time I believe you, as you said, revealed the initial
12         results from the 2012 testing, which included a 440 maximum
13         cancer risk; is that correct?

14   A.    I don't believe I testified to that.

15         I testify that we presented the results focused mostly on the
16         second test and that the risk portrayed in that meeting were
           somewhere around the order of magnitude of 100 in a million.

17         In going through the subsequent testimony, I was reminded that
18         *the risk from that second test alone would be around 200 in a*
19         *million.* That would have been what was discussed.

20   (emphasis added).

21         96.    CI 13 (the assistant deputy executive officer at AQMD) said that at the

22   time of the 2012 discussions, Exide was likely aware that the arsenic levels were a
23

24   problem. "Toward the end of last year there were meetings regarding the averaging,

25   and at that point it seemed they realized it was going to be high." *CI 13 explained*
26
     *that Exide has environmental consultants who can run the risk assessment models*
27
     *at any point. "I wouldn't be surprised that they could run the model anytime they*
28

37

*want," CI 13 said, adding that at any point "[t]hey may have had some idea what the risk would be."* CI 13 explained that as part of the HRA, the 2010 and 2012 averaged emission numbers were input into a computer model that calculates the human health risk level to plant workers and the surrounding populace. *CI 13 said that based on the health risk model run using the averaged emission numbers, the Vernon plant had greatly exceeded several regulation thresholds for acceptable health risks.*

97.     The Health Risk Assessment that contained the average of the 2010 and 2012 source test results was submitted to AQMD and to DTSC in December 2012. Exide additionally held meetings with the agencies in January and February 2013 to discuss the results.

98.     In discussing Exide's meeting with DTSC, Kemp testified as follows:

Q.     Can you tell me who was present at the [January 23, 2013] meeting?

A.     I was present on behalf of Exide; Joe Preuth, the Exide's vice president for recycling was there; Fred Ganster, director of E.H.S. [Environmental Health and Safety], joined by phone.

\*\*\*

*What was the number that you discussed with the D.T.S.C. at the January 23rd meeting?*

*A.     We discussed the -- we discussed the 440 in a million maximally exposed worker.*

99.     In describing Exide's meeting with AQMD, Kemp explained:

*Q.     Now, was the 2013 H.R.A. discussed with the A.Q.M.D. after*

1    *it was submitted?*

2    **A.**   **Yes.   We had a meeting at the A.Q.M.D. in February to**
3         **discuss the H.R.A.**

4    **Q.**   **And what were the results of the meeting?**

5    **A.**   **AQMD, of course, expressed that this is above the risk – the**
6         **action risk level reduction targets and that public notification**
7         **would be required and preparations for that needed to get**
         **underway, that a risk reduction plan would be due within six**
8         **months of March 1st.   And that they did want the company to**
9         **move more quickly to accomplish emission reductions as soon**
         **as possible and not wait for the entire process to begin, not**
10        **wait for the entire regulatory process to run its course before**
11        **achieving emission reduction.**

12                                          ***

13   Q.   Okay.   Before that meeting, had Exide already started to
14        develop a risk reduction plan?

15   **A.**   **Yes.   As I mentioned, in August [2012] we -- it was clear that**
16        **that was going to be the ultimate path, that risk reduction had**
         **to be achieved.**

17        In December, my staff was involved in doing tracing and
18        further detail of all the details of the hard lead ventilation
19        system.   And we began developing an engineering testing plan
         to explore various hypotheses of how best to control the
20        emissions from various portions of that hard lead ventilation
21        system.

22   Q.   So even though the removal of the obstruction had reduced
23        arsenic emissions by about 70 percent; right?

24   A.   Correct.

25   Q.   You still had more work to do; is that right?

26   **A.**   **It was recognized there was still more work to do and we were**
27        **moving about to doing that.**

28   **Q.**   **Okay.   And did you agree with that, that there was more work**

                                    39

*to do?*

A.   *Yes, sir.*

Q.   *And did you actually tell the A.Q.M.D. that you felt there was more work to do?*

A.   *Yes.*

(emphasis added).

100.   Following Exide's submission of the revised HRA, which was based on the average of the 2010 and 2012 source test results, AQMD reviewed the test in order to provide its approval of the results. On March 1, 2013, AQMD submitted a letter to Exide, which approved the revised HRA and determined that the cancer risk was 156 in one million.[9]

101.   William Bosan, PhD., ("Dr. Bosan") the Senior Toxicologist at the Department of Toxic Substances Control, the Human Ecological Risk Office, testified at the DTSC hearing that "the risk for the maximally-exposed worker [at the Vernon facility] are outside the acceptable range of risk and the hazards are *well above what is considered an acceptable number*." Id. at 177. He further testified that the facility is contributing both chronic and acute cancer risks above acceptable limits. *Id.* at 178. He further characterized the risks and hazards presented by the facility as "significant and unacceptable risks and hazards." *Id.*   *"It's pretty serious,"* CI 13 (*the assistant*

---

[9] According to Kemp, "the A.Q.M.D. concluded and interpreted the results in its March 1st approval letter of [the HRA] report that the maximum exposed individual worker risk is 156 in a million [down from 440 in one million], as they said, at a different location, as they chose to assess on the basis of a different receptor point than is used in this document."

*deputy executive officer at AQMD) said. "Of all the HRA we've ever done, it was by far the highest risk of any facility in our area."* CI 17 similarly explained that AQMD was very actively working with Exide to try to get Exide's air emissions within safe levels and described it as *"one of [AQMD's] highest priority projects for some time."*

102. Additionally, as explained by Dr. Bosan, Senior Toxicologist and Unit Chief for the Southern California Unit of the Human and Ecological Risk Office of the DTSC, in his June 25, 2013 declaration filed with the Superior Court of the State of California, County of Los Angeles (the "Bosan Declaration"), the community surrounding the Vernon facility has been exposed to unacceptable emissions and substantial health risks for three years. The Bosan Declaration states, in relevant part, the following:

> Human health risk assessment is a scientific tool used by Government agencies to help them prioritize which potential hazards are the most significant and guide them in mitigating environmental hazards….Risk assessment aids regulators in identifying serious health threats and determining realistic goals for reducing exposure to harmful chemicals and pollutants so that there is no significant health threat to the public.

> ***

> DTSC received notice in March 2013 that the revised AB2588 Health Risk Assessment (HRA) for the Exide Facility had been accepted by the South Coast Air Quality Management District (SCAQMD). On March 1, 2013, the SCAQMD issued an approval letter of the revised AB2588 HRA for the Exide facility, with a modification to the risk assessment using the maximum, non-facility receptor as the Maximally Exposed individual Worker (MEIW) instead of the

41

fenceline or facility worker. In addition to approving the AB2588 HRA, the letter from the SCAQMD also requested public notification and risk reduction by Exide because the exceptionally high risks and hazards posed by the facility to the surrounding community. Because of the elevated cancer risks, chronic hazards and acute hazards for workers and off-site receptors, I personally reviewed the HRA.

\*\*\*

Given the revised location of the MEIW by the SCAQMD in their letter of March 1, 2013, the risk and hazard to off-site workers were now associated with actual off-site worker locations, unlike previous drafts of the HRA. *The maximum individual cancer risk (MICR) for an off-site worker was 156 in one million or 1.56 x 10$^{-4}$. This clearly represents an unacceptable risk.*

According to the March 1, 2013 SCAQMD letter, the MICR "far exceeds the AB2588 Public Notice MICR Threshold." The SCAQMD further requested that risk reduction be completed as quickly as feasible due to the elevated cancer risk In addition to cancer risk; the maximum chronic HI [hazard index] was 63, well above the 1.0 level of concern. Likewise, the maximum acute HI was 3.8 and above the 1.0 level of concern, indicating that adverse health effects may occur from both short-term and long-term exposure. *These unacceptable risks and hazards were based on emission data averaged from 2010 and 2012 source tests. Consequently, receptors in the community surrounding the facility have been exposed to unacceptable emissions for three years.*

Based on these multiple lines of evidence, it is my opinion that the Exide facility emissions present an imminent and substantial danger to the public health of the surrounding community, requiring immediate action.

\*\*\*

In addition to the nearest off-site workers, the Exide facility poses a MICR [maximum individual cancer risk] of 22 in one million or 2.2 x 10-5 for the nearest residential receptor. The maximum chronic HI for the nearest resident was 2.9. Both the risk and hazard were well above DTSC's point of departure for cancer risk (10-6) and noncancer risk

(1.0). The number of residents and sensitive receptors impacted by Exide facility emissions at the $10^{-5}$ risk level is approximately 110,000 people.

The Office of Environmental Health Hazard Assessment (OEHHA) of the Cal/EPA recently released the California Communities Environmental Health Screening Tool (CalEnviroScreen 1:0, April 2013). . . . According to this model, the communities surrounding the Exide facility and within the $10^{-5}$ risk contour are some of the most impacted communities in the State of California. Given the fact that these are disadvantaged communities shown to be more vulnerable to the affects of pollution burden, DTSC believes it is crucial that the facility take all feasible actions to minimize the health risks from their operations, so as not to impact the community further.

*Id.* at 1-5 (emphasis added).

103.   The foregoing testimony as well as publicly available documents demonstrate that Exide had: (i) performed a health risk assessment ("HRA") in 2011 (based on the 2010 source test results); (ii) prepared a memoranda regarding the high October 2010 test results by at least March 12, 2012; and (iii) retested arsenic emissions at the Vernon facility in May 2012, the results of which revealed arsenic emissions that were still significantly higher than emissions prior to 2010.[10] Moreover, according to CI 17 (Program Supervisor at AQMD), all HRAs submitted by Exide during the Class Period indicated cancer risks in excess of the 25 in one million threshold and therefore required Exide to prepare and implement a risk reduction plan.  This statement is corroborated by Kemp's testimony (that the 2012

---

[10] An August 22, 2012 letter from Exide to AQMD revealed that even in May 2012 Exide's arsenic emissions tests showed results as high as 4.37E-02 lb/hr, which is well above the 2008 arsenic emissions levels of around 0.80E-02 lb/hr.

43
CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      MASTER FILE NO. 2:13-cv-02607-SVW-E

1    tests indicated a cancer risk of 100 in one million) and Exide's own presentation (that

2    showed the 2010 tests as causing a cancer risk of 58 in one million).

3

4        104. CI 13 explained that because Exide exceeded the emissions thresholds,

5    Exide is required by regulation to prepare a Risk Reduction plan within 180 days of

6    AQMD approval of the HRA. According to CI 13, the Risk Reduction plan must

7

8    include detailed plans for upgrades and other measures at the facility that will lower

9    the amount of toxic emissions. After the plan is approved, Exide has to implement it

10    and show the risk has been reduced.

11

12    **E.   Exide's Increasing Liquidity Problems And Failed Restructuring**
           **And Cost Reduction Efforts**

13

14        105. As explained in the filings in Exide's Chapter 11 proceedings Exide had

15    experienced liquidity problems since it lost Wal-Mart as a customer and a source for

16    core material in February 2010. CI 10 (a bag house operator at Exide's Reading,

17

18    Pennsylvania plant from 1994 to May 10, 2013) similarly explained that a big hit to

19    the Company came when Exide lost Wal-Mart's business and as a source for core

20    material. To keep the Company "afloat," CI 10 said Exide relied on the battery-

21    recycling branch of the business. As CI 19 (Senior Director, Technical Accounting

22

23    and SEC Reporting at Exide from October 2005 to May 2013) put it, Exide was

24    operating its business in a "difficult environment," further explaining that profit

25

26    margins were shrinking. Exide's liquidity problems were exacerbated by the

27    increasingly stringent environmental standards, which required Exide to expend

28

considerable amounts in remediation measures. Indeed, according to CI 19, environmental issues were always a factor at Exide: "Working in that type of business it's obviously a challenge," CI 19 said. "I think there were significant challenges." Exide's deteriorating liquidity, its environmental noncompliance, and its increasing struggles with the California environmental agencies led the Company to hire bankruptcy experts to advise Exide on its financial restructuring options by April 2013. The temporary shutdown of its recycling facility on April 24, 2013 only furthered Exide's liquidity struggles.

106. According to the Declaration of Defendant Damaska, the Company's CFO, the following events lead to Exide's Chapter 11 filing:

> *In recent years, a number of factors have contributed to a decline in Exide's earnings and liquidity position ultimately making this chapter 11 filing a necessary step for Exide to de-lever its balance sheet and implement an operational restructuring plan with the tools available to it under the Bankruptcy Code.* These forces have included:
>
> • **Rising production costs resulting in compressed margins.** The cost of lead currently represents approximately 46% of the Debtor's cost of goods sold. The Debtor has generally managed this key cost driver through its recycling facilities. *However, higher spent-battery costs and lead-related price increases have put pressure on the Debtor's margins—exacerbated further by the shutdown of the Debtor's Vernon facility, discussed below.* Suppliers of raw materials have subjected Exide to pricing premiums, and Exide has been unable to pass along higher production costs to customers.
>
> • **Intense competition.** In recent years, competition in the battery industry has intensified, especially in the auto parts retail and mass merchandise channels where large customers are able to

45

use their buying power to negotiate lower prices and longer payment terms, or move business elsewhere if their demands are not met. In this regard, one of Exide's then major customers, Wal-Mart Stores Inc., designated Johnson Controls—Exide's principal competitor—its sole-source supplier of transportation batteries and stopped carrying Exide's transportation products. This switch resulted in Exide's loss of approximately $160 million in annual revenue. More significantly, in addition to the revenue lost from Wal-Mart sales, Exide also lost an important and reliable source of battery cores under a captive-core arrangement with Wal-Mart.

- **Exposure to European Market.** *With significant operations in Europe accounting for approximately 51.2% of the Company's worldwide revenue, Exide has been negatively impacted by the recent economic downturn that has persisted in Europe.*

- **Constrained Liquidity.** In the midst of market and competitive challenges, the Company recently has experienced additional pressure on its liquidity. Downgrades by credit-ratings agencies, discussed below, resulted in less favorable credit terms with the Company's trade creditors and limited the Company's ability to receive new financing outside the context of chapter 11. Constrained liquidity also has limited Exide's ability to invest in its businesses, primarily in North America, causing the Company to be at a competitive disadvantage relative to bigger, better-capitalized competitors.

*In early 2010, the Company began pursuing initiatives to address the significant loss of revenue and battery cores from Wal-Mart. The Company engaged in efforts to cut costs, including reducing corporate and regional overhead costs and exiting unfavorable arrangements to sell lead to third parties. In addition to its efforts to reduce expenses, the Company took steps to reposition its business and to consolidate its North American operations, including closing its Frisco, Texas plant  and idling the Reading, Pennsylvania smelting facility.*

*Despite these efforts, the Debtor's financial position continued to decline, culminating in operating results for the fourth fiscal*

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        MASTER FILE NO. 2:13-cv-02607-SVW-E

*quarter of 2013 (for the period January 1 through March 31, 2013) that came in well below the Company's targets.* Based on these results and the Company's declining liquidity, Moody's Investors Service downgraded Exide's corporate-family rating on March 12, 2013.

To respond to the negative operating trends—and mindful that it was approaching its peak season for working-capital requirements—Exide engaged Deutsche Bank to explore financing options and Lazard Frères & Company LLC to advise the Company on strategic alternatives. *Exide suffered a significant setback, however, while considering its various out-of-court restructuring alternatives. On April 24, 2013, the California Department of Toxic Substances Control ("CDTSC") issued an order suspending operations at its Vernon, California secondary lead-recycling facility alleging that the facility's underground storm-water system was not in compliance with state requirements and that the Company's furnace emissions are not meeting applicable CDTSC health-risk standards. As a result of the Vernon shutdown, Exide had to source lead requirements from its remaining recycling facilities, open-market purchases of refined lead, and third-party lead recyclers to make up for the lost capacity increasing its costs. The Vernon shutdown will directly impact Exide's bottom line by eliminating an estimated $24 million in projected EBITDA from its business plan for the six month period following the shutdown. Approximately two weeks after the CDTSC order, Standard & Poor's Ratings Service lowered its corporate credit rating of Exide to triple-C-plus, which further constrained Exide's liquidity due to the tightened availability of trade credit.*

*As a result of the Vernon shutdown and the Company's poor financial performance in the fourth fiscal quarter of 2013,*[11] *it became apparent that a successful out-of court restructuring was unlikely.* Exide therefore retained Alvarez & Marsal North America, LLC ("A&M") and Skadden, Arps, Slate, Meagher & Flom LLP to provide financial and legal restructuring advice, respectively.

(emphasis in bold italics added).

---

[11] Exide's fiscal year starts on April 1.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS     MASTER FILE NO. 2:13-cv-02607-SVW-E

107.   Damaska went on to discuss how the Court's approval of the Debtor in Possession ("DIP") loan averted "an imminent liquidity crisis":

> This Court's interim approval of the DIP Facilities has not only allowed the Debtor to avert an imminent liquidity crisis, but has buoyed the Debtor's operations by allowing for a smooth transition into Chapter 11 and setting the stage for the Debtor to execute a comprehensive restructuring.

108.   Exide was experiencing a liquidity crisis throughout the Class Period. While the Company attempted to implement efforts to cut costs, these efforts were increasingly unsuccessful, as described in Defendant Damaska's declaration, above. Exide's restructuring and liquidity problems are further discussed in the below. *See infra* Section IV.F.

109.   Because of Exide's deteriorating financial condition, the Company was in no position to pay for the increasing costs of environmental compliance nor was it in a position to bear the costs of potential liability or shutdown of the Vernon facility that were known risks caused by noncompliance with environmental laws.

110.   To make matters worse, due to the closures of Exide's recycling facilities in Reading, Pennsylvania and Frisco, Texas, by the end of 2012, Exide was largely dependent on the Vernon facility in order to manufacture new batteries to satisfy Exide's contractual obligations to its customers, as described *infra* by Joseph Preuth, Exide's Vice President of Recycling Operations and Operational Excellence.  Indeed, in May 2012, Exide reached a tentative agreement with the city of Frisco to shut down operations and clean up the Company's battery recycling facility in Frisco, amid the

facility's violations of the EPA's Lead National Ambient Air Quality Standards. By November 30, 2012, the Frisco recycling plant had ending its operations.   Similarly, on November 8, 2012 Exide announced that the Company "will be idling its lead recycling operations at its Reading, Pa. facility, effective no later than March 31, 2013."   Here again, Exide had been struggling to finance the high costs required to bring the Reading facility into compliance with EPA regulations and to repair damage that had been done as a result of the facility's environmental noncompliance, which included discovered soil lead contractions nearly three times the allowed amount of 400 mg/kg.  With the closure of the Frisco and Reading facilities, Exide was left with only three lead recycling facilities: the recycling centers in Vernon, California, Canon Hollow, Missouri, and Muncie, Indiana.

**F.    The Company's Ongoing Liquidity Problems Prevented Exide from Maintaining Environmental Compliance**

111.   During the Class Period, Exide was struggling to keep the Vernon facility in compliance with the increasingly strict environmental standards.   Stricter air emissions standards that became effective in January 2012 had required Exide to implement costly upgrades in an attempt to prevent immediate shutdown of the Vernon facility.  While these remediation measures cost Exide millions of dollars, the Company consistently failed to implement Best in Practice technologies, and instead opted to implement quick fixes that provided only bare minimum, short-term solutions.

112.  CI 10 explained that throughout CI 10's time at Exide, there was always talk about improving the manufacturing and environmental protection systems, but that rarely occurred at the facilities, including Vernon, because of financial constraints.  According to CI 10, at the Reading recycling plant, Exide invested throughout the 2000s in expanding the capacity of its furnaces so it could produce more lead faster, but it did not invest equally in beefing up the environmental protection measures to handle more capacity.  CI 10 complained to CI 10's managers about this issue several times. "Seems like the one thing they were most concerned about was just the pure production numbers," CI 10 said. "They didn't really take into account that the more production you are going to get, means more waste." CI 10 said that an example of a counterproductive cost saving measure was when the Reading plant started using a cheaper form of coke to fuel the furnace, which caused serious problems with disintegrating the bag house bags in Reading. The Reading plant, however, continued to use the cheaper coke for months despite the problems it created, CI 10 explained.

113.  CI 10 recalled that broken equipment or environmental problems were often not fixed or addressed due to budgetary constraints, so long as the Reading plant could continue to operate without it.  *"The money was always a problem," CI 10 said.*  According to CI 10, when employees complained or pointed out broken equipment, leaky pipes, and other issues that needed upkeep or maintenance at the Reading plant, including employee facilities, they were usually told there was no

money to fix it unless it was essential. *"It was always, 'The Company is broke. The Company doesn't have any money.'" CI 10 said.*

114. CI 10 also explained that Exide has long used an outside contractor, Moyer Instruments, to calibrate the emissions monitoring systems and to make sure the equipment was operating correctly. According to CI 10, in 2012, citing cost savings, the Company assigned an in-house electrician at the Reading plant, Glen Grim, to do the calibration. "What was told to us, the operators, was that the reason they were doing it, [was that] they would be able to save quite a bit of money over Moyer," CI 10 said.

