1  GREEN & NOBLIN, P.C.
2  Robert S. Green
   700 Larkspur Landing Circle, Suite 275
3  Larkspur, California 94939
4  Tel: (415) 477-6700
   Fax: (415) 477-6710
5  -and-
6  4500 East Pacific Coast Highway
   Fourth Floor
7  Long Beach, California 90804
8  Tel: (562) 391-2487
   rsg@classcounsel.com
9  *Liaison Counsel for Plaintiffs*

10
11 William B. Federman (admitted *pro hac vice*)
   A. Brooke Murphy (admitted *pro hac vice*)
12 FEDERMAN & SHERWOOD
   10205 N. Pennsylvania Ave.
13 Oklahoma City, OK 73120
14 Telephone:  405-235-1560
   Facsimile:  405-239-2112
15 wbf@federmanlaw.com
16 abm@federmanlaw.com
   *Lead Counsel for Plaintiffs*
17

18              UNITED STATES DISTRICT COURT
19              CENTRAL DISTRICT OF CALIFORNIA

20 DAVID M. LORITZ, Individually        Case No.  2:13-cv-02607-SVW-E
   and on Behalf of All Others                    2:13-cv-03194-SVW-E
21 Similarly Situated,                            2:13-cv-03991-SVW-E

22              Plaintiff,             CLASS ACTION

23
                                      [5]AMENDED CONSOLIDATED
24      v.                            COMPLAINT FOR VIOLATIONS
                                      OF THE FEDERAL SECURITIES
25 EXIDE TECHNOLOGIES, et al.,        LAWS

26              Defendants.
27
                                      DEMAND FOR JURY TRIAL
28

FILED
CLERK, U.S. DISTRICT COURT
JAN 3 0 2014
CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY

BY FAX

1

# **TABLE OF CONTENTS**

2

3    I.      NATURE OF THE ACTION.................................................................1

4            A.     Exide's Environmental and Financial Problems Progressively
                    Materialized to the Detriment of Investors .................................3

5            B.     The Aftermath .............................................................................7

6

7    II.     JURISDICTION AND VENUE .......................................................11

8    III.    PARTIES .........................................................................................11

9    IV.     SUBSTANTIVE ALLEGATIONS ..................................................15

10           A.     Descriptions of Confidential Informants ..................................15

11           B.     Exide's Previous Environmental Problems Prompted Increased Scrutiny
                    from Environmental Regulatory Agencies ...............................18

12           C.     Exide's Non-Compliant Stormwater Piping System ................21

13           D.     Exide's Consistent Non-Compliance with Air Emissions Standards ......31

14           E.     Exide's Decreasing Margins and Increasing Liquidity Problems ...........44

15           F.     The Company's Ongoing Liquidity Problems Prevented Exide from
                    Maintaining Environmental Compliance ..................................49

16

17   V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS UNDER THE
             EXCHANGE ACT ..........................................................................55

18           A.     Defendants' False and/or Misleading Statements Regarding
19                  Environmental Compliance........................................................55

20           B.     Defendants' False and/or Misleading Statements Regarding Exide's
                    Liquidity and Business Operations ...........................................80

21           C.     Additional Scienter Allegations ................................................92

22                  1.     Environmental Issues Went Up The Chain To Defendants...........92

23                         a.     Interactions With Regulators Were Reported To Corporate
                                  Management ...................................................................93

24
25                         b.     Non-Compliant Test Results Were Reported.....................99

26                         c.     Corporate Management Was Involved When Environmental
                                  Improvements Or Remediations Were Considered...........102

27                  2.     The Importance of the Vernon Facility to Exide .........................107

28

i

VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN VIOLATION OF THE SECURITIES ACT ......................................................108

    A.   Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi Negligence .......................................112

VII.   THE TRUTH EMERGES ...............................................................................113

VIII.  NO SAFE HARBOR ......................................................................................115

IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCRTINE ....................................................................................116

X.   CLASS ALLEGATIONS ...............................................................................118

ii

1    Lead Plaintiffs James Cassella and Sandra Weitsman, Plaintiff James Close and

2

3    Plaintiff Kevin Grace ("Plaintiffs") individually and on behalf of all others similarly

4    situated, allege the following based upon personal knowledge as to Plaintiffs and

5    Plaintiffs' own acts, and upon information and belief as to all other matters based on

6
     the investigation conducted by and through Plaintiffs' attorneys, which included,
7

8    among other things, a review of Securities and Exchange Commission ("SEC") filings

9    by Exide Technologies ("Exide" or the "Company"), publicly available records of the

10
     Department of Toxic Substances Control of the State of California ("DTSC")[1] and the
11

12   South Coast Air Quality Management District of the State of California ("AQMD"),

13   transcripts from administrative hearings, filings in Exide's bankruptcy proceeding, as

14
     well as media reports about the Company, conference call transcripts and interviews
15

16   with confidential informants. Plaintiffs believe that substantial additional evidentiary

17   support will exist for the allegations set forth herein after a reasonable opportunity for

18
     discovery.
19

20   ## I.   NATURE OF THE ACTION

21        1.    This is a securities class action on behalf of all purchasers of the common

22
     stock of Exide between June 1, 2011 and May 24, 2013, inclusive (the "Class
23

24   Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities

25   Exchange Act of 1934 (the "Exchange Act"); and on behalf of purchasers of Exide's

26
     $8^{5/8}$% senior secured notes due 2018 traceable to its Form S-4/A effective August 12,
27

28
     ---
     [1] A glossary of frequently used defined terms is attached hereto as Exhibit 1.

2011 seeking remedies under §§11 and 15 of the Securities Act of 1933; and on behalf of purchasers of Exide's $8^{5/8}$% senior secured notes due 2018 during the period August 8, 2011 through May 24, 2013 seeking remedies under §§10(b) and 20(a) of the Exchange Act. Defendants include Exide, James R. Bolch ("Bolch"), Phillip A. Damaska ("Damaska"), R. Paul Hirt ("Hirt"), Louis E. Martinez ("Martinez"), John P. Reilly ("Reilly"), Herbert F. Aspbury ("Aspbury"), Michael R. D'Appolonia ("D'Appolonia"), David S. Ferguson ("Ferguson"), John O'Higgins ("O'Higgins"), and Dominic J. Pileggi ("Pileggi").

2.      Exide operates in 89 countries, producing, recycling and distributing lead-acid batteries.  Among the various activities of the Company, Exide operates three battery recycling facilities worldwide, including a recycling facility in Vernon, California, located approximately four miles due south of downtown Los Angeles. According to Exide, the Vernon facility is key to Exide's survival.  The Vernon facility recycles between 20,000 and 40,000 batteries per day.[2]  The Vernon facility produces approximately 120,000 tons of lead annually, which is far more batteries than either of Exide's other two remaining recycling facilities.  Exide recycles batteries to extract lead that the Company then uses to manufacture new batteries. Exide relies on the recycled batteries to keep its margins at maintainable levels. Without the lead from recycled batteries, Exide is forced to purchase lead on the open

---

[2] *See* the declaration of Joseph Preuth, Exide's Vice President of Recycling Operations and Operational Excellence, filed with the Superior Court of the State of California, County of Los Angeles (the "Preuth Declaration") at 2.

market at premium rates.  The cost of purchased lead represents approximately 46% of Exide's cost of goods sold.  Because the cost of lead has skyrocketed in recent years, Exide's ability to keep the Vernon facility, its key recycling facility, in operation is, and was, critical to Exide's ability to continue as a going concern.

A. **Exide's Environmental and Financial Problems Progressively Materialized to the Detriment of Investors**

3.     On March 22, 2013, the Vernon recycling facility was cited by AQMD as posing a greater cancer risk to residents of Southern California than any of the more than 450 facilities the agency has regulated in the 25-year history of AQMD's monitoring of toxic air contaminants.[3]   A spokesman for AQMD, Sam Atwood, summarily put the Vernon facility's violations into perspective by explaining that in his experience with the AQMD there has been "nothing close to this…never."[4]

4.     Moreover, during the Class Period, Exide's Vernon facility created toxic waste (that includes lead and arsenic) that infiltrated the Los Angeles area groundwater. Indeed, Exide's relationship with California state environmental agencies—specifically DTSC and the AQMD—was growing increasingly tense during the Class Period, as these regulatory agencies became aware of the scope of the Vernon facility's pollution and repeatedly unsuccessful attempts to have Exide address it.

5.     Despite receiving ever more drastic and heated requests from California

---

[3] *See Los Angeles Times* article: "Battery Recycler Exide's Problems Aren't Just Local," dated May 29, 2013.

[4] *Id.*

3

environmental agencies, Exide issued materially false or misleading statements during the Class Period that failed to inform investors of the environmental violations and/or the risk that the Vernon facility could be shut down.  In particular, though Exide told investors that it maintained a reserve for the cost of addressing environmental problems "where such costs are probable and reasonably estimable," Exide never told investors that it was in constant contact with California environmental agencies concerning the Vernon facility.  Nor did Exide even inform investors that it had established reserves to address liabilities arising from the Vernon facility (despite discussing reserves for other facilities), despite ever worsening environmental problems that would need to be addressed by the Company.

6.     Defendants were themselves informed of problems at the Vernon facility. Over a dozen former Exide employees who are confidential informants have reported on the extensive lengths that Exide went through to ensure that Exide's senior management was fully informed of all material environmental developments. Among these confidential informants is Exide's six-year former Vice President of Global Environmental Health and Safety (confidential informant 15) who explained that Defendant Bolch (Exide's CEO), Defendant Damaska (Exide's CFO), and  Defendant Martinez (Corporate Controller) all received reports of the environmental law violations at each of the Company's facilities.

7.     Following the AQMD citation, on April 3, 2013, Los Angeles City Council members held a public hearing asking the government to press charges

4

against the Company to correct the health risk posed by the Company's environmental contamination.   On April 4, 2013, the *Los Angeles Times* published an article discussing the April 3, 2013 public hearing held by Los Angeles City Council members, wherein officials with AQMD testified before the committee about the risks posed by Exide's Vernon facility.  According to the *LA Times* article, AQMD officials became aware of the surprisingly high levels of arsenic emissions from Exide in late 2010.  Indeed, based on Exide's own representations to California's environmental regulatory agencies, health risk assessment testing from October 2010 indicated that the arsenic emission rate was 7.59E-02 lb/hr, which was far in excess of previous levels.  AQMD officials explained that it took AQMD two years to determine where in the Vernon plant the dangerous emissions were coming from and to quantify the risk to people and the environment.

8.     Also on April 4, 2013, news source *Debtwire.com* published a report that Exide had hired financial advisory firm Lazard Ltd. and the law firm of Akin Gump LLP, both bankruptcy experts, to advise the Company on its financial restructuring after prior restructuring efforts failed.

9.     In response to these adverse disclosures, the price of Exide's shares fell $1.24 per share to close at $1.37 per share (a 46% drop), on April 4, 2013, before trading in the stock was halted.

10.     On April 25, 2013, before the market opened, Exide issued a press release announcing that the Company had received an order dated April 24, 2013 from

5

DTSC requiring the Company to suspend operations at its Vernon facility, alleging that Exide's underground storm water system was not in compliance with California requirements and that Exide's furnace emissions were not meeting applicable DTSC health risk standards.

11.     In response to this news, Exide's shares closed at $1.02 per share on April 25, 2013, compared to the closing price of $1.34 on April 24, 2013 — a drop of 24%, on heavy trading volume.

12.     On May 24, 2013, news source *Debtwire.com* reported that Exide was in talks with bankers to arrange a debtor in possession ("DIP") loan that was expected to be around $200 million to fund the Company through Chapter 11 bankruptcy proceedings.

13.     In response to this news, Exide's shares closed at $0.45 per share on May 24, 2013, compared to the day's opening price of $0.78 — a drop of 42%, on heavy trading volume.

14.     A press release issued by *Consumer Watchdog*, a California consumer advocacy organization that, among other things, investigates corporate misbehavior, sheds further light on the hazardous conditions at the Vernon facility and Defendants' knowledge of same.  According to the May 30, 2013 press release:

> • ***Exide's own arsenic emissions source tests in 2010 and 2012, showed a significant spike in emissions over tests in 2006 and 2008. "DTSC had the ability to evaluate the change in emissions risk years before it issued this order" suspending the plant's operations.***

6

***

The Exide facility emitted hazardous waste for years under a permit from the South Coast Air Quality Management District. This waste had a history of depositing and accumulating on the ground and roofs around the site.

***

Though DTSC regulators in Southern California pushed the company to investigate and clean up, higher ups deferred taking corrective action in favor of issuing a final permit to the company that never materialized. ***"While lead and arsenic were piling up, soaking into the groundwater, and also flowing into the Los Angeles River, Exide and its negligent operations were falling through the regulatory cracks,"*** said [Consumer Watchdog spokeswomen, Liza] Tucker. ***"And top DTSC managers refused to force the company, which is a polluter on a national scale, into compliance."***

(emphasis added).

**B.     The Aftermath**

15.     In the past few months, following the end of the Class Period, the situation for Exide has continued to worsen as additional information about the extent and implications of the Vernon facility's environmental problems have come to light.

16.     As required under California law based on the high health risks posed by the Vernon facility's air emissions, Exide prepared and submitted an extensive risk reduction plan to AQMD on August 28, 2013.  The primary element of Exide's risk reduction plan was an isolation door that was installed at the Vernon facility in April 2013 to reduce the arsenic emissions.  In October 2013, however, AQMD informed Exide that AQMD had rejected the proposed risk reduction plan (including the

7

isolation door) as a sufficient risk reduction measure. *See* AQMD's October 24, 2013 letter to Exide.   AQMD further informed Exide that AQMD had dismissed the preliminary testing results of the risk reduction measures presented by Exide, explaining among other things that "[t]he results of the source tests conducted by SCAQMD staff shows that the emissions measured during SCAQMD source tests are in some cases an order of magnitude higher than emission levels measured during Exide's August/September 2013 source tests." *See id.* at 5-6.

17.    In fact, despite risk reduction measures implemented by Exide in April 2013, on October 18, 2013, AQMD filed a Petition with the AQMD Governing Board to again ***close the Vernon facility*** until Exide can correct its serious arsenic emissions based on AQMD's determination that the Vernon facility's hazardous emissions pose severe and unacceptable health risks to the community.   *See* Petition for Order of Abatement, *South Coast Air Quality Management District v. Exide Technologies*, Case No. 3151-29.   The case is currently pending before AQMD's Governing Board.

18.    On December 17, 2013, DTSC informed Exide *via* letter that recent soil sampling from an area going out 4,500 feet from the Vernon facility revealed "elevated concentrations of lead and other contaminants" that posed an "immediate threat to human health and the environment (*i.e.* the Los Angeles River) that will require implementing emergency response interim measures."   As a result, DTSC ordered the Company "to perform emergency response interim measures to clean up the dust, soil, and sediment found with concentrations of metals at or above hazardous

8

waste levels in the storm water curb boxes and at the sampled locations surrounding the Exide Facility."

19.    Most recently, on January 16, 2014, AQMD filed a lawsuit in the Superior Court of the State of California, County of Los Angeles, against the Company and Does 1 through 50 including Exide's "owners, officers, directors, agents, employees, contractors, vendor affiliates, and/or representatives of Exide." *See* Complaint for Civil Penalties, *People of the State of California, ex rel South Coast Air Quality Management District v. Exide Technologies, et al.*, Case No. BC-533528. The lawsuit seeks up to $40 million in penalties from Exide, its officers, employees and directors for numerous air quality violations due primarily to alleged illegal emissions of arsenic and lead that began as early as 2010 and continued through 2013. Specifically, the lawsuit alleges that Exide and its corporate officers (who AQMD alleged to be "personally liable under the 'responsible corporate officer doctrine'") violated, *inter alia*, the following regulations: (i) District Rule 1407, which requires Exide to employ "[g]ood operating practices . . . to maintain air movement and emission collection efficiency . . . ." (*id.* at  3-4); (ii) District Rules 203(b) and 3002(c)(1) and Health and Safety Code Section 42402.2(a) for "operat[ing] equipment in a manner that failed to ensure the equipment's proper operation, and operat[ing] equipment while it was venting to air pollution control equipment that was not in full use, which resulted in arsenic emissions into the atmosphere, and that defendants, and each of them, knew of these emissions and failed to take corrective action within a

9

reasonable period of time" contrary to the terms of Exide's Title V permit (*id.* at 5 and 10); (iii) District Rules 203(b) and 3002(c)(1) and Health and Safety Code Section 42402.2(a) based on Exide's operation of "Venturi and Neptune scrubbers with differential pressure of less than 36 inches water column, which resulted in arsenic emissions into the atmosphere, and that defendants, and each of them, knew of these emissions and failed to take corrective action within a reasonable time" (*id.* at 10); and (iv) District Rule 1420.1(d)(2) for "discharging emissions into the atmosphere that contributed to ambient air concentrations of lead at its on-site north monitor that exceeded .15 micrograms per cubic meter averaged over any 30 consecutive days," during certain periods in 2012 and 2013 (*id.* at 8).

20.     The repeated enforcement actions by California's environmental regulators demonstrate the severity of the problems at Exide's Vernon facility.  The AQMD civil action, in particular, further demonstrates the culpability of Exide and its officers.  Indeed, AQMD's executive officer, Barry Wallerstein, discussed AQMD's lawsuit against Exide by explaining that "Exide has had a steady stream of operational problems that have resulted in excess toxic emissions."  Mr. Wallerstein further said, "These toxic emissions have exposed many thousands of residents to an unacceptable cancer risk and for that reason we are seeking to recover a significant penalty from them."  *See Los Angeles Times* article, "Air Quality District Sues Battery Recycler Exide for $40 Million," published on January 16, 2014.

10

## II.   JURISDICTION AND VENUE

21.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C §§77k and 77l) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

22.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v (a)) and Section 27 of the Exchange Act (15 U.S.C. 78aa), and 28 U.S.C. §§ 1331.

23.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act, and 28 U.S.C. § 1391.  Acts and transactions giving rise to the violations of law complained of occurred in this district. The Company's recycling facility in Vernon, California that exposed residents to potentially fatal levels of arsenic lies within this district, and many of the relevant witnesses and facts are within the jurisdiction of this district.

24.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.   PARTIES

25.    Lead Plaintiffs James Cassella ("Cassella") and Sandra Weitsman ("Weitsman") purchased Exide common stock during the Class Period as set forth in

11

the Certifications previously filed with the Court, and incorporated herein by reference, and suffered damages.

26.     Plaintiff James Close ("Close") purchased Exide common stock during the Class Period as set forth in the Certification previously filed with the Court, and incorporated herein by reference, and suffered damages thereon.

27.     Plaintiff Kevin Grace ("Grace") purchased Exide's $8^{5/8}$ senior secured notes during the Class Period and traceable to the Company's August 12, 2011 Amended Registration Statement on Form S-4A and Prospectus on Form 424B, as set forth in the Certification previously filed with the Court, and incorporated herein by reference, and suffered damages thereon.

28.     Exide is organized under the laws of the State of Delaware and headquartered in Milton, GA. During the Class Period, Exide had millions of shares of common stock outstanding, which shares traded in an efficient market on NASDAQ under the ticker symbol "XIDE." Exide was followed by many stock analysts and stock rating agencies and was constantly in communication with the markets and investors in quarterly conference calls and frequent presentations to investors and analysts. Exide also filed periodic public reports with the SEC, and regularly issued press releases to the financial press.[5]

29.     Defendant Bolch has served as Exide's President and Chief Executive Officer ("CEO") since July 2010.  Defendant Bolch signed the Company's 2011 Form

---

[5] Exide is not named as a Defendant due to the fact that Exide filed for Chapter 11 bankruptcy on June 10, 2013.

12

10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K. Bolch also certified the Company's Form 10-Ks and 10-Qs pursuant to the Sarbanes-Oxley Act.

30.     Defendant Damaska has served as Exide's Executive Vice-President and Chief Financial Officer ("CFO") since April 2008.  Defendant Damaska signed the Company's 2011 Form 10-K, the Company's Registration Statement, the Company's 2012 Form 10-K, and the Company's Form 10-Qs.  Damaska also certified the Company's Form 10-Ks and 10-Qs pursuant to the Sarbanes-Oxley Act.

31.     Defendant Hirt has served as President of Exide America since November 2011.

32.     Defendant Martinez has served as Vice President, Corporate Controller, and Chief Accounting Officer since March 2008.  Defendant Martinez signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

33.     Defendant Reilly has served as Chairman of Exide's Board of Directors (the "Board") since May 2004.  Defendant Reilly signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

34.     Defendant Aspbury has served as a member of Exide's Board since August 2006.  Defendant Aspbury signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

35.     Defendant D'Appolonia has served as a member of Exide's Board since

13

May 2004.   Defendant D'Appolonia signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

36.     Defendant Ferguson has served as a member of Exide's Board since August 2005.   Defendant Ferguson signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

37.     Defendant O'Higgins has served as a member of Exide's Board since 2010.  Defendant O'Higgins signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

38.     Defendant Pileggi has served as a member of Exide's Board since May 2004.  Defendant Pileggi signed the Company's 2011 Form 10-K, the Company's Registration Statement, and the Company's 2012 Form 10-K.

39.     Defendants   Bolch,   Damaska,   Hirt,   Martinez,   Reilly,   Aspbury, D'Appolonia, Ferguson, O'Higgins, and Pileggi are sometimes referred to herein collectively as "Defendants" or the "Individual Defendants."

40.     During the Class Period, the Individual Defendants possessed the power and authority to control the contents of Exide's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions with the Company, and their access to

14

material non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false or misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

## IV.  SUBSTANTIVE ALLEGATIONS

### A.  Descriptions of Confidential Informants

41.  Confidential Informant 1 ("CI 1") – CI 1 was an industrial engineer at Exide from 1979 to 2010 who worked out of corporate headquarters and traveled to different Exide facilities to check on manufacturing issues and ensure procedures were being followed correctly.

42.  Confidential Informant 2 ("CI 2") – CI 2 worked as a project engineer at the Vernon facility from 2012 to June 2013.

43.  Confidential Informant 3 ("CI 3") – CI 3 was the manager of Exide's distribution center in Fresno, California from 2009 to January 2013.

44.  Confidential Informant 4 ("CI 4") – CI 4 was Exide's Vice President, Operations - Transportation North America from 2006 to 2011, the operating segment that included the Vernon facility.

45.  Confidential Informant 5 ("CI 5") – CI 5 was the manager of Environmental Health and Safety at an Exide plant in Bristol, Tennessee from July 2011 to February 2012.

