UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE | |
|---|---|---|
| Paul M. Cruz | | N/A |
| Deputy Clerk | | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| N/A | | N/A |

**Proceedings:**      IN CHAMBERS ORDER Re: Defendants' Motion to Dismiss [73]

## I. INTRODUCTION

On April 15, 2013, a class of investors in Exide Technologies ("Plaintiffs") filed suit against Exide's corporate executives and members of the Board of Directors ("Defendants").[1]  Plaintiffs assert that Defendants made misleading statements and omitted material information about Exide's lack of compliance with environmental regulations and Exide's worsening financial condition during the class period, in violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and § 11 of the Securities Act of 1933 ("Securities Act").  Plaintiffs also assert control person liability claims under § 20 of the Exchange Act and § 15 of the Securities Act.

In an order issued on December 19, 2013, the Court granted Defendants' motion to dismiss

---

[1]  Exide Technologies itself was voluntarily dismissed as a defendant on July 17, 2013, after the company filed for Chapter 11 bankruptcy.  (Dkt. 45).  Plaintiffs specifically are (1) purchasers of Exide's common stock between June 1, 2011 and May 24, 2013; (2) purchasers of Exide's $8^{5/8}$ senior secured notes due in 2018, traceable to Exide's Form S-4/A Registration Statement effective August 12, 2011; and (3) purchasers of Exide's $8^{5/8}$ senior secured notes due in 2018, purchases between August 8, 2011 and May 23, 2013.  (FAC ¶¶ 29-38).  Defendants are Exide's CEO, James R. Bolch; CFO, Phillip A. Damaska; Controller, Louis E. Martinez; and the following members of the board of directors: R. Paul Hirt, John P. Reilly, Herbert F. Aspbury, Michael R. D'Appolonia, David S. Ferguson, John O'Higgins, and Dominic J. Pileggi.  (Id.).

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

Plaintiffs' Consolidated Amended Complaint ("CAC"), without prejudice.  (Dkt. 70).  In granting the motion, the Court held that the CAC did not identify the allegedly false or misleading statements and omissions with adequate specificity in order to satisfy Federal Rule of Civil Procedure 8 and the Private Securities Litigation Reform Act ("PSLRA").  On February 13, 2013, Plaintiffs filed their First Amended Complaint ("FAC").  For the reasons explained below, the Court finds that the FAC adequately pleads claims under § 10(b) and § 20 of the Exchange Act and § 11 and § 15 of the Securities Act.  As a result, the motion to dismiss is DENIED.[2]

## II. BACKGROUND

Exide Technologies is a public company that operates in 89 countries.  (FAC ¶ 2).  Its primary business is producing, recycling, and distributing lead-acid batteries.  (Id.).  Exide's lead-acid battery recycling operations, specifically those at a recycling plant in Vernon, California, are the principal focus of this case.  The company's Vernon plant is one of three battery recycling facilities the it operates worldwide.  (Id.).  Exide recycles batteries to extract lead that it then uses to manufacture new batteries.  (Id.).  The extracted lead from recycled batteries is generally less expensive then buying lead on the open market, and Exide therefore relies on recycled batteries to keep its margins at maintainable levels.  (Id.).  The Vernon battery recycling plant is located approximately four miles south of downtown Los Angeles.  (Id.).  It recycles between 20,000 and 40,000 batteries per day, and produces approximately 120,000 tons of lead annually.  (Id.).

Plaintiffs first amended complaint alleges that from June 1, 2011 to May 23, 2013 (the "class period"), Exide's Vernon facility was emitting extremely high levels of arsenic into the air and using a non-compliant piping system that was leaking hazardous materials into the groundwater.  (FAC ¶¶ 70-73, 77-78, 84, 87-102).  The FAC asserts, however, that these problems were not publically disclosed until March, April and May of 2013.  (Id. ¶¶ 9-13).  The specifics of Exide's air and piping environmental issues are discussed below.

---

[2]  The Court limits its analysis in this order to Plaintiffs' allegations of misleading statements and omissions by Defendants related to Exide's environmental compliance.  Thus, the Court does not directly address whether Defendants made false or misleading statements or omissions about Exide's financial operations.  Given that Defendants' omissions related to the environmental issues alone state Exchange Act and Securities Act claims, it is not necessary to address the financial operations facts in order to deny the motion to dismiss.  The specifics of the financial operations facts will be addressed at a later stage in the litigation.

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

        A. Exide's Vernon Facility's Air Emissions

        Exide's Vernon, California battery recycling facility is monitored by a number of different federal and state environmental agencies.  One of these agencies is California's South Coast Air Quality Management District (AQMD), which monitors and regulates Vernon's air pollutant emissions.  (See FAC ¶¶ 3-4).  In 2009, AQMD discovered considerable deposits of lead near the Vernon facility that were well above required levels.  (Id. ¶ 65).  AQMD and other environmental agencies oversaw an emergency cleanup, and after the cleanup AQMD decided to impose more stringent monitoring and reporting requirements on Exide related to lead and other air pollutants.  (Id.).  Specifically, in 2010 AQMD required Exide to prepare a Human Health Assessment (HHA) report, which required the company to submit test results and reports on a number of toxic emissions.  (Id. ¶¶ 65, 87).

        In June 2011, Exide submitted its Human Health Assessment report to AQMD.  (FAC ¶ 89). The test results showed a "shockingly high" level of arsenic emissions at the facility, which were more than 96% higher than 2008 levels.  (Id. ¶88).  Exide requested and received permission to investigate the source of the emissions and to conduct a retest, which it did in 2012.  (Id. ¶ 91).  While the 2012 test results showed lower levels of arsenic emissions, the results were still of the "same order of magnitude." (Id. ¶ 92).  Using a cancer-risk assessment score, AQMD calculated that Exide's arsenic emissions from the 2012 test corresponded to a cancer risk of approximately 100 in one million people, which was well above both the 25 in one million threshold AQMD set for requiring a risk reduction plan and the 10 in one million threshold at which AQMD required public notification.  (Id. ¶¶ 92-93, 102).

