# Exhibit 6

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| DAVID M. LORITZ, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    v.<br><br>EXIDE TECHNOLOGIES, et al.,<br><br>        Defendants. | Case No. 2:13-cv-02607-SVW-E<br>2:13-cv-03194-SVW-E<br>2:13-cv-03991-SVW-E |

**EXPERT REBUTTAL REPORT OF FRANK C. TORCHIO**
May 26, 2015

## TABLE OF CONTENTS+

I. INTRODUCTION AND SUMMARY OF OPINIONS.............................................................. 1

    i)   Prof. James' Criticisms of My Cause and Effect Analyses are Flawed
        and His Prior Reports Contradict his Views ............................................. 3

    ii)  Prof. James' Criticisms of My Complementary Analyses are Flawed and
        His Prior Reports Contradict his Views ................................................... 7

    iii) Responses to Criticisms Specific to Exide Notes.................................... 10

    iv) Damages Methodology ................................................................................ 13

II. ADDITIONAL MATERIALS REVIEWED ........................................................................ 13

III. PROF. JAMES PREVIOUSLY RELIED ON THE SAME ANALYSES USED IN THE
    TORCHIO REPORT.......................................................................................................... 14

    A. Prof. James Relies on the Same Reverse Event Study in the James Adams Golf
        Report that He Now Claims Is Unscientific in Exide................................. 14

    B. Prof James Previously Opined that "Indirect" Analyses Support Conclusions of
        Market Efficiency ............................................................................................. 17

        i)   Contradictions in Stance on Trading Volume ...................................... 20

        ii)  Contradictions in Stance on Analyst Coverage ................................... 22

        iii) Contradictions in Stance on Market Makers........................................ 23

        iv) Contradictions in Stance on Institutional Ownership.......................... 24

        v)   Contradictions in Stance on Short Interest .......................................... 25

        vi) Comparison of Exide's Indirect Analyses with those in the James Adams
            Golf Report and the James SOI Report ............................................... 26

IV. RESPONSE TO PROF. JAMES' CRITICISMS OF COMPLEMENTARY
    ANALYSES ......................................................................................................................... 27

    A. Prof. James' Approach of Compartmentalizing Is Flawed ................................. 27

    B. Many Court Opinions Have Considered Complementary Analyses in Assessing
        Market Efficiency ............................................................................................. 29

    C. Prof. James Cites Academic Literature that Primarily Relates to Fundamental
        Efficiency or Perceived Anomalies in Stock Returns ................................. 30

V. RESPONSE TO CAUSE-AND-EFFECT ARGUMENTS ................................................ 32

    A. News/No-News Analysis ...................................................................................... 32

        i)   Justification ............................................................................................ 33

        ii)  Ex-Ante Specification of Stock Price Movements .............................. 34

        iii) Selection of News ................................................................................. 37

        iv) Variance test ......................................................................................... 40

    B. Reverse Event Study ............................................................................................ 41

        i)   The Reverse Event Study is Complementary to News/No-News ........... 43

    C.  Adjusted R-squared ................................................................................ 46

    D.  Prof. James' Only Cause-and-Effect Analysis Is Subjective ................................ 48

        i)  Lack of Academic Support ....................................................... 49

**VI. PROF. JAMES' ADDITIONAL CRITICISMS RELATING TO EXIDE NOTES ....... 50**

    A.  Trading Volume in Sub-periods within the Class Period ......................... 50

    B.  Benchmarking Analysis for the Notes ................................................. 55

    C.  Analyst Coverage and Rating Agency Coverage ................................... 56

        i)  Analyst Coverage ...................................................................... 56

        ii)  Ratings Agency Actions ............................................................. 58

    D.  Cause-and-Effect Analyses ............................................................... 62

        i)  Correlation with Exide Stock .................................................... 62

        ii)  Analysis of News vs. No-News Days ......................................... 62

        iii)  Reverse Event Study ................................................................. 63

**VII. METHODS AND TECHNIQUES USED IN DAMAGES ANALYSES ...................... 65**

    A.  Overview ....................................................................................... 65

    B.  Event Study Statistical Analysis ......................................................... 69

        i)  Market and Industry Variables .................................................. 70

        ii)  Predicted Returns, Excess Returns and Statistical Significance ........... 70

        iii)  Efficient Market ....................................................................... 72

    C.  Analysis of Information from Disclosures in Event Studies ................... 72

        i)  Economic Correspondence ......................................................... 72

        ii)  Direct and Foreseeable Consequences ........................................ 73

        iii)  Truth on the Market ................................................................. 75

        iv)  Confounding Information ......................................................... 76

        v)  Length of Event Window ........................................................... 78

    D.  Additional Financial Analysis ........................................................... 78

        i)  Economic Inferences from Behavior .......................................... 79

        ii)  Financial Analysis .................................................................... 79

    E.  Techniques Used in Calculating Artificial Inflation ............................. 79

        i)  Methods of Calculating Artificial Inflation ................................ 80

        ii)  Methods of Scaling Artificial Inflation ...................................... 82

    F.  Response to Prof. James .................................................................... 82

        i)  Materialization of Concealed Risk ............................................ 83

        ii)  Method for Measuring the Impact Associated with Each Element of the Alleged Fraud ........................................................................ 84

        iii)  Damages Methodology Consistent With Evolving Nature of Alleged Fraudulent Behavior .............................................................. 85

    G.  Class-Wide Damages Approach for Exide's Stock and Notes ............................. 86

## I. INTRODUCTION AND SUMMARY OF OPINIONS

1.      I am the President of Forensic Economics, Inc. and have been retained by Federman & Sherwood, Lead Plaintiff's Counsel in this Action.  I have previously submitted an Expert Report dated March 30, 2015 (the "Torchio Report") in which I opined that the common stock of Exide Technologies, Inc. ("Exide" or the "Company") traded in what economists refer to as an efficient market with regard to publicly-disclosed information during the period June 1, 2011 through May 24, 2013, inclusive (the "Class Period").  In the Torchio Report, I also opined that the Exide $8^5/_8\%$ senior secured notes due 2018 (the "Notes") traded in an efficient market with regard to publicly-disclosed information during the period August 12, 2011 through May 24, 2013, inclusive (the "Notes Class Period").[1]

2.      I based my conclusions on a number of findings from analyses that provide information on trading costs, information flow, and competition among investors.  Among the analyses I conducted include several cause-and-effect analyses as well as numerous analyses that support a finding of market efficiency.  The *Cammer* factors relied on by many courts are included in my analyses.

3.      I have received the Expert Report of Prof. Christopher M. James dated May 4, 2015 (the "James Report") on behalf of Defendants in this matter.  In the James Report, Prof. James expresses the following opinions:

    a) Mr. Torchio's analyses of Exide common stock are inadequate to establish market efficiency throughout the Class Period;[2]

---

[1] *See* First Amended Consolidated Complaint for Violations of the Federal Securities Laws dated January 30, 2014 (the "Complaint"), ¶1 and Torchio Report, ¶1.

[2] James Report, ¶15.

b) Mr. Torchio's analyses of the Exide Notes are inadequate to establish market efficiency throughout the Notes Class Period;[3]

c) Plaintiffs have not proposed a damages methodology.[4]

4.      I have been asked to respond to the opinions and criticisms contained in the James Report of my opinions and analyses presented in the Torchio Report.

5.      After reading the James Report, I have not changed my opinion that the markets for Exide common stock and Notes were efficient over the Class Period.  It is particularly noteworthy that, despite all of Prof. James' criticisms, protestations, and purported analyses, he does not opine that the markets for Exide stock or Notes were inefficient over the Class Period. In his deposition, when asked whether it is his conclusion that Exide's stock was trading in an inefficient market during the Class Period, Prof. James responded with "I haven't reached that conclusion."[5]  Similarly, Prof. James has not reached a conclusion about the efficiency or inefficiency of Exide Notes.  The James Report presents conjectures of the possibilities that Exide securities might not be efficient, but the James Report is short of actual economic evidence against efficiency.  In several instances the James Report asserted the lack of efficiency evidence based on indicia associated fundamental efficiency, despite the U.S. Supreme Court's decision in *Halliburton II* which stated that fundamental efficiency is not a requirement for efficiency (see section IV. C. .  At other time the James Report relies on several academic studies that discuss findings of market-wide anomalies in stock returns that may be inconsistent with efficiency.  But such anomalies are not specific to Exide and the James Report does not provide evidence that such anomalies presented arbitrage opportunities in Exide securities (see section IV. C. .

---

[3] James Report, ¶15.

[4] James Report, ¶15.

[5] Transcript of deposition of Professor Christopher M. James dated May 15, 2015 ("James Deposition Transcript"), 74:15-17.

6.      Prof. James previously submitted the Expert Report of Christopher M. James dated July 14, 2006 in *In Re Adams Golf, Inc. Securities Litigation* 2012 WL 7150873 (the "James Adams Golf Report.")  In the James Adams Golf Report, Prof. James was able to conclude that the market for Adams Golf common stock was efficient in 25 paragraphs.  A second report previously submitted by Prof. James is the Expert Report of Professor Christopher M. James dated June 15, 2012 in *In re Superior Offshore International, Inc., v. Louis SCHAEFER, Jr., et al.*, 2012 WL 7150873 (the "James SOI Report").  He concluded that the stock for Superior Offshore International ("SOI") was also traded in an efficient market.  He reached this conclusion in 6 paragraphs.

7.       One would think that Prof. James could have demonstrated that Exide was inefficient in such a succinct manner.  Instead, Prof. James provides no such opinion, but rather dedicates 38 pages of text purportedly explaining why my analyses are insufficient for a finding of market efficiency.  To paraphrase Shakespeare, ***he doth protest too much, methinks.***

8.      I provide below a summary of my conclusions regarding the James Report.

   *i)*      ***Prof. James' Criticisms of My Cause and Effect Analyses are Flawed and His Prior Reports Contradict his Views***

9.      As stated above, Prof. James has in two previous expert reports concluded that the markets for those securities in those cases were efficient.  Paradoxically, Prof. James uses many of the analyses that in the James Report, he concludes are flawed, unscientific, or not probative of market efficiency.  I provide a detailed comparison of what Prof. James said in the James Report to what he said in the two previous reports in which he opined to an efficient market.

10.      **Contradictory Stance -** In his criticism of one of my cause and effect analyses, Prof. James stated my reverse event study, which is based on the methodology set forth in the Ryan and Taffler (2004) academic paper, is "flawed in its design, is not a generally accepted or

3

objective scientific approach for testing market efficiency."[6]  Yet, in the James Adams Golf Report, Prof. James conducted his event study analysis by using the precise methodology I used based on Ryan and Taffler.  He first found statistically significant returns and then looked for news items that might explain those returns, which is a reverse event study and the method that I employed.  Prof. James conducted no other cause-and-effect analysis in the James Adams Golf Report.  And Prof. James' entire cause-and-effect analysis relied on only <u>two</u> days for which he concluded that news was driving the statistically significant stock price response he determined.

11.     **Reverse Event Study** – Notwithstanding, his previous use of a reverse event study, Prof. James disavows the use of a reverse event study and disparages the academic study I relied on.  First, Ryan and Taffler's findings have been cited in other published research and the reverse event-study methodology has been employed in other published research.

12.     Second, unlike Prof. James' use of only the reverse event study in the James Adams Golf Report, the Torchio Report uses the reverse event study as a complement to my news/no news analyses.  Performing the analysis Prof. James suggests would involve pre-defining news events, which this test is not designed to do.  I do perform a separate analysis that pre-defines news events – the news/no news analysis.  But the reverse event study methodology is specifically designed to avoid any *ex ante* definition of news in an effort to objectively determine if there is information present that might explain statistically significant stock price movements.

13.     Third, Prof. James describes a "reliable" cause-and-effect analysis to be one in which the researcher analyzes "individual days" during the time period of interest when "value-

---

[6] James Report, ¶43.

relevant information" is released and assesses whether the security price rapidly incorporates such information.

14.     In order to determine whether any "individual" day contained "value-relevant information" I imagine the researcher must read news stories on any day that contains at least one piece of news and then the researcher must make a determination about whether each singular piece of news would be important enough to cause a statistically significant price response.  Then test if it did or didn't cause a statistically significant price response.

15.     It is evident that the approach prescribed by Prof. James' analysis involves a high degree of subjectivity as to what is and what is not value-relevant information on individual days in a class period.  Two analysts can review the same information and disagree about whether that information is value-relevant or not.  Hence, it is difficult to understand how such an analysis is replicable or reliable?

16.     Again, paradoxically Prof. James failed to use in the James Adams Golf Report, the cause-and-effect test that in the James Report he now asserts is the only test that can be used.

17.     **News/No-News** - Prof. James also criticizes my use of news/no-news analysis to establish cause and effect.

18.     First, Prof. James' selected quoting from the article I cited for the use of my news/no-news analyses is quite misleading.  Prof. James quotes from the Ferrillo, Dunbar, and Tabak (2004)[7] paper that: "[T]his test is a threshold step, not a sufficient condition, to show that a stock traded in an efficient market."  But Prof. James conveniently omitted the very next sentence from that passage.  The entire passage is:

---

[7] Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs In Fraud-On-The-Market Cases," *St. John's Law Review* 78(1), Winter 2004, 81-129.

> Therefore, this test is a threshold step, not a sufficient condition, to show that a stock traded in an efficient market.  As discussed, passing this or most other tests of market efficiency only _serves to show that the stock is responding to news and/or trading in a way in which one cannot earn a supernormal profit_; the tests do not show that the stock price itself necessarily reflects the fundamental value of the underlying company.[8]

19.     Thus, the definition of "efficient" from the partial quote used by Prof. James unambiguously refers to the news/no-news test as a threshold step because it does not show that the price is <u>fundamentally efficient</u>, but rather that it does demonstrate when the stock prices are responding to news, which shows informational efficiency.

20.     Second, Prof. James stated that my news/no news analysis failed to test whether price responses to new value-relevant information are in the expected direction.  Prof. James misses the point of the news/no-news test.  This test is designed to be an objective test.  An _ex ante_ expectation of direction would inject a measure of subjectivity because news is often complex in nature, with simultaneous release of confounding information.  This test is designed to be as objective as possible after the selection of the definition of news.

21.     Third, Prof. James stated that my news vs. non-news analysis is also unreliable because I failed to investigate whether the price of Exide common stock rapidly incorporated information disclosed during the Class Period that was related to Exide's environmental issues that are alleged by Plaintiffs to be misrepresented.  Prof. James does not provide any support for his contention that a market efficiency analysis by plaintiffs <u>must</u> include an analysis of information that is alleged to have been misrepresented.  Thus, Prof. James appears to complain that the absence of a price impact analysis of the Plaintiffs' alleged disclosure dates in my report

---

[8] Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs In Fraud-On-The-Market Cases," _St. John's Law Review_ 78(1), Winter 2004, 81-129, p. 122 (emphasis added).

failed a requirement for showing market efficiency. But it is my understanding that the *Halliburton II* decision does not say such an analysis is a prerequisite for plaintiffs at the class certification stage, but rather that it is defendants who are afforded the opportunity to use such an analysis to rebut plaintiffs' market efficiency analysis.

### ii) *Prof. James' Criticisms of My Complementary Analyses are Flawed and His Prior Reports Contradict his Views*

22.     In the James Report, Prof. James characterized any analysis of market efficiency other than those in the category of cause-and-effect analysis as "indirect analyses", which he views as non-probative of market efficiency. I disagree with Prof. James' characterization in the first instance and for the remainder of this Report when I refer to all market efficiency analyses that are not cause-and-effect analyses, I represent these analyses as "Complementary Analyses" because such analyses are part of a comprehensive assessment of market efficiency.

23.     **Contradictory Stance** - The James Report characterized any analysis of market efficiency other than those in the category of cause-and-effect analysis as "indirect analyses." Prof. James claims that so-called "indirect analyses" are not probative of market efficiency. This conclusion in the James Report directly contradicts his own analyses and conclusions in Prof. James' other expert reports in the two cases mentioned previously in which he expressed an affirmative opinion of market efficiency.

24.     Among the indirect analyses that Prof. James believes not to be probative for Exide's market efficiency are trading volume and securities analyst coverage. But the James Adams Golf Report relied on the fact that the average weekly volume for Adams Golf exceeded the 2% benchmark from *Cammer*. In the James SOI Report, Prof. James quoted a paper that suggested that the courts should look at volume, in considering the market efficiency presumption.

7

25.     Regarding analyst coverage, Prof. James stated, regarding my analysis of Exide common stock and Notes, that there can be limitations to the information that analysts generate and disseminate.  Prof. James cited academic studies that purportedly found that analyst reports are relatively more effective at generating and disseminating market- or industry-wide information than firm-specific information.  But, the James Adams Golf Report contained analysis of analyst coverage in support of market efficiency in that case.  And once again in the James SOI Report, Prof. James quoted a paper that suggested that the courts should look at analyst coverage in considering the market efficiency presumption.

26.     Section III. B. contains specific excerpts and discussions of other analyses that Prof. James used in the James Adams Golf Report and the James SOI Report that he now asserts are not probative.

27.     **Complementary Analyses -** In light of Prof. James' self-contradictory stance, which further contradicts a number of courts including *Cammer*, little weight should be given to Prof. James' overly incredulous views on factors that are well-established as supportive of market efficiency.  Nevertheless, I respond to Prof. James' criticisms to my Complementary Analyses.

28.     First, Prof. James provides commentary which is purportedly substantiated by some academic research that he uses to show that narrow bid-ask spreads MAY not mean the market is efficient, high volume MAY not mean the market is efficient, high institutional ownership MAY not mean the market is efficient, analyst coverage MAY not mean the market is efficient, etc.

29.     Prof. James' approach can be likened to an analysis of indicia of a good (low-handicap) golfer in which the analyst recognizes that hitting a driver over 300 yds MAY not

prove that a golfer is good, hitting 70% of the fairways off the tee MAY not prove that a golfer is good, hitting 80% of greens in regulation MAY not prove that a golfer is good, averaging 25 puts a round MAY not prove that a golfer is good, and recent scores averaging 73 per round MAY not prove that a golfer is good.  But if a golfer possess all of the above skills or even most of the above skills, it is highly likely that these indicia will allow the analyst to correctly determine that a golfer is good.  Similarly, if a stock demonstrates a strong showing in most of the Complementary Analyses, then such evidence is probative of market efficiency just as proficiency in the above golf skills is probative of a good golfer.

30.    Second, there are many instances in which courts have considered these Complementary Analyses for decisions of market efficiency.  I recount those instances in Section IV. B.

31.    Third, Prof. James uses certain academic citations to purportedly substantiate his views that my Complementary Analyses "may" not provide probative evidence of market efficiency.  In several instances, the papers Prof. James cites are related to fundamental efficiency as opposed to informational efficiency.  The recent U.S. Supreme Court decision in *Halliburton II* is consistent with lower court decisions that fundamental efficiency is not a necessary condition for securities litigation when the U.S. Supreme Court stated that: "Debates about the precise *degree* to which stock prices accurately reflect public information are thus largely beside the point."[9]  Prof. James also relies on certain academic papers that relate to anomalies in stock returns to purportedly substantiate his views that my Complementary Analyses "may" not provide probative evidence of market efficiency.  Anomalies may represent

---

[9] *See Halliburton Co., et al. v. Erica P. John Fund, Inc., FKA Archdiocese of Milwaukee Supporting Fund, Inc.*, 134 S. Ct 2398; 189 L. Ed. 2d. 339 (2014) ("*Halliburton II*"). p. 2410 (emphasis added).

arbitrage profit opportunities, which is inconsistent with efficient markets.  But, Prof. James does not present any analysis to indicate that arbitrage opportunities from the anomalies he cites were exploitable by investors in Exide common stock or Notes.  Moreover, the general findings of anomalies over the past 30 years by researchers has not resulted in wide-spread rejection of the efficient market hypothesis by economists and, in fact, these same kinds of findings of anomalies were presented to the Supreme Court as bases for overturning *Basic*, but the U.S. Supreme Court rejected such arguments in *Halliburton II*.