115. CI 5 (manager of Environmental Health and Safety at an Exide plant in Bristol, Tennessee from July 2011 to February 2012) said Exide was barely hanging on financially when he was at the Company from July 2011 to February 2012. "Environmental issues were really killing them," CI 5 said. "They were spending all their capital on retrofitting the (facilities) out west." CI 5 said due to the expense of retrofitting western facilities with air pollution prevention measures, the Company could not afford to invest in new, more efficient manufacturing and recycling capabilities.

116. CI 9 (environmental manager at Exide's Muncie, Indiana plant from January 2012 to March 2013, who reported to the plant manager, Bob Saurer, and also directly to Fred Ganster) described similar money shortages. In September 2012, CI 9 went with several other Exide employees to the Vernon plant as part of Exide's "Lean

Leader" efforts to improve efficiency throughout the Company. The group visiting Vernon observed problems and inefficient processes at the plant and recommended ways to cut waste. CI 9's goal was to observe the water treatment system, which cleaned lead, arsenic and other impurities from the water that became polluted during the recycling processes at the plant.

117.   CI 9 said the water treatment system's automated mechanism was broken at the time. The automated mechanism was designed to put a very exact amount of acid in the water to maintain a proper pH balance. The proper pH balance is necessary for proper treatment of the water.

118.   CI 9 said workers were manually releasing acid from a valve into the water and measuring it regularly. This was not an exact method, and sometimes the workers added too much acid. This required adding alkaline powder further along in the process and then required adding more acid at another step.

119.   CI 9's recommendation was for the Company to repair the automated mechanism. CI 9 did not know for sure, but CI 9 suggested that the reason the plant had not fixed the broken mechanism because it did not think it was necessary and did not want to spend the money.

120.   "They were short on personnel, short on money," CI 9 said. "They were very conservative with cash flow. The operators had figured out a way around it, and they didn't push the issue because everyone was told to save money."

121.  According to CI 9, all of the Exide plants at the time were working toward compliance with new National Emissions Standards for Hazardous Air Pollutants.

122.  CI 9 said Exide was always short on cash flow, and that managers were constantly pressured to keep costs down. "Spending money was the big issue," he said. "We were pushed to spend the least amount of money we could to get what we needed to accomplish."   According to CI 9, sometimes the plants would pilfer equipment from shuttered plants to fulfill their equipment needs.

123.  CI 9 said he often heard from vendors and consultants who complained they were not being paid by the Company.  CI 9 regularly had to bring the overdue bills to management's attention to obtain payments.

124.  CI 9 also said Exide had "skinnied down" its recycling division by closing plants in Frisco, Texas and Reading, Pennsylvania.  CI 9 believed the Company only had three recycling plants left: Vernon and two others.  "Paul Hirt would do town hall meetings" with employees, CI 9 said. "He would say, 'Exide was a battery company and not a recycling company.'"  CI 9 recalled Hirt making this announcement in the December 2012 quarterly meeting with employees, which was available *via* webcast at the Company.

125.  CI 11, environmental systems manager at Exide's Vernon plant from September 2009 to April 2013, explained that in recent years, the plant submitted an application for a permanent status permit and that permit application was still under

review when CI 11 left the Company in April 2013.   As part of the application process, DTSC has given Exide a list of environmental upgrades that need to be completed before the permanent permit will be approved, CI 11 said.   According to CI 11, DTSC "had a whole list of stuff" that they wanted Exide to do in order to get permanent status.  CI 11 said that "[s]ome of (the upgrades) were very expensive. *In the end, it would be several million dollars to do.* There were multiple projects that DTSC was requiring."  CI 11 refused to give additional details on this, citing to CI 11's confidentiality agreement.

126.   *CI 11 also declined to comment about specific violations at the plant, or characterize their severity, but CI 11 said that he was aware that the violations could potentially lead to an agency shutting down the plant.   "If you don't meet your permit conditions, you're always at risk of being shut down."*

127.   CI 10 (elected union representative for all of Exide's plant workers) learned a lot about the Company's financial situation and business status during contract negotiations and other interactions with Exide management as a union representative, CI 10 said.   According to CI 10, CI 10 participated in several negotiations with Exide's management during his tenure at the Company and was informed during these negotiations about the Company's finances, environmental problems and maintenance issues.   CI 10 explained that in recent years, Exide's battery manufacturing business was "a losing proposition" for the Company.  Exide's battery volume had dropped off from about 52 million batteries sold a year to about 14

million last year. "It's no wonder why they are floundering the way they are," CI 10 said.   CI 14 similarly described Exide as "kind of living on the edge as far as their profit and loss statements."

128.   In reality, Exide did not have the cash flow necessary to properly retrofit the Vernon facility.  According to minutes from a November 5, 2010, AQMD district board meeting, Joe Dowd, Exide's Vice President and General Manager of North American Recycling, expressed disapproval over amendments to Rule 1420.1 – Emissions Standard for Lead from Large Lead-acid Battery Recycling Facilities. Specifically, the minutes explain that Joe Dowd:

> Expressed support for the original proposal, but disagreed with the amendments that have been made, specifically, with regard to the feasibility study requirement concerning the 0.003 pounds-per-hour mass emission rate. He explained that the company submitted a plan to the District detailing nine significant projects that they plan to pursue in order to obtain the NAAQS standard of 0.15 micrograms per cubic meter of air (mg/m3). ***The cost associated with further technology implementations may be too burdensome for them to continue operations in California.*** They feel that Exide does not fit into the same categories as others in the industry because they utilize different technology, and, therefore, should not necessarily be subject to the same standard.
>
> Dr. Wallerstein [AQMD's Executive Officer] explained that the Board received a request from Quemetco to contemplate putting an emission limitation of 0.003 pounds per hour on stack emissions in the rule. Staff's investigation led to the proposal that the 0.003 not be written into the rule at this time as a stack limitation, but the rate should be as originally proposed at 0.045 pounds per hour. . . . A feasibility study would be triggered if either company exceeds 0.12 mg/m3, where they would provide the Board with an analysis of the technical, economic and physical feasibility of achieving a total facility mass lead emission rate of 0.003 pounds per hour from all lead

point sources. *He explained that as a result of continued high readings from Exide's facility, the U.S. EPA changed the characterization of our region from attainment to non-attainment. Since Quemetco has been able to achieve the acceptable level of control and health concerns have been raised by neighboring workers and residents, staff believes it is reasonable to require a feasibility study from Exide if they exceed 0.12 mg/m3.*

(emphasis added).

129.   The minutes from the November 5, 2010, AQMD district board meeting, further read:

*Mayor Yates explained that because of Exide being slow to take action in the past, he felt it necessary to include a provision in the rule for the feasibility study to be conducted if adequate progress is not being made by the measures detailed in the aggressive plan that they submitted to staff.*

130.   The above comments from Exide's Vice President and General Manager of North American Recycling demonstrate that Exide's failure to maintain environmental compliance was entirely a result of Exide's financial constraints. Indeed, technology had been on the market for years that drastically reduced emissions from battery recycling facilities.   This technology, known as Wet Electrostatic Precipitator ("WESP") was not only known to Exide but had been openly recognized by regulatory agencies and the industry as the best available technology.

131.   In his declaration, Rizgar Ghazi (Branch Chief of the Office of Permitting with DTSC) explained that the environmental requirements for Exide are no different than the requirements for other battery recycling facilities, specifically Exide's competitor Quemetco, which has received a permanent hazardous facility

permit from DTSC.  As emphasized by Ghazi, "unlike Exide, Quemetco installed best available control technologies to reduce the health risks from Quemetco's operations." *Id.* at 5.

132.  In October 2008, Quemetco completed installation of the five WESP control devices and RTO units, which have significantly lowered its hazardous emissions.  As Mr. Kemp explains in his declaration, "[i]t was the installation of these devices that achieved the reduction in health risk from the Quemetco facility." *Id.* at 3.  Specifically, the installation of WESP technology reduced Quemetco's lead emissions to one percent of their previous levels -- from 614.96 lbs. emitted per year to less than 5 lbs. per year – and reduced over 90% of arsenic, nickel and cadmium emissions.  Moreover, Quemetco's maximum individual cancer risk was 4.4 in one million for 2010 compared to Exide's 156 in one million.  According to Quemetco's public estimates, Quemetco expended approximately $20 million to install the WESP technology.

133.  In truth, WESP had been specifically recommended to Exide by the regulatory agencies.  For example, an August 2012 memorandum listed as a "recommend[ation]" that Exide "implement Best Management Practices (BMPs) to reduce or eliminate off-site contamination from the facility." *Id.* at 2.

134.  CI 18 (Senior Hazardous Substances Engineering Geologist at DTSC) explained that Quemetco, another battery recycling facility previously had problems with emissions but that it drastically lowered its emissions levels by implementing

WESP technology.  CI 18 also said that Quemetco had less groundwater issues than Exide.

135.  CI 7 explained that after working at Quemetco, which took anti-pollution measures very seriously, CI 7 was disturbed by the lack of effort made at Exide to protect the environment and operate a clean plant.  CI 7, a refinery operator at the Vernon plant from March 2013 to the end of April 2013, said the Vernon plant did not clean the bag houses[12] enough or properly, which could lead to clogs and other problems.  CI 7 said the bag houses were not cleaned the entire time CI 7 was at Exide, and CI 7 understood from other employees that they were rarely cleaned. To clean the bag houses properly, the furnace needs to be shut down so that employees can go inside the bags and vacuum the pollutants out.  Prior to taking a job at Exide, CI 7 worked at the other Los Angeles area battery recycling plant owned by Quemetco, Inc. ("Quemetco").   At Quemetco, according to CI 7, the bags were cleaned frequently, and every two to three months the furnace was shut down for a more thorough cleaning and vacuuming.

136.  In general, CI 7 said that employees at the Vernon plant did not seem to care about anti-pollution measures or maintaining a clean plant.  CI 7 said the plant was dirty throughout and that management did not instill in employees a commitment to environmental protection like CI 7 had seen at Quemetco.

---

[12] The bag house captures polluted air emitted by the plant's furnace.

137.   In truth, the economic impact of the Vernon facility's regulatory violations were more than Exide could withstand.  Indeed, the violations were at least one of the reasons why Exide was forced to file for Chapter 11 bankruptcy.

138.   Joseph Preuth, Vice President of Recycling Operations and Operational Excellence, has described the impact of the Vernon facility's shutdown in a June 11, 2013 declaration submitted in the California Superior Court case.  In his declaration, Mr. Preuth stated, in relevant part:

> *In order to maintain Exide's market share and avoid potentially disastrous and irreparable long-term impacts on its economic viability, Exide must continue to manufacture new batteries to satisfy its contractual obligations to its customers.*  It is simply not a viable solution to suspend or scale back production of batteries.  *Alternatively, continuing to manufacture the same number of batteries without the Vernon Facility in operation will cost Exide significantly more in procuring lead on the open market than with the Facility on-line.*

> I, and Exide employees working at my direction have compiled and analyzed information to calculate the economic impacts to Exide of the DTSC's Order shutting down the Vernon Facility.  *The monthly financial impact to Exide as a result of DTSC's Order shutting down the Vernon Facility is in the millions.*

> The largest additional costs related to the components needed as raw materials (plastic and lead) for the manufacture of new batteries.  As a result of the Vernon shutdown, Exide had to source lead requirements from its remaining recycling facilities, open-market purchases of refined lead, and third-party lead recyclers to make up for the lost capacity increasing its costs.  *The Vernon shutdown will directly impact Exide's bottom line by eliminating an estimated $24 million in projected Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA) from its business plan for the six-month period following the shutdown.*

Because Exide has been ordered to cease battery recycling activities at the Facility, it has been forced to lay off 65 employees in Vernon. However, Exide's operational expenses at Vernon continue.  Because Exide must maintain certain ongoing activities at the Vernon Facility in order to prevent it from violating South Coast Air Quality Management District permits, rules, and regulations, *Exide has and will incur numerous expenses related to the Facility averaging a five figure cost per month commencing in late April and every month thereafter.  This activity is not revenue-generating.*  The expenses that fall into this category are: plant fixed costs and salaries, wages, and benefits for a reduced Facility staff to run the primary pollution control systems known as "baghouses" and grounds cleaning that are required to operate under South Coast Air Quality Management District Rule 1420.

(emphasis added).

139.   Importantly, Mr. Preuth's declaration only assessed the economic impact of the temporary shutdown, which is but one aspect of the costs resulting from the Vernon facility's non-compliance.   In truth, the Vernon facility will also have the large expenses associated with the significant costs of remediating the violations, any liability found to have been caused by the environment violations, as well as, and the costs of defending against suits alleging harm based on the environmental violations.[13]

140.   The remediation costs alone will likely cost Exide tens of millions of dollars.  Indeed, CI 23 (project manager at DTSC overseeing Exide's plans to upgrade the pipe system) estimated that it would cost the Company several million dollars to replace the stormwater pipes.  With regard to the toxic air emissions, Mohsen Nazemi

---

[13] A class action on behalf of Los Angeles residents has already been brought against Exide, alleging physical harm due to the Vernon facility's environmental violations. *See Zach Hernandez v. Exide Technologies*, Case No. BC 506901, filed on April 25, 2013 before the Superior Court of the State of California County of Los Angeles.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      MASTER FILE NO. 2:13-cv-02607-SVW-E

(District Deputy Executive Officer of AQMD), indicated that, despite the Company's current remediations, Exide may still be required to design a new air pollution system that could "potentially cost the Company millions of dollars."[14]

141.   As previously discussed, the implementation of WESP technology costs several million dollars.  Moreover, Exide has represented that the implementation of WESP or WESP equivalent technology is economically unfeasible for the Company. Indeed, according to minutes from a November 5, 2010, AQMD district board meeting, Joe Dowd, Exide's Vice President and General Manager of North American Recycling, represented that "[t]he cost associated with further technology implementations may be too burdensome for [Exide] to continue operations in California."  Moreover, in an August 29, 2011 letter to DTSC, Exide represented that it would not be economically feasible for Exide to implement the "available EPA-designated process control and ventilation control technologies, including (but not limited to) Wet Electrostatic Precipitators and/or Fugitive Emission Filtration Units with HEPA filtration."  Indeed, Exide further explained in the letter that *"the expected $30 million capital cost (and incremental cost of over $6 million per ton) renders the available technologies economically infeasible."* (emphasis added).

---

[14] This quote is taken from an article by *City New Source*, entitled "LA Council Committee Considers Taking Legal Action Against Vernon-Based Facility."

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          MASTER FILE NO. 2:13-cv-02607-SVW-E

142.   Brian Jeffrey Johnson ("Johnson"), Deputy Director of the Hazardous Waste Management Program at DTSC testified as to what efforts Exide would have to undertake to remedy the identified environmental issues:

> Exide needs to cease the use that they had of the failed underground piping system and implement alternative water drainage systems to ensure that they can continue to maintain compliance with the A.Q.M.D. requirements, which requires them to watch roots, which requires them to keep the facility wetted down to minimize offsite migration of the dusts that are on-site, seemingly consistently.
>
> As well as, in the event, it rains this is the on-site system that captures rain water to make sure that dust does not migrate off-site.
>
> Ultimately, there needs to be a more permanent fix compliant with California hazardous waste control law.  And that would be -- that would address that aspect of the suspension order.
>
> Secondly, since the D.T.S.C. has an abiding interest that they reduce the risk posed by the operations and emissions at their facility. This can be achieved through operational adjustments, installation of additional technology and other adjustments to how they operate the facility.
>
> ***
>
> There are -- there are different paths to reducing the risks.
>
> Given the elevated risk level or as the D.T.S.C. puts it, the high risk level associated with the facility, and D.T.S.C.'s expectations of the level of risks that are acceptable from a facility that treats hazardous waste, it was our decision that these corrections need to happen much quicker than has been proposed by Exide representatives.

Transcript at 52-53.

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN VIOLATION OF THE SECURITIES ACT

143.   Defendants failed to disclose to investors any of the Company's environmental violations, the enormous cost to remedy them, or that the Company could not afford to do so.

144.   The claims alleged in this Section are based on principles of negligence and strict liability only.   Plaintiffs repeat and reallege each and every allegation, above, exclusive of allegations that contain facts necessary to prove any elements not required to state a claim under Sections 11 or 15 of the Securities Act.

145.   On August 5, 2011, the Company filed with the SEC an Amended Registration Statement on Form S-4A  in connection with its exchange offer of its $675,000,000 of Outstanding  $8^{5/8}$% Senior Secured Notes due 2018 for its $675,000,000 Registered $8^{5/8}$% Senior Secured Notes due 2018 (the "Exchange Offer").  The Registration Statement, which became effective on August 8, 2011, was signed by Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi.

146.   On August 15, 2011, the Company filed with the SEC on Form 424B3 its Prospectus in connection with the Exchange Offer (the Registration Statement and the Prospectus are collectively referred to hole in as the "Registration Statement").

147.   The Registration Statement provided in part:

On January 25, 2011, we issued $675.0 million aggregate principal amount of restricted $8^{5/8}$% senior secured notes due 2018 in a private

placement exempt from the registration requirements under the Securities Act of 1933, or the Securities Act, which we refer to as the old notes.

**The exchange offer:**

- We are offering to exchange a new issue of 8 5/8% senior secured notes due 2018, which we refer to as the new notes, for our outstanding old notes. We sometimes refer to the old notes and the new notes in this prospectus together as the notes.

- Our offer to exchange old notes for new notes will be open until 5:00 p.m., New York City time, on September 13, 2011, unless extended.

- The exchange offer is subject to certain conditions, including that the exchange offer does not violate any law or applicable interpretation of any law by the staff of the Securities and Exchange Commission, or SEC.

- You may withdraw your tender of old notes at any time before the exchange offer expires.

- We will not receive any cash proceeds from the exchange offer.

- We do not intend to list the new notes on any national securities exchange or seek approval through any automated quotation system, and no active market currently exists for the old notes or is anticipated for the new notes.

**The new notes:**

- The terms of the new notes offered in the exchange offer are substantially identical to the terms of the old notes, except that the new notes will be registered under the Securities Act, and will not be subject to the restrictions on transfer or related provisions relating to additional interest applicable to the old notes.

- Interest on the new notes will accrue at a rate of 8 5/8% per year, payable on February 1 and August 1 of each year, beginning on February 1, 2012.

- On the issue date, the new notes will not have the benefit of any guarantees from our subsidiaries.

- The new notes will be our senior secured obligations, will rank equally in right of payment with all of our existing and future senior obligations, and will rank senior to all of our existing and future indebtedness that is expressly subordinated to the new notes.

- The new notes will bear a different CUSIP or ISIN number from the old notes and will not entitle their holders to registration rights.

148.  As set forth above, Exide utilized Form S-4 in connection with the Exchange Offer.  A Form S–4 is a streamlined registration statement that certain qualifying issuers are allowed to file; it allows issuers to incorporate by reference prior periodic filings like Forms 10–K and 10–Q. An issuer using Form S–4 is required to describe "any and all material changes in the registrant's affairs that have occurred since the end of the latest fiscal year for which audited financial statements were included in the latest annual report to security holders and that have not been described in a report on [Form 10–Q] or [Form 8–K]." U.S. Securities and Exchange Commission Form S–4, at 8–9, *available at* http://www.sec.gov/about/forms/forms–4.pdf.  Among other things, this requires that the Form S–4 include "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations" that have not already been disclosed in the company's Forms 10–Q or 8–K. *See* Item 303(a) of Regulation S–K, 17 C.F.R. § 229.303(a).

149.   The Registration Statement and Prospectus specifically incorporated by reference the following documents:

- Annual Report on Form 10-K for the fiscal year ended March 31, 2011 and filed with the SEC on June 1, 2011;

- Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2011, filed with the SEC on August 4, 2011;

- Definitive Proxy Statement on Schedule 14A filed with the SEC on July 28, 2011, but only to the extent that such Proxy Statement was incorporated by reference into our Annual Report on Form 10-K for the fiscal year ended March 31, 2011, filed with the SEC on June 1, 2011; and

- Current Report on Form 8-K filed on April 4, 2011.