15

46.    Confidential Informant 6 ("CI 6") – CI 6 was the Environmental Health and Safety (EHS) manager at Exide's Columbus, Georgia facility, which had a battery recycling plant similar to the one at Vernon, California from the late 1990s to 2005.

47.    Confidential Informant 7 ("CI 7") – CI 7 was a refinery operator at Exide's Vernon, California facility from March 2013 to the end of April 2013.

48.    Confidential Informant 8 ("CI 8") – CI 8 was the Environmental Health and Safety (EHS) manager at Exide's distribution center in Reading, Pennsylvania from 1981 to 2010, when CI 8 went to work at Exide's Lancaster, Pennsylvania distribution center until 2012.   CI 8 reported to Exide's Director of EHS, Fred Ganster, and sometimes to Ganster's superior, Mark Cummings, the Vice President of Global EHS.

49.    Confidential Informant 9 ("CI 9") - CI 9 was the environmental manager at Exide's Muncie, Indiana plant from January 2012 to March 2013.   CI 9 reported to the plant manager, Bob Saurer, and also directly to Fred Ganster, Exide's Director of Environmental Health and Safety (EHS).

50.    Confidential Informant 10 ("CI 10") - CI 10 was a bag house[6] operator at Exide's Reading, Pennsylvania plant from 1994 to May 10, 2013 and union representative for Exide workers.

51.    Confidential Informant 11 ("CI 11") - CI 11 was the environmental systems manager at Exide's Vernon plant from September 2009 to April 2013.

_____
[6] A bag house is a device intended to prevent environmental pollution.

16

52.     Confidential Informant 12 ("CI 12") - CI 12 is a project manager for the DTSC and is overseeing corrective action at Exide's Vernon plant.

53.     Confidential Informant 13 ("CI 13") - CI 13 is the assistant deputy executive officer at AQMD.

54.     Confidential Informant 14 ("CI 14") – CI 14 was Regional Finance Manager in the North-Central Region for Exide from 1989 to March 2011.

55.     Confidential Informant 15 ("CI 15") – CI 15 was the Vice President of Global Environmental Health and Safety at Exide from July 2005 to March 2011.

56.     Confidential Informant 16 ("CI 16") – CI 16 was the plant accountant at Exide's Bristol, Tennessee facility from June 2010 to March 2012.

57.     Confidential Informant 17 ("CI 17") – CI 17 is Program Supervisor at AQMD who worked closely with Exide regarding its health risk assessments.

58.     Confidential Informant 18 ("CI 18") – CI 18 is a Senior Hazardous Substances Engineering Geologist at DTSC.  CI 18 assisted DTSC in overseeing the Vernon facility's compliance since before the facility was owned by Exide to the present.

59.     Confidential Informant 19 ("CI 19") – CI 19 was Senior Director, Technical Accounting and SEC Reporting at Exide from October 2005 to May 2013.

60.     Confidential Informant 20 ("CI 20") – CI 20 was the EHS Manager at the Columbus, Georgia plant from August 2004 to December 2012.

61.     Confidential Informant 21 ("CI 21")  – CI 21 was a Regional Finance

17

Manager in the South-Central region for Exide from July 2006 to September 2011.

62.     Confidential Informant 22 ("CI 22")  – CI 22 was the Accounts Payable Clerk at Exide's Vernon facility from September 2008 to July 2010, when CI 11's contract was not renewed for budgetary reasons.

63.     Confidential Informant 23 ("CI 23") – CI 23 is a project manager at DTSC who is overseeing the Vernon facility.

**B.      Exide's Previous Environmental Problems Prompted Increased Scrutiny from Environmental Regulatory Agencies**

64.     Exide's Vernon facility has had a history of environmental issues.   In recent years, these problems have caused environmental regulatory agencies to increase their scrutiny of the Vernon facility in order to effectuate environmental compliance.   Indeed, over the past four years, the AQMD has inspected the Vernon facility at least 277 times.

65.     In or around 2009, DTSC and AQMD discovered considerable deposits of lead near the Vernon facility that were "well above" the required levels that prompted DTSC to order Exide to perform an immediate emergency clean up, according to CI 18 (the Senior Hazardous Substances Engineering Geologist at DTSC).   Following the discovery of the large deposits of lead at the Vernon facility, both DTSC and AQMD have increased their environmental requirements on Exide. CI 12 (a project manager at DTSC) explained that due to previous discoveries of serious lead contamination at the Vernon facility, DTSC has required Exide to prepare

18

an extensive plan to do more monitoring and testing for historical and current pollutants in the air, water and soil.  Similarly, AQMD, in November 2010, adopted Rule 1420.1 – Emissions Standards for Lead from Large Lead-Acid Battery Recycling Facilities, which according to AQMD literature "imposed on Exide even more stringent monitoring, operating and reporting requirements . . . [and] requires total facility enclosure, additional air monitoring and sampling, annual source testing, and additional housekeeping measures."  For example, Rule 1420.1 mandates that battery recycling facilities must maintain a 30-day rolling average concentration of lead that does not exceed 0.150 ug/m3.  Additionally, as discussed further herein, CI 13 (the assistant deputy executive officer at AQMD) explained that Exide's elevated lead emissions caused AQMD to require the Vernon facility to provide a new, more extensive health risk assessment in 2010.

66.    The increased regulatory scrutiny of the Vernon facility was only further exacerbated when Exide submitted an application for a permanent operating permit to the DTSC in 2010.  CI 12 (project manager for the DTSC who is overseeing corrective action at Exide's Vernon plant) explained that Exide's Vernon facility is operating under an Interim Status Document ("ISD"), which is an interim operating permit under the federal Resource Conservation and Recovery Act ("RCRA").  *CI 12 explained that the Vernon facility is one of only "a few" out of the thousands of hazardous waste facilities in California that still has not obtained the permanent permit.*  According to CI 12, in 2010, Exide was required by DTSC to submit a new

Part B application for a permanent permit. CI 12 explained that the Part B application process has required Exide to submit numerous reports and assessments about the Vernon plant, including the facility's current conditions report, plans for cleaning up existing and future contaminants, pollution monitoring plans, and plans for upgrading environmental equipment, among other things.

67.   CI 11 (environmental systems manager at Exide's Vernon plant from September 2009 to April 2013) corroborated this and explained that in recent years, the plant submitted an application for a permanent status permit and that permit application was still under review when CI 11 left the Company in April 2013.  As part of Exide's permanent permit application process, DTSC gave Exide a list of environmental upgrades that need to be completed before the permanent permit would be approved, CI 11 said.  According to CI 11, DTSC "had a whole list of stuff" that they wanted Exide to do in order to get permanent status.  CI 11 said that "[s]ome of (the upgrades) were very expensive. ***In the end, it would be several million dollars to do.*** There were multiple projects that DTSC was requiring."  CI 11 refused to give additional details on this, citing to CI 11's confidentiality agreement.  CI 11 also refused to comment about specific violations at the plant, or characterize their severity, but CI 11 said that he was aware that the violations could lead to an agency shutting down the plant.  ***"If you don't meet your permit conditions, you're always at risk of being shut down,"*** CI 11 said.  Currently, Exide is operating under its interim permit, as its permanent permit application is still under review by DTSC.

20

## C.     Exide's Non-Compliant Stormwater Piping System

68.     The 3,500 feet long stormwater piping system at Exide's Vernon facility is a series of catch basins, connected with underground pipes that capture water from the facility wash-down activities and rain.  Exide continuously introduces water to the piping system under its daily wash-down operations.  These waters and stormwater runoff contain toxic (*i.e.* hazardous) metals (sludge) that are released into the environment from Exide's battery smelting operations.

69.     As explained by Rizgar Ghazi, Branch Chief of the Office of Permitting of the DTSC, in his June 25, 2013 declaration filed with the Superior Court of the State of California, County of Los Angeles (the "Ghazi Declaration"), "Exide's stormwater piping system is appurtenant to, attached to and connects to devices that are hazardous waste management units for purposes of D.T.S.C. reporting."  Thus, "the catch basins and the pipes are considered ancillary equipment to the Unit 46 Pump Sump and thus the hazardous waste standards in Chapter 6.5 [of the California Health and Safety Code, Division 20] apply to them."  *Id.* at 2.  According to Rizgar Ghazi in his declaration, "as part of DTSC's review of Exide's 2010 application for a hazardous waste facility permit (a "Part B" permit, named after that section in RCRA), DTSC requested that Exide include the underground storm water piping as ancillary equipment to Unit 46 associated with the Part B application."  *Id.* at 3.

70.     ***As discussed in documents exchanged between DTSC and Exide dating back to 2006 and as CI 23 (project manager at DTSC) explained, under Exide's***

21

*interim operating permit requirements Exide is mandated to install secondary containment and leak detection around any underground pipes that collect or convey hazardous waste or completely replace all underground piping at the site.* The piping system at the Vernon facility, however, does not have the required secondary containment and leak detection. According to CI 23, Exide initially argued with DTSC that the underground piping system did not contain hazardous waste and therefore Exide did not need to upgrade the piping system. CI 23 explained that DTSC disagreed with Exide's contention and maintained that the underground system was connected to the hazardous waste storage and treatment tank system and would need to comply with California Code of Regulations Title 22, Division 4.5, Chapter 15 requirements. According to CI 23, discussions between Exide and DTSC continued on this issue until Exide agreed in late 2011 that it would submit a description and assessment of the pipeline system.

71. On March 21, 2011, DTSC issued Exide's Vernon facility with its First Notice of Deficiency for Exide's Part B application for a permanent permit, citing several deficiencies, including hazardous conditions that did not comply with the State of California requirements for toxic substance storage. Specifically, the Notice of Deficiency noted that "groundwater has been contaminated due to releases from undetermined sources at Exide" and requested that Exide propose groundwater monitoring, in accordance with California Code of Regulations ("CCR"), Article 6. The Notice of Deficiency further required Exide to "identify all pertinent

22

surface/subsurface features."

72.     According to a June 30, 2011 letter from DTSC to Exide, DTSC had asked Exide for samples from the stormwater drains that indicated whether the drains contained hazardous contaminants, but this request had been ignored by Exide in its September 29, 2010 "*Summary Report for Initial Cleaning and Recommendations for Additional Interim Measures, Exide Technologies Off-site Areas*."   For example, the DTSC letter stated, "DTSC recognizes that Exide departed significantly from the approved workplan. . . . Several conditions of approval have been totally ignored, e.g. recontamination verification and storm drain inlet sampling."

73.     According to Ghazi, who testified as part of the administrative hearing held before the State of California Environmental Protection Agency DTSC (the "Administrative Hearing"),[7] Todd Wallbom a geologist with the DTSC visited the Vernon facility in October 2011 and attempted to take several samples from the sump. Transcript Vol. 2 at 29.   ***Ghazi explained that the sampling indicated hazardous waste levels for lead, arsenic and cadmium.  Id*. at 31

74.     According to CI 23 (project manager at DTSC), DTSC required Exide to submit a pipe system inspection report as part of the Company's permit application

_____

[7] The purpose of the Administrative Hearing was to determine whether and under what circumstances the Vernon facility would be allowed to reopen.  In October 2013, DTSC entered into a settlement with Exide, whereby Exide was required, among other things, to install a new groundwater piping system and conduct more extensive soil sampling for hazardous materials including arsenic, lead, and cadmium.  As part of the settlement, Exide was required to deposit in a segregated account $7.73 million that would go toward the contemplated environmental remediations.

23

process.  Without it, CI 23 said, DTSC would not approve the permit.  In January 2012, Exide incorporated the catch basins and underground stormwater piping system as ancillary equipment to the Unit 46 Pump Sump.  Exide was required to provide an assessment of Unit 46 Pump Sump and its ancillary equipment to determine compliance with the California Code of Regulations Title 22, Division 4.5, Chapter 15 requirements.

75.    On June 11, 2012, Exide submitted a schedule to survey and clean the pipes and assess the integrity of the pipes. Assessment work began in July 2012 and terminated in December 2012, as reported in the March 5, 2013 Storm Sewer Inspection Report prepared by Advanced GeoServices (the "Inspection Report").[8]

76.    On July 18, 2012, DTSC submitted its Technical Review of Area of Interest Technical Memorandum ("Technical Review") to Exide.  In the Technical Review, DTSC discussed several deficiencies in the Area of Interest Technical Memorandum ("TM") Exide had submitted on May 24, 2012.   Among the deficiencies in Exide's TM, DTSC explained that Exide failed to discuss the status of the underground piping, including piping that had been identified as "compromised." *See* Technical Review at 10-11.  Moreover, the Technical Review dated July 18, 2012 emphasized the need for Exide to ensure that the soil did not contain contaminants as a result of the deteriorating pipes and put Exide on notice of soil samples that

---

[8] Ghazi, Branch Chief of the Office of Permitting of the DTSC, testified as part of the Administrative Hearing that in June/July 2012 Exide attempted to pressure wash the sediments from the pipe but was unable to complete the process and, therefore, it attempted to video log the pipes.  Transcript Vol. 2 at 17-20.

24

contained hazardous amounts of lead:

> *A significant number of underground drains, piping, and catch basins occur on the facility.  See also our General Comment No. 3, above, on the broken underground drain in the West Yard.  The catch Basin/Drain System was constructed post-1980 and is located in areas of heavy traffic and adjacent to HWMUs that had either no containment or containment that was demonstrably impaired.* Surface drainage directed to catch basins would have had experienced the releases.  In addition, the airborne emissions that continue to this day also wash into these catch basins.  *DTSC recently obtained a sample from one catch basin that was in excess of 180,000 mg/kg of lead.*

> *It is imperative to determine the soil contamination situation underneath and adjacent to the existing drains and catch basins.*  As noted earlier in General Comment No. 3, particular attention should be paid to compromised sections of drains, as well as catch basins. Presence of significant contamination should necessitate efforts to assure that these devices could not release infiltrating fluids that would mobilize the older contamination from pre-1980 operations and practices.

*Id.* at 14 (emphasis added).

77.   On August 2, 2012, DTSC presented Exide with a Second Notice of Deficiency for Exide's Part B application, again citing "major deficiencies" in the Vernon facility's "groundwater monitoring and/or clean closure criteria," which still were not in compliance with California requirements.  Specifically, the Second Notice of Deficiency explained that the "*[t]he tank assessments do not comply with section 6624.192(I)(7) and 6624.192(k)1) with regard to any underground piping.  No leak testing data was presented*." (Emphasis added). *The Second Notice of Deficiency further stated: "Please note that this is the second notice of deficiency.  A third*

*notice of deficiency is grounds for denying the permit according to California Code of Regulations, section 66271.2(d)."*   According to CI 23 (a project manager at DTSC), such language was unusually harsh, and DTSC would not usually be so abrupt as to threaten to deny the permit.   "I have not seen that sort of statement before," CI 23 explained.   CI 23 explained that the statement indicated that DTSC needed to pressure Exide to take steps that the Company was resisting.

78.   An August 28, 2012 memorandum prepared by DTSC and sent to Exide identified hazardous levels of lead and zinc in the Vernon facility's stormwater pipes:

> *Sampling performed by the City of Vernon Health Department (the City) on December 12, 2011, in a storm drain located near the corner of Indiana Street and Bandini Boulevard found elevated levels of lead and zinc in storm water exceeding nearly 10x the TMDL WLAs [Total Maximum Daily Load Waste Load Allocations].*  This storm drain eventually discharges to the LA River.
>
> Lead was detected in storm water sampled from this drain at 618 ug/L (TMDL WLA=62 ug/L) and zinc was detected at 377 ug/L (TMDL WLA=159 ug/L).  Antimony was not one of the inorganics analyzed by the City.  This sampling was performed approximately two months after Exide collected samples in the LA River, or during the wet season. *The City data strongly suggests lead-loading from Exide to the surrounding storm drains, and potentially the LA River.* Therefore, we recommend that several sample locations be included in Exide's SWMRP, placed upstream and downstream of the drain outfall(s) in the LA River.

*Id.* at 4 (emphasis added).

79.   On March 5, 2013, Exide received the Inspection Report prepared by Advanced GeoServices on behalf of Exide. *As explained in the Ghazi Declaration, the Inspection Report was not delivered to DTSC until "eight (8) months after the*

26

*inspections were started."*  *Id.* at 3.  The Inspection Report included a copy of the inspection videos.   CI 12, project manager at DTSC, recalled that CI 12 first saw the videos of the pipe inspections in March 2013.  *CI 12 said that CI 12 immediately saw that some of the pipes were breached, and that it was a serious problem.  Asked to characterize the severity of the pipe problems at Vernon, CI 12 responded, "It's serious enough that we thought it was an imminent danger" and warranted a shut down.*  CI 12 said that discussions began right away about how to address the issue, including plans to shut down the Vernon plant.  CI 23 (project manager at DTSC) provided similar descriptions of DTSC's reaction to the inspection videos: *"As soon as [the pipe inspection report] was reviewed, DTSC determined something was going on," explaining that DTSC inspectors had sampled the sediments taken from the sumps feeding the pipelines and had determined that "hazardous waste was in the sumps and pipes."*

80.     The Ghazi Declaration summarized the findings of the Inspection Report:

**West Yard Piping Inspection:** The Inspection Report indicates that approximately 526 lineal feet of the West Yard piping contained a significant amount of sediment and required extensive cleaning using high pressure water before [Video] inspection could be completed. *The technician's observation of the pipes indicated that segments of the pipes had either scaling, fraying, splitting, cracking and/or sagging*. Video logs and assessment for certain parts of the pipes were not provided due to obstructions and conditions of the pipes.

**North Yard Piping Inspection:** The Inspection Report indicates the approximately 2,175 lineal feet of North Yard piping contained a significant amount of sediment and required extensive cleaning using high pressure water before [Video] inspection could be

27

completed. ***The technician's observation of the pipes indicated that segments of the pipes had either damage, collapsed, scaling, and/or fraying***. Most of the pipes in the North Yard were not video recorded or assessed due to obstruction.

**South Yard Piping inspection:** The Inspection Report indicates that approximately 680 lineal feet of South Yard piping contained a significant amount of sediment and required extensive cleaning using high pressure water before [Video] inspection could be completed. The technician's observation of the condition of the pipes is minimal or was not provided.

***The Inspection Report, and associated videos and photographs reveal an accumulation of semi-solid materials (also known in the industry as mud) generally throughout the piping system that is highly likely to contain elevated levels of hazardous waste, based on how Exide uses the piping system. The documentation shows several areas within the pipelines with failed structural integrity (breaches), and lack of cured-in-place fiberglass slip lining that was reportedly applied in the 1990s. The videos show the slip linings are scaling, fraying, or nonexistent. Additionally, the sewer system does not include required secondary containment. No leak testing data was presented and, based upon the physical condition of the pipes, as evidenced in the Inspection Report, the existing breaches would cause the ancillary equipment to fail any leak test.***

***Additionally, the Inspection Report proposes a replacement/abandonment schedule that spans over four (4) years. This would not resolve the requirement and the need to contain future releases into the environment until the new system is installed.***

***Based on information in Exide['s] permit application submittals and reports, the existing pipes have been in service for over thirty years, and are long past their service life. In the mid-to-late 1990s, GNB, Exide's predecessor, attempted to lengthen the service life by slip lining the piping system after less than fifteen years of operation. It has been over fifteen years since the pipes were last repaired and as indicated in the Inspection Report and the videos, the pipes show wear and tear and are in no condition to***

28

*convey hazardous wastes through the system. In addition, many*
*segments of the pipes were never assessed due to damage and*
*obstructions.*

*Based on my review of the report and video excerpts, and*
*knowledge of Exide's system, I believe that the degraded and*
*compromised physical condition of the piping system presents a*
*continuous threat of releases to the environment of hazardous*
*waste-containing water, and actually causes such releases on a*
*regular basis.* Furthermore, these hazardous waste releases to the
environment present a serious threat of additional soil and
groundwater underlying the facility, which is already contaminated.
*Groundwater in the area underlying the facility is already above*
*maximum contaminant levels for drinking water, thereby increasing*
*the urgency with which any sources of contamination must be*
*curtailed and remediated to minimize further deleterious impacts to*
*the state's drinking water supplies.*

*Id.* at 4-5 (emphasis added).

81.     Ghazi, Branch Chief of the Office of Permitting of the DTSC, further

testified during the Administrative Hearing that a report prepared on behalf of Exide

dated February 20, 2013 "indicates there is contamination in most of the wells at

Exide, including lead, antimony.  The findings of the report and the results of the

monitoring sampling that was done indicate there is contamination in most of the

wells, including compounds, antimony, lead, sulfates."  Transcript Vol. 2 at 56-57.

Ghazi's declaration provides further detail and explains that *"[o]n two occasions*

*(October 4, 2011 and July 27, 2012), DTSC collected sediment samples within the*

*ancillary equipment for the Unit 46 Pump Sump piping system at the Exide Vernon*

*facility.  The results for lead were found to be up to 150 times above hazardous*

*levels.  Cadmium and Antimony were also found above hazardous waste levels in*

29

*the same catch basins.*"  *Id*. at 3 (emphasis added).

82.    Based on the poor state of the stormwater piping, repairs alone could not bring the stormwater management system into compliance.  Indeed, according to the Inspection Report, the Vernon facility's stormwater management piping would need to be ***removed and replaced***.  *See id.* at 5-2 and 5-3. As explained in the Inspection Report, "DTSC has indicated that stormwater piping and structures must be double-lined with leak detection. . . . Given spatial constraints at the ground surface and the extent of damage and solids in existing piping, slip-lining the existing piping in most areas is not feasible." *Id.* at 5-3.

83.    CI 23 (DTSC's project manager overseeing the Vernon plant) is currently working with Exide on the Company's plans to upgrade the piping system. CI 23 estimated that the cost to replace the pipes will likely be several million dollars.

84.    According to CI 12 (project manager for DTSC), ***Exide "knew they had to replace these pipes" back in 2012***.  "That was a given. These pipes in general are not compliant with [regulations]. They need to be constructed with certain materials," CI 12 said.  CI 12 said because the piping system was installed so long ago it was not done according to current hazardous waste guidelines.  In order to be in compliance with regulations, the Part B permitting approval would have required that the piping system be upgraded.  "Our permit itself would have already said replace these pipes," CI 12 said.  CI 23 (another DTSC project manager overseeing the Vernon plant) similarly explained that RCRA required replacement of the pipes. CI 23 also

30

emphasized that Exide's consultants acknowledge that the pipes are out of compliance with permit regulations.  Indeed, the Inspection Report states: "*As a condition of the RCRA permit, Exide will be required to upgrade the existing storm water drainage system (pipes and structures) to provide dual containment* because the sediment that accumulates within the storm water collection system can contain hazardous concentrations of lead and other inorganic constituents."  *Id.* at 1-1 (emphasis added).