        In December 2012, Exide submitted a new Human Health Assessment report for the Vernon facility using the average of the 2011 and 2012 test results.  (Id. ¶ 95).  In February 2013, AQMD notified Exide that based on the arsenic-emissions levels in the HRA, Exide would have to notify the public and prepare a risk reduction plan, including detailed plans for upgrades and remediation measures, within 180 days of March 1, 2013.  (Id. ¶ 102).  The district deputy executive officer of AQMD expected the remediation measures to "potentially cost the company millions of dollars."  (FAC ¶ 116).  On March 22, 2013, AQMD publically cited the Vernon facility for its arsenic emissions, stating that the facility "posed a greater cancer risk to Southern California than any of the 450 facilities it had regulated in its twenty-five year history."  (Id. ¶ 3).  On April 3, the Los Angeles City Council held a public hearing on the matter, at which members of the council urged the city to press charges against Exide.  (Id. ¶ 7).  The Los Angeles Times also published an article about the hearing on April 4, which the FAC alleges caused Exide's stock value to fall by 46% the same day.  (Id. ¶¶ 7, 9; see also Dkt. 74-1).

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

B. Exide's Vernon Facility's Stormwater Piping System

Plaintiffs' FAC alleges that Exide's Vernon plant not only emitted significant amounts of arsenic during the class period, but also contaminated the groundwater around the Vernon plant with lead and other hazardous chemicals. Exide's Vernon facility includes a 3,500 foot long stormwater piping system, which includes a series of catch basins that capture water from the facility's wash-down operations. (FAC ¶ 68). Because the piping system is appurtenant to certain hazardous waste management units, the pipes are monitored by California's Department of Toxic Substances Control ("DTSC").

The FAC asserts that as early as 2006, Exide was informed that its pipes were non-compliant with DTSC requirements, and was informed by DTSC that it would either need to install secondary containment and leak detection technology, or completely replace the piping system. (Id. ¶ 70). Exide, however, disputed DTSC's assertion that these modifications were necessary on the grounds that the piping system was not connected to the hazardous waste storage systems. (Id.).

In 2010, however, Exide submitted an application to DTSC for a permanent operating permit for the Vernon plant. (Id. ¶ 66). Exide's Vernon facility had been operating under an interim permit under the federal Resource Conservation and Recovery Act, and the Company's application for a permanent permit required it to submit numerous reports and assessments on the Vernon plant, including reports on groundwater contamination levels. (Id.). On March 21, 2011, DTSC issued Exide's Vernon facility its first Notice of Deficiency for its permit application. (Id. ¶ 71). The Notice stated that based on testing associated with the permit application, DTSC had observed that groundwater around the Vernon facility had been contaminated due to releases from undetermined sources at Exide. (Id.). An environmental systems manager at Exide during the class period also states that DTSC gave Exide a list of upgrades they wanted Exide to complete to obtain the permanent operating permit, and that these upgrades would be "several million dollars to do." (Id. ¶ 67).

Over the next year and a half, DTSC requested additional stormwater samples from Exide. (Id. ¶¶ 72-76). Exide complied with certain requests, but was delinquent with others. (Id.). On August 2, 2012, DTSC presented Exide with a Second Notice of Deficiency for its permanent permit application. (Id. ¶ 77). The Second Notice specifically explained that Exide had not provided adequate leak testing data for its pipes. (Id.). In support of its permit application, Exide then commissioned Advanced GeoServices to prepare an Inspection Report on its stormwater piping system. (Id. ¶ 75).

On August 28, 2012, DTSC sent Exide a memorandum identifying hazardous levels of lead and zinc in the Vernon facility's stormwater pipes. (Id. ¶ 78). The complaint does not state whether

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

DTSC's memo required Exide to respond in a particular manner, or whether Exide made any changes to its pipes or conducted further testing at that time.  (See id.).

On March 5, 2013, Exide received the Inspection Report prepared by Advanced GeoServices. (*Id.*). The Inspection Report included inspection videos, which showed that some of Vernon's stormwater pipes were breached.  (Id.).  DTSC inspectors had previously sampled the sediments taken from the sumps feeding into the pipelines and had determined that hazardous waste was in the sumps and pipes.  (Id.).  Once DTSC determined that the pipes were materially damaged, it concluded that there was a serious threat to the groundwater in the area surrounding the Vernon facility.  (Id.).  In fact, DTSC concluded that the breach in the pipes was serious enough to warrant a shut down of the Vernon facility.  (Id.).  The Inspection Report also concluded that the existing pipes were long past their service life, over thirty years old, and that the pipes were in no condition to convey hazardous wastes through the system.  (Id. ¶ 80).

On April 24, 2013, Exide received an order from DTSC requiring the Company to suspend operations at its Vernon facility given that Exide's underground stormwater system was not in compliance with California requirements.  (Id. ¶ 10).  The FAC alleges that in response to this news, Exide's shares closed down 24% on April 25, 2013.  (Id. ¶ 11).  On May 24, 2013, Exide announced it was filing for bankruptcy.  (Id. ¶ 12).

## III. EXCHANGE ACT CLAIMS

Securities fraud claims under the Securities Exchange Act of 1934 arise out of SEC Rule 10b-5, which interprets the Act and provides that "[i]t shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(c); see also 15 U.S.C. § 78j(b) (providing the SEC with the authority to promulgate Rule 10b-5 among other regulations).