### iii)   *Responses to Criticisms Specific to Exide Notes*

32.    Prof. James makes some additional criticisms with respect to my analyses of market efficiency for Exide Notes.

33.    First, Prof. James rejects market efficiency if there was non-continuous trading.  As I stated in the Torchio Report, I find that trading volume is a proper subject of analysis for market efficiency.  I further stated that my degree of certainty about the Notes' efficiency is less for 2011 than it is for post-2011.  This lower degree of certainty is primarily an issue during the period of August 12, 2011 to September 13, 2011 when the Exchange Offer was still open and trading was non-continuous.  While the low amount of trading and non-continuous trading in Exide Notes during certain sub-periods in 2011 is of concern to me, I disagree with Prof. James that market efficiency can be simply dismissed out of hand because of non-continuous trading in bonds.

34.    I am in partial agreement with Prof. James in that, analyzed in isolation, the low, non-continuous trading of the Notes in August-September 2011 is not evidence in itself that supports efficiency.  And I said as much in the Torchio Report.  But I did not find that the lack of continuous trading resulted in arbitrage profit opportunities, which is the hallmark of inefficiency.  Specifically, there was a strong statistical relationship between the returns on the

Notes and the returns on Exide stock over the Class Period, indicating that in general the Notes'
prices reacted similarly to that of the stock.  And the first piece of news (on November 8, 2011)
during the Notes Class Period that caused a statistically significant price reaction for the stock
also caused a statistically significant price reaction for the Notes.  So, the first instance of
important news during the Notes Class Period did result in substantial trading volume for the
Notes and a statistically significant price reaction in the Notes.  In addition, unlike stock, non-
continuous trading in bonds is quite common; indeed it is more common than not.  Yet, Prof.
James' singular rule that efficiency cannot be proved when there is non-continuous trading
would relegate most bonds in the inefficient category.  But Prof. James does not provide support
that most bonds are inefficient.  Therefore, I find that the non-continuous trading in Exide Notes
particularly during the August-September 2011 period is not itself sufficient evidence against
efficiency because I found no evidence of arbitrage profit opportunities.

     35.     Second, Prof. James complains that I deviated from the methodology I followed
for Exide common stock of "reviewing news items, or lack thereof, on days on which there were
statistically significant excess returns on the *Exide Notes*,"[10] and simply examined dates on
which I found "statistically significant excess returns for *Exide common stock*."[11]

     36.     I stated in the Torchio Report that, because the credit quality of the Exide Notes
was not investment grade and the credit quality worsened over the Class Period, the news that is
relevant to stockholders would likely also be relevant to noteholders.  Accordingly, my reverse
event study of the Notes focused on the news that was driving the statistically significant stock

---

[10] James Report, ¶73.
[11] James Report, ¶73.

returns as opposed to ignoring results from my reverse event study analysis of the stock, which is evidently Prof. James' view.

37.     Therefore, my approach of starting with the results from my reverse event study of the stock returns to perform a reverse event study of the Notes makes logical sense because it builds upon my analyses and conclusions about the efficiency of Exide stock.

38.     Prof. James also complains that, for Exide Notes, the existence of statistically significant returns without any news on four days in 2011 is evidence against market efficiency He similarly contends that the single day in which the statistically significant Notes return was in an opposite direction than the movement in Exide's stock is evidence of market inefficiency.[12]

39.     However, researchers expect that, for any market for a security that is efficient, there will be random statistically significant days that cannot be explained by any news.  Indeed, as discussed in the Torchio Report, Ryan and Taffler report that over their large sample study of stock returns for many firms, 44% of statistically significant days were not associated with news.  Thus, finding random statistically significant days is not prima facie evidence of inefficiency.

40.     Moreover, my news/no news analysis of the Notes correctly includes in the No-News category, all statistically days for which I found no news and includes the single day in which there was a statistically significant return that moved in the opposite direction as that for the stock.  And my news/no-news test shows that the Notes reacted on days with news versus days with no news, similar to the analysis of Exide stock, which is consistent with a cause-and-effect relationship one would find in an informationally efficient market.

41.     In addition, I also demonstrated in the Torchio Report, that over the entire Class Period, there was a strong statistical relationship between the returns on the Notes and the returns

---

[12] James Report, ¶78.

on the stock despite Prof. James observation that there were 8 statistically significant days with no news.[13]  Finally, in the Torchio Report, I concluded that there were 9 statistically significant stock-return days for which I found no news, which is similar to that for the Notes.

### iv)   *Damages Methodology*

42.     Finally, I provide an explanation of the methodology and techniques used to perform a damages analysis under Section 10(b) of the Securities Exchange Act of 1934 and Section 11 under the Securities Act of 1933 on a class-wide basis and describe the methodology I would apply in this case.

43.     My qualifications and compensation in this Action were stated in the Torchio Report.  I reserve the right to amend this Report to reflect new information available to me in light of the ongoing discovery process, information provided by other experts in the litigation, additional documents produced in discovery, future rulings from the Court in these proceedings, and Trial proceedings.

## II.  ADDITIONAL MATERIALS REVIEWED

44.     For the purpose of this Report, I have reviewed additional documents, including: the James Report, academic articles, and court opinions.  The attached Exhibit A is a comprehensive list of additional materials I considered in connection with this Report.  Specific documents and information relied upon in reaching my opinions are cited throughout this Report.

---

[13] Torchio Report, ¶¶ 207-211.

### III.  PROF. JAMES PREVIOUSLY RELIED ON THE SAME ANALYSES USED IN THE TORCHIO REPORT

**A.  Prof. James Relies on the Same Reverse Event Study in the James Adams Golf Report that He Now Claims Is Unscientific in Exide**

45.    To recap, in the Torchio Report, as part of my cause-and-effect analyses, I performed a reverse event study.  I provided a discussion on the reverse event study and provided citations to published academic papers that used such analyses.  I stated that:

> Ryan and Taffler (2004) study the effect of broad-based (not a single event), company-specific corporate news on firm prices. The authors present a variant of the traditional event study methodology.  Their method is to restrict their analysis to economically significant returns and volume.  Then they explore for information that may be driving the significant returns or volume.[14]

46.    Prof. James stated that my reverse event study based on Ryan and Taffler (2004) is "flawed in its design, is not a generally accepted or objective scientific approach for testing market efficiency."[15]  However, Prof. James himself has applied such an analysis to support a finding of market efficiency.

47.    In the James Adams Golf Report, Prof. James provided an analysis of the fifth *Cammer* Factor, which is the cause-and-effect factor.  Prof. James stated that:

> The analysis of Adams Golf's stock price reaction to new and material information demonstrates that the stock rapidly incorporated new information about the company and its business. Thus, the market for Adams Golf was efficient throughout the class period.[16]

---

[14] Torchio Report, ¶150, footnote omitted.

[15] James Report, ¶43.

[16] James Adams Golf Report, ¶48.

14

48.     Prof. James further stated that:

A rapid, statistically significant reaction of a stock price to new material information is indicative that the market for a stock is efficient.  To determine whether new material information or events significantly changed the total mix of information, I use <u>standard statistical analysis</u>, i.e., an event study analysis.[17]

49.     Thus, Prof. James stated in the James Adams Golf Report that he used standard event study analysis, which presumably in his view is a generally accepted, objective scientific approach.

50.     Prof. James then described the methodology he used:

As discussed in the Methodology section above, the movement in Adams Golf's common stock on most days during this period can be explained largely by broad market factors and normal trading behavior.  To analyze <u>what firm-specific information influenced the stock price over this time period, I performed an event study and researched what new information was released on each statistically significant day</u>.[18]

51.     Thus, in the methodology used by Prof. James in his cause-and-effect analysis, he first determined which days were statistically significant and then analyzed the news released on those days, which is what I refer to as a reverse event study.

52.     Below, I show that in the James Adams Golf Report, Prof. James implemented his stated methodology in virtually the same way as I did my reverse event study in Exide.

53.     As I did in the Torchio Report, Prof. James first computed a market model:

For the purposes of event study analysis, I modeled Adams Golf's daily stock returns as a function of the Nasdaq index.  I estimated my regression over the period of July 10, 1998 to October 22,

---

[17] James Adams Golf Report, ¶49, (emphasis added).

[18] James Adams Golf Report, ¶50, (emphasis added), footnote omitted.

15

1998.  As shown in Exhibit 4, the Nasdaq index changes explained 16% of the daily stock returns of Adams Golf.[19]

54.     As I did in the Torchio Report, Prof. James used his market model to calculate the price changes after adjusting for market movements.[20]

55.     And critically, Prof. James then stated that the first step in his analysis was to determine which days were statistically significant at a 95% confidence interval, which is the precise step I used in my reverse event study.  He stated:

> The regression model estimation indicates that there are three significant days during the class period at a 95% confidence interval: August, 12, 1998; September 1, 1998; and October 23, 1998. (*see* Exhibit 6.)[21]

56.     As stated above, Prof. James found three statistically significant days (I found 22 for Exide common stock).  Prof. James' second step was to read and analyze any news that came out on those three statistically significant days and determine whether the news could be reasonably expected to drive the three statistically significant price movements.   Prof. James concluded that:

> Two of the three days contained new and material information that was released to the public domain.  Adams Golf's stock reacted rapidly to this new material information as one would expect in efficient markets.[22]

57.     Thus, Prof. James concluded that in his view, two of the three days he found that were statistically significant could have reasonably been caused by new information.  In my reverse event study analysis of Exide common stock, I found that 13 out of 22 statistically significant days could be driven by new information.  Consequently, Prof. James could not

---

[19] James Adams Golf Report, ¶51 (footnote omitted).

[20] James Adams Golf Report, ¶52.

[21] James Adams Golf Report, ¶53.

[22] James Adams Golf Report, ¶54.

identify any news that caused the price reaction for one of the three (33%) of his days with
statistically significant returns.

58.     Prof. James conducted no other cause-and-effect analysis in the James Adams
Golf Report.  And his entire cause-and-effect analysis relied on only <u>two</u> days for which he
concluded that news was driving the statistically significant stock price response.  Based on the
price reaction for only two days and on the "indirect analyses" in the James Adams Golf Report
(which analysis Prof. James now disavows in the James Report), Prof. James then concluded
that:

> Overall I found that Adams Golf's stock was traded in a developed
> and efficient market.  New and material information about the
> company and its business was impounded in the stock price rapidly
> after its arrival to the market place.[23]

59.     It is incredulous that Prof. James now takes the position that my reverse event
study in Exide is "flawed in its design and not a generally accepted or objective scientific
approach for testing market efficiency," when he himself has conducted the very same analysis
in the James Adams Golf Report as his <u>sole</u> basis of cause-and-effect, and relied on that analysis
to opine that Adams Golf was traded in an efficient market.

**B.  Prof James Previously Opined that "Indirect" Analyses Support Conclusions of Market
Efficiency**

60.     Prof. James' claim that so-called "indirect" analyses are not probative of market
efficiency directly contradicts his own analyses and conclusions in his other expert reports for
cases in which he expressed affirmative opinions of market efficiency.  In the James Report,
Prof. James characterized my analyses of market efficiency other than those in the category of
cause-and-effect analysis as "indirect analyses" which are analyses he views as not probative of

---

[23] James Adams Golf Report, ¶55.

market efficiency.  I disagree with Prof. James' characterization in the first instance and for the remainder of this Report when I refer to all market efficiency analyses that are not cause-and-effect analyses, I represent these analyses as "Complementary Analyses" because such analyses are part of a comprehensive assessment of market efficiency.

61.     Significantly, Prof. James has submitted at least two expert reports in separate cases in which he has opined that the market for the stock in question was efficient, and I will discuss these reports.  The first report is the James Adams Golf Report.  The second report is the James SOI Report.

62.     In the James Adams Golf Report, Prof. James acknowledged the various components of efficient markets that closely mirror the overview I provided in the Torchio Report at ¶¶53-65.  Prof. James specifically stated that:

> Efficient markets arise when there is a sufficiently large number of competing investors, particularly market professionals such as institutional investors, so that any new information concerning a stock is reviewed immediately, assessed for its implications for stock price, and fully impounded in the price through active trading by different investors.[24]

63.     The James Adams Golf Report contained analyses of several *Cammer*[25] factors which include: weekly trading volume, securities analyst coverage, market makers, and S-3 Registration.  These are four of the five *Cammer* factors that are characterized in the James Report under his category of "Indirect Analyses."  Indeed, despite his current view in the James Report that the so-called "indirect" analyses are not probative, he in fact relied on many of these same analyses in his opinions of market efficiency in both the James Adams Golf Report and James SOI Report in which he concluded that the markets for those stocks were efficient.  In

---

[24] James Adams Golf Report, ¶35.

[25] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*").

fact, in the James Adams Golf Report, the titles of the sections that contained the analyses Prof. James now refers to as "indirect" were:  "Applications of Concepts of Economic Efficiency to the Fraud-on-the-Market Theory" and "Adams Golf's Stock Traded in a Developed and Efficient Market."[26]

64.     Moreover, in the James Adams Golf Report, Prof. James endorsed the use of the *Cammer* factors to assess market efficiency, which he now refers to as "indirect analyses":

> An analysis of these criteria [*Cammer* Factors] shows that they correspond to the economic concepts of market efficiency and the underlying economic mechanism that results in market efficiency. For example, of the "five factors" identified by Bagley, the first four are indicative for economic conditions of a developed market that supports market efficiency, while the fifth factor is a definition of market efficiency (and hence provides the ultimate test of efficiency).[27]

65.     So, while the James Report stated that the "indirect analyses" are not probative, in the James Adams Golf Report, Prof. James stated that these analyses "support" market efficiency.  Prof. James further stated in the James SOI Report that:

> An academic paper by Barber, Griffin, and Lev (1994) shows that two of the *Cammer* factors help to differentiate between efficiently and inefficiently priced stocks in the Nasdaq market, where SOI stock traded: trading volume and the number of analysts following the security.[28]

66.     In the James SOI Report, Prof. James quotes the findings of Barber, Griffin, and Lev (1994) that courts ought to look closely at and consider only two "key variables," both of

---

[26] James Adams Golf Report, p. 7.

[27] James Adams Golf Report, ¶39 (emphasis added).

[28] James SOI Report, ¶118, footnote omitted.

which Prof. James now characterizes as "indirect analyses" that cannot be used to prove efficiency.[29]

67.    Prof. James' view of the probative nature of what he now refers to as "indirect analyses" evidently depends on whether he is for or against an efficient market, as discussed further below.

### i)    Contradictions in Stance on Trading Volume

68.    As can be seen in the table below, while in the James Report, Prof. James appears to side with the academic paper he cited that trading volume does not demonstrate market efficiency, he clearly invoked the benchmarks of weekly trading volume from *Cammer* in his analysis of market efficiency in both the James Adams Golf Report and the James SOI Report. And, in both cases he relied on his analysis of trading volume to form conclusions that the market was efficient.

---

[29] James SOI Report, ¶118, footnote omitted.

| Excerpts from James Report | Excerpts from Other James Reports |
|---|---|
| The academic literature suggests that measuring trading volume by itself does not demonstrate market efficiency. For instance, Statman, Thorley, and Vorkink (2006) show that high observed trading volumes may instead be driven by investors who are overconfident about their valuation and trading skills.<br><br>(James Report, ¶22, footnote omitted) | During the class period, Adams Golfs stock was widely held and traded frequently, and did not have any non-trading days.<br><br>(James Adams Golf Report, ¶43)<br><br>I found that during the class period there were 16 trading weeks with an average weekly reported trading volume of 1,985,278 shares, which was 8.8% of the outstanding shares. In the Cammer decision, a 2% average trading volume was set as the benchmark for sufficient average trading volume.<br><br>(James Adams Golf Report, ¶43) |
|  | First, it had high volume: the ratio of average weekly volume to average weekly shares outstanding during the analysis period was 7.1%, which is higher than the 2% threshold noted by the *Cammer* court.<br><br>(James SOI Report, ¶119) |

69.     Moreover, in the James SOI Report, Prof. James specifically quoted Barber, Griffin, and Lev (1994) that trading volume helps "to differentiate between efficiently and inefficiently priced stocks in the <u>Nasdaq</u> Market"[30] (which is the market in which Exide traded). James SOI Report in support of examining trading volume further quotes Barber, Griffin, and Lev (1994), which recommended that the "court should look closely at just two key variables [one of which is trading volume] in considering the market efficiency presumption underlying the fraud-on-the-market theory."[31]   But, in the James Report, trading volume – according to Prof.

---

[30] James SOI Report, ¶118 (footnote omitted).
[31] James SOI Report, ¶118, (footnote omitted).

James' new view – is inconclusive with regard to market efficiency.  This contradicts prior stances taken by Prof. James.

### ii)    Contradictions in Stance on Analyst Coverage

70.    As can be seen in the table below, Prof. James analyzed coverage by securities analysts in forming his affirmative opinions about market efficiency in the other matters, but now in the James Report he raises concerns that there are "limitations to the information that analysts generate," presumably casting doubt on any inferences that can be drawn from analyst coverage of Exide.  No such limitations were discussed by Prof. James in either the James Adams Golf Report or the James SOI Report where he analyzed analyst coverage.

| Excerpts from James Report | Excerpts from Other James Reports |
|---|---|
| Although analysts do help to interpret and disseminate information throughout the broader marketplace, and although one would typically expect an efficiently traded stock to be covered by numerous analysts, *there can be limitations to the information that analysts generate and disseminate*. In fact, academic studies have found that analyst reports are relatively more effective at generating and disseminating market- or industry-wide information than firm-specific information.<br><br>(James Report, ¶26, footnote omitted, emphasis added) | According to various public information sources, Adams Golf was followed by six analysts: Lehman Brothers, NationsBanc Montgomery Securities, Ferris Baker Watts, Renaissance Capital Corp, Midtown Research Group and IPO Value Monitor.<br><br>(James Adams Golf Report, ¶44, footnote omitted) |
| | Second, SOI had at least four securities analysts covering the stock during the estimation period.<br><br>(James SOI Report, ¶119, footnote omitted) |

71.    As with trading volume, in the James SOI Report, Prof. James quotes Barber, Griffin, and Lev (1994) that recommended that the "court should look closely at just two key variables [one of which is analysts' coverage] in considering the market efficiency presumption

underlying the fraud-on-the-market theory."[32]  But in the James Report, analyst coverage, according to Prof. James' new view, is inconclusive with regard to market efficiency, which contradicts prior stances taken by Prof. James.

### iii)   Contradictions in Stance on Market Makers

72.    As can be seen in the table below, in the James Report, Prof. James intimated that because there were stocks with numerous market makers in two cases in which the courts determined the stocks were not efficient, the presence of market makers is irrelevant to market efficiency.  But notwithstanding, Prof. James has analyzed market makers in the James Adams Golf Report and the James SOI Report to support his finding of market efficiency in those cases.

| Excerpts from James Report | Excerpts from Other James Reports |
|---|---|
| However, Mr. Torchio's own analysis in his Exhibit 12 shows that *stocks with numerous market makers may trade in an inefficient market.*<br><br>(James Report, ¶24, footnote omitted, emphasis added) | According to the Center for Research in Security Prices (CRSP) the average number of market makers for Adams Golf's stock on the Nasdaq during the class period was 18, with a maximum of 21 market makers and a minimum of 16 market makers.<br><br>(James Adams Golf Report, ¶45) |
| | Indeed, it was traded on Nasdaq, one of the main national stock markets in the US, and had an average of 33 market makers during the class period.<br><br>(James SOI Report, footnote 151) |

73.    Moreover, in his discussion of market makers, Prof. James specifically states that SOI traded on Nasdaq, "one of the main national stock markets in the U.S."[33]  Clearly, in the

---

[32] James SOI Report, ¶118, (footnote omitted).

[33] James SOI Report, footnote151.

James SOI Report, Prof. James puts weight on the fact that SOI traded on Nasdaq with regard to an assessment of market efficiency.  Exide common stock also traded on the Nasdaq.  But Prof. James now expresses the view that such interpretations are inconclusive.[34]

74.      Similar to previous analyses, Prof. James offers contradictory stances regarding market makers.

### iv)      Contradictions in Stance on Institutional Ownership

75.      As can be seen in the table below, in the James Report, Prof. James intimated that based on certain academic studies, "stocks owned by many institutional owners <u>may</u> be prone to mispricing for a variety of reasons."[35]  But Prof. James analyzed institutional ownership in forming his opinion of an efficient market in James Adams Golf Report.  There was no mention by Prof. James in the James Adams Golf Report of these "multiple studies [that] indicate that stocks owned by many institutional investors may be prone to mispricing for a variety of reasons."  Nor did Prof. James caution the court in the James Adams Golf Report to not rely on his own analysis of institutional ownership.  Indeed, Prof. James did recount the degree of institutional ownership in forming his opinion of an efficient market in the James Adams Golf Report.