150.   The disclosures made in the paragraphs above were materially false or misleading when made because the disclosures omitted the following material facts known by Defendants: (i) since at least 2010, Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas; (ii) the Vernon facility's more than 30 years-old stormwater pipes were not in compliance and would need to be upgraded to include secondary containment and lead detection as required under RCRA and Exide's ISD; (iii) the Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011; (iv) the Company could not afford to finance the necessary remediations, which Exide knew would likely include the installation of best available technology, including WESP; and (v) the Company's

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS     MASTER FILE NO. 2:13-cv-02607-SVW-E

liquidity was deteriorating and the restructuring and cost reduction measures were failing, as described by Preuth in his declaration.

151. The circumstances described in the above paragraph constituted, pursuant to Subsection of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

152. Defendants were aware of the shockingly hazardous levels of arsenic emissions at the Company's Vernon facility based on Exide's own arsenic emissions source tests from 2010 that showed a significant spike in emissions over tests in 2006 and 2008. Indeed, the 2010 source test results had been known by Exide by at least June 2011 and demonstrated that the arsenic emissions were approximately 100 times higher than arsenic emissions levels in 2008. Moreover, Defendants were aware, based on discussions with DTSC and documents between Exide and DTSC dating back to 2006, that the stormwater pipes were noncompliant and would need substantial upgrades, including secondary containment and leak detection in order to bring the deteriorating pipes into compliance with RCRA.

153. As alleged herein, the Vernon facility's environmental noncompliance, outdated and deteriorated stormwater pipes containing hazardous waste that compromised underlying soil and water supply, excessive arsenic emissions that posed significantly high cancer risks, liquidity problems, and increasing inability to

fund necessary remediations constitute information that would be material to investors.

154.   Based on Exide's own source tests and health risk assessments, it was evident that the Vernon facility's emissions posed a cancer risk far in excess of Rule 1420.1 thresholds.  By exceeding the cancer risk of 10 in one million, it was clear that Exide would be required to hold a public hearing to discuss the high cancer risk with the community.  This requirement alone had material implications on the Company. By all accounts, including numerous accounts from AQMD officials, the arsenic levels and the cancer risk posed by the Vernon facility's emissions were outrageous. Indeed, according to AQMD, the cancer risk associated with the Vernon's facility's 2010 and 2012 tests were far above any cancer risk AQMD had encountered in its more than 25 year history.  Thus, the requirement that Exide hold a public meeting to discuss the astonishing cancer risk with the surrounding community that had been consistently exposed to the toxic emissions from the Vernon facility for more than two years posed considerable risks, including the risks and costs associated with defending and funding recoveries for any lawsuits that were brought against Exide alleging physical harm as a result of the exposure.  In addition, the public hearing mandate created the risk that the community might pressure regulators and/or other public officials to shut down the Vernon facility.  Moreover, the public meetings regarding the dangerously high arsenic levels would inevitably result in a call for regulators to increase their scrutiny of the Vernon facility.  Further, because the cancer risks posed

by the Vernon facility's emissions exceeded 25 in one million, Exide knew it would be required to present risk reduction measures to AQMD, which would require Exide to fund the costs of extensive remediations.

155.   Based on Exide's communications with AQMD and DTSC and based on Exide's previous experiences with its Frisco facility, Defendants were specifically aware, or should have been aware in the absence of recklessness, that the Vernon facility's environmental violations would at worst result in a shutdown of the facility, and would at best cost the Company tens of millions of dollars in remediation measures and require temporary shutdowns of all or part of the facility during implementation of those remediation measures.  Indeed, Defendants knew or should have known that it would require drastic and costly retrofitting in order to bring the Vernon facility into maintainable compliance. As explained by AQMD's Deputy Executive Officer Mohsen Nazemi, the emission problems at Exide could not be resolved with minor pollution control measures as these do not provide "a permanent fix."  Not surprisingly, AQMD required more from Exide.  Indeed, to provide a permanent solution, AQMD explained that Exide could be responsible for designing a "brand new air pollution system" that would cost the Company "millions of dollars." However, Exide has already represented to AQMD and DTSC that implementation of best available technology was economically unfeasible.  If Exide fails to comply with AQMD's conditions, it could face fines of $25,000 a day and, ultimately, a court order to shut down the facility.  Similarly, Exide is also required to remove and replace its

stormwater pipes, which is likely to cost the Company several million dollars in remediation costs alone.

156.   For Exide, the materiality of the undisclosed environmental problems and associated risks is evidenced by the events that followed the Company's public hearing to discuss the arsenic emissions and corresponding cancer risk.   Since the public hearing, Exide has been made to present and implement risk reduction measures, has been targeted by Los Angeles residents and organizations devoted to environmental safety concerns (including the *Consumer Watchdog* group), has been more closely scrutinized by regulatory agencies (including recent requirements that the Company conduct extensive sampling in the neighborhoods surrounding the Vernon facility to determine whether hazardous levels of metals are present, has been shut down by the DTSC, has become subject to potential amendments to Rule 1420 that would require Exide to implement best available technologies, and has filed for bankruptcy.

A.   **Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi Negligence**

157.   Exide was the issuer of the 8 $^{5/8}$% senior secured notes due 2018. Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi owed to the purchasers of the notes obtained through the Registration Statement and Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus

at the time they became effective to ensure that such statements were true and correct and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  These Section 11 Defendants bear the burden of demonstrating their compliance with this duty.

158.  Neither Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins or Pileggi made a reasonable investigation or possessed reasonable grounds for the belief that the challenged statements contained in the Registration Statement and Prospectus were true or that there was no omission of material fact necessary to make the statements made therein not misleading.

159.  Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, among other things, the challenged facts set forth above.  By reason of the conduct alleged herein, Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi violated Section 11 of the Securities Act.

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS UNDER THE EXCHANGE ACT

160.  The Class Period begins on June 1, 2011. On that day, Exide filed with the SEC on Form 10-K its annual report for the fiscal year ended March 31, 2011.

The Form 10-K was signed by Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolonia, Ferguson, O'Higgins, and Pileggi.  In the Form 10-K, Defendants made the following disclosures:

> ***The Company is subject to costly regulation in relation to environmental and occupational, health and safety matters, which could adversely affect its business, financial condition, cash flows or results of operations.***
>
> Throughout the world, the Company manufactures, distributes, recycles, and otherwise uses large amounts of potentially hazardous materials, especially lead and acid. As a result, the Company is subject to a substantial number of costly regulations. In particular, the Company is required to comply with increasingly stringent requirements of federal, state, and local environmental, occupational health and safety laws and regulations in the U.S. and other countries, including those governing (1) emissions to air, discharges to water, noise and odor emissions; (2) the generation, handling, storage, transportation, treatment, and disposal of waste materials; and (3) the cleanup of contaminated properties and human health and safety. Compliance with these laws and regulations results in ongoing costs. The Company could also incur substantial costs, including cleanup costs, fines, and civil or criminal sanctions, third-party property damage or personal injury claims, or costs to upgrade or replace existing equipment, as a result of violations of or liabilities under environmental laws or non-compliance with environmental permits required at its facilities. In addition, many of the Company's current and former facilities are located on properties with histories of industrial or commercial operations. Because some environmental laws can impose liability for the entire cost of cleanup upon any of the current or former owners or operators, regardless of fault, the Company could become liable for the cost of investigating or remediating contamination at these properties if contamination requiring such activities is discovered in the future. There is also inherent difficulty in assessing the Company's potential liability due to the large number of other potentially responsible parties. For example, a demand for the total cleanup costs of a landfill used by many entities may be asserted by the government using joint and several liability theories. Although the Company believes that there is

72

a reasonable basis in law to believe that it will ultimately be responsible for only its share of these remediation costs, there can be no assurance that the Company will prevail on these claims. In addition, the scope of remedial costs or other environmental injuries are highly variable, and estimating these costs involves complex legal, scientific and technical judgments. The Company may become obligated to pay material remediation-related costs at its closed Tampa, Florida facility in the amount of approximately $13.2 million to $19.9 million, and at the Columbus, Georgia facility in the amount of approximately $5.7 million to $8.5 million.

*The Company cannot be certain that it has been, or will at all times be, in complete compliance with all environmental requirements, or that the Company will not incur additional material costs or liabilities in connection with these requirements in excess of amounts it has reserved.* Private parties, including current or former employees, could bring personal injury or other claims against the Company due to the presence of, or exposure to, hazardous substances used, stored or disposed of by it, or contained in its products, especially lead. Environmental requirements are complex and have tended to become more stringent over time. These requirements or their enforcement may change in the future in a manner that could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations. The Company has made and will continue to make expenditures to comply with environmental requirements. These requirements, responsibilities and associated expenditures, if they continue to increase, could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations. While the Company's costs to defend and settle claims arising under environmental laws in the past have not been material, the Company cannot provide assurance that this will remain so in the future.

On November 12, 2008, the Environmental Protection Agency ("EPA") published new lead emissions standards under the National Ambient Air Quality Standards ("NAAQS"), which became effective on January 12, 2009. The new standards further restrict lead emissions by reducing the off-site concentration standards for lead in air from 1.5 micrograms per cubic meter to 0.15 micrograms per cubic meter. The Company believes that the new standards could impact a number of its U.S. facilities. Under the Clean Air Act ("CAA"), publication by the EPA of these ambient air quality standards initiates a process by

which the states develop rules implementing the standards. Recently, some states have accelerated their implementation and the Company is working with these states to meet their requirements. Although the final impact on the Company's operations cannot be reasonably determined at the current time, the Company believes that the financial impact of compliance with these lead emissions standards on its U.S. facilities will be funded through normal operations. Noncompliance with these standards could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations.

\*\*\*

### Environmental Matters

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. ...

\*\*\*

Separate from the EPA Settlement, the Company monitors and responds to inquiries from the EPA, equivalent state and local agencies and others at approximately 50 federally defined Superfund or state equivalent sites. While the ultimate outcome of the environmental matters described in this paragraph is uncertain due to several factors, including the number of other parties that may also be responsible, the scope of investigation performed at such sites and the remediation alternatives pursued by such federal and equivalent state and local agencies, the Company presently believes any liability for these matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly

owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. While the ultimate outcome of the environmental matters described in this paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.

**_The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate._** As of March 31, 2011 and March 31, 2010, the amount of such liabilities on the Company's Consolidated Balance Sheets was approximately $28.2 million and $31.8 million, respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material adverse effect on the recorded reserves and cash flows.

The sites that currently have the largest reserves include the following:

**_Tampa, Florida_**

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.2 million to $19.9 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

**_Columbus, Georgia_**

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $5.7 million to $8.5 million.

161.   On June 1, 2011, the Company reported its Fiscal 2011 Fourth Quarter and year end results. The Company's press release reported: net sales for fiscal 2011 aggregated $2.9 billion as compared with $2.7 billion for the prior fiscal year period, an increase of approximately 7.5%; net income for fiscal 2011 of $26.4 million or $0.33 per diluted share as compared to a net loss of $11.8 million or ($0.16) per share in the prior year period. The Company reported that "[t]he improvement in net income was driven by significantly lower restructuring and impairment charges, higher gross profit and lower operating expenses. Adjusted net income for fiscal 2011 was $57.9 million or $0.72 per share. This compares to adjusted net income of $48.5 million or $0.64 per share for fiscal 2010."

162.   Defendant Bolch stated, "We are pleased with the progress made during fiscal 2011. We have successfully realigned our businesses on a regional basis and made some key management changes, further strengthening an already solid executive team." Bolch further stated, "The cost increases experienced during the last several months of fiscal 2011 coupled with delayed pricing action will likely cause first quarter profits to be slightly down from the comparable fiscal 2011 period. We remain confident, however, in our ability to continue to improve the operating performance of

the Company and expect full year fiscal 2012 operating income to be in the range of $160 million to $170 million, up from $95.8 million in fiscal 2011."

163.   On June 2, 2011, Exide held its earnings conference call for fiscal fourth quarter 2012.  In the conference call Defendants discussed their plans to reduce costs and inefficiencies with respect to the Company's operations:

> [Bolch:]  Turning to slide 6, I want to provide a few comments on our global focus, on continuous improvement, productivity, and cost reduction. A version of this slide was shared during our investor meeting in February. Since that time, we have relaunched our continuous improvement programs which in simplistic terms is a focus on eliminating inefficiencies throughout the manufacturing process and ultimately the entire supply chain. We've created a Global Operations Council of senior leaders charged with rapidly driving best practices developed across the world.
>
> Six Sigma is one element of this initiative. We've launched an aggressive program in our European businesses to train and develop Six Sigma green and black belts in each of our facilities. Another formal initiative, maintenance excellence program or MAP is also well under way in Europe. The focus of MAP is on preventive maintenance, to significantly improve our overall equipment effectiveness and productivity and to reduce costs associated with maintenance and repair. We anticipate first year savings from our European activities of approximately $6.5 million.
>
> ***
>
> In the Americas, we've now recruited a highly experienced Vice President of Operations who's charged with driving these initiatives to improve cost and quality across all of our US plants. The Americas organization has partnered with one of our key customers, Toyota, to implement lean techniques in all of our plants. By the end of the month, lean leaders from 9 of the US plants will have completed the Toyota production system training. Finally, we've created a formal value analysis, value engineering or VAVE function with a dedicated

77

global leader. This is a critical function with significant opportunity to drive non-value-added cost out of our products and services. I'm very confident that these actions taken together will allow Exide to rapidly accelerate our continuous improvement efforts and to drive quality improvement and margin expansion.

***

[Defendant Damaska:] ... We will continue to focus on optimizing our cost structure which when coupled with improving sales, caused us to be very confident regarding earnings prospects for the current year. ...

***

[Defendant Bolch:] ... Clearly, fiscal 2011 was a challenging year for our Transportation Americas business, driven by escalating core costs and operational issues. We expect the operational issues in our Reading facility to be corrected by early next week and we now believe we have actions in place to mitigate the impact of core costs going forward. ...

164. The disclosures made in the paragraphs above were materially false or misleading when made because the disclosures omitted the following material facts known by Defendants: (i) since at least 2010, Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas; (ii) the Vernon facility's more than 30 years-old stormwater pipes were not in compliance and would need to be upgraded to include secondary containment and lead detection as required under RCRA and Exide's ISD; (iii) the Vernon facility's hazardous conditions and/or the Notice of

Deficiency issued by the DTSC on March 21, 2011; (iv) the Company could not afford to finance the necessary remediations, which Exide knew would likely include the installation of best available technology, including WESP; and (v) the Company's liquidity was deteriorating and the restructuring and cost reduction measures were failing, as described by Preuth in his declaration.

165.  The circumstances described in the above paragraph constituted, pursuant to Subsection of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

166.  In addition, the omitted material facts, described above, rendered the following statements by Defendants materially false or misleading:

■ *The Company cannot be certain that it has been, or will at all times be, in complete compliance with all environmental requirements, or that the Company will not incur additional material costs or liabilities in connection with these requirements in excess of amounts it has reserved.*

■ *The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.*

167.  Defendants were aware, or should have been aware in the absence of recklessness, of the shockingly hazardous levels of arsenic emissions at the Company's Vernon facility based on Exide's own arsenic emissions source tests from 2010 that showed a significant spike in emissions over tests in 2006 and 2008.

Indeed, the 2010 source test results had been known by Exide by at least June 2011 and demonstrated that the arsenic emissions were approximately 100 times higher than arsenic emissions levels in 2008. Moreover, Defendants were aware that the stormwater pipes were noncompliant and would need substantial upgrades, including secondary containment and leak detection in order to bring the deteriorating pipes into compliance with RCRA based on discussions with DTSC and documents between Exide and DTSC dating back to 2006.

168.   On August 4, 2011, the Company reported its Fiscal 2012 First Quarter results. The Company's press release reported: fiscal 2012 first quarter consolidated net sales were $745.1 million as compared to net sales of $644.7 million in the fiscal 2011 first quarter; and, fiscal 2012 first quarter operating income increased approximately 30% to $13.6 million compared to $10.5 million in the prior year first quarter primarily due to improved manufacturing efficiencies and the significant reduction in restructuring and impairment costs. Operating income for the period was favorably impacted by approximately $1.8 million of foreign currency translation.

169.   Defendant Bolch stated, "Our first quarter results exceeded our previously communicated guidance and we are pleased with the continuing improvements in our European businesses and Industrial Americas. However, we continue to be disappointed with results for our Transportation Americas business, which limited first quarter results. Actions are being finalized to address the overall cost structure of this business."

170. On August 4, 2011, Exide filed with the SEC on Form 10-Q its quarterly report for the fiscal first quarter 2012 ended June 30, 2011. The Form 10-Q was signed by Defendant Damaska and was certified by Defendants Damaska and Bolch pursuant to the Sarbanes-Oxley Act. In the Form 10-Q, Defendants made the following disclosures:

***Environmental Matters***

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. The Company previously has received notification from the U.S. Environmental Protection Agency ("EPA"), equivalent state and local agencies or others alleging or indicating that the Company is or may be responsible for performing and/or investigating environmental remediation, or seeking the repayment of the costs spent by governmental entities or others performing investigations and/or remediation at certain U.S. sites under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws.

***

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or

operating locations. While the ultimate outcome of these environmental matters is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.

***The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.*** As of June 30, 2011 and March 31, 2011, the amount of such liabilities on the Company's Consolidated Balance Sheets was approximately $28.7 million and $28.2 million, respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material adverse effect on the recorded reserves and cash flows.

The sites that currently have the largest reserves include the following:

***Tampa, Florida***

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.0 million to $20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

***Columbus, Georgia***

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $6.0 million to $9.0 million.

171.   On August 5, 2011, Exide held its earnings conference call for fiscal first quarter 2012.  During the conference call, Defendants expressed dissatisfaction with the performance of Exide's Transportation America business and suggested that the Company was taking efforts to improve it:

> [Bolch:]  We, however, are extremely dissatisfied · with the performance of the Transportation Americas business, which limited our first quarter results. We intend to take aggressive actions over the next 60 to 90 days to improve the operating performance of this segment significantly. We incurred a net loss for the first quarter of $5.2 million, compared to the prior year period net loss of $9 million. On an adjusted basis, first quarter adjusted loss of $4.6 million, or $0.06 per share versus the prior year period adjusted net loss of $1.8 million, or $0.02 per share.
>
> \*\*\*
>
> Moving to slide 6, I'll cover a couple of items in engineering and operations. To assist in driving our initiatives in productivity and continuous improvement, we've established a global operations council led by our senior business leaders from around the world. The objective is to drive standardized best practices in all of our global facilities. Products are already under way in implementing lean Six Sigma tools, preventive maintenance practices, energy reduction, and common manufacturing equipment standards. Equally important is to engage our engineering organization in driving productivity for more efficient designs and processes. We remain committed to the development of advanced technology products. However, we have redirected a significant portion of our technical resources to focus on value analysis, value engineering, or VaVe initiatives.
>
> These activities will concentrate on the redesign of existing products with the intent of reducing costs without sacrificing customer value. Early results are promising with the identification of up to $9 million of reduced product costs in Transportation Americas alone.
>
> \*\*\*
>
> Our confidence in terms of full year's earnings is predicated on the

83

following; Continued strength in our Global Industrial business, greater penetration of our higher margin AGM and MHF products in Europe, and implementation of more extensive cost reduction initiatives across our business, but most specifically in Transportation Americas. As always, we appreciate your interest and support of Exide.

\*\*\*

JOHN FRANZREB: Okay. And Jim, I guess it's a bit of a philosophical question. You've been at the helm for a year now, can you give us your assessment of what has been better than expected at Exide, and what that be maybe not up to what your expectations were when you took the job?

JAMES BOLCH: That's kinds of a big question, John, but let's see if I can fill it in here. One is it's certainly been a huge learning year for me. I've had the opportunity to really spend time around all pieces of the Company and all geographies. I think one of the things that has really come home to me as a big opportunity is product cost opportunities, and we see that in a lot of forums. We talked in the call today about activities in operational excellence, what we call it competitive operations, things like lead manufacturing, preventive maintenance, equipment standardization is really not something that we've gone too far down that path in the past. That's a huge opportunity. Likewise on the design side. We talked on the last earnings call about creation of a global VaVe position in our engineering organization. In the last three months that activity has accelerated tremendously as we see opportunities to take costs out of our product, and as know, in any large volume business if you just take pennies out of a product it falls to the bottom line pretty fast. I think those are areas that right away we see big opportunities for cost reduction, which translates to margin improvement.

\*\*\*

What I said was, we are looking at significant cost initiatives in the next 60 to 90 days. I really didn't speak to restructuring charges. It's not clear to me what -- and I'll let Phil comment on the restructuring charges. We're really looking at the full spectrum of cost opportunities in that business, whether it comes from the design side in product, whether it comes from manufacturing efficiency, whether

it comes from SG&A and factory capacity. Everything is on the table as we go through this. It's a bottom to top review because that's results that we're not pleased with and we're going to drive them to better numbers.