85.    In truth, Exide had "been undergoing ground water investigation for 16 to 18 years," as noted by Jeffrey Parker, an attorney for Exide, in statements made during the Administrative Hearing.  According to testimony from Rizgar Ghazi (Branch Chief of the Office of Permitting of the DTSC), underground monitoring at Exide has shown levels for hazardous materials that are "*consistently above M.C.L.'s [Maximum Contaminant Levels].*" Transcript Vol. 2 at 61-62 (emphasis added). Ghazi further explained that "the ground water underneath Exide is considered a beneficial use and can be used for drinking water. And contamination are [sic] above M.C.L.'s requiring a state action to Exide to remediate that over time, sometime in the future or now."  Transcript Vol. 2 at 71.

### D.    Exide's Consistent Non-Compliance with Air Emissions Standards

86.    According to CI 13 (the assistant deputy executive officer at AQMD), AQMD administers a Toxic Hot Spot program, which requires polluting facilities like Exide's Vernon plant to submit a report every four years of their toxic emissions.  If the emissions could pose a risk to human health, AQMD requires the facility to

31

conduct a Human Health Risk Assessment ("HRA"). CI 13, who oversaw this process at the Vernon plant, said the facility has had previous problems with lead, which prompted AQMD to ask Exide to conduct a HRA. "In 2010, they did a whole series of tests," CI 13 said. "The source tests were very extensive and expensive."

87.   Indeed, Russell Kemp (Exide's environmental consultant) testified that in the summer of 2010 AQMD required Exide to prepare a new health risk assessment with the new approach of direct testing for metals other than lead.[9]  Transcript Vol. 3 at 45. Kemp explained that the tests were different in that AQMD required "[s]pecific testing on all of the stacks for the full suite of metals; additional testing for more organic compound emissions on more stacks; really, a full and comprehensive testing program to cover the breadth of potential air toxins for subsequent feeding into a health risk assessment." Kemp explained that the testing was conducted in October 2010 and that the results were known in 2011.

88.   ***According to CI 13 (the assistant deputy executive officer at AQMD), the 2010 test results showed extremely high levels of arsenic.*** CI 17 (Program Supervisor at AQMD) similarly explained that ***AQMD was "shocked" by the levels of arsenic found in the 2010 source tests and that the 2010 tests revealed much higher arsenic levels than in previous years.*** In truth, the arsenic levels detected in October 2010 were more than nearly 100 times higher than the arsenic results from 2008.[10]

---

[9] Russell Kemp provided testimony before the Administrative Hearing.

[10] The information was obtained from a February 27, 2013 PowerPoint presentation prepared

32

Indeed, according to Russell Kemp (Exide's environmental consultant[11]), the arsenic emissions were "***approximately on the order of 100 times higher***."  Transcript Vol. 3 at 157.  Kemp confirmed that this was a significant increase.  *Id.* at 154.

89.    In June 2011, the Company reported the results to AQMD with the "submittal of the formal test report," as explained in Exide's Verified Petition for Writ of Mandate and Complaint for Injunctive Relief & Declaratory Relief filed in the Superior Court of the State of California County of Los Angeles, Central District (the "Petition").  According to CI 17 (Program Supervisor at AQMD), Exide attributed the extremely high arsenic levels to a process abnormality at the time of testing and requested that Exide be allowed to re-conduct its source tests and to replace its 2010 results with results received from a second set of source tests.  CI 13 (assistant deputy executive officer at AQMD) similarly explained that Exide represented that the results "were not indicative of normal operating conditions."  CI 13 explained that "[o]ur [AQMD's] response was: 'You have to show they weren't indicative.'"

90.    Russell Kemp (Exide's environmental consultant) testified that a health risk assessment report (using the 2010 source test results) was provided to AQMD in 2011.  *See* Transcript Vol. III at 56, 112.  CI 17 recalled that Exide performed health risk assessments based on the 2010 results, and while CI 17 could not remember the

by Exide. Slides from the presentation were used as exhibits in the Administrative Hearing held in June 2013.

[11]  Russell Kemp is a Principal of Environ International Corporation ("Environ"), an environmental engineering and health sciences consulting firm.  Russell Kemp and Environ served as Exide's environmental consultant throughout the Class Period.

exact health risk, CI 17 said that the health risk results were higher than the 25 in one million threshold that required a facility to submit a risk reduction plan.  Indeed, a presentation prepared by Exide in 2013 shows that the 2010 test results indicated a cancer risk of 58 in one million.[12]

91.    Exide's representations in its Petition filed in the injunction proceeding show that in response to the October 2010 source tests that revealed "elevated arsenic levels," Exide conducted an investigation to determine "why arsenic emission rates from the Hard Lead Stack had increased."   Kemp's testimony provides further information, as follows:

> Q.    Did Exide try to figure out why there had been this increase in arsenic emissions over the measured 2008 A.Q.M.D. testing?
>
> A.    Yes.  There was quite a lot of sample work to do.  ***The results from the laboratory from the testing in late 2010 came in in 2011, and the effort focused on trying to determine the source of the cause.***
>
> ***
>
> … Not only were the arsenic emissions from the hard lead stack higher than expected, but emissions of organic toxics from the hard lead stack were higher than we would expect.
>
> ***
>
> Q.    Okay.  So let me see if I understand correctly.
>
> When trying to figure out the source of the increased arsenic emissions, you noticed that some other character -- some other emissions characteristic of the hard lead stack had increased also; is that right?

_____

[12] The information was obtained from a February 27, 2013 PowerPoint presentation prepared by Exide. Slides from the presentation were used as exhibits in the Administrative Hearing held in June 2013.

34

A.     Well, actually, we noticed that the degree of organic emission from the hard lead stack were not what we would have expected from a system that is just supposed to be picking up dust generated at the charging points -- metal-bearing dust.

And that lead [sic] us to conclude that some of the direct combustion process gases were making their way to this ancillary ventilation system.

***

The obstruction was cleared, and the facility also then instituted a new -- an enhanced inspection and operating practice of looking into that duct more frequently, I believe on a weekly basis, and clearing any build-up so that any build-up would not reach the point of an obstruction that would change the pressure valves.

Ms. Bothwell: objection, your honor.

Can we determine when this occurred, time frame we're talking about now, when this obstruction was cleared?

The witness: ***November of 2011.***

By Mr. O'Neil:

Q.     So once the obstruction was removed, was there additional testing performed to see if it had had an effect on the arsenic emissions?

A.     Yes.  There was further testing conducted in 2012 to determine the degree to which emissions had been reduced.

92.     Indeed, Exide conducted a new round of tests on its stack emissions in 2012, which showed lower numbers for arsenic, and provided those test results to AQMD in the summer of 2012.  "They [the new arsenic emissions numbers] were different but in the same order of magnitude," CI 13 (assistant deputy officer at AQMD) said.  However, according to CI 13, Exide was unable to prove to AQMD that the 2010 numbers were not indicative of normal operations, nor was Exide able to

35

prove to AQMD that the 2012 numbers were indicative of normal operations. CI 17 (program supervisor at AQMD) similarly explained that AQMD was not entirely satisfied with the source tests conducted in 2012, to the extent that Exide could not prove that the 2012 tests' results provided a more accurate measure of Exide's arsenic emissions. According to CI 17 and CI 13, because AQMD questioned the accuracy of the 2012 source test results, AQMD had discussions with Exide in late 2012 about whether Exide could use the 2012 numbers instead of the 2010 numbers, and an agreement was reached to average the two numbers for use in the HRA. Kemp's testimony provides further insight and explains that even with the reduced emissions levels, the 2012 test results indicated a cancer risk on the order of 100 in one million and would require a risk reduction plan:

> *Q.    Mr. Kemp, before the break, you had mentioned an August 2012 meeting with the A.Q.M.D. Do you remember that?*
>
> *A.    I believe so. We met with them in August of last year.*
>
> *Q.    All right. What was the purpose of that meeting?*
>
> *A.    We met at the A.Q.M.D. offices to go over the results of the 2012 stack testing and the implications from a risk-calculation perspective of those 2012 testing results.*
>
> Q.    Was anyone from the D.T.S.C. present at that meeting?
>
> A.    Yes. Shukla Roy-Semmen. She's a toxicologist at the department. She joined us at the A.Q.M.D. offices for that meeting.
>
> ***
>
> *Q.    What did you tell Ms. Semmen and the other people there in terms of the risk calculations in the August 2012 meeting?*

36

1
2
3
4

    A.    ***That while the 2012 test results were 70 percent improved from the 2010 stack test results, the remaining risk would still be well above the A.Q.M.D.'s action risk level and we would have to be completing a risk assessment and head towards the risk reduction program.***

5
6

    Q.    Do you recall what numbers you were talking about in terms of cancer risk at that point?

7
8
9

    A.    We were more focused about discussing the calculated risk from the 2012 second set of tests. ***On the order of a hundred and a million.  In that range.  Well above the 25.***  I don't recall the exact number because, subsequently, we moved right into dealing with the average of the two.

10
11

    Q.    Okay.  So you talked about if you were allowed to use just the new test data with the unobstructed exhaust system?

12
13

    A.    Yes.

14

    Q.    The level would be around a hundred or somewhere over a hundred; is that right?

15
16

    A.    ***I don't recall if it was just over or just under.  Well above the 25.***

17
18

    Q.    And the discussion also centered around whether you would be allowed to use that data; right?

19
20

    A.    Yes.  There was a discussion about -- I don't think there was a debate at that point about whether we could use that data, but how.

21
22

                               ***

23
24
25
26

    A.    A couple months after that meeting -- a couple of months after the August [2012] meeting, their direction came to us: "We've considered it.  We won't let you just replace the prior data with the new data.  Instead, we want the final health risk assessment done on the basis of the average of the 2010 and 2012 tests."

27

    Q.    So is that what Environ did on behalf of Exide?

28

    A.    Yes.  At that point, we proceeded to produce the document that

37

is Exhibit Z [the January 2013 Health Risk Assessment].

93.   In response to DTSC's questioning, Kemp provided further testimony, as follows:

A.   I believe I testified about a meeting in August, at which time we discussed testing that was conducted in 2012, not 2011.

Q.   ***Okay. And at that time you said that the facility understood that they needed to do a reduction plan; is that correct?***

A.   ***Yes.***

Q.   And at that time -- was A.Q.M.D. at this meeting?

A.   This meeting was held as A.Q.M.D.'s offices and A.Q.M.D. was present.

Q.   Correct. And I believe you mention that had Shukla Roy-Semmen was there; right?

A.   Correct.

Q.   At that time I believe you, as you said, revealed the initial results from the 2012 testing, which included a 440 maximum cancer risk; is that correct?

A.   I don't believe I testified to that.

I testify that we presented the results focused mostly on the second test and that the risk portrayed in that meeting were somewhere around the order of magnitude of 100 in a million.

In going through the subsequent testimony, I was reminded that ***the risk from that second test alone would be around 200 in a million.*** That would have been what was discussed.

(emphasis added).

94.   CI 13 (the assistant deputy executive officer at AQMD) said that at the time of the 2012 discussions, Exide was likely aware that the arsenic levels were a

38

problem. "Toward the end of [2012] there were meetings regarding the averaging, and at that point it seemed they realized it was going to be high." *CI 13 explained that Exide has environmental consultants who can run the risk assessment models at any point. "I wouldn't be surprised that they could run the model anytime they want," CI 13 said, adding that at any point "[t]hey may have had some idea what the risk would be."* CI 13 explained that as part of the HRA, the 2010 and 2012 averaged emission numbers were input into a computer model that calculates the human health risk level to plant workers and the surrounding populace. *CI 13 said that based on the health risk model run using the averaged emission numbers, the Vernon plant had greatly exceeded several regulation thresholds for acceptable health risks.*

95.     The Health Risk Assessment that contained the average of the 2010 and 2012 source test results was submitted to AQMD and to DTSC in December 2012. Exide additionally held meetings with the regulatory agencies in January and February 2013 to discuss the results.

96.     In discussing Exide's meeting with DTSC, Kemp testified as follows:

Q.     Can you tell me who was present at the [January 23, 2013] meeting?

A.     I was present on behalf of Exide; Joe Preuth, the Exide's vice president for recycling was there; Fred Ganster, director of E.H.S. [Environmental Health and Safety], joined by phone.

\*\*\*

*What was the number that you discussed with the D.T.S.C. at the*

39

1    *January 23rd meeting?*

2    *A.    We discussed the -- we discussed the 440 in a million*
3          *maximally exposed worker.*

4    97.   In describing Exide's meeting with AQMD, Kemp explained:

5    *Q.    Now, was the 2013 H.R.A. discussed with the A.Q.M.D. after*
6          *it was submitted?*

7    *A.    Yes.   We had a meeting at the A.Q.M.D. in February to*
8          *discuss the H.R.A.*

9    *Q.    And what were the results of the meeting?*

10   *A.    AQMD, of course, expressed that <u>this is above the risk – the</u>*
11        *<u>action risk level reduction targets and that public notification</u>*
12        *<u>would be required and preparations for that needed to get</u>*
13        *<u>underway, that a risk reduction plan would be due</u> within six*
         *months of March 1st.   And that they did want the company to*
14        *move more quickly to accomplish emission reductions as soon*
15        *as possible and not wait for the entire process to begin, not*
         *wait for the entire regulatory process to run its course before*
16        *achieving emission reduction.*

17                                    ***

18   Q.    Okay.   Before that meeting, had Exide already started to
19         develop a risk reduction plan?

20   *A.    <u>Yes.  As I mentioned, in August [2012] we -- it was clear that</u>*
21        *<u>that was going to be the ultimate path, that risk reduction had</u>*
22        *<u>to be achieved.</u>*

23         In December, my staff was involved in doing tracing and
24         further detail of all the details of the hard lead ventilation
         system.   And we began developing an engineering testing plan
25         to explore various hypotheses of how best to control the
         emissions from various portions of that hard lead ventilation
26         system.

27   Q.    So even though the removal of the obstruction had reduced
28         arsenic emissions by about 70 percent; right?

                                     40

A.    Correct.

Q.    You still had more work to do; is that right?

**A.    It was recognized there was still more work to do and we were moving about to doing that.**

**Q.    Okay.  And did you agree with that, that there was more work to do?**

**A.    Yes, sir.**

**Q.    And did you actually tell the A.Q.M.D. that you felt there was more work to do?**

**A.    Yes.**

(emphasis added).

98.    Following Exide's submission of the revised HRA, which was based on the average of the 2010 and 2012 source test results, AQMD reviewed the test in order to provide its approval of the results.  On March 1, 2013, AQMD submitted a letter to Exide, which approved the revised HRA and determined that the cancer risk was 156 in one million.[13]

99.    William Bosan, PhD., ("Dr. Bosan") the Senior Toxicologist at the Department of Toxic Substances Control, the Human Ecological Risk Office, testified at the DTSC hearing that "the risk for the maximally-exposed worker [at the Vernon facility] are outside the acceptable range of risk and the hazards are ***well above what is***

---

[13] According to Kemp, "the A.Q.M.D. concluded and interpreted the results in its March 1st approval letter of [the HRA] report that the maximum exposed individual worker risk is 156 in a million [down from 440 in one million], as they said, at a different location, as they chose to assess on the basis of a different receptor point than is used in this document."

*considered an acceptable number*." Id. at 177.  He further testified that the facility is

contributing both chronic and acute cancer risks above acceptable limits.  *Id.* at 178.

***Dr. Bosan further characterized the risks and hazards presented by the facility as***

***"significant and unacceptable risks and hazards." Id.***  "It's pretty serious," CI 13

(the assistant deputy executive officer at AQMD) said. ***"Of all the HRA we've ever***

***done, it was by far the highest risk of any facility in our area."***

100.   As explained by Dr. Bosan, Senior Toxicologist and Unit Chief for the

Southern California Unit of the Human and Ecological Risk Office of the DTSC, in

his June 25, 2013 declaration filed with the Superior Court of the State of California,

County of Los Angeles (the "Bosan Declaration"), the community surrounding the

Vernon facility has been exposed to unacceptable emissions and substantial health

risks for three years.  The Bosan Declaration states, in relevant part, the following:

> On March 1, 2013, the SCAQMD issued an approval letter of the
> revised AB2588 HRA for the Exide facility, with a modification to the
> risk assessment using the maximum, non-facility receptor as the
> Maximally Exposed individual Worker (MEIW) instead of the
> fenceline or facility worker. In addition to approving the AB2588
> HRA, ***the letter from the SCAQMD also requested public***
> ***notification and risk reduction by Exide because the exceptionally***
> ***high risks and hazards posed by the facility to the surrounding***
> ***community***. Because of the elevated cancer risks, chronic hazards and
> acute hazards for workers and off-site receptors, I personally reviewed
> the HRA.
>
> ***
>
> Given the revised location of the MEIW by the SCAQMD in their
> letter of March 1, 2013, the risk and hazard to off-site workers were
> now associated with actual off-site worker locations, unlike previous

42

drafts of the HRA. *The maximum individual cancer risk (MICR) for an off-site worker was 156 in one million or 1.56 x 10$^{-4}$. This clearly represents an unacceptable risk.*

According to the March 1, 2013 SCAQMD letter, *the MICR "far exceeds the AB2588 Public Notice MICR Threshold."* The SCAQMD further requested that risk reduction be completed as quickly as feasible due to the elevated cancer risk In addition to cancer risk; the maximum chronic HI [hazard index] was 63, well above the 1.0 level of concern. Likewise, the maximum acute HI was 3.8 and above the 1.0 level of concern, indicating that adverse health effects may occur from both short-term and long-term exposure. *These unacceptable risks and hazards were based on emission data averaged from 2010 and 2012 source tests. Consequently, receptors in the community surrounding the facility have been exposed to unacceptable emissions for three years.*

Based on these multiple lines of evidence, it is my opinion that the Exide facility emissions present an imminent and substantial danger to the public health of the surrounding community, requiring immediate action.

***

In addition to the nearest off-site workers, the Exide facility poses a MICR [maximum individual cancer risk] of 22 in one million or 2.2 x 10-5 for the nearest residential receptor. The maximum chronic HI for the nearest resident was 2.9. Both the risk and hazard were well above DTSC's point of departure for cancer risk (10-6) and noncancer risk (1.0). *The number of residents and sensitive receptors impacted by Exide facility emissions at the 10$^{-5}$ risk level is approximately 110,000 people.*

*Id.* at 1-5 (emphasis added).

101. The foregoing testimony as well as publicly available documents demonstrate that Exide had: (i) performed a health risk assessment ("HRA") in 2011 (based on the 2010 source test results); (ii) prepared a memoranda regarding the high

43

October 2010 test results by at least June 2011; and (iii) retested arsenic emissions at the Vernon facility in 2012, the results of which revealed arsenic emissions that were still significantly higher than emissions prior to 2010.[14]  Moreover, according to CI 17 (Program Supervisor at AQMD), all HRAs submitted by Exide during the Class Period indicated cancer risks in excess of the 25 in one million threshold and therefore required Exide to prepare and implement a risk reduction plan, as corroborated by Kemp's testimony (that the 2012 tests indicated a cancer risk of 100 in one million) and Exide's own presentation (that showed the 2010 tests as causing a cancer risk of 58 in one million).

102.  CI 13 explained that because Exide exceeded the emissions thresholds, Exide is required by regulation to prepare a Risk Reduction plan within 180 days of AQMD approval of the HRA.  The Risk Reduction plan must include detailed plans for upgrades and other measures at the facility that will lower the amount of toxic emissions.  After the plan is approved, Exide has to implement it and show the risk has been reduced.

**E.    Exide's Decreasing Margins and Increasing Liquidity Problems**

103.  As explained in the filings in Exide's Chapter 11 proceedings and as similarly explained by CI 10 (a bag house operator at Exide's Reading, Pennsylvania plant and union representative for all of Exide's plants), Exide had experienced

---

[14] An August 22, 2012 letter from Exide to AQMD revealed that even in May 2012 Exide's arsenic emissions tests showed results as high as 4.37E-02 lb/hr, which is well above the 2008 arsenic emissions levels of around 0.80E-02 lb/hr.

44

liquidity problems since it lost Wal-Mart as a customer and a source for core material in February 2010.  CI 10 learned a lot about the Company's financial situation and business status during contract negotiations and other interactions with Exide management as a union representative, CI 10 said.  CI 10 explained that in recent years, Exide's battery manufacturing business was "a losing proposition."  CI 10 explained that Exide's battery volume had dropped off from about 52 million batteries sold a year to about 14 million in 2012.  "It's no wonder why they are floundering the way they are," CI 10 said.   To keep the Company "afloat," CI 10 said Exide relied on the battery-recycling branch of the business.  As CI 19 (Senior Director, Technical Accounting and SEC Reporting at Exide from October 2005 to May 2013) put it, Exide was operating its business in a "difficult environment," further explaining that profit margins were shrinking.

104.   Exide's liquidity problems were exacerbated by the increasingly stringent environmental standards, which required Exide to expend considerable amounts in remediation measures.  CI 5 (manager of Environmental Health and Safety at an Exide plant in Bristol, Tennessee from July 2011 to February 2012) said Exide was barely hanging on financially when he was at the Company from July 2011 to February 2012. "Environmental issues were really killing them," CI 5 said. "They were spending all their capital on retrofitting the (facilities) out west." CI 9 (environmental manager at Exide's Muncie, Indiana plant) corroborated this and explained that during 2012 all of Exide plants were struggling to comply with the new national emissions

45

standards.   CI 9 further said he often heard from vendors and consultants who complained they were not being paid by the Company.   CI 9 regularly had to bring the overdue bills to management's attention to obtain payments.

105.   Exide's deteriorating liquidity, its environmental noncompliance, and its increasing struggles with the California environmental agencies led the Company to hire bankruptcy experts to advise Exide on its financial restructuring options by April 2013.   The temporary shutdown of its recycling facility on April 24, 2013 only furthered Exide's liquidity struggles.