Five elements are required in order to prove a violation of Rule 10b-5.  In particular, a plaintiff must demonstrate "(1) a material misrepresentation or omission of fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) transaction and loss causation; and (5) economic loss." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009) (quoting In re Daou Systems, Inc., 411 F.3d 1006, 1014 (9th Cir. 2005)).  In the instant case, Defendants focus only on the first two of these requirements, arguing that Plaintiffs' FAC does not allege facts sufficient to establish the elements of a material misrepresentation or omission of fact, and scienter.

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

A. Material Misrepresentations or Omissions of Fact

To adequately plead a Section 10(b) violation, Plaintiffs must identify specific, materially false or misleading statements or omissions made by Defendants and explain why those statements or omissions are false or misleading. See Zucco Partners, 552 F.3d at 990-91 (citing 15 U.S.C. § 78u-4(b)(1)(B); Fed. R. Civ. P. 9(b)). A statement or omission is materially false or misleading "when there is 'a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as significantly alter[ing] the total mix of information made available.'" Reese v. Malone, 747 F.3d 557, 568 (9th Cir. 2014) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1976)); see also Brody v. Transitional Hospital Corp., 280 F.3d 997, 1006 (9th Cir. 2002) (holding that a statement or omission is misleading when, considered by the reasonable investor, it creates an impression of a "state of affairs that differs in a material way from the one that actually exists").

To plead materiality, the complaint's allegations must "suffice to raise a reasonable expectation that discovery will reveal information satisfying the materiality requirement, and to allow the court to draw the reasonable inference that defendant is liable." Matrixx Intiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1323 (2011) (citations omitted). "[D]etermining materiality in securities fraud cases should ordinarily be left to the trier of fact." Reese, 747 F.3d at 568 (quoting In re Cutera Sec. Litig., 610 F.3d 1103, 1108 (9th Cir. 2010)). However, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." In re Cutera, 610 F.3d at 1108 (internal citations and quotation marks omitted).

1. The Misleading Statements and Omissions

Plaintiffs' first amended complaint alleges that throughout the class period of June 1, 2011 to May 23, 2013, Defendants issued multiple 10-Q and 10-K SEC filings, and conducted multiple earnings calls with analysts and investors, but never informed investors of Exide's Vernon facility's air and water contamination issues. Specifically, the complaint alleges that Defendants did not disclose during the class period that (1) in June 2011, the Vernon facility's Human Health Assessment report showed arsenic emissions at the facility that were 96 percent higher than 2008 levels, (FAC ¶ 88); (2) a retest of arsenic emissions in 2012 revealed similarly high levels of arsenic, and the 2012 emissions corresponded to a cancer risk of approximately 100 in one million people, which was well above AQMD's accepted limits and would require significant upgrades and remediation measures, (FAC ¶¶ 92-93); (3) in mid 2011 DTSC notified Exide that the groundwater around its Vernon facility had been contaminated due to releases from undetermined sources; (4) on August 28, 2012, DTSC sent Exide a memorandum identifying hazardous levles of lead and zinc in the Vernon facility's stormwater pipes, (FAC ¶ 78); and (4) on March 5, 2013, Exide received the inspection report prepared by

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

Advanced GeoServices, which included videos showing that some of Vernon's stormwater pipes were breached and were leaking hazardous waste into the groundwater in the area surrounding the Vernon facility.  (Id.).

Additionally, Plaintiffs contend that Defendants not only omitted to inform investors of these alleged facts, but also mislead investors by making comments about the company's compliance with environmental standards that suggested that all known issues had been disclosed.  For example, in each of Exide's 10-Q and 10-K filings, the company stated that it "could become liable for the cost of investigating or remediating contamination at [its] properties if contamination requiring such activities *is discovered in the future*."  (FAC ¶¶ 117, 119, 121, 123, 130, 135, 137) (emphasis added).  Plaintiffs contend that this disclosure mislead investors because by stating that contamination may be discovered in the future, Exide implicitly suggested that there were no outstanding issues of environmental contamination.

Further, in a June 8, 2012 quarterly earnings conference call, defendant CEO Bolch made specific comments about air emissions at the Vernon facility.  He stated that "[the Vernon facility] is a facility where we have now completed all of the environmental modifications . . . and that the results as measured by the air monitors are well within the new stricter air standards."  (FAC ¶ 28).  Bolch also said during the call that "we are seeing excellent results from out completed investment in Vernon, where air monitor readings are now tracking well below the new stricter standard."  (Id.).  Plaintiffs argue that these statements by Exide's CEO were misleading because they suggested that the Vernon plant was in compliance with all air quality requirements, when in fact the Vernon plant was emitting dangerous levels of arsenic into the air.

By identifying specific omissions and misleading statements by Defendants in their reports to, and discussions with investors, Plaintiffs' have satisfied the lion's share of their pleading burden for the first element of their Exchange Act claim.  See Zucco Partners, 552 F.3d at 990-91 (a securities fraud complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading").  The remaining component to plead the first element of a § 10(b) claim is that the allegations must "raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement."  Matrixx, 131 S. Ct. at 1323.

Here, Plaintiffs contend that Defendants' omissions were material given the severity of the environmental issues, and the importance of the Vernon plant for Exide's operations.  The FAC includes allegations that provide a sufficient factual basis for both of these claims.  In discussing the Vernon facility's arsenic emissions, AQMD publically stated that the facility "posed a greater cancer risk to Southern California than any of the 450 facilities it had regulated in its twenty-five year history."  (FAC

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

¶ 3).  AQMD also expected the remediation measures to "potentially cost the company millions of dollars."  (FAC ¶ 116).  Similarly, DTSC found the groundwater around the Vernon plant to be significantly contaminated and provided Exide with a list of expensive piping upgrades.  (Id. ¶ 67).