---

[34] James Report, ¶21.

[35] James Report, ¶27, footnote omitted, (emphasis added).

| Excerpts from James Report | Excerpts from Other James Reports |
|---|---|
| Although institutional investors may help interpret and disseminate information throughout the broader marketplace, multiple studies indicate that stocks owned by many institutional investors may be prone to mispricing for a variety of reasons.<br><br>(James Report, ¶27, footnote omitted) | Lastly, there were 24 and 16 institutional investors holding 2,368,415 and 1,024,006 shares of Adams Golf as of September 30, 1998 and December 31, 1998, respectively.<br><br>(James Adams Golf Report, ¶43, footnote omitted) |

       *v)*     **Contradictions in Stance on Short Interest**

76.      Once again, Prof. James has cited to academic literature, this time the literature is purported to demonstrate "that stocks that have short selling activity <u>may</u> still not rapidly incorporate all publicly available value-relevant information."[36]

| Excerpts from James Report | Excerpts from Other James Reports |
|---|---|
| Although the presence of short sellers may help prices adjust to and incorporate information in the market, *the academic literature demonstrates that stocks that have short selling activity may still not rapidly incorporate all publicly available value-relevant information*.<br><br>(James Report, ¶28, footnote omitted, emphasis added) | It had arbitrageurs, as evidenced by the fact that SOI had shares sold short throughout the period. For example, it had 1,098,946 shares (or 4% of its shares outstanding) sold short as of December 31, 2007.<br><br>(James SOI Report, footnote 151) |

77.      But once again, no mention of this academic literature was discussed as a caveat to Prof. James analysis of short interest in the James SOI Report when he stated that: "It [SOI] had arbitrageurs, as evidenced by the fact that that SOI had shares sold short throughout the period."[37]

---

[36] James Report, ¶28, (emphasis added).

[37] James SOI Report, footnote 151.

78.     In the Torchio Report, the indicators of market efficiency encompassed all of the
*Cammer* factors that Prof. James relied on in the James Adams Golf Report and the James SOI
Report to conclude market efficiency, which he now disavows as probative.

79.     Thus, in the James Adams Golf Report and the James SOI Report, Prof. James
himself used many of the very same "indirect" analyses to assess the efficiency of the market for
Adams Golf and SOI stock that he now considers non-probative to assessing market efficiency
for Exide common stock and Notes.[38]

80.     In light of Prof. James' self-contradictory stance, which further contradicts a
number of courts including *Cammer*, little weight should be given to Prof. James' overly
skeptical views on factors that are well-established as supportive of market efficiency.

### vi)     Comparison of Exide's Indirect Analyses with those in the James Adams Golf Report and the James SOI Report

81.     Below I provide a table that compares the relevant statistics from my "Indirect
Analyses" for Exide common stock and Notes to the corresponding relevant statistics for Adams
Golf and Superior Offshore common stocks, which Prof. James relied on to conclude that those
stocks were efficient.  As can be seen in this table, Exide securities compare favorably with the
statistics that Prof. James presented in James Adams Golf Report and the James SOI Report.

---

[38] James Adams Golf Report, ¶43 (Weekly Trading Volume), ¶44 (Analysis by
Investment Professionals), ¶45 (Market Makers), and ¶¶46-47 (S-3 Registration).  James SOI
Report, ¶119 and footnote 151.

| Criteria | Exide | | Adams Golf* | Superior Offshore** |
| | Common Stock | Notes | | |
|---|---|---|---|---|
| Average Weekly Volume as % of Shares Outstanding | 6.20% | 4.30% | 8.80% | 7.10% |
| Analysts Coverage | 4 - 10, avg. 8 | | 6 | 4 |
| Market Makers | 44 - 58, avg. 53 | 266 | 16 - 21, avg. 18 | 33 |
| Institutional Holdings | 77% | 43% | 4.56% - 10.54%[1] | n/a |
| Short Interest as % of Shares Outstanding | 6.70% | n/a | n/a | 4% |

\* James Adams Golf Report, ¶¶43-45.

\*\* James SOI Report, ¶121 and footnote 151.

[1] Calculated based on information in James Adams Golf Report, ¶43.


## IV.  RESPONSE TO PROF. JAMES' CRITICISMS OF COMPLEMENTARY ANALYSES

### A.  Prof. James' Approach of Compartmentalizing Is Flawed

82.     Putting to one side the contradictory views expressed by Prof. James, Prof. James' basic approach is to argue against the probative nature of my Complementary Analyses in the James Report and to purportedly show that it is *possible* that the market for a stock may or might be inefficient even if a measure of efficiency strongly indicates an efficient market.

83.     Prof. James' approach can be likened to an analysis of indicia of a good (low-handicap) golfer in which the analyst recognizes that:

    a)  Hitting a driver over 300 yds. MAY not prove that a golfer is good;

    b)  Hitting 70% of the fairways off the tee MAY not prove that a golfer is good;

    c)  Hitting 80% of greens in regulation MAY not prove that a golfer is good;

    d)  Averaging 25 puts a round MAY not prove that a golfer is good; and

    e)  Recent scores averaging 73 per round MAY not prove that a golfer is good.

84.     Anyone who has golfed before can certainly think of circumstances or golfers they know who possess one of the above skills but is not a good golfer (as I have defined that

term above).  But if a golfer possess all of the above skills or even most of the above skills, it is highly likely that these indicia will allow the analyst to correctly determine that a golfer is good. In other words, the chances of a golfer who possesses all these skills but is not a good golfer is quite low.

85.     Prof. James' analysis is quite similar.  He provides commentary which is purportedly substantiated by some academic research that he uses to show that narrow bid-ask spreads <u>MAY</u> not mean the market is efficient, high volume <u>MAY</u> not mean the market is efficient, high institutional ownership <u>MAY</u> not mean the market is efficient, analyst coverage <u>MAY</u> not mean the market is efficient, etc.[39]  But like my golf example above, if a stock demonstrates a strong showing in most of the Complimentary Analyses, then such evidence <u>is</u> probative of market efficiency just as proficiency in the above golf skills is probative of a good golfer.

86.     This holistic approach is precisely why I did not conclude that any individual indicator proves market efficiency.  Rather the Torchio Report summarized results of the various indicators for evidence of information flow, trading costs, and competition among investors. That is, I analyzed the indicators together that apply to each of three areas of inquiry for market efficiency.  Then, based on my conclusions about information flow, trading costs, and competition among investors, I was able to reach a conclusion that the preponderance of the evidence supported a finding of an efficient market for Exide common stock and Notes.

87.     My approach to assessing market efficiency is not an approach that must compartmentalize the results of tests.  My approach is to analyze the factors in total and conclude either efficiency or inefficiency based on the preponderance of the evidence.  This holistic

---

[39] *See*, for example, James Report, ¶¶22, 23, 26 and 27.

approach is often noted by courts as the appropriate methodology as opposed to merely counting factors.[40]

## B. Many Court Opinions Have Considered Complementary Analyses in Assessing Market Efficiency

88.     In addition to being endorsed by experts, as in the James Adams Golf Report, courts have considered Complementary Analyses for market efficiency decisions.[41]  Below is a table that summarizes the results from Exhibit B and shows instances in which courts considered the Complementary Analyses I used in the Torchio Report.

---

[40] For example, as stated in reference to a court decision in *Unger v. Amedisys, Inc*: "once a court endeavors to apply these factors, they must be weighed analytically, not merely counted, as each of them represents a distinct facet of market efficiency."  *See* David Tabak, "Do Courts Count *Cammer* Factors?" NERA working paper, August 7, 2012, p. 4.

[41] *See*, for example, *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 247-48 (N.D. Cal. 2013) ("An actively traded security, as evidenced by a large weekly volume of stock trades, indicates 'significant investor interest in the company,' and therefore, a 'likelihood that many investors are executing trades on the basis of newly available or disseminated  corporate information.'") (quoting *Cammer v. Bloom,* 711 F. Supp. 1264, 1286 (D.N.J. 1989); *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009) ("[T]he presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading."); and *In re Diamond Foods,* 295 F.R.D. at 248 ("The existence of securities analysts following Diamond stock during the class period would imply that the market would rapidly and fully incorporate information into the stock price because analyst reports would likely be 'closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.'") (quoting *Cammer,* 711 F. Supp. at 1287).

| Complementary Analyses | Considered by Courts | Considered by Courts in 9th Circuit |
|---|---|---|
| Trading Volume | 25 out of 27 cases | 9 out of 9 cases |
| Analyst/Media Coverage | 25 out of 27 cases | 9 out of 9 cases |
| Market Maker/Arbitrageurs | 19 out of 27 cases | 9 out of 9 cases |
| Eligible to File SEC Form S-3 | 22 out of 27 cases | 9 out of 9 cases |
| Market Capitalization/Float | 10 out of 27 cases | 3 out of 9 cases |
| Bid-Ask Spread | 8 out of 27 cases | 2 out of 9 cases |
| Institutional Holdings | 8 out of 27 cases | 2 out of 9 cases |
| Short Interest | 5 out of 27 cases | 3 out of 9 cases |
| Lack of Serial Correlation | 4 out of 27 cases | 2 out of 9 cases |
| Put-Call Parity | 4 out of 27 cases | 2 out of 9 cases |

## C. Prof. James Cites Academic Literature that Primarily Relates to Fundamental Efficiency or Perceived Anomalies in Stock Returns

89.   Prof. James uses certain academic cites to purportedly substantiate his views that my Complementary Analyses "may" not provide probative evidence of market efficiency.

90.   In several instances, the papers Prof. James cites are related to fundamental efficiency as opposed to informational efficiency (*see* Exhibit C).

91.   In the Torchio Report, I discussed informational versus fundamental efficiency:

> While informational efficiency refers to whether public information is quickly impounded in the stock price, fundamental efficiency is concerned with whether the information is impounded correctly or accurately.  These criticisms can be found in the literature written by "behavioral economists" such as Robert Shiller and Lawrence Summers.[42]

92.   The U.S. Supreme Court in *Halliburton II* [43] heard arguments based on behavioral economics, but concluded that: "Debates about the precise *degree* to which stock prices accurately reflect public information are thus largely beside the point."[44]

---

[42] Torchio Report, ¶59.

[43] *See, Halliburton II*.

93.     In addition to the clarification that fundamental efficiency is not required for class

certification, the U.S. Supreme Court also discussed that stocks are generally efficient, which is

an acceptance of the efficient markets hypothesis for traded securities overall as shown in many

large sample academic research studies:

> The academic debates [concerning overall market efficiency]
> discussed by Halliburton have not refuted the modest premise
> underlying the presumption of reliance.  Even the foremost critics
> of the efficient-capital-markets hypothesis acknowledge that public
> information generally affects stock prices[45]

94.     Therefore, Prof. James' reliance on academic research that relates to fundamental

efficiency is misplaced.

95.     Prof. James also relies on certain academic papers that relate to anomalies in stock

returns to purportedly substantiate his views that my Complementary Analyses "may" not

provide probative evidence of market efficiency.  Anomalies may represent arbitrage profit

opportunities, which is inconsistent with efficient markets.

96.     As I stated in the Torchio Report:

> Analysis of such anomalies by noted economists, however, show
> that the anomalies do not contradict the EMH [efficient market
> hypothesis].[46]  The literature that responds to anomalies presents
> findings that show that such anomalies do not hold in other periods
> outside of the sample periods that are the bases of the anomalous
> findings.  One hypothesis for these findings is that investors, after
> becoming aware of potential profit opportunities presented by
> anomalies, compete away the excess returns over time.  The

---

[44] Torchio Report, ¶61.

[45] *Halliburton II* at 2410.

[46] For a comprehensive review of the economic literature, *see* G. William Schwert,
"Anomalies and Market Efficiency*," Handbook of the Economics of Finance*, edited by G.M.
Constantinides, M. Harris, and R. Stulz, 2003, Chapter 15.

second hypothesis is that certain anomalies are statistical aberrations that simply do not hold in other sample periods.[47]

97.     Many of the issues in the articles cited by Prof. James, however, are simply a recasting of the same "anomaly" arguments presented to the U.S. Supreme Court in *Halliburton II*.

98.     Prof. James does not present any analysis to indicate that arbitrage opportunities from the anomalies he cites were exploitable by investors in Exide common stock or Notes. Moreover, the general findings of anomalies over the past 30 years by researchers has not resulted in wide-spread rejection of the efficient market hypothesis by economists and, moreover, these same kinds of findings of anomalies were presented to the Supreme Court as bases for overturning *Basic*,[48] but the U.S. Supreme Court rejected such arguments in *Halliburton II*.

## V.  RESPONSE TO CAUSE-AND-EFFECT ARGUMENTS

### A.  News/No-News Analysis

99.     Prof. James states that:

> Mr. Torchio's analysis of "news vs. non-news days" is not a generally accepted scientific approach for testing market efficiency and fails to demonstrate that there was a cause-and-effect relationship between value-relevant information released during the Class Period and the movements in the price of Exide common stock.[49]

---

[47] Torchio Report, ¶58 (emphasis added).

[48] *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978 (1988) ("*Basic*").

[49] James Report, ¶32.

### i)     *Justification*

100.    Prof. James quotes from the Ferrillo, Dunbar, and Tabak (2004)[50] paper that:

> [T]his test is a threshold step, not a sufficient condition, to show
> that a stock traded in an efficient market."[51]

101.    Prof. James uses this quote to suggest that this test is insufficient to show market efficiency. Prof. James, however, failed to include the remaining conclusion cited by Ferrillo, Dunbar, and Tabak.  I quote the entire passage from that paper below which includes the next sentence that was omitted from the quote in the James Report:

> Therefore, this test is a threshold step, not a sufficient condition, to
> show that a stock traded in an efficient market.  As discussed,
> passing this or most other tests of market efficiency only *serves to
> show that the stock is responding to news and/or trading in a way
> in which one cannot earn a supernormal profit*; the tests do not
> show that the stock price itself necessarily reflects the fundamental
> value of the underlying company.[52]

102.    Thus, the definition of "efficient" from the partial quote used by Prof. James unambiguously refers to the news/no-news test as a threshold step because it does not show that the price is fundamentally efficient.  But the passage that was omitted by Prof. James clearly states that the news/no-news test does show whether "the stock is responding to news and/or trading in a way in which one cannot earn a supernormal profit," which is the definition of informational efficiency.

---

[50] Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs In Fraud-On-The-Market Cases," *St. John's Law Review* 78(1), Winter 2004, 81-129, p. 122.

[51] James Report, ¶33 (footnote omitted).

[52] Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs In Fraud-On-The-Market Cases," *St. John's Law Review* 78(1), Winter 2004, 81-129, p. 122 (emphasis added).

103.    Prof. James' selective quoting of this passage from Ferrillo, Dunbar, and Tabak is
misleading.

104.    One of the paper's authors, David Tabak, has used the same test as proof of
market efficiency in a securities case.[53]  Thus, one of the paper's authors has used the test as not
just a "threshold" test but rather as affirmative evidence of efficiency.

### ii)    *Ex-Ante Specification of Stock Price Movements*

105.    Prof. James also states that:

> Mr. Torchio's analysis also fails to test whether price responses to
> new value-relevant information are in the expected direction.[54]

106.    Prof. James asserts that: "A reliable and replicable test would articulate *in
advance* the expected relationship between the new information (i.e., surprises) and the price
movement and then test whether the stock price response was as expected."[55]

107.    Prof. James misses the point of the news/no-news test. This test is designed to be
an objective test. The authors describe this test as "a scientific test of what that Court called 'the
essence of an efficient market and the foundation of the fraud on the market theory.'"[56]

108.     An *ex ante* expectation of direction would inject a measure of subjectivity into
this test, and it is designed to be as objective as possible after the selection of the definition of
news.  Stock prices may move in opposite directions from *ex ante* expectations from a single
piece of information because there may be other information released at the same time that could

---

[53] *In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation* (USDC for the
District of New Jersey, MDL No. 1658 (SRC), Case 2:05-cv-01151-SRC-CLW), Declaration
dated April 10, 2012 on behalf of Plaintiffs (Document 301-9 Filed 04/10/12) , pp. 13-19.

[54] James Report, ¶34.

[55] James Report, ¶34.

[56] Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, "The 'Less Than' Efficient
Capital Markets Hypothesis: Requiring More Proof From Plaintiffs In Fraud-On-The-Market
Cases," *St. John's Law Review* 78(1), Winter 2004, 81-129, p. 129 citing to *Cammer*.

cause investors to have an opposite valuation judgment than what would be expected by the *ex ante* expectation based on the single piece of information.  In academic research on earnings surprises, large sample studies do not find that all stocks move in the expected direction.  For example, Kinney, Burgstahler, and Martin (2002) report that: "And although *most* surprises and returns have the same sign, *43% to 45% of firms' surprises are associated with returns with the opposite sign*."[57]

109.    But, Prof. James' complaint that Exhibit 9 to the Torchio Report showed "no systematic relationship between the direction of price movements and the surprises, and it provides no *ex ante* assessment of the expected price response when earnings and revenue surprises are in opposite directions"[58] fails to consider these empirical findings.

110.    In support, Prof. James points to Exide's earnings releases on August 5, 2011 and June 8, 2012 in which there were negative quarterly EPS and positive quarterly revenue surprises.  Prof. James notes that the August 5, 2011 earnings disclosure was followed by a "significant negative stock price movement" whereas the June 8, 2012 earnings disclosure was followed by a "significant positive stock price movement."[59]  Prof. James complains that I had not provided any "explanation why these two price movements were in opposite directions when the surprises were in the same direction on both days."[60]

111.    But by Prof. James own analysis, neither of these disclosures were unambiguously positive or unambiguously negative.  How can one determine if the returns

---

[57] William Kinney, David Burgstahler, and Roger Martin, "Earnings Surprise 'Materiality' as Measured by Stock Returns," *Journal of Accounting Research* 40(5), December 2002, 1297-1329, at 1326 (emphasis added and in original).

[58] James Report, ¶34.

[59] James Report, ¶34.

[60] James Report, ¶34.

moved in the opposite direction of the "surprise" when there is both a positive and a negative surprise disclosed?

112.    On August 4, 2011, after the close of trading, Exide announced its financial results for the first fiscal quarter of 2011, which included quarterly revenue of $745.1 million compared to analyst consensus expectations of $695.6 million and quarterly EPS of -$0.07 compared to analyst consensus expectations of -$0.06 (see Exhibit 9 to the Torchio Report.) Thus, on August 4, there was a positive revenue surprise and a negative earnings surprise. Similarly, on June 7, 2012, after the close of trading, Exide announced its financial results for the fourth fiscal quarter of 2012, which included quarterly revenue of $782.6 million compared to the analyst consensus estimates of $750.5 million and quarterly EPS of -$0.03 compared to the consensus analyst estimates of $0.08 (see Exhibit 9 to the Torchio Report.) Thus, on June 7, there was a positive revenue surprise and a negative earnings surprise. Therefore, there was confounding news on each of these days and the resulting stock price movements are a reflection of the market's consensus assessment of the information disclosed on each of those days.

113.    In addition, Prof. James points to Exide's price reaction to an earnings disclosure on August 3, 2012 in which Exide announced quarterly EPS that resulted in the largest negative quarterly EPS surprise during the Class Period. Prof. James notes that the earnings disclosure was not followed by "any significant stock price movement."[61] Based on this instance, Prof. James complains that I did not provide an "explanation for this seemingly inconsistent result" and that I was silent on the question of which of the factors in Exhibit 9 to the Torchio Report "would be expected to affect Exide's stock price."[62] However, following the earnings disclosure

---

[61] James Report, ¶34.
[62] James Report, ¶34.

on August 2, 2012, after the close of trading, the stock price declined in after-hours trading, as one would expect.[63]  In the initial half hour after the start of trading the next day, Exide's stock price was trading below the price it closed at the previous day.[64]  However, Exide held a conference call on August 3, 2012 starting at 9.00 a.m. to discuss its results.[65]  On the conference call, Exide management shared positive information including that Exide had become the sole battery supplier to Pep Boys.[66]  During the day, Exide's stock price recovered and was trading up relative to the closing price on the previous day.[67]  Exide's stock price closed at $2.96, up 2.78% from the previous closing price.  The excess return was not statistically significant, which is consistent with positive confounding news that offset the negative earnings announcement that Prof. James uses.