172.   The disclosures made in the paragraphs above were materially false or misleading when made because the disclosures omitted the following material facts known by Defendants: (i) since at least 2010, Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas; (ii) the Vernon facility's more than 30 years-old stormwater pipes were not in compliance and would need to be upgraded to include secondary containment and lead detection as required under RCRA and Exide's ISD; (iii) the Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011; (iv) the Company could not afford to finance the necessary remediations, which Exide knew would likely include the installation of best available technology, including WESP; and (v) the Company's liquidity was deteriorating and the restructuring and cost reduction measures were failing, as described by Preuth in his declaration.

173.   The circumstances described in the above paragraph constituted, pursuant to Subsection of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . .

1   unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R.

2   § 229.303(a)(3).

3

4       174.   In addition, the omitted material facts, described above, rendered the

5   following statements by Defendants materially false or misleading:

6       ■ *The Company cannot be certain that it has been, or will at all*
7         *times be, in complete compliance with all environmental*
8         *requirements, or that the Company will not incur additional*
          *material costs or liabilities in connection with these requirements*
9         *in excess of amounts it has reserved.*

10      ■ *The Company has established liabilities for on-site and off-site*
11        *environmental remediation costs where such costs are probable*
          *and reasonably estimable and believes that such liabilities are*
12        *adequate.*

13      175.   On November 7, 2011, the Company reported its fiscal 2012 first quarter

14

15  results. The Company's press release reported: net sales for the fiscal 2012 second

16  quarter of $773 million, up $105 million versus the prior year second quarter and up

17
    $28 million sequentially; operating income for the current year period of $21.2 million
18

19  versus $26.3 million of operating income in the second quarter of fiscal 2011, which

20  includes an out of period charge of approximately $5.0 million pretax for the

21
    Transportation Europe and ROW segment relating to the intentional misstatements of
22

23  production and inventories. "[W]e are taking aggressive actions to reduce costs and

24  improve operating results, particularly in the Transportation Americas segment,"

25
    Defendant Bolch added.
26

27      176.   On November 8, 2011, Exide held its earnings conference call for fiscal

28  second quarter 2012.  During the conference, call Defendants outlined five "action

items" to address issues related to the disappointing performance of the Company's

Transportation Americas business:

> [Bolch:]  With slide 5, let me begin with stating very clearly, that I'm extremely disappointed with the performance of our Transportation Americas business. The performance of this business is not what I expected when I came to Exide last year, and I have no intention of accepting performance at this level. I will not offer any excuses. This business has issues that must be addressed immediately. As discussed in the last call, we've completed a deep dive review to assess the issues of this business. Our plans to address these issues include the following 5 action items.
>
> First, as recently announced, we made a leadership change in the Americas. Paul Hirt, Jr. will join the Company next week as President Exide Americas.
>
> ***
>
> Second, we have an ongoing structural cost issue related to significant excess capacity in our flooded transportation battery business. We have carried this excess capacity for 18 months, and we simply cannot continue to operate at these low levels of factory utilization. To correct the situation, we've made the decision to discontinue production of flooded batteries at our Bristol, Tennessee facility.
>
> ***
>
> Third, we've also identified battery assembly cost disadvantages, as compared to a few key competitors. Through ongoing value analysis, value engineering initiatives, we've identified battery design opportunities to reduce costs. ... Fourth, we're taking steps to improve our acquisition of spent core materials required for our recycling facilities. A number of strategic efforts have been identified and are underway which we believe will improve our access to captive cores. One effort, capturing used industrial batteries, is already showing markedly improved recovery rates.
>
> ***

87

And fifth, we've continued to reduce SG&A costs in the business via recent incremental reduction in force, and expect savings from these actions will aggregate $7 million annually. These actions, while difficult in many ways, are of absolute necessity to turn this segment around.

177.   On November 9, 2011, Exide filed with the SEC on Form 10-Q its quarterly report for the fiscal second quarter ended September 31, 2011.  The Form 10-Q was signed by Defendant Damaska and was certified by Defendants Damaska and Bolch pursuant to the Sarbanes-Oxley Act.  In the Form 10-Q, Defendants made the following disclosures:

***Environmental Matters***

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. The Company previously has received notification from the U.S. Environmental Protection Agency ("EPA"), equivalent state and local agencies or others alleging or indicating that the Company is or may be responsible for performing and/or investigating environmental remediation, or seeking the repayment of the costs spent by governmental entities or others performing investigations and/or remediation at certain U.S. sites under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws.

***

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly

owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. While the ultimate outcome of these environmental matters is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.

***The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.*** As of September 30, 2011 and March 31, 2011, the amount of such liabilities on the Company's Consolidated Balance Sheets was approximately $28.2 million. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material adverse effect on the recorded reserves and cash flows.

The sites that currently have the largest reserves include the following:

***Tampa, Florida***

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.0 million to $20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

***Columbus, Georgia***

The Columbus site is a former secondary lead recycling plant that was

taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $6.0 million to $9.0 million.

178.   The disclosures made in the paragraph above was materially false or misleading when made because the disclosures omitted the following material facts known by Defendants: (i) since at least 2010, Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas; (ii) the Vernon facility's more than 30 years-old stormwater pipes were not in compliance and would need to be upgraded to include secondary containment and lead detection as required under RCRA and Exide's ISD; (iii) the Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011; (iv) the Company could not afford to finance the necessary remediations, which Exide knew would likely include the installation of best available technology, including WESP; and (v) the Company's liquidity was deteriorating and the restructuring and cost reduction measures were failing, as described by Preuth in his declaration.

179.   The circumstances described in the above paragraph constituted, pursuant to Subsection of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . .

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          MASTER FILE NO. 2:13-cv-02607-SVW-E

unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

180.   In addition, the omitted material facts, described above, rendered the following statements by Defendants materially false or misleading:

- **The Company cannot be certain that it has been, or will at all times be, in complete compliance with all environmental requirements, or that the Company will not incur additional material costs or liabilities in connection with these requirements in excess of amounts it has reserved.**

- **The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.**

181.   Defendants were aware, or should have been aware in the absence of recklessness, of the shockingly hazardous levels of arsenic emissions at the Company's Vernon facility based on Exide's own arsenic emissions source tests from 2010 that showed a significant spike in emissions over tests in 2006 and 2008. Indeed, the 2010 source test results had been known by Exide by at least June 2011 and demonstrated that the arsenic emissions were approximately 100 times higher than arsenic emissions levels in 2008.   Moreover, Defendants knew that the stormwater pipes were noncompliant and would need substantial upgrades, including secondary containment and leak detection in order to bring the deteriorating pipes into compliance with RCRA based on discussions with DTSC and documents between Exide and DTSC dating back to 2006.  In fact, by October 2011, DTSC had already obtained samples from the piping system that indicated hazardous waste levels for

lead, arsenic, and cadmium, and by late 2011, Defendants had agreed to provide a description of the pipeline system to DTSC.

182.   Moreover, the Company failed to disclose that the Vernon facility would need to substantially lower its lead emissions by the end of the year in order to bring the facility into compliance with the impending 2012 lead emissions standards.   As acknowledged by Exide in an August 29, 2011 letter to the DTSC, the Vernon facility's lead emissions were in excess of the 2012 emissions standards.   As additionally admitted in the August 29, 2011 letter, Exide would need to implement costly upgrades to the Vernon facility in order to get its lead emissions under the 2012 limits.   Exide's plan to reduce its lead emissions was to construct an enclosure over certain baghouses[15] on the Vernon facility, and Exide quantified that this would be a "$5 million dollar project."   However, even with the enclosure, it was unclear whether the emission levels would fall within the necessary levels, which would require Exide to "implement additional Compliance Plan measures to further reduce emissions." The letter, went on to explain that it would not be economically feasible for Exide to implement the "available EPA-designated process control and ventilation control technologies, including (but not limited to) Wet Electrostatic Precipitators and/or Fugitive Emission Filtration Units with HEPA filtration."   Indeed, Exide further explained that "the expected $30 million capital cost (and incremental cost of over $6 million per ton) renders the available technologies economically infeasible."

---

[15] A baghouse is an air pollution control device that removes particles out of air or gas.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      MASTER FILE NO. 2:13-cv-02607-SVW-E

183.   Despite Defendants' clear knowledge of compliance problems and necessary remediation measures, such information was not disclosed to investors. Moreover, the remediation measures needed to make the Vernon facility complaint with the 2012 emission standards were not accounted for in the Company's remediation liabilities.  As explained, to achieve the new lead emissions standards, it would cost Exide a minimum of $5 million (to enclose the baghouses) and potentially more if that first line of defense was unsuccessful in bringing Vernon into compliance. Indeed, as admitted by Exide, EPA-designated process control and ventilation control technologies would cost Exide approximately $30 million should it be required to implement those devices, which the only other California battery recycling facility had implemented to attain compliance.

184.   On February 9, 2012, Exide filed with the SEC on Form 10-Q its quarterly report for fiscal third quarter 2012, ended December 31, 2011.  The Form 10-Q was signed by Defendant Damaska and was certified by Defendants Damaska and Bolch pursuant to the Sarbanes-Oxley Act.  In the Form 10-Q Defendants made the following disclosures:

*Environmental Matters*

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

The Company received a number of notices of violation issued by the Pennsylvania Department of Environmental Protection ("PADEP") for alleged violations of pollution control laws at its Reading, Pennsylvania recycling facility. To resolve these notices of violation, the Company negotiated a settlement agreement with PADEP that included monetary sanctions of $0.12 million to PADEP. The settlement also included an agreement to perform an emission control project.

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. The Company previously has received notification from the U.S. Environmental Protection Agency ("EPA"), equivalent state and local agencies or others alleging or indicating that the Company is or may be responsible for performing and/or investigating environmental remediation, or seeking the repayment of the costs spent by governmental entities or others performing investigations and/or remediation at certain U.S. sites under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws.

\*\*\*

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In

addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. *While the ultimate outcome of these environmental matters is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.*

*The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.* As of December 31, 2011 and March 31, 2011, the amount of such liabilities on the Company's Consolidated Balance Sheets was approximately $27.7 million and $28.2 million respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material adverse effect on the recorded reserves and cash flows.

The sites that currently have the largest reserves include the following:

*Tampa, Florida*

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.0 million to $20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

*Columbus, Georgia*

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $6.0 million to $9.0 million.

185.   On February 9, 2012, the Company also issued a press release that reported net sales for the fiscal 2012 third quarter of $784.1 million versus $800.3 million in the prior year's third quarter, operating income for the current year period of $28.2 million versus $49.7 million of operating income in the third quarter of fiscal 2011, and net income for the fiscal 2012 third quarter of $68.2 million or $0.84 per diluted share, the result of favorable discrete income tax items. This compared to the prior year period net income of $31.2 million or $0.38 per diluted share.

186.   On February 12, 2012, Exide held its earnings conference call for fiscal third quarter 2012.  Defendants Bolch and Damaska participated in and spoke during the call.  Defendants made the following materially false or misleading statements:

> [Bolch:]   Please turn to slide 4. As I just noted, Transportation America has continued to have its challenges with the results quarter over quarter. ***During our conference call in November, we identified five key actions to turn this business around.*** Fixing this business remains a top priority for the company, and for me personally. ***Based upon our progress to date in these key areas, we believe this business has stabilized.***
>
> ***
>
> [Bolch:]   Thanks, Phil. [As shown] this morning, it was a challenging quarter made tougher by warmer than normal weather that impacted

our aftermarket transportation businesses. *While I'm disappointed with the results, I am encouraged that the transportation Americas turnaround plan announced last quarter is solidly on track* and we have seen wins in all global businesses.

\*\*\*

SEAN NAUGHTON, ANALYST, PIPER JAFFRAY: This is [Sean] for Amar. Just wondering if you guys could give us a little bit more color on the Transportation Americas segment? You talk about stabilizing it, the turnaround is on track; can you tell us how things progressed in the quarter, and where we are in terms of getting that business back to a sustained and profitable level?

PHIL DAMASKA: You saw the profits of about $3 million, down dramatically year-over-year. The $3 million this year, as I indicated, included a $1 million restructuring charge. In our commentary, we indicated it was essentially our first profitable quarter of the year, and we also indicated that it was principally driven by results in the month of December. *So, we are cautiously optimistic, we have indicated that we believe we have stabilized the business,* and January results also appear to be moving in that direction and that trend, as well. So, again, we are cautiously optimistic that we have the initiatives in place to drive that business forward.

\*\*\*

KIRK LUDTKE: Okay. Then, lastly, is it too early to talk about fiscal 2013 cash requirements? Is there anything you can share with us on that?

PHIL DAMASKA: We are still in our -- in finalizing our operating plan for FY '13. At this point in time, I am not prepared to comment on cash, *other than to say that our liquidity remains very solid,* and we expect to be able to fund the necessary investments for the remainder of this year, and in through '13 with cash generation and lateral liquidity.

\*\*\*

ERIC WERWE, ANALYST, EBF & ASSOCIATES: I have a

question on CapEx -- you took your CapEx guidance from $110 million down to $100 million for this year. What areas are you taking down? I know you had some environmental CapEx in there that you are going to need to spend, there was AGM buildout. What area are you scrimping back on? Then, as you look into next year, do you have room to pare back, if you were to see results deteriorate further? And in what areas?

PHIL DAMASKA: We have clearly scaled back the capital this year, to address the cash flow. We want to make sure that we maximize cash flow this year. ***We haven't taken it out of major environmental-related projects. We understand we have to keep our recycling businesses in compliance with regulations, and we aren't going to compromise that.*** We aren't compromising our AGM buildout.

(emphasis added).

187.   The disclosures made in the paragraphs above were materially false or misleading when made because the disclosures omitted the following material facts known by Defendants: (i) since at least 2010, Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas; (ii) the health risks based on Vernon facility's arsenic emissions substantially exceeded Rule 1420 risk reduction limits and would require public notification and risk reduction measures; (iii) the Vernon facility's more than 30 years-old stormwater pipes were not in compliance and would need to be upgraded to include secondary containment and lead detection as required under RCRA and Exide's ISD; (iv) the Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011; (v) the Company

could not afford and was not willing to finance the necessary remediations, which Exide knew would likely include the installation of best available technology, including WESP; and (iv) the Company's liquidity was deteriorating and the restructuring and cost reduction measures were failing, as described by Preuth in his declaration.

188.   The circumstances described in the above paragraph constituted, pursuant to Subsection of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

189.   Additionally, the omitted material facts, described above, rendered the following statement by Defendants materially false or misleading:

- ■ [Damaska:] *We understand we have to keep our recycling businesses in compliance with regulations, and we aren't going to compromise that.*

- ■ *The Company cannot be certain that it has been, or will at all times be, in complete compliance with all environmental requirements, or that the Company will not incur additional material costs or liabilities in connection with these requirements in excess of amounts it has reserved.*

- ■ *The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.*

190.   Defendants were aware, or should have been aware in the absence of recklessness, of the shockingly hazardous levels of arsenic emissions at the

1  Company's Vernon facility based on Exide's own arsenic emissions source tests from

2  2010 that showed a significant spike in emissions over tests in 2006 and 2008.

3

4  Indeed, the 2010 source test results had been known by Exide by at least June 2011

5  and demonstrated that the arsenic emissions were approximately 100 times higher

6  than arsenic emissions levels in 2008.  By this time, Defendants had also received the

7

8  health risk assessment based on the 2010 source test results, which indicated a cancer

9  risk well above the risk reduction limits.   Moreover, Defendants knew that the

10  stormwater pipes were noncompliant and would need substantial upgrades, including

11

12  secondary containment and leak detection in order to bring the deteriorating pipes into

13  compliance with RCRA based on discussions with DTSC and documents between

14  Exide and DTSC dating back to 2006.  In fact, by October 2011, DTSC had already

15

16  obtained samples from the piping system that indicated hazardous waste levels for

17  lead, arsenic, and cadmium, and by late 2011, Defendants had agreed to provide a

18  description of the pipeline system to DTSC.

19

20      191.  Additionally, material omissions rendered the following statements by

21  Defendants materially false or misleading:

22
    ■  [Bolch:] ***Based upon our progress to date in these key areas, we***
23       ***believe this [transportation] business has stabilized.***

24
    ■  [Bolch:] ***While I'm disappointed with the results, I am***
25       ***encouraged that the transportation Americas turnaround plan***
26       ***announced last quarter is solidly on track*** and we have seen wins
         in all global businesses.
27

28

■ [Damaska:]  At this point in time, I am not prepared to comment on cash, *other than to say that our liquidity remains very solid*, and we expect to be able to fund the necessary investments for the remainder of this year, and in through '13 with cash generation and lateral liquidity.

■  [Damaska:] *So, we are cautiously optimistic, we have indicated that we believe we have stabilized the business, ...*

192.  In reality, the Company's liquidity was not "very solid," and the Americas turnaround plan was not "solidly on track" or "stabilized."

193.  As Defendant Damaska admitted in his bankruptcy proceeding declaration, Exide's cost cutting and restructuring plans that were implemented in 2010 after the Company lost WalMart as a customer had failed and  "[d]espite these efforts, the Debtor's financial position continued to decline."  CI 10 (a bag house operator at Exide's Redding, Pennsylvania plant from 1994 to May 10, 2013 and union representative) similarly explained that a big hit to the Company came when Exide lost Wal-Mart as a customer and as a source for core material.

194.  CI 10 explained that in recent years, Exide's battery manufacturing business was "a losing proposition" for the Company.  Exide's battery volume had dropped off from about 52 million batteries sold a year to about 14 million last year.  "It's no wonder why they are floundering the way they are," CI 10 said.  CI 5 (manager of Environmental, Health and Safety at an Exide plant in Bristol, Tennessee from July 2011 to February 2012) similarly described that Exide was barely hanging

on financially when he was at the Company from July 2011 to February 2012. "Environmental issues were really killing them," CI 5 said.

195. CI 9 (environmental manager at Exide's Muncie, Indiana plant from January 2012 to March 2013, who reported to the plant manager, Bob Saurer, and also directly to Fred Ganster) described similar money shortages. CI 9 said Exide was always short on cash flow, and that managers were constantly pressured to keep costs down. "Spending money was the big issue," he said. CI 9 said he often heard from vendors and consultants who complained they were not being paid by the Company. CI 9 regularly had to bring the overdue bills to management's attention to obtain payments.

196. On June 7, 2012, Exide filed with the SEC on Form 10-K its annual report for the fiscal year ended March 31, 2012. The Form 10-K was signed by Defendants Bolch, Damaska, Martinez, Aspbury D'Appolonia, Reilly Ferguson, O'Higgins and Pileggi. In the Form 10-K, Defendants made the following disclosures:

> ***The Company is subject to costly regulation in relation to environmental and occupational, health and safety matters, which could adversely affect its business, financial condition, cash flows or results of operations.***
>
> ***
>
> On November 12, 2008, the Environmental Protection Agency ("EPA") published new lead emissions standards under the National Ambient Air Quality Standards ("NAAQS"), which became effective

on January 12, 2009. The new standards further restrict lead emissions by reducing the off-site concentration standards for lead in air from 1.5 micrograms per cubic meter to 0.15 micrograms per cubic meter. The Company believes that the new standards could impact a number of its U.S. facilities. Under the Clean Air Act ("CAA"), publication by the EPA of these ambient air quality standards initiates a process by which the states develop rules implementing the standards. Recently, some states have accelerated their implementation and the Company is working with these states to meet their requirements. Although the final impact on the Company's operations cannot be reasonably determined at the current time, the Company believes that the financial impact of compliance with these lead emissions standards on its U.S. facilities will be funded through normal operations. *Noncompliance with these standards could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations.*

On January 5, 2012, the EPA passed the National Emissions Standards for Hazardous Air Pollutants ("NESHAP") for secondary lead smelting. The final regulations include limits for lead and other fugitive emissions, particularly at the Company's lead recycling facilities, as well as additional testing and monitoring, recordkeeping, and reporting requirements. Although the Company currently believes a majority of these requirements will be met through efforts to attain compliance with NAAQS standards, our failure to attain compliance with NESHAP could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations.

On January 17, 2012, the City of Frisco, Texas initiated actions that could have prevented the Company from proceeding with projects designed to comply with certain NAAQS implementation requirements related to the Company's Frisco, Texas recycling facility and that could have imposed an involuntary closure of the facility. The Company contested the City's actions, and subsequently reached a settlement with the City in June 2012 whereby the Company will sell certain land around the Company's facility for a total purchase

price of $45.0 million, in return for the Company's agreement to cease operations at the site on or before December 31, 2012, assuming the City's funding commitments are met and the Company receives state certification for its remedial activities. If the funding obligations cannot be met, it is uncertain when the Company would be able to meet NAAQS and NESHAP compliance and continue operating the facility.