106.   According to the Declaration of Defendant Damaska, the Company's CFO, filed in the bankruptcy proceedings, the following events led to Exide's Chapter 11 filing:

> *In recent years, a number of factors have contributed to a decline in Exide's earnings and liquidity position ultimately making this chapter 11 filing a necessary step for Exide to de-lever its balance sheet and implement an operational restructuring plan with the tools available to it under the Bankruptcy Code.* These forces have included:
>
> - **Rising production costs resulting in compressed margins.** The cost of lead currently represents approximately 46% of the Debtor's cost of goods sold. The Debtor has generally managed this key cost driver through its recycling facilities. *However, higher spent-battery costs and lead-related price increases have put pressure on the Debtor's margins—exacerbated further by the shutdown of the Debtor's Vernon facility, discussed below.* Suppliers of raw materials have subjected Exide to pricing premiums, and Exide has been unable to pass along higher production costs to customers.
>
> - **Intense competition.** In recent years, competition in the battery

46

industry has intensified, especially in the auto parts retail and mass merchandise channels where large customers are able to use their buying power to negotiate lower prices and longer payment terms, or move business elsewhere if their demands are not met. *In this regard, one of Exide's then major customers, Wal-Mart Stores Inc., designated Johnson Controls—Exide's principal competitor—its sole-source supplier of transportation batteries and stopped carrying Exide's transportation products. This switch resulted in Exide's loss of approximately $160 million in annual revenue. More significantly, in addition to the revenue lost from Wal-Mart sales, Exide also lost an important and reliable source of battery cores under a captive-core arrangement with Wal-Mart.*

- **Exposure to European Market.** *With significant operations in Europe accounting for approximately 51.2% of the Company's worldwide revenue, Exide has been negatively impacted by the recent economic downturn that has persisted in Europe.*

- **Constrained Liquidity.** In the midst of market and competitive challenges, the Company recently has experienced additional pressure on its liquidity. Downgrades by credit-ratings agencies, discussed below, resulted in less favorable credit terms with the Company's trade creditors and limited the Company's ability to receive new financing outside the context of chapter 11. Constrained liquidity also has limited Exide's ability to invest in its businesses, primarily in North America, causing the Company to be at a competitive disadvantage relative to bigger, better-capitalized competitors.

*In early 2010, the Company began pursuing initiatives to address the significant loss of revenue and battery cores from Wal-Mart. The Company engaged in efforts to cut costs, including reducing corporate and regional overhead costs and exiting unfavorable arrangements to sell lead to third parties. In addition to its efforts to reduce expenses, the Company took steps to reposition its business and to consolidate its North American operations, including closing its Frisco, Texas plant and idling the Reading, Pennsylvania smelting facility.*

47

*Despite these efforts, the Debtor's financial position continued to decline, culminating in operating results for the fourth fiscal quarter of 2013 (for the period January 1 through March 31, 2013) that came in well below the Company's targets.* Based on these results and the Company's declining liquidity, Moody's Investors Service downgraded Exide's corporate-family rating on March 12, 2013.

To respond to the negative operating trends—and mindful that it was approaching its peak season for working-capital requirements—Exide engaged Deutsche Bank to explore financing options and Lazard Frères & Company LLC to advise the Company on strategic alternatives. *Exide suffered a significant setback, however, while considering its various out-of-court restructuring alternatives. On April 24, 2013, the California Department of Toxic Substances Control ("CDTSC") issued an order suspending operations at its Vernon, California secondary lead-recycling facility alleging that the facility's underground storm-water system was not in compliance with state requirements and that the Company's furnace emissions are not meeting applicable CDTSC health-risk standards. As a result of the Vernon shutdown, Exide had to source lead requirements from its remaining recycling facilities, open-market purchases of refined lead, and third-party lead recyclers to make up for the lost capacity increasing its costs. The Vernon shutdown will directly impact Exide's bottom line by eliminating an estimated $24 million in projected EBITDA from its business plan for the six month period following the shutdown. Approximately two weeks after the CDTSC order, Standard & Poor's Ratings Service lowered its corporate credit rating of Exide to triple-C-plus, which further constrained Exide's liquidity due to the tightened availability of trade credit.*

*As a result of the Vernon shutdown and the Company's poor financial performance in the fourth fiscal quarter of 2013,[15] it became apparent that a successful out-of court restructuring was unlikely.* Exide therefore retained Alvarez & Marsal North America, LLC ("A&M") and Skadden, Arps, Slate, Meagher & Flom LLP to provide financial and legal restructuring advice, respectively.

---

[15] Exide's fiscal year starts on April 1.

48

(emphasis in bold italics added).

107.  To make matters worse, due to the closures of Exide's recycling facilities in Reading, Pennsylvania and Frisco, Texas, by the end of 2012, Exide was largely dependent on the Vernon facility in order to recycle lead needed to manufacture new batteries to satisfy Exide's contractual obligations to its customers, as described *infra* by Joseph Preuth, Exide's Vice President of Recycling Operations and Operational Excellence.[16]  With the closure of the Frisco and Reading facilities, Exide was left with only three lead recycling facilities: the recycling centers in Vernon, California, Canon Hollow, Missouri, and Muncie, Indiana.  If Exide could not recycle enough lead to meet its battery recycling obligations, it was forced to purchase lead on the open market which was far more expensive.  Thus, as further explained below, Exide was faced with a difficult situation.  It could not afford to keep its Vernon facility in environmental compliance, yet it was dependent on the Vernon facility to continue as a going concern.

### F.   The Company's Ongoing Liquidity Problems Prevented Exide from Maintaining Environmental Compliance

108.  Because of Exide's deteriorating financial condition, the Company was in

---

[16]  Indeed, in May 2012, Exide reached a tentative agreement with the city of Frisco to shut down operations and clean up the Company's battery recycling facility in Frisco, amid the facility's violations of the EPA's Lead National Ambient Air Quality Standards. By November 30, 2012, the Frisco recycling plant had ended its operations.   Similarly, on November 8, 2012 Exide announced that the Company "will be idling its lead recycling operations at its Reading, Pa. facility, effective no later than March 31, 2013."  Here again, Exide had been struggling to finance the high costs required to bring the Reading facility into compliance with EPA regulations and to repair damage that had been done as a result of the facility's environmental noncompliance, which included discovered soil lead concentrations nearly three times the allowed amount of 400 mg/kg.

49

no position to pay for the increasing costs of environmental compliance, nor was it in a position to bear the costs of potential liability nor to withstand a potential shutdown of the Vernon facility. Each of these were known risks and uncertainties caused by noncompliance with environmental laws that could reasonably be expected to have a material adverse effect on Exide's liquidity and results of operations.

109. Technology had been on the market for years that drastically reduced emissions from battery recycling facilities. This technology, known as Wet Electrostatic Precipitator ("WESP") was installed at Quemetco, Inc. ("Quemetco"), a competing battery recycling facility in Southern California, in 2008, and it rendered Quemetco's maximum individual cancer risk only 4.4 in one million in 2010—compared to Exide's, 156 in one million.[17] According to Quemetco's public estimates, Quemetco expended approximately $20 million to install the WESP technology.[18]

---

[17] As Russell Kemp (Exide's environmental consultant) explains in his declaration, "[i]t was the installation of these devices that achieved the reduction in health risk from the Quemetco facility." *Id.* at 3.

[18] CI 7 (a refinery operator at Exide's Vernon facility from March 2013 to the end of April 2013, who had worked at Quemetco prior to working at Exide) explained that after working at Quemetco, which took anti-pollution measures very seriously, CI 7 was disturbed by the lack of effort made at Exide to protect the environment and operate a clean plant. CI 7 said the Vernon plant did not clean the bag houses enough or properly, which could lead to clogs and other problems. CI 7 said the bag houses were not cleaned the entire time CI 7 was at Exide, and CI 7 understood from other employees that they were rarely cleaned. To clean the bag houses properly, the furnace needs to be shut down so that employees can go inside the bags and vacuum the pollutants out. At Quemetco, according to CI 7, the bags were cleaned frequently, and every two to three months the furnace was shut down for a more thorough cleaning and vacuuming. In general, CI 7 said that employees at the Vernon plant did not seem to care about anti-pollution measures or maintaining a clean plant. CI 7 said the plant was dirty throughout and that management did not instill in employees a commitment to environmental protection like CI 7 had seen at Quemetco.

50

110.   WESP technology was not only known to Exide throughout the Class Period but had been openly recognized by regulatory agencies and the industry as the best available technology.   *See* Ghazi Declaration at 5.   WESP had also been specifically recommended to Exide by environmental regulators.   For example, an August 2012 memorandum "recommend[ed]" that Exide "implement Best Management Practices (BMPs) [including WESP] to reduce or eliminate off-site contamination from the facility."   *Id.* at 2.

111.   However, the implementation of WESP technology costs several million dollars, which Exide considered economically unfeasible for the Company.   Indeed, according to minutes from a November 5, 2010, AQMD district board meeting, Joe Dowd, Exide's Vice President and General Manager of North American Recycling, represented that "[t]he cost associated with further technology implementations may be too burdensome for [Exide] to continue operations in California."[19]   Moreover, in an August 29, 2011 letter to DTSC, Exide represented that it would not be economically feasible for Exide to implement the "available EPA-designated process control and ventilation control technologies, including (but not limited to) Wet

---

[19]   In response to this representation from Exide, AQMD informed Exide that "*since Quemetco has been able to achieve the acceptable level of control and health concerns have been raised by neighboring workers and residents [of Exide], staff believes it is reasonable to require a feasibility study from Exide if they exceed 0.12 mg/m3.*" (Emphasis added).   The minutes from the November 5, 2010, AQMD district board meeting, further stated, "*because of Exide being slow to take action in the past, [Mayor Yates] felt it necessary to include a provision in the rule for the feasibility study to be conducted if adequate progress is not being made by the measures detailed in the aggressive plan that they submitted to staff.*"

51

Electrostatic Precipitators and/or Fugitive Emission Filtration Units with HEPA filtration." Indeed, Exide further explained in the letter that *"the expected $30 million capital cost (and incremental cost of over $6 million per ton) renders the available technologies economically infeasible."* (emphasis added).

112.   The statements of former Exide employees further indicate that Exide did not have sufficient capital to ensure compliance with environmental regulations.  CI 10 (bag operator at Exide's Reading plant and union representative) recalled that broken equipment or environmental problems were often not fixed or addressed due to budgetary constraints.  According to CI 10, when employees pointed out broken equipment, leaky pipes, and other issues that needed upkeep, *"[i]t was always, 'The Company is broke. The Company doesn't have any money.'" CI 10 said.*  CI 9 (environmental manager at Exide's Muncie, Indiana plant from January 2012 to March 2013, who reported to the plant manager, Bob Saurer, and also directly to Fred Ganster) described similar instances in which Exide refused to implement needed upgrades. "Spending money was the big issue," CI 9 said. "We were pushed to spend the least amount of money we could to get what we needed to accomplish." According to CI 9, due to money shortages at Exide, worker at Exide plants would sometimes pilfer equipment from shuttered plants to fulfill their equipment needs.

113.   In truth, the economic impact of the Vernon facility's regulatory violations were, in fact, more than Exide could withstand.  Indeed, the violations were at least one of the reasons why Exide was forced to file for Chapter 11 bankruptcy.

52

*See* ¶106.

114.   Joseph Preuth (Vice President of Recycling Operations and Operational Excellence) described the impact of the Vernon facility's shutdown in a June 11, 2013 declaration submitted in the California Superior Court case.   In his declaration, Mr. Preuth stated, in relevant part:

> ***In order to maintain Exide's market share and avoid potentially disastrous and irreparable long-term impacts on its economic viability, Exide must continue to manufacture new batteries to satisfy its contractual obligations to its customers.***   It is simply not a viable solution to suspend or scale back production of batteries. ***Alternatively, continuing to manufacture the same number of batteries without the Vernon Facility in operation will cost Exide significantly more in procuring lead on the open market than with the Facility on-line.***

> I, and Exide employees working at my direction have compiled and analyzed information to calculate the economic impacts to Exide of the DTSC's Order shutting down the Vernon Facility. ***The monthly financial impact to Exide as a result of DTSC's Order shutting down the Vernon Facility is in the millions.***

> The largest additional costs related to the components needed as raw materials (plastic and lead) for the manufacture of new batteries. As a result of the Vernon shutdown, Exide had to source lead requirements from its remaining recycling facilities, open-market purchases of refined lead, and third-party lead recyclers to make up for the lost capacity increasing its costs. ***The Vernon shutdown will directly impact Exide's bottom line by eliminating an estimated $24 million in projected Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA) from its business plan for the six-month period following the shutdown.***

> Because Exide has been ordered to cease battery recycling activities at the Facility, it has been forced to lay off 65 employees in Vernon. However, Exide's operational expenses at Vernon continue. Because Exide must maintain certain ongoing activities at the Vernon Facility

53

in order to prevent it from violating South Coast Air Quality Management District permits, rules, and regulations, *Exide has and will incur numerous expenses related to the Facility averaging a five figure cost per month commencing in late April and every month thereafter.  This activity is not revenue-generating.*  The expenses that fall into this category are: plant fixed costs and salaries, wages, and benefits for a reduced Facility staff to run the primary pollution control systems known as "baghouses" and grounds cleaning that are required to operate under South Coast Air Quality Management District Rule 1420.

(emphasis added).

115.   Importantly, Mr. Preuth's declaration only assessed the economic impact of the temporary shutdown, which is but one aspect of the costs resulting from the Vernon facility's non-compliance.  In truth, the Vernon facility will also have the large expenses associated with the significant costs of remediating the violations, any liability found to have been caused by the environment violations, as well as, and the costs of defending against suits alleging harm based on the environmental violations.[20]

116.   The remediation costs alone will likely cost Exide tens of millions of dollars.  Indeed, CI 23 (project manager at DTSC overseeing Exide's plans to upgrade the pipe system) estimated that it would cost the Company several million dollars to replace the stormwater pipes.  With regard to the toxic air emissions, Mohsen Nazemi (District Deputy Executive Officer of AQMD), indicated that, despite the Company's current remediations, Exide may still be required to design a new air pollution system

---

[20] A class action on behalf of Los Angeles residents has already been brought against Exide, alleging physical harm due to the Vernon facility's environmental violations.  *See Zach Hernandez v. Exide Technologies*, Case No. BC 506901, filed on April 25, 2013 before the Superior Court of the State of California County of Los Angeles.

that could "potentially cost the Company millions of dollars."[21]

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS UNDER THE EXCHANGE ACT

### A.   Defendants' False and/or Misleading Statements Regarding Environmental Compliance

117.   The Class Period begins on June 1, 2011. On that day, Exide filed with the SEC on Form 10-K its annual report for the fiscal year ended March 31, 2011. The Form 10-K was signed by Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolonia, Ferguson, O'Higgins, and Pileggi.   In the Form 10-K, Defendants made the following disclosures:

> ***The Company is subject to costly regulation in relation to environmental and occupational, health and safety matters, which could adversely affect its business, financial condition, cash flows or results of operations.***[22]
>
> Throughout the world, the Company manufactures, distributes, recycles, and otherwise uses large amounts of potentially hazardous materials, especially lead and acid. As a result, the Company is subject to a substantial number of costly regulations. . . . ***Because some environmental laws can impose liability for the entire cost of cleanup upon any of the current or former owners or operators, regardless of fault, the Company could become liable for the cost of investigating or remediating contamination at these properties if contamination requiring such activities is discovered in the future***. . . . Although the Company believes that there is a reasonable basis in law to believe that it will ultimately be responsible for only its share of these remediation costs, there can be no assurance that the Company will prevail on these claims. . . . The Company may become obligated to pay material remediation-related costs at its closed

---

[21] This quote is taken from an article by *City New Source*, entitled "LA Council Committee Considers Taking Legal Action Against Vernon-Based Facility."

[22] Unless otherwise indicated, all bold and italics statements in the quoted segments denote a materially false or misleading statement.

55

Tampa, Florida facility in the amount of approximately $13.2 million to $19.9 million, and at the Columbus, Georgia facility in the amount of approximately $5.7 million to $8.5 million.

***The Company cannot be certain that it has been, or will at all times be, in complete compliance with all environmental requirements, or that the Company will not incur additional material costs or liabilities in connection with these requirements in excess of amounts it has reserved. . . . The Company has made and will continue to make expenditures to comply with environmental requirements. . . .***

(Emphasis added).

118.  Also in the Form 10-K was the following "Environmental Matters" disclosure:

**Environmental Matters**

As a result of its multinational manufacturing, distribution and recycling operations, the Company is subject to numerous federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which the Company operates (collectively, "EH&S laws").

The Company is exposed to liabilities under such EH&S laws arising from its past handling, release, storage and disposal of materials now designated as hazardous substances and hazardous wastes. The Company previously has received notification from the U.S. Environmental Protection Agency ("EPA"), equivalent state and local agencies or others alleging or indicating that the Company is or may be responsible for performing and/or investigating environmental remediation, or seeking the repayment of the costs spent by governmental entities or others performing investigations and/or remediation at certain U.S. sites under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws.

\*\*\*

56

The Company is also involved in the assessment and remediation of various other properties, including certain currently and formerly owned or operating facilities. Such assessment and remedial work is being conducted pursuant to applicable EH&S laws with varying degrees of involvement by appropriate regulatory authorities. In addition, certain environmental matters concerning the Company are pending in various courts or with certain environmental regulatory agencies with respect to these currently or formerly owned or operating locations. ***While the ultimate outcome of the environmental matters described in this paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.***

***The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.*** As of March 31, 2011 and March 31, 2010, the amount of such liabilities on the Company's Consolidated Balance Sheets was approximately $28.2 million and $31.8 million, respectively. Because environmental liabilities are not accrued until a liability is determined to be probable and reasonably estimable, not all potential future environmental liabilities have been included in the Company's environmental liabilities and, therefore, additional earnings charges are possible. Also, future findings or changes in estimates could have a material adverse effect on the recorded reserves and cash flows.

The sites that currently have the largest reserves include the following:

**Tampa, Florida**

The Tampa site is a former secondary lead recycling plant, lead oxide production facility, and sheet lead-rolling mill that operated from 1943 to 1989. Under a RCRA Part B Closure Permit and a Consent Decree with the State of Florida, Exide is required to investigate and remediate certain historic environmental impacts to the site. Cost estimates for remediation (closure and post-closure) are expected to range from $13.2 million to $19.9 million depending on final State of Florida requirements. The remediation activities are expected to occur over the course of several years.

57

**Columbus, Georgia**

The Columbus site is a former secondary lead recycling plant that was taken out of service in 1999, but remains part of a larger facility that includes an operating lead-acid battery manufacturing facility. Groundwater remediation activities began in 1988. Costs for supplemental investigations, remediation and site closure are currently estimated at $5.7 million to $8.5 million.

(Emphasis added.)

119.   Of the aforementioned Form 10-K disclosures, the following specific statements were materially misleading:

■ The Company is subject to costly regulation in relation to environmental and occupational, health and safety matters, which *could* adversely affect its business, financial condition, cash flows or results of operations.

■ Because some environmental laws can impose liability for the entire cost of cleanup upon any of the current or former owners or operators, regardless of fault, the Company *could* become liable for the cost of investigating or remediating contamination at these properties *if contamination requiring such activities is discovered in the future*.

■ The Company *cannot be certain* that it has been, or will at all times be, in complete compliance with all environmental requirements, or that the Company will not incur additional material costs or liabilities in connection with these requirements in excess of amounts it has reserved.

■ The Company *has made and will continue* to make expenditures *to comply with environmental requirements*.

■ While the ultimate outcome of the environmental matters described in this paragraph is uncertain, *the Company presently believes the resolution of these known environmental matters,* individually and in the aggregate, *will not have a material adverse* effect on the Company's financial condition, cash flows or results of operations.

58

■ The Company has *established liabilities for on-site and off-site environmental remediation costs* where such costs are probable and reasonably estimable and *believes that such liabilities are adequate*.

(Emphasis added).   Also materially misleading were the discussions of certain Exide facilities' environmental problems and remediation costs (*e.g.,* the discussion of Exide's Tampa, Florida and Columbus, Georgia facilities).

120.   The statements identified in the above paragraph were materially misleading when made because the disclosures omitted the following material facts that existed at the time and that were known by Defendants: (i) since at least 2010 (based on Exide's own source tests conducted in October 2010), Exide's Vernon battery recycling facility was continuously leaking arsenic into the environment at dangerously high levels that were approximately 100 times higher than arsenic emissions levels in 2008 (¶88), at levels AQMD claimed it had not seen in 25 years (¶3) and at levels that posed a non-compliant cancer risk (¶92) that was endangering over 100,000 residents in surrounding areas (¶100); (ii) the Vernon facility's more than 30 years-old stormwater pipes were not in compliance with regulations and would need to be upgraded to include secondary containment and leak detection as required under RCRA and Exide's interim operating permit, which was known to Exide since 2006 based on documents from DTSC to Exide (¶70); (iii) the Vernon facility's hazardous conditions and/or the Notice of Deficiency issued by the DTSC on March 21, 2011 (*see, e.g.,* ¶71); (iv) the Company could not afford to finance the

59

necessary remediations (¶¶108-116), which Exide knew would likely include the installation of best available technology, including WESP (¶¶109-111); and (v) the Vernon facility's environmental problems would require substantial and costly remediation (¶116).  Additionally, the statements regarding remediation costs and environmental problems at certain Exide facilities (*e.g.*, Tampa and Columbus) were materially misleading as they omitted any mention of Vernon and suggested that Exide's other facilities, including the Vernon facility, were environmentally compliant and/or would not require substantial remediations.  In fact, the remediation measures needed to make the Vernon facility compliant with the 2012 emission standards were not accounted for in the Company's remediation liabilities.[23]

121.  On August 4, 2011, November 9, 2011, and February 9, 2012 Exide issued Forms 10-Q.  The Forms 10-Q were signed by Defendant Damaska and were certified by Defendants Damaska and Bolch pursuant to the Sarbanes-Oxley Act.  The Forms 10-Q included "Environmental Matters" sections that were substantially the same as the "Environmental Matters" section quoted in paragraph 118.[24]  Accordingly,

---

[23] As acknowledged by Exide in an August 29, 2011 letter to DTSC, the Vernon facility's lead emissions were, at that time and earlier, in excess of the 2012 emissions standards.  As additionally admitted in the August 29, 2011 letter, Exide would need to implement costly upgrades to the Vernon facility in order to get its lead emissions under the 2012 limits.  Exide's plan to reduce its lead emissions was to construct an enclosure over certain baghouses on the Vernon facility, and Exide quantified that this would be a "$5 million dollar project."  However, even with the enclosure, it was unclear whether the emission levels would fall within the necessary levels, which would require Exide to "implement additional Compliance Plan measures to further reduce emissions."