The FAC not only includes allegations supporting the seriousness of the environmental issues at Vernon, but also depicts the Vernon facility as a significant component of Exide's operations.  It states that Exide relied heavily on the Vernon plant to extract lead from recycled batteries so that new batteries could be manufactured cost effectively.  (FAC ¶ 114).  The FAC also includes statements made by defendant CFO Damaska and Exide's vice president of recycling operations, Joseph Preuth, that the Vernon plant's shutdown was one of the largest contributors to Exide's bankruptcy.  (FAC ¶ 106).[3] Captured in the complaint is also a statement by Damaska that the Vernon shutdown would "directly impact Exide's bottom line by eliminating an estimated $24 million in projected [EBITDA] from its business plan for the six-month period following the shutdown."  (FAC ¶¶ 106, 114).[4]

In total, because the FAC alleges that the environmental issues at Vernon were substantial and that Vernon was an important part of Exide's operations, Plaintiffs' allegations are sufficient to "raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement." Matrixx, 131 S. Ct. at 1323.

Defendants argue, however, that the omissions identified by Plaintiffs are not material as a matter of law.  They contend that (1) Exide was working cooperatively with AQMD and DTSC during the majority of the class period, and the shutdown of Vernon was unexpected and improper;[5] (2) as set forth in Plaintiffs' complaint, Defendants disclosed in every 10-Q and 10-K during the class period that "[t]he Company cannot be certain that it has been, or will at all times be, in complete compliance with

---

[3]  These statements were made in declarations prepared as part of Exide's bankruptcy filing.  Excerpts from these declarations are quoted directly in the FAC.  (See FAC ¶¶ 106, 114).

[4]  By comparison, for the fiscal-year ending March 31, 2012, Exide's company-wide net income was approximately $55 million; and for the fiscal-year ending March 31, 2011, Exide's company-wide net income was approximately $26 million.

[5]  DTSC issued the shutdown order without holding an administrative hearing.  Exide sued in the Los Angeles County Superior Court seeking a preliminary injunction staying enforcement of the order.  In an opinion handed down on July 2, 2013, Judge Luis A. Lavin granted the stay, holding that the DTSC should have completed the available administrative process before issuing a shutdown order.  (Dkt. 74, Def.'s RJN, Ex. 3).

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

all environmental requirements, or that the Company will not incur additional material costs or liabilities in connection with these requirements in excess of amounts it has reserved," (Mem. at 6-10; FAC ¶¶ 117, 119, 121, 123, 130, 135, 137); and (3) the FAC's allegations related to CEO Bolch's statements in the June 8, 2012 conference are taken out of context and therefore should be disregarded.   Based on these contentions, Defendants aver that a reasonable investor would not have be mislead by Defendants omissions and statements about the Vernon facility.

Defendants' arguments essentially raise factual issues that cannot be resolved as a matter of law at this stage in the litigation.  Reese, 747 F.3d at 568 ("[D]etermining materiality in securities fraud cases should ordinarily be left to the trier of fact.").  First, even if DTSC's shutdown of Vernon was unexpected or improper, the FAC alleges that plant upgrades and remediation measures were expected to be costly, and the disclosure of the environmental issues at Vernon (specifically the serious arsenic and lead contamination) would conceivably present a material risk of adverse public opinion and action. Thus, even putting aside the shutdown of Vernon, a reasonable investor could plausibly find Defendants' omissions about Exide's arsenic emissions and groundwater pollution material.  Cf. Reese, 747 F.3d at 579 ("Based on the pled facts [of egregious environmental compliance issues], it is unclear how BP's management could consider the company to be 'in compliance' or, alternatively, could view the violations to be immaterial.")

Additionally, although Defendants disclosed in their 10-Q and 10-K filings throughout the class period that Exide could not "be certain that it has been, or will at all times be, in complete compliance with all environmental requirements, or that the Company will not incur additional material costs or liabilities in connection with these requirements in excess of amounts it has reserved," it is an issue of fact whether a reasonable investor would consider this boilerplate disclosure sufficient enough that the disclosure of the actual environmental issues at Vernon during the class period would not have "significantly altered the total mix of information made available" about the company.  The Court notes, however, that if Defendants general environmental disclosures were sufficient to cover the existing environmental problems at Vernon as a matter of law at the pleading stage, it is difficult to see a logical stopping point to the ability of companies to "disclose" serious environmental or other problems to investors through vague, general or boilerplate statements.

Lastly, the objectively reasonable meaning of CEO Bolch's statements in the June 8, 2012 conference call regarding Vernon's completion of "all of the environmental modifications" and compliance with "the new stricter air standards" is also a factual question.  (FAC ¶¶ 127-29). Defendants contend that this quote was taken out of context in Plaintiffs' FAC.  Specifically, Defendants assert that the "new stricter air standards" Bolch was referring to were National Ambient Air Quality Standards (NAAQS), not the standards imposed by AQMD.  Plaintiffs claim, however, that

|  | : |  |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

Bolch's statements created the false impression that Vernon had completed all modifications necessary for compliance with *all* air emissions standards, because Bolch never specifically stated that he was talking about the NAAQS lead standards in the call.  (Opp. at 10-12).  Whether a reasonable investor would be mislead by Bolch's statement is a question for the trier of fact.

In sum, Plaintiffs have pled allegations sufficient to present a question of fact as to whether Defendants omissions and misrepresentations regarding the Vernon plant's environmental contamination issues made Defendants' communications with investors misleading.  As a result, Plaintiffs' FAC sufficiently pleads the first element of their § 10(b) claim.