114.  Therefore, Prof. James contentions are without merit.

*iii)*  ***Selection of News***

115.  Prof. James states that:

> Mr. Torchio's "news vs. non-news days" analysis is also unreliable because Mr. Torchio fails to investigate whether the price of Exide common stock rapidly incorporated information disclosed during the Class Period that was related to Exide's environmental issues.[68]

---

[63] *See*, for example, "Exide Technologies Shares Discharge 13% After Hours on Sales Miss," Midnight Trader Live Briefs, August 2, 2012, 5:30 p.m.

[64] "MARKET PULSE – Knight Capital, Procter & Gamble, Molycorp," Reuters News, August 3, 2012, 10:09 a.m.

[65] "Exide Technologies Reports Fiscal 2013 First Quarter Results," PrimeZone Media Network, August 2, 2012, 4:30 p.m.

[66] "Exide Technologies Earnings Teleconference XIDE US," Bloomberg Transcripts, August 3, 2012, 10:09 a.m.

[67] "UPDATE: Exide Tech Turns Positive," Midnight Trader Live Briefs, August 3, 2012, 12:36 p.m.

[68] James Report, ¶36.

116.    Prof. James further states that any conclusions I drew from my news/no-news tests would not necessarily be applicable to information related to the alleged regulatory and environmental issues.[69]  Prof. James argues my "analyses are inadequate to demonstrate that at all times during the Class Period, the price of Exide common stock rapidly incorporated new value-relevant information, including the types of information that Plaintiffs allege were misrepresented or concealed in this matter."[70]

117.    Importantly, Prof. James does not provide any support for his contention that a market efficiency analysis by plaintiffs <u>must</u> include an analysis of information that is alleged to have been misrepresented.  In fact, the U.S. Supreme Court in *Halliburton II*, specifically states:

> *Basic* instead establishes that a plaintiff satisfies that burden by proving the prerequisites for invoking the presumption—namely, publicity, materiality, market efficiency, and market timing. The burden of proving those prerequisites still rests with plaintiffs and (with the exception of materiality) must be satisfied before class certification.[71]

118.    The U.S. Supreme Court further stated that:

> As explained, it is appropriate to allow plaintiffs to rely on this <u>indirect</u> proxy for price impact, rather than requiring them to prove price impact [from an alleged misrepresentation] directly, given *Basic*'s rationales for recognizing a presumption of reliance in the first place.[72]

119.    Prof. James does not provide any support for his contention that a market efficiency analysis by plaintiffs <u>must</u> include an analysis of information that is alleged to have been misrepresented, which is a price impact analysis.  The U.S. Supreme Court stated that Defendants could rebut plaintiffs' evidence of market efficiency by means of a price impact

---

[69] James Report, ¶36.

[70] James Report, ¶42.

[71] *Halliburton II* at 2412.

[72] *Halliburton II* at 2415, (emphasis added).

analysis of the alleged misrepresentations.  Prof. James appears to complain that the absence of a

price impact analysis of the Plaintiffs' alleged disclosure dates in my report failed a requirement

for showing market efficiency.  But it is my understanding that the *Halliburton II* decision does

not say such an analysis is a prerequisite for plaintiffs at the class certification stage, but rather

that it is defendants who are afforded the opportunity to use such an analysis to rebut plaintiffs'

market efficiency analysis:

> But to maintain the consistency of the presumption with the class
> certification requirements *of Federal Rule of Civil Procedure 23*,
> defendants must be afforded an opportunity before class
> certification to defeat the presumption through evidence that an
> <u>alleged misrepresentation</u> did not actually affect the market price
> of the stock.[73]

120.     Nonetheless, I did provide analysis of events related to the alleged

misrepresentations via my reverse event study.  Specifically, items 17, 19, and 22 in Exhibit 10

to the Torchio Report are dates that Plaintiffs allege are corrective disclosures, and those dates

are statistically significant.

121.     Significantly, Prof. James does not perform a price impact analysis as afforded to

defendants in *Halliburton II*, which could be used to attempt to rebut the evidence of market

efficiency in my report.  The absence of such analysis to directly rebut my efficiency evidence is

telling.

122.     Overall, Prof. James' tactic is to make conclusory challenges to my analyses but

without presenting any actually analyses to contradict my results or conclusions.  Indeed, in his

deposition, when asked whether it was his conclusion that Exide's stock was trading in an

inefficient market during the Class Period, Prof. James responded with "I haven't reached that

---

[73] *Halliburton II* at 2417, (emphasis added).

conclusion."[74]  Similarly, Prof. James has not reached a conclusion about the efficiency or inefficiency of Exide Notes.[75]

### iv)    Variance test

123.    Prof. James states:

> In an attempt to further validate his flawed "news vs. non-news days" analysis, Mr. Torchio also performs a test of the difference in volatility of excess returns on "earnings days" vs. "non-earnings days."  However, this volatility test is not a relevant test for whether Exide's stock price rapidly incorporated new value-relevant information, as it does not test whether the stock price responded to individual events efficiently or in the expected direction, but instead focuses only on the dispersion of returns on the "reaction date" of earnings announcements.[76]

124.    This test shows that, on the objectively defined news days, there is higher volatility than on the other days, consistent with the market reflecting information on these pre-defined news days.

125.    Prof. James also cites to a paper:

> Fama (1991), a paper that Mr. Torchio himself relies upon, explains that tests that evaluate the volatility of stock price returns "are not informative about market efficiency" because they "give no help on the central issue" of market efficiency.[77]

126.    The precise quote from Fama (1991) is that: "The volatility tests, however, give no help on the central issue of whether the variation in expected returns is rational."[78]  Prof. James replaces "of whether the variation in expected returns is rational" with "of market

---

[74] James Deposition Transcript at 74:15-17.

[75] James Deposition Transcript, 76:9-13.

[76] James Report, ¶41 (footnote omitted).

[77] James Report, ¶41 (footnote omitted).  Fama (1991) refers to: Eugene Fama, "Efficient Capital Markets: II," *The Journal of Finance*, 46(5), 1991, 1575–1617.

[78] Eugene F. Fama, "Efficient Capital Markets: II," *Journal of Finance* 46(5), December 1991, 1575-1617, p. 1586.

efficiency."  But notwithstanding the academic anomaly, the results do show that prices move

more around announcement dates than otherwise, which is precisely the intent of this analysis.

Moreover, the increased volatility in Exide's stock around the earnings announcements is similar

to the findings of the academic studies I cited in the Torchio Report.[79]  Thus, Exide's stock

behaved in a similar fashion to other stocks around earnings announcement days.  Therefore,

unless Prof. James is arguing, counter to the *Halliburton II* decision, that markets are generally

inefficient or generally inefficient around earnings announcement dates, his criticisms of my

volatility test are misplaced.

## B.  Reverse Event Study

127.    Regarding my reverse event study analysis and despite his own use of the very

same analysis in the James Adams Golf Report, Prof. James states:

> Mr. Torchio's "reverse event study" is flawed in its design, is not a
> generally accepted or objective scientific approach for testing
> market efficiency.  As such this analysis does not demonstrate that
> Exide common stock traded in an efficient market throughout the
> Class Period.[80]

128.    Prof. James states that I employ a methodology derived from a paper by Ryan and

Taffler (2004), which he evidently views as having been published in a poorly rated journal:

> In addition, Ryan and Taffler (2004) was published in the *Journal
> of Business Finance and Accounting*, which is not among the top
> 50 finance journals.  The *Journal of Business Finance and
> Accounting* was not ranked by Thomson Reuters Journal Citation
> reports, nor did it appear on the University of Washington's Eigen
> factor ranking list (www.eigenfactor.org) *at the time*.  Both of
> these rankings measure the influence a journal may have in the
> scientific community based on how many times the journal is cited

---

[79] Torchio Report, footnote 82.

[80] James Report, ¶43.

41

in other academic journals, with lower rankings indicating a
relatively low number of academic citations.[81]

129.    I note that, in the current Journal Citation Reports for 2013 for the category

"Business, Finance", the *Journal of Business Finance and Accounting* was ranked 26.  From the

first ranking for *Journal of Business Finance and Accounting* I was able to locate in the Journal

Citation Reports, the *Journal of Business Finance and Accounting* was ranked: 29 in 2007; 30 in

2008; 29 in 2009; 53 in 2010; 48 in 2011; and 34 in 2012.[82]  The Eigen factor ranking list also

began to rank the journal starting in 2007 and, as of May 12, 2015, was ranked 33rd in the

category of "Business, Finance."[83]  After the publication of Ryan and Taffler, based on rankings

available starting in 2007 the *Journal of Business Finance and Accounting* would be considered

a "top 50" journal.  Although perhaps not appearing in these rankings at the time of the

publication of Ryan and Taffler, the journal could be considered based on Prof. James' sources a

top 50 journal a few years after the article's publication.

130.    In addition, Ryan and Taffler's finding have been cited in other published

research and the "reverse event-study" methodology has been employed in other published

research.  For example, a search on Google scholar returns 82 citations to Ryan and Taffler and a

search on the ISI Web of Science Citation database returns 23 citations to Ryan and Taffler.[84]

131.    For example, the following published articles cite to Ryan and Taffler's findings:

> E. Bajo, "The Information Content of Abnormal Trading Volume,"
> *Journal of Business Finance & Accounting* 37(7&8),
> September/October 2010, 950-978; R. Brown, H.  Chan and Y. Ho,
> "Analysts' recommendations: from which signal does the market

---

[81] James Report, footnote 69 (emphasis added).

[82] Journal Citation Reports accessed May 12, 2015. Source: www.wokinfo.com.

[83] Eigenfactors accessed May 12, 2015. Source: www.eigenfactor.org.

[84] Google scholar search and ISI Web of Science accessed May 12, 2015. Sources:
scholar.google.com; www.wokinfo.com.

take its lead?," *Review of Quantitative Finance and Accounting* 33, 2009, 91-111; J. Cao and M. Kohlbeck, "Analyst Quality, Optimistic Bias, and Reactions to Major News," *Journal of Accounting, Auditing & Finance* 26(3), 2011, 502-526; J. Fisch, "Does Analyst Independence Sell Investors Short?," *UCLA Law Review* 55, 2007-2008, 39-98; C. Holden and P. Stuerke, "The Frequency of Financial Analysts' Forecast Revisions: Theory and Evidence about Determinants of Demand for Predisclosure Information," *Journal of Business Finance & Accounting* 35(7 & 8), September/October 2008, 860–888; T. Mahipala, H. Chan and R. Faff, "Trading volume and information asymmetry: routine versus nonroutine earnings announcements in Australia," *Applied Financial Economics* 19, 2009, 1737–1752; and C. Wirth, J. Chi and M. Young, "The Economic Impact of Capital Expenditures: Environmental Regulatory Delay as a Source of Competitive Advantage?," *Journal of Business Finance & Accounting* 40(1 & 2), January/February 2013, 115–141.

132. Other published papers have also employed the Ryan and Taffler methodology.

For example:

G. Capelle-Blancard and N. Couderc, "What drives the market value of firms in the defense industry?," *Review of Financial Economics* 17 (2008), 14-32; N. Collett and E. Dedman, "Large share price movements, the disclosure of news and corporate governance: Implications for disclosure rules," *Journal of Applied Accounting Research* 11(2), 2010, 109-132; J. Hobbs, T. Kovacs and V. Sharma, "The investment value of the frequency of analyst recommendation changes for the ordinary investor," *Journal of Empirical Finance* 19, 2012, 94–108; and J. Conrad, B. Cornell, W. Landsman and B. Rountree, "How Do Analyst Recommendations Respond to Major News?," *Journal of Financial and Quantitative Analysis* 41(1), March 2006, 25-49.

133. Although Prof. James' footnote appears to disparage the Ryan and Taffler paper's methodology and findings, both the methodology and findings have been accepted by other academics.

*i)* **The Reverse Event Study is Complementary to News/No-News**

134. In the Torchio Report, I provided a discussion on the reverse event study and provided citations to published academic papers that used such analyses. I stated that:

43

Ryan and Taffler (2004) study the effect of broad-based (not a
single event), company-specific corporate news on firm prices.[85]
The authors present a variant of the traditional event study
methodology.  Their method is to restrict their analysis to
economically significant returns and volume.  Then they explore
for information that may be driving the significant returns or
volume.[86]

135.    Prof. James complains that my study does not test all days when value-relevant

information is released and then assess the effect.  Rather, the reverse event study looks at the

"effect" first to determine if there is a cause.  Prof. James then complains that: "As such, the

'reverse event study' is incapable of testing whether the price of a security *fails* to react to value-

relevant information, as any such failure is excluded from the 'reverse event study' by design."[87]

136.    The benefit of the reverse event study is that it does not require a pre-defined

definition of news or to read every news event to determine whether it contains value-relevant

news.  It therefore operates as a check on my news/no news study, which first identifies news

events and then determines whether the event is statistically significant.  As I explained in the

Torchio Report:

There are striking similarities between the empirical problems that
Ryan and Taffler's methodology solves and the empirical problems
in applying traditional event study methodology to an analysis of
market efficiency for a single company.  First, a single-company
study concerns the whole information set and not just a single
event.  Second, this method reduces the amount of judgment
required in identifying events *a priori*.  Third, it reduces the

---

[85] *See* Paul Ryan and Richard J. Taffler, "Are Economically Significant Stock Returns
and Trading Volumes Driven by Firm-Specific News Releases?" *Journal of Business Finance &
Accounting*, 31(1) & (2), January/March 2004, 49-82.  Another study focused on stock price
movements as a sufficient statistic for information events.  *See* Jennifer Conrad, Bradford
Cornell, Wayne R. Landsman, and Brian R. Rountree, "How Do Analyst Recommendations
Respond to Major News?" *Journal of Financial and Quantitative Analysis* 41(1), March 2006,
25-49, p. 31.

[86] Torchio Report, ¶150.

[87] James Report, ¶44.

chances of picking up significant amounts of random noise by concentrating only on statistically significant returns (or volume). Fourth, as stated by Ryan and Taffler, the analysis is focused on economically significant events that are of most relevance to investors and other capital market participants.  A recent paper advocates this approach to assess market efficiency for a single stock for class action litigation.[88]

137.    In my opinion, the methodology is useful for testing market efficiency because it is an event study method that is used to determine if stock price changes are associated with news, which is precisely what is necessary to show for a finding of informational efficiency. Indeed, US courts have recently recognized such reverse event study analyses as evidence of market efficiency.  For example, the *DVI* court noted:

> Second, Lead Plaintiffs' method of first identifying those days with significant stock returns and then identifying news events to explain the price change is a reasonable method of demonstrating the cause-and-effect relationship associated with an efficient market.
>
> Furthermore, a study that first focused on news events and only then attempted to analyze price fluctuations would be ambiguous: if a stock price was seemingly unaffected on the date of a news release, one would not be able to discern whether this was due to market inefficiency or simply investor indifference to that particular news event.[89]

138.    Similarly, the *Pain Therapeutics* court noted:

> Finally, Mr. Torchio conducted an empirical study of the ten days during the Class Period on which PTI's stock price had the largest changes, evaluating the news released on each day to determine if the stock price was reacting to material new information.  Torchio Decl. ¶ 32.  Mr. Torchio concluded the study provided some support for efficiency, though he noted the results were "not strong."  Id. ¶ 37.  Dr. Tabak claims Mr. Torchio's results fall below the threshold suggested by the academic literature. Tabak Decl. ¶ 67.  Mr. Torchio responds the article referenced by Dr.

---

[88] Torchio Report, ¶151 (footnotes omitted).

[89] *In re DVI Securities Litigation*, 249 F.R.D. 196 (E.D. PA. 2008) at 211.

> Tabak is "not a litmus test," and notes courts have recognized there are many days on which even large stocks traded on efficient markets experience significant changes [*30] in price despite an absence of major news events.  Torchio Rebuttal Decl. ¶ 141.[90]

139.    Based on the preceding responses to Prof. James, I strongly disagree with his assertions that a reverse event study is a flawed analysis.  And I find his assertions particularly disingenuous in light of his use of this analysis in the James Adams Golf Report.[91]

## C.  Adjusted R-squared

140.    Prof. James notes that:

> Mr. Torchio first performs a regression analysis of Exide common stock returns on market and industry returns.  While performing a regression model is a first step in evaluating market efficiency, a regression analysis does not, by itself, demonstrate market efficiency.[92]

141.    I had not opined that by itself my regression result demonstrated market efficiency, I had stated that:

> For Exide's market model, the adjusted R-squared is 36%, indicating that Exide's common stock prices react to new general market and industry information over the Class Period.  An adjusted R-squared of 36% is substantially greater than that found for stocks in general.  Studies indicate that on the average R-squared across large samples of stocks can range from 11% to 17%.[93]

142.    Prof. James states in a footnote that:

> Mr. Torchio finds that the returns of Exide common stock can be partially explained by the market and industry returns.  This finding is inadequate to demonstrate market efficiency for Exide common stock.  At most, the partial explanatory power of market

---

[90] *In re KB Partners I, L.P., et al, v. Pain Therapeutics, Inc., et al, Case No. A-11-CA-1034-SS, (U.S.D.C. WD Texas 2013) ("Pain Therapeutics")* at 29-30.

[91] James Adams Golf Report, ¶¶53-55.

[92] James Report, ¶31 (footnote omitted).

[93] Torchio Report, ¶129 (footnote omitted), emphasis added.

and industry returns for Exide common stock returns suggests that, on average, the price of Exide common stock tended to move with the market and industry indices selected.  It does not establish whether Exide common stock rapidly incorporated all value-relevant market- and industry-wide information at all times during the Class Period.[94]

143.   The degree of explanatory power I found in my analysis of 36% is greater than the average across large samples of stocks.  If Exide common stock did not rapidly incorporate market and industry information, I would expect this measure to be lower than the average of other stocks.

144.   Prof. James incorrectly conveys that I somehow used this analysis to show that Exide reacted to new company-specific information: "Furthermore, these results do not test whether the price of Exide common stock rapidly incorporated all value-relevant firm-specific information at all times during the Class Period."[95]  Prof. James ignored the Torchio Report, which specifically stated that:

> Therefore, the market model parameters <u>can inform one about the degree to which market and industry information is reflected</u> in the price of the security in question.[96]

145.   Nowhere did I state or even imply that this R-squared analysis shows any evidence regarding Exide's reaction to company-specific information.  I could not have been clearer as to the purpose of this analysis.

---

[94] James Report, footnote 47.

[95] James Report, footnote 47.

[96] Torchio Report, ¶128, (emphasis added).

**D.  Prof. James' Only Cause-and-Effect Analysis Is Subjective**

146.    Prof. James describes a "reliable" cause-and-effect analysis:

> As discussed previously, a reliable test of market efficiency must analyze individual days during the time period of interest when value-relevant information is released (i.e., a cause) and assess whether the security price rapidly incorporates such information (i.e., an effect).[97]

147.    In order to determine whether any "individual" day contained "value-relevant information" I imagine the researcher must read news stories on any day that contains at least one piece of news and then the researcher must make a determination about whether each singular piece of news would be important enough to cause a statistically significant price response.  Then test if it did or didn't cause a statistically significant price response.

148.    When there are two or more pieces of information disclosed on any one day, the researcher must also make a determination of whether one piece of information is important enough to cancel out the effect of the other; or whether one piece of information trumps the other.  For example, assume a company beats its consensus earnings expectations for the quarter (positive news) but provides lower earnings guidance for the upcoming quarter (negative news).  Which direction would Prof. James predict the stock would move?

149.    It is evident that the approach prescribed by Prof. James analysis involves a high degree of subjectivity as to what is and what is not value-relevant information on "individual days" in a class period.  Two analysts can review the same information and disagree about whether that information is value-relevant or not.  Hence, it is difficult to understand how such an analysis is replicable or reliable?

---

[97] James Report, ¶44.

150.    Again, paradoxically Prof. James failed to use in the James Adams Golf Report

the cause-and-effect test that in the James Report he now asserts is the only test that can be used.

> i)    *Lack of Academic Support*

151.    Prof. James provides no academic support that is on point for an analysis that

"must analyze individual days during the time period of interest when value-relevant information

is released (i.e., a cause) and assess whether the security price rapidly incorporates such

information (i.e., an effect)."