***

### Environmental Matters

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. …

***

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. *While the ultimate outcome of the environmental matters described in this paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not*

104

*have a material adverse effect on the Company's financial condition, cash flows or results of operations.*

*The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.* As of March 31, 2012 and March 31, 2011, the amount of such liabilities on the Company's Consolidated Balance Sheets was approximately $27.7 million and $28.2 million, respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material adverse effect on the recorded reserves and cash flows.

The sites that currently have the largest reserves include the following:

*Tampa, Florida*

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.2 million to $20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

*Columbus, Georgia*

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for

supplemental investigations, remediation and site closure are currently
estimated at $5.7 million to $8.5 million.

197.   Also on June 7, 2012, the Company reported its Fiscal 2012 Fourth
Quarter Results through a press release. The Company's press release reported, "[n]et
sales of $782.6 million versus $774.5 million in the prior year fourth quarter;
Operating income was $15.9 million versus $9.3 million in the fourth quarter of fiscal
2011; net loss was $2.7 million or ($0.03) per share as compared to the prior year
period net loss of $13.7 million or ($0.18) per share; and free cash flow generation
was approximately $55.7 million compared to a use of cash of ($14.7 million) in the
prior year period."

198.   Defendant Bolch stated, "[o]ur fourth quarter results improved over the
comparative prior year period, principally due to lower restructuring and impairment
charges. *We are making steady progress with substantial opportunities for further*
*improvement in the areas of product cost, recovery through pricing and*
*optimization of plant capacity."* (emphasis added).

199.   On June 8, 2012, Exide held its earnings conference call for fiscal fourth
quarter 2012.  Defendants Bolch and Damaska participated in and spoke during the
call. Defendants made the following materially false or misleading statements:

> [Jim Bolch;]  Please turn to slide 4 for an update of our Transportation
> Americas business. During our conference call in November we
> identified five key actions to improve the financial performance of
> this business. *We remain committed to this strategy and we are*
> *tracking well to our plans.*

*I am pleased with the new leadership in the Americas business; and despite challenges, the team is making steady progress.*

\*\*\*

Additionally, I am pleased with our progress in complying with new stricter environmental standards, which have required significant investment to our US recycling facilities. Investments that began in 2008 will be completed by the end of calendar 2013.

*The photo on the right side of this slide [6] is our Vernon, California, recycling facility, where these environment modifications were recently completed. We are seeing excellent results from our completed investment in Vernon, where air monitor readings are now tracking well below the new stricter standard.*

\*\*\*

[Damaska:]  *We believe the Company's current liquidity position remains healthy.* At March 31, 2012, we had total liquidity of $312 million versus $318 million at the end of the fiscal 2011. The current year includes $155 million in cash and $153 million under the revolving credit facility.

Year-end liquidity for the most recent two years is the highest reported level for the Company in the past decade. In light of the agreement with the city of Frisco along with other identified initiatives, we believe the liquidity position will remain solid. Capital spending for fiscal 2013 is expected to be at levels consistent with the recent past.

\*\*\*

[Bolch:]  All of us at Exide are working diligently so that the results of 2012 will not be repeated. *I strongly believe we are on track to drive improved results.* We are investing in our future through a number of initiatives.

*We are making good progress with our actions to turn around the Americas Transportation business* and are increasing our focus on the European Industrial business as well. We have chosen to sell or

close certain assets to improve our operating performance and enhance cash flow.

***

TOM DANIELS, ANALYST, STIFEL NICOLAUS: Good morning, guys. Thanks for taking my question. I was hoping maybe you could talk a little bit more about your European outlook given everything going on. I think competitors saw Western Europe being in a clear recession. How are you guys seeing your business there over the next 12 months?

JIM BOLCH: I think, a little bit of this you have to read the newspaper every morning, decide what you think Europe is going to do. Clearly it is a volatile situation and it's something we watch. What we can see today in our backlogs -- and probably the one -- or I should say there's actually two areas that you would be most concerned about.

*One is the Industrial side, and there we actually have not seen any letup in orders. In fact Industrial Europe sequentially back order was up 25% over last quarter and also up versus last year as well.* I will also comment there that the Industrial North America business was also up about 50% over last quarter.

So we will continue to watch that one pretty carefully. I think on the Industrial side though in Europe, as we stated earlier, that market has never fully recovered back from the recession. So I think there's really less buffer there than there was before, and so consequently less to fall. But we will watch it very carefully and monitor costs.

*The other one that potentially could be impacted by European economic issues is the OE build. There's certainly a lot of people watching that. To date our orders have remained pretty stable there.*

We certainly feel good about the new platforms coming in with new technology, and we are well positioned on those platforms. So I think time will tell how the car build goes.

*Then lastly would be the aftermarket side. The aftermarket side we*

108

*have seen has been quite steady throughout the economic cycles. Especially if people aren't buying new cars they hold onto older cars, and that aftermarket business holds up pretty well.*

\*\*\*

STAN MANOUKIAN, ANALYST, INDEPENDENT CREDIT RESEARCH: Good afternoon; good morning, actually. Thank you for taking my question. *Slide 6, can you please clarify what it is exactly that you mean about the facility -- California recycling facility? Have you closed it or the problem is this part of the conversation.*

JIM BOLCH: Sure, no problem. *No, in fact we have definitely not closed that facility. That is our Vernon, California, facility which is just outside of Los Angeles. That's a facility where we have now completed all of the environmental modifications, which include fully enclosing the building and putting it under negative pressure.*

*So the comment there was that those environmental modifications are complete. And that the results as measured by the air monitors are well within the new stricter air standards.* But it's (technical difficulty) up and running at capacity.

\*\*\*

SEAN BRITAIN: Okay. *As of right now you are not seeing a slowdown in that Industrial European sector?*

JIM BOLCH: *No, if anything -- and I quoted the number before -- we saw sequentially quarter-over-quarter backlogs going up about 25% in that business, and we are seeing still strong demand.*

(emphasis added).

200.   The disclosures made in the paragraphs above were materially false or misleading when made because the disclosures omitted the following material facts known by Defendants: (i) since at least 2010, Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high

levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas; (ii) the health risks based on Vernon facility's arsenic emissions substantially exceeded Rule 1420 risk reduction limits and would require public notification and risk reduction measures; (iii) the Vernon facility's more than 30 years-old stormwater pipes were not in compliance and would need to be upgraded to include secondary containment and lead detection as required under RCRA and Exide's ISD; (iv) the Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011; (v) the Company could not afford to finance the necessary remediations, which Exide knew would likely include the installation of best available technology, including WESP; and (iv) the Company's liquidity was deteriorating and the restructuring and cost reduction measures were failing, as described by Damaska in his declaration.

201.   The circumstances described in the above paragraph constituted, pursuant to Subsection of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

202.   In addition, the omitted material facts, described above, rendered the following statements by Defendants materially false or misleading:

- ■ *The Company cannot be certain that it has been, or will at all times be, in complete compliance with all environmental requirements, or that the Company will not incur additional*

*material costs or liabilities in connection with these requirements in excess of amounts it has reserved.*

■ *The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.*

203.  Defendants were aware, or should have been aware in the absence of recklessness, of the shockingly hazardous levels of arsenic emissions at the Company's Vernon facility based on Exide's own arsenic emissions source tests from 2010 that showed a significant spike in emissions over tests in 2006 and 2008. Indeed, the 2010 source test results had been known by Exide by at least June 2011 and demonstrated that the arsenic emissions were approximately 100 times higher than arsenic emissions levels in 2008.  By this time, Defendants had also received the health risk assessment based on the 2010 source test results that indicated a cancer risk well above the risk reduction limits, and had even retested the arsenic emissions at the Vernon facility, which also revealed extremely high arsenic emissions well in excess of pre-2010 levels.  Moreover, Defendants knew that the stormwater pipes were noncompliant and would need substantial upgrades, including secondary containment and leak detection in order to bring the deteriorating pipes into compliance with RCRA based on discussions with DTSC and documents between Exide and DTSC dating back to 2006.  In fact, by October 2011, DTSC had already obtained samples from the piping system that indicated hazardous waste levels for lead, arsenic, and

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          MASTER FILE NO. 2:13-cv-02607-SVW-E

cadmium, and by late 2011, Defendants had agreed to provide a description of the pipeline system to DTSC.

204.   Additionally, the omitted material facts, described above, rendered the following statements by Defendants materially false or misleading:

- ■ [Bolch:] The photo on the right side of this slide [6] is our Vernon, California, recycling facility, where these environment modifications were recently completed. *We are seeing excellent results from our completed investment in Vernon, where air monitor readings are now tracking well below the new stricter standard.*

- ■ [In response to Analyst Stan Manoukian's question about whether there are problems with the Vernon facility, Bolch:] *No, in fact we have definitely not closed that facility. That is our Vernon, California, facility which is just outside of Los Angeles. That's a facility where we have now completed all of the environmental modifications, which include fully enclosing the building and putting it under negative pressure.*

- ■ [Bolch:] *So the comment there was that those environmental modifications are complete. And that the results as measured by the air monitors are well within the new stricter air standards.*

205.   Contrary to Defendant Bolch's statements "air monitor readings" were not "tracking well below the new stricter standard, and the results as measured by the air monitors" were not "well within the new stricter air standards." In addition to the significantly high arsenic emissions and corresponding noncompliant health risks, in June 2012, Exide was aware of high levels of lead emissions that resulted in a 30-day rolling average concentration of lead that exceeded the 0.150 ug/m3 limit required by Rule 1420.1.   For example, based on documents obtained from AQMD, analyses

conducted by Exide and AQMD on June 11, 2012 showed lead concentrations ranging from 0.27 ug/m3, to 0.29 ug/m3, to 0.301 ug/m3, which resulted in a 30-day rolling average concentration of lead that exceeded the 0.150 ug/m3 limit required by Rule 1420.1.   During June and July 2012, AQMD conferred with Exide about Exide's violation of Rule 1420.1.   According to a publicly available Notice of Violation ("NOV"), AQMD served Exide with an official Notice of Violation on August 10, 2012.  The NOV lists the date of violation as June 1, 2012.  No disposition is given on the NOV, and AQMD has refused to provide  Plaintiffs with additional documents relating to this NOV, stating that the issues are still pending investigation.  Moreover, Defendants' positive statements regarding environmental compliance led investors to believe there were no environmental violations at the Vernon plant when, in fact, there were many.

206.   In addition, material omissions, discussed above, made the following statements made by Defendants Bolch and Damaska materially false or misleading:

- ■ [Bolch:] *We remain committed to this strategy and we are tracking well to our plans.*

- ■ [Bolch:] *I am pleased with the new leadership in the Americas business; and despite challenges, the team is making steady progress.*

- ■ [Damaska:] *We believe the Company's current liquidity position remains healthy.*

- ■ [Bolch:] *We are making good progress with our actions to turn around the Americas Transportation business.*

113

207.   In reality, the Company's cost cutting plan was failing, the Compnay was not "making steady progress" in turning around the Americas transportation business and the Company's liquidity was not "healthy."   As Defendant Damaska admitted in his bankruptcy proceeding declaration, Exide's cost cutting and restructuring plans that were implemented in 2010 after the Company lost WalMart as a customer had failed and "[d]espite these efforts, the Debtor's financial position continued to decline."   Similarly, CI 5 (manager of Environmental, Health and Safety at an Exide plant in Bristol, Tennessee from July 2011 to February 2012) said Exide was barely hanging on financially when he was at the Company from July 2011 to February 2012. "Environmental issues were really killing them," CI 5 said.

208.   Further, Defendants' statements about the Company's operations in Europe were materially false or misleading.   In his declaration filed in Exide's bankruptcy, Defendant Damaska cited the following as one of the factors leading to the Company's bankruptcy:

> Exposure to European Market. With significant operations in Europe accounting for approximately 51.2% of the Company's worldwide revenue, Exide has been negatively impacted by the recent economic downturn that has persisted in Europe.

209.   This was clearly contrary to the following materially false or misleading statements made by Defendants:

- [Bolch:] *One is the Industrial side, and there we actually have not seen any letup in orders. In fact Industrial Europe sequentially back order was up 25% over last quarter and also up versus last year as well.*

■ [Bolch:] *The other one that potentially could be impacted by European economic issues is the OE build. There's certainly a lot of people watching that. To date our orders have remained pretty stable there.*

■ [Bolch:] *Then lastly would be the aftermarket side. The aftermarket side we have seen has been quite steady throughout the economic cycles. Especially if people aren't buying new cars they hold onto older cars, and that aftermarket business holds up pretty well.*

210.    On August 2, 2012, the Company issued a press release announcing Exide's financial results for the fiscal first quarter, ended June 30, 2012.

211.    Also in the August 2 press release, Defendant Damaska stated, "[t]he Company continues to execute its strategy to right-size Transportation Americas through the announced closure of our Bristol, Tennessee battery plant and the closure and land sale of our Frisco, Texas lead recycling facility. We believe these actions, among other ongoing initiatives will return the overall Americas region to profitability and allow us to ultimately utilize this long-lived deferred tax benefit."

212.    In addition, on August 2, 2012, Exide filed with the SEC on Form 10-Q its quarterly report for the fiscal first quarter, ended June 30, 2012.  The Company reported net sales of $693.4 million as compared to net sales of $745.1 million in the fiscal 2012 first quarter.  The Form 10-Q was signed by Defendant Damaska and was certified by Defendants Damaska and Bolch pursuant to the Sarbanes-Oxley Act.  In the Form 10-Q, Defendants made the following disclosures, in part:

*Environmental Matters*

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

*The Company received a number of notices of violation issued by the South Coast Air Quality Management District ("SCAOMD") for alleged violations of relevant air rules at its Vernon California recycling facility. On May 22, 2012 the Company agreed to a settlement including payment of monetary sanctions of $0.12 million to SCAOMD to resolve these notices of violation.*

The Company received a Notice of Proposed Assessment of Civil Penalty issued by the United States Environmental Protection Agency ("EPA") for an alleged violation related to its Frisco. Texas recycling facility's National Pollutant Discharge Elimination System (NPDES) permit. Effective July 3, 2012, the Company and EPA entered into a consent agreement for the Company to pay a penalty of $0.14 million to EPA to resolve the matter.

*The Company received an administrative enforcement order and first amendment to enforcement order issued by the Department of Toxic Substances Control ("DTSC") for alleged violations of relevant health and safety rules related to the operation and management of the storm water retention pond at its Vernon. California recycling facility. On July 9, 2012, the Company agreed to a payment of monetary sanctions of $0.2 million to DTSC to resolve the administrative order.*

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. The Company previously has received notification from the U.S.

116

Environmental Protection Agency ("EPA"), equivalent state and local agencies or others alleging or indicating that the Company is or may be responsible for performing and/or investigating environmental remediation, or seeking the repayment of the costs spent by governmental entities or others performing investigations and/or remediation at certain U.S. sites under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws.

The Company monitors and responds to inquiries from the EPA, equivalent state and local agencies and others at approximately 50 federally defined Superfund or state equivalent sites. While the ultimate outcome of the environmental matters described in this paragraph is uncertain due to several factors, including the number of other parties that may also be responsible, the scope of investigation performed at such sites and the remediation alternatives pursued by such federal and equivalent state and local agencies, *the Company presently believes any liability for these matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.*

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. *While the ultimate outcome of the environmental matters described in this paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.*

*The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.* As of June 30, 2012 and March 31, 2012, the amount of such liabilities on the Company's Condensed Consolidated Balance Sheet was approximately $27.0 million and $27.7 million, respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material adverse effect on the recorded reserves and cash flows.

The sites that currently have the largest reserves include the following:

*Tampa, Florida*

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.2 million to $20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

*Columbus, Georgia*

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $5.7 million to $8.5 million.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        MASTER FILE NO. 2:13-cv-02607-SVW-E

213.  On August 3, 2012, Exide held its earnings conference call for fiscal first quarter 2013.  Defendants Bolch and Damaska participated in and spoke during the call.  Defendants made the following materially false or misleading statements:

[Phil Damaska:] Operating income declined versus the prior year period, primarily the result of higher core costs, lower after market mix in the America's, and much lower profits on third party lead sales. Given the decline in profitability in the America's business, the evaluation of our US deferred tax asset resulted in the establishment of evaluation allowance of approximately $88 million. This non cash charge does not necessarily impact the ultimate utilization of the associated net operating losses. *As we execute our strategy of cost reduction [in] transportation, and growth in industrial energy, we are confident in our ability to return the America's business to sustained profitability, and allow us to ultimately utilize this long lived tax asset.*

\*\*\*

CRAIG IRWIN: Excellent, and then another follow-up. Just really another housekeeping question is, over the past few quarters, you discussed a level of price competition in the Industrials business. Given the nice units actually that you had in industrial rest of world, and I guess decent units for industrial North America, it sort of suggests that sort of more alarmist views out there on demand might be completely wrong. Can you update us on whether or not the macro environment is impacting pricing and your ability to get price when lead goes up and down?

JIM BOLCH: *Well in terms of Europe and rest of world I think you characterized it, demand has been pretty solid there in spite of the economic uncertainties in Europe and we have seen the order backlog increase, as well. Most of those contracts, if not all, have lead escalators built into them. That equation still works pretty well in Europe today, as our input costs tend to be pretty well correlated to the LME [London Metal Exchange].*

(emphasis added).

214.   The disclosures made in the paragraphs above were materially false or misleading when made because the disclosures omitted the following material facts known by Defendants: (i) since at least 2010, Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas; (ii) the health risks based on the Vernon facility's arsenic emissions substantially exceeded Rule 1420 risk reduction limits and would require public notification and risk reduction measures; (iii) the Vernon facility's more than 30 years-old stormwater pipes were not in compliance and would need to be upgraded to include secondary containment and lead detection as required under RCRA and Exide's ISD; (iv) the Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011; (v) the Company could not afford to finance the necessary remediations, which Exide knew would likely include the installation of best available technology, including WESP; and (iv) the Company's liquidity was deteriorating and the restructuring and cost reduction measures were failing, as described by Damaska in his declaration.

215.   The circumstances described in the above paragraph constituted, pursuant to Subsection of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        MASTER FILE NO. 2:13-cv-02607-SVW-E

216.   Defendants were aware, or should have been aware in the absence of recklessness, of the shockingly hazardous levels of arsenic emissions at the Company's Vernon facility based on Exide's own arsenic emissions source tests from 2010 that showed a significant spike in emissions over tests in 2006 and 2008. Indeed, the 2010 source test results had been known by Exide by at least June 2011 and demonstrated that the arsenic emissions were approximately 100 times higher than arsenic emissions levels in 2008.   By this time, Defendants had also received the health risk assessment based on the 2010 source test results that indicated a cancer risk well above the risk reduction limits, and had even retested the arsenic emissions at the Vernon facility, which also revealed extremely high arsenic emissions well in excess of pre-2010 levels.   Moreover, Defendants knew that the stormwater pipes were noncompliant and would need substantial upgrades, including secondary containment and leak detection in order to bring the deteriorating pipes into compliance with RCRA based on discussions with DTSC and documents between Exide and DTSC dating back to 2006.   In fact, by October 2011, DTSC had already obtained samples from the piping system that indicated hazardous waste levels for lead, arsenic, and cadmium, and by late 2011, Defendants had agreed to provide a description of the pipeline system to DTSC.   Moreover, in July 2012, DTSC had submitted a Technical Review to Exide, which identified the pipes as "compromised," discussed a recent sample obtained from one of the pipe's catch basins that contained hazardous amounts of lead, and emphasized the need for Exide to ensure that the soil underneath the pipes

121

did not contain contaminants.  Defendants were also advised of major deficiencies in the Vernon facility's compliance with California regulations based on the Notice of Deficiency issued by the DTSC in March 2011.