[24] The February 9, 2012 Form 10-Q also included the following additional statement in its "Environmental Matters" disclosure:

60

the Forms 10-Q disclosures included the following specific statements that were materially misleading:

- While the ultimate outcome of the environmental matters described in this paragraph is uncertain, *the Company presently believes the resolution of these known environmental matters,* individually and in the aggregate, *will not have a material adverse* effect on the Company's financial condition, cash flows or results of operations.

- The Company has *established liabilities for on-site and off-site environmental remediation costs* where such costs are probable and reasonably estimable and *believes that such liabilities are adequate*.

(Emphasis added).  Also materially misleading were the discussions of certain Exide facilities' environmental problems and remediation costs (*e.g.,* the discussion of Exide's Tampa, Florida and Columbus, Georgia facilities, and in the case of Exide's February 9, 2012 Form 10-Q, the discussion of Exide's Reading, Pennsylvania facility (*see* fn. 24)).

122.   The statements in the above paragraph were materially misleading for the reasons described in paragraph 120, including that Exide was emitting hazardous and non-compliant levels of arsenic into the air and was maintaining a non-compliant piping system that was leaking hazardous materials into the ground water.   In addition, by the time these statements were issued, Exide was in the process of

---

The Company received a number of notices of violation issued by the Pennsylvania Department of Environmental Protection ("PADEP") for alleged violations of pollution control laws at its Reading, Pennsylvania recycling facility. To resolve these notices of violation, the Company negotiated a settlement agreement with PADEP that included monetary sanctions of $0.12 million to PADEP. The settlement also included an agreement to perform an emission control project.

investigating the cause of the extremely high arsenic emissions at the Vernon facility and by at least November 2011 had implemented certain remediation measures in an attempt to lower the arsenic emission levels (¶91).   Moreover, by October 2011, DTSC had already obtained samples from the piping system that indicated hazardous waste levels for lead, arsenic, and cadmium (¶73), and by late 2011, Defendants had agreed to provide a description of the piping system to DTSC (¶70).   Additionally, the statements regarding remediation costs and environmental problems at certain Exide facilities (*e.g.*, Tampa, Columbus, and Reading) were materially misleading as they omitted any mention of Vernon and suggested that Exide's other facilities, including the Vernon facility, were environmentally compliant and/or would not require substantial remediations.

123.   On June 7, 2012, Exide filed with the SEC on Form 10-K its annual report for the fiscal year ended March 31, 2012.   The Form 10-K was signed by Defendants Bolch, Damaska, Martinez, Aspbury D'Appolonia, Reilly Ferguson, O'Higgins and Pileggi.   The Form 10-K included statements that were substantially the same as the statements quoted in paragraphs 117 and 118.   Accordingly, the Form 10-K disclosures included the following specific statements that were materially misleading:

- The Company is subject to costly regulation in relation to environmental and occupational, health and safety matters, which *could* adversely affect its business, financial condition, cash flows or results of operations.

62

■ Because some environmental laws can impose liability for the entire cost of cleanup upon any of the current or former owners or operators, regardless of fault, the Company *could* become liable for the cost of investigating or remediating contamination at these properties *if contamination requiring such activities is discovered in the future*.

■ The Company *cannot be certain* that it has been, or will at all times be, in complete compliance with all environmental requirements, or that the Company will not incur additional material costs or liabilities in connection with these requirements in excess of amounts it has reserved.

■ The Company *has made and will continue* to make expenditures *to comply with environmental requirements*.

■ While the ultimate outcome of the environmental matters described in this paragraph is uncertain, *the Company presently believes the resolution of these known environmental matters,* individually and in the aggregate, *will not have a material adverse* effect on the Company's financial condition, cash flows or results of operations.

■ The Company has *established liabilities for on-site and off-site environmental remediation costs* where such costs are probable and reasonably estimable and *believes that such liabilities are adequate*.

(Emphasis added). Also materially misleading were the discussions of certain Exide facilities' environmental problems (*e.g.,* the discussions of Exide's Tampa, Florida and Columbus, Georgia facilities), which suggested that Exide's other facilities, including the Vernon facility, were environmentally compliant.

124.  The statements discussed in the above paragraph were materially misleading for the reasons described in paragraphs 120 and 122, including that Exide was emitting hazardous and non-compliant levels of arsenic and was maintaining a non-compliant piping system that was leaking hazardous materials into the ground

63

water.  In addition, by the time these statements were issued, Exide had completed an extensive investigation into the cause of the arsenic emissions and had implemented certain remediation measures in an attempt to lower the arsenic emission levels (¶91). Moreover, according to DTSC documents, by this time Exide had committed to survey, clean, and assess the integrity of the underground pipes in order to appease DTSC and to determine whether the pipes could be upgraded or would need to be wholly replaced (¶75).

125.   In addition, the Form 10-K included the following new disclosures:

On November 12, 2008, the Environmental Protection Agency ("EPA") published new lead emissions standards under the National Ambient Air Quality Standards ("NAAQS"), which became effective on January 12, 2009. The new standards further restrict lead emissions by reducing the off-site concentration standards for lead in air from 1.5 micrograms per cubic meter to 0.15 micrograms per cubic meter. The Company believes that the new standards could impact a number of its U.S. facilities. Under the Clean Air Act ("CAA"), publication by the EPA of these ambient air quality standards initiates a process by which the states develop rules implementing the standards. Recently, some states have accelerated their implementation and the Company is working with these states to meet their requirements. Although the final impact on the Company's operations cannot be reasonably determined at the current time, the Company believes that the financial impact of compliance with these lead emissions standards on its U.S. facilities will be funded through normal operations. Noncompliance with these standards could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations.

On January 5, 2012, the EPA passed the National Emissions Standards for Hazardous Air Pollutants ("NESHAP") for secondary

64

lead smelting. The final regulations include limits for lead and other fugitive emissions, particularly at the Company's lead recycling facilities, as well as additional testing and monitoring, recordkeeping, and reporting requirements. ***Although the Company currently believes a majority of these requirements will be met through efforts to attain compliance with NAAQS standards, our failure to attain compliance with NESHAP could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations.***

On January 17, 2012, the City of Frisco, Texas initiated actions that could have prevented the Company from proceeding with projects designed to comply with certain NAAQS implementation requirements related to the Company's Frisco, Texas recycling facility and that could have imposed an involuntary closure of the facility. The Company contested the City's actions, and subsequently reached a settlement with the City in June 2012 whereby the Company will sell certain land around the Company's facility for a total purchase price of $45.0 million, in return for the Company's agreement to cease operations at the site on or before December 31, 2012, assuming the City's funding commitments are met and the Company receives state certification for its remedial activities. If the funding obligations cannot be met, it is uncertain when the Company would be able to meet NAAQS and NESHAP compliance and continue operating the facility.

126.   The statements in the above paragraph were materially misleading because they discussed the Company's need to comply with specific environmental regulations, including the National Ambient Air Quality Standards and the National Air Emissions Standards for Hazardous Air Pollutants, and even discussed a specific site that had encountered problems complying with air emission standards, yet Defendants failed to disclose the then significant, costly and potentially devastating

65

existing problems at the Vernon facility (discussed in paragraphs 120, 122 and 124), which included non-compliant and highly toxic air emissions and a non-compliant and hazardous underground piping system.

127.   The day after filing its Form 10-K, on June 8, 2012, Exide held its earnings conference call for fiscal fourth quarter and year ended 2012.  Defendants Bolch and Damaska participated in and spoke during the call.  Defendant Bolch made the following materially false or misleading statements regarding Exide's environmental compliance:

> [BOLCH:] Additionally, I am pleased with our progress in complying with new stricter environmental standards, which have required significant investment to our US recycling facilities. Investments that began in 2008 will be completed by the end of calendar 2013.
>
> *The photo on the right side of this slide [6] is our Vernon, California, recycling facility, where these environment modifications were recently completed. We are seeing excellent results from our completed investment in Vernon, where air monitor readings are now tracking well below the new stricter standard.*
>
> \*\*\*
>
> STAN MANOUKIAN, ANALYST, INDEPENDENT CREDIT RESEARCH: Good afternoon; good morning, actually. Thank you for taking my question. *Slide 6, can you please clarify what it is exactly that you mean about the facility -- California recycling facility? Have you closed it or the problem is this part of the conversation.*
>
> JIM BOLCH: Sure, no problem. *No, in fact we have definitely not closed that facility. That is our Vernon, California, facility which is just outside of Los Angeles. That's a facility where we have now completed all of the environmental modifications, which include fully enclosing the building and putting it under negative pressure.*

66

*So the comment there was that those environmental modifications are complete. And that the results as measured by the air monitors are well within the new stricter air standards.* But it's (technical difficulty) up and running at capacity.

\*\*\*

ERIC WERWE, ANALYST, EBF & ASSOCIATES: I have a question on CapEx -- you took your CapEx guidance from $110 million down to $100 million for this year. What areas are you taking down? I know you had some environmental CapEx in there that you are going to need to spend, there was AGM buildout. What area are you scrimping back on? Then, as you look into next year, do you have room to pare back, if you were to see results deteriorate further? And in what areas?

PHIL DAMASKA: We have clearly scaled back the capital this year, to address the cash flow. We want to make sure that we maximize cash flow this year. *We haven't taken it out of major environmental-related projects. We understand we have to keep our recycling businesses in compliance with regulations, and we aren't going to compromise that.* We aren't compromising our AGM buildout.

(Emphasis added).

128.   Of the aforementioned statements, the following specific statements regarding Exide's environmental compliance were materially false or misleading:

■ [Bolch:] The photo on the right side of this slide [6] is our Vernon, California, recycling facility, where these environment modifications were recently completed. *We are seeing excellent results from our completed investment in Vernon, where air monitor readings are now tracking well below the new stricter standard.*

■ [In response to Analyst Stan Manoukian's question about whether there are problems with the Vernon facility, Bolch:] *No, in fact we have definitely not closed that facility. That is our Vernon, California, facility which is just outside of Los Angeles. That's a facility where we have now completed all of the environmental*

67

*modifications, which include fully enclosing the building and putting it under negative pressure.*

■ [Bolch:] *So the comment there was that those environmental modifications are complete. And that the results as measured by the air monitors are well within the new stricter air standards.*

129.   Contrary to Defendant Bolch's statements "air monitor readings" were not "tracking well below the new stricter standard, and the results as measured by the air monitors" were not "well within the new stricter air standards."  Since 2011, Exide had known that the Vernon facility was emitting significantly high arsenic emissions and had known that the emissions caused non-compliant cancer risks well above the regulated levels. *See* ¶¶87-90.[25]  Moreover, Defendant Bolch's statement that Exide had "now completed all of the environmental modifications" at Vernon was materially false or at least misleading because Exide was at that time emitting dangerous and non-compliant levels of arsenic into the air and was maintaining a non-compliant piping system that Exide knew would at least require substantial retrofitting, including secondary lining and leak detection, and that could likely require complete

---

[25] Moroever, in June 2012, Exide was aware of high levels of lead emissions that resulted in a 30-day rolling average concentration of lead that exceeded the 0.150 ug/m3 limit required by Rule 1420.1.  According to a publicly available Notice of Violation ("NOV"), AQMD served Exide with an official Notice of Violation on August 10, 2012.  The NOV lists the date of violation as *June 1, 2012* and describes the violation as: "(1) not complying with R. 1420.1 complaint plan . . . (2) discharging into the atmosphere lead emissions exceeding 0.15mg/m3 averaged over 30 days, (3) not beginning daily sampling within 3 calendar days of exceeding 0.15 mg/m3 averages over 30 days at the mid sampler."  No disposition is given on the NOV, and AQMD has refused to provide Plaintiffs with additional documents relating to this NOV, stating that the issues are still pending investigation.  However, on January 16, 2014, AQMD filed a civil complaint against Exide for violation of various environmental regulations and alleged that the Vernon facility discharged non-compliant led emissions during 2012 and in 2013.

68

replacement (¶¶70, 82, and 84). Moreover, Bolch's positive statements regarding environmental compliance, when viewed as a whole, led investors to believe there were no significant environmental violations at the Vernon plant when, in fact, there were many.

130.   On August 2, 2012, Exide filed with the SEC on Form 10-Q its quarterly report for the fiscal first quarter, ended June 30, 2012.  The Form 10-Q was signed by Defendant Damaska and was certified by Defendants Damaska and Bolch pursuant to the Sarbanes-Oxley Act.  The Form 10-Q included statements that were substantially the same as the statements quoted in paragraph 118 and included the following specific statements that were materially misleading:

- ■ While the ultimate outcome of the environmental matters described in this paragraph is uncertain due to several factors, including the number of other parties that may also be responsible, the scope of investigation performed at such sites and the remediation alternatives pursued by such federal and equivalent state and local agencies, *the Company presently believes any liability for these matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations*.

- ■ While the ultimate outcome of the environmental matters described in this paragraph is uncertain, *the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations*.

- ■ The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable *and reasonably estimable and believes that such liabilities are adequate*.

69

(Emphasis added).  Also materially misleading were the discussions of certain Exide facilities' environmental problems (*e.g.,* the discussions of Exide's Tampa, Florida and Columbus, Georgia facilities), which suggested that Exide's other facilities, including the Vernon facility, were environmentally compliant.

131.  The statements in the above paragraph were materially misleading for the reasons described in paragraphs 120, 122, and 124, including that Exide was emitting hazardous and non-compliant levels of arsenic and was maintaining a non-compliant piping system that was leaking hazardous materials into the gorund water and which Exide knew would require substantial upgrades if not entire replacement to bring the pipes into code.  In fact, by October 2011, DTSC had already notified Exide of samples from the piping system that indicated hazardous waste levels for lead, arsenic, and cadmium, and by late 2011, Defendants had agreed to provide a description of the pipeline system to DTSC (¶75).  Moreover, in July 2012, DTSC had submitted a Technical Review to Exide, which identified the pipes as "compromised," discussed a recent sample obtained from one of the pipe's catch basins that contained hazardous amounts of lead, and emphasized the need for Exide to ensure that the soil underneath the pipes did not contain contaminants (¶76).  In addition, by the time these statements were issued, Exide had completed an extensive investigation into the cause of the arsenic emissions, had implemented certain remediation measures, which were unsuccessful, in an attempt to lower the arsenic emission levels (¶91) and had

conducted the second health risk assessment, which revealed a cancer risk of "around 200 in a million," which was "well above the 25 [risk reduction threshold]" (¶¶92-93). In fact, according to Exide's environmental consultant, Exide knew in August 2012 that "*we would have to be completing a risk assessment and head towards the risk reduction program*" (¶92).

132.   In addition, the Form 10-Q included the following new disclosures:

*The Company received a number of notices of violation issued by the South Coast Air Quality Management District ("SCAQMD") for alleged violations of relevant air rules at its Vernon California recycling facility. On May 22, 2012 the Company agreed to a settlement including payment of monetary sanctions of $0.12 million to SCAQMD to resolve these notices of violation.*

The Company received a Notice of Proposed Assessment of Civil Penalty issued by the United States Environmental Protection Agency ("EPA") for an alleged violation related to its Frisco, Texas recycling facility's National Pollutant Discharge Elimination System (NPDES) permit. Effective July 3, 2012, the Company and EPA entered into a consent agreement for the Company to pay a penalty of $0.14 million to EPA to resolve the matter.

*The Company received an administrative enforcement order and first amendment to enforcement order issued by the Department of Toxic Substances Control ("DTSC") for alleged violations of relevant health and safety rules related to the operation and management of the storm water retention pond at its Vernon. California recycling facility. On July 9, 2012, the Company agreed to a payment of monetary sanctions of $0.2 million to DTSC to resolve the administrative order.*

133.   Of the above disclosures, the following statements regarding the Veron facility were materially misleading:

71

- The Company received a number of notices of violation issued by the South Coast Air Quality Management District ("SCAOMD") for alleged violations of relevant air rules at its Vernon California recycling facility. On May 22, 2012 the Company agreed to a settlement including payment of monetary sanctions of $0.12 million to SCAOMD to resolve these notices of violation.

- The Company received an administrative enforcement order and first amendment to enforcement order issued by the Department of Toxic Substances Control ("DTSC") for alleged violations of relevant health and safety rules related to the operation and management of the storm water retention pond at its Vernon. California recycling facility. On July 9, 2012, the Company agreed to a payment of monetary sanctions of $0.2 million to DTSC to resolve the administrative order.

134.   These statements misleadingly suggested that while the Company had violated certain environmental regulations at its Vernon facility such violations were minor, such violations had been remediated, and such violations represented the only violations at the Vernon facility.  Specifically, while Exide disclosed that it had received notices of violations from the AQMD as well as an administrative enforcement order from DTCS, the Company misleadingly presented the alleged violations as minor infractions and further misleadingly suggested that the facility was otherwise environmentally compliant.  In truth, Exide's Vernon facility was emitting extremely toxic air contaminants (¶¶87-99), had underground piping that was not in compliance with relevant codes and that was depositing toxic waste into the groundwater (¶¶70-84), had not remediated the severe environmental problems (¶¶85, 97), and had received additional Notices of Deficiencies as well as other regulatory communications regarding the noncompliant air emissions and underground piping

72

that were never disclosed (¶¶71, 76-78, 90-98).

135.   On November 11, 2012, Exide filed with the SEC on Form 10-Q its quarterly report for its fiscal second quarter ended September 30, 2012.  The Form 10-Q was signed by Defendant Damaska and was certified by Defendants Damaska and Bolch pursuant to the Sarbanes-Oxley Act.   The Form 10-Q included an "Environmental Matters" section that was substantially the same as the "Environmental Matters" section quoted in paragraph 118.  Accordingly, the Form 10-Q disclosures included the following specific statements that were materially misleading:

■   While the ultimate outcome of the environmental matters described in this paragraph is uncertain, *the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.*

■   The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable *and believes that such liabilities are adequate*.

(Emphasis added).

136.   The statements in the above paragraph were materially misleading for the reasons described in paragraphs 120, 122, 124, and 131, including that Exide was emitting hazardous and non-compliant levels of arsenic[26] and was maintaining a non-

---

[26] In fact, by at least August 2012, Exide knew it "*would have to be completing a risk assessment and head towards the risk reduction program*" (¶96).

73

compliant piping system that was leaking hazardous materials into the ground water and which Exide knew would require substantial upgrades if not entire replacement to bring the pipes into code. Additionally, by this time, Exide was nearly complete with its inspection of the pipes, which began in July 2012 and ended in December 2012, and which revealed considerable deterioration to the point that the pipes would need to be wholly replaced (¶¶75, 79-82). Indeed, according to CI 12 (DTSC project manager overseeing Exide's compliance), Exide "knew they had to replace the pipes" back in 2012, describing it as "a given" (¶84). Moreover, by this time, Defendants acknowledged that the arsenic emissions were creating health risks well above the risk reduction thresholds (¶92). In fact, according to slides from an Exide presentation, by November 2012, Exide had engaged Environ, its environmental consultant, to assist Exide in developing a risk reduction plan to address the Vernon facility's high arsenic emissions.[27]

137. On February 6, 2013, Exide filed with the SEC on Form 10-Q its quarterly report for the fiscal third quarter ended December 31, 2012. The Form 10-Q was signed by Defendant Damaska and was certified by Defendants Damaska and Bolch pursuant to the Sarbanes-Oxley Act. The Form 10-Q included an "Environmental Matters" section that was substantially the same as the "Environmental Matters" section quoted in paragraph 118. Accordingly, the Forms

---

[27] This information was obtained from a February 27, 2013 PowerPoint presentation prepared by Exide. Slides from the presentation were used as exhibits in the Administrative Hearing held in June 2013.

10-Q disclosures included the following specific statements that were materially misleading:

■ While the ultimate outcome of the environmental matters described in this paragraph is uncertain, the Company presently believes the resolution of these known environmental matters, individually and in the aggregate, will not have a material adverse effect on the Company's financial condition, cash flows or results of operations.

■ On December 7, 2012, the Company entered into an Agreed Order with the Texas Commission on Environmental Quality ("TCEQ") that includes a penalty of $0.6 million to resolve a notice of enforcement issued by TCEQ for alleged air and waste rule violations at the Company's now closed Frisco, Texas recycling facility.

■ The Company has established liabilities for on-site and off-site environmental remediation costs where such costs are probable and reasonably estimable and believes that such liabilities are adequate.

138.   The statements in the above paragraph were materially misleading for the reasons described in paragraphs 120, 122, 124, 131, and 136, including that Exide was emitting hazardous and non-compliant levels of arsenic[28] and was maintaining a non-compliant piping system that was leaking hazardous materials into the gorund water and which Exide knew would require substantial upgrades if not entire replacement to bring the pipes into code.  Indeed, by this time, Exide had completed its inspection of the pipes, which began in July 2012 and ended in December 2012, which revealed considerable deterioration to the point that the pipes would need to be wholly replaced (¶¶75, 79-82).  Moreover, by this time, Exide had presented the results of the health

---

[28] In fact, by at least August 2012, Exide knew it "*would have to be completing a risk assessment and head towards the risk reduction program*" (¶96).

75

risk assessments based on the average of the 2010 and 2012 results to DTSC and AQMD and were admittedly aware that the cancer risk from arsenic emissions was well above the risk reduction limits, and would require considerable remediation (¶¶92-93).

139.   Defendants' Class Period materially false and misleading statements concealed the large looming liability arising out of the toxic conditions of Exide's Vernon, California facility, and the inability of the Company to meet its debt obligations, its liquidity crisis and potential insolvency. As a result, Exide stock and notes traded at artificially inflated prices during the Class Period.

140.   The Vernon facility's environmental noncompliance, outdated and deteriorated stormwater pipes containing hazardous waste that compromised underlying soil and water supply, excessive arsenic emissions that posed significantly high cancer risks, liquidity problems, and increasing inability to fund necessary remediations and operations constituted information that would be material to investors.