B. Scienter

To support their § 10(b) claim, Plaintiffs must also adequately allege that Defendants made their false or misleading statements and omissions with the required state of mind—that is, either intentionally or with deliberate recklessness.  Zucco, 552 F.3d at 991.  In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).  Under the PSLRA, plaintiffs in § 10(b) claims must plead facts with particularity that are sufficient to establish a "strong inference" of scienter.  Id. § 78u-4(b)(2)(A).  The Supreme Court has defined a "strong inference" as one that is cogent and at least as compelling as any opposing non-fraudulent inference.  Tellabs, Inc. v. Makor Issues and Rights, Ltd., 551 U.S. 308, 322 (2007).  The Court must "review all the allegations holistically" when determining if Plaintiffs have adequately pled scienter.  Matrixx, 131 S. Ct. at 1324 (quoting Tellabs, 551 U.S. at 322).  Thus, it is possible for the Plaintiffs to adequately plead scienter, even if none of the individual allegations examined alone would be sufficient to support a strong inference of the required state of mind.  Id.

To demonstrate scienter, Plaintiffs' FAC relies in part on the statements of a number of confidential informants.  The Ninth Circuit has explained that because of the PSLRA's particularity requirement, a securities fraud complaint "relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements."  Zucco Partners, 552 F.3d at 995.  First, "the confidential witness whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge."  Id. (citing Daou, 411 F.3d at 1015-16).  Second, "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."  Id. (citing Daou, 411 F.3d at 1022).  Thus, before considering whether the FAC's allegations support a strong inference of scienter, the Court first considers whether the FAC adequately describes its confidential informants so as to establish their reliability and personal knowledge.

|  | : |  |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

1. Confidential Informants' Statements

The FAC principally relies on confidential informants to demonstrate that Exide had systems in place for reporting environmental compliance issues up the chain of command.  Specifically, Plaintiffs' CIs (who include current and former employees at Exide's Vernon facility, and employees at other Exide facilities and Exide's corporate office), describe an information chain at Exide for communicating environmental issues to Exide's corporate Environmental Health and Safety (EHS) department, and then to Exide's corporate management.[6]

Exide's information chain, as alleged in the FAC, starts at the plant level.  CI 2, a project engineer at Exide's Vernon plant from 2012 until June 2013, states that any interactions with environmental regulators at Vernon are reported to the Vernon plant manager.  (FAC ¶ 162).  CI 5, the EHS manager at an Exide plant in Bristol, Tennessee from July 2011 to February 2012, also states that any time an environmental regulatory agency interacts with his facility, he was involved, along with the plant manager.  (Id.).  According to CI 5, EHS plant managers at Exide are then required to inform corporate EHS of all interactions with regulators.  (Id.).  CI 6, an EHS manager at Exide's Columbus, Ohio facility from the late 1990s to 2005 (which had a battery recycling plant similar to Vernon's) makes a similar statement, noting that regardless of why regulators are at his plant, he is required to make an immediate report of the inspection to the corporate Director of EHS.  (Id.).

Plaintiffs' CIs also state that Exide has forms and procedures in place to report environmental related incidents to corporate level employees.  CI 8, the EHS manager at Exide's Reading, Pennsylvania distribution center from 2010 to 2012, explains that the corporate EHS office provided him with an EHS manual that specifically detailed how facility level employees are to respond to environmental incidents, including forms for different incidents that the EHS facility manager is required to fill out and submit to corporate level management.  (FAC ¶ 163).  CI 8 also notes that if an incident is environmental in nature, the report goes to EHS corporate management.  (Id.).  CI 3, a plant manager of Exide's Fresno, California distribution center from 2009 to January 2012, makes similar comments, stating that Exide has forms for reporting incidents, such as environmental problems.  (Id.).
The CIs also state that Exide's corporate EHS department, and sometimes Defendants themselves, participate in regularly scheduled calls with plant EHS departments to review environmental incidents and compliance matters.  CI 8 notes that every month the corporate EHS

---

[6]  Plaintiffs' First Amended Complaint includes more CI statements than those highlighted by the Court.  (See generally FAC ¶¶ 160-205).  The Court only excerpts those statements it finds to be material to its decision.

:

Initials of Preparer          PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

department holds a conference call with EHS managers from all of the company's facilities.  (FAC ¶ 164).  CI 8 also states that Exide's CEO sometimes participates in these EHS conference calls if there is an ongoing problem at a particular facility.  (Id.).

In addition to reporting all interactions with regulators to corporate EHS, CIs also note that plant's EHS departments regularly prepare reports on environmental testing.  According to CI 1, an industrial engineer at Exide from 1979 to 2010, who worked at corporate headquarters and frequently traveled to different Exide sites, each plant's EHS department prepares monthly, quarterly, and annual reports about the internal environmental tests done at each of the company's plants (such as air and water samples).  (FAC ¶ 169).  CI 6, the EHS manager at Exide's Columbus facility from the late 1990s to 2005, and CI 8, the EHS manager at Exide's Reading facility from 1981 to 2010 and then the EHS manager at Exide's Lancaster distribution center from 2010 to 2012, describe the same practice of regularly reporting environmental tests to corporate EHS.  (Id.).

Once EHS plant managements provide environmental forms and reports to corporate EHS, other CIs state that corporate EHS then provides reports on environmental violations to Defendants.  CI 15, the vice president of global EHS at Exide from July 2005 to March 2011, explains that Exide's CEO, CFO, and corporate controller all receive reports on environmental violations at each of the company's facilities from Exide's corporate EHS department.  (FAC ¶ 165).  Similarly, CI 4, Exide's former Vice President of Operations in its North America division—the operating segment that includes Vernon—also explains that the corporate EHS director reports directly to Exide's CEO about environmental issues.  (FAC ¶ 163).  CI 15 also stated that if there was a serious environmental matter, such as a citation or a major project that needed to be done, it would be reported to the CEO of Exide: "[w]ithout a doubt if there was an actual citation, that went right up the ladder to the top."  (FAC ¶ 165).