152.    An academic citation that Prof. James relies on in support of his contention that

"academic studies in peer reviewed journals frequently conduct *ex ante* analyses that examine

price reactions to numerous types of disclosures (i.e., earnings announcement surprises, merger

announcements, etc.) in an objective manner" is Chari, Jagannathan, and Ofer (1988).[98]  But this

paper contains a <u>large sample</u> event study of many firms that experienced the <u>same type of event</u>

(earnings announcement), as opposed to a study that examined "individual days during the time

period of interest when value-relevant information is released."  If it is Prof. James contention

that the analysis conducted in Chari, Jagannathan, and Ofer (1988) included an analysis to

determine if the return for each company in their sample reacted to the earnings announcements

in a directionally consistent manner, I strongly disagree.

153.    I did specifically examine earnings announcements in my "News/No-News"

analysis.

---

[98] James Report, footnote 55 citing to V.V. Chari, Ravi Jagannathan, and Aharon Ofer, "Seasonality in Security Returns: The Case of Earnings Announcements," *Journal of Financial Economics*, 1988, 21(1), pp. 101-121.

## VI.  PROF. JAMES' ADDITIONAL CRITICISMS RELATING TO EXIDE NOTES

154.    Many of the arguments Prof. James makes in criticism of my analyses of market efficiency for Exide Notes are the same as the ones he makes for Exide common stock.  I have addressed these criticisms above.  However, Prof. James makes some additional criticisms specifically with respect to my analyses of market efficiency for Exide Notes.  I address these additional criticisms below.

### A.  Trading Volume in Sub-periods within the Class Period

155.    In the Torchio Report, I stated that:

> Therefore, the preponderance of economic evidence supports a finding that the market for Exide Notes was informationally efficient. My degree of certainty about the Notes' efficiency, however, is less in 2011 than it is post-2011. This lower degree of certainty is primarily an issue during the period of August 8, 2011 to September 13, 2011, when the Exchange Offer was still open and trading was low because I am unaware of how many Notes were available to trade until after the Exchange Offer expired on September 13, 2011. In addition, there was not continuous trading of the Notes during the balance of 2011 as compared to the trading after 2011. However, this relatively short 3-month period of low, non-continuous trading is included in the efficiency statistics and analyses I conducted, which found an average weekly trading volume of 6.3% and other strong indications of robust trading activity.[99]

156.    Prof. James comments that "[d]uring the period from August 12, 2011 to September 13, 2011, there was no trading of the Exide Notes on 64% (14 of the 22) of the trading days."[100]  Then, Prof. James claims that "[w]ithout trading, there are no prices of the Exide Notes to observe and therefore no prices with which to analyze whether new value-

---

[99] Torchio Report, ¶38.

[100] James Report, ¶49 (footnote omitted).

relevant public information was rapidly incorporated into the price."[101]  Based on this argument, Prof. James asserts that "Mr. Torchio has provided no proof of market efficiency for the Exide Notes from August 12, 2011 through September 13, 2011."[102]

157.    In addition, Prof. James comments that "a review of Mr. Torchio's analysis shows that there was no trading in the Exide Notes on over 13% (10 out of 76) of the trading days between September 14, 2011 and December 31, 2011."[103]  Prof. James then claims that "without trading prices to observe, Mr. Torchio has no basis to analyze whether new value-relevant public information was incorporated into the price of the Exide Notes."[104]

158.    As I stated in the Torchio Report, I find that trading volume is a proper subject of analysis for market efficiency.  I further stated that "My degree of certainty about the Notes' efficiency, however, is less for 2011 than it is for post-2011.  This lower degree of certainty is primarily an issue during the period of August 12, 2011 to September 13, 2011 when the Exchange Offer was still open and <u>trading was low</u>."[105]  Thus, infrequent trading during the period of August 12, 2011 through September 13, 2011 is clearly a concern to me and affected my view of the efficiency of the market for the Notes during that one-month period.

159.    Prof. James, however, evidently concludes that any sub-period within a class period for which there is non-continuous trading must necessarily mean the security is inefficient or that there is no way to satisfy the necessary proof of efficiency for that sub-period.

---

[101] James Report, ¶49 (footnote omitted).
[102] James Report, ¶49 (footnote omitted).
[103] James Report, ¶50.
[104] James Report, ¶50.
[105] Torchio Report, ¶231 (emphasis added).

160.    It is my understanding that market efficiency is assessed over an entire class

period and Prof. James cites no authoritative source for his opposite view.[106]  Because bonds

trade differently than stocks and it is not at all unusual for bonds to have non-continuous trading,

it is not all at clear to me that if a bond is thinly traded in a particular sub-period, one cannot

conclude market efficiency.

161.    Again Prof, James does not cite to any authoritative source for his assertion.

While I do agree with Prof. James insofar as the sub-period from August 12, 2011 to September

13, 2011 is problematic because of the low level of trading, I do not dismiss out of hand that the

market during this period is efficient.  The following are the reasons that form the basis of my

view:

  a)  In the Torchio Report I cited to three affirmative market efficiency decisions for
      bonds in which there were non-continuous trading of the bonds in each case.[107]

  b)  For the vast majority of the Class Period the Notes were actively traded and
      reacted to most of the same news that moved the stock in a statistically significant
      way.[108]

  c)  There were no statistically significant stock price returns driven by news during
      the sub-period, which indicates there may not have been any important
      information released in that month-long period.[109]

      a.  Additionally there were no earnings announcements during the sub-
          period.[110]

      b.  There were no Company press releases during the sub-period other than
          the announcement of the exchange offer for the notes, which was
          previously announced.[111]

---

[106] Transcript of 30(b)(6) Deposition of Frank C. Torchio dated April 17, 2015 ("Torchio
Deposition Transcript"), pp. 65-72.

[107] Torchio Report, footnotes 118-120 at p. 74.

[108] Torchio Report, Exhibits 10 and 13.

[109] Torchio Report, Exhibit 10.

[110] Torchio Report, Exhibit 9.

d) The Note holders who exchanged the Notes were sophisticated investors based on their ability to qualify as investors in Rule 144 securities who would be more likely to monitor their investment and trade if a company-specific disclosure resulted in a significant change in the valuation of Exide Notes.[112]  Consequently, it is likely that important, value-relevant information would have resulted in some trading, but consistent with the lack of important news during this period, trading was low.

e) Exhibit 10 to the Torchio Report shows that, from the beginning of the Notes Class Period on August 12, 2011 through the end of 2011, there was one day (November 8, 2011) when there was a statistically significant reaction in the price of Exide common stock that I deemed to have been explained by company-specific news.  Exhibit 10 to the Torchio Report also shows that there was also a statistically significant reaction in the prices of the Notes in response to the same news.  This observation provides some comfort that when there was some value-relevant news that would cause a change in the valuation of Exide, the prices of Exide Notes also reacted in 2011.[113]

f) In addition, as I referenced in the Torchio Report, academic findings from Mahanti (2008) indicate that the median number of elapsed days between successive trades for the approximately nineteen thousand corporate bonds in their sample was 14 days between successive trades in 2000 and 12 days in 2005.[114]  The average number of elapsed days between trades for Exide Notes during the August 12, 2011 to September 13, 2011 period was 2.8 days,[115] which is better than the median from the academic study.

---

[111] Torchio Report, Exhibit 7, Form S-4/A filed with the SEC on August 5, 2011.

[112] Torchio Deposition Transcript, pp. 161-164.

[113] Torchio Report, Exhibit 10.

[114] Torchio Report, ¶191 citing to Sriketan Mahanti, Amrut Nashikkar, Marti Subrahmanyam, George Chacko, and Gaurav Mallik, "Latent Liquidity: A new measure of liquidity, with an application to corporate bonds," *Journal of Financial Economics*, 88 (2008) 272-298 ("Mahanti Paper"), p. 282.

[115] Torchio Report, Exhibit 13.

162.    In the Torchio Report, I specifically noted:

> The Mahanti Paper uses bond data from the databases of State Street Corporation, one of the world's largest custodial banks. The bonds in the sample used in the Mahanti Paper represent approximately 14.52% of the total US corporate bond market. Mahanti Paper, pp. 276-278. The volume for the bonds in the sample used in the Mahanti Paper represents approximately 5.39% to 7.84% of the volume for the total US corporate bond market. Mahanti Paper, p. 279.[116]

163.    Prof. James complains that I failed "to demonstrate why the sample presented in the article [Mahanti (2008) paper] would be an appropriate benchmark for the Exide Notes."[117] But contrary to Prof. James assertions, and as stated in the Torchio Report, the authors conclude:

> Based on the above comparisons, we can conclude that our database is reasonably representative of the publicly traded market for US corporate bonds. *See* Mahanti Paper, p. 278.[118]

164.    Therefore, a sample that is "reasonably representative of the publicly traded market for US corporate bonds" would be precisely the sample that one would want to benchmark the Exide Notes. This approach is wholly consistent with the benchmarking analysis I performed for Exide common stock. I do not understand why Prof. James considers as insufficient a sample that the authors found to be "reasonably representative of the publicly traded market for US corporate bonds" in a paper published in the *Journal of Financial Economics*, a journal which Prof. James serves on the editorial board.[119]

165.    In summary, I disagree with Prof. James that market efficiency can be simply dismissed out of hand because of non-continuous trading of bonds during isolated periods. I am in partial agreement with Prof. James in that, analyzed in isolation, the low, non-continuous

---

[116] Torchio Report, fn 116 at p. 73.

[117] James Report, fn 84 at p. 30.

[118] Torchio Report, fn 116 at p. 73 (emphasis added).

[119] James Report, ¶5.

trading of the Notes in the sub-period of between August 12, 2011 and September 13, 2011 is not evidence in itself that supports efficiency. And I said as much in the Torchio Report. But I did not find that the lack of continuous trading resulted in arbitrage profit opportunities, which is the hallmark of inefficiency. Specifically, there was a strong statistical relationship between the returns on the Notes and the returns on Exide stock over the Class Period, indicating that in general the Notes' prices reacted similarly to that of the stock. And the first piece of news (on November 8, 2011) during the Notes Class Period that caused a statistically significant price reaction for the stock also caused a statistically significant price reaction for the Notes (see Exhibit 10 of the Torchio Report). So, the first instance of important news during the Notes Class Period did result in substantial trading volume for the Notes and a statistically significant price reaction in the Notes. In addition, unlike stock, non-continuous trading in bonds is quite common; indeed it is more common than not. Yet, Prof. James' singular rule that efficiency cannot be proved when there is non-continuous trading would relegate most bonds in the inefficient category. But Prof. James does not provide support that most bonds are inefficient. Therefore, I find that the non-continuous trading in Exide Notes particularly during the August-September 2011 period is not itself sufficient evidence against efficiency because I found no evidence of arbitrage profit opportunities in Exide Notes.

## B. Benchmarking Analysis for the Notes

166.    Prof. James complains that I did not make "a full comparison of the Exide Notes to a broad benchmark" as I did for Exide common stock but rather only made "passing comparisons to no more than four bonds"[120] which I asserted that courts have determined traded in efficient markets.

---

[120] James Report, ¶52.

167.    Prof. James evidently views that an analysis of the efficiency of the Notes should be performed in isolation from that of the stock.  I disagree. As I stated in the Torchio Report, I showed an extremely strong statistical relationship between the returns for the Notes and the returns on the stock.[121]  That is, movements in the stock price were highly correlated with movements in prices of the Notes.  Consequently, my previous finding that the market for Exide stock was efficient in concert with my finding of a strong statistical relationship between the returns on the Notes and the returns on Exide stock supports a conclusion that the Notes also reacted to important information about Exide.

168.    Therefore, in my view, a complete replication for the Exide Notes of the benchmarking analysis I performed for Exide stock did not justify the cost.

169.    With respect to my comparison of the statistics for the Exide Notes with statistics for other bonds that the courts have determined to be efficient, Prof. James claims that these are bonds that I "assert" have been determined to have traded in efficient markets.  I am not sure why Prof. James deems it to be an assertion.  Prof. James could have easily verified whether the courts have determined these bonds to have traded in efficient markets or not but he does not do so.

## C.  Analyst Coverage and Rating Agency Coverage

### i)    *Analyst Coverage*

170.    With respect to analyst coverage, I stated in the Torchio Report:

> For example, as stated above, an important aspect in valuing a bond is the default risk of the bond. The analysis and information detailed in the equity analyst reports would substantially assist a bond investor in determining the default risk associated with the company.  This information is of particular importance to investors in the Notes, because the Notes were not investment grade. Non-

---

[121] Torchio Report, ¶¶207-211.

> investment grade bonds are rated below BBB-. The price of non-investment grade or high-yield bonds can be sensitive, like the underlying stock, to events like changes in earnings expectations. Therefore, one would expect that, in general, information that affects the stock would also affect the value of the Notes. Therefore, Exide equity analysts' coverage is also part of the information flow for the Notes.[122]

171.    Prof. James criticizes me for failing "to analyze analyst coverage as it relates to the Exide Notes."[123]  Prof. James opines that "one cannot conclude that equity analyst coverage of Exide common stock would indicate that the market for the Exide Notes was efficient."[124]

172.    I strongly disagree with Prof. James.  Company reports by securities analysts provide information about the value of the company's assets as well as the value of equity, and it is an indication of the degree of information flow.

173.    Because finance theory teaches that the value of a company's bonds (and other similar liabilities) represent the difference between the value of the assets and the value of the equity, then it is inconceivable to me that securities analysts reports do not convey information to bond investors generally.[125]

174.    Moreover, because the credit quality of the Exide's Notes was low – non-investment grade – securities analysts' reports are even more, perhaps extremely more, meaningful to Note investors.  This is because if bonds have low, non-investment grade credit rating, then:

> This information is of particular importance to investors in the Notes, because the Notes were not investment grade.  Non-investment grade bonds are rated below BBB-.  The price of non-investment grade or high-yield bonds can be sensitive, like the

---

[122] Torchio Report, ¶198 (footnotes omitted).

[123] James Report, ¶55.

[124] James Report, ¶55.

[125] Torchio Report, ¶197.

underlying stock, to events like changes in earnings expectations.[126]

175.    In fact, this application of finance theory was accepted by the court in *DVI*:

Though equity analyst coverage is not a perfect substitute for debt analyst coverage, the equity reports nevertheless provide substantial information to the Senior Notes investors.  Such information, particularly forecasts of DVI's financial prospects and condition, would likewise have allowed bond investors to better understand DVI's risk profile and its potential for default.  (*See DVI*, p. 215.)[127]

176.    Therefore, securities analyst coverage is certainly relevant to a determination about the efficiency of the Exide Notes.

## ii)    *Ratings Agency Actions*

177.    In addition to coverage by securities analysts, Exide Notes were covered by two bond rating agencies.

178.     With respect to ratings agency actions, I stated in the Torchio Report:

In addition, during the Class Period, Exide Notes were rated by two major credit ratings agencies, Moody's and S&P. These ratings agencies dispense valuable information to the bond market regarding the creditworthiness of the bond issuer. Generally speaking, the rating agencies are sometimes provided with non-public information by the bond issuer to assist them in providing the most accurate rating for the bond. Therefore, when a credit rating agency issues a credit rating for a bond, or changes the credit rating for a bond, the bond investors are provided with valuable information regarding this bond and this information is impounded in the price of the bond.[128]

179.    With respect to my cause-and-effect analyses of the Exide Notes, Prof. James complains that I failed "to analyze the days during the Notes Class Period when information was

---

[126] Torchio Report, ¶198 (footnote omitted).

[127] Torchio Report, footnote 121.

[128] Torchio Report, ¶199.

released by ratings agencies."[129]  Prof. James asserts that my "failure to assess whether ratings actions were associated with significant excess returns is inconsistent with [my] own statements about the value of such ratings agency actions."[130]

180.    Prof. James points out that of the three downgrades of the Exide Notes by credit ratings agencies and one Credit Watch warning discussed in the Torchio Report, none of these disclosures were associated with significant movements in the price of the Exide Notes.  Based on this argument Prof. James concludes that: "[I]f one accepts Mr. Torchio's theory that these events do contain 'valuable information regarding [the] bond,' his own event study analysis shows evidence *against* market efficiency."[131]

181.    Prof. James' conclusion is flawed.  Academic studies have concluded that ratings changes can often be anticipated by the market.[132]  To the extent that the market anticipates a rating change, the one-day price effect on the rating change announcement can be minimal.  One way of analyzing market anticipation is to look to price changes prior to the announcement.

182.    For the Exide Notes, the first downgrade during the Class Period occurred on Feb. 28, 2013 when S&P lowered its rating to B-.[133]  I examined the returns in the one-month leading up to the rating change and found that the change in market capitalization for the Notes

---

[129] James Report, ¶62.

[130] James Report, ¶63.

[131] James Report, ¶64 (emphasis in original).

[132] *See*, for example, L. Macdonald Wakeman, "The Real Function of Bond Rating Agencies," edited by Joel M. Stern and Donald H. Chew, Jr., The Revolution in Corporate Finance, 3rd ed., Malden, MA & Oxford: Blackwell Publishers Inc., 1998, pp. 25-28 and Louis H. Ederington and Jeremy C. Goh, "Bond Rating Agencies and Stock Analysts: Who Knows What When?" *Journal of Financial and Quantitative Analysis*, December 1998, 33(4), pp. 569-585.

[133] *See*, "S&P Cuts Exide Technologies Rtg to 'B-' from B; Outlk Neg," Dow Jones News Service, February 28, 2013, 12:27 p.m.

was -4.6%, corresponding to a -23.3% change in the market capitalization for Exide common stock.[134]  As discussed in the Torchio Report, non-investment grade bonds are affected by the market capitalization of equity, because the market capitalization of equity is the cushion.  The thinner the equity cushion becomes, the lower is the credit quality of the bonds.  It is quite likely that the large 23% decline in the market capitalization of equity precipitated the cotemporaneous decline in the Notes, which of course means that in the market's eye, the credit quality of the Notes had declined.  Consequently, it is not proof against efficiency to observe no statistically significant price reaction to the February 28, 2013 rating change.

183.    Eight trading days later, Moody's lowered its rating for the Notes to B3 on March 12, 2013.[135]  But a rating from Moody's of B3 is equivalent to a rating from S&P of B-.[136]  Consequently, because of the short time period between the S&P rating change and the Moody's rating change, and the fact the Moody's rating change substantiated the same credit quality as implied from the prior S&P rating change, one would not expect to observe a statistically significant price reaction to the March 12, 2013 rating change by Moody's.

184.    On April 9, 2013, S&P placed the Exide Notes on credit watch.[137]  Once again over the approximate one-month period before the credit watch announcement, the market capitalization of Notes declined by 12.6%, corresponding to a 48.3% decline in the market

---

[134] Change in market capitalization calculated from January 25, 2013 to February 27, 2013.  *See*, Torchio Report, Exhibits 3, 6, 13, and 16.

[135] "Moody's lowers Exide's ratings to Caa1, outlook remains negative," Moody's Investors Service Press Release, March 12, 2013.

[136] Shourya Ghosh, "A Study of Differences in Standard & Poor's and Moody's Corporate Credit Ratings," Working Paper (March 4, 2013).

[137] "S&P Places Exide's Ratings on Watch After Company Hires Adviser," DBR High Yield, April 9, 2013, 1:08 p.m.

capitalization of equity.[138]  Therefore, it is highly likely that the market understood the credit quality of the Notes had diminished because of the large loss of market capitalization of equity. Consequently, the rating watch announcement was anticipated.

185.    S&P finally downgraded the Notes on May 3, 2013,[139] almost one month after it placed the Notes on credit watch on April 9, 2013.  Between the April 9, 2013 credit watch announcement and the actual downgrade on May 3, 2013, the market capitalization of Exide's equity lost 46.4% of its value, which precipitated a decline in the market capitalization of the Notes of 10.1%.[140]  Consequently, the rating change announcement on May 3, 2013 was also likely anticipated.

186.    Therefore, the analysis that Prof. James <u>did not do</u> shows the lack of statistically significant price responses to ratings actions is <u>not</u> inconsistent with my statements about the value of coverage by rating agencies.  Just as not all opinions from securities analysts have a statistically significant stock price effect, not all rating agency actions result in statistically significant bond price effects.  Nonetheless, like securities analyst coverage, coverage by ratings agencies "implies that information about the company is disseminated to investors and how easily it is understood."[141]

---

[138] Change in market capitalization calculated from March 8, 2013 to April 8, 2013.  *See*, Torchio Report, Exhibits 3, 6, 13, and 16.