217.   Moreover, the following statements by Defendants were materially false and misleading:

- *The Company received a number of notices of violation issued by the South Coast Air Quality Management District ("SCAOMD") for alleged violations of relevant air rules at its Vernon California recycling facility. On May 22, 2012 the Company agreed to a settlement including payment of monetary sanctions of $0.12 million to SCAOMD to resolve these notices of violation.*

- *The Company received an administrative enforcement order and first amendment to enforcement order issued by the Department of Toxic Substances Control ("DTSC") for alleged violations of relevant health and safety rules related to the operation and management of the storm water retention pond at its Vernon. California recycling facility. On July 9, 2012, the Company agreed to a payment of monetary sanctions of $0.2 million to DTSC to resolve the administrative order.*

- *[T]he Company presently believes any liability for these matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.*

- *While the ultimate outcome of the environmental matters described in this paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.*

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          MASTER FILE NO. 2:13-cv-02607-SVW-E

- ***The Company cannot be certain that it has been, or will at all times be, in complete compliance with all environmental requirements, or that the Company will not incur additional material costs or liabilities in connection with these requirements in excess of amounts it has reserved.***

- ***The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.***

218.   These statements misleadingly suggested that while the Company had violated certain environmental regulations at its Vernon facility such violations were minor, such violations had been remedied, and such violations represented the only violations at the Vernon facility.   Specifically, while Exide disclosed that it had received notices of violations from the AQMD as well as an administrative enforcement order from DTCS, the Company misleadingly presented the alleged violations as minor infractions and further misleadingly suggested that the facility was otherwise environmentally compliant.   In truth, Exide's Vernon facility was emitting extremely toxic air and water contaminants, had underground piping that was not in compliance with relevant codes and that was depositing toxic waste into the groundwater, had not remedied the problems identified by the AQMD and the DTCS, and had received additional Notices of Deficiencies as well as other regulatory communications regarding the noncompliant air emissions and underground piping that were never disclosed.

219.   Further, Defendants' statements about the Company's operations in Europe were materially false or misleading.   In his declaration filed in Exide's

bankruptcy, Defendant Damaska cited the following as one of the factors leading to

the Company's bankruptcy:

> Exposure to European Market. With significant operations in Europe accounting for approximately 51.2% of the Company's worldwide revenue, Exide has been negatively impacted by the recent economic downturn that has persisted in Europe.

220.   This was clearly contrary to Bolch's statement set forth below:

> ■ [BOLCH:] *Well in terms of Europe and rest of world I think you characterized it, demand has been pretty solid there in spite of the economic uncertainties in Europe and we have seen the order backlog increase, as well. Most of those contracts, if not all, have lead escalators built into them. That equation still works pretty well in Europe today, as our input costs tend to be pretty well correlated to the LME [London Metal Exchange].*

221.   On November 9, 2012, the Company reported its fiscal 2013 second quarter results in a press release. The Company's press release reported that, "[f]iscal 2013 second quarter consolidated net sales were $712 million as compared to net sales of $773 million in the fiscal 2012 second quarter. Net sales in the fiscal 2013 period were negatively impacted by both foreign currency translation ($41.7) million and lead related pricing ($30.5) million. The decrease was partially offset by increased sales in Industrial Energy Americas, higher unit sales in the original equipment ("OE") channel in both Transportation segments, and modest pricing in the Americas' aftermarket channel."

222.   The November 9 press release also reported, "[g]ross profit for the quarter of $103.7 million, declined by $15 million when compared with the prior year

period. A combination of continued high cost of spent batteries in the Americas, coupled with a lower LME [London Metal Exchange] price of lead weighed on results. The impact of this combination on the Americas business aggregated $18.6 million when compared to the prior year period; and was only partially offset by favorable pricing of $5.5 million, principally in the transportation aftermarket channel."

223.   The November 9 press release further reported, "fiscal 2013 second quarter operating income was $6.8 million compared to $21.2 million in the prior year second quarter. The decrease is primarily the result of higher spent battery input cost coupled with lower LME [London Metal Exchange] lead prices, and compressed margins on third party lead sales. Net loss for the current quarter was $13.9 million or ($0.18) per share compared to the prior year period net loss of $3.6 million or ($0.05) per share."

224.   In the November 9 press release, Defendant Bolch stated, "[w]e expect the normal seasonal nature of our business will result in higher revenue and substantially improved operating income in the second half of the fiscal year. This should be further supplemented by the combination of transportation aftermarket pricing and a better lead equation, assuming the cost of cores and LME lead pricing remain stable at the improved levels we saw in the month of October."

225.   On November 11, 2012, Exide filed with the SEC on Form 10-Q its quarterly report for its fiscal second quarter ended September 30, 2012. The Form 10-

Q was signed by Defendant Damaska and was certified by Defendants Damaska and Bolch pursuant to the Sarbanes-Oxley Act.  In the Form 10-Q Defendants made the following disclosures:

### Environmental Matters

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. *The Company previously has received notification from the U.S. Environmental Protection Agency ("EPA"), equivalent state and local agencies or others alleging or indicating that the Company is or may be responsible for performing and/or investigating environmental remediation, or seeking the repayment of the costs spent by governmental entities or others performing investigations and/or remediation at certain U.S. sites under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws.*

\*\*\*

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or

operating locations. *While the ultimate outcome of the environmental matters described in this paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows, or results of operations.*

*The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.* As of September 30, 2012 and March 31, 2012, the amount of such liabilities on the Company's Condensed Consolidated Balance Sheet was approximately $26.7 million and $27.7 million, respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities. Therefore, changes in estimates or future findings could have a material adverse effect on the Company's financial condition, cash flows, or results of operations.

The sites that currently have the largest reserves include the following:

***Tampa, Florida***

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.0 million to $20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

*Columbus, Georgia*

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $6.0 million to $8.5 million.

226.   On November 12, 2012, Exide held its earnings conference call for fiscal second quarter 2013.   Defendants Bolch and Damaska participated in and spoke during the call.   Defendants made the following materially false or misleading statements:

MICHAEL GUARNIERI, ANALYST, NOMURA: I had a couple of questions, one is coming back to the question of margin and there was a fellow earlier who was very specific about Transportation Americas. But would you be comfortable giving us a view on what your gross and operating margin is by segment if you exclude currency and lead?

What I'm trying to get at is I think -- we have done a back of the envelope analysis and it appears that we are starting to see a material improvement, but we think our analysis is less than perfect. And I was wondering if you could just give us some -- at least some indication and some thoughts about margin by business excluding the effects of lead in currency?

PHIL DAMASKA: Let me give that a shot, Michael. I mean there are a lot of moving parts certainly, but as I look at the Industrial Energy Americas business, strong growth, should've expected margins to improve as a result of that growth, but $6 million of reduced lead margin, the definition of that being higher core costs, lower LME [London Metal Exchange], certainly impacted that business.

That business has historically been a business that has generated mid 20%'s and higher gross margins. It is a business that has historically operated at call it 10% of operating income or higher. And we believe

that those are numbers that are certainly attainable once we get this lead equation back in sync and we think we have the right strategy and right plans to accomplish that.

Transportation Americas business, certainly we've seen operational improvements in that business. But the big evolutionary change of that is to take a plant of excess capacity and take it out of the equation.

And the $20 million to $25 million of operating income improvement, we continue to confirm that, it is a number that we can now see on the near-term horizon with assembly being transitioned between now and Christmas and then formation transitioning in the next three to six months thereafter.

That is a business that we will see operating income dip over the breakeven point and then, as Jim indicated, we focus on continued productivity in a smaller footprint. We don't focus on growth; we focus on better management of our customer portfolio with the intent of driving much higher return on investment than we have today.

*So that is a business that we think we have the right strategy in place, we are executing on that strategy. And again, as I said, we see the light on the horizon with respect to getting that business back into the positive and then building on that as we move into 2014 and beyond.*

\*\*\*

CRAIG IRWIN: So two questions, first one is really a housekeeping issue. In the past you talked about environmental maintenance CapEx being somewhere in the range of 30, 35 just for environmental, but you've brought down -- well, Bristol is almost done, Frisco and now Reading are on their way down.

Can you talk about the environmental maintenance CapEx and then the rest of the maintenance CapEx, how you expect that to shake out? Is it still going to be in the sort of $60 million range or is this going to bring it down as far as the base level of annual spend that we should see in the business?

PHIL DAMASKA: *Craig, let me try to take a crack at that. The $35*

129

*million to $40 million of what I will call replacement maintenance capital that we have historically talked about included that for moderate environmental projects, it certainly didn't encompass all of the $50 million that we have talked about in terms of Frisco and Reading.*

*But taking the footprint from where it has historically been at to where it is going to be, that $35 million to $40 million of replacement maintenance capital will come down. I don't have a precise number to share with you today, but it is certainly a number that given a smaller footprint is going to come down.* And certainly as we finalize our fiscal 2014 budget and get a better sense of what capital looks like for fiscal 2014 we will share that at the appropriate time.

(emphasis added).

227.   The disclosures made in the paragraphs above were materially false or misleading when made because the disclosures omitted the following material facts known by Defendants: (i) since at least 2010, Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas; (ii) the health risks based on Vernon facility's arsenic emissions substantially exceeded Rule 1420 risk reduction limits and would require public notification and risk reduction measures; (iii) the Vernon facility's more than 30 years-old stormwater pipes were not in compliance and would need to be upgraded to include secondary containment and lead detection as required under RCRA and Exide's ISD; (iv) the Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011; (v) the Company

1   could not afford to finance the necessary remediations, which Exide knew would

2   likely include the installation of best available technology, including WESP; and (iv)

3

4   the Company's liquidity was deteriorating and the restructuring and cost reduction

5   measures were failing, as described by Preuth in his declaration.

6       228.   The circumstances described in the above paragraph constituted, pursuant

7

8   to Subsection of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events,

9   trends or uncertainties that "the registrant reasonably expects will have a material . . .

10  unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R.

11

12  § 229.303(a)(3).

13      229.   Moreover, the following statements, in particular, were materially false

14

15  and misleading:

16      ■ *While the ultimate outcome of the environmental matters*
        *described in this paragraph is uncertain, the Company presently*

17      *believes the resolution of these known environmental matters,*
        *individually and in the aggregate, will not have a material*

18      *adverse effect on the Company's financial condition, cash flows*

19      *or results of operations.*

20

21      ■ *The Company has established liabilities for on-site and off-site*
        *environmental remediation costs where such costs are probable*

22      *and reasonably estimable and believes that such liabilities are*

23      *adequate.*

24

25      230.   These statements were materially false and misleadingly for the reasons

26  set forth in paragraph 216, above.   Additionally, by this time, Exide was nearly

27

28  complete with its inspection of the pipes, which began in July 2012 and ended in

December 2012, and which revealed considerable deterioration to the point that the pipes would need to be wholly replaced.  Indeed, according to CI 12 (DTSC project manager overseeing Exide's compliance), Exide "knew they had to replace the pipes" back in 2012, describing it as "a given."   Moreover, by this time, Defendants acknowleged that the arsenic emissions were creating health risks well above the risk reduction thresholds.   In fact, according to slides from an Exide presentation, by November 2012, Exide had engaged Environ to assist Exide in developing a risk reduction plan to address the Vernon facility's high arsenic emissions.[16]

231.   In addition, material omissions made the following statement made by Defendant Damaska materially false or misleading:

■ [Damaska:] *So that is a business that we think we have the right strategy in place, we are executing on that strategy. And again, as I said, we see the light on the horizon with respect to getting that business back into the positive and then building on that as we move into 2014 and beyond.*

232.   These statements were materially false and misleading for the reasons set forth in paragraph 207, above.  In reality the Company's cost cutting plan was failing, the Compnay was not "executing on [its] strategy."

233.   On February 6, 2013, the Company reported Fiscal 2013 Third Quarter results in a press release.  The Company's press release reported, "[f]iscal 2013 third quarter consolidated net sales were $804.9 million as compared to net sales of $784.1

---

[16] The information was obtained from a February 27, 2013 PowerPoint presentation prepared by Exide. Slides from the presentation were used as exhibits in the Administrative Hearing held in June 2013.

1   million in the fiscal 2012 third quarter. Net sales in the fiscal 2013 period were

2   negatively impacted by foreign currency translation of $10.2 million and lead related

3

4   pricing of $16.3 million. Excluding the negative impact of foreign currency translation

5   and lead-related pricing, net sales increased 6% primarily due to increased sales in the

6   motive power and network power channels of both Industrial Energy segments as well

7

8   as higher unit sales in the aftermarket channel in Transportation Europe."

9       234.  The February 6 press release continued, "[g]ross profit for the third

10  quarter of $120.1 million, declined by $6.4 million when compared with the prior year

11

12  period. Continued higher spent battery acquisition costs in the Americas combined

13  with lower margins from third party lead sales negatively impacted gross margin by

14  approximately $11 million. Improvement in spent battery acquisition costs in the U.S.

15

16  began in November 2012. This trend has continued into the early part of the fiscal

17  fourth quarter which should benefit both Americas businesses if the trend continues."

18      235.  The Company also reported in the February 6 press release, "[f]iscal third

19

20  quarter operating income, excluding $15.8 million for restructuring and impairment

21  charges, was $20.5 million compared to $30.3 million, excluding $2.1 million for

22

23  restructuring and impairment charges, in the prior year third quarter. The decrease is

24  primarily due to lower gross profits discussed above. Current period restructuring

25  charges were $5.2 million related to the closure of the Bristol, Tennessee flooded

26

27  battery manufacturing facility, the idling of lead recycling operations in Reading,

28  Pennsylvania and the closure of GNB India. Impairment charges of $10.6 million are

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        MASTER FILE NO. 2:13-cv-02607-SVW-E

principally related to asset write-downs for the closure of GNB India and the sale of the Australasia transportation business that was completed on February 4, 2013. Net loss for the fiscal 2013 third quarter was $15.4 million or $0.20 per share as compared to the prior year period net income of $68.2 million or $0.84 per share. Fiscal 2012 third quarter net income included the non- cash reversal of the tax valuation allowance in France for $76.7 million partially offset by a $13.4 million charge to settle a tax audit in Spain."

236.   Also on February 6, 2013, Exide filed with the SEC on Form 10-Q its quarterly report for the fiscal third quarter ended December 31, 2012.  The Form 10-Q was signed by Defendant Damaska and was certified by Defendants Damaska and Bolch pursuant to the Sarbanes-Oxley Act.  In the Form 10-Q, Defendants made the following disclosures:

***Environmental Matters***

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

On December 7, 2012, the Company entered into an Agreed Order with the Texas Commission on Environmental Quality ("TCEQ") that includes a penalty of $0.6 million to resolve a notice of enforcement issued by TCEQ for alleged air and waste rule violations at the Company's now closed Frisco, Texas recycling facility.

Effective December 17, 2012, the Company and the United States

Environmental Protection Agency ("EPA") entered into a consent agreement that includes a penalty of $0.2 million to resolve alleged air and waste rule violations at the Frisco, Texas recycling facility.

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. The Company previously has received notification from the EPA, equivalent state and local agencies or others alleging or indicating that the Company is or may be responsible for performing and/or investigating environmental remediation, or seeking the repayment of the costs spent by governmental entities or others performing investigations and/or remediation at certain U.S. sites under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws.

*** 

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. *While the ultimate outcome of the environmental matters described in this paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows, or results of operations.*

*The Company has established liabilities for environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.* As of

December 31, 2012 and March 31, 2012, the amount of such liabilities on the Company's Condensed Consolidated Balance Sheet was approximately $25.6 million and $27.7 million, respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities. Therefore, changes in estimates or future findings could have a material adverse effect on the Company's financial condition, cash flows, or results of operations.

The sites that currently have the largest reserves include the following:

### Tampa, Florida

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.0 million to $20.0 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

### Columbus, Georgia

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $6.0 million to $8.5 million.

237.   On February 7, 2013, Exide held its earnings conference call for fiscal third quarter 2013.  Defendants Bolch and Damaska participated in and spoke during the call.  Defendants made the following materially false or misleading statements:

JAMES BOLCH: Thanks, Phil. *Slide 12 is a summary of the progress we've made in our strategic initiatives by segment.* I discussed most of these in my earlier dialogue, so this slide serves to bring those comments together. *We've made solid progress on executing our strategic initiatives this year.*

Most of the expected financial benefits will not become evident though until fiscal 2014. This is certainly the case for Transportation Americas. As Phil indicated, we'll be ramping to the full run rate savings for the Bristol closure in the first half of fiscal '14.

\*\*\*

*While I am slightly satisfied with the current financial performance, I am very encouraged with the steady progress on many fronts. We are laser focused on the execution of our key initiatives and driving to improve results.* As we close fiscal 2013 and prepare for the next fiscal year, driving productivity and cash generation is without a doubt in the forefront of our plans.

\*\*\*

We think we've seen strong operational improvements through the quarter and it's really the result of all the actions that we've talked about on past calls to drive higher captive returns, which gives you obviously a better blending cost. As we've exited now Frisco in the quarter, third party lead sales are down again and that helps the blended cost, and as looking forward and we're right on track with the plan that we've been executing. So today, this morning I think LME [London Metal Exchange] was about $1.10.

We've been -- and we've been able hold core costs effectively flat, so for the Americas business it's really that spread of core costs to LME [London Metal Exchange] that drives the profitability. And we expect to see that come through stronger in the fourth quarter.

***

KIRK LUDTKE: Right, okay. On the core cost of sounds like -- I'm trying to understand the comment about things moderating in November and so far in the fourth quarter. I'm curious. Is it that they're actually down year-over-year or are they just not up as much as they were in the third quarter?

JAMES BOLCH: I'd look at it with a couple perspectives. One is that absolute core costs have moderated and even a bit down. The LME [London Metal Exchange] or which tends to set the pricing mechanism in a lot of the markets has gone up. So the spread between core cost and LME [London Metal Exchange] has tended back toward more historical levels.

The other really important part is that we have dramatically continued to improve our captive core return rates, which has the impact of taking you out of the market for buying those higher priced core. So our blended core cost has definitely gone down. And so what you would see in November would move into inventory, which would then be realized in the fourth quarter period.

***

JARED WEIL: Okay, fair enough. And then sort of as we -- as you guys look at your expectation for free cash flow in Q4 and next fiscal year and the Frisco proceeds coming in, and your expected level of CapEx, how comfortable are you guys with your liquidity position? And then can you just remind what as we move past this Bristol closing and recycling capacity reduction what a new sort of minimum level of liquidity you guys feel is comfortable for this business?

PHILLIP DAMASKA: Well I'll take that, Jared. And we talked about the $161 million of liquidity at December 31st and the free cash flow generation estimated that in the $30 million range. *I'm certainly comfortable with our current liquidity level. And as we move into fiscal '14 we're clearly as I indicated going to be very mindful of cash as we approach the convert repayment.*

We are going to look to reduce our capital spending from the $50 million range that we had in fiscal '13. And as we enter the year with

a higher than ideal level of inventory, *my expectation is we'll use less cash in building inventory that we typically do in the first half of next year, so again comfortable. I think our liquidity is adequate and stable at this point in time to allow us to continue to operate this business and make the investments necessary.*

(emphasis added).

238.   Defendants also gave a power point presentation during the call.  Slide 13 entitled *"Summary & Wrap Up,"* stated "Strategic initiatives on track."

239.   The disclosures made in the paragraphs above were materially false or misleading when made because the disclosures omitted the following material facts known by Defendants: (i) since at least 2010, Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas; (ii) the health risks based on Vernon facility's arsenic emissions substantially exceeded Rule 1420 risk reduction limits and would require public notification and risk reduction measures; (iii) the Vernon facility's more than 30 years-old stormwater pipes were not in compliance and would need to be upgraded to include secondary containment and lead detection as required under RCRA and Exide's ISD; (iv) the Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011; (v) the Company could not afford to finance the necessary remediations, which Exide knew would likely include the installation of best available technology, including WESP; and (iv)

the Company's liquidity was deteriorating and the restructuring and cost reduction measures were failing, as described by Damaska in his declaration.

240.  The circumstances described in the above paragraph constituted, pursuant to Subsection of Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3).

241.  Moreover, material omissions rendered the following statements by Defendants materially false and misleading:

- *On December 7, 2012, the Company entered into an Agreed Order with the Texas Commission on Environmental Quality ("TCEQ") that includes a penalty of $0.6 million to resolve a notice of enforcement issued by TCEQ for alleged air and waste rule violations at the Company's now closed Frisco, Texas recycling facility.*

- *Effective December 17, 2012, the Company and the United States Environmental Protection Agency ("EPA") entered into a consent agreement that includes a penalty of $0.2 million to resolve alleged air and waste rule violations at the Frisco, Texas recycling facility.*

- *While the ultimate outcome of the environmental matters described in this paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows, or results of operations.*

- *The Company has established liabilities for environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.*

242.   These statements were materially false and misleadingly for the reasons set forth in paragraphs 216 and 230, above.   Moreover, by this time, Exide had complete its inspection of the pipes, which began in July 2012 and ended in December 2012, and which revealed considerable deterioration to the point that the pipes would need to be wholly replaced.  Moreover, by this time, Exide has presented the results of the health risk assessments based on the average of the 2010 and 2012 results to DTSC and AQMD and were clearly aware that the cancer risk was well above the risk reduction limits, and would require considerable remediations.