141.   Based on Exide's own source tests and health risk assessments, it was evident that the Vernon facility's emissions posed a cancer risk far in excess of Rule 1402 thresholds (*see* ¶92).  By exceeding the cancer risk of 10 in one million, it was clear that Exide would be required to hold a public hearing to discuss the high cancer risk with the community (¶96).  This requirement alone had material implications on the Company.  By all accounts, including numerous accounts from AQMD officials,

76

the arsenic levels and the cancer risk posed by the Vernon facility's emissions were outrageous (¶88).  Indeed, according to AQMD, the cancer risk associated with the Vernon's facility's 2010 and 2012 tests were far above any cancer risk AQMD had encountered in its more than 25 year history (¶3).  Thus, the requirement that Exide hold a public meeting to discuss the astonishing cancer risk with the surrounding community that had been consistently exposed to the toxic emissions from the Vernon facility for more than two years posed considerable risks, including the risks and costs associated with defending and funding recoveries for any lawsuits that were brought against Exide alleging physical harm as a result of the exposure.[29]  In addition, the public hearing mandate created the risk that the community might pressure regulators and/or other public officials to shut down the Vernon facility.  To be sure, Defendants had first-hand knowledge of this risk based on the response of the Frisco community upon discovering that Exide's battery recycling plant in Frisco was not in compliance with air emissions standards.  Moreover, the public meetings regarding the dangerously high arsenic levels would inevitably result in a call for regulators to increase their scrutiny of the Vernon facility, and in fact, since the public meetings, AQMD has filed a petition to close the Vernon facility's operations until its air emissions are remediated (¶17) and has filed a civil lawsuit seeking up to $40 million in damages (¶19) while DTSC has separately sought and settled an action against

---

[29] Following requests from two California state senators, the bankruptcy court agreed to provide Vernon residents with additional time to file claims based on alleged personal injury suffered as a result of the facility's pollution.

Exide (¶¶10 and 73, fn. 7),  and has further ordered Exide to perform an extensive emergency cleanup of areas surrounding the facility (¶18).  Further, because the cancer risks posed by the Vernon facility's emissions exceeded 25 in one million, Exide knew it would be required to present risk reduction measures to AQMD, which would require Exide to fund the costs of extensive remediations (¶92).

142.  Based on Exide's communications with AQMD and DTSC and based on Exide's previous experiences with its Frisco facility, Defendants were specifically aware, or should have been aware in the absence of extreme recklessness, that the Vernon facility's environmental violations would at worst result in a shutdown of the facility, and would at best cost the Company tens of millions of dollars in remediation measures and require temporary shutdowns of all or part of the facility during implementation of those remediation measures.  Indeed, Defendants knew or should have known that it would require drastic and costly retrofitting in order to bring the Vernon facility into maintainable compliance (¶¶67, 70, 84, 97, 102).  As explained by AQMD's Deputy Executive Officer Mohsen Nazemi, the emission problems at Exide could not be resolved with minor pollution control measures as these do not provide "a permanent fix."  Not surprisingly, AQMD required more from Exide. Indeed, to provide a permanent solution, AQMD explained that Exide could be responsible for designing a "brand new air pollution system" that would cost the Company "millions of dollars."  However, Exide has already represented to AQMD and DTSC that implementation of best available technology was economically

unfeasible.  If Exide fails to comply with AQMD's conditions, it could face fines of $25,000 a day and, ultimately, a court order to shut down the facility.  Similarly, Exide is also required to remove and replace its stormwater pipes, which is likely to cost the Company several million dollars in remediation costs alone.

143.   For Exide, the materiality of the undisclosed environmental problems and associated risks is evidenced by the events that followed the Company's public hearing to discuss the arsenic emissions and corresponding cancer risk.  Since the public hearing, Exide has been made to present and implement risk reduction measures, has been targeted by Los Angeles residents and organizations devoted to environmental safety concerns (including the *Consumer Watchdog* group), has been more closely scrutinized by regulatory agencies (including recent requirements that the Company conduct extensive sampling in the neighborhoods surrounding the Vernon facility to determine whether hazardous levels of metals are present, has been shut down by the DTSC, has become subject to an amended Rule 1420 (adopted on January 10, 2014 in response to Exide's high arsenic levels)[30] that requires Exide to implement additional air pollution control equipment and other modifications projected to cost Exide $1.83 million annually and that will subject Exide to frequent regulatory testing specific to arsenic, benzene and 1,3-butadiene, and has filed for bankruptcy.

---

[30] According to an official statement from AQMD, "AQMD staff proposed the additional requirements in Rule 1420.1 last year in the wake of a Health Risk Assessment showing that Exide caused an unacceptably high cancer risk for 110,000 residents in southeast Los Angeles County due in large part to its arsenic emissions."

79

**B.     Defendants' False and/or Misleading Statements Regarding Exide's Liquidity and Business Operations**

144.   On February 12, 2012, Exide held its earnings conference call for fiscal third quarter 2012.  Defendants Bolch and Damaska participated in and spoke during the call.  Defendants made the following materially false or misleading statements:

> [Bolch:]   Please turn to slide 4. As I just noted, Transportation America has continued to have its challenges with the results quarter over quarter. During our conference call in November, we identified five key actions to turn this business around. Fixing this business remains a top priority for the company, and for me personally. ***Based upon our progress to date in these key areas, we believe this business has stabilized.***
>
> ***
>
> [Bolch:]  Thanks, Phil. [As shown] this morning, it was a challenging quarter made tougher by warmer than normal weather that impacted our aftermarket transportation businesses. ***While I'm disappointed with the results, I am encouraged that the transportation Americas turnaround plan announced last quarter is solidly on track*** and we have seen wins in all global businesses.
>
> ***
>
> SEAN NAUGHTON, ANALYST, PIPER JAFFRAY: This is [Sean] for Amar. Just wondering if you guys could give us a little bit more color on the Transportation Americas segment? You talk about stabilizing it, the turnaround is on track; can you tell us how things progressed in the quarter, and where we are in terms of getting that business back to a sustained and profitable level?
>
> PHIL DAMASKA: You saw the profits of about $3 million, down dramatically year-over-year. The $3 million this year, as I indicated, included a $1 million restructuring charge. In our commentary, we indicated it was essentially our first profitable quarter of the year, and we also indicated that it was principally driven by results in the month of December. ***So, we are cautiously optimistic, we have indicated that we believe we have stabilized the business,*** and January results

80

also appear to be moving in that direction and that trend, as well. So, again, we are cautiously optimistic that we have the initiatives in place to drive that business forward.

*** 

KIRK LUDTKE: Okay. Then, lastly, is it too early to talk about fiscal 2013 cash requirements? Is there anything you can share with us on that?

PHIL DAMASKA: We are still in our -- in finalizing our operating plan for FY '13. At this point in time, I am not prepared to comment on cash, *other than to say that our liquidity remains very solid*, and we expect to be able to fund the necessary investments for the remainder of this year, and in through '13 with cash generation and lateral liquidity.

(emphasis added).

145.   Of the aforementioned statements, the following specific statements by Defendants Bolch and Damaska were materially false or misleading:

■ [Bolch:]  *Based upon our progress to date in these key areas, we believe this [transportation] business has stabilized.*

■ [Bolch:]  *While I'm disappointed with the results, I am encouraged that the transportation Americas turnaround plan announced last quarter is solidly on track* and we have seen wins in all global businesses.

■ [Damaska:]  At this point in time, I am not prepared to comment on cash, *other than to say that our liquidity remains very solid*, and we expect to be able to fund the necessary investments for the remainder of this year, and in through '13 with cash generation and lateral liquidity.

■  [Damaska:] *So, we are cautiously optimistic, we have indicated that we believe we have stabilized the business, …*

81

146. In reality, the Company's liquidity was not "very solid," and the Americas turnaround plan was not "solidly on track" or "stabilized."[31] As Defendant Damaska admitted in his bankruptcy proceeding declaration, Exide's cost cutting and restructuring plans that were implemented in 2010 after the Company lost Wal-Mart as a customer had failed and "[d]espite these efforts, the Debtor's financial position continued to decline." CI 10 (a bag house operator at Exide's Redding, Pennsylvania plant from 1994 to May 10, 2013 and union representative) similarly explained that a big hit to the Company came when Exide lost Wal-Mart as a customer and as a source for core material. CI 10 explained that in recent years, Exide's battery manufacturing business was "a losing proposition." Exide's battery volume had dropped off from about 52 million batteries sold a year to about 14 million last year (2012). "It's no wonder why they are floundering the way they are," CI 10 said. CI 5 (manager of Environmental, Health and Safety at an Exide plant in Bristol, Tennessee from July 2011 to February 2012) similarly described that Exide was barely hanging on financially when he was at the Company from July 2011 to February 2012. "Environmental issues were really killing them," CI 5 said. CI 9 (environmental manager at Exide's Muncie, Indiana plant from January 2012 to March 2013, who reported to the plant manager, Bob Saurer, and also directly to Fred Ganster) also described money shortages and said that Exide was always short on cash flow, and

---

[31] Liquidity has been described by financial experts as "the ability or ease with which [a company can] timely meet its financial obligations and fund its operations with cash on hand, assets readily convertible to cash on hand, cash from operations, or readily accessible sources of debt." *See, e.g., In re Vivendi Universal, S.A. Sec. Litig.,* 634 F.Supp.2d 352, 366 (S.D.N.Y. 2009).

82

that managers were constantly pressured to keep costs down. "Spending money was the big issue," CI 9 said.   CI 9 often heard from vendors and consultants who complained they were not being paid by the Company and CI 9 regularly had to bring the overdue bills to management's attention to obtain payments.  Indeed, as admitted by Damaska in his bankruptcy declaration: "Constrained liquidity also has limited Exide's ability to invest in its businesses, primarily in North America, causing the Company to be at a competitive disadvantage relative to bigger, better-capitalized competitors."

147.   On June 8, 2012, Exide held its earnings conference call for fiscal fourth quarter 2012.  Defendants Bolch and Damaska participated in and spoke during the call.  Defendants made the following materially false or misleading statements:

> [Jim Bolch;]  Please turn to slide 4 for an update of our Transportation Americas business. During our conference call in November we identified five key actions to improve the financial performance of this business. *We remain committed to this strategy and we are tracking well to our plans.*
>
> *I am pleased with the new leadership in the Americas business; and despite challenges, the team is making steady progress.*
>
>                         ***
>
> [Damaska:]  *We believe the Company's current liquidity position remains healthy.* At March 31, 2012, we had total liquidity of $312 million versus $318 million at the end of the fiscal 2011. The current year includes $155 million in cash and $153 million under the revolving credit facility.
>
> Year-end liquidity for the most recent two years is the highest reported level for the Company in the past decade. In light of the

83

1
2
3

agreement with the city of Frisco along with other identified initiatives, we believe the liquidity position will remain solid. Capital spending for fiscal 2013 is expected to be at levels consistent with the recent past.

4
5

***

6
7
8

[Bolch:]  All of us at Exide are working diligently so that the results of 2012 will not be repeated. *I strongly believe we are on track to drive improved results.* We are investing in our future through a number of initiatives.

9
10
11
12

*We are making good progress with our actions to turn around the Americas Transportation business* and are increasing our focus on the European Industrial business as well. We have chosen to sell or close certain assets to improve our operating performance and enhance cash flow.

13
14

***

15
16
17
18

TOM DANIELS, ANALYST, STIFEL NICOLAUS: Good morning, guys. Thanks for taking my question. I was hoping maybe you could talk a little bit more about your European outlook given everything going on. I think competitors saw Western Europe being in a clear recession. How are you guys seeing your business there over the next 12 months?

19
20
21
22
23

JIM BOLCH: I think, a little bit of this you have to read the newspaper every morning, decide what you think Europe is going to do. Clearly it is a volatile situation and it's something we watch. What we can see today in our backlogs -- and probably the one -- or I should say there's actually two areas that you would be most concerned about.

24
25
26
27

*One is the Industrial side, and there we actually have not seen any letup in orders. In fact Industrial Europe sequentially back order was up 25% over last quarter and also up versus last year as well.* I will also comment there that the Industrial North America business was also up about 50% over last quarter.

28

84

So we will continue to watch that one pretty carefully. I think on the Industrial side though in Europe, as we stated earlier, that market has never fully recovered back from the recession. So I think there's really less buffer there than there was before, and so consequently less to fall. But we will watch it very carefully and monitor costs.

*The other one that potentially could be impacted by European economic issues is the OE build. There's certainly a lot of people watching that. To date our orders have remained pretty stable there.*

We certainly feel good about the new platforms coming in with new technology, and we are well positioned on those platforms. So I think time will tell how the car build goes.

*Then lastly would be the aftermarket side. The aftermarket side we have seen has been quite steady throughout the economic cycles. Especially if people aren't buying new cars they hold onto older cars, and that aftermarket business holds up pretty well.*

\*\*\*

SEAN BRITAIN: Okay. *As of right now you are not seeing a slowdown in that Industrial European sector?*

JIM BOLCH: *No, if anything -- and I quoted the number before -- we saw sequentially quarter-over-quarter backlogs going up about 25% in that business, and we are seeing still strong demand.*

(emphasis added).

148.   Of the aforementioned statements, the following specific statements regarding liquidity and business prospects were materially false or misleading:

■   [Bolch:] *We remain committed to this strategy and we are tracking well to our plans.*

■   [Bolch:] *I am pleased with the new leadership in the Americas business; and despite challenges, the team is making steady progress.*

85

1
2

- ■ [Damaska:] *We believe the Company's current liquidity position remains healthy.*

3
4

- ■ [Bolch:] *We are making good progress with our actions to turn around the Americas Transportation business.*

5

149.   In reality, the Company's cost cutting plan was failing, the Compnay was

6
7

not "making steady progress" in turning around the Americas transportation business

8

and the Company's liquidity was not "healthy."  As Defendant Damaska admitted in

9

his bankruptcy proceeding declaration, Exide's cost cutting and restructuring plans

10
11

that were implemented in 2010 after the Company lost WalMart as a customer had

12

failed and "[d]espite these efforts, the Debtor's financial position continued to

13

decline." Similarly, CI 5 (manager of Environmental, Health and Safety at an Exide

14
15

plant in Bristol, Tennessee from July 2011 to February 2012) said Exide was barely

16

hanging on financially when he was at the Company from July 2011 to February

17

2012. "Environmental issues were really killing them," CI 5 said.

18
19

150.  Further, the following specific statements about the Company's

20

operations in Europe were materially false or misleading:

21

- ■ [Bolch:] *One is the Industrial side, and there we actually have not seen any letup in orders. In fact Industrial Europe sequentially back order was up 25% over last quarter and also up versus last year as well.*

22
23

24

- ■ [Bolch:] *The other one that potentially could be impacted by European economic issues is the OE build. There's certainly a lot of people watching that. To date our orders have remained pretty stable there.*

25
26

27

28

- ■ [Bolch:] *Then lastly would be the aftermarket side. The*

86

*aftermarket side we have seen has been quite steady throughout the economic cycles. Especially if people aren't buying new cars they hold onto older cars, and that aftermarket business holds up pretty well.*

151.   In direct contrast to the above statements, Defendant Damaska, in his declaration filed in Exide's bankruptcy, explained that Exide's exposure to European markets was one of the key factors leading to the Company's bankruptcy, stating, "[w]ith significant operations in Europe accounting for approximately 51.2% of the Company's worldwide revenue, Exide has been negatively impacted by the recent economic downturn that has persisted in Europe."

152.   On August 3, 2012, Exide held its earnings conference call for fiscal first quarter 2013.  Defendants Bolch and Damaska participated in and spoke during the call.  Defendants made the following materially false or misleading statements:

[Phil Damaska:] Operating income declined versus the prior year period, primarily the result of higher core costs, lower after market mix in the America's, and much lower profits on third party lead sales. Given the decline in profitability in the America's business, the evaluation of our US deferred tax asset resulted in the establishment of evaluation allowance of approximately $88 million. This non cash charge does not necessarily impact the ultimate utilization of the associated net operating losses. *As we execute our strategy of cost reduction [in] transportation, and growth in industrial energy, we are confident in our ability to return the America's business to sustained profitability, and allow us to ultimately utilize this long lived tax asset.*

***

CRAIG IRWIN: Excellent, and then another follow-up. Just really another housekeeping question is, over the past few quarters, you discussed a level of price competition in the Industrials business.

87

Given the nice units actually that you had in industrial rest of world, and I guess decent units for industrial North America, it sort of suggests that sort of more alarmist views out there on demand might be completely wrong. Can you update us on whether or not the macro environment is impacting pricing and your ability to get price when lead goes up and down?

JIM BOLCH: ***Well in terms of Europe and rest of world I think you characterized it, demand has been pretty solid there in spite of the economic uncertainties in Europe and we have seen the order backlog increase, as well. Most of those contracts, if not all, have lead escalators built into them. That equation still works pretty well in Europe today, as our input costs tend to be pretty well correlated to the LME [London Metal Exchange].***

(emphasis added).

153.  Of the aforementioned statements, the following specific statements regarding liquidity and business prospects were materially false or misleading:

- ***As we execute our strategy of cost reduction [in] transportation, and growth in industrial energy, we are confident in our ability to return the America's business to sustained profitability, and allow us to ultimately utilize this long lived tax asset.***

- [BOLCH:] ***Well in terms of Europe and rest of world I think you characterized it, demand has been pretty solid there in spite of the economic uncertainties in Europe and we have seen the order backlog increase, as well. Most of those contracts, if not all, have lead escalators built into them. That equation still works pretty well in Europe today, as our input costs tend to be pretty well correlated to the LME [London Metal Exchange].***

154.  Defendants' statements about the Company's operations in Europe were materially false or misleading for the reasons described in paragraphs 149, 151 and 154.  Moreover, Exide's financial problems were, by at least this time, exacerbated by

88

the mounting environmental problems at the Vernon facility.[32]

155.   On February 7, 2013, Exide held its earnings conference call for fiscal third quarter 2013.  Defendants Bolch and Damaska participated in and spoke during the call.  Defendants made the following materially false or misleading statements:

> JAMES BOLCH: Thanks, Phil. ***Slide 12 is a summary of the progress we've made in our strategic initiatives by segment.*** I discussed most of these in my earlier dialogue, so this slide serves to bring those comments together. ***We've made solid progress on executing our strategic initiatives this year.***
>
> Most of the expected financial benefits will not become evident though until fiscal 2014. This is certainly the case for Transportation Americas. As Phil indicated, we'll be ramping to the full run rate savings for the Bristol closure in the first half of fiscal '14.
>
> ***
>
> ***While I am slightly satisfied with the current financial performance, I am very encouraged with the steady progress on many fronts. We are laser focused on the execution of our key initiatives and driving to improve results.*** As we close fiscal 2013 and prepare for the next fiscal year, driving productivity and cash generation is without a doubt in the forefront of our plans.
>
> ***

---

[32] By this time, DTSC had already notified Exide of samples from the piping system that indicated hazardous waste levels for lead, arsenic, and cadmium, and by late 2011, Defendants had agreed to provide a description of the pipeline system to DTSC (¶75). Moreover, in July 2012, DTSC had submitted a Technical Review to Exide, which identified the pipes as "compromised," discussed a recent sample obtained from one of the pipe's catch basins that contained hazardous amounts of lead, and emphasized the need for Exide to ensure that the soil underneath the pipes did not contain contaminants.  In addition, by the time these statements were issued, Exide had completed an extensive investigation into the cause of the arsenic emissions, had implemented certain remediation measures in attempt to lower the arsenic emission levels (¶91) and had conducted the second health risk assessment, which revealed a cancer risk of "around 200 in a million," which was "well above the 25 [risk reduction threshold]" (¶94).  In fact, according to Exide's environmental consultant, Exide knew in August 2012 that "***we would have to be completing a risk assessment and head towards the risk reduction program***" (¶96).

89

We think we've seen strong operational improvements through the quarter and it's really the result of all the actions that we've talked about on past calls to drive higher captive returns, which gives you obviously a better blending cost. As we've exited now Frisco in the quarter, third party lead sales are down again and that helps the blended cost, and as looking forward and we're right on track with the plan that we've been executing. So today, this morning I think LME [London Metal Exchange] was about $1.10.

\*\*\*

JARED WEIL: Okay, fair enough. And then sort of as we -- as you guys look at your expectation for free cash flow in Q4 and next fiscal year and the Frisco proceeds coming in, and your expected level of CapEx, how comfortable are you guys with your liquidity position? And then can you just remind what as we move past this Bristol closing and recycling capacity reduction what a new sort of minimum level of liquidity you guys feel is comfortable for this business?

PHILLIP DAMASKA: Well I'll take that, Jared. And we talked about the $161 million of liquidity at December 31st and the free cash flow generation estimated that in the $30 million range. ***I'm certainly comfortable with our current liquidity level. And as we move into fiscal '14 we're clearly as I indicated going to be very mindful of cash as we approach the convert repayment.***

We are going to look to reduce our capital spending from the $50 million range that we had in fiscal '13. And as we enter the year with a higher than ideal level of inventory, ***my expectation is we'll use less cash in building inventory that we typically do in the first half of next year, so again comfortable. I think our liquidity is adequate and stable at this point in time to allow us to continue to operate this business and make the investments necessary.***

(emphasis added).

156.   Defendants also gave a power point presentation during the call. Slide 13 entitled "Summary & Wrap Up," stated ***"Strategic initiatives on track."*** (Emphasis added).

90

157.   Material omissions made the following statements made by Defendant Damaska materially false or misleading:

- ■ ***Strategic initiatives on track.***

- ■ ***We've made solid progress on executing our strategic initiatives this year.***

- ■ ***While I am slightly satisfied with the current financial performance, I am very encouraged with the steady progress on many fronts. We are laser focused on the execution of our key initiatives and driving to improve results.***

- ■ ***I'm certainly comfortable with our current liquidity level. And as we move into fiscal '14 we're clearly as I indicated going to be very mindful of cash as we approach the convert repayment.***

- ■ ***I think our liquidity is adequate and stable at this point in time to allow us to continue to operate this business and make the investments necessary.***

158.   These statements were materially false and misleading for the reasons set forth in paragraphs 149 and 151, above.  Moreover, these statements were made just two months before Exide engaged Deutsche Bank to explore financing options and Lazard Frères & Company LLC to advise the Company on strategic alternatives (¶196).   In fact, these statements came just three months before Exide filed for bankruptcy protection (¶200).  It accordingly stands to reason that the circumstances that led Exide to explore strategic alternative and bankruptcy did not wholly occur in just two to three months time.

159.   In addition, each of Exide's SEC filings during the Class Period were required to disclose material changes in the items listed in Item 303(a), including

91

known trends and uncertainties.  *See* Item 303(a)(b), 17 C.F.R. §303(a)(b). Accordingly, the circumstances described in paragraphs 120, 122, 124, 126, 131, 134, 136, and 138  were required to be disclosed, pursuant to Item 303(a)(1) and (3) of SEC Regulation S-K, as these circumstances constituted material known events, trends or uncertainties that "are reasonably likely to result in the registrant's liquidity . . . decreasing in any material way" and/or that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(1) and (3).

## C.  Additional Scienter Allegations

160.  As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading and participated in the fraudulent conduct alleged herein.