### 2. Analyzing the Reliability of the Confidential Informants' Statements

To determine whether a complaint has provided sufficient detail about a confidential witness' position within a company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge, see Zucco Partners, 552 F.3d at 995, the Ninth Circuit instructs courts to look at a number of factors.  Id.  These factors include "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."  Id.

Here, for each of the confidential witnesses relied on in Plaintiffs' FAC, the FAC provides the CI's job title and the approximate period during which the person was in that position.  Each CI's

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

statements are also corroborated by other CIs at Exide who work at different plants or in different positions, but who testify to similar procedures at Exide for handling environmental matters.  For example, CIs 5 and 6, both EHS managers at Exide plants, each state that they are required to report all interactions with environmental regulators to corporate EHS.  (FAC ¶ 162).   Multiple EHS managers also note that they were provided with manuals by corporate EHS that specify how facility level employees are to respond to environmental incidents, and that corporate EHS has a monthly conference call with all of the plant EHS managers.  (FAC ¶ 163).  And CIs 15 and CI 4, both senior executives at Exide (respectively the vice president of global EHS at Exide and the vice president of operations in North America) corroborate each others' statements that Exide's CEO, CFO, and corporate controller receive reports of environmental violations from corporate EHS.  (FAC ¶¶ 165, 172).  By providing background on each CIs position within the company, and by corroborating each CI with other CI statements, the complaint describes the CIs with "sufficient particularity to establish their reliability and personal knowledge."  Id.; see also Daou, 411 F.3d at 1016 (the plaintiffs "describe the confidential witnesses with a large degree of specificity;" the complaint "number[s] each witness and describe[s] his or her job description and responsibilities").

Defendants attempt to discredit the reliability of some of the Exide CIs by arguing that they do not have personal knowledge relevant to this case because they worked at facilities other than Vernon or left Exide before the class period started.  (Def.'s Mot. at 19).  This argument, however, goes to whether the CI statements are helpful to Plaintiffs' allegations of scienter, not to whether they are reliable.  The question of reliability is grounded in whether the Court, at the pleading stage, has reason to believe that the CIs were in a position to have personal knowledge of the facts which they allege.  Once the Court determines that the CIs are reliable, it must take the statements as true for the purposes of ruling on a motion to dismiss.  Zucco Partners, 552 F.3d at 995-97.

3. Conducting a Holistic Analysis of Scienter

Having concluded that the confidential informants' statements are sufficiently reliable and based on personal knowledge, the Court must now consider whether the allegations in the FAC support a "strong inference" of scienter as required under the PSLRA.

The CI statements set forth above plausibly demonstrate that there was an information chain at Exide between plant level management and corporate management for sharing environmental compliance information.  Although many of the CIs relied upon do not work at the Vernon plant itself, their positions within the company (mostly EHS managers and senior management employees who would be familiar with environmental protocols at Exide), and the corroboration of their statements by other CIs, supports the existence of this information chain throughout Exide, including at Vernon.

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

When combined with allegations in the FAC that Vernon plant-management knew of the dangerously high arsenic emissions levels and groundwater pollution at the plant through regular communications with AQMD and DTSC, it seems reasonable to infer that Defendants themselves were likely made aware of Vernon's environmental compliance issues.

The Ninth Circuit, however, has cautioned against scienter arguments based solely on allegations of miscellaneous company-prepared reports.  Rather, to plead a *strong* inference of scienter based entirely on company reports, courts have generally required corroborating details such as who drafted the reports and which officers received them.  See In re Vanitive Corp. Sec. Litig., 283 F.3d 1079, 1087-88 (9th Cir. 2002) ("Plaintiffs have failed to cite any specific report, to mention any dates or contents of reports, or to allege their sources of information about any reports."); Daou, 411 F.3d at 1022 ("General allegations of . . . defendants' receipts of unspecified weekly or monthly reports are insufficient."); Metzler, 540 F.3d at 1067-68 ("Corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud.").

This does not mean, however, that Plaintiffs' allegations of an information chain for communicating environmental compliance issues to management are entitled to no weight.  Rather, these allegations are still properly considered as part of a holistic review of Plaintiffs' allegations.  See Tellabs, 551 U.S. 308 ("We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."); South Ferry LP, No. 2 v. Killinger, 542 F.3d 776 784 (9th Cir. 2008) ("Vague or ambiguous allegations are . . . properly considered as part of a holistic review when considering whether the complaint raises a strong inference of scienter.").  Here, Plaintiffs' FAC not only relies on the information chain at Exide for communicating environmental issues, but also sets forth other allegations supporting that Defendants had knowledge of Vernon's environmental contamination.

As noted above, the environmental problems at Vernon were significant.  2010 test results showed arsenic levels that were characterized by AQMD officials as "shockingly high."  (FAC ¶ 88). While 2012 test results corresponded to a cancer risk of approximately 100 in one million people, which was well above AQMD standards.  (FAC ¶¶ 92-93, 102).  After Vernon's management prepared a Human Health Assessment report in early 2013, AQMD also stated that the Vernon facility "posed a greater cancer risk to Southern California than any of the 450 facilities it had regulated in its twenty-five year history."  (FAC ¶ 3).  Similarly, over the course of the class period, DTSC officials told Exide's Vernon officials on multiple occasions that hazardous levels of lead and zinc were detected in the Vernon facility's stormwater pipes and in the groundwater around the Vernon facility.  (FAC ¶¶ 71-80).

|  |  | : |  |
|---|---|---|---|
|  | Initials of Preparer | | PMC |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

Not only were the environmental problems at Vernon significant during the class period, but also as noted above, the Vernon facility was an important component of Exide's company-wide operations. CFO Damaska notes that one of the key factors contributing to Exide's bankruptcy filing was "the shutdown of the Vernon facility."  (FAC ¶ 106).  Damaska also notes that the shut down of Vernon was a "significant setback" for the company, and that the shutdown of Vernon was expected to "directly impact Exide's bottom line by eliminating an estimated $24 million in projected EBITDA from its business plan for the six months following the shutdown."  (Id.).  Similar statements were made by Joseph Preuth, Exide's vice president of recycling operations, who stated that the Vernon facility was critical to Exide's ability to manufacture new batteries cost effectively, and that the monthly financial impact to Exide as a result of Vernon's closure "is in the millions."  (FAC ¶ 114).