[139] "DJ S&P Lowers Exide Technologies Rtg to 'CCC+'; Rtgs On Watch Neg," Dow Jones Newswires, May 3, 2013, 1:32 p.m.

[140] Change in market capitalization calculated from April 9, 2013 to May 2, 2013.  *See*, Torchio Report, Exhibits 3, 6, 13, and 16.

[141] Torchio Report, ¶84

**D. Cause-and-Effect Analyses**

*i)*        *Correlation with Exide Stock*

187.    In the Torchio Report, I reported the results of my analysis of correlation of

returns for Exide Notes with returns for Exide common stock:

> The cause-and-effect analyses I performed showed an extremely
> strong statistical relationship between the returns for the Notes and
> the returns on the stock.  That is, movements in the stock price
> were highly correlated with movements in prices of the Notes.
> Consequently, my previous finding that the market for Exide stock
> was efficient in concert with my finding of a strong statistical
> relationship between the returns on the Notes and the returns on
> Exide stock supports a conclusion that the Notes also reacted to
> important information about Exide.[142]

> I also found that the Notes prices reacted quickly to information
> because there was no statistically significant residual effect from
> lagged stock returns.  That is, if I found a statistical relationship
> between the return on the Notes with the return on Exide stock for
> the previous day, that may indicate that the market for the Notes is
> not reacting as quickly as the stock to the information that moves
> the stock price.  But I did not find such a relationship, which is
> consistent with the Note prices reacting quickly like that for the
> stock.[143]

*ii)*       *Analysis of News vs. No-News Days*

188.    In the Torchio Report, I reported the results of my analysis of news vs. no-news

days for Exide Notes:

> I then conducted the same News versus Non News analyses that I
> conducted for the stock.  The analyses shows that the Notes reacted
> more on days with news versus days with no news, similar to the
> analysis of Exide stock.[144]

---

[142] Torchio Report, ¶33.

[143] Torchio Report, ¶34.

[144] Torchio Report, ¶35.

### iii) *Reverse Event Study*

189.    With respect to the reverse event study for the Notes, I reported in the Torchio

Report:

> I found 13 days for which Exide stock had statistically significant excess returns on days on which there was news that might be driving such economically significant movements. Of the 13 total days, 11 days occurred during the Notes Class Period.[145]
>
> For those 11 days, I found 8 days that resulted in statistically significant returns for the Notes for which the Notes' returns moved in the same direction as that for the stock. And I found 3 days for which there was no statistically significant return for the Notes that were directionally consistent with the stock returns. This finding is supportive of an efficient market.[146]
>
> Virtually all of the 8 days in which the Notes had statistically significant returns with direction consistent with the stock occurred on days which exhibited the greatest (absolute) returns for the stock. Thus, the 3 out of the 11 days with Notes returns that are not statistically significant or are not directionally consistent with stock returns, are days on which stock returns were among the smallest returns out of the 11 total stock returns.[147]

190.    Prof. James complains that I deviated from the methodology I followed for Exide

common stock of "reviewing news items, or lack thereof, on days on which there were

statistically significant excess returns on the *Exide Notes*," and simply examined dates on which

I found "statistically significant excess returns for *Exide common stock*."[148]

191.    I stated in the Torchio Report[149] that, because the credit quality of the Exide Notes

was not investment grade and the credit quality worsened over the Class Period, my reverse

event study of the Notes focused on the news that was driving the statistically significant stock

---

[145] Torchio Report, ¶217.

[146] Torchio Report, ¶218.

[147] Torchio Report, ¶219.

[148] James Report, ¶73.

[149] Torchio Report, ¶¶198, 220.

returns as opposed to ignoring results from my reverse event study analysis of the stock, which is evidently Prof. James' view.

192.    Therefore, my approach of starting with the results from my reverse event study of the stock returns to perform a reverse event study of the Notes makes logical sense because it builds upon my analyses and conclusions about the efficiency of Exide stock.

193.    Prof. James also complains that, for Exide Notes, the existence of statistically significant returns without any news on four days in 2011 is evidence against market efficiency He similarly contends that the single day in which the statistically significant Note return was in an opposite direction than the movement in Exide's stock is evidence of market inefficiency.[150]

194.    However, researchers expect that for any market for a security that is efficient there will be random statistically significant days that cannot be explained by any news.  Indeed, as discussed in the Torchio Report, Ryan and Taffler report that over their large sample study of stock returns for many firms, 44% of statistically significant days were not associated with news.[151]  Thus, finding random statistically significant days is not prima facie evidence of inefficiency.  In Section III. A.  I also quoted from the James Adams Golf Report that 33% (1 out of 3) of the statistically significant days had no news, according to Prof. James.

195.    Moreover, my news/no news analysis of the Notes correctly includes in the No-News category, all statistically significant days for which I found no news and includes the single day in which there was a statistically significant return that moved in the opposite direction as that for the stock.  And my news/no-news test shows that the Notes reacted on days

---

[150] James Report, ¶75-77.

[151] Torchio Report, ¶156.  Also, *see*, Paul Ryan and Richard J. Taffler, "Are Economically Significant Stock Returns and Trading Volumes Driven by Firm-Specific News Releases?" *Journal of Business Finance & Accounting*, 31(1) & (2), January/March 2004, 49-82, p. 61.

with news versus days with no news, similar to the analysis of Exide stock, which is consistent with a cause-and-effect relationship one would find in an informationally efficient market.[152]

196.     In addition, I also demonstrated in the Torchio Report, that over the entire Class Period, there was a strong statistical relationship between the returns on the Notes and the returns on the stock despite Prof. James observation that there were 9 statistically significant days for Exide Notes on days for which there was no news for the stock.[153]  Finally, in the Torchio Report, I concluded that there were 9 statistically significant stock-return days for which I found no news, which is similar to the findings for the Notes.

## VII.  METHODS AND TECHNIQUES USED IN DAMAGES ANALYSES

### A.  Overview

197.     Damages under Section 10(b) of the Exchange Act and SEC Rule 10b-5are generally based on an out-of-pocket measure – the difference between the price paid and the true value of the date of the transaction.  Damages under Section 11 of the Securities Act are based on a statutory formula that is recessionary measure.[154]  Damages experts routinely provide economic evidence to assist the Court or jury in determining whether or not certain information was material and whether it caused losses and damages.

198.     It is my understanding that, for Section 10(b) claims, Plaintiffs are ultimately required to show a sufficient connection between the alleged misconduct and financial losses suffered by investors when the truth was revealed.   I refer to this as economic evidence of loss causation.  It is my further understanding that, for Section 11 claims, the burden is on defendants

---

[152] Torchio Report, ¶ 216.

[153] Torchio Report, ¶¶207-211.

[154] 15 U.S.C. §77k(e).  Defendants can reduce statutory damages with evidence that some or all of the damages were caused by something other than the misrepresentations.

to show that the losses were not caused by defendants' misconduct.  In general, losses that result from disclosure failures are manifested as this conduct is actually revealed through "curative" or "corrective" disclosures that eventually bring an alleged disclosure failure and/or its economic effects to light.  These disclosures can emanate from the issuer or from a third party such as securities analysts.  Corrective disclosures can include leakage of a disclosure, speculation in the market, or any new important information corresponding to the disclosure failures that alters the total mix of information in the marketplace.

199.    I primarily rely on a technique called event study analysis as the basis of my opinions.  An event study is an empirical technique that measures the effect of new information on the market prices of a company's publicly traded securities.  Since the publication in 1969 of a classic paper by Fama, Fisher, Jensen, and Roll,[155] financial economists have used the event study methodology as a tool to measure the effect on market prices of new information relevant to a company's equity valuation.

200.    As a general proposition, modern finance theory holds that the market price of a common stock reflects the present value of expected future cash flows to the stockholder.[156]  Thus, new information that causes the market to significantly alter its expectation of future cash

---

[155] Eugene Fama, Lawrence Fisher, Michael Jensen and Richard Roll, "The Adjustment of Stock Prices to New Information," *International Economic Review* 10 (February 1969), pp. 1-21.

[156] "The discounted-cash-flow (DCF) formula for the present value of a stock is just the same as it is for the present value of any other asset.  We just discount the cash flows by the return that can be earned in the capital market on securities of comparable risk."  Richard Brealey and Stewart Myers, Principles of Corporate Finance, 5th ed. (McGraw Hill, 1996), p. 59.  Thus, $1 tomorrow is worth less than $1 today because of the time value of money and the risk of actually attaining that $1 in the future.

flows will cause a prompt re-pricing of the security to reflect the new expectations.[157]  New information may include, for example, earnings reports, dividend changes, stock-splits, regulatory rulings, acquisition bids, asset sales, company press releases, ratings agency actions, and analyst reports.  In general, the speed with which the price responds to new information is dependent on the degree of market efficiency for the stock in question and the complexity of the new information.

201.    Because the event study methodology measures the market's response to new information, it has been widely used to assess materiality, loss causation, artificial inflation, and market efficiency in securities litigation.[158]

202.    The focus of event studies in securities litigation is predominantly on disclosures that correct prior disclosure failures.  Negative price reactions from corrective disclosures can provide economic evidence of materiality and loss causation.  The stock price change caused by a corrective disclosure is generally the best estimate of the change in the amount of artificial inflation present in the security on the date of the disclosure because the corrective disclosure removes artificial inflation from the market price of the stock.

203.    In addition to analysis of the disclosures that correct prior disclosure failures, event study analysis can also be used in certain circumstances to examine the stock price reaction on the date of misstatement for an "affirmative misstatement."  An affirmative misstatement is a

---

[157] Eugene Fama, "Efficient Capital Markets: II," *Journal of Finance* 46, no. 5 (December 1991), pp. 1575-1617.

[158] Mark Mitchell and Jeffrey Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49 (February 1994), pp. 545-90; and David Tabak and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in <u>Litigation Services Handbook: The Role of the Financial Expert</u>, *Third Edition*, ed. by Roman L. Weil, Michael Wagner and Peter Frank (Wiley, 2001).

statement containing misleading information for which such information was unanticipated or unexpected by the market.  Only in circumstances for which there are affirmative misstatements can an event study analysis for the disclosure day of the affirmative misstatement provide useful economic evidence.

204.     On the other hand, for a statement that omits material information, as opposed to an affirmative misstatement, it is widely recognized and understood that a researcher would not expect to observe a price reaction.  By definition, an omitted fact is not disclosed to the market. An event study is designed to quantify the effect of disclosed information, not undisclosed information.[159]  Consequently, an event study is not used to assess disclosures that omit material information.[160]  While one would not expect a statement that omits material information to result in a positive price reaction, the omitted information, however, can still result in a significant negative price reaction when it is ultimately corrected.  Therefore, omitted information can cause the price of a security to be artificially inflated at a level it otherwise would not be at if the omitted information had been disclosed.

205.     In summary, the event study method combines a statistical analysis of the price movements in the stock being analyzed with a thorough analysis of the information obtained from all disclosures that are relevant to the allegations.  Relevant disclosures include disclosures that correct prior disclosure failures and any affirmative misstatements made by defendants.

---

[159]   David Tabak and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19  in Litigation Services Handbook: The Role of the Financial Expert, *Third Edition*, ed. by Roman L. Weil, Michael Wagner and Peter Frank (Wiley, 2001) (emphasis added).

[160] Frank Torchio, "Proper Event Study Analysis in Securities Litigation," *The Journal of Corporation Law* 35, no.1 (Fall 2009): pp.159-68.

206.    I discuss both aspects of an event study (the statistical analysis and the analysis of the information in relevant disclosures) below, and then I discuss additional financial and economic techniques that can be used to corroborate an event study analysis.

**B.  Event Study Statistical Analysis**

207.    When significant new information about a company is disclosed to the market, a market model is used to determine the component of that company's security "return" that would have been expected based on the return on the overall market and the industry, if applicable.  A return is the percentage change in the price, which is also called a "simple" return.[161]  The "excess return," which is the remaining component of the security return (that which cannot be explained by the return on the market and the industry, if applicable), is attributed to new company-specific information or to random price movements caused by normal volatility.

208.    If the disclosure of company-specific information is accompanied by an excess return that is outside of its normal volatility range (as measured by the market model described below), then the return is said to be "statistically significant" and the excess return is evidence that the new information is economically material to investors.

209.    To conduct an event study one must determine an appropriate market model of the daily returns of the subject company's security.  The market model quantifies the relation between the daily returns on the selected market and industry indexes and the returns for a particular security through a statistical technique known as regression analysis.[162]  In order to determine whether the movement in the market price of a security occurred in response to a

---

[161] A return can also be computed as the natural logarithm ("log") of today's price minus the log of yesterday's price or as the log of (one plus the simple return).

[162] For a more complete description of the market model, see John Campbell, Andrew Lo, and A. Craig MacKinlay, The Econometrics of Financial Markets (Princeton University Press, 1997), pp. 155-156.

specific public disclosure, the actual daily return for that security is compared to the return predicted by a market model that accounts for market, and possibly industry-wide, effects on that security's return.

210.     This statistical analysis involves well-defined steps that I discuss below.

### i)     *Market and Industry Variables*

211.     The first step in an event study statistical analysis is to select a proxy for the market, such as the Standard & Poor's 500 Index or another broad-based market index.  A proxy index for the industry is usually included if the industry variable improves the model.[163]

212.     The selection of a specific market model is based on how well the market model explains the data.  Measures used to select one model among several candidates include the variance of the excess returns, the adjusted R-squared, the t-statistic for each variable, and the F-statistic for the model.  As noted above, a variable such as an industry index is generally added if it improves these model statistics.

### ii)     *Predicted Returns, Excess Returns and Statistical Significance*

213.     The regression analysis produces a "constant" term, also called an "intercept" term, and one or more slope coefficients called "betas".  Generally, the constant term is very close to zero.  The slope coefficients or betas quantify the sensitivity of a stock's return to the return to the market index and also the return to any industry indexes (net of market), if used.  A stock with a market beta of 1.0 is expected to increase (decrease) by one percent for each one

---

[163] "The [single-factor] market model is an example of a one-factor model, but in a multifactor model one might include industry indexes in addition to the market."  John Campbell, Andrew Lo and A. Craig MacKinlay, <u>The Econometrics of Financial Markets</u> (Princeton University Press, 1997), pp. 155-156.  The return on the industry index is generally measured as a "net of the market" return to minimize the effects of a statistical phenomenon called multicollinearity in which two or more predictor variables in a multiple regression model are highly correlated.

percent increase (decrease) in the market index.  Similarly, a stock with a market beta of 2.0 is expected to increase (decrease) by two percent for each one percent increase (decrease) in the market index.  Likewise, a stock with a net-of-market industry beta of 1.0 is expected to increase (decrease) by one percent for each one percent increase (decrease) in the value of the industry index (net of the market return).

214.    After estimating the market model, one can then calculate the daily predicted returns for the common stock.  The predicted returns are equal to the constant term from the market model regression, plus the market beta times the return on the market index, plus the net-of-market industry beta times the return on the industry index net of market (the net-of-market industry return is the return on the industry index minus the return on the market index.)

215.    Excess returns are then calculated by subtracting the predicted return from the actual return on each day.  The excess price change is the amount of the change in the stock price after accounting for the movement in the market and industry.  It is computed as the excess return multiplied by the closing price on the previous day.

216.    In general, actual returns deviate from predicted returns even when no discernible event has occurred.  Accordingly, the event study methodology requires a determination of whether an excess return is attributable to chance.  This is done by testing whether the excess return is statistically significant.  The statistical significance of daily excess returns is assessed using a "t-statistic."  A t-statistic is generally computed as the excess return on a given day divided by the "standard error" of the market model regression.  The standard error of the regression is a measure of the "normal" volatility of excess returns.  The higher the standard error, the greater the threshold for determining statistical significance.

217.    A t-statistic greater than or equal to 1.96 in absolute value (*i.e.*, either positive or negative) means that the excess return is statistically significant at the 95% confidence level; a t-statistic greater than or equal to 2.58 in absolute value means that the excess return is significant at the 99% confidence level.  As is common in financial economics research, I consider an excess return with a t-statistic greater than or equal to 1.96 in absolute value to be statistically significant.

### *iii)    Efficient Market*

218.    Because an event study measures the price reaction to newly disclosed information, an event study analysis is most useful when the security in question is traded in an efficient market, which is generally required to demonstrate reliance.

## C.  Analysis of Information from Disclosures in Event Studies

219.    The first step in performing this part of the event study analysis is to identify disclosures that informed market investors of the alleged misconduct and its direct and foreseeable economic effects.  Then the results of the statistical analysis discussed above are used to determine whether the identified disclosures resulted in statistically significant stock price declines and to quantify the per-share losses caused by the revelation of alleged disclosure failures.

220.    There are several important factors, which I discuss below, that should be considered when identifying which disclosures are relevant in securities litigation.

### *i)    Economic Correspondence*

221.    In general, losses that result from disclosure failures are manifested as this conduct is revealed through the release of "curative" or "corrective" information that eventually brings the alleged disclosure failure and/or its economic effects to light.  If the new information disclosed has sufficient economic correspondence to the information alleged to have been

previously misrepresented and/or omitted, then the information is said to "correct," to some degree, the previous misrepresentation and/or omission.

222.    Corrective information can emanate from issuers or from various other sources including securities analysts, rating agencies, news media, regulators, whistle-blowers, and activist shareholders.  While the market may react immediately to the release of information, as an economic matter, the full effect from the initial release of particularly complex information usually requires the inclusion of subsequent-related or follow-on disclosures, such as reports or statements by expert analysts and additional media reports, to measure the full impact of the information.

223.    I refer to economic correspondence as the extent to which disclosures of economic information connect or correspond to the reasonably foreseeable economic consequences of the alleged misrepresentations (misstated or omitted information) and other activities that together constitute the alleged disclosure failure.  Thus, economic correspondence means that the economic content and substance of the information disclosed accords with the foreseeable economic effects of the alleged misrepresentations and related misconduct.

### ii)    *Direct and Foreseeable Consequences*

224.    Direct and foreseeable consequences, as I apply the term in an economic context, refer to whether the ultimate effects or consequences of the alleged misrepresentations would have been anticipated or predictable at the time of the disclosure failures.  One common example of foreseeable consequences in securities litigation concerns the loss of management credibility or integrity because of disclosure failures.  Some argue that loss causation should not include any stock losses attributable to a diminution in management credibility that results from the disclosure failures.  This view is based principally on a legal theory that a stock loss from diminished management credibility, even if directly caused by the disclosure failures, is a form

of "collateral damage" and that collateral damages should not be included in a damage award to harmed shareholders.[164]  It is my view, however, that calculated losses should include any losses that result from the negative effect on management credibility that resulted from the revelation of a disclosure failure.

225.    Generally, top managers in publicly traded corporations are sophisticated and knowledgeable.  Therefore, top managers could and would anticipate that if they fail to disclose important and relevant information to investors (for example, by overstating their firm's performance in its financial statements) and the disclosure failure is later discovered, the market could well reduce the firm's stock price because of any perceived deception associated with the disclosure failure in addition to the direct effect from the true financial information hidden by the disclosure failure.  That is, the revelation that management withheld information, when discovered, can have significant negative effects on the stock in excess of <u>the direct effect</u> from the revelation of previously undisclosed information itself.

226.    Consequently, based on the legal theory of damages from foreseeable consequences, calculated losses would necessarily include any losses that result from the negative effect on management credibility because of disclosure failures.

227.    In my view, this approach is appropriate and proper to answer the question of what losses were caused by the disclosure failures.

---

[164] *See* Frederick Dunbar and Arun Sen, "Counterfactual Keys to Causation and Damages in Shareholder Class Actions," *Wisconsin Law Review* 2009, no. 2 (January 15, 2009); and Bradford Cornell and James Rutten, "Collateral Damage and Securities Litigation," *Utah Law Review* 3 (2009).  *See also*, Randy C. Joshi, Catherine F. Madrid, and Lee-Anne V. Mulholland, "Causation Issues and Expert Testimony," Chapter 3 in <u>Litigation Services Handbook: The Role of the Financial Expert</u>, *Fifth Edition*, ed. by Roman L. Weil, Daniel G. Lentz and David P. Hoffman (Wiley, 2012), p. 3.4.