243.   In addition, material omissions made the following statement made by Defendant Damaska materially false or misleading:

- *We've made solid progress on executing our strategic initiatives this year.*

- *While I am slightly satisfied with the current financial performance, I am very encouraged with the steady progress on many fronts. We are laser focused on the execution of our key initiatives and driving to improve results.*

- *I'm certainly comfortable with our current liquidity level. And as we move into fiscal '14 we're clearly as I indicated going to be very mindful of cash as we approach the convert repayment.*

- *I think our liquidity is adequate and stable at this point in time to allow us to continue to operate this business and make the investments necessary.*

244.   These statements were materially false and misleading for the reasons set forth in paragraph 207, above.

245.   Defendants' Class Period materially false and misleading statements concealed the large potential liability arising out at the toxic conditions of Exide's Vernon, California facility, and the inability of the Company to meet its debt obligations, its liquidity crisis and potential insolvency. As a result, Exide stock notes traded at artificially inflated prices during the Class Period.

246.   The Vernon facility's environmental noncompliance, outdated and deteriorated stormwater pipes containing hazardous waste that compromised underlying soil and water supply, excessive arsenic emissions that posed significantly high cancer risks, liquidity problems, and increasing inability to fund necessary remediations constitute information that would be material to investors.

247.   Based on Exide's own source tests and health risk assessments, it was evident that the Vernon facility's emissions posed a cancer risk far in excess of Rule 1420 thresholds.  By exceeding the cancer risk of 10 in one million, it was clear that Exide would be required to hold a public hearing to discuss the high cancer risk with the community.  This requirement alone had material implications on the Company. By all accounts, including numerous accounts from AQMD officials, the arsenic levels and the cancer risk posed by the Vernon facility's emissions were outrageous. Indeed, according to AQMD, the cancer risk associated with the Vernon's facility's 2010 and 2012 tests were far above any cancer risk AQMD had encountered in its more than 25 year history.  Thus, the requirement that Exide hold a public meeting to discuss the astonishing cancer risk with the surrounding community that had been

consistently exposed to the toxic emissions from the Vernon facility for more than two years posed considerable risks, including the risks and costs associated with defending and funding recoveries for any lawsuits that were brought against Exide alleging physical harm as a result of the exposure. In addition, the public hearing mandate created the risk that the community might pressure regulators and/or other public officials to shut down the Vernon facility. To be sure, Defendants had first-hand knowledge of this risk based on the response of the Frisco community upon discovering that Exide's battery recycling plant in Frisco was not in compliance with air emissions standards. Moreover, the public meetings regarding the dangerously high arsenic levels would inevitably result in a call for regulators to increase their scrutiny of the Vernon facility. Further, because the cancer risks posed by the Vernon facility's emissions exceeded 25 in one million, Exide knew it would be required to present risk reduction measures to AQMD, which would require Exide to fund the costs of extensive remediations.

248. Based on Exide's communications with AQMD and DTSC and based on Exide's previous experiences with its Frisco facility, Defendants were specifically aware, or should have been aware in the absence of recklessness, that the Vernon facility's environmental violations would at worst result in a shutdown of the facility, and would at best cost the Company tens of millions of dollars in remediation measures and require temporary shutdowns of all or part of the facility during implementation of those remediation measures. Indeed, Defendants knew or should

have known that it would require drastic and costly retrofitting in order to bring the Vernon facility into maintainable compliance. As explained by AQMD's Deputy Executive Officer Mohsen Nazemi, the emission problems at Exide could not be resolved with minor pollution control measures as these do not provide "a permanent fix." Not surprisingly, AQMD required more from Exide. Indeed, to provide a permanent solution, AQMD explained that Exide could be responsible for designing a "brand new air pollution system" that would cost the Company "millions of dollars." However, Exide has already represented to AQMD and DTSC that implementation of best available technology was economically unfeasible. If Exide fails to comply with AQMD's conditions, it could face fines of $25,000 a day and, ultimately, a court order to shut down the facility. Similarly, Exide is also required to remove and replace its stormwater pipes, which is likely to cost the Company several million dollars in remediation costs alone.

249.   For Exide, the materiality of the undisclosed environmental problems and associated risks is evidenced by the events that followed the Company's public hearing to discuss the arsenic emissions and corresponding cancer risk. Since the public hearing, Exide has been made to present and implement risk reduction measures, has been targeted by Los Angeles residents and organizations devoted to environmental safety concerns (including the *Consumer Watchdog* group), has been more closely scrutinized by regulatory agencies (including recent requirements that the Company conduct extensive sampling in the neighborhoods surrounding the

Vernon facility to determine whether hazardous levels of metals are present, has been shut down by the DTSC, has become subject to potential amendments to Rule 1420 that would require Exide to implement best available technologies, and has filed for bankruptcy.

A.    **Additional Scienter Allegations**

250.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Exide, their control over, and/or receipt of notification of Exide's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Exide, participated in the fraudulent conduct alleged herein.

1.    **Environmental Issues Went Up the Chain to Defendants**

251.    CI 1, an industrial engineer at Exide from 1979 to 2010 who became familiar with the Company's policies and practices for dealing with and responding to environmental citations by regulatory agencies, explained that any regulatory citation would first go to the plant's environmental chief and/or to the plant manager.

According to CI 1, a citation letter from the agency would also be sent directly to corporate headquarters. Speaking in general about Exide's environmental health and safety ("EHS") division, CI 1 said each plant would have an EHS manager, who would report any regulatory citations or problems to corporate EHS. "Without a doubt if there was an actual citation, that went right up the ladder to the top," CI 1 said. CI 22 (the Accounts Payable Clerk at Exide's Vernon plant from September 2008 to July 2010) recalls that AQMD made recommendations for environmental protection improvements at the plant. "I know they did make recommendations for improvement, and the person who worked with them at Exide (Mopas) had to go through channels to take care of what needed to be fixed," CI 22 said. CI 22 understood that Mopas had to go up the chain of command to EHS directors at the Company's headquarters to get the go ahead to spend money to implement the changes.

252.  CI 1 said that each plant's EHS manager would write up reports about all interactions with environmental regulators, internally conducted tests of air and water samples that were out of acceptable range, and any work that was being done to deal with environmental pollution. These reports were sent to corporate EHS. CI 1 said if there was a serious matter, such as a citation or a major project that needed to be done, it would be reported to the CEO of Exide.

253.  In addition to these reports, the EHS also prepared monthly or quarterly as well as annual reports about the internal environmental tests done at each of the Company's plants, such as air and water samplings, as well as the status of ongoing

1   issues, such as regulatory actions, according to CI 1. These reports were presented to

2   the director level of EHS, who would then present it to the VP of EHS, who would

3

4   present it to the CEO, CI 1 said.

5   254.   CI 2, a project engineer at the Vernon facility from 2012 to June 2013,

6   similarly said that the plant manager and corporate level employees were aware of the

7

8   Vernon facility's environmental pollution issues and the citations earlier this year and

9   last year. According to CI 2, the plant manager of the Vernon facility received a copy

10   of any citations and so did corporate headquarters. Exide and plant management had

11

12   been working with AQMD to figure out "what was the source" of the pollution

13   problems at the Vernon facility and "what measures were being done" to correct it, CI

14   2 said. "It was something that was happening over some time. AQMD and Exide

15

16   were still working together on finding a solution" when the Vernon facility was shut

17   down by DTSC in April 2013, CI 2 explained. According to CI 2, any interactions

18   with environmental regulators or tests that showed the Vernon facility was in violation

19

20   of regulations were reported to the plant manager.

21   255.   According to CI 3, the position as manager of the distribution center

22   made CI 3 very familiar with Exide's policies on reporting incidents at facilities to

23

24   upper management.   CI 3 explained that Exide took the reporting of incidents

25   seriously and was very adamant that employees follow the proper reporting

26   procedures. CI 3 said that managers were required to report any and all "incidents,"

27

28   such as a citation from a government agency or OSHA problems that occurred at an

147

Exide facility, including the one in Vernon. "Anything that would put Exide in a bad light, we were supposed to be reporting to corporate management," CI 3 explained.

256. According to CI 3, the Company had forms for reporting incidents, such as environmental problems or safety issues, that were to be filled out by managers. CI 3 recalled that the forms were about three pages long, and on the last page was a list of upper level managers from the regional directors up to Exide's CEO (Defendant Bolch) to whom the reports were to be transmitted depending on the incident.

257. When CI 3 had an incident at a facility that involved Environmental Health & Safety issues, CI 3 first sent the report to Eric Murray, who was CI 3's first level contact in the EHS division. CI 3 said Murray would check the report before giving CI 3 the go ahead to send it up the chain to the Company's executives. *"On more serious things, it was supposed to go all the way to the top," CI 3 said. "If it was a serious incident, the people at the top got notice of that." CI 15 (Vice President of Global Environmental Health and Safety at Exide from July 2005 to March 2011) similarly said that Exide's CEO, CFO and Corporate Controller received reports of the environmental violations at each of the Company's facilities, including Vernon, from the Company's EHS Department. CI 9 (environmental manager at Exide's Muncie plant) similarly explained that anytime a plant was cited for a violation of environmental regulations, "those went all the way up to the top," CI 9 said. CI 9 explained that reports of violations went to Defendant CEO James Bolch, VP of Global EHS Dean Rossi, and Defendant Paul Hirt.* CI 8 also

corroborated this. *CI 8 said that if corrective action was necessary to fix the problem, the CEO was copied on the correspondence.*

258. CI 4 (Exide's Vice President, Operations - Transportation North America from 2006 to 2011) said that any environmental issues or regulatory actions were handled under the purview of the EHS division of the Company, which had its own hierarchy. "The whole environmental health and safety division would deal with those things," CI 4 said. According to CI 4, the corporate EHS leader "reported directly to the CEO" about environmental issues.

259. CI 5 (manager of Environmental Health and Safety at an Exide plant in Bristol, Tennessee from July 2011 to February 2012) explained that any time an environmental regulatory agency interacts with an Exide facility, that facility's EHS manager would be involved, along with the plant manager. According to CI 5, the EHS manager would take the regulators through the plant, provide any information required and act as the point person at the plant in discussions about ongoing issues. CI 5 said the plant's EHS manager was required to inform corporate EHS of all interaction with regulators. If the environmental problems were ongoing, the plant's EHS manager would be in regular discussions with corporate EHS leaders about the issue, CI 5 said. These discussions would be *via* memos, telephone calls, conference calls and in-person meetings, according to CI 5.

260. As EHS manager at Exide's Columbus facility (which had a battery recycling plant similar to the one at Vernon), CI 6 was the point person for

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        MASTER FILE NO. 2:13-cv-02607-SVW-E

environmental issues at the plant and was usually involved when regulatory inspections took place. CI 6 explained that regardless of why the regulators were at the plant, CI 6 was required to make an immediate report of the inspection, detailing why the regulators visited and the findings of the inspection to the corporate Director of EHS. If the inspection revealed a violation of environmental regulations, CI 6 immediately informed the Director of EHS at Corporate headquarters of the problem by telephone. CI 6 would tell the Director of EHS what the violation was, CI 6's preliminary assessment of how it happened, and the plans for corrective action to fix it. The director remained involved in the ongoing process until the problem was corrected.

261.   According to CI 6, every month CI 6 was required to submit to the Corporate Director of EHS a report detailing all results of the tests. This was done in spreadsheet form. CI 6 said all of Exide's plants followed this procedure. CI 6 explained that the spreadsheet showed the entire regulatory agency permits that the plant was required to maintain in order to continue operating. The plant maintains permits from state and local government agencies that monitor air, water and hazardous waste pollution levels. Each separate permit sets parameters on the level of pollutants allowed, which were measured by a testing company's equipment, according to CI 6. Each permit section on the spreadsheet listed the different pollution parameters that particular permit required for the plant to maintain. Each month, CI 6 input into the spreadsheet the testing results at the plant that showed

whether it was within the permit parameters or in violation of the limits. The spreadsheet maintained a running history of testing at the plant. Anytime an internal plant test revealed pollution outside the permit parameters, CI 6 got on the phone with the Director of EHS to report it.  For example, the "bag house," which captures polluted air emitted by the plant's furnace, might have a small hole through which pollutants were leaking, CI 6 explained.

262.   Whenever CI 6 received a Notice of Violation ("NOV"), CI 6 wrote an update about the issue and forwarded the NOV to the Director of EHS at Corporate Headquarters in Milton, Georgia.  Any subsequent discussions with the regulatory agency were reported to the Director of EHS. *The Director also had discussions and memo communications with CI 6 about any investigations that were ongoing to determine what was causing the problem. They also discussed the planned corrective action, the budget needs of that corrective action and the progress of corrective action.*  CI 6 also said that *corporate EHS was always aware of any remedial delays, interactions with the agencies, and any requests for more time from the agencies.*  Indeed, according to CI 8 (EHS manager at Exide's Reading facility from 1981 to 2010 and then EHS manager at Exide's Lancaster distribution center from 2010 to 2012), every month, the corporate EHS department held a conference call with EHS managers from all of the Company's facilities. *CI 8 said that Exide's CEO would sometimes participate in the EHS conference calls, usually if there was an ongoing problem at a particular facility.*  CI 8 said that the calls were

designed to keep everyone updated about environmental issues at Exide's different facilities. During the calls, Fred Ganster (Director of EHS), Mark Cummings (VP Global EHS), or Joseph Bolea (Director of EHS) would question the facility EHS managers about ongoing issues at their particular facilities, requesting updates on existing problems and reports on any new problems. According to CI 8, the managers also gave verbal reports about their facilities, discussing violations, how the violations happened, the status of regulatory actions, progress on corrective actions and other environmental projects that were in the works.

263.  According to CI 6, the Corporate General Counsel Barbara Hatcher sometimes became involved if it was a serious issue. "Barbara Hatcher, she wanted to stay in the loop," CI 6 said. "She took this kind of stuff very seriously and wanted to be kept informed." CI 6 also said that higher-level corporate officers, such as the Vice President of Operations, would sometimes become involved depending on the seriousness of the issue. CI 6 characterized "serious issues" as including a large fine that was looming or major capital expenditures. CI 9 also said that major capital expenditures for environmental upgrades were supposed to be approved at the top.

264.  CI 15 said that as Vice President of Global EHS from 2005 to 2011, CI 15 was very involved in discussions and the approval process of substantial environmental upgrades or projects at Exide's facilities. *According to CI 15, Corporate Controller Defendant Martinez, CFO Defendant Damaska and CEO Defendant Bolch approved any large environmental upgrades at Exide's facilities,*

*including the Vernon plant.  CI 15 said that all environmental upgrades went through a standard approval process at the Company, with the more costly ones requiring approval from the higher-level personnel.  CI 11 similarly explained that all environmental remediation projects had to go through an internal approval process up the chain of command within the company.*[17]  According to CI 15, *"It would go through the financial people and have to be approved by the CEO and the board of directors.  The directors were involved in all of that, too."*  According to CI 15, the discussion and approval process also involved the departments of finance, operations, capital projects, corporate, and sometimes legal.  "The presidents (of the divisions) would sign off on anything that came into our corporate office for approval," CI 15 said.  *"Bolch had ultimate responsibility for the budget that went to board of directors."*

265.   According to CI 20 (the EHS Manager at the Columbus, Georgia plant from August 2004 to December 2012), requests for capital expenditures, including environmental projects, were multiple pages long and signed by "almost everybody and his brother" at the Company.  "Everybody under the sun ended up signing off on those things," CI 20 said.  CI 16 provided similar information.  CI 16 (the plant accountant at Exide's Bristol, Tennessee facility from June 2010 to March 2012) explained that when the plant required an environmental upgrade costing more than $25,000, CI 16's department submitted the request to the fixed assets or capital

---

[17] CI 11 would not discuss the process, and he would not name what executives were aware of the environmental violations, citing to CI 11's confidentiality agreement with Exide.

expenditures department at Exide's corporate offices.  According to CI 16, Exide's Vice President was responsible for approving the expenditures.

266.  According to CI 21 (Regional Finance Manager in the South-Central region for Exide from July 2006 to September 2011), any capital expenditures, including environmental upgrades, that exceeded $500,000 required approval from Exide's Chief Financial Officer.  CI 15 similarly recalled that any expenditures from about $500,000 to $1 million, would require high level approval.  CI 15 said that the cost of environmental upgrades and regulatory fines were substantial and they got more expensive in 2010 and 2011.  CI 15 explained that when the new stricter federal air emissions regulations went into effect, the upgrades required at Exide facilities were very expensive. "These requirements became final after I left, and [Exide] would have had to spend a lot of money to comply.  I don't know what kind of issue that became for the Company and whether or not it had an impact" on the Company's decision to file for bankruptcy or overall financial status, CI 15 explained  According to CI 16 (the plant accountant at Exide's Bristol, Tennessee facility from June 2010 to March 2012), environmental issues were "a major expenditure" for Exide. *CI 16 said that pollution and air monitoring issues were the Company's largest concern.*

267.  CI 6 said that in addition to the monthly testing results spreadsheet, CI 6 also submitted what was called monthly "three-box summaries" of EHS issues at the plant to the Director of EHS.  CI 6 recalled that the "three-boxes" broke down into: 1) any issues or problems that arose during the month; 2) all progress the department had

made with ongoing projects; and 3) any plans for upcoming projects.  CI 6 said the monthly reports went directly to the Director of EHS, and that CI 6 also emailed the reports to several other people, including the plant manager and corporate officers.  CI 8 provided corroborating statements.

268.  CI 8 also explained that EHS managers submitted monthly reports to the Corporate Director of EHS and Vice President of EHS that detailed environmental activities and testing results from the facility for that month.  CI 8 said that there was a specific form that the Environmental manager needed to fill out for the report.  On the forms, CI 8 had to list injuries in CI 8's department, any violations of environmental regulations, accidents, leaks, malfunctioning equipment, "anything that happen[ed] during that month," CI 8 said.  CI 8 explained that as part of the monthly report, EHS managers included the results from all internal testing equipment used to measure the facility's pollution rate.  All violations were highlighted on the monthly report, CI 8 said.

269.  If an internal test revealed the facility was in violation of pollution regulations, CI 8 could not wait until the monthly report was due to inform corporate.  She was required to immediately file a report with the Corporate Director and/or the Corporate Vice President of EHS. The report would describe the violation, the cause, any investigation needed to find the cause and the planned corrective action if known, CI 8 said.  According to CI 8, Ganster, Cummings, and/or Bolea remained involved, receiving frequent updates and sometimes steering the response, while the facility

dealt with the problem and the regulatory agency. CI 8 explained that sometimes, Ganster, Cummings, and/or Bolea became so involved that they took over dealing with the regulatory agency themselves at the corporate level, CI 8 said. CI 8 explained that around 2009 and 2010 when the Reading, Pennsylvania smelter was having problems that were causing violations and $100,000 fines, the Company sent Bolea to Reading for a month to deal with the problem and help the plant personnel put all the paperwork and reports together for the regulatory agency involved.

270.   According to CI 8, every Exide facility was supplied by the corporate office with an EHS manual prepared by the Company that very specifically detailed how facility level employees were supposed to respond to an environmental incident at their facilities. The manual contained forms for different types of incidents that the EHS manager was required to fill out and submit to corporate level management. The manual included instructions on which corporate leaders were to be sent which incident reports. *CI 8 said that if the incident was environmental, the report went to EHS management, usually up to the Vice President level, and it might also have to be submitted to legal or operations. According to CI 8, any and all environmental reports went to Ganster and Cummings, who reported issues directly to the CEO.* "There wasn't anything in EHS that those two weren't involved in," CI 8 said.

271.   *Further, if corrective action was necessary to fix the problem, CI 8 said that the CEO was copied on the correspondence, even if he was not included in the initial reports and correspondence about the incident.*

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          MASTER FILE NO. 2:13-cv-02607-SVW-E

272.   CI 13 (assistant deputy executive officer at AQMD) explained that his correspondence with Exide is usually sent to Fred Ganster, the Executive Director of Environmental Health and Safety (who reports to Exide's CEO).   CI 13 also sent letters on behalf of AQMD to the Vernon plant manager.

273.   CI 13 explained that after the HRA was approved on March 1, 2013, Exide was required to host public hearings in the surrounding community. According to CI 13, Defendant Hirt, formerly Executive Vice President and President-Exide Americas, attended several of these public hearings.

274.   According to CI 18, AQMD met with Exide on a regular basis following the discovered lead emissions.   CI 18 said that AQMD was probably at the Vernon facility on a weekly basis, sometimes multiple times a week.   CI 18 said that AQMD was very involved with the Vernon facility.   CI 11 similarly said that the AQMD personnel visited the Vernon plant almost daily. "We were on a first name basis with them," CI 11 said.   According to CI 11, AQMD visited for routine check-ins, if they had received a complaint, if they suspected a problem and/or to check on known problems.   CI 11 additionally said that DTSC visited the Vernon plant about once a month for check-ins.