### 1.  Environmental Issues Went Up The Chain To Defendants

161.  CI 2, a project engineer at the Vernon facility from 2012 to June 2013, said that the plant manager and corporate level employees were aware of the Vernon facility's environmental pollution issues (including the high arsenic emissions) and the citations earlier in 2012 and 2013.  According to CI 2, the plant manager of the Vernon facility received a copy of any citations and so did corporate headquarters. Exide and plant management had been working with AQMD to determine "what was the source" of the pollution problems at the Vernon facility and "what measures were

92

being done" to correct it, CI 2 said.  "It was something that was happening over some time.  AQMD and Exide were still working together on finding a solution" when the Vernon facility was shut down by DTSC in April 2013, CI 2 explained.

### a. Interactions With Regulators Were Reported To Corporate Management

162.   CI 2 (a project engineer at the Vernon facility from 2012 to June 2013) said that any interactions with environmental regulators were reported to the plant manager.  CI 5 (manager of Environmental Health and Safety at an Exide plant in Bristol, Tennessee from July 2011 to February 2012) provided further details and explained that any time an environmental regulatory agency interacts with an Exide facility, that facility's EHS manager would be involved, along with the plant manager. CI 5 explained that the plant's *EHS manager was required to inform corporate EHS of all interaction with regulators*.  *If the environmental problems were ongoing, the plant's EHS manager would be in regular discussions (via memos, telephone calls, conference calls and in-person meetings) with corporate EHS leaders about the issue*, CI 5 said. CI 6 (EHS manager at Exide's Columbus facility and who was the point person for environmental issues at the facility, which had a battery recycling plant similar to the one at Vernon) corroborated this and explained that *regardless of why the regulators were at the plant, CI 6 was required to make an immediate report of the inspection, detailing why the regulators visited and the findings of the inspection, to the corporate Director of EHS*.  CI 6 said that if the inspection revealed

a violation of environmental regulations, CI 6 immediately informed the Director of EHS at Corporate headquarters what the violation was, CI 6's preliminary assessment of how it happened, and the plans for corrective action to fix it. The EHS Director remained involved in the ongoing process until the problem was corrected, CI 6 said. The Director also had discussions and memo communications with CI 6 about any investigations that were ongoing to determine what was causing the problem. They also discussed the planned corrective action, the budget needs of that corrective action and the progress of the corrective action. *CI 6 also said that corporate EHS was always aware of any delays in remediation, interactions with the agencies, and any requests to the agencies for more time to complete remediations.*

163.   According to CI 3 (manager of the Fresno, California distribution center from 2009 to January 2013) CI 3 was very familiar with Exide's policies on reporting incidents at facilities to upper management.  CI 3 explained that the Company had forms for reporting incidents, such as environmental problems or safety issues, that were to be filled out by managers. *CI 3 recalled that the forms were about three pages long, and on the last page was a list of upper level managers from the regional directors up to Exide's CEO (Defendant Bolch) to whom the reports were to be transmitted depending on the incident.*  CI 3 said that *managers were required to report to corporate any and all "incidents,"* such as a citation from a government agency or OSHA problems that occurred at an Exide facility, including the one in Vernon.  *"Anything that would put Exide in a bad light, we were supposed to be*

94

*reporting to corporate management*," CI 3 explained.  CI 8 (EHS manager at Exide's Reading facility from 1981 to 2010 and then EHS manager at Exide's Lancaster distribution center from 2010 to 2012) similarly explained that every Exide facility was supplied by the corporate office with an EHS manual that specifically detailed how facility level employees were to respond to environmental incidents, including forms for different incidents that the EHS manager was required to fill out and submit to corporate level management. *CI 8 said that if the incident was environmental, the report went to EHS management, usually up to the Vice President level, and it might also have to be submitted to legal or operations.   According to CI 8, any and all environmental reports went to Ganster and Cummings, who reported issues directly to the CEO.*  CI 4 (Exide's fomer Vice President, Operations - Transportation North America) likewise explained that *the corporate EHS leader "reported directly to the CEO" about environmental issues*.  CI 1 (an industrial engineer at Exide from 1979 to 2010 who became familiar with the Company's policies and practices for dealing with and responding to environmental citations by regulatory agencies) similarly explained that each plant had an EHS manager who wrote up reports to corporate EHS about all interactions with environmental regulators, internally conducted tests of air and water samples that were out of acceptable range, and any work that was being done to deal with environmental pollution.

164.  CI 8 further explained that every month, the corporate EHS department held a conference call with EHS managers from all of the Company's facilities.  *CI 8*

95

*said that Exide's CEO would sometimes participate in the EHS conference calls, usually if there was an ongoing problem at a particular facility.* CI 8 said that the calls were designed to keep everyone updated about environmental issues at Exide's different facilities.  During the calls, Fred Ganster (Director of EHS), Mark Cummings (VP Global EHS), or Joseph Bolea (Director of EHS) would question the facility EHS managers about ongoing issues at their particular facilities, requesting updates on existing problems and reports on any new problems.  According to CI 8, the managers also gave verbal reports about their facilities, discussing violations, how the violations happened, the status of regulatory actions, progress on corrective actions and other environmental projects that were in the works.

165.  *CI 1, CI 3, CI 6, CI 15, CI 9, and CI 8, all said that if there was a serious matter, such as a citation or a major project that needed to be done, it would be reported to the CEO of Exide. "Without a doubt if there was an actual citation, that went right up the ladder to the top*," CI 1 (industrial engineer at Exide) said.  CI 3 (manager of Exide's distribution center in Fresno, California) likewise stated: *"On more serious things, it was supposed to go all the way to the top.  If it was a serious incident, the people at the top got notice of that."*  CI 6 provided similar testimony and said that higher-level corporate officers, such as the Vice President of Operations, would become involved in environmental incidences when the incidences were "serious issues," and explained that a "serious issue" would be when a large fine was

96

looming or when major capital expenditures were considered.[33]  *CI 15 (Vice President of Global Environmental Health and Safety at Exide from July 2005 to March 2011) similarly said that Exide's CEO, CFO and Corporate Controller received reports of the environmental violations at each of the Company's facilities, including Vernon, from the Company's EHS Department.  CI 9 (environmental manager at Exide's Muncie plant) also explained that anytime a plant was cited for a violation of environmental regulations, "those went all the way up to the top."  CI 9 explained that reports of violations went to Defendant CEO James Bolch, VP of Global EHS Dean Rossi, and Defendant Hirt (President of Exide America).*  CI 8 (EHS manager at Exide's Reading facility from 1981 to 2010 and then EHS manager at Exide's Lancaster distribution center from 2010 to 2012) also corroborated this.  *CI 8 said that if corrective action was necessary to fix the problem, the CEO was copied on the correspondence.*

166.  Indeed, AQMD Rule3004(a)(4)(F) required, and continues to require, Exide to perform specific monitoring, recordkeeping, and reporting requirements, including "Submittal, to the Executive Officer, of reports of any required monitoring at least every six months."  Exide was required by AQMD to monitor the emissions at the Vernon facility.  *Accordingly, it was mandated under AQMD rules that Defendant Bolch (Exide's CEO) receive reports from those emissions tests, which*

---

[33] CI 6 knew that the Corporate General Counsel Barbara Hatcher, in particular, would become involved if it was a serious issue.  "Barbara Hatcher, she wanted to stay in the loop," CI 6 said. "She took this kind of stuff very seriously and wanted to be kept informed."

97

*included the tests demonstrating the Vernon facility's high arsenic emissions and corresponding non-compliant health risks.*

167.   Based on Exide's reporting hierarchy, Defendants would have been aware of the severe and ongoing environmental problems at the Vernon facility. Throughout the Class Period, as discussed *supra,* Exide was in frequent and ongoing interaction with both AQMD and DTSC regarding the Vernon facility's emissions problems (¶¶90-98) and non-compliant piping system (¶¶71-78).   Indeed, CI 17 (Program Supervisor at AQMD) said that AQMD was very actively working with Exide to try to get Exide's air emissions within safe levels and described it as ***"one of [AQMD's] highest priority projects for some time."***   According to CI 18 (Senior Hazardous Substances Engineering Geologist at DTSC, AQMD met with Exide on a regular basis following the discovered lead emissions.   CI 18 said that AQMD was probably at the Vernon facility on a weekly basis, sometimes multiple times a week. CI 18 said that AQMD was very involved with the Vernon facility and explained that "South Coast [AQMD] is very proactive in terms of getting people into compliance." CI 11 (environmental systems manager at Exide's Vernon plant from September 2009 to April 2013) similarly said that AQMD personnel visited the Vernon plant almost daily. "We were on a first name basis with them," CI 11 said.   According to CI 11, AQMD visited for routine check-ins, if they had received a complaint, if they suspected a problem and/or to check on known problems.   CI 11 additionally said that DTSC visited the Vernon plant about once a month for check-ins.   DTSC was also in

98

ongoing correspondence with Exide regarding the underground piping system, as evidenced by the numerous letters and reports that were exchanged between Exide and DTSC regarding the piping system and the groundwater contamination (¶¶70-78).[34]

168.   CI 13 further described facts showing the Exide corporate management must have had involvement in the Vernon facility's environmental compliance issues. CI 13 (assistant deputy executive officer at AQMD) explained that his correspondence with Exide is usually sent to Fred Ganster, the Executive Director of EHS (who reports to Exide's CEO).  CI 13 also sent letters on behalf of AQMD to the Vernon plant manager.   Moreover, CI 3 explained that after the HRA was approved by AQMD on March 1, 2013, Exide was required to host public hearings in the surrounding community. According to CI 13, Defendant Hirt, formerly Executive Vice President and President-Exide Americas, attended several of these public hearings.

## b.    Non-Compliant Test Results Were Reported

169.   According to CI 1 (industrial engineer at Exide from 1979 to 2010), in addition to reporting all interactions with regulators up the corporate ladder, the EHS departments also prepared monthly, quarterly, and annual reports about the internal environmental tests done at each of the Company's plants (such as air and water samplings), and about the status of ongoing issues, such as regulatory actions. ***These***

---

[34] CI 11 declined to comment about specific violations at the plant, or characterize their severity, citing to CI 11's confidentiality agreement, but said that he was aware that the violations could potentially lead to an agency shutting down the plant.

*reports were presented to the director level of EHS, who would then present it to the VP of EHS, who would present it to the CEO, CI 1 said*.  CI 6 (EHS manager at Exide's Columbus facility) also described this company-wide practice.  According to CI 6, every month all Exide plants were required to submit to the Corporate Director of EHS a spreadsheet report detailing all results of environmental tests. CI 6 explained that the spreadsheet showed the entire regulatory agency permits that the plant was required to maintain in order to continue operating.[35]  Each month, CI 6 input into the spreadsheet the testing results at the plant that showed whether it was within the regulatory permit parameters or in violation of the limits. CI 2 (a project engineer at the Vernon facility from 2012 to June 2013) said that tests that showed the Vernon facility was in violation of regulations were reported to the plant manager.  Indeed, CI 6 said, anytime an internal plant test revealed pollution outside the permit parameters, CI 6 got on the phone with the Director of EHS to immediately report it.  CI 8 (EHS manager at Exide's Reading facility from 1981 to 2010 and then EHS manager at Exide's Lancaster distribution center from 2010 to 2012) similarly explained that if an internal test revealed the facility was in violation of pollution regulations, CI 8 was required to immediately file a report with the Corporate Director and/or the Corporate Vice President of EHS.  The report would describe the violation, the cause, any

---

[35]  The plant maintains permits from state and local government agencies that monitor air, water and hazardous waste pollution levels.  Each separate permit sets parameters on the level of pollutants allowed, which were measured by a testing company's equipment, according to CI 6.  Each permit section on the spreadsheet listed the different pollution parameters that particular permit required for the plant to maintain.

investigation needed to find the cause and the planned corrective action if known, CI 8 said.   According to CI 8, Fred Ganster (Director of EHS), Mark Cummings (VP Global EHS), and/or Joseph Bolea (Director of EHS) remained involved, receiving frequent updates and sometimes steering the response, while the facility dealt with the problem and the regulatory agency.[36]

170.   CI 6 (EHS manager at Exide's Columbus facility) said that in addition to the monthly testing results spreadsheet, CI 6 also submitted what was called monthly "three-box summaries" of EHS issues at the plant to the Director of EHS.   CI 6 recalled that the "three-boxes" broke down into: 1) any issues or problems that arose during the month; 2) all progress the department had made with ongoing projects; and 3) any plans for upcoming projects.   CI 6 said the monthly reports went directly to the Director of EHS, and that CI 6 also emailed the reports to several other people, including the plant manager and corporate officers.   CI 8 (EHS manager at Exide's Reading facility from 1981 to 2010 and then EHS manager at Exide's Lancaster distribution center from 2010 to 2012) provided corroborating statements, explaining that EHS managers submitted monthly reports to the Corporate Director of EHS and Vice President of EHS that detailed environmental activities and testing results from the facility for that month.   CI 8 said that there was a specific form that the

---

[36] CI 8 explained that sometimes, Ganster, Cummings, and/or Bolea became so involved that they took over dealing with the regulatory agency themselves at the corporate level.   CI 8 explained that around 2009 and 2010 when the Reading, Pennsylvania smelter was having problems that were causing violations and $100,000 fines, the Company sent Bolea to Reading for a month to deal with the problem and help the plant personnel put all the paperwork and reports together for the regulatory agency involved.

Environmental manager needed to fill out for the report.  According to CI 8, the forms were meant to report "anything that happen[ed] during that month."  CI 8 explained that as part of the monthly report, EHS managers included the results from all internal testing equipment used to measure the facility's pollution rate.  All violations were highlighted on the monthly report, CI 8 said.

171.   In 2011, Exide knew the results of internal testing conducted in 2010, which showed extremely high levels of arsenic at and around the Vernon facility that posed a cancer risk well above the regulatory thresholds (¶¶87-97).   Moreover, beginning in March 2011 and continuing through the Class Period, Exide was informed of DTSC's soil testing that showed maximum containment levels of lead, arsenic, and antimony that were consistently above regulated levels (¶85).  Based on Exide's reporting policies, these non-compliant test results would have been reported to corporate management.

### c.   Corporate Management Was Involved When Environmental Improvements Or Remediations Were Considered

172.   CI 15 said that as Vice President of Global EHS from 2005 to 2011, CI 15 was very involved in discussions and the approval process of substantial environmental upgrades or projects at Exide's facilities. *According to CI 15, Corporate Controller Defendant Martinez, CFO Defendant Damaska and CEO Defendant Bolch approved any large environmental upgrades at Exide's facilities, including the Vernon plant.   CI 15 said that all environmental upgrades went*

102

1  *through a standard approval process at the Company, with the more costly ones*

2  *requiring approval from the higher-level personnel.  CI 11 similarly explained that*

3  *all environmental remediation projects had to go through an internal approval*

4  *process up the chain of command within the Company.*[37]  According to CI 15, *"It*

5  *would go through the financial people and have to be approved by the CEO and the*

6  *board of directors.  The directors were involved in all of that, too."*  According to CI

7  15, the discussion and approval process also involved the departments of finance,

8  operations, capital projects, corporate, and sometimes legal.  "The presidents (of the

9  divisions) would sign off on anything that came into our corporate office for

10  approval," CI 15 said.  *"Bolch had ultimate responsibility for the budget that went to*

11  *the board of directors."  CI 9 also said that major capital expenditures for*

12  *environmental upgrades were required to be approved at the top.*

173.  According to CI 20 (the EHS Manager at the Columbus, Georgia plant

from August 2004 to December 2012), requests for capital expenditures, including

environmental projects, were multiple pages long and signed by "almost everybody

and his brother" at the Company.  "Everybody under the sun ended up signing off on

those things," CI 20 said.  CI 16 provided similar information.  CI 16 (the plant

accountant at Exide's Bristol, Tennessee facility from June 2010 to March 2012)

explained that when the plant required an environmental upgrade costing more than

---

[37] CI 11 would not discuss the process, and he would not name what executives were aware
of the environmental violations, citing to CI 11's confidentiality agreement with Exide.

103

$25,000, CI 16's department submitted the request to the fixed assets or capital expenditures department at Exide's corporate offices.  According to CI 16, Exide's Vice President was responsible for approving the expenditures.

174.  According to CI 21 (Regional Finance Manager in the South-Central region for Exide from July 2006 to September 2011), any capital expenditures, including environmental upgrades, that exceeded $500,000 required approval from Exide's Chief Financial Officer.  CI 15 similarly recalled that any expenditures from about $500,000 to $1 million, would require high level approval.  CI 15 (former VP of Exide's Global EHS) said that the cost of environmental upgrades and regulatory fines were substantial and they got more expensive in 2010 and 2011.  CI 15 explained that when the new stricter federal air emissions regulations went into effect, the upgrades required at Exide facilities were very expensive. "These requirements became final after I left, and [Exide] would have had to spend a lot of money to comply.  I don't know what kind of issue that became for the Company and whether or not it had an impact" on the Company's decision to file for bankruptcy or overall financial status, CI 15 explained.   According to CI 16 (the plant accountant at Exide's Bristol, Tennessee facility from June 2010 to March 2012), environmental issues were "a major expenditure" for Exide.  *CI 16 said that pollution and air monitoring issues were the Company's largest concern.*

175. CI 22 (the Accounts Payable Clerk at Exide's Vernon plant from September 2008 to July 2010) recalled that AQMD made recommendations for

104

environmental protection improvements at the plant. "I know they did make recommendations for improvement, and the person who worked with them at Exide [Mopas] had to go through channels to take care of what needed to be fixed," CI 22 said.  CI 22 understood that Mopas had to go up the chain of command to EHS directors at the Company's headquarters to get the go ahead to spend money to implement the changes.

176.  Because Defendants were responsible for considering and approving significant remediations and were also responsible for approving large expenditures, Defendants were aware of the Vernon facility's environmental problems as a result of the large expenditures associated with the investigations and necessary remediations at the facility.  To be sure, the environmental issues at the Vernon facility required extensive investigation, including the investigation from 2011 through 2012 into the arsenic emissions (¶91) and the months-long investigation and formal reporting regarding the underground piping system (¶¶70-85).  These formal investigations and reporting were conducted by consultants, were protracted, and were costly (¶86). More importantly still, the investigations were the result of severe problems that would require significant and costly remediations.  Indeed, according to Exide's own consultant, Exide knew since August 2012 that it would need to present a formal risk reduction plan because of its non-compliant emissions and had begun by that time to formulate possible remediations (¶97).  Moreover, Exide knew throughout the Class Period that its stormwater pipes did not include the required secondary lining and leak

105

detection (¶70), knew since at least July 2012 that its pipes were compromised (¶76), knew that samples indicated hazardous waste levels for lead, arsenic, and cadmium (¶73), and knew that the remediations costs to replace or retrofit the pipes would likely be "several million dollars" (¶¶83-84).

177. Ultimately, the testimony of the numerous confidential informants demonstrates that Defendants were aware of the adverse undisclosed information, including environmental problems at the Vernon facility.   The reports of the confidential informants are bolstered by Defendant Damaska's own statements in his declaration filed in Exide's bankruptcy proceeding, wherein Damaska admitted that Exide's management carefully monitored environmental matters:

> Specifically, Exide operates under EHS [Environmental Health and Safety] policies, procedures, and permit requirements to ensure compliance with EHS regulations. In addition, Exide tracks EHS performance metrics and sets goals for performance improvement. ***Exide's management conducts periodic reviews of its EHS management system and plans and prioritizes EHS projects in its CAPEX budgeting process.***

(emphasis added).

178. Defendant Damaska, in his declaration, further admitted that based on his position as CFO of Exide, he was familiar with Exide's day to day operations, business affairs and books and records:

> I have held my current positions with Exide since April 1, 2008. As a result of my time with [Exide], my review of relevant documents, and my discussions with other members of [Exide's] management team, I am familiar with the Debtor's [Exide's] day-to-day operations, business affairs, and books and records.

106

## 2.    The Importance of the Vernon Facility to Exide

179.    As discussed *supra*, Exide was dependent on the Vernon facility in order to satisfy its contractual battery manufacturing obligations and to remain a going concern.  Testimony obtained from confidential informants provides additional insight into the importance of the Vernon facility.

180.    CI 14 (Regional Finance Manager in the North-Central Region for Exide) explained that the recycling facilities played a large and important role in Exide's ability to remain financially profitable because the smelters protected the Company from fluctuations in the price of lead.  According to CI 14, "[a] lot of what [Exide] can and can't do is dependent on the cost of lead. They can't pass on the cost of lead to the customer when it jumped up like it did in the last few years."  By using its own recycling facilities to supply lead, Exide did not have to buy lead on the market where costs were skyrocketing, CI 14 explained. This allowed Exide to earn a higher profit margin on its batteries than it otherwise could if the Company was buying lead on the market, CI 14 said.  "The better that the smelters were able to produce lead, the better the plants were able to run [financially]," CI 14 said.

181.    CI 14 explained that the loss of the Vernon recycling plant would have a damaging effect on Exide's profit margins.  "If other smelters were running at full capacity and one was shut down, it would have a definite, negative impact," CI 14 said. "Exide would have to go out and buy lead on the market at higher costs. It would

have a definite, immediate negative impact."

182.   CI 10 was a bag house operator at Exide's Reading plant from 1994 to May 10, 2013.   CI 10 also acted as an elected union representative for all of Exide's plant workers, participating in several negotiations with Company management wherein CI 10 was informed about the Company's finances and operations. According to CI 10, "the Vernon plant without a doubt was [Exide's] bellwether facility." CI 10 said, "[t]he ability that it has to produce lead far exceeded us (in Reading). It's like AAA vs. major league," CI 10 said.   CI 10 explained that Reading, at its best, produced about 250 tons of lead a day from recycling, while Vernon easily produced 330 tons a day.   CI 10 said that when Vernon was shut down in April 2013, it was deeply damaging to Exide because the Vernon facility was such a highly productive facility and because the recycling operations were so essential to the Company's survival.   "Obviously it's a big hit if you take their primary way that they are going to make money and biggest generator of their finished product," CI 10 said. "To lose their major and primary cash cow was a huge hit for [Exide] without a doubt."

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS IN VIOLATION OF THE SECURITIES ACT

183.   Defendants failed to disclose to investors any of the Company's environmental violations, the enormous cost to remedy them, or that the Company could not afford to do so.

108

184.   The claims alleged in this Section are based on principles of negligence and strict liability only.   Plaintiffs repeat and reallege each and every allegation, above, exclusive of allegations that contain facts necessary to prove any elements not required to state a claim under Sections 11 or 15 of the Securities Act.