These allegations support that the Vernon facility was critical to Exide's operations, and that the environmental contamination issues at Vernon were severe.  In conjunction with Exide's environmental reporting system, these allegations support a cogent inference that Defendants were aware of Vernon's environmental issues.  See Reese, 747 F.3d at 576 ("[W]here the nature of the relevant fact is of such prominence that it would be 'absured' to suggest that management was without knowledge of the matter," such allegations can support a strong inference of scienter).  Additionally, Defendants themselves explicitly addressed environmental issues at Vernon. CEO Bolch himself spoke to investors about environmental modifications at the Vernon plant on June 8, 2012.  (FAC ¶ 127).  In that call, Bolch stated that the Vernon plant's "air monitor readings are now tracking well below the new stricter standard."  (Id.).  Bolch then went on to describe various environmental modifications made by the company at Vernon, including "fully enclosing the building and putting it under negative pressure."  (Id.).  Even if Bolch's statements were in relation to Vernon's compliance with NAAQS standards rather than AQMD arsenic standards, as Defendants contend, these statements show that management was aware of, and involved in environmental compliance issues at Vernon, making it even less likely that Defendants were not aware of Vernon's contamination issues.  See id. at 572 ("[T]he inference that [defendant] did not have access to the corrosion data is directly contradicted by the fact that she specifically addressed it in her statement.").

Given the importance of the Vernon facility to Exide's overall operations, the significance of the environmental problems at Vernon, and the role of management in overseeing environmental problems, it is highly unlikely that Defendants did not know about the arsenic emissions and noncompliant piping system at Vernon.  It may not have been impossible for them not to know, but the cogent inference that Defendants knew about these issues when they spoke to investors during the class period is at least as plausible, if not more plausible, than the inference that they did not know.  See Tellabs, 551 U.S. at 324 (noting that the "inference that the defendant acted with scienter need not be irrefutable, i.e. of the 'smoking-gun' genre, or even 'the most plausible of competing inferences'").  Accordingly, taken as a

_____ : _____

Initials of Preparer       PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|

| Title | David M. Loritz et al. v. Exide Technologies et al. |
|---|---|

whole, Plaintiffs' allegations are sufficient to plead a strong inference that Defendants made their alleged material misrepresentations and omissions about environmental compliance intentionally or with deliberate reckless to whether the statements were misleading.

## IV. SECURITIES ACT CLAIMS

Plaintiffs also allege that Defendants violated § 11 of the Securities Act.  This claim is based on an amended S-4A registration form Exide filed with the SEC on August 5, 2011.  (FAC ¶ 185).  Exide file the amended S-4A registration form in connection with its exchange offer of $675 million in outstanding $8^{5/8}$ percent senior secured notes due in 2018, for $675 million in registered $8^{5/8}$ percent senior secured notes due in 2018.  (Id.).  The registration statement became effective on August 8, 2011.

The elements of a § 11 claim are "(1) the registration statement contained an omission or representation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment."  In re Stac Elecs. Litig., 89 F.3d 1399, 1403-04 (9th Cir. 1999).  Unlike under § 10(b), scienter is not an element of a §11 claim, and thus defendants are liable for innocent or negligent misrepresentations.  Id. (citing Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983)).

Here, Plaintiffs contend that Exide's amended S-4A registration filing violated § 11 because it did not disclose the Vernon facility's significant environmental issues.  For example, the S-4 form did not disclose the results of Vernon's June 2011 Human Health Assessment report, which revealed "shockingly high" levels of arsenic emissions at the facility.  (FAC ¶ 88).  Nor did the S-4 disclose that on March 21, 2011, DTSC had observed significant groundwater contamination around the Vernon facility.  (FAC ¶ 71).  Above, the Court held that the FAC's allegations related to the omission of these incidents were sufficient to satisfy the pleading requirements under the PSLRA.  This holding controls here too.  Defendants argue, however, that Plaintiffs' § 11 claim should be dismissed because Plaintiffs' do not have standing to bring such a claim.  The Court considers this argument below.

### A. Standing

Defendants argue that Plaintiffs lack standing to bring their § 11 claim because Mr. Grace, the named plaintiff for the putative class of bondholders, acquired his bonds in the aftermarket following an "Exxon Capital exchange transaction."  (FAC ¶¶ 27, 183-187).  In an Exxon Capital exchange, a company offers unregistered securities to qualified institutional investors (QIBs); these unregistered securities cannot be sold on the open market.  The company offering the securities later files a registration statement, and the QIBs exchange their illiquid, unregistered securities for registered

:

Initials of Preparer                PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|

| Title | David M. Loritz et al. v. Exide Technologies et al. |
|---|---|

securities which can be freely traded.  See In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 431 (S.D.N.Y. 2001) (describing the Exxon Capital exchange process).