### iii)     *Truth on the Market*

228.    "Truth-on-the-market" means that the information identified in a specific

disclosure that corrects the alleged misrepresentations has already been previously disclosed and,

therefore, is already in the total mix of publicly available information and incorporated in the

company's market price.[165]  If the information that corrects the misrepresentations and/or

omissions has already been disclosed so that the market price has already adjusted to this news,

then the same news cannot later cause any stock-price changes, all else held equal.

229.    An economic analysis of truth-on-the-market requires that "new" information

must be analyzed, not only with regard to the specific language and economic content of a

disclosure, but the analyst must also be cognizant of the relevant context of the disclosure.  The

economic context is comprised of the relevant facts and circumstances that surround the

disclosure, which allows the researcher to determine the likely interpretation of the disclosure by

the market.

230.    For example, a disclosure by a securities analyst speculating that there will be a

takeover of Company A by Company B may contain similar language as a subsequent

announcement made by Company A itself two days later when it officially announces the

acquisition.  The fact that the company made the second announcement, however, may allow the

market to place significantly more weight on the same news content.  Thus, despite the prior

disclosure by the securities analyst, the market price would still react to the company's

disclosure made two days later.  Therefore, it would be incorrect to conclude that the securities

analyst's disclosure constituted truth-on-the-market regarding the subsequent takeover

---

[165] Daniel Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving
Actively Traded Securities," *The Business Lawyer* 38 (November 1982): pp. 1-20.

announcement.  While the content of the two disclosures may be similar, the economic context is certainly not.

231.    Similarly, if a company previously disclosed that its financial results may be adversely affected by declining commodity prices but misleads the market regarding the true extent of its financial exposure to declining commodity prices, then it may be incorrect to conclude that the prior disclosure of potential risk exposure constitutes truth on the market.  The misstatement can still cause the stock price to be artificially inflated (or deflated).

232.    Therefore, economic analysis of truth-on-the-market requires an analysis of the content and context of disclosures so the researcher may correctly determine the interpretation of the disclosure made by the market.

### iv)    Confounding Information

233.    Confounding information refers to other information that affects the valuation of a stock that enters the market in the event window and is unrelated to the alleged disclosure failure or its foreseeable economic consequences.  Such news can have a simultaneous, "confounding" effect on the stock's price.

234.    It is important to understand that the multi-factor market model is designed to account for and "net out" from the subject company's stock returns the effects of simultaneous movements in the market and the industry indices, so that the excess return should be largely free of any confounding macro-economic and industry-specific news on that day.  This presumes, however, that the company's disclosure did not substantially affect the prices of firms in the industry.  If the company's disclosure was of such import that it affected the prices for firms in its industry, then the industry return should not be used to compute a predicted return for that event.  To do so would artificially mask the true effect of the information on the company's price.  This is sometimes referred to as a "contagion" effect.

235.     If the analyst believes that confounding information outside of market-wide and industry-specific influences may still be present, there are several analyses that may shed light on the potential magnitude of any confounding firm-specific information.

236.     First, one should attempt to determine whether or not the confounding information is sufficiently material, *i.e.*, whether it would be expected to significantly change the security's price when it is disclosed.  If it is found to be immaterial, then such confounding information should not affect the conclusion.  Often, the analyst can analyze contemporaneous commentary by analysts and the media to help gauge the importance to investors of the disclosure failure information relative to the potentially confounding information.  Sometimes the confounding information has economic implications that can be potentially measured or quantified independently of the subject company's stock returns.

237.     Second, one should determine if the confounding information was previously disclosed in full or in part to the investing public.  If it has already been disclosed and fully incorporated into the stock price, then such confounding information is unlikely to have caused any stock-price changes measured on the day of the corrective disclosure.

238.     Third, if confounding information is disclosed at a different time of day than the corrective disclosure, intraday price movements can sometimes be used to differentiate the price responses to each piece of information.

239.     Fourth, financial analysis such as discounted cash flow or price-earnings ratio analyses can be used to differentiate the price responses to each piece of information.

240.     Although this is not meant to be an exhaustive list, the aforementioned techniques include some of the ways researchers can attempt to deal with confounding news.  If confounding news is present and material, then the researcher must attempt to exclude the effect

of the confounding news so that it is not included in the quantification of investor losses and artificial inflation.

### *v)*     *Length of Event Window*

241.     The length of the event window used to measure the full effect on the stock price of new information is often an important consideration.  It is common to use windows of one or two days depending on the information that is being disclosed.  But, a window of more than two days can also be appropriate in certain circumstances.  The determination of the appropriate length of an event window is dependent on case-specific circumstances such as the complexity of the disclosure, the extent of its distribution and dissemination among the investing public, whether or not the defendants are denying or otherwise influencing the market's interpretations of the event, as well as the degree to which additional information from securities analysts and other commentators is forthcoming in subsequent hours or days.

242.     If a particular material disclosure continues to generate analyst commentary and additional news stories beyond the first event day and the excess returns are statistically significant in active trading, then the analyst should consider lengthening the event window to include the effects of this continued market response.  Otherwise, improperly excluding a day with a significant negative excess return can understate damages, and improperly excluding a day with a significant positive excess return can overstate damages.

### D.  Additional Financial Analysis

243.     In addition to event study analysis, there are various analyses that can be used to corroborate event study findings.

### i)       *Economic Inferences from Behavior*

244.     Many economic inferences can be confirmed from observed behavior.[166]  Indeed, the economic inferences from observed behavior have been the bases for many scholarly articles.[167]

### ii)      *Financial Analysis*

245.     Standard financial valuation analysis can be used to determine the impact of information on a company's stock price.[168]  Analyses such as discounted cash flow analyses, price-earnings ratio, etc., may be used assess the implications of disclosed information.

## E.  Techniques Used in Calculating Artificial Inflation

246.     Artificial inflation is defined as the difference between the actual stock price and the "true value" of the stock on each day in a class period, where the true value of the stock is its value after accounting for the effect of the disclosure failures.  In general, losses per share caused by disclosures of alleged misrepresentations and omissions are translated into artificial inflation per share for each day of a class period.  Thus, artificial inflation is generally computed by first starting with the losses measured from the declines in the stock price over the event window used for each identified corrective disclosure, which generally occur toward the end of a class period.  As discussed previously, corrective disclosures are relevant disclosures that reveal or partially reveal the disclosure failures to the market.  Artificial inflation for each day is then determined

---

[166] This economic approach and the conclusions resulting from this approach are discussed in Gary S. Becker, The Economic Approach to Human Behavior, The University of Chicago Press, 1976.

[167] On application of the economic theory of behavior to law, *see* Richard Posner, Economic Analysis of Law, Little Brown, 1973 and Gary S. Becker and William M. Landes, Essays in the Economics of Crime and Punishment, Columbia University Press for the National Bureau of Economic Research, 1974.

[168] *See, e.g.*, Bradford Cornell, John I. Hirshleifer, and John N. Haut, "Securities Fraud Damages," *Developments in Litigation Economics*, Volume 87 (2005), pp. 29-57.

by working backward from the dates of the measured losses from identified corrective disclosures to the beginning of the class period.[169]

   *i)*     ***Methods of Calculating Artificial Inflation***

247.     There are several different ways or methods to translate the computed losses per share into a computation of artificial inflation per share.  Among the commonly used methods are the "constant dollar" (sometimes called the "constant ribbon") method and the "constant percentage" method.[170]

248.     Under a constant dollar method, the "dollar per share" measure of losses from each correction of a disclosure failure is applied to all days preceding that corrective disclosure. This approach is better understood by the following example.

249.     Assume that the class period is one year ending December 31, 2007.  Further assume that there are two corrective disclosures – one on December 14, 2007 and the other on December 31, 2007.  The loss per share as measured by the excess price decline on December 15, 2007 is $2.00 and on December 31, 2007 the loss per share is $5.00.  Starting from the end of the class period and working backward, the artificial inflation is $5.00 per share until December 13, 2007 (one day before the December 14, 2007 corrective disclosure) when the artificial inflation becomes $7.00 per share, or the sum of $2.00 and $5.00.  The economic logic is that just before December 14, 2007, all the inflation, as measured by the total losses of $7.00 per

---

[169] Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* 37 (June 1990): pp. 883-924; David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA (July 2002); David Tabak, "Loss Causation And Damages in Shareholder Class Actions: When It Takes Two Steps To Tango," NERA (May 2004); and David Tabak, "Inflation and Damages in a Post-*Dura* World," NERA (September 2007).

[170] *See, e.g.,* David Tabak and Chudozie Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA (July 2002).

share, is still in the stock price.  After the December 14, 2007 disclosure, the market price now reflects that $2.00 (of the total $7.00 artificial inflation) has come out of the stock price and hence inflation goes from $7.00 to $5.00.  After December 31, 2007, the inflation is zero because the remaining $5.00 of inflation has now come out of the stock price.

250.    Using the constant dollar approach, and continuing to work backward from December 14, 2007, artificial inflation will equal a constant $7.00 per share on each day going back to January 1, 2007, the first day of the class period.

251.    The constant percentage method is similar but instead of using the dollar losses, it uses the measured losses as a <u>percentage</u> of the price before a corrective disclosure.  This percentage is multiplied by the prices on each day in the class period that precedes the date of the corrective disclosure.  Under the constant percentage method, the dollar amount of artificial inflation will generally change on a daily basis with the changes in the stock price.  For circumstances in which the stock price is generally declining prior to a corrective disclosure, the constant percentage approach will yield higher artificial inflation than the constant dollar method.

252.    The choice between the constant dollar method and the constant percentage method is dependent on case-specific factors relating to the disclosure failure but, based on the 2005 U.S. Supreme Court decision in *Dura Pharmaceuticals, Inc. v. Broudo*, artificial inflation from the percentage method cannot exceed the cumulative amount of dollar per share declines

over the corrective disclosures (*i.e.*, cannot exceed the constant dollar artificial inflation measure) in computing Section 10(b) damages.[171]

### ii) *Methods of Scaling Artificial Inflation*

253.    Scaling methods for artificial inflation generally start with the same dollar losses used for the constant dollar approach (or constant percentage) but then those measured losses are scaled or indexed to a selected economic or accounting variable.  Examples of scaling using accounting variables can be seen in cases involving earnings overstatements in which the amount of overstated retained earnings increase over the class period.  In these situations, inflation can be scaled to the amount of overstated retained earnings.[172]

254.    One can also scale artificial inflation to economic variables such as industry metrics or bond yields to reflect changes in the broader economy.[173]

## F.  Response to Prof. James

255.    Prof. James does not dispute there were statistically significant declines in the prices of Exide securities on each of the alleged corrective disclosures.  Prof. James also appears to conclude that for each corrective disclosure date, that the "price responses would take into account information <u>not only about the allegedly concealed risks</u>, but also about subsequent

---

[171] *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).  The *Williams* decision ruled that the use of the percentage approach violated *Dura* because it resulted in artificial inflation that exceeded the per share losses caused when the misrepresentations were corrected. *In re Williams Securities Litigation – WCG Subclass*, 496 F. Supp. 2d 1195 (N.D. Okla. 2007).

[172] *See*, for example, In *re California Micro Devices Securities Litigation*, 965 F.Supp. 1327 (N.D. Cal. 1997) and *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 256 (D.N.J. 2000)

[173] Declaration of Frank C. Torchio for Settlement Purposes, *In Re Countrywide Financial Corporation Securities Litigation*, Lead Case No. CV 07-05295 MRP (MANx) (June 29, 2010).

events that could not have been disclosed earlier."[174]   Thus Prof. James has tacitly admitted that the corrective disclosures alleged by Plaintiffs contain information that corrected the prior misrepresentation of concealed risks.  But Prof. James fails to perform a price impact analysis, which is accorded to defendants under *Halliburton II*, to show how much of the price reaction was due to things unrelated to the correction of the misrepresentation, which would be part of a price impact analysis.

### i)      *Materialization of Concealed Risk*

256.    Prof. James discusses that a proper damages analysis should account for any differences between information in a corrective disclosure and the information alleged to have been misrepresented.

257.    Specifically, Prof. James is concerned with an issue sometimes called the materialization of a concealed risk.[175]   This occurs when the misrepresentation is a failure to properly disclose a particular risk but the corrective disclosure contains a bad outcome associated with that risk.  In this case, the concealed risks relate to environmental problems and liquidity problems at Exide.

258.    As discussed above in section VII. C. i), this issue falls under the general heading of the degree with which the corrective disclosure has economic correspondence to the misrepresentations.  This assessment of economic correspondence is part of a general damages analysis common to all securities cases.  With regard to a materialization of concealed risk, there are a number of analyses that may be utilized to determine how much of the stock price decline from a corrective disclosure of a bad outcome can be used to assess the true value associated

---

[174] James Report, ¶ 92.
[175] James Report, ¶91.

with a failure to disclose the true risk or under disclosure of a true risk, including analyses designed to examine economic correspondence, direct and foreseeable consequences, truth on the market, and confounding information. *See* section VII. C.  Such analyses are commonly applied on a class-wide basis, and they would be applied on a class-wide basis in this action.

### ii)  *Method for Measuring the Impact Associated with Each Element of the Alleged Fraud*

259.  Prof. James classifies Plaintiffs' allegations into two broad categories: (i) alleged misstatements with regard to environmental issues concerning Exide; and (ii) alleged misstatements regarding the financial stability of the Company.[176]  Further, Prof. James classifies the alleged misstatements with regard to environmental issues concerning Exide into three subcategories: (i) the potential issues with the Vernon facility's storm piping water system; (ii) Exide's emission not meeting set standards; and (iii) increased tensions between Exide and regulators.[177]

260.  Prof. James then hypothesizes circumstances in which the jury does not agree on all elements of Plaintiffs' allegations.[178]  Put another way, Prof. James engages in an exercise in which some of the information in a corrective disclosure may be determined by a jury to be confounding information.  Issues of confounding or potentially confounding information as hypothesized by Prof. James, occur in virtually every modern day securities litigation matter.  As discussed above in Section VII. C. iv), there are a variety of analyses that can be brought to bear to determine what portion of the stock price decline corresponds to the misrepresentations and which part corresponds to confounding information.  Such analyses may be applied, and

---

[176] James Report, ¶97.

[177] James Report, ¶99.

[178] James Report, ¶¶96-99.

commonly are applied, on a class-wide basis.  Nothing in the James Report causes me to believe that scaling techniques, if required, could not be applied in this case.

### iii)    *Damages Methodology Consistent With Evolving Nature of Alleged Fraudulent Behavior*

261.    The James Report presents a discussion that a reliable methodology should reflect the evolving nature of the alleged misrepresentations in damages for a Class Member who bought Exide securities in the early part of the Class Periods relative to another Class Member who bought Exide securities in the latter part of the Class Periods.  That is, if a problem associated with a particular misrepresentation grows over the Class Period, then it is appropriate that the artificial inflation or damages per share grows over the class period too.

262.    I discuss this in section VII. E. ii), which is titled Methods of Scaling Artificial Inflation.  Again this issue is present in many securities cases.  I filed a report recently in the Bank of America opt-out securities fraud litigation matter in which I provided a method to scale artificial inflation based on internal information and data I obtained from the defendant in discovery.[179]  The same, or similar, approach could be applied in this case to the extent that it is ultimately determined that the risks did, in fact, evolve.  However, a determination of whether or to what extent (if any) the risks evolved would require an evaluation of the merits of Plaintiffs' claims (following sufficient discovery) and would require extensive analyses, both of which go

---

[179] Expert Report of Frank Torchio, *In Re Bank of America Corp. Securities, Derivatives, and Employee Retirement Security Act (ERISA) Litigation*, No. 09-MD-2058 (PKC), May 24, 2013.

beyond what is required of plaintiffs at class certification.[180]  Nevertheless, the methods used to scale artificial inflation may be applied, and commonly are applied, on a class-wide basis. Nothing in the James Report causes me to believe and that such techniques that deal with evolving nature of bad behavior, if required, could not be applied in this case.

## G.  Class-Wide Damages Approach for Exide's Stock and Notes

263.    In this case, based on the information that is available to me, I would likely use an event study to compute the losses caused by the alleged misrepresentations.  As is my general practice I would analyze any confounding information contained in corrective disclosures.  I would also analyze the economic correspondence between information in corrective disclosures with the alleged misrepresented or omitted information in determining whether all, part, or none of the price decline is attributable to the alleged misrepresentations and omissions because of issues related to materialization of concealed risk.  I will likely use a constant dollar inflation approach, but may scale this inflation line downward to comport with Plaintiffs' liability theory after discovery.  My methods and techniques would be applied on a class-wide basis.

---

[180] *See Amgen Inc. v. Connecticut Retirement Plans and Trust Funds,* 133 S.Ct. 1184, 1194-95 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied."); *Erica P. John Fund, Inc. v. Halliburton Co*., 131 S. Ct. 2179, 2183 (2011) (it is not plaintiff's burden at the class certification stage to prove that the subsequent loss was not "caused by factors other than the revelation of a misrepresentation").

I certify that, to the best of my knowledge and belief:

— the statements of fact contained in this Report are true and correct;

— the reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions and conclusions;

— I have no present or prospective interest in the parties to this case, and I have no personal interest or bias with respect to the parties involved;

— I have made all the inquiries that I believe are desirable and appropriate and that no matters of significance that I regard as relevant have, to my knowledge, been withheld from the Court; and

— my compensation is not contingent on an action or event resulting from the analyses, opinions or conclusions in, or the use of, this Report.

May 26, 2015
Date

Frank C. Torchio

**Exhibit A**
**Additional Materials Reviewed**

Expert Report of Prof. Christopher M. James dated May 4, 2015.

Transcript of 30(b)(6) deposition of Frank C. Torchio dated April 17, 2015.

Transcript of deposition of Professor Christopher M. James dated May 15, 2015.

Expert Report of Christopher M. James dated July 14, 2006 in *In Re Adams Golf, Inc. Securities Litigation*, 2006 WL 6048215.

Expert Report of Professor Christopher M. James dated June 15, 2012 in *In re Superior Offshore International, Inc., v. Louis SCHAEFER, Jr., et al.*, 2012 WL 7150873.

**<u>Academic Papers:</u>**

Bloomfield, R., M. O'Hara, and G. Saar, "How Noise Trading Affects Markets: An Experimental Analysis," *Review of Financial Studies*, 2009, 22(6), pp. 2275-2302.

Chan, K., and A. Hameed, "Stock Price Synchronicity and Analyst Coverage in Emerging Markets," *Journal of Financial Economics*, 2006, 80(1), pp. 115-47.

Chari, V., R. Jagannathan, and A. Ofer, "Seasonality in Security Returns: The Case of Earnings Announcements," *Journal of Financial Economics*, 1988, 21(1), pp. 101-121.

Daniel, K., D. Hirshleifer, and S. Teoh, "Investor psychology in capital markets: evidence and policy implications," *Journal of Monetary Economics*, 2002, 49(1), pp. 139-209.

Dennis, P. and D. Strickland, "Who Blinks in Volatile Markets, Individuals or Institutions?" *The Journal of Finance*, 2002, 57(5), pp. 1923-1950.

Hirshleifer, D., S. Lim, and S. Teoh, "Driven to Distraction: Extraneous Events and Underreaction to Earnings News," *The Journal of Finance*, 2009, 64(5), pp. 2289-2325.

Huberman, G. and T. Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance*, 2001, 56(1), pp. 387–396.

Jones, S. and G. Larsen, "The Information Content of Short Sales," 2008, in <u>Handbook of Finance</u>, Volume 1, ed. F. Fabozzi, Hoboken: John Wiley & Sons, pp. 151-161.

Lamont, O. and R. Thaler, "Anomalies: The Law of One Price in Financial Markets," The *Journal of Economic Perspectives*, 2003, 17(4), pp. 191-202.

Lamont, O. and R. Thaler, "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-outs," *Journal of Political Economy*, 2003, 111(2), pp. 227-268.

Lamont, O. and J. Stein, "Aggregate Short Interest and Market Valuations," *American Economic Review*, 2004, 94(2), pp. 29-32.

**Exhibit A**
**Additional Materials Reviewed**

MacKinlay, A., "Event Studies in Economics and Finance," *Journal of Economic Literature*, 1997, 35(1), pp. 13–39.