275.   The testimony of the numerous confidential informants demonstrate that Defendants were aware of the adverse undisclosed information, including environmental problems at the Vernon facility.   The reports of the confidential informants are bolstered by Defendant Damaska's own statements in his declaration

filed in Exide's bankruptcy proceeding, wherein Damaska admitted that Exide's management carefully monitored environmental matters:

> Specifically, Exide operates under EHS [Environmental Health and Safety] policies, procedures, and permit requirements to ensure compliance with EHS regulations. In addition, Exide tracks EHS performance metrics and sets goals for performance improvement. ***Exide's management conducts periodic reviews of its EHS management system and plans and prioritizes EHS projects in its CAPEX budgeting process.***

(emphasis added).

276.   Defendant Damaska, in his declaration, further admitted that based on his position as CFO of Exide, he was familiar with Exide's day to day operations, business affairs and books and records:

> I have held my current positions with Exide since April 1, 2008. As a result of my time with [Exide], my review of relevant documents, and my discussions with other members of [Exide's] management team, I am familiar with the Debtor's [Exide's] day-to-day operations, business affairs, and books and records.

### 2.   The Importance of the Vernon Facility to Exide

277.   As discussed *supra*, Exide was dependent on the Vernon facility in order to meet its battery manufacturing obligations and to remain a going concern. Testimony obtained from confidential informants provides additional insight into the importance of the Vernon facility.

278.   CI 14 (Regional Finance Manager in the North-Central Region for Exide) explained that the recycling facilities played a large and important role in Exide's ability to remain financially profitable because the smelters protected the Company

from fluctuations in the price of lead.  According to CI 14, "[a] lot of what [Exide] can and can't do is dependent on the cost of lead. They can't pass on the cost of lead to the customer when it jumped up like it did in the last few years."  By using its own recycling facilities to supply lead, Exide did not have to buy lead on the market where costs were skyrocketing, CI 14 explained. This allowed Exide to earn a higher profit margin on its batteries than it otherwise could if the Company was buying lead on the market, CI 14 said.  "The better that the smelters were able to produce lead, the better the plants were able to run [financially]," CI 14 said.

279.  CI 14 explained that the loss of the Vernon recycling plant would have a damaging effect on Exide's profit margins.  "If other smelters were running at full capacity and one was shut down, it would have a definite, negative impact," CI 14 said. "Exide would have to go out and buy lead on the market at higher costs. It would have a definite, immediate negative impact."

280.  CI 10 was a bag house operator at Exide's Reading plant from 1994 to May 10, 2013.  CI 10 also acted as an elected union representative for all of Exide's plant workers, participating in several negotiations with company management wherein CI 10 was informed about the Company's finances and operations. According to CI 10, "the Vernon plant without a doubt was [Exide's] bellwether facility." CI 10 said, "[t]he ability that it has to produce lead far exceeded us (in Reading). It's like AAA vs. major league," CI 10 said.  CI 10 explained that Reading, at its best, produced about 250 tons of lead a day from recycling, while Vernon easily

produced 330 tons a day.  CI 10 said that when Vernon was shut down in April 2013, it was deeply damaging to Exide because the Vernon facility was such a highly productive facility and because the recycling operations were so essential to the Company's survival.  "Obviously it's a big hit if you take their primary way that they are going to make money and biggest generator of their finished product," CI 10 said. "To lose their major and primary cash cow was a huge hit for [Exide] without a doubt."

## VII.   THE TRUTH EMERGES

281.   On April 4, 2013, various news sources reported that Los Angeles City Council members had held a hearing calling for the city's attorneys to take action against Exide to protect residents from the potentially fatal conditions caused by Exide's unhealthy practices. Also, on April 4, 2013, *Debtwire* revealed that the Company had engaged the services of noted restructuring specialist firms Lazard and Akin Gump after the Company could not arrange financing through traditional means. That same day, the Company confirmed that financial advisory firm Lazard had been retained, "to advise the [C]ompany on financing alternatives to maximize the value of the [C]ompany for all stakeholders."

282.   On this news, the Company shares fell on April 4, 2013, $1.24 per share to $1.37 per share (a 46% drop) before trading was halted.

283.   On April 25, 2013, at 6:30 a.m., Exide issued a press release announcing that the Company had received an order dated April 24, 2013 from DTSC requiring

1  the Company to suspend operations at its Vernon facility, asserting that Exide's

2  underground storm water system was not in compliance with California requirements

3

4  and that Exide's furnace emissions were not meeting applicable DTSC health risk

5  standards.

6      284.  In response to this news, Exide's shares closed at $1.02 on April 25,

7

8  2013, compared to a closing price of $1.34 on April 24, 2013, a drop of 24%, on

9  heavy trading volume.

10     285.  On May 24, 2013, news source *Debtwire.com* reported that Exide was in

11

12  talks with bankers to arrange a debtor in possession ("DIP") loan that was expected to

13  be around $200 million to fund the Company through Chapter 11 bankruptcy

14

15  proceedings.

16     286.  In response to this news, Exide's shares closed at $0.45 per share on May

17  24, 2013, compared to the day's opening price of $0.78 — a drop of 42%, on heavy

18

19  trading volume.

20     287.  As a result of Defendants' materially false and misleading statements,

21  Exide stock traded at artificially inflated levels during the Class Period. However,

22

23  after the above revelations seeped into the market and the undisclosed risks

24  materialized, Exide's shares were hammered by massive sales, causing substantial

25  declines.

26

27

28

288.   Defendants failed to disclose existing events, uncertainties, and trends in violation of SEC Regulation S-K, Item 303(a), which rendered Class Period statements materially false or misleading.

289.   SEC Regulation S-K (and SEC Forms S-4, 10-K and 10-Q) requires disclosure of certain information, including information required to be disclosed under Item 303(a) of Regulation S-K (17 CFR §229.303), in the non-financial-statement portions of registration statements filed on SEC Form S-4 under the Securities Act and annual reports filed on SEC Form 10-K, and quarterly reports filed on SEC Form 10-Q under the 1934 Securities Exchange Act. 17 C.F.R. § 229.10.

290.   Pursuant to Subsection (a)(3)(ii) of Item 303, a registrant must "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3). Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a), Instruction 3. The SEC's interpretive release regarding Item 303 clarifies that the Regulation imposes a disclosure duty "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Management's Discussion

and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989).

291.   Beginning by at least the fiscal year ended 2011, and continuing through May 2013, Defendants were aware of material unfavorable circumstances at Exide's Vernon battery recycling facility.  Specifically, by June 2011, Defendants were aware that Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels, levels a regulatory agency claimed it had not seen in 25 years, endangering over 100,000 residents in surrounding areas, and by at least August 2012, Defendants were aware that Exide's 3,500 foot long stormwater piping system was seriously degraded and leaked lead and other contaminants.  These circumstances, among others alleged in the Complaint, were, pursuant to Item 303(a)(3)(ii) of SEC Regulation S-K, material known events, trends or uncertainties that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations," 17 C.F.R. § 229.303(a)(3), which were required to be disclosed but were not, rendering Defendants' statements materially false and misleading.

## VIII.  NO SAFE HARBOR

292.   Exide's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield Defendants' false or misleading statements from liability. Because most of the false

1   and misleading statements related to existing facts or conditions, the Safe Harbor has

2   no applicability.

3

4   293.   Defendants are also liable for any false or misleading forward-looking

5   statements pleaded because, at the time each forward-looking statement was made, the

6   speaker knew the forward-looking statement was false or misleading and the forward-

7

8   looking statement was authorized and/or approved by an executive officer and/or

9   director of Exide who knew that the forward-looking statement was false. In addition,

10   the forward-looking statements were contradicted by existing, undisclosed material

11

12   facts that were required to be disclosed so that the forward-looking statement would

13   not be misleading.   Finally most of the purported "Safe Harbor" warnings were

14   themselves misleading because they warned of "risks" that had already materialized or

15

16   failed to provide meaningful disclosures of the relevant risks.

17   **IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-**
     **THE-MARKET DOCRTINE**
18

19   294.   At all relevant times, the markets for Exide common stock and notes

20   were efficient markets for the following reasons, among others:

21

22   a)   Exide stock met the requirements for listing, and was listed and

23   actively traded on the NASDAQ, a highly efficient and automated market;

24   b)   According to the Company's Form 10-K filed June 7, 2012, the

25

26   Company had 78,346,859 shares outstanding as of May 25, 2012. During the Class

27   Period, on average, more than half a million shares of Exide stock were traded on a

28

1    daily basis, demonstrating a very active and broad market for Exide stock and

2    permitting a very strong presumption of an efficient market;

3

4              c)      Exide's notes were actively traded;

5              d)      as a regulated issuer, Exide filed periodic public reports with the

6    SEC;

7

8              e)      Exide regularly communicated with public investors *via*

9    established market communication mechanisms, including regular disseminations of

10   press releases on the national circuits of major news wire services, the Internet and

11   other wide-ranging public disclosures, such as communications with the financial

12

13   press and other similar reporting services;

14             f)      Exide was followed by many securities analysts who wrote reports

15   that were distributed to the sales force and certain customers of their respective firms

16

17   during the Class Period. Each of these reports was publicly available and entered the

18   public marketplace;

19             g)      numerous National Association of Securities Dealers' member

20

21   firms were active market-makers in Exide stock at all times during the Class Period;

22   and

23

24             h)      unexpected material news about Exide was rapidly reflected in and

25   incorporated into the Company's stock price during the Class Period.

26        295.   As a result of the foregoing, the markets for Exide common stock and

27   notes promptly digested current information regarding Exide from publicly available

28

1   sources and reflected such information in Exide's stock and note prices. Under these

2   circumstances, all purchasers of Exide common stock and notes during the Class

3

4   Period suffered similar injury through their purchase of Exide common stock and

5   notes at artificially inflated prices, and a presumption of reliance applies.

6
## X.   LOSS CAUSATION
7

8   296.   During the Class Period, as detailed herein, Defendants made false and

9   misleading statements, and omitted material information, concerning Exide's business

10  fundamentals, liquidity, and environmental issues.

11

12  297.   By artificially inflating and manipulating Exide's stock and note price,

13  Defendants deceived Plaintiffs and the Class and caused them losses when the truth

14  was revealed. When Defendants' prior misrepresentations and fraudulent conduct

15

16  became apparent to the market, as detailed herein, it caused the price of Exide's stock

17  and notes to fall precipitously as the prior artificial inflation came out of the price. As

18  a result of their purchases of Exide stock or notes during the Class Period, Plaintiffs

19

20  and other members of the Class suffered economic loss, i.e., damages, under the

21  federal securities laws.

22  298.   On April 3, 2013, Los Angeles City Council members held a public

23

24  hearing asking the government to press charges against the Exide to correct the health

25  risk posed by the Company's environmental contamination. On April 4, 2013, the *Los*

26  *Angeles Times* published an article discussing the April 3, 2013 public hearing held by

27

28  Los Angeles City Council members, wherein officials with AQMD testified before the

committee about the risks posed by Exide's Vernon facility.   According to the *LA Times* article, AQMD officials became aware of the surprisingly high levels of arsenic emissions from Exide in late 2010.

299.   Also on April 4, 2013, news source *Debtwire.com* published a report that Exide had hired financial advisory firm Lazard Ltd. and the law firm of Akin Gump LLP, both bankruptcy experts, to advise on its financial restructuring after prior restructuring efforts stalled.

300.   In response to these adverse disclosures, the price of Exide's shares fell $1.24 per share to close at $1.37 per share (a 46% drop), on April 4, 2013, before trading in the stock was halted.

301.   On April 25, 2013, before the market opened, Exide issued a press release announcing that the Company had received an order dated April 24, 2013 from DTSC requiring the Company to suspend operations at its Vernon facility, alleging that Exide's underground storm water system was not in compliance with California requirements and that Exide's furnace emissions were not meeting applicable DTSC health risk standards.

302.   In response to this news, Exide's shares closed at $1.02 per share on April 25, 2013, compared to the closing price of $1.34 on April 24, 2013 — a drop of 24%, on heavy trading volume.

303.   On May 24, 2013, news source *Debtwire.com* reported that Exide was in talks with bankers to arrange a debtor in possession ("DIP") loan that was expected to

be around $200 million to fund the Company through Chapter 11 bankruptcy proceedings.

304.   In response to this news, Exide's shares closed at $0.45 per share on May 24, 2013, compared to the day's opening price of $0.78 — a drop of 42%, on heavy trading volume.

305.   The price of Exide's $8^{5/8}$% senior secured notes due 2018 also declined precipitously on the foregoing news referenced in the paragraphs above.

306.   As illustrated in the chart attached hereto as Exhibit 1 on April 4, 2005, April 25, 2013 and May 24, 2013 the price of Exide's notes dropped precipitously. On April 4, 2013 the price of Exide's notes closed at $77.75, down from their previous day closing price of $86.24 on April 3, 2013.  On April 25, 2013 the price of Exide's notes closed at $70.37, down from their previous day closing price on April 24, 2013 of $77.55.  On May 24, 2013 the price of Exides's notes closed at $66.32, down from their previous day closing price of $71.82.

307.   As reported by Bloomberg on April 26, 2013:

Bonds of Exide Technologies (XIDE), a lead-acid battery producer, plunged to the lowest level ever after California regulators ordered it to close a recycling unit because of health risks.

The company's $674.2 million of 8.625 percent, first-lien notes due February 2018 dropped 4 cents on the dollar to 65 cents to yield 20.5 percent at 2:43 p.m. in New York, according to Trace, the bond-price reporting system of the Financial Industry Regulatory Authority. The securities have fallen 14.3 cents since April 23.

The California Department of Toxic Substances and Control ordered the company to suspend operations at its Vernon, California, plant on April 24, alleging that the facility isn't in compliance with the state's health risk standards, the company said yesterday in a regulatory filing.

Exide hired Lazard Ltd. (LAZ) to advise it on financing alternatives and restructuring activities, the Milton, Georgia- based company said in an April 4 statement.

308.   As a result of Defendants' material misrepresentations and omissions, the prices of Exide's stock and bonds were artificially inflated during the Class Period and Plaintiffs and Class members were damaged when the truth was revealed, and/or when the concealed risks materialized.

## XI.   CLASS ALLEGATIONS

309.   This is a securities class action on behalf of all purchasers of the common stock of Exide between June 1, 2011 and May 24, 2013, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and on behalf of purchasers of Exide's $8^{5/8}\%$ senior secured notes due 2018 traceable to its Form S-4/A effective August 12, 2011 seeking remedies under §§11 and 15 of the Securities Act of 1933; and on behalf of purchasers of Exide's $8^{5/8}\%$ senior secured notes due 2018 during the period August 8, 2011 through May 24, 2013 seeking remedies under §§10(b) and 20(a) of the Exchange Act.  Excluded from the Class are officers and directors of the Company as well as their families and the families of the Defendants. Class members are so numerous that joinder of them is impracticable.

310.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the Defendants violated the Exchange Act; (b) whether Defendants violated the Securities Act; (c) whether the Defendants omitted and/or misrepresented material facts; (d) whether the Defendants knew or recklessly disregarded that their statements were false and misleading; (e) whether the Defendants artificially inflated the price of Exide common stock; and (f) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

311.   Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### COUNT I

**For Violation of Section 11 of the Securities Act**
**Against Defendants Bolch, Damaska, Martinez, Reilly, Aspbury,**
**D'Appolenia, Ferguson, O'Higgins and Pileggi**

312.   Plaintiff Grace repeats and realleges each and every allegation contained above in paragraphs 1-159 and 282-311 as if fully set forth herein exclusive of allegations that contain facts necessary to prove any elements not required to state a claim under Section 11 of the Securities Act.

313.   This claim is not based on and does not sound in fraud but is based solely

on negligent conduct.

314.  This claim is brought by Plaintiff Grace on his own behalf and on behalf of other members of the Class who acquired Exide's notes pursuant to or traceable to the Company's Registration Statement effective August 12, 2011 and Prospectus issued in connection with Exide's exchange offering of $8^{5/8}\%$ senior secured notes due 2018.  Members of the Class acquired his, her, or its shares pursuant to and/or traceable to the Registration Statement and Prospectus. Exide is the issuer of the securities through the Registration Statement and Prospectus. Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi are signatories to the Registration Statement.

315.  The Registration Statement and Prospectus contained untrue statements of material fact and/or omitted to state material facts necessary to make statements therein not misleading.

316.  The false statements, misrepresentations and omissions identified above caused the market price of Exide's notes to be artificially inflated at the various times of the offering.

317.  Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi owed to the purchasers of the notes acquired pursuant or traceable to the Registration Statement and Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time they became effective to ensure that such

statements were true and correct and that there were no omissions of material fact required to be stated in order to make the statements contained therein not misleading.

318.   Neither Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins nor Pileggi made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true or that there were no omissions of material fact necessary to make the statements made therein not misleading.

319.   Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, among other things, the material facts set forth above.  By reason of the conduct alleged herein, each Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi violated Section 11 of the Securities Act.

320.   At the times they obtained the notes issued by Exide, Plaintiff Grace and other members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.  As a direct and proximate result of the wrongdoing of Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi, Plaintiff Grace and the other members of the Class have suffered substantial damages.

321.   This claim is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement and Prospectus that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement and Prospectus.

322.   By virtue of the foregoing, Plaintiff Grace and the other members of the Class are entitled to damages, under Section 11 of the Securities Act, as measured by the provisions of Section 11(e), from Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi and each of them, jointly and severally.

## COUNT II

**For Violation of Section 15 of the Securities Act Against All Defendants**

323.   Plaintiff Grace repeats and realleges each and every allegation contained in paragraphs 1-159 and 282-311 above as if fully set forth herein exclusive of allegations that contain facts necessary to prove any elements not required to state a claim under Section 15 of the Securities Act.  This claim is not based on and does not sound in fraud, but is based solely on negligent conduct.

324.   This claim is asserted against the Defendants, each of whom was a control person of Exide during the relevant time period.

325.   The Defendants were control persons of Exide by virtue of, among other things, ownership and control of the Company and their positions as senior officers

and/or directors of the Company. They were in positions to control, and did control, the false and misleading statements and omissions contained in the Registration Statement and Prospectus. Defendants had the power and authority to cause the issuer to engage in the wrongful conduct complained of herein, including the issuance of the false and misleading statements and omissions in the Registration Statement and Prospectus.

326. None of the Defendants made reasonable investigations or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

327. This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and Prospectus and within three years after Exide's notes were issued to the Class in connection with the Exchange Offering.

328. By reason of the misconduct alleged herein, for which Exide is primarily liable, as set forth above, the Defendants are jointly and severally liable with and to the same extent pursuant to Section 15 of the Securities Act.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT III**

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against Defendants Bolch, Damaska, Hirt, and Martinez**

329.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

330.   Throughout the Class Period, Defendant Exide and the Individual Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Exide common stock and notes, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

331.   During the Class Period, Exide and Defendants Bolch, Damaska, Hirt and Martinez, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Exide common stock and notes; (b) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (c) cause Plaintiffs and other members of the Class to purchase Exide common stock and notes at inflated prices; and (d) cause them losses when the truth was revealed. In furtherance of this unlawful scheme, plan and course of conduct, Exide and Defendants Bolch, Damaska, Hirt and Martinez, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5. Defendants Bolch,

175

Damaska, Hirt and Martinez are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

332.   In addition to the duties of full disclosure imposed on Exide and Defendants Bolch, Damaska, Hirt and Martinez as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Exide's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information.

333.   Exide and these Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

334.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Exide common stock and notes were artificially inflated during the Class Period. In ignorance of the fact that the market price of Exide common stock and notes were artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Exide and these Defendants, or upon the integrity of the market in which the shares and notes traded,

Plaintiffs and other members of the Class purchased Exide stock and notes during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

335.  Had Plaintiffs and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Exide and Defendants Bolch, Damaska, Hirt and Martinez, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their Exide shares during the Class Period, or if they had acquired such shares and notes during the Class Period, they would not have done so at the artificially inflated prices which they paid.

336.  By virtue of the foregoing, Exide and Defendants Bolch, Damaska, Hirt and Martinez have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 17 C.P.R. §240.10-5

## COUNT IV

### For Violation of Section 20(a) of the Exchange Act
### Against All Defendants

337.  Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

338.  The Individual Defendants had control over Exide and made the materially false and misleading statements and omissions on behalf of Exide within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their controlling shareholder status, executive positions, board membership, and/or stock ownership, and their culpable participation, as alleged above, the Individual