185.   On August 5, 2011, the Company filed with the SEC an Amended Registration Statement on Form S-4A  in connection with its exchange offer of its $675,000,000 of Outstanding  8$^{5/8}$% Senior Secured Notes due 2018 for its $675,000,000 Registered 8$^{5/8}$% Senior Secured Notes due 2018 (the "Exchange Offer").  The Registration Statement, which became effective on August 8, 2011, was signed by Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi.

186.   On August 15, 2011, the Company filed with the SEC on Form 424B3 its Prospectus in connection with the Exchange Offer (the Registration Statement and the Prospectus are collectively referred to in whole as the "Registration Statement").

187.   As set forth above, Exide utilized Form S-4 in connection with the Exchange Offer.   A Form S–4 is a streamlined registration statement that certain qualifying issuers are allowed to file; it allows issuers to incorporate by reference prior periodic filings like Forms 10–K and 10–Q. An issuer using Form S–4 is required to describe "any and all material changes in the registrant's affairs that have occurred since the end of the latest fiscal year for which audited financial statements were included in the latest annual report to security holders and that have not been

109

described in a report on [Form 10–Q] or [Form 8–K]." U.S. Securities and Exchange Commission Form S–4, at 8–9, *available at* http://www.sec.gov/about/forms/forms–4.pdf. Among other things, this requires that the Form S–4 include "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations" that have not already been disclosed in the company's Forms 10–Q or 8–K. *See* Item 303(a) of Regulation S–K, 17 C.F.R. § 229.303(a).

188. The Registration Statement and Prospectus specifically incorporated by reference the following documents:

- Annual Report on Form 10-K for the fiscal year ended March 31, 2011 and filed with the SEC on June 1, 2011;

- Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2011, filed with the SEC on August 4, 2011;

- Definitive Proxy Statement on Schedule 14A filed with the SEC on July 28, 2011, but only to the extent that such Proxy Statement was incorporated by reference into our Annual Report on Form 10-K for the fiscal year ended March 31, 2011, filed with the SEC on June 1, 2011; and

- Current Report on Form 8-K filed on April 4, 2011.

189. Exide's June 1, 2011 Form 10-K and its August 4, 2011 Form 10-Q are discussed *infra* at paragraphs 117-119 and 121, respectively.

190. Defendants failed to disclose existing events, uncertainties, and trends in violation of SEC Regulation S-K, Item 303(a), which rendered Class Period statements materially false or misleading. With regard to a registration statement's Management Discussion and Analysis ("MD&A") section, Regulation S-K Item

110

303(a)(1), 303(a)(3)(ii) and Instruction No. 3 to Paragraph 303(a) require companies to:

> *Identify any known trends* or any known demands, commitments, events *or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity* increasing or *decreasing in any material way*.
>
>                  * * *
>
> *Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material* favorable or *unfavorable impact on net sales or revenues* or income from continuing operations.
>
>                  * * *
>
> *The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition*.

(Emphasis added).

191.   Instruction 5 to Item 303(a) defines "liquidity" for purposes of Item 303(a) as "the ability of an enterprise to generate adequate amounts of cash to meet the enterprise's needs for cash."

192.   Defendants violated their disclosure duty under Item 303(a) by failing to disclose the following known trends and uncertainties that existed at the time the Registration Statement and Prospectus were filed that could reasonably be expected to have a material negative effect on Exide's results of operations and liquidity: Exide's worsening environmental problems and increased regulatory scrutiny at its Vernon facility (*see, e.g.,* ¶¶64-67, 70-98); the stagnated demand caused largely by the loss of

Wal-Mart as a customer and by weakened demand from Europe (¶¶103, 106); and its ongoing liquidity problems exacerbated by the increasing environmental problems, the increased scrutiny by regulators, and by the loss of Wal-Mart as a supplier of old batteries (*see, e.g.,*¶106).

### A. Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi Negligence

193.   Exide was the issuer of the $8^{5/8}$% senior secured notes due 2018. Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi owed to the purchasers of the notes obtained pursuant or traceable to the Registration Statement and Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time they became effective to ensure that such statements were true and correct and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.   These Section 11 Defendants bear the burden of demonstrating their compliance with this duty.

194.   Neither Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins or Pileggi made a reasonable investigation or possessed reasonable grounds for the belief that the challenged statements contained in the Registration Statement and Prospectus were true or that there was no omission of material fact necessary to make the statements made therein not misleading.

195.   Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia,

Ferguson, O'Higgins and Pileggi issued and disseminated material misstatements and omissions to the investing public that were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, among other things, the adverse facts set forth above.  By reason of the conduct alleged herein, Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi violated Section 11 of the Securities Act.

## VII.   THE TRUTH EMERGES

196.   On April 4, 2013, various news sources reported that Los Angeles City Council members had held a hearing calling for the city's attorneys to take action against Exide to protect residents from the potentially fatal conditions caused by Exide's unhealthy practices. Also, on April 4, 2013, *Debtwire* revealed that the Company had engaged the services of noted restructuring specialist firms Lazard and Akin Gump after the Company could not arrange financing through traditional means. That same day, the Company confirmed that financial advisory firm Lazard had been retained, "to advise the [C]ompany on financing alternatives to maximize the value of the [C]ompany for all stakeholders."

197.   On this news, the Company shares fell on April 4, 2013, $1.24 per share to $1.37 per share (a 46% drop) before trading was halted.

198.   On April 25, 2013, at 6:30 a.m., Exide issued a press release announcing that the Company had received an order dated April 24, 2013 from DTSC requiring the Company to suspend operations at its Vernon facility, asserting that Exide's

113

underground storm water system was not in compliance with California requirements and that Exide's furnace emissions were not meeting applicable DTSC health risk standards.

199.   In response to this news, Exide's shares closed at $1.02 on April 25, 2013, compared to a closing price of $1.34 on April 24, 2013, a drop of 24%, on heavy trading volume.

200.   On May 24, 2013, news source *Debtwire.com* reported that Exide was in talks with bankers to arrange a debtor in possession ("DIP") loan that was expected to be around $200 million to fund the Company through Chapter 11 bankruptcy proceedings.

201.   In response to this news, Exide's shares closed at $0.45 per share on May 24, 2013, compared to the day's opening price of $0.78 — a drop of 42%, on heavy trading volume.

202.   The price of Exide's $8^{5/8}$% senior secured notes due 2018 also declined precipitously on the foregoing news referenced in the paragraphs above.

203.   As illustrated in the chart attached hereto as Exhibit 2 on April 4, 2005, April 25, 2013 and May 24, 2013 the price of Exide's notes dropped precipitously. On April 4, 2013 the price of Exide's notes closed at $77.75, down from their previous day closing price of $86.24 on April 3, 2013.  On April 25, 2013 the price of Exide's notes closed at $70.37, down from their previous day closing price on April 24, 2013 of $77.55.  On May 24, 2013 the price of Exides's notes closed at $66.32,

down from their previous day closing price of $71.82.

204. As reported by Bloomberg on April 26, 2013:

Bonds of Exide Technologies (XIDE), a lead-acid battery producer, plunged to the lowest level ever after California regulators ordered it to close a recycling unit because of health risks.

The company's $674.2 million of 8.625 percent, first-lien notes due February 2018 dropped 4 cents on the dollar to 65 cents to yield 20.5 percent at 2:43 p.m. in New York, according to Trace, the bond-price reporting system of the Financial Industry Regulatory Authority. The securities have fallen 14.3 cents since April 23.

The California Department of Toxic Substances and Control ordered the company to suspend operations at its Vernon, California, plant on April 24, alleging that the facility isn't in compliance with the state's health risk standards, the company said yesterday in a regulatory filing.

Exide hired Lazard Ltd. (LAZ) to advise it on financing alternatives and restructuring activities, the Milton, Georgia- based company said in an April 4 statement.

205. As a result of Defendants' material misrepresentations and omissions, the prices of Exide's stock and notes were artificially inflated during the Class Period and Plaintiffs and Class members were damaged when the truth was revealed, and/or when the concealed risks materialized.

## VIII.  NO SAFE HARBOR

206. Exide's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield Defendants' false or misleading statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.

115

207.   Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer and/or director of Exide who knew that the forward-looking statement was false.  In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statement would not be misleading.  Finally most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCRTINE

208.   At all relevant times, the markets for Exide common stock and notes were efficient markets for the following reasons, among others:

a)      Exide stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b)      According to the Company's Form 10-K filed June 7, 2012, the Company had 78,346,859 shares outstanding as of May 25, 2012. During the Class Period, on average, more than half a million shares of Exide stock were traded on a daily basis, demonstrating a very active and broad market for Exide stock and permitting a very strong presumption of an efficient market;

116

c) Exide's notes were actively traded;

d) as a regulated issuer, Exide filed periodic public reports with the SEC;

e) Exide regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major news wire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

f) Exide was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

g) numerous National Association of Securities Dealers' member firms were active market-makers in Exide stock at all times during the Class Period; and

h) unexpected material news about Exide was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

209. As a result of the foregoing, the markets for Exide common stock and notes promptly digested current information regarding Exide from publicly available sources and reflected such information in Exide's stock and note prices. Under these circumstances, all purchasers of Exide common stock and notes during the Class

Period suffered similar injury through their purchase of Exide common stock and notes at artificially inflated prices, and a presumption of reliance applies.

## X.   CLASS ALLEGATIONS

210.   This is a securities class action on behalf of all purchasers of the common stock of Exide between June 1, 2011 and May 24, 2013, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and on behalf of purchasers of Exide's $8^{5/8}$% senior secured notes due 2018 traceable to its Form S-4/A effective August 12, 2011 seeking remedies under §§11 and 15 of the Securities Act of 1933; and on behalf of purchasers of Exide's $8^{5/8}$% senior secured notes due 2018 during the period August 8, 2011 through May 24, 2013 seeking remedies under §§10(b) and 20(a) of the Exchange Act.  Excluded from the Class are officers and directors of the Company as well as their families and the families of the Defendants. Class members are so numerous that joinder of them is impracticable.

211.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the Defendants violated the Exchange Act; (b) whether Defendants violated the Securities Act; (c) whether the Defendants omitted and/or misrepresented material facts; (d) whether the Defendants knew or recklessly disregarded that their statements were false and misleading; (e) whether the Defendants artificially inflated the price of Exide

common stock; and (f) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

212.   Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**
**For Violation of Section 11 of the Securities Act**
**Against Defendants Bolch, Damaska, Martinez, Reilly, Aspbury,**
**D'Appolenia, Ferguson, O'Higgins and Pileggi**

213.   Plaintiff Grace repeats and realleges each and every allegation contained above in paragraphs 1-116 and 183-212 as if fully set forth herein exclusive of allegations that contain facts necessary to prove any elements not required to state a claim under Section 11 of the Securities Act.

214.   This claim is not based on and does not sound in fraud but is based solely on negligent conduct.

215.   This claim is brought by Plaintiff Grace on his own behalf and on behalf of other members of the Class who acquired Exide's notes pursuant to or traceable to the Company's Registration Statement effective August 12, 2011 and Prospectus issued in connection with Exide's exchange offering of $8^{5/8}$% senior secured notes due 2018.   Members of the Class acquired his, her, or its shares pursuant to and/or traceable to the Registration Statement and Prospectus. Exide is the issuer of the

119

securities through the Registration Statement and Prospectus. Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi are signatories to the Registration Statement.

216.   The Registration Statement and Prospectus contained untrue statements of material fact and/or omitted to state material facts necessary to make statements therein not misleading.

217.   The false statements, misrepresentations and omissions identified above caused the market price of Exide's notes to be artificially inflated.

218.   Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi owed to the purchasers of the notes acquired pursuant or traceable to the Registration Statement and Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time they became effective to ensure that such statements were true and correct and that there were no omissions of material fact required to be stated in order to make the statements contained therein not misleading. These Defendants failed to do so and as a result negligently disseminated false and misleading statements to the investing public.

219.   By reason of the conduct alleged herein, Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi and non-party Exide violated Section 11 of the Securities Act.

220.   At the times they obtained the notes issued by Exide, Plaintiff Grace and

120

other members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.  As a direct and proximate result of the wrongdoing of Defendants Bolch, Damaska, Martinez, Reilly, Aspbury, D'Appolenia, Ferguson, O'Higgins and Pileggi and non-party Exide, Plaintiff Grace and the other members of the Class have suffered substantial damages.

221.   This claim is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement and Prospectus, and within three years of the effective date of the Registration Statement and Prospectus.

## COUNT II
### For Violation of Section 15 of the Securities Act Against All Defendants

222.   Plaintiff Grace repeats and realleges each and every allegation contained in paragraphs 1-116 and 183-212 above as if fully set forth herein exclusive of allegations that contain facts necessary to prove any elements not required to state a claim under Section 15 of the Securities Act.  This claim is not based on and does not sound in fraud, but is based solely on negligent conduct.

223.   The Defendants were control persons of Exide by virtue of, among other things, ownership and control of the Company and their positions as senior officers and/or directors of the Company.  They were in positions to control, and did control, the false and misleading statements and omissions contained in the Registration Statement and Prospectus.

224.   None of the Defendants made reasonable investigations or possessed

121

reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material respects.

225.   This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and Prospectus and within three years after Exide's notes were issued to the Class in connection with the Exchange Offering.

226.   By reason of the misconduct alleged herein, for which Exide is primarily liable, as set forth above, the Defendants are jointly and severally liable with and to the same extent pursuant to Section 15 of the Securities Act.

**COUNT III**
**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against Defendants Bolch, Damaska, Hirt, and Martinez**

227.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

228.   Throughout the Class Period, Exide and the Individual Defendants knowingly or recklessly made materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

229.   During the Class Period, Exide and these Defendants, and Exide, used the instrumentalities of interstate commerce and the mails to (a) artificially inflate and maintain the market price of Exide common stock and notes; (b) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (c) cause

122

Plaintiffs and other members of the Class to purchase Exide common stock and notes at inflated prices; and (d) cause them losses when the truth was revealed. In doing so Exide and each of these Defendants violated §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

230.   In ignorance of the fact that the market price of Exide common stock and notes were artificially inflated, and relying upon the integrity of the market in which the shares and notes traded, Plaintiffs and other members of the Class purchased Exide stock and notes during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

**COUNT IV**
**For Violation of Section 20(a) of the Exchange Act**
**Against All Defendants**

231.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

232.   The Individual Defendants had control over Exide and made the materially false and misleading statements and omissions on behalf of Exide within the meaning of §20(a) of the Exchange Act. By virtue of their controlling shareholder status, executive positions, board membership, and/or stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contends were false and misleading.

123

233.   By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock and notes during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of himself and the Class, pray for judgment follows:

A.     Determining that this action is a proper class action, designating plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of Federal Rules of Civil Procedure and Plaintiffs counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: January 30, 2014

*James Robert Noblin*

James Robert Noblin
Robert S. Green
GREEN & NOBLIN, P.C.
700 Larkspur Landing Circle, Suite 275
Larkspur, California 94939
Tel: (415) 477-6700
Fax: (415) 477-6710
-and-
4500 East Pacific Coast Highway
Fourth Floor
Long Beach, CA 90804
Tel: (562) 391-2487
jrn@classcounsel.com
rsg@classcounsel.com

*Liaison Counsel for Plaintiffs*
William B. Federman (admitted *Pro Hac Vice*)
A. Brooke Murphy (admitted *Pro Hac Vice*)
FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
Telephone: (405) 235-1560
Facsimile:  (405) 239-2112
wbf@federmanlaw.com
abm@federmanlaw.com

*Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this Notice was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on Thursday, January 30, 2014.

*J. Robert Noblin*

James Robert Noblin

125

# EXHIBIT 1

## GLOSSARY OF TERMS

| TERM | DESCRIPTION |
|---|---|
| Administrative Hearing | Administrative Hearing held before the State of California Environmental Protection Agency DTSC |
| AQMD | South Coast Air Quality Management District of the State of California |
| Bosan Declaration | Declaration of Dr. Bosan, Senior Toxicologist and Unit Chief for the Southern California Unit of the Human and Ecological Risk Office of the DTSC, filed with the Superior Court of the State of California, County of Los Angeles |
| CCR | California Code of Regulations |
| DTSC | Department of Toxic Substances Control of the State of California |
| EHS | Environmental Health and Safety |
| Ghazi Declaration | Declaration of Rizgar Ghazi, Branch Chief of the Office of Permitting of the DTSC, filed with the Superior Court of the State of California, County of Los Angeles |
| HRA | Human Health Risk Assessment |
| Inspection Report | Storm Sewer Inspection Report prepared by Advanced GeoServices |
| ISD | Interim Status Document |
| Preuth Declaration | Declaration of Joseph Preuth, Vice President of Recycling Operations and Operational Excellence, filed with the Superior Court of the State of California, County of Los Angeles |
| RCRA | Resource Conservation and Recovery Act |
| SEC | Securities and Exchange Commission |
| Technical Review | Technical Review of Area of Interest Technical Memorandum |
| WESP | Wet Electrostatic Precipitator |

# EXHIBIT 2

# EXIDE TECHNOLOGIES

+ ADD TO WATCHLIST

| | | | | | |
|---|---|---|---|---|---|
| **Coupon Rate** 8.625% | **Maturity Date** 02/01/2018 | **Symbol** XIDE.AC | **CUSIP** 302051AQ0 | **Next Call Date** 02/01/2015 | **Callable** Yes |

| **Last Trade Price** $65.00 | **Last Trade Yield** .000% | **Last Trade Date** 08/15/2013 | **US Treasury Yield** — |
|---|---|---|---|

Trade History

## Price/Yield Chart

[ Price Chart ] [ Yield Chart ]

01/01/2013  - 08/16/2013          Zoom: 5D 1M 3M YTD 1Y 3Y 5Y 10Y Max

Price



Price $
81.00
72.00
63.00
54.00

01/2013     03/2013     05/2013     07/2013

## Credit and Rating Elements

| | |
|---|---|
| Moody's Rating | WR (06/11/2013) |
| Standard & Poor's Rating | D (06/11/2013) |
| Fitch Rating | — |
| TRACE Grade | High Yield |
| Default | — |
| Bankruptcy | Y |
| Insurance | — |
| Mortgage Insurer | — |
| Pre-Refunded/Escrowed | — |
| Additional Description | Note |

## Put & Redemption Provisions

| **Call Date** | **Call Price** | **Call Frequency** |
|---|---|---|
| 02/01/2015 | $104.31 | Continuously |

| **Put Date** | **Put Price** | **Put Frequency** |
|---|---|---|
| — | — | — |

## Classification Elements

| | |
|---|---|
| Bond Type | US Corporate Debentures |
| Debt Type | Note |
| Industry Group | Industrial |
| Industry Sub Group | Manufacturing |
| Sub-Product Asset | CORP |
| Sub-Product Asset Type | Corporate Bond |
| State | — |
| Use of Proceeds | — |
| Security Code | — |

### Special Characteristics

| | |
|---|---|
| Medium Term Note | N |

## Issue Elements

| | |
|---|---|
| Offering Date | 08/15/2011 |
| Dated Date | 08/01/2011 |
| First Coupon Date | 02/01/2012 |
| Original Offering* | $674,450.00 |
| Amount Outstanding* | $674,450.00 |
| Series | — |
| Issue Description | — |
| Project Name | — |
| Payment Frequency | Semi-Annual |
| Day Count | 30/360 |
| Form | Book Entry |
| Depository/Registration | Depository Trust Company |
| Security Level | Senior Secured |
| Collateral Pledge | — |
| Capital Purpose | — |

*dollar amount in thousands

## Bond Elements

| | |
|---|---|
| Original Maturity Size* | 674,450.00 |
| Amount Outstanding Size* | 674,450.00 |
| Yield at Offering | — |
| Price at Offering | — |
| Coupon Type | Fixed |
| Escrow Type | — |

*dollar amount in thousands

# EXIDE TECHNOLOGIES

+ ADD TO WATCHLIST

| Coupon Rate | Maturity Date | | | | |
|---|---|---|---|---|---|
| 8.625% | 02/01/2018 | **Symbol**<br>XIDE.AC | **CUSIP**<br>302051AQ0 | **Next Call Date**<br>02/01/2015 | **Callable**<br>Yes |

| Last Trade Price | Last Trade Yield | Last Trade Date | US Treasury Yield |
|---|---|---|---|
| $65.00 | .000% | 08/15/2013 | — |

Trade History

## Price/Yield Chart

| Price Chart | Yield Chart |
|---|---|

| 08/22/2011 | - 08/16/2013 | Zoom: 5D 1M 3M YTD 1Y **3Y** 5Y 10Y Max |



## Credit and Rating Elements

| | |
|---|---|
| Moody's Rating | WR (06/11/2013) |
| Standard & Poor's Rating | D (06/11/2013) |
| Fitch Rating | — |
| TRACE Grade | High Yield |
| Default | — |
| Bankruptcy | Y |
| Insurance | — |
| Mortgage Insurer | — |
| Pre-Refunded/Escrowed | — |
| Additional Description | Note |

## Put & Redemption Provisions

| Call Date | Call Price | Call Frequency |
|---|---|---|
| 02/01/2015 | $104.31 | Continuously |

| Put Date | Put Price | Put Frequency |
|---|---|---|
| — | — | — |

## Classification Elements

| | |
|---|---|
| Bond Type | US Corporate Debentures |
| Debt Type | Note |
| Industry Group | Industrial |
| Industry Sub Group | Manufacturing |
| Sub-Product Asset | CORP |
| Sub-Product Asset Type | Corporate Bond |
| State | — |
| Use of Proceeds | — |
| Security Code | — |

### Special Characteristics

| | |
|---|---|
| Medium Term Note | N |

## Issue Elements

| | |
|---|---|
| Offering Date | 08/15/2011 |
| Dated Date | 08/01/2011 |
| First Coupon Date | 02/01/2012 |
| Original Offering* | $674,450.00 |
| Amount Outstanding* | $674,450.00 |
| Series | — |
| Issue Description | — |
| Project Name | — |
| Payment Frequency | Semi-Annual |
| Day Count | 30/360 |
| Form | Book Entry |
| Depository/Registration | Depository Trust Company |
| Security Level | Senior Secured |
| Collateral Pledge | — |
| Capital Purpose | — |

*dollar amount in thousands

## Bond Elements

| | |
|---|---|
| Original Maturity Size* | 674,450.00 |
| Amount Outstanding Size* | 674,450.00 |
| Yield at Offering | — |
| Price at Offering | — |
| Coupon Type | Fixed |
| Escrow Type | — |

*dollar amount in thousands