The majority of courts have held that QIBs who acquire their securities in an Exxon Capital exchange cannot bring § 11 claims.  See In re Levi Strauss & Co. Sec. Litig., 527 F. Supp. 2d 965, 978 (N.D. Cal. 2007) (holding that the alleged misstatements and omissions in the registration statement "would not have been material to the unregistered bondholders' decision whether to exchange unregistered shares they had already chosen to purchase" in an Exxon Capital exchange); In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007) (stating that the content of a registration statement would not reasonably impact a qualified purchaser's decision to exchange unregistered bonds for registered bonds because, even if the state of the company was worse than disclosed, exchanging the bonds would be the only way for the qualified purchaser to rid himself of the bonds); In re HealthSouth Corp. Sec. Litig., 261 F.R.D. 616, 647 (N.D. Ala. 2009) ("[P]laintiffs who acquired registered bonds through a voluntary 144A/Exxon Capital exchange are precluded from asserting claims under Section 11.").[7]

Plaintiff Grace, however, was not a QIB.  Rather, he purchased his notes in the aftermarket following the issuance of Exide's Amended S-4A registration form.  Unlike QIBs in Exxon Capital exchanges, who make their purchasing decisions before a registration statement is issued, aftermarket purchasers may reasonably rely on a company's registration statement in determining whether to purchase a company's bonds.  As a result, the majority of courts to consider the issue have held that such aftermarket purchasers do have standing to assert § 11 claims.  See In re Levi Strauss, 527 F. Supp. 2d at 978-79 (denying defendants' motion to dismiss aftermarket purchasers and stating that "the purpose of the registration statements at issue was to protect the potential investors in the public market who may be purchasers of the registered bonds not based on a Rule 144A offering document, but based on the registration statements' disclosures"); In re HealthSouth, 261 F.R.D. at 649 (holding that aftermarket purchasers of bonds that were registered through an Exxon Capital exchange had standing to bring a § 11 claim).  The Court endorses this majority approach.  Because aftermarket investors such as

---

[7]  In re Gentiva Securities Litigation is the only decision to hold otherwise, on the ground that there was "at least a question of fact" as to whether alleged misrepresentations in a registration statement were material to the QIBs' decision to exchange their shares.  932 F. Supp. 2d 352, 396 (E.D.N.Y. 2013). However, In re Gentiva's reasoning seems at odds with the logic of a QIB's transfer of unregistered bonds for registered bonds.  Because the unregistered bonds in an Exxon Exchange are not exchangeable, a QIB would want to exchange its unregistered securities for registered securities no matter what the registration statement said.  See In re Refco, 503 F. Supp. 2d at 637.

|  | : |  |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|
| Title | David M. Loritz et al. v. Exide Technologies et al. | | |

Mr. Grace may have reasonably relied on Exide's registration statement, at this stage of the litigation the Court concludes that they have standing.[8]

For the reasons stated in the Court's analysis of Plaintiffs' § 10(b) claim, Plaintiffs' FAC adequately pleads that Defendants omitted material information in their disclosures to investors.  The same is true for Exide's S-4A registration form.  And having determined that Mr. Grace and other aftermarket purchasers have standing to pursue a § 11 claim, Defendants' motion to dismiss Plaintiffs' § 11 claim is DENIED.

**V.    CONTROL PERSON LIABILITY CLAIMS**

In addition to their § 10(b) and § 11 claims, Plaintiffs also bring control person liability claims under § 20 of the Exchange Act and § 15 of the Securities Act, respectively.  Under these provisions "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" Zucco Partners, 552 F.3d at 990 (quoting No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003).  "This inquiry is normally an 'intensely factual question,'" and control person liability claims can generally only be dismissed at the pleading stage "if a plaintiff fails to adequately plead a primary violation" of § 10(b) or § 11.  Id. (citations omitted).

Because Plaintiffs' have sufficiently pled their underlying § 10(b) and § 11 claims, Defendants only make a limited attack on Plaintiffs' control person liability claims.  Specifically, Defendants contend that Plaintiffs cannot plead a § 15 claim as to Defendant Hirt[9] because he was not an employee of the company when the amended S-4A registration statement constituting the basis of Plaintiffs' § 11 claims was issued.  (Mem. at 25 n.10).  Plaintiffs' do not oppose Defendants' motion to dismiss as it

---

[8]  In re Empyrean Bioscience, cited by Defendants, is distinguishable.  See In re Empyrean Bioscience, Inc. Sec. Litig., 255 F. Supp. 2d 751, 766 (N.D. Ohio 2003).  There, the registration statement was issued as part of a one for one exchange of Empyrean-Wyoming stock for Empyrean-Delaware stock, where the purpose of the exchange was to affect a change in corporate domicile.  Id.  The court based its decision on the fact that such mergers are specifically exempted from the definition of a "sale" for purposes of § 11 claims under 17 C.F.R. § 230.145(a)(2).  Id.

[9]  Hirt has served as President of Exide America since November 2011. ( FAC ¶ 31).  The S-4 Registration Form which Plaintiffs allege violated § 11 of the Securities Act was filed on August 5, 2011.  (*Id.* ¶ 185).

                   :

Initials of Preparer         PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:13-cv-2607-SVW-Ex | Date | August 7, 2014 |
|---|---|---|---|

| Title | David M. Loritz et al. v. Exide Technologies et al. | | |
|---|---|---|---|

pertains to the § 15 claim against Defendant Hirt.  As a result, Plaintiffs' § 15 claim as it pertains to Defendant Hirt is DISMISSED.

**VI.     CONCLUSION**

        For the reasons stated above, Defendants motion to dismiss is DENIED except for the dismissal of Plaintiffs' § 15 claim against Defendant Hirt.

                                                                                                        :

                                                        Initials of Preparer              PMC

CV-2607                                        **CIVIL MINUTES - GENERAL**                                        Page 19 of 19