Mitchell, M., T. Pulvino, and E. Stafford, "Limited Arbitrage in Equity Markets," *The Journal of Finance*, 2002, 57(2), pp. 551-584.

Nofsinger, J. and R. Sias, "Herding and Feedback Trading by Institutional and Individual Investors," *The Journal of Finance*, 1999, 54(6), pp. 2263-2295.

Piotroski, J., and D. Roulstone, "The Influence of Analysts, Institutional Investors, and Insiders on the Incorporation of Market, Industry, and Firm-Specific Information on Stock Prices," *Accounting Review*, 2004, 79(4), pp. 1119-51.

Saar, A., and T. Lybek, "Measuring Liquidity in Financial Markets," IMF Working Paper, 2002, pp. 1-64.

Statman, M., S. Thorley, and K. Vorkink, "Investor Overconfidence and Trading Volume," *The Review of Financial Studies*, 2006, 19(4), pp. 1531-1565.

Thomson Reuters Journal Citation reports.

University of Washington's Eigen factor ranking list (www.eigenfactor.org)

Any other materials referenced in the Report or Exhibits to the Report.

**Exhibit B**
**Complementary Analyses Considered by Courts in Assessing Market Efficiency for Common Stocks**

| Complementary Analyses | Considered by Courts | Considered by Courts within 9th Circuit | [1] Akeena Solar, Inc. | [2] Amgen, Inc. | [3] Caraco Pharm. Labs., Ltd. | [4] Catalyst Pharm. Partners, Inc. | [5] China Agritech, Inc. | [6] China Automotive Sys., Inc. | [7] China Integrated Energy, Inc. | [8] China MediaExpress Holdings, Inc. | [9] Computer Sciences Corp. | [10] Countrywide Financial Corp. | [11] Diamond Foods, Inc. | [12] FCStone Group, Inc. | [13] First Solar, Inc. | [14] Heckmann Corp. | [15] Idearc, Inc. | [16] Inyx, Inc. | [17] LDK Solar Co., Ltd. | [18] Merck & Co., Inc. | [19] Moody's Corp. | [20] Nature's Sunshine Products, Inc. | [21] Netbank, Inc. | [22] Pain Therapeutics, Inc. | [23] Radient Pharms. Corp. | [24] Regions Financial Corp. | [25] Schering-Plough Corp. | [26] Sonoco Products Co. | [27] Sprint Nextel Corp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Within Circuit | | | 9th | 9th | 6th | 11th | 9th | 2nd | 9th | 2nd | 4th | 9th | 9th | 8th | 9th | 3rd | 5th | 2nd | 9th | 3rd | 2nd | 10th | 11th | 5th | 9th | 11th | 3rd | 4th | 10th |
| Trading Volume | 25 out of 27 | 9 out of 9 | x | x | x | x | x |  | x | x | x | x | x | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | x |
| Analyst/Media Coverage | 25 out of 27 | 9 out of 9 | x | x | x | x | x |  | x | x | x | x | x | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | x |
| Market Maker/Arbitrageurs | 19 out of 27 | 9 out of 9 | x | x | x | x | x |  | x |  |  | x | x | x | x | x | x |  | x | x |  |  | x | x | x |  |  | x | x |
| Eligible to File SEC Form S-3 | 22 out of 27 | 9 out of 9 | x | x | x | x | x |  | x | x |  | x | x | x | x | x | x |  | x | x |  | x | x | x | x | x | x |  | x |
| Market Capitalization/Float | 10 out of 27 | 3 out of 9 |  |  |  |  |  |  |  | x |  |  |  |  | x |  | x | x | x |  |  |  | x | x | x | x |  |  | x |
| Bid-Ask Spread | 8 out of 27 | 2 out of 9 |  |  |  |  |  |  |  | x |  |  |  |  |  |  | x | x | x |  |  |  |  | x | x |  |  | x | x |
| Institutional Holdings | 8 out of 27 | 2 out of 9 |  |  |  |  |  |  |  |  |  |  |  | x | x |  |  |  |  |  |  |  | x | x | x | x |  | x | x |
| Short Interest | 5 out of 27 | 3 out of 9 |  |  |  |  |  |  | x |  |  |  | x |  | x |  |  |  |  |  |  |  |  | x |  | x |  |  |  |
| Lack of Serial Correlation | 4 out of 27 | 2 out of 9 |  |  |  |  |  |  |  |  |  | x |  |  | x |  |  |  |  |  |  |  |  | x |  |  | x |  |  |
| Put-call parity | 4 out of 27 | 2 out of 9 |  |  |  |  |  |  |  | x |  | x |  |  | x |  |  |  |  |  |  |  |  |  |  |  |  | x |  |

**Notes:**

[1] "x" indicates that the complementary analyses were considered by courts in assessing market efficiency of common stocks.

[2] China Agritech [5] and China Automotive [6] were deemed inefficient.

[3] In Moody's [19], the Court stated: "Normally, a court determines market efficiency by examining the Cammer factors. See e.g., Fogarazzo v. Lehman Bros., Inc., 263 F.R.D. 90, 102 n. 84. However, the NYSE is a paradigmatic efficient market."

[4] In Sprint Nextel [27], defendants conceded that the stock traded in an efficient market during the class period. Therefore, the court did not discuss any factors in assessing market efficiency of the stock. However, in discussing the efficiency of the bonds, the Court stated that courts generally consider Cammer factors and the following additional factors in evaluating an efficiently traded security: company's market capitalization; the bid-ask spread; the float or issue amount outstanding excluding insider-owned securities; and the percentage of institutional ownership. The Court discussed each of these factors for the bonds, and noted that the Cammer factors were created in the context of evaluating the efficiency of stock markets.

**Sources:**

Court decisions regarding class certification of common stocks used in Torchio Report Exhibit 12.

[1] Sharon Hodges v. Akeena Solar, Inc., 274 F.R.D. 259 (N.D.Cal., 2011)

[2] Conn. Ret. Plans & Trust Funds v. Amgen, Inc., Case No. CV 07-2536 PSG (PLAx) (C.D. Cal., 2009)

[3] Jonathan Wilkof, et al. v. Caraco Pharmaceutical Laboratories, Ltd., 280 F.R.D. 332 (E.D. Mich. 2012)

[4] Aranaz v. Catalyst Pharmaceutical Partners Inc., 302 F.R.D. 657 (S.D.Fla.2014)

[5] Dean v. China Agritech, Inc., CV 11-01331-RGK (PJWx) (C.D. Cal., 2012)

[6] George v. China Auto. Sys., 11 Civ. 7533 (KBF) (S.D.N.Y., 2013)

[7] Brown v. China Integrated Energy Inc., CV 11-02559 BRO (PLAx) (C.D. Cal., 2015)

[8] McIntire v. China MediaExpress Holdings, Inc., 38 F.Supp.3d 415 (S.D.N.Y., 2014)

[9] In re Computer Scis. Corp. Secs. Litig., 288 F.R.D. 112 (E.D. Va., 2012)

**Exhibit B**
**Complementary Analyses Considered by Courts in Assessing Market Efficiency for Common Stocks**

| Complementary Analyses | Considered by Courts | Considered by Courts within 9th Circuit | [1] Akeena Solar, Inc. | [2] Amgen, Inc. | [3] Caraco Pharm. Labs., Ltd. | [4] Catalyst Pharm. Partners, Inc. | [5] China Agritech, Inc. | [6] China Automotive Sys., Inc. | [7] China Integrated Energy, Inc. | [8] China MediaExpress Holdings, Inc. | [9] Computer Sciences Corp. | [10] Countrywide Financial Corp. | [11] Diamond Foods, Inc. | [12] FCStone Group, Inc. | [13] First Solar, Inc. | [14] Heckmann Corp. | [15] Idearc, Inc. | [16] Inyx, Inc. | [17] LDK Solar Co., Ltd. | [18] Merck & Co., Inc. | [19] Moody's Corp. | [20] Nature's Sunshine Products, Inc. | [21] Netbank, Inc. | [22] Pain Therapeutics, Inc. | [23] Radient Pharms. Corp. | [24] Regions Financial Corp. | [25] Schering-Plough Corp. | [26] Sonoco Products Co. | [27] Sprint Nextel Corp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

[10] In Re Countrywide Fin. Corp. Sec. Litig., 273 F.R.D. 586 (C.D. Cal., 2009)
[11] In re Diamond Foods, Inc., Securities Litigation, 295 F.R.D. 240 (N.D. Cal., 2013)
[12] Lumen v. Anderson, 280 F.R.D. 451 (W.D. Mo., 2012)
[13] Smilovits v. First Solar, Inc., 295 F.R.D. 423 (D. Ariz., 2013)
[14] In re Heckmann Corp. Sec. Litig., C. A. No. 10-378-LPS-MPT (D. Del., 2013)
[15] Buettgen v. Harless, Civil Action No. 3:09-CV-791-K (N.D. Tex., 2011)
[16] Pa. Ave. Funds v. Inyx Inc., 08 Civ. 6857 (PKC) (S.D.N.Y., 2011)
[17] In re LDK Solar Secs. Litig., 255 F.R.D. 519 (N.D. Cal., 2009)
[18] In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig., Civil Action No. 08-2177 (DMC)(JAD) (D.N.J., 2012)
[19] In re Moody's Corp. Sec. Litig., 274 F.R.D. 480 (S.D.N.Y., 2011)
[20] In re Nature's Sunshine Prods. Secs. Litig., 251 F.R.D. 656 (D. Utah, 2008)
[21] In re Netbank, Inc. Sec. Litig., 259 F.R.D. 656 (N.D. Ga., 2009)
[22] KB Partners I, L.P. v. Barbier, Case No. A-11-CA-1034-SS (W.D. Tex., 2013)
[23] Vinh Nguyen v. Radient Pharms. Corp., 287 F.R.D. 563 (C.D. Cal., 2012)
[24] Local 703, I.B. of T. Grocery & Food Emples. Welfare Fund v. Regions Fin. Corp., 762 F.3d 1248 (11th Cir. Ala., 2014)
[25] In re Schering-Plough Corp. / Enhance Secs. Litig., Civil Action No. 8-397 (DMC)(JAD) (D.N.J., 2012)
[26] City of Ann Arbor Employees' Ret. Sys. v. Sonoco Prods. Co., 270 F.R.D. 247 (D.S.C., 2010)
[27] Bennett v. Sprint Nextel Corp., 298 F.R.D. 498 (D. Kan., 2014)

**Exhibit C**
**Prof. James' Cites to Academic Literature Relate to Fundamental Efficiency or Anomalies**

  *i)*   ***Prof. James' Cites to Academic Literature Relating to Fundamental Efficiency***

     <u>*a)  Lamont and Thaler (2003)*</u>

  1.  Prof. James cites to Lamont and Thaler (2003) paper titled "Can the Market Add and Subtract?  Mispricing in Tech Stock Carve-outs," in support of his contentions that: (i) "Academic literature has shown that even widely-followed stocks of large companies can sometimes trade in inefficient markets"[1]; and (ii) "various studies in the academic literature have found examples of 'companies large and small appear[ing] to be flagrantly mispriced.'"[2] This paper concludes:

> The evidence from options markets show that these stocks were unambiguously overpriced, and it is difficult to explain why in equilibrium anyone would own these shares.  The mispricing persisted because of the sluggish functioning of the shorting market.[3]

  2.  But the Lamont and Thaler (2003) paper also states that

> First, we observe gross violations of the law of one price.  Second, they do *not* present exploitable arbitrage opportunities because of the costs of shorting the subsidiary.  In other words, the no free lunch component of the efficient market hypothesis is intact, but the price equals intrinsic value component takes another beating.[4]

  3.  The "no free lunch component" phrase implies that the markets are informationally efficient.  The "price equals intrinsic value takes another beating" phrase means

---

  [1] James Report, ¶21 and fn 26 at p. 12.

  [2] James Report, ¶25 and fn 36 at p. 13.

  [3] Owen A. Lamont and Richard Thaler, "Can the Market Add and Subtract? Mispricing in Tech Carve-outs," *Journal of Political Economy*, vol. 111, no. 2, (2003) 227-268, at 265.

  [4] Owen A. Lamont and Richard Thaler, "Can the Market Add and Subtract? Mispricing in Tech Carve-outs," *Journal of Political Economy*, vol. 111, no. 2, (2003) 227-268, at 265.

that the findings support violations of fundamental efficiency, but not violations of informational efficiency.

### b)  Daniel, Hirshlefeir and Teoh (2002)

4.      Prof. James cites to Daniel, Hirshlefeir and Teoh (2002) in support of his contention that "[A]cademic literature has found that investors can face constraints in processing information and that it can take relatively more time for them to process information that is more complex or technical in nature, as a result of which stock prices may not rapidly incorporate information that is complex to process or that requires expertise to understand."[5]

5.      Daniel, Hirshlefeir and Teoh (2002) conclude that "the evidence is persuasive the psychological biases affect market prices substantially."[6]  This mispricing refers to deviations of price from true intrinsic value, which again evidently addresses issues of fundamental efficiency and not informational` efficiency.

### c)  Bloomfield, O'Hara, and Saar (2009)

6.      Prof. James cites to Bloomfield, O'Hara, and Saar (2009) in support of his contention that "while wide bid-ask spreads may indicate that a lack of liquidity may be hindering market efficiency, narrow spreads do not provide affirmative evidence that the securities in question actually trade in efficient markets."[7]

7.       Bloomfield, O'Hara, and Saar (2009) conclude that noise traders "tend to hinder the adjustment of prices to the true value most when the market is least efficient."[8]  Again,

---

[5] James Report, ¶36 and fn 56 at p. 20.

[6] Kent Daniel, David Hirshleifer, and Siew Hong Teoh, "Investor Psychology in Capital Markets: Evidence and Policy Implications," *Journal of Monetary Economics*, vol. 49, (2002), 139-209, at 193.

[7] James Report, ¶23 and fn 32 at p. 13.

[8] Robert Bloomfield, Maureen O'Hara, and Gideon Saar, "How noise Trading Affects Markets: An Experimental Analysis," *The Review of Financial Studies*, vol. 22, no. 6, (2009),

deviation of price from true value is generally an issue of fundamental efficiency not informational efficiency.

#### d)  Mitchell, Puvino and Stafford (2002)

8.      Prof. James cites to Mitchell, Puvino and Stafford (2002).[9]

9.      In Mitchell, Puvino and Stafford (2002), the authors "find that there are costs that limit arbitrage in equity markets, which tests our faith in market forces keeping prices at fundamental values."[10]  This paper does not conclude that markets are not informationally efficient

### ii)     Prof. James' Cites to Academic Literature Relating to Anomalies

#### a)  Statman, Thorley, and Vorkink (2006)

10.     Prof. James cites to Statman, Thorley, and Vorkink (2006) in support of his contention that "the academic literature suggests that measuring trading volume by itself does not demonstrate market efficiency."  As an example, Prof. James points to the showing in Statman, Thorley, and Vorkink (2006) that "high observed trading volumes may instead be driven by investors who are overconfident about their valuation and trading skills."[11]

11.     Investor overconfidence is an indication of irrationality by investors.  The authors state the basis of this irrationality holds for both market wide and individual security turnover.  Thus, the authors purport to present findings of market-wide irrationality from conclusions that trading volume is dependent on past stock returns.  The authors also state that "while our

---

2275-2302, at 2301.

     [9] James Report, ¶23 and fn 31 at p. 12.

     [10] Mark Mitchell, Todd Pulvino, and Erik Stafford, "Limited Arbitrage in Equity Markets," *The Journal of Finance*, vol. LVII, no. 2, (April 2002), 551-584, at 582, emphasis added.

     [11] James Report, ¶22 and fn 29 at p. 12.

motivation is an example of investor overconfidence, we acknowledge that <u>there may be alternative explanations</u> to our empirical results."[12]

12.      Moreover, while Prof. James relies on this general empirical finding he makes no effort to test this proposition for Exide.

### b)  Dennis and Strickland (2002)

13.      Prof. James contends that "although institutional investors may help interpret and disseminate information throughout the broader marketplace, multiple studies indicate that stocks owned by many institutional investors may be prone to mispricing for a variety of reasons."[13]  In support of this contention, Prof. James states: "Dennis and Strickland (2002) report that institutional investors sometimes follow momentum based strategies and exhibit herding behavior.  The authors show that such behavior could lead to stock prices deviating from their fundamental value." [14]

14.      Again Prof. James is concerned with deviations of price from fundamental value as opposed to whether prices react to news.

15.      In addition, this article cited by Prof. James provides an indication of a market anomaly in which for a certain type of events for certain magnitudes of intuitional ownership, there have been arbitrage profits that could have been be exploited by investors.[15]  As discussed above, the economic literature that responds to anomalies presents findings that show that such

---

[12] Meir Statman, Steven Thorley, and Keith Vorunik, "Investor Overconfidence and Trading Volume," *The Review of Financial Studies*, vol. 19, no. 4, (2006), 1531-1565, at 1532, emphasis added.

[13] James Report, ¶27 and fn 40 at p. 14.

[14] James Report, fn 40 at p. 14.  Prof. James also cites to the Nofsinger and Sias (1999), "Herding and Feedback Trading by Institutional and Individual Investors," *The Journal of Finance*, 54(6), pp. 2263–2295.

[15] Patrick J. Dennis and Deon Strickland, "Who Blinks in Volatile Markets, Individuals or Institutions?," *The Journal of Finance*, vol. LVII, no. 5, (October 2002), 1923-1950, at 1946-1948.

anomalies do not hold in other periods outside of the sample periods that are the bases of the anomaly findings.  One hypothesis for these findings is that investors, after becoming aware of potential profit opportunities presented by anomalies, compete away the excess returns over time.  The second hypothesis is that certain anomalies are statistical aberrations that simply do not hold in other sample periods.  This paper was written in 2002 and uses data from 1988-1996.  Prof. James does not present any findings that there were unexploited arbitrage profits opportunities related to the degree of institutional ownership for Exide or that this potential anomaly from data before 1996, nearly 20 years ago, still persists today.

*c)  Jones and Larsen, Jr. (2008)*

16.  Prof. James also cites to a chapter by Jones and Larsen, Jr. chapter in the Handbook of Finance in support of his contention that "although the presence of short sellers may help prices adjust to and incorporate information in the market, the academic literature demonstrates that stocks that have short selling activity may still not rapidly incorporate all publicly available value-relevant information."[16]

17.  Prof. James fails to state the authors' conclusion offers the following possible interpretations of their findings:

> Thus, on  the one hand, these results may be interpreted as consistent with Fama (1991) who defines an efficient capital market as one in which traders reflect information in prices only to within the cost of attaining and trading on the information [i.e, informationally efficient].  On the other hand, if noise traders impact the risks of recall or short squeeze, and they certainly may, then market efficiency exists only in the sense that of the limits to arbitrage argument of Schelifer and Vishney (1997).[17]

---

[16] James Report, ¶28 and fn 42 at p. 15.

[17] Steven L. Jones and Glen Larsen, Jr., "The Information Content of Short Sales," in Handbook of Finance, Volume I, edited by Frank J. Fabozzi, John Wiley & Sons, (2008), at p. 160, emphasis added.

18.     Prof. James does not opine that Exide was the subject of a short squeeze during the Class Period.  Moreover, the authors clearly indicate that their results may be consistent with an informationally efficient market.

### d)  Hirshleifer, Lim and Teoh (2009)

19.     Prof. James also cites to the Hirshleifer, Lim and Teoh (2009) paper in support of his contention that "academic literature has found that investors can face constraints in processing information and that it can take relatively more time for them to process information that is more complex or technical in nature, as a result of which stock prices may not rapidly incorporate information that is complex to process or that requires expertise to understand."[18]

20.     The paper cited by Prof. James discusses "underreaction anomalies."  The authors' hypothesis holds that extraneous news distracts investors which can result in under reaction to earnings news and post-announcement return reaction.  This, the authors conclude, can provide exploitable arbitrage profit opportunities for investors.[19]

---

[18] James Report, ¶36 and fn 56 at p. 20.

[19] David Hirshleifer, Sonya Seongyeon, and Siew Hong Teoh, "Driven to Distraction: Extraneous Events and Underreaction to Earnings News," *The Journal of Finance*, vol. LXIV, no. 5, (October 2009), 2289-2325.