1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10

11   DAVID M. LORITZ, et al., individually    )   CASE NO. 2:13-cv-02607-SVW-E
12   and on behalf of others similarly situated, )
                                              )   ORDER GRANTING IN PART
13            Plaintiffs,                      )   PLAINTIFFS' MOTION FOR CLASS
                                              )   CERTIFICATION [93]
14            v.                              )
                                              )
15   EXIDE TECHNOLOGIES, et al.,              )
                                              )
16            Defendants.                     )
                                              )
17                                            )
                                              )
18   **I.      INTRODUCTION**

19          In this putative class action, Plaintiffs charge Exide Technologies, Inc. ("Exide") with

20   failing to disclose its battery recycling facility's noncompliance with environmental regulations

21   or its related financial liquidity issues.  Plaintiffs allege that Exide withheld or misrepresented

22   this information until shortly before the company announced its intention to file for bankruptcy.

23   Plaintiffs assert that Exide's misrepresentations or omissions polluted the market's information

24   channels, resulting in artificially inflated Exide securities prices.

25          On April 15, 2013, a class of investors in Exide securities ("Plaintiffs") filed suit against

26
27
28

1    Exide's corporate executives and members of the Board of Directors ("Defendants").[1]  In their

2    Second Amended Complaint ("SAC") Plaintiffs assert that Defendants made misleading

3    statements and omitted material information about Exide's lack of compliance with

4    environmental regulations and about Exide's worsening financial condition during the class

5    period—purportedly in violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange

6    Act") and (as to Exide's Notes) § 11 of the Securities Act of 1933 ("Securities Act").  Plaintiffs

7    also assert control person liability claims under § 20 of the Exchange Act and § 15 of the

8    Securities Act.

9         Presently before the Court is Plaintiffs' motion for class certification.  (Dkt. 93.)

10   Plaintiffs seek to certify a Class of all persons and entities, other than Defendants and their

11   affiliates, who purchased or otherwise acquired:

12        (a) Exide's common stock during the period June 1, 2011 through May 24,
         2013; and

13

14        (b) Exide's 8⅝ senior secured notes due in 2018, purchased between August
         8, 2011 and May 23, 2013, including persons or entities that purchased such
15       notes in the aftermarket pursuant and/or traceable to the Company's Form
         S-4/A Registration Statement effective August 12, 2011, and who were
16       damaged thereby.

17        For the reasons discussed below, the Court GRANTS IN PART Plaintiffs' motion and

     certifies a liability-only class as to their § 10(b) claim.
18

19   **II.    STATEMENT OF FACTS**

20        Exide is a public company that operates in 89 countries.  (SAC ¶ 2.)  Exide produces,

21   recycles, and distributes lead-acid batteries.  (*Id.*)  Exide's Vernon, California plant is one of

22   three battery recycling facilities that it operates worldwide.  (*Id.*)  Exide recycles batteries to

23   ─────────────────

24   [1]  Exide itself was voluntarily dismissed as a defendant on July 17, 2013, after the company filed
     for Chapter 11 bankruptcy.  (Dkt. 45.)  Plaintiffs specifically are (1) purchasers of Exide's
25   common stock between June 1, 2011 and May 24, 2013; (2) purchasers of Exide's 8⅝ senior
     secured notes due in 2018, traceable to Exide's Form S-4/A Registration Statement effective
26   August 12, 2011; and (3) purchasers of Exide's 8⅝ senior secured notes due in 2018, purchased
     between August 8, 2011 and May 23, 2013.  (Second Amended Consolidated Complaint ("SAC")
27   ¶¶ 25–27.)  Defendants are Exide's CEO, James R. Bolch; CFO, Phillip A. Damaska; Controller,
     Louis E. Martinez; and the following members of the board of directors: R. Paul Hirt, John P.
28   Reilly, Herbert F. Aspbury, Michael R. D'Appolonia, David S. Ferguson, John O'Higgins, and
     Dominic J. Pileggi.  (SAC ¶¶ 29–38.)

extract lead that it then uses to manufacture new batteries.  (*Id.*)  Exide relies on recycled batteries to keep its margins at maintainable levels.  (*Id.*)  The Vernon plant  recycles as much as 40,000 batteries per day, and produces approximately 120,000 tons of lead annually.  (*Id.*)

Plaintiffs allege that Exide's Vernon plant has a significant history of issues regarding compliance with environmental regulations, which progressively escalated until related financial issues lead the company to declare bankruptcy.  These environmental issues pertain to the Vernon plant's air emissions and stormwater piping system.

California's South Coast Air Quality Management District ("AQMD") and its Department of Toxic Substances Control ("DTSC") are among the agencies that regulate Exide's Vernon plant.  (SAC ¶¶ 3–4.)  In approximately 2009, DTSC and AQMD found lead deposits near the Vernon plant that were "well above" the required levels.  (SAC ¶ 65.)  This discovery allegedly led DTSC to order Exide to perform an emergency clean up and led DTSC and AQMD to increase their scrutiny of Exide's Vernon plant.  (*Id.*)

DTSC's scrutiny was allegedly further heightened in 2010, when Exide applied for a permanent operating permit for the Vernon plant.  (SAC ¶ 66.)  DTSC purportedly required Exide to submit a new Part B application for the permanent permit, which required Exide to submit numerous reports and assessments regarding the Vernon plant's current conditions, plans for cleaning up existing and future contaminants, pollution monitoring plans, and more.  (*Id.*)  Also in 2010, AQMD allegedly required Exide to prepare a new health risk assessment ("HRA") using new, more comprehensive testing protocols.  (SAC ¶ 87.)  These new testing results purportedly showed "extremely high" levels of arsenic, which were approximately 100 times higher than the 2008 results.  (SAC ¶ 88.)

On March 21, 2011, DTSC allegedly issued to the Vernon plant its First Notice of Deficiency for Exide's Part B application, citing *inter alia* groundwater contamination from releases at Exide.  (SAC ¶ 71.)

In June 2011, Exide reported the high arsenic tests to AQMD and allegedly asked for permission to re-conduct the test.  (SAC ¶ 89.)  In 2012, Exide repeated these tests, allegedly obtaining different but not materially improved results.  (SAC ¶ 92.)

3

In August 2012, DTSC presented Exide with a Second Notice of Deficiency for the Vernon plant's part B application, again citing "major deficiencies" in the Vernon plant's "groundwater monitoring and/or clean closure criteria."  (SAC ¶ 77.)  This notice also alerted Exide that a third notice of deficiency would be grounds for denying the permit.  (*Id.*)  An August 28, 2012 memorandum from DTSC to Exide identified hazardous levels of lead and zinc in the Vernon facility's stormwater pipes.  (SAC ¶ 78.)

In December 2012, Exide submitted an HRA containing the average of the 2010 and 2012 test results.  (SAC ¶ 95.)  In January and February of 2013, Exide purportedly held meetings with the regulatory agencies to discuss these results.  (*Id.*)

On March 1, 2013, AQMD allegedly approved the revised HRA, requested that Exide notify the public, and requested that Exide propose a risk reduction plan within 180 days.  (SAC ¶¶ 98–102.)

On March 5, 2013, Exide purportedly received an inspection report prepared for it by an independent investigator.  (SAC ¶ 79.)  The Inspection Report was purportedly not delivered to DTSC until eight months after the inspections were started.  (*Id.*)  This report allegedly included videos showing that some of the Vernon plant's drainage pipes were breached, and that the issues were serious enough to warrant a shut down.  (*Id.*)  The report further indicated that the Vernon plant's stormwater management piping needed to be removed and replaced.  (SAC ¶¶ 80, 82.)

On March 22, 2013, AQMD publicly cited the Vernon plant for its arsenic emissions.  (SAC ¶ 3.)  On April 3, 2013, the Los Angeles City Council held a public hearing on the matter, at which members of the Council urged the government to press charges against Exide.  (SAC ¶ 7.)  On April 4, the Los Angeles Times published an article about the hearing.  (SAC ¶¶ 7, 9.)

Also on April 4, 2013, *Debtwire.com* published a report that Exide had hired bankruptcy experts Lazard Ltd. and Akin Gump LLP to advise it on its financial restructuring after its prior efforts failed.  (SAC ¶ 8.)  Plaintiffs allege that the Los Angeles Times article and *Debtwire* report caused Exide's share price to drop by 46% on April 4, 2013.  (SAC ¶ 9.)

On April 24, 2013, DTSC ordered Exide to suspend operations at the Vernon plant

4

because its underground stormwater system and furnace emissions were not compliant with applicable requirements.  (SAC ¶ 10.)  The following day, Exide publicly announced its receipt of DTSC's order.  (*Id.*)  Plaintiffs allege that this news caused Exide's share prices to drop by 24% on April 25, 2013.  (SAC ¶ 11.)

On May 24, 2013, *Debtwire.com* reported that Exide was in talks to arrange a debtor in possession ("DIP") loan of around $200 million to fund Exide through bankruptcy proceedings.  (SAC ¶ 12.)  This news purportedly caused Exide's share prices to drop 42% on that same day.  (SAC ¶ 13.)

## III.    PROCEDURAL HISTORY

On April 15, 2013, Plaintiff David M. Loritz ("Loritz") instituted this action.  (Dkt. 1.)  On July 9, 2013, the Court consolidated Loritz's action with two other actions pending against Exide and others.  (Dkt. 44.)  The Court appointed plaintiffs James Casella ("Casella") and Sandra Weitsman ("Weitsman") as lead plaintiffs.  (*Id.*)  On September 9, 2013, lead plaintiffs Weitsman and Casella filed their consolidated complaint.  (Dkt. 50.)

On March 30, 2015, lead plaintiffs Weitsman and Casella, as well as plaintiffs James Close ("Close") and Kevin Grace ("Grace") filed the instant motion for class certification.  (Dkt. 93.)  On April 24, 2015, the parties filed a joint stipulation to amend the complaint.  (Dkt. 101.)  Pursuant to this stipulation, the Court accepted Plaintiffs' second amended consolidated complaint.  (Dkt. 103.)  In their SAC, Plaintiffs add Mitchell Abel ("Abel") and Steamfitters' Industry Security Benefit Fund ("Steamfitters").  Plaintiffs added Abel and Steamfitters to substitute for Grace, who is allegedly no longer able to represent the Note-holder class due to medical problems.  (Dkts. 101 & 103.)

## IV.    LEGAL STANDARD

A party seeking class certification must satisfy two requirements.  *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001).  First, the moving party must show that the proposed class meets four criteria: (1) the members of the proposed class must be so numerous that joinder of all claims would be impracticable ("numerosity"); (2) there must be questions of law and fact common to the class

("commonality"); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of absent class members ("typicality"); and (4) the representative parties must fairly and adequately protect the interests of the class ("adequacy").  Fed. R. Civ. P. 23(a).

Second, the moving party must demonstrate that the class fulfills the conditions of at least one of the three subdivisions of Rule 23(b).  A class seeking damages must satisfy Rule 23(b)(3).  To qualify for certification under subsection 23(b)(3), a class must satisfy two conditions: (1) common questions of law or fact must "predominate over any questions affecting only individual members," and (2) class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  The predominance requirement is satisfied where common questions comprise a significant portion of the case and can be resolved for all class members in one adjudication.  *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 576 (C.D. Cal. 2014).  Rule 23(b)(3)'s predominance requirement also requires the moving party to show that "damages are capable of measurement on a classwide basis."  *Comcast Corp. v. Behrend*, —— U.S. ——, 133 S. Ct. 1426, 1433 (2013).  Specifically, this requires plaintiffs to tie their method of proving damages to their theory of liability.[2]  *Id.*  "The party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met."  *Zinser*, 253 F.3d at 1186.

A party seeking to certify a class may not merely rest on his pleadings.  Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are ***in fact*** sufficiently numerous parties, common questions of law or fact, etc."  *Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 2551 (2011) (emphasis added).  Thus, a trial court is expected to engage in "rigorous analysis" to determine if the moving party has discharged its burden.  *Dukes*, 131 S. Ct. at 2551 (quoting *Falcon*, 457 U.S. at 161).  This analysis often "will entail some overlap with the merits of the

---

[2]  Nevertheless, class certification is not defeated solely by the requirement to engage in individualized damages calculations.  *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167-69 (9th Cir. 2014) *cert. denied*, No. 14-910, 2015 WL 355696 (U.S. June 15, 2015); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (allowing class certification where individualized damages could readily be calculated from computerized payroll records).

6

1  plaintiff's underlying claim." *Id.*

2  **V.      ANALYSIS**

3      **A.      Certification as to Only Some of Plaintiff's Claims**

4      As a preliminary matter, the Court notes that the parties' briefs fail to address each of

5  Plaintiffs' claims.  In particular, Plaintiffs' moving papers focus on their § 10(b) claim and

6  briefly address their § 11 claim.  Defendants' opposition addresses only the § 10(b) claim.  No

7  party addresses the control person claims under § 15 of the Securities Act or under § 20 of the

8  Exchange Act.  The Court therefore only addresses class certification as to Plaintiffs' § 10(b) and

9  § 11 claims.

10      **B.      Numerosity**

11      The Court FINDS that Plaintiffs readily satisfy the numerosity requirement.  They

12  present unrefuted evidence showing that during the class period, Exide had between 77.6 million

13  and 79.3 million shares outstanding and that the average weekly trading volume was 4.9 million

14  shares.  (Torchio Rep. ¶ 49.)  They further submit evidence that as of May 16, 2013, Exide had

15  over 79 million shares of common stock outstanding, with approximately 4,216 recorded stock

16  holders.  (Federman Decl., Ex. B.)  Plaintiffs also submit evidence indicating that there were 88

17  institutional investors that owned Exide Notes during the class period.  (Torchio Rep**.** ¶ 202.)

18  Moreover, Defendants do not dispute that Plaintiffs' proposed classes satisfy the numerosity

19  requirement.

20      **C.      Commonality**

21      Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Rule

22  23(a)(2).  While all questions of law or fact need not be common, the putative class's claims

23  must depend on a common contention capable of classwide resolution—meaning that

24  "determination of its truth or falsity will resolve an issue that is central to the validity of each

25  one of the claims in one stroke."  *In re ConAgra Foods, Inc.*, 2014 WL 4104405, at *23 (quoting

26  *Dukes*, 131 S. Ct. at 2551).  The commonality requirement is less stringent than the Rule

27  23(b)(3) predominance requirement.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.

28  1998).  Several courts have found that a single issue common to the proposed class satisfies Rul

23(a)(2).  *In re THQ, Inc. Sec. Litig.*, No. CV 00-1783AHM(EX), 2002 WL 1832145, at *3

(C.D. Cal. Mar. 22, 2002) (citing *Haley v. Medtronic*, 169 F.R.D. 643, 648 (C.D. Cal.1996); *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1080 (6th Cir.1996)).

Here, Plaintiffs allege that common questions of law and fact include, *inter alia*: (1) whether public statements, including Exide's SEC filings, Registration Statement, and press releases made by Defendants during the class period contained material misrepresentations or omissions; and (2) whether Defendants acted with the requisite state of mind in misrepresenting material facts.  Additionally, Defendants do not dispute that Plaintiffs meet this requirement. For the aforementioned reasons, the Court FINDS that Plaintiffs meet the 23(a)(2) commonality requirement.  *Id.* (holding that Plaintiffs satisfied commonality requirement where Plaintiffs alleged a "common course of conduct" involving defendants' alleged misrepresentations of company's projected earnings).

**D.    Typicality**

**1.    Legal Standard**

Rule 23(a)(3) requires a showing that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Rule 23(a)(3).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).  Typicality requires that "the representative's claims are reasonably co-extensive with those of the absent class members; they need not be substantially identical." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 502 (S.D. Cal. 2013) (quoting *Hanlon*,  150 F.3d at 1020).  A named plaintiff's claim is atypical where he is "subject to unique defenses which threaten to become the focus of litigation."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990)).

**2.    Application**

**a.    Weitsman, Close, and Cassella**

Plaintiffs assert that Weitsman, Close, and Cassella have claims typical of the stockholder class because they each purchased shares of Exide common stock ("Exide Stock") during the class period and each seek to recover damages for losses caused by the same allegedly false and misleading statements.  Defendants argue that class certification is improper because Weitsman, Close, and Cassella each used an investment strategy that subjects them to the unique defense of nonreliance.

Weitsman testified that she chose to invest in Exide because she knew "that the company was well known" and "thought it was a good investment, financially stable."  (Volz Decl., Ex. 2, at 36:16–19.)  She further testified that she's "seen Exide truck go by all of the time, that [she] thought [she] had some money to invest, and [she] thought that would be a stable company to invest the money that [she] had into."  (*Id.* at 36:19–22.)  Finally, she testified that although she believes some investments are riskier than others, she does not evaluate an investment's risk before making it.  (*Id.* at 40:14–19.)

Close testified that "[i]f it's an area or technology that [he is] particularly interested in, that would be generally the first criteria" in his general investment strategy.  (Volz Decl., Ex. 1, 96:7–12.)  If a company passes this criteria, then Close will investigate the company further.  (*Id.* at 96:15–22; 99:1–5.)  He also testified that it is important to him that a company is a publicly traded company regulated by the SEC.  (*Id.* at 97:14–23.)  Specifically as to Exide, Close testified that he first learned of Exide in blogger John Petersen's articles in "Seeking Alpha."  (*Id.* at 99:6–11.)  According to Close, the overall thrust of Petersen's analysis was that Exide was a safe investment.  (*Id.* at 99:12-24.)

Cassella testified that he generally relies "first and above all" on "the management of the company and the integrity of that management; second, what the company looks like from a growth standpoint, what industry they're in, what's their performance."  (Volz Decl., Ex. 3, at 47:12–20.)

Defendants' argument regarding typicality is inapt.  First, the defense of nonreliance is not itself a basis for denial of class certification.  *Hanon*, 976 F.2d at 509.  Second, no Plaintiff testified that he or she did not rely on the integrity of the market for Exide's securities.  Third,

Defendants' argument ignores the Supreme Court's recognition that "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity." *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988) (quoting *Schlanger v. Four–Phase Systems Inc.*, 555 F. Supp. 535, 538 (SDNY 1982). Courts therefore typically presume reliance in securities fraud cases. *Id.* at 245–46. Here, evidence that Plaintiffs relied on their own interpretation of publicly available data (such as Exide's reputation, information about management, or published articles) in choosing to invest in Exide securities is insufficient to rebut the presumption of reliance. *See In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 252–53 (N.D. Cal. 2013) (finding plaintiff typical where plaintiff relied on its investment advisor, which relied on its own "research and review of publicly available information); *see also In re THQ, Inc. Sec. Litig.*, 2002 WL 1832145, at *4 ("The fact that a purchaser . . . considered a number of other factors in making his decision to purchase does not render him subject to a unique defense, so long as he substantially or significantly relied upon either the challenged statements or the integrity of the market.") (quoting *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 195 (S.D.N.Y.1985)). Moreover, the fact that Weitsman did not independently evaluate Exide securities' risk before investing in Exide has no bearing on whether she relied on Exide's securities' prices as an accurate and adequate expression of its value.

Additionally, the cases finding a named plaintiff's claims atypical because he is subject to the defense of nonreliance are readily distinguishable. For example, in *Hanon*, the named Plaintiff's reliance would have been "subject to serious dispute as a result of his extensive experience in prior securities litigation, his relationship with his lawyers, his practice of buying a minimal number shares of stock in various companies, and his uneconomical purchase of only ten shares of stock in Dataproducts." *Hanon*, 976 F.2d at 508. Also distinguishable is *Kline v. Wolf*, 88 F.R.D. 696 (S.D.N.Y. 1981). In that case there was evidence that the allegedly misleading report was not released until after the named plaintiff's security purchase and that (contrary to his representation) his broker never sent him the report at issue. *Id.* at 698–99.

For the aforementioned reasons, the Court finds the claims of Weitsman, Close, and Cassella typical of the Stockholder class.

10

1

**b.       Steamfitters and Abel**

2      Plaintiffs assert that Steamfitters and Able are typical of the Note-holder class because

3   they seek to recover for losses caused by the same allegedly false and misleading statements and

4   because they each purchased Exide's $8^{5/8}$ senior secured notes during the class period.

5   Defendants argue that Abel's claim is inadequate because his largest acquisition of the Notes at

6   issue occurred after the final corrective disclosure and after Exide filed for bankruptcy.  (Pls.'

7   Supp. Mem. P. & A., Ex. A.)  Defendants apparently do not contest that Steamfitters satisfies the

8   typicality requirement.

9      Plaintiffs respond that the purchase of securities following full disclosure is "essentially

10   irrelevant" to a plaintiff's reliance.  In support of their argument, Plaintiffs cite cases indicating

11   that the purchase of securities after a corrective disclosure is not a per se bar to finding

12   typicality.  *See, e.g., In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 577 (N.D. Cal. 2009)

13   ("Accordingly, the Court finds that lead plaintiff's post-disclosure purchases do not

14   automatically defeat typicality.").  However, Plaintiffs fail to cite to any case holding that a

15   named plaintiff's purchase of debt securities after the issuing company declares bankruptcy does

16   not render the plaintiff's claim atypical.  Nor do Plaintiffs proffer any evidence indicating that

17   Abel's claim is typical notwithstanding his substantial post-disclosure and post-bankruptcy

18   purchase.

19      Plaintiffs have the burden of proving that Abel's claim is typical of the class.  For the

20   aforementioned reasons, the Court FINDS that Plaintiffs fail to carry their burden with respect to

21   Abel.  In contrast, the Court FINDS that Steamfitters' claim is typical of the Note-holder class.

22      **E.       Adequacy**

23         **1.       Legal Standard**

24      The named parties must "fairly and adequately protect the interests of the class."  Rule

25   23(a)(4).  This requirement looks to whether the named plaintiffs and their counsel have any

26   conflicts of interest and whether they will prosecute the action vigorously on behalf of the class.

27   *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

28      While the "law leans somewhat against disqualifying individual investors on adequacy

1   grounds[,] . . . the adequacy requirement must make some demand of the representative party----

2   not just the party's counsel—even if that representative is an individual." *In re Countrywide*

3   *Fin. Corp. Sec. Litig.,* 273 F.R.D. 586, 606 (C.D. Cal. 2009). Thus, "the cases recognize that a

4   class representative must himself have independent significance and cannot entirely abdicate his

5   responsibilities to counsel." *Id.* (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222

6   F.3d 52, at 61 (2d Cir. 2000)). However, "the threshold for sufficient knowledge [of the case] is

7   not high." *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 120 (C.D. Cal. 2007)**.** "All that is

8   necessary is a 'rudimentary understanding of the present action and . . . a demonstrated

9   willingness to assist counsel in the prosecution of the litigation.'" *Id.* (citing *Thomas & Thomas*

10   *Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 165 (C.D. Cal.

11   2002)). The requisite degree of knowledge is lowered in cases involving complicated legal

12   issues. *Id.*

### 2.   Application

#### a.   Named Plaintiffs

15   Plaintiffs assert that they will adequately represent the absent members of the proposed

16   classes because they do not have any conflicts of interest with the class members and because

17   they were injured by the same alleged misrepresentations and omissions as the other class

18   members.[3] Plaintiffs further assert that they are adequate because they will vigorously pursue

19   this action on class members' behalf. In support of this assertion, Plaintiffs submit their

20   attestations that they are willing to fulfill the duties of class representatives. They also assert that

21   they have shown they are adequate by conducting an extensive investigation into Defendants'

22   alleged fraud, defeating Defendants' motion to dismiss, and aggressively pursuing discovery.

23   Defendants assert that Plaintiffs are inadequate because they have entirely abdicated their

24   responsibility to their attorneys and because they lack basic knowledge of the case. Defendants'

25   argument fails. First, the fact that Steamfitters and Abel had no involvement in various strategic

26   decisions made and documents drafted before they joined this action is irrelevant to their

27   adequacy. If a plaintiff was rendered inadequate for failing to participate in aspects of the

28   ─────────────

[3] Plaintiffs concede that Grace is an inadequate representative in light of his medical issues.

litigation that predated his involvement in the case, then no plaintiff who joined an action after the filing of the initial complaint would ever be an adequate class representative.  More importantly, Plaintiffs submit evidence that each of the named Plaintiffs has a general familiarity with the theory of the case, who is being sued, and their role as class representative.[4]  Additionally, Plaintiffs submit evidence that they have reviewed documents, cooperated with discovery by producing documents and sitting for deposition, and have remained informed about the litigation by receiving emails from their counsel.[5]

Plaintiffs sufficiently show their adequacy.  *See Ortega v. Natural Balance, Inc.*, 300 F.R.D. 422, 427-28 (C.D. Cal. 2014) (finding plaintiffs adequate where they were willing to testify at trial, appeared for depositions, and communicated with counsel); *Hernandez v. Midland Credit Mgmt., Inc.*, 236 F.R.D. 406, 414 (N.D. Ill. 2006) (finding named plaintiff adequate even though "class counsel necessarily is the driving force behind some of the more complicated legal theories"); *see also In re THQ, Inc. Sec. Litig.*, 2002 WL 1832145, at *6 (C.D. Cal. Mar. 22, 2002) (quoting *In re Frontier Ins. Group Sec. Litig.*, 172 F.R.D. 31, 46 (E.D.N.Y. 1997)) (stating that courts finding a plaintiff inadequate because of his unfamiliarity with the suit "have only done so in flagrant cases, where the [plaintiffs] . . . display 'an alarming unfamiliarity with the suit'").

Plaintiffs' purported shortcomings do not rise to the flagrant level required to render them inadequate.  Defendants assert that: (1) none of the named plaintiffs met or communicated directly with each other; (2) Plaintiffs' only communications consist of receiving emails sent by their attorneys; (3) they gave no input on the selection of experts; (4) Weitsman never discussed strategy with counsel; (5) Close, Weitsman, Cassella, and Steamfitters admitted that they gave no input on the drafting of Plaintiffs' initial disclosures; (6) Close gave no input on any filing

---

[4]  *See, e.g.*, (Federman Supp. Decl., Ex. 1, at 17:17–20:14; Federman Supp. Decl., Ex. 2, at 71:16–75:23; Federman Supp. Decl., Ex. 3, at 12:8–14:11; Federman Supp. Decl., Ex. 4, at 18:13–19:17, 26:12–27:15; Federman Supp. Decl., Ex. 5, 8:6–17; Volz Decl., Ex. 5, at 70:14–71:24.)

[5]  *See, e.g.*, (Federman Supp. Decl., Ex. 1, at 18:21–19:15, 24:16–27:9, 33:19–36:4; Federman Supp. Decl., Ex. 2, at 82:15–87:11, 140:2–145:16; Federman Supp. Decl., Ex. 3, at 20:11–23:24, 30:2–31:25; Federman Supp. Decl., Ex. 4, at 6:2–19, 20:8–23:23, 65:1–25; Federman Supp. Decl., Ex. 5, at 8:18–9:24, 47:15–50:17.)

other than discovery responses; (7) neither Close, Cassella, nor Weistman negotiated or knows

of their counsel's fees; (8) neither Close, Abel, nor Steamfitters identified misrepresentations

regarding Exide's liquidity as a basis for the suit; (9) neither Cassella nor Weitsman knew how

many motions to dismiss that had been filed; and (10) Weitsman didn't know the exact dates of

the class period, the precise date the complaint was filed, or whether Plaintiffs were then briefing

a motion for class certification.  These purported shortcomings are readily distinguishable from

those that have led courts to find proposed class representatives inadequate.

For example, in *Umsted v. Intelect Commc'ns, Inc.*, No. CIV.A. 3:99-CV-2604-, 2003

WL 79750,(N.D. Tex. Jan. 7, 2003), the court found a plaintiff inadequate where he: did not

know lead plaintiffs' counsel's names, hadn't inquired into lead counsel's qualifications, hadn't

inquired into litigation costs or expenses, had never spoke with his co-lead plaintiff, did not

know the names of others who had served as lead plaintiffs, hadn't met lead plaintiffs' counsel

prior to the morning of his deposition, couldn't recall commenting on any draft pleading,

couldn't name any cause of action asserted, couldn't reference any of the defendant's specific

misrepresentations or omissions, and had a complete lack of knowledge regarding multiple

significant procedural developments in the case.  *Id.* at *2–3; *see also In re Quarterdeck Office

Sys., Inc. Sec. Litig.*, No. CV 92-3970-DWW(GHKX), 1993 WL 623310, at *6 (C.D. Cal. Sept.

30, 1993) (finding named plaintiffs inadequate where "[n]either [named plaintiff] had any

participation in the decision to drop certain defendants or whether the class received any

consideration from the dropped defendants . . . . Neither seemed to even care . . . [and] neither

plaintiff named current co-lead counsel, Milberg, Weiss, as their counsel").

For the aforementioned reasons, the Court FINDS that Plaintiffs are adequate class

representatives.

### b.    Proposed Class Counsel

Plaintiffs seek to have Federman & Sherwood appointed as class counsel.  Plaintiffs

submit Federman & Sherwood's firm resume, which indicates that the firm has extensive

experience litigating securities class actions in federal court.  (Federman Decl., Ex. G.)

Additionally, lead attorney William B. Federman was first admitted to practice law in 1983, has

14

1    practiced before numerous courts, and has given numerous lectures regarding securities litigation

2    and class actions.  (*Id.*)  Moreover, Defendants do not contest proposed class counsel's

3    adequacy.  For the aforementioned reasons, the Court FINDS proposed lead class counsel

4    Federman & Sherwood adequate.

5         **F.    Predominance**

6         Both the Stockholder and Note-holder proposed classes seek damages.  As such, each

7    class must satisfy Rule 23(b)(3)'s predominance requirement.  With respect to their § 10(b)

8    claims, Plaintiffs assert that common questions predominate because either: (1) they can rely on

9    the fraud-on-the-market presumption to show classwide reliance or (2) because they are entitled

10   to a classwide presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406

11   U.S. 128 (1972).[6]

12            **1.    Fraud on the Marketplace**

13               **a.    Legal Standard**

14       Under the fraud-on-the-marketplace theory, a securities fraud plaintiff can satisfy the

15   reliance element of a Rule 10b-5 action by showing: "(1) that the alleged misrepresentations

16   were publicly known, (2) that they were material, (3) that the [security] traded in an efficient

17   market, and (4) that the plaintiff traded the [security]  between the time the misrepresentations

18   were made and when the truth was revealed."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134

19   S. Ct. 2398, 2408 (2014) (*Halliburton II*).  "The majority of courts in this circuit agree that, for

20   purposes of the fraud-on-the-market theory, market 'efficiency' means that prices will 'reflect all

21   relevant information,' a definition of efficiency known as informational efficiency."  *In re*

22   *Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 247 (N.D. Cal. 2013).

23       The Ninth Circuit has not articulated a specific test to determine market efficiency.

24   Instead, the Ninth Circuit looks to the nonexclusive factors set out in *Cammer v. Bloom*, 711

25   ─────────────────

26   [6]  Plaintiffs assert that they are not required to prove reliance for purposes of their § 11 claim.  *See*
     *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859-60 (9th Cir. 2013) *cert. denied sub nom.*

27   *Moores v. Hildes*, 135 S. Ct. 46 (2014).  However, this is true only for investors who have
     purchased a security within twelve months of the registration statement.  *Id.*  Plaintiffs fail to even

28   address this issue, let alone to show that none of the members of the proposed Noteholder class,
     which spans nearly two years, will be required to present individualized proof of reliance.  The
     Court therefore DENIES Plaintiffs' motion to certify a class as to their § 11 claim.

F.Supp. 1264, 1285–87 (D.N.J.1989).  *In re Diamond Foods*, 295 F.R.D. at 247.  These factors are: (1) trading volume of the security during the relevant period; (2) analysts following the issuer; (3) the issuer's eligibility to file SEC Form S-3; (4) arbitrageurs and market-makers; and (5) empirical evidence suggesting a causal connection between new information and price movements.  *In re Countrywide Fin. Corp. Sec. Litig.,* 273 F.R.D. 586, 613–14 (C.D. Cal. 2009).  The fifth *Cammer* factor—causation—is the most important.  *Id.* at 614 (citing *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 268 (D. Mass. 2006)).

### b.  Application

#### (1)  Exide's Common Stock

Most of the argument regarding predominance concerns the adequacy of Plaintiffs' proof that the markets for Exide's Stock and Notes were efficient during the relevant class period.  In support of their motion, Plaintiffs offer the expert report of Frank C. Torchio ("Torchio").[7] Torchio bases his analysis largely on the five *Cammer* factors.

#### (a)  Trading Volume

During the class period, Exide Stock was traded on the NASDAQ Global Select Market—which has the most stringent listing requirements of NASDAQ's three tiers.  (Torchio Rep. ¶¶ 49, 70.)  Courts have found a stock's listing on NASDAQ to be a good indicator of efficiency.  *Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 573 (C.D. Cal. 2012); *see also In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 208 (E.D. Pa. 2008) *aff'd sub nom. In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011) (internal citations omitted) ("While Defendants are correct that trading on a national exchange is not a per se indicator of market efficiency, the fact remains that neither Defendants nor this Court have been able to locate a single case where the market for a NYSE-traded security was deemed inefficient.").

Torchio examines Exide's weekly trading volume and liquidity.  Exide Stock's average weekly trading volume during the class period was 4.9 million shares.  (*Id.* ¶ 67.)  Its average

---

[7]  Torchio has a B.A. in math and an M.B.A.. (Torchio Rep., Ex. 1.)  He is a CFA and is a part-time faculty member at the Simon Business School.  (*Id.*)  He has given expert opinions in numerous securities cases, including cases litigated in federal district courts.  (*Id.*)  The Court accordingly finds Torchio qualified to render the opinions expressed in his reports.

1    weekly trading volume as a percentage of outstanding shares during the class period was 6.2

2    percent.  (*Id.*)  This is higher than the two percent turnover rate that *Cammer* suggested would

3    justify a strong presumption of market efficiency.  *Cammer*, 711 F. Supp. 1286; *see also In re*

4    *Diamond Foods*, 295 F.R.D. at 247–48.  As further proof of efficiency, Torchio compares Exide

5    Stocks's share turnover during the class period to the turnover of stocks listed on NASDAQ (the

6    "NASDAQ Benchmark").  (Torchio Rep. ¶¶ 6, 68.)  He finds that Exide's share turnover was in

7    the 77th percentile of these stocks.  (*Id.* ¶ 69.)

8         For the aforementioned reasons, the Court FINDS that this factor favors finding that

9    Exide's common stock traded on an efficient market.

10                           (b)    Analyst Interest

11        The existence of securities analysts following Exide's Stock during the class period

12   implies that the market rapidly and fully incorporates information into the stock price because

13   analyst reports would likely be closely reviewed by investment professionals.  *In re*

14   *Countrywide*, 273 F.R.D. at 613.  Between 4 and 10 analysts (8 on average) provided

15   buy/sell/hold recommendations for Exide's Stock during the class period.  (*Id.* ¶ 85.)  During the

16   class period, 70 analyst reports were issued for Exide stock, including by such firms as Deutsche

17   Bank, Macquarie Research, Piper Jaffray, and Wedbush securities.  (Torchio Rep. ¶ 5.)  Torchio

18   finds that, on average, Exide's analyst coverage was in the 57th percentile of stocks in his

19   NASDAQ benchmark.  (*Id.* at ¶ 87.)

20        The Court FINDS that this factor favors market efficiency.  *See In re Turbodyne*

21   *Technologies, Inc. Sec. Litig.*, No. CV9900697MMMBQRX, 2000 WL 33961193, at *14 (C.D.

22   Cal. Mar. 15, 2000) (finding the second *Cammer* factor satisfied where the plaintiff alleged that

23   during the class period at least three analysts followed and reported on the defendant's stock).

24                           (c)    SEC Form S-3 Eligibility

25        SEX Form S-3 eligibility is probative of market efficiency because eligibility to use this

26   abbreviated disclosure form is based on the assumption that the market has sufficient information

27   about the issuer.  *In re Countrywide*, 273 F.R.D. at 613.  An issuer may use Form S-3 "when (1)

28   the public market values the issuer's securities at a high price (that is, the 'public float' is

                                        17

1 sufficiently large); and (2) the issuer has been publicly disclosing information by making

2 periodic reports to the SEC for at least twelve consecutive months." *Id.*

3        Torchio finds that during the class period, Exide's public float was generally above the

4 $75 million threshold required for Form S-3 eligibility. *See SEC Form S-3*, *available at*

5 https://www.sec.gov/about/forms/forms-3.pdf. According to Torchio, Exide's public float was

6 below the $75 million threshold requirement on only 20 out of 499 trading days (4%) during the

7 class period—and these days were all after the first alleged partial corrective disclosure .

8 (Torchio Rep. ¶ 94.) Thus, Torchio asserts that Exide was eligible to file Form S-3 for all but the

9 tail end of the class period. (*Id.*)

10        For the aforementioned reasons, the Court FINDS that this factor favors market

11 efficiency as to the 96% of trading days during which Exide was eligible to file SEC Form S-3.

12 *See In re Diamond Foods*, 295 F.R.D. at 248.

13 (d)     Market Makers

14        Torchio also states that during the class period, the number of NASDAQ market makers

15 for Exide common stock ranged from 44 to 58, with an average of 53. (Torchio Rep. ¶ 74.)[8]

16 While this factor is less important for a stock traded on NASDAQ than for an over-the-counter

17 stock, it nonetheless favors a finding of market efficiency. *See Cammer*, 711 F. Supp at 1283

18 n.30, 1286–87.

19 (e)     Empirical Evidence Suggesting a Causal

20 Relationship

21        Finally, and most importantly, Torchio examines the causal relationship between price

22 changes and new information. Torchio's analysis of this relationship relies primarily on two

23

24 [8]  The Court notes that Torchio looked to other factors, such as Exide common stock's market

25 capitalization and the correlation between stock price changes and trading volume. (Torchio Rep. ¶¶ 90, 92, 95–98.) Some of these factors were derived from *Krogman v. Sterritt*, 202 F.R.D. 467

26 (N.D. Tex. 2001), which has not been as widely used as *Cammer.* Moreover, Defendants dispute the propriety of considering some of these factors. Regardless, the Court finds that these

27 additional factors would not change its conclusions and accordingly confines its analysis to the *Cammer* factors. For the same reasons, the Court declines to reach the propriety of Torchio's

28 comparisons between Exide's common stock and an index of twenty-seven stocks that he created.

studies: his event study of news v. non-news days (the "news v. non-news study") and his "reverse-event" study.

### i)   Torchio's Models

Torchio begins by creating a market model which describes the "normal relation" between a stock's return,[9] the return on a "broad-based market index,"—here the S&P 500 Total Return Index—and an industry index.  (Torchio Rep., App. B., at ¶¶ 3, 13.)  He does this by regressing Exide Stock's return on a market return index and on an industry return index.[10] (Torchio Rep. ¶¶ 128–130; Torchio Rep., App. B.)  Based on this regression, Torchio finds statistically significant correlations between: (1) Exide Stock's return and market return, and (2) Exide Stock's return and the industry index's return.  Torchio thus opines that Exide's common stock price reacts to new market and industry information over the class period.  (Id. at ¶ 129.)

From this market model regression, Torchio computes daily predicted returns for Exide's Stock.  (Id., App. B, at ¶ 15.)  He then subtracts the predicted return from the actual return on each day to compute Exide Stock's daily excess return.  (Id.)  A security's excess return (also known as its abnormal return) is the component of the security's return that cannot be explained by overall market or industry movements.  (Id., App. B., at ¶ 4.)  Torchio then uses this daily excess return to examine the existence of a causal relationship between changes in Exide's Stock price and new information.

"The most common empirical test for a causal connection is an event study, which attempts to calculate the effect of an event on the value of the stock of a company."  In re Diamond Foods, 295 F.R.D. at 248.  To conduct his event study, Torchio first defines what events will qualify as "news."  To avoid making subjective decisions based on his own valuation of news events, he defines news as: (1) Exide-issued press releases, and (2) Exide disclosures of financial results.  (Torchio Rep. ¶ 135.)  He then separately analyzes the effects of these news events on Exide Stock's returns—looking specifically to stock price reactions on the same

---

[9]  A security's return is the day-to-day percentage change in its price.  (Torchio Rep., Ex. B, at ¶ 3.)

[10]  The industry return index is adjusted to be net of market effects.  (Torchio Rep., Ex. B, at ¶ 14.)

trading day as the news item (if it was issued before the market closed) or looking to the stock price reaction on the following trading day (if it was issued after the market closed). (*Id.* at ¶¶ 137, 139–44.)

Torchio identifies 25 trading days during the class period on which Exide issued press releases. (*Id.* at ¶ 140.) Of these 25 news days, 9 days (36%) were accompanied by "statistically significant stock-price movements." (*Id.*) Conversely, only 13 of the 474 non-news days (3%) had "statistically significant excess returns." (*Id.*) According to Torchio, the difference between these percentages (which he finds is 33.3%) is statistically significant. (*Id.*; *Id.* at Ex. 8)

Torchio finds that during the class period there were 8 trading days on which Exide disclosed financial results (earnings). (*Id.* at ¶ 142.) Of these 8 news days, 7 days (88%) were accompanied by statistically significant stock-price movements. (*Id.*) Conversely, of the 491 non-news days, only 15 (3%) were statistically significant. (*Id.*) According to Torchio, the difference between these proportions (which he finds is 84.4%) is statistically significant. (*Id.*; *Id.* at Ex. 8.)

Torchio also examines the volatility of Exide Stock's excess returns on Exide earnings-announcement days compared to non-earnings days. (*Id.* at ¶ 143–144.) According to Torchio, if days on which a company announces its earnings, on average, "provide more value-relevant information than other days . . . then this implies that stock returns in large samples should be more volatile for earnings days than for other days." (*Id.* at ¶ 143.) He finds that the variance of excess returns on the 8 earnings days was 9 times as large as the variance on non-earnings days—a difference which he found was statistically significant. (*Id.* at ¶ 145.) In sum, Torchio opines that his news v. non-news study shows that, on average, Exide Stock's price reacted to information contained on news days. (*Id.* at ¶ 146.)

Torchio's reverse event study examines the existence of a causal effect between Exide Stock's returns and economic news by examining days in the class period for which the excess stock returns were statistically significant. (*Id.* at ¶ 147.) Torchio finds 22 days during the class period for which there were statistically significant excess returns. (*Id.* at ¶ 155.) On 13 of these 22 days (59%), Torchio found news items that might be driving the significant price movements.

1    (*Id.*) According to Torchio, this result supports a finding that Exide's common stock was traded

2    on an efficient market.  (*Id.* at ¶ 156.)

3         Finally, Torchio analyzes whether Exide's common stock returns exhibit

4    autocorrelation—meaning that "tomorrow's stock price movement can be systematically

5    predicted with a degree of statistical confidence based solely on the price movement today." (*Id.*

6    at ¶ 159.)  The presence of autocorrelation is indicative of inefficiency.  (*Id.*)  To test for

7    autocorrelation, Torchio regresses Exide Stock's daily returns on the return from the previous

8    day over the duration of the class period.  (*Id.* at ¶ 161.)  Torchio also regresses Exide Stock's

9    daily excess returns on the excess return from the previous day for the class period.  (*Id.*)

10   Torchio found no statistically significant autocorrelation for Exide Stock's raw returns or for its

11   excess returns.  (*Id.*)

12                    *ii)      Analysis of Torchio's Models*

13        Defendants object to each of Torchio's causation studies.  Defendants offer Professor

14   Christopher M. James's ("James") expert report to rebut Torchio's findings.[11]  James opines that

15   neither Torchio's news v. non-news study nor his reverse-event study is a generally accepted

16   scientific technique for establishing market efficiency.  (James Rep. ¶ 31.)  According to James,

17   the news v. non-news study may be capable of demonstrating market inefficiency, but it is not

18   sufficient to prove market efficiency.  (*Id.* at ¶ 33.)  Even if James is correct that this study is not

19   alone sufficient to prove market efficiency, it is still capable of showing that a stock's price

20   behaves in a manner consistent with market efficiency.  Moreover, this study is offered alongside

21   several other causation studies and with evidence that each of the other *Cammer* factors is

22   satisfied.

23        James also opines that Torchio's news v. non-news test is deficient because it fails to test

24   whether price responses to new value-relevant information are in the expected direction—i.e. the

25

26   _____

     [11]  James possess a B.A., an M.B.A. with a focus in finance, and a Ph.D. in economics.  (James

27   Rep., Ex 1.)  From 1989 to present day he has been a William H. Dial/SunTrust Eminent Scholar
     in Finance at the University of Florida.  (*Id.*)  He has numerous publications relating to finance.

28   (*Id.*)  He has also given expert opinions in numerous securities litigation cases, including cases in
     federal district courts.  (James Rep., Ex. 2.)  The Court thus FINDS James qualified to render the
     opinions expressed in his report.

1    test yields the same conclusion regardless of whether the stock price rises or falls in response to

2    a piece of information.  (*Id.* at ¶ 34.)  In support of this argument, James points to two days on

3    which there were negative quarterly earnings-per-share ("EPS") surprises and positive quarterly

4    revenue surprises; however, one was followed by a negative stock price movement and another

5    was followed by a positive stock price movement.  (*Id.*)  James also objects that Torchio's

6    analysis shows that the largest negative quarterly EPS surprise (on August 3, 2012) was not

7    followed by any significant stock price movement.  (*Id.*)

8        Torchio responds that adopting an *ex ante* expectation of direction would improperly

9    inject a measure of subjectivity into the model.  Moreover, he opines that stock prices may move

10   in the opposite direction from what is expected because of other information released

11   simultaneously that causes investors to have an opposite valuation of the examined news event

12   than what would be expected.  (Torchio Supp. Rep. ¶ 108.)  Torchio cites a 2002 article

13   published in the Journal of Accounting Research in support of this argument.[12]  (*Id.*)  Torchio

14   also points out that on the two dates that James cites—August 5, 2011 and June 8, 2012—the

15   news was neither unambiguously positive or negative because there was both a positive and a

16   negative surprise disclosed.  (Torchio Supp. Rep. ¶¶ 111—12.)  Thus, "there was confounding

17   news on each of these days and the resulting stock price movements are a reflection of the

18   market's consensus assessment of the information disclosed on each of those days."  (Torchio

19   Supp. Rep. ¶ 112.)  In response to James's criticism surrounding the August 3, 2012 earnings

20   surprise, Torchio asserts that the relevant earnings disclosure occurred after the close of trading

21   on August 2, 2012—after which the stock price declined in after-hours trading.  (Torchio Supp.

22   Rep. ¶ 113.)  However, starting at 9:00 a.m. on August 3, 2012, Exide held a conference call

23   during which it shared positive information.  (*Id.*)  Torchio asserts that this announcement was a

24   piece of confounding information that caused Exide Stock's price to recover from its earlier

25   decline following the negative earnings surprise.  (*Id.*)

26       The Court finds Torchio's analysis persuasive.  Torchio selected the events to be

27

28   _____
     [12]  William Kinney, David Burgstahler, and Roger Martin, *Earnings Surprise "Materiality" as Measured by Stock Returns*, 40 J. Acct. Res. 1297 (2002).

1  included in his event study using objective criteria determined before looking at the results. *See*

2  *In re Countrywide*, 273 F.R.D. at 618.  It was also proper for him to avoid engaging in subjective

3  *ex ante* evaluations of the studied events.  *See id.*  Moreover, other courts have considered and

4  rejected James's argument that a proper event study should examine whether stock prices move

5  in the direction expected based on an *ex ante* evaluation of the news event at issue.

6      In *In re PolyMedica Corporation Securities Litigation*, 432 F.3d 1 (1st Cir. 2005), the

7  Court considered what it means for a stock's price to "fully reflect" all publicly available

8  information.  *Id.* at 14.  The Court distinguished informational efficiency from fundamental

9  efficiency.  Informational efficiency means that a stock's price "fully reflects" all publicly

10  available information when "prices respond so quickly to new information that it is impossible

11  for traders to make trading profits on the basis of that information" *Id.* (internal quotations and

12  citation omitted).  In contrast, fundamental efficiency means that a stock's price "fully reflects"

13  all publicly available information when "it responds to information not only quickly *but*

14  *accurately*"—i.e. in the correct direction.  *Id.* (internal quotations and citation omitted).  The

15  First Circuit found that in order to show an efficient market for purposes of the fraud-on-the-

16  market presumption, a plaintiff need only show informational efficiency.  *Id.* at 16–17.  The

17  Court adopted this approach in part because courts that require a showing of fundamental

18  efficiency risk turning the class-certification proceeding into a mini-trial.  *Id.*; *see also In re*

19  *Countrywide*, 273 F.R.D. 586, at 610–11 (finding *PolyMedica* consistent with Ninth Circuit

20  authority and stating that "'accurately' and 'all available' do not mean that the information is

21  impounded in some objectively 'correct' way, as suggested by the 'fundamental value' version

22  of efficiency that has been rejected by the cases" ).

23      This Court agrees with the First Circuit and with *In re Countrywide* that for purposes of

24  showing entitlement to the fraud-on-the-market presumption, a plaintiff need only show that a

25  security's market is informationally efficient; the plaintiff need not show fundamental

26

27

28

1    efficiency.[13]

2         Additionally, the Court agrees with Torchio that because there were both positive and

3    negative surprises on August 5, 2011 and June 8, 2012, the fact that the stock price moved in

4    opposite directions on these dates does not show a deficiency with Torchio's analysis.  Instead it

5    simply shows that the market placed different relative values on the two surprises revealed on

6    each of the dates in question.

7         The Court is also persuaded by Torchio's analysis of the events surrounding August 3,

8    2012.  Corporate announcements and press releases do not occur in a vacuum, nor is information

9    static.  Thus, where both positive and negative news is disclosed in a short time span, the price of

10    a stock traded on an efficient market will logically be expected to swing in different directions in

11    response to the successive announcements.

12         Defendants also argue that Torchio's news v. non-news study is deficient because it fails

13    to show that during the class period Exide Stock's price rapidly incorporated information related

14    to environmental and regulatory issues.  (James Rep. ¶ 36.)  This argument is inapposite.  While

15    the fact that a misrepresentation had a price impact is a fundamental premise underlying the

16    fraud-on-the-market presumption, a plaintiff may prove price impact indirectly at the class

17    certification stage.  *See Halliburton II*, 134 S.Ct. at 2416.  As the Supreme Court has recognized,

18    evidence that a stock traded in an efficient market and that the alleged misrepresentation was

19    publicly known indirectly proves price impact.  *Halliburton II*, 134 S.Ct. at 2416.  Thus, a

20    plaintiff invoking the *Basic* fraud-on-the-market presumption must "at least" show publicity and

21    market efficiency at the class certification stage.  *Id.*  This statement in *Halliburton II* suggests

22    that indirect proof is sufficient and thus direct proof of price impact is not required.  Moreover,

23    the Court is unaware of any case requiring such direct evidence of price impact; nor do

24    Defendants identify any such case.  While Defendants may submit evidence that Exide Stock's

25

26    [13]  Nevertheless, as the First Circuit noted, "evidence of fundamental value may be relevant to the

27    extent that it raises questions about informational efficiency."  *In re PolyMedica*, 432 F.3d at 16.
For example, evidence of the "correctness" of the direction that a stock's price moves in

28    comparison to a news event may be relevant as circumstantial evidence that "arbitrageurs are not
trading in the market, with the result that securities prices do not fully reflect all publically
available information."  *Id.*

1    price was not affected by the alleged misstatements in order to rebut the fraud-on-the-market

2    presumption, Plaintiff is not required to affirmatively prove price impact to qualify for the fraud-

3    on-the-market presumption in the first place. *See id.* at 2416–17; *Local 703, I.B. of T. Grocery*

4    *& Food Employees Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1257 (11th Cir. 2014)

5    (holding that plaintiffs were not required to show that the alleged misrepresentations

6    immediately affected the stock's price in order to prove market efficiency). Moreover,

7    Defendants offer no such evidence of a lack of price impact.

8         Defendants also object to Torchio's reverse-event study because this test does not

9    evaluate whether the market price failed to account for important information. (James Rep. ¶

10   44.) Torchio responds that his reverse-event study was meant as a check on his news v. non-

11   news study. (Torchio Supp. Rep. ¶ 136.) In other words, it compliments his news v. non-news

12   study because, instead of looking first to the existence of a news event, it looks first to the

13   existence of statistically significant stock returns and then asks whether the statistically

14   significant stock returns corresponded to news. The Court agrees with Torchio that his reverse-

15   event study is proper for this purpose and when considered in conjunction with his news v. non-

16   news study. Moreover, it is supported by academic authority[14] and at least two courts have

17   accepted similar analyses. *See, e.g.*, *KB Partners I, L.P. v. Barbier*, No. A-11-CA-1034-SS,

18   2013 WL 2443217, at *9 (W.D. Tex. June 4, 2013) (accepting a reverse-event study conducted

19   by Torchio); *In re DVI*, 249 F.R.D. at 211.

20                    (f)    Conclusion Regarding Exide's Common Stock

21        In sum, Exide's common stock was traded on NASDAQ and Plaintiffs offer evidence

22   showing that each of the *Cammer* factors[15] favors market efficiency. As to the critical fifth

23   *Cammer* factor, Plaintiffs offer multiple studies proving a causal relationship. Defendants

24

25   [14]  Torchio derives his reverse-event study methodology from Paul Ryan and Richard J. Taffler,
26   *Are Economically Significant Stock Returns and Trading Volumes Driven by Firm-Specific News
     Releases?*, 31 J. Bus. Fin. & Acct. 49 (2004). (Torchio Rep. ¶ 154.)

27   [15]  The Court notes that Defendants object to Plaintiffs' evidence regarding the first four factors as
28   being insufficient to establish that the market is efficient. Defendants' argument is inapposite.
     Regardless of whether any of these factors is sufficient, they are still relevant to showing market
     efficiency.

1   arguments objecting to Torchio's analyses fail.  Moreover, Defendants's expert, James, does not

2   submit any studies of his own.  On this record, the Court FINDS that Plaintiffs adequately show

3   that Exide Stock traded on an efficient market during the class period.  *See In re Countrywide*,

4   273 F.R.D. at 617–19 (finding that plaintiffs sufficiently proved that common stock was traded

5   on an efficient market where all *Cammer* factors favored efficiency).

6         For the aforementioned reasons, the Court FINDS that Plaintiffs are entitled to invoke

7   *Basic*'s fraud-on-the-marketplace presumption as to Exide Stock.

8                        *(2)     Exide's Notes*

9         To establish that they may rely on the fraud-on-the-market presumption with respect to

10   the Exide Notes, Plaintiffs must also show that the Notes were traded on an efficient market

11   during the Notes class period.

12         As a preliminary matter, the Court observes that debt and equity securities may respond

13   differently to some types of news.  *In re Countrywide*, 273 F.R.D. at 616.  For example, debt

14   reacts to the risk that interests rates will change and to the risk that the issuer will default on the

15   debt.  *Id.*  Additionally, equity and debt securities may react to similar news to different degrees.

16   *Id.*  For example, because in bankruptcy the debt securities are paid off before the equity, there

17   may be an "equity cushion."  This cushion protects debt securities' prices from negative

18   financial news about the issuer until the situation becomes so dire that the issuer is likely to

19   default.  *Id.*  Debt and equity securities may also have divergent reactions to news because,

20   unlike equity holders, debt holders' upside is limited by the debt's terms.  *Id.*  Additionally, the

21   mechanics of effectuating a trade on the bond market differ from those of effectuating a trade in

22   the stock market.  (Torchio Rep. ¶ 184.)  Thus, "[b]ecause the *Cammer* factors were created in

23   the context of the stock markets, courts adjust them for the realities of the over the counter bond

24   market."  *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013); *see also In*

25   *re Countrywide*, 273 F.R.D. at 616.

26         The Notes at issue are Exide's $8^{5/8}$% senior secured notes due in 2018.  Plaintiffs allege

27   that on August 5, 2011, the Company filed with the SEC an amended registration form and

28   prospectus in connection with its exchange offer of its $675 million in outstanding $8^{5/8}$% senior

26

secured notes due in 2018 (the "Old Notes") for its $675 million registered $8^{5/8}$% senior secured notes due in 2018 (the "Exide Notes").  (SAC ¶¶ 185–86.)  According to Torchio, the Exchange Offer closed on September 13, 2011—at which time $674.45 million aggregate principal amount of the Old Notes had been validly exchanged for an equal aggregate initial principal amount of the registered Exide Notes.  (Torchio Rep. ¶ 187.)  Based on Plaintiffs' stipulation in their Reply, the members of the proposed note-holder class are the purchasers of these registered Exide Notes in the aftermarket during the period from August 8, 2011 to May 23, 2013.  (Pls.' Reply at 1–2.)

### (a)    Trading Volume

Torchio asserts that during the class period, the average weekly trading volume as a percentage of the number of outstanding Exide Notes was 4.3 percent.  (Torchio Rep. ¶ 189.) Nevertheless, Torchio acknowledges that there was low trading volume during the initial part of the Notes class period until the Exchange Offer expired on September 13, 2011.  (*Id.* at ¶ 190.) He further admits that he does not know how many Notes had been exchanged during this interim period and thus assumes that the total number of Exide Notes eligible to trade was 674,450 (the total number of Notes exchanged as of September 13, 2011).  (*Id.* at 190 n.114.)

As Torchio acknowledges, the frequency of trading in corporate bonds is less than trading in corporate equities.  (*Id.* at ¶ 191.); *see also In re DVI*, 249 F.R.D. at 215.  Torchio finds that Exide Notes traded on 74 out of 98 trading days (approximately 76%) in 2011 and on 100% of trading days in 2012 and 2013.  (*Id.* at ¶ 193.)

In light of the foregoing, the Court finds that this factor favors a finding of efficiency. *See In re DVI*, 249 F.R.D. at 214–15 (finding that trading volume favored efficiency where the company's senior notes had an average weekly trading volume of 1.25%).  However, in light of Torchio's admission that the Notes had low trading volume before the Exchange Offer expired, the Court FINDS that this factor only favors efficiency with respect to the period after September 13, 2011.

### (b)    Analyst Interest

According to Torchio, during the class period, Exide Notes were rated by two major

1    credit ratings agencies—Moody's and Standard & Poor's ("S&P").  (Torchio Rep. ¶ 199.)

2    Torchio does not point to any instances in which analysts covered Exide Notes.  Instead, he

3    asserts that information included in analysts' reports regarding Exide Stock would also be

4    important to a bond investor.  (*Id.* at ¶ 198.)  According to Torchio, this information would be

5    particularly important to Exide Note-holders because such information would help them to

6    determine Exide Notes' default risk—which would have been of particular importance given that

7    Exide Notes were not investment grade.  (*Id.*)

8        While courts have found analysts' coverage of a company's stock relevant to the

9    efficiency of its debt securities' market, they have noted that equity analyst coverage is not a

10   perfect substitute for debt analyst coverage.  *In re DVI*, 249 F.R.D. at 215; *see also* (James Rep.

11   ¶ 55.)  Thus, while the lack of debt analyst coverage weighs against market efficiency, this

12   conclusion is mitigated by Exide's coverage by two ratings agencies and by Exide Stock's

13   analyst coverage (discussed above).  The Court thus finds that this factor favors efficiency.

14   *Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1162 (N.D. Ohio

15   2013).

16                              (c)      SEC Form S-3 Eligibility

17       For the same reasons discussed with respect to Exide's stocks, this factor favors finding

18   that Exide's Notes traded on an efficient market—as least as to the 96% of trading days during

19   which Exide was eligible to file SEC Form S-3.  *See In re Diamond Foods*, 295 F.R.D. at 248.

20                              (d)      Market Makers

21       Torchio asserts that ownership of Exide Notes by institutional investors is indicative of

22   an efficient market for similar reasons that the presence of market makers indicates efficiency.

23   (Torchio Rep. ¶ 203.)  According to Torchio, during the class period, the face value of Exide

24   Notes held by 88 different institutions as a percentage of outstanding face amount ranged from

25   30.4% to 52%, with an average of 43 percent.  (*Id.* at ¶ 202.)

26       While Plaintiffs may be correct that institutional ownership is probative of efficiency, the

27   Court finds that Plaintiffs' showing of an average of 43% institutional ownership is far less

28   convincing than the showing in *In re DVI* of over 90% ownership by institutional investors and

1  dealers. *In re DVI*, 249 F.R.D. at 215.  Nevertheless, the Court still finds that this factor favors

2  market efficiency.

3                    (e)      Empirical Evidence Suggesting a Causal

4                             Relationship

5          Torchio's analysis of the fifth and most important *Cammer* factor—causal

6  relationship—with respect to the Notes differs in several meaningful ways from his analysis of

7  Exide's stocks.  Torchio again conducts a news v. non-news study and a reverse event study.  He

8  also examines the correlation between Exide stock's returns and its Notes' returns.  However, the

9  methods he uses to conduct these studies differ from the methods he uses to examine Exide

10  Stocks.

11                         i)      *Torchio's Model*

12         Torchio begins by computing a market model for Exide Notes' returns.  He does this by

13  regressing the Exide Notes' daily return on the return for the Bloomberg USD High Yield

14  Corporate Technology Bond Index (Bloomberg Ticker: BUHYTE).  (Torchio Rep. ¶ 205.)

15  Torchio does not explain why he chose the BUHYTE index as a proxy for the market.  Torchio

16  finds that the BUHYTE Index has a statistically significant correlation with Exide's Notes'

17  returns—indicating that the Exide Note prices reacted to new important general market

18  information over the class period.  (*Id.*)  Torchio uses this model to compute the Notes' excess

19  returns.  (*Id.* at ¶ 206.)

20         Torchio next repeats this regression but also includes the excess returns for Exide Stock

21  in the model.  (*Id.* at ¶ 209.)  Torchio finds a statistically significant correlation between Exide

22  Stock's excess returns and the Notes' returns.  (*Id.*)  According to Torchio, this test examines

23  whether the Notes are influenced by company-specific information that influenced the stock on

24  that day.  (*Id.*)  Thus, the statistically significant result is probative of market efficiency.  (*Id.*)

25  Torchio then repeats this model but adds the Stocks' excess return lagged by one day.  (*Id.* at ¶

26  210.)  This test purportedly shows whether, on average, the daily returns for Exide Notes are

27  influenced by the previous day's return on the Stock.  (*Id.*)  Torchio finds that the lagged excess

28  stock return is not statistically significant, which implies that the Notes market is efficient.  (*Id.*

1   at ¶¶ 210–11.)

2          Torchio next performs a news v. non-news study using the same method that he applied

3   to the Exide stock market.  He defines news events in the same way he defined them for the

4   Exide stock market—days on which Exide issued press releases and days on which Exide issued

5   earnings releases.  *See* (Torchio Rep., Ex. 18.)  Torchio finds that during the class period there

6   were 21 trading days on which Exide issued press releases.  (*Id.*)  Of these 21 news days, 6 days

7   (29%) were accompanied by statistically significant excess Note returns.[16]  (*Id.*)  Conversely,

8   only 11 of the 420 non-news days (3%) had statistically significant excess returns.  (*Id.*)

9   According to Torchio, the difference between these percentages (which he finds is 26%) is

10  statistically significant.  (*Id.*)

11         Torchio finds that during the class period there were 6 trading days on which Exide

12  disclosed financial results (earnings).  (*Id.*)  Of these 6 news days, 3 days (50%) were

13  accompanied by statistically significant stock-price movements.  (*Id.*)  Conversely, of the 443

14  non-news days, only 14 (3%) were statistically significant.  (*Id.*)  According to Torchio, the

15  difference between these proportions (which he finds is 46.8%) is statistically significant.  (*Id.*)

16         Torchio also compares the variance of excess returns on days with earnings

17  announcements to the variance of excess returns on days without earnings announcements.  (*Id.*

18  at ¶ 215.)  Torchio finds that the variance of the Notes' returns is statistically significantly

19  greater on days with earnings announcements.  (*Id.*; *Id.* at Ex. 19.)

20         Next, Torchio conducts a reverse-event study of the Notes' excess returns.  However,

21  Torchio does not separately analyze news on all days on which the Notes exhibit a statistically

22  significant excess return.  Instead, he begins by looking only to the 13 days on which Exide

23  Stock had statistically significant excess returns.  (*Id.* at ¶ 217.)  Of these 13 days, 11 occurred

24  during the Notes class period.  (*Id.*)  Exide Notes had statistically significant excess returns that

25  were directionally consistent with the Exide Stock excess returns on 8 of those 11 days.  (*Id.* at ¶

26  218.)  According to Torchio, the remaining 3 days with Note return movements that are either

27  ─────────────

28  [16]  Though Torchio's report states that the data examined pertains to excess returns for Exide's
    stocks, in context it appears that this was a typographical error and that Torchio actually refers to
    the excess returns for Exide's Notes.  *See* (Torchio Rep., Ex.18.)

                                                30

1    statistically insignificant or directionally inconsistent with the stock price movements correspond

2    to the days on which the Stock returns were among the smallest returns out of the 11 days.  (*Id.*

3    at ¶ 219.)  He also finds that for "all of the 7 days during the Notes Class Period for which [he]

4    found no news item to explain the statistically significant stock return, none of the 7 days were

5    associated with statistically significant returns for the Notes."  (*Id.* at ¶ 221.)  Torchio thus finds

6    that the reverse-event study is indicative of an efficient Exide Note market.  (*Id.* at ¶ 222.)

7          As he did for Exide Stock, Torchio tests for serial correlation by regressing: (1) Exide

8    Notes' daily raw returns on daily raw returns from the previous day and (2) Exide Notes' daily

9    excess returns on excess returns from the previous day.  (*Id.* at ¶ 223.)  Torchio does not find any

10   statistically significant autocorrelation in either the raw or the excess returns for Exide Notes

11   during the class period.  (*Id.*)

12                        *ii)      Analysis of Torchio's Models*

13         First, the Court notes that although Torchio cites authority purportedly showing statistical

14   relationships between bond returns and stock returns, he fails to cite any authority supporting his

15   assertion that a correlation between an efficiently traded stock's returns and the same company's

16   note's returns indicates that the notes' returns are influenced by the news that influenced the

17   stock—or to any authority showing that such a finding is probative of the efficiency of the notes'

18   market.  Moreover, Torchio acknowledges that the news content affecting note prices may differ

19   from the news content affecting common stock prices.  (Torchio Rep. ¶ 207 n.131.)  The Court

20   thus rejects this analysis and does not find the correlation between Exide Stock returns and Exide

21   Note returns probative of Exide Notes' market's efficiency.  For similar reasons, the Court

22   rejects Torchio's analysis of the correlation between Note returns and the excess return of the

23   Stock lagged by one day.

24         Though Defendants do not raise this issue, the Court observes that Torchio designs his

25   market model for the Notes in a different manner from the way in which he designs his market

26   model for Exide Stock.  Unlike the market model for Exide Stock, Torchio does not include a

27   separate industry index to account for industry-specific information.  Additionally, rather than

28   using a generalized index (such as the S&P 500 Total Return Index used for the stock market

1    model), (Torchio Rep., App. B, at ¶ 13) Torchio uses the BUHYTE—which is a subindex

2    specific to the technology sector.  *See* Bloomberg, *Bloomberg USD High Yield Corporate Bond*

3    *Index*, *available at*

4    http://www.bloombergindexes.com/content/uploads/sites/3/2014/05/USD_High_Yield_Corporat

5    e_Bond_Index_Fact_Sheet.pdf (last visited July 8, 2015).  Torchio fails to explain why he used a

6    different approach when modeling the Exide Notes market.  This failure is particularly troubling

7    given that this approach contradicts Torchio's own statement that "the determination of an

8    appropriate market model involves the selection of a broad-based market index as a proxy for the

9    market, customarily the S&P 500 Index or the NASDAQ Composite Index for stocks listed on

10   U.S. exchanges, and usually a proxy for the industry."  (Torchio Rep., App. B, at ¶ 7.)

11        Defendants argue that Torchio's news v. non-news study of the Notes is deficient

12   because it fails to analyze the impact of credit ratings changes.  (James Rep. ¶¶ 61–63.)  Torchio

13   acknowledges that credit agency ratings changes are important information regarding a debt

14   security and are impounded into its price.  (Torchio Rep. ¶ 199.)  He also acknowledges that

15   there were days during the class period on which credit agencies change Exide Notes' rating.

16   (*Id.*)  Nevertheless, he does not consider credit agency ratings changes as news events for

17   purposes of his news v. non-news study.

18        James opines that during the Notes class period there were three downgrades of Exide

19   Notes by credit ratings agencies and one CreditWatch warning—none of which were associated

20   with significant movements in the price of Exide Notes.  (James Rep. ¶ 64.)  In his rebuttal

21   report, Torchio responds that the reason why Exide's Notes' prices didn't move on these days

22   was because the market had already anticipated these ratings changes.  (Torchio Supp. Rep. ¶¶

23   181–86.)  However, Torchio's analysis of market anticipation is unsupported by academic

24   authority and amounts to little more than speculation.  For example: Torchio examines a roughly

25   one month period before S&P downgraded Exide Notes to a B-, finds that there was a -23.3%

26   change in Exide's common stock's market capitalization, and opines that a bond's credit quality

27   diminishes as its "equity cushion" becomes thinner.  (Torchio Supp. Rep. ¶ 182.)  Torchio

28   therefore finds it:

1
2
3
4

> is quite likely that the large 23% decline in the market capitalization of equity precipitated the cotemporaneous [sic] decline in the Notes, which of course means that in the market's eye, the credit quality of the Notes had declined.  Consequently it is not proof against efficiency to observe no statistically significant price reaction to the February 28, 2013 rating change.

5

(Torchio Supp. Rep. ¶ 182.)  The Court is not convinced by Torchio's speculative explanation.

6

Instead, the Court credits James's critique and rejects Torchio's news v. non-news study because

7

it fails to account for news that Torchio admits is important and which he expects bond price to

8

absorb.

9

Defendants also object to Torchio's reverse-event study of the Notes market because it

10

looks only to the days on which there was a statistically significant movement in Exide Stock's

11

price rather than evaluating the Notes' prices independently.  (James Rep. ¶¶ 69–74.)

12

Defendants also assert that Torchio's reverse-event study of the Notes fails to account for 9 days

13

with a statistically significant price movement in the Notes but not in Exide's common stock.

14

(James Rep. ¶ 76.)  Defendants further object that Torchio failed to examine dayson which there

15

were statistically significant price movements for both Exide's stock and notes but in different

16

directions (such as November 12, 2012).  (James Rep. ¶ 77.)

17

Torchio responds that it makes "logical sense" to focus on the news that was driving

18

statistically significant stock returns because the Exide Notes' credit quality was not investment

19

grade and worsened over time.  (Torchio Supp. Rep. ¶¶ 191–92.)  He also emphasizes his finding

20

that there was a strong statistical relationship between Exide Stock's returns and the Notes'

21

returns.  (Torchio Supp. Rep. ¶ 196.)  Finally, he discounts James's criticism that he failed to

22

account for days with inconsistent Stock and Note movements by: (1) pointing out the small

23

number of days with inconsistencies and (2) pointing to academic authority allegedly showing

24

that in any efficient security market researchers expect that there will be random statistically

25

significant movements that can't be explained by news.  (Torchio Supp. Rep. ¶ 193–95.)

26

Torchio's "logical sense" is refuted by the internal inconsistencies in his analysis.

27

Though he asserts that it makes sense to focus on the news that was driving statistically

28

significant returns for Exide Stock, he also asserts that a bond's price will be somewhat insulated

from negative financial news by an "equity cushion" (at least until a company is in truly dire

1   financial straits).  (Torchio Rep. ¶ 204) ("I would expect to see that the prices of Exide Notes

2   react to non-company specific information, such as changes in interest rates, and also to

3   company-specific information once Exide's equity cushion is no longer sufficient enough (or

4   default risk is increased).").  Given that Torchio does not opine that Exide's cushion was no

5   longer sufficient to insulate the Notes' prices as of the beginning of the Notes class period, under

6   Torchio's own rationale it makes little sense to focus solely on the news driving the stock returns

7   for the entirety of the Notes class period.

8          Moreover, Torchio readily acknowledges that there are fundamental differences between

9   debt and equity securities and the ways in which they are traded.  *See* (Torchio Rep. ¶¶

10  179–181.)  Additionally, Torchio states that "finance theory teaches that the value of a

11  company's bonds (and other similar liabilities) represent the difference between the value of the

12  assets and the value of the equity.  (Torchio Supp. Rep. ¶ 173.)  Thus, under Torchio's own

13  understanding of finance theory, one would expect an inverse relationship between the value of a

14  company's bonds and the value of its equities—i.e. if assets value remains constant then an

15  increase in the equities' value will correspond to a decrease in the bonds' value.[17]  However,

16  Torchio's finding of a strong statistical correlation between Exide stock and Notes returns and

17  his Notes reverse-event study methodology suggest the contrary.  Torchio fails to acknowledge

18  or explain this discrepancy.

19         Finally, Torchio fails to adequately address James's criticisms regarding inconsistencies

20  between movements in Exide's Stocks and Notes.

21         In light of Torchio's internal inconsistencies and conclusory responses to James's

22  critiques, the Court credits James's criticisms of Torchio's reverse-event study of Exide Notes.

23  Additionally, Torchio fails to show that his methodology is soundly supported by academic

24  authority or is a generally accepted approach to studying the efficiency of a company's debt

25  securities' market.

26         For the aforementioned reasons, the Court FINDS that Plaintiffs fail to show a causal

27

28  [17]  Torchio's description of finance theory is represented mathematically as: (value of bonds and
    similar liabilities) = (value of assets) - (value of equities).

34

1  relationship between movements in Exide Notes' prices and new information.  Thus, the fifth

2  and most important *Cammer* factor weighs against efficiency.

3  (f)        Conclusion Regarding Exide's Notes

4          Plaintiffs fail to show a causal relationship between Exide Note prices and new

5  information.  Additionally, though the other *Cammer* factors support efficiency, Plaintiffs'

6  showing regarding these factors is not as strong with respect to Exide Notes as it is with respect

7  to Exide Stock.  In light of the foregoing, the Court FINDS that Plaintiffs fail to carry their

8  burden of showing that Exide Notes traded in an efficient market during the class period.

9  Plaintiffs thus may not rely on the fraud-on-the-market presumption for purposes of their claims

10  regarding Exide's Notes.[18]

11          ***2.        Affiliated Ute***

12          Plaintiffs also assert that they are entitled to a classwide presumption of reliance under

13  *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  In *Affiliated Ute*, the Court

14  held that a plaintiff stating a securities fraud claim based on a failure to disclose can presume

15  reliance when the information withheld is material.  *Id.* at 153–54.  In cases involving either

16  misrepresentations or both misrepresentations and omissions, the Ninth Circuit limits the

17  *Affiliated Ute* presumption to cases that "can be characterized as . . . primarily alleg[ing]

18  omissions."  *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940 (9th Cir. 2009) (per curiam)

19  (quoting *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir.1999)) (alteration in original).  The

20  Ninth Circuit imposes this limit because of the "difficulty of proving 'a speculative

21  negative'—that the plaintiff relied on what was not said."  *Binder*, 184 F.3d at 1064 (quoting

22  *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir.1975)).  Nevertheless, the Court is also cognizant

23  that this standard itself creates a difficult inquiry because "[t]he categories of 'omission' and

24  'misrepresentation' are not mutually exclusive."  *Id.* (quoting *Little v. First Cal. Co.*, 532 F.2d

25  1302, 1305 n.4 (9th Cir.1976)) (alteration in original).  Thus, there is a "true dilemma presented

26  in a case in which there has been a general representation from which material facts are

27

28  [18]   The Court declines to reach the propriety of Torchio's failure to compare the Notes to a benchmark of bonds that courts have found efficient because this issue would not change the Court's conclusion.

35

1    omitted[.]" *Little*, 532 F.2d at 1305 n.4.

2        Here, Plaintiffs allege that Exide affirmatively made numerous misleading statements in

3    various regulatory filings and other public settings. *See, e.g.* (SAC ¶¶ 117–158.) Examples of

4    these allegedly misleading statements are statements made in Exide's Form 10-K disclosure that:

5    (1) "the Company ***has made and will continue*** to make expenditures ***to comply with***

6    ***environmental requirements***" (SAC ¶ 119) (emphasis in original), and (2) that "[w]hile the

7    ultimate outcome of the environmental matters described in this paragraph is uncertain, ***the***

8    ***Company presently believes the resolution of these known environmental matters***, individually

9    and in the aggregate, ***will not have a material adverse*** effect on the Company's financial

10   condition, cash flows or results of operations," (*id..*) (emphasis in original). Plaintiffs allege that

11   these statements were materially misleading because they "omitted" material facts. *See, e.g.*

12   (SAC ¶ 120.) Plaintiffs also allege that Defendants were required to disclose certain changes

13   regarding Exide's compliance with environmental regulations and other circumstances but failed

14   to do so. *See, e.g.* (SAC ¶ 159.) Thus, the Court must decide whether this is a case primarily

15   alleging omissions.

16       The Court recognizes that this case presents a difficult inquiry: On the one hand,

17   Plaintiffs assert that Defendants made numerous affirmatively misleading statements; on the

18   other hand, Plaintiffs allege that the statements were misleading precisely because they failed to

19   disclose certain material information. Plaintiffs also allege specific omissions.

20       The Court finds this case analogous to *George v. California Infrastructure & Econ. Dev.*

21   *Bank*, No. 2:09CV01610-GEB-DAD, 2010 WL 2383520 (E.D. Cal. June 10, 2010). There, the

22   Plaintiff asserted that the Defendant made materially misleading statements in its prospectus

23   indicating the timing with which certain bonds would be defeased. *Id.* at *4. These statements

24   were allegedly misleading, in part, because they failed to disclose that the company's counsel

25   was unwilling to issue an opinion required as a precondition to the bonds' defeasance. *Id.* at *4.

26   The plaintiff also alleged that the prospectus improperly omitted counsel's unwillingness to

27   render the required opinion. *Id.* The Court held that the *Affiliated Ute* presumption of reliance

28   did not apply because the case "at the very least . . . must be characterized . . . as a mixed case of

misstatements and omissions." *Id.* at *6 (quoting *Binder*, 184 F.3d at 1063); *see also In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 219–21 (D.C. Cir. 2010) (considering motion for leave to amend and finding that *Affiliated Ute* presumption did not apply where defendant allegedly participated in a Ponzi scheme and "the gravamen of the appellants' complaint [was] that, by certifying Interbank's materially false financial statements, Radin affirmatively misrepresented Interbank's financial situation"); *Carr v. Int'l Game Tech.*, No. 3:09-CV-00584-ECR, 2012 WL 909437, at *5 (D. Nev. Mar. 16, 2012) (finding that *Affiliated Ute* did not apply because "[w]hile Plaintiffs may attempt to style the alleged misrepresentations as failures to disclose the truth of the IG''s financial health, Plaintiffs primarily complain of inflated and overly optimistic press releases and growth projections").

Moreover, the rationale behind the *Affiliated Ute* presumption—the difficulty of proving a "speculative negative"—does not apply to this case. Here, Plaintiffs assert that Exide made affirmative statements relating to Exide's exposure to risk from environmental and regulatory issues and to its financial stability. To prove their § 10(b) claim, Plaintiffs must show that they relied on these allegedly misleading statements in purchasing Exide's securities. This is thus not a case where Plaintiffs must show that they relied on Exide's silence.

For the aforementioned reasons, the Court finds that this is not a case primarily alleging omissions. Accordingly, Plaintiffs are not entitled to rely on the *Affiliated Ute* presumption. Thus, because the Note-holder class cannot rely on either the fraud-on-the-market presumption or on the *Affiliated Ute* presumption, Plaintiffs fail to show that common issues predominate with respect to the Note-holder class. The Court accordingly DENIES Plaintiffs' motion to certify the Note-holder class.

### 3.   Damages

Defendants assert that Plaintiffs' motion should be denied because Plaintiffs fail to propose a damages model. As discussed above, Plaintiffs must show that "damages are capable of measurement on a classwide basis" and must tie their damages method to their theory of liability. *Comcast Corp*, 133 S. Ct. at 1433. Nevertheless, in the Ninth Circuit, the need to engage in individualized damages calculations alone cannot defeat class certification. *Jimenez*,

765 F.3d at 1167 (citing *Leyva*, 716 F.3d at 513).

Both *Jimenez* and *Leyva* were wage-and-hour class actions.  *See Jimenez*, 765 F.3d at 1163; *Leyva*, 716 F.3d at 511–12.  The Ninth Circuit has recognized that "damages determinations are individual in nearly all" such cases.  *Jimenez*, 765 F.3d at 1167.  Additionally, in each of those cases the plaintiff presented an acceptable method to be applied classwide in order to make individual damages calculations.  *Id.* at 1168; *Leyva*, 716 F.3d at 514.  Though the Ninth Circuit has not yet decided whether the failure to present any damages model defeats class certification, other district courts have so found.

Thus, in *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014)**,** the court decertified a damages class because the plaintiff failed to set forth a viable damages theory tied to its theory of liability.  *Id.* at *14–15. Specifically, the Court decertified the damages class not because of the need for individualized damages calculations, but because the plaintiff "failed to show that his proposed damages stemmed from the defendant's actions that created the legal liability."  *Id.* at *14; *see also In re POM Wonderful LLC*, No. ML 10-02199 DDP RZX, 2014 WL 1225184, at *5–6 (C.D. Cal. Mar. 25, 2014) (decertifying a class where plaintiffs' damages model didn't comport with *Comcast* because their expert didn't tie damages calculations to the alleged misrepresentations).

Here, Plaintiffs failed to set forth any model of damages (let alone one tied to their theory of liability) in their opening brief.  Defendants point out that this failure is particularly problematic in a case such as this, where: (1) there are multiple alleged misrepresentations, (2) corrective information was allegedly disclosed at multiple times, (3) corrective information regarding different alleged misrepresentations was allegedly disclosed on the same day, and (4) some of the allegedly concealed facts arose or were made known to the company (and thus for the first time could have been disclosed) during the class period.  (James Rep.  ¶¶ 88–99.)

In his Rebuttal Report, Torchio for the first time addresses damages.  Torchio there discusses general techniques for computing damages in securities fraud cases.  He acknowledges the difficulties that James points out and describes generally some techniques that he asserts can be used to address each issue (most of which he claims arise commonly in cases such as this).

1   (Torchio Supp. Rep. ¶¶ 197–263.)  However, Torchio fails to tie these theories to the facts of this

2   case or to each other—in other words, he fails to propose one model explaining how he would

3   use these techniques in concert to calculate damages in this case.

4        On this record, Plaintiffs fail to show a damages theory tied to their theory of liability.

5   *See Comcast*, 133 S. Ct. at 1434–35 (finding damages class improperly certified where the

6   plaintiffs failed to set forth a damages theory tied to their theory of liability).

7        The Court thus FINDS that Plaintiffs fail to show that common issues predominate as to

8   the proposed Stockholder class.  Nevertheless, as discussed below, where the only bar to

9   certification is the failure to present a damages model, the Court may certify a liability-only

10  class.

11       **G.    Superiority**

12       Plaintiffs assert that a class action is superior because it will promote judicial efficiency

13  by allowing common claims and issues to be resolved at once with a binding effect on all parties.

14  They also assert that a class action is superior because the geographical dispersion of the class

15  members makes consolidation of claims in one forum desirable.  They further assert that

16  controversies such as this, involving many purchasers of securities injured by the same violation

17  of securities laws, are particularly well suited for class action resolution.  *In re Cooper*

18  *Companies Inc. Sec. Litig.*, 254 F.R.D. 628, 641 (C.D. Cal. 2009).  Defendants do not contest

19  that the superiority requirement is met.  Accordingly, the Court FINDS that Plaintiffs satisfy the

20  superiority requirement for a liability-only class (discussed below).

21       **H.    Rule 23(c) Issue Class**

22       Federal Rule of Civil Procedure 23(c)(4) states that "[w]hen appropriate, an action may

23  be brought or maintained as a class action with respect to particular issues."  Federal Rule of

24  Civil Procedure 23(c)(4).  The Ninth Circuit has stated that "[s]o long as the plaintiffs were

25  harmed by the same conduct, disparities in how or by how much they were harmed did not

26  defeat class certification."  *Jimenez*, 765 F.3d at 1168.  In *Jimenez*, the Court also cited favorably

27  to several out of circuit cases accepting certification of a liability-only class under Rule 23(c)(4).

28  *See id.* at 1167–68 (citing *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*,

1    722 F.3d 838 (6th Cir. 2013) *cert. denied sub nom. Whirlpool Corp. v. Glazer*, 134 S. Ct. 1277

2    (2014); *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801–02 (7th Cir.2013)).

3         Courts differ regarding whether to certify a liability-only class when Plaintiffs fail to

4    adequately present a damages model tied to their theory of liability.  *See Kamakahi v. Am. Soc'y*

5    *for Reprod. Med.*, 305 F.R.D. 164, 188, 194 (N.D. Cal. 2015) (certifying an issue class regarding

6    whether challenged limitations on compensation violated the Sherman Act where plaintiffs failed

7    to demonstrate an "ability to show the fact of damage to each class member through common

8    proof"); *but see Rahman v. Mott's LLP*, No. 13-CV-03482-SI, 2014 WL 6815779, at *7–9 (N.D.

9    Cal. Dec. 3, 2014) (declining to certify liability only class in case where plaintiff satisfied

10   predominance requirement as to liability but not damages).  Nevertheless, the courts declining to

11   certify a liability-only class generally do so where plaintiffs utterly fail to show any model for

12   calculating damages that (1) can be applied classwide (even if the model will be used to make

13   individualized determinations) and (2) is tied specifically to the plaintiffs' theory of liability.

14   *See, e.g.*, *Werdebaugh*, 2014 WL 7148923, at *11 (decertifying class where plaintiff failed to put

15   forth any valid damages model—even one requiring individualized determinations—tying

16   defendant's liability to the injuries it allegedly caused); *In re POM Wonderful LLC*, 2014 WL

17   1225184, at *2–5 (same); *Rahman*, 2014 WL 6815779, at *9 (stating that a court should only

18   certify a Rule 23(c)(4) issue class where resolution of the common issues would materially

19   advance case's disposition as a whole and declining to certify a liability class).

20        While the Court finds that Plaintiffs fail to present a classwide damages model tied to

21   their theory of liability, the Court does not find Plaintiffs' showing as deficient as in *Wedebaugh*,

22   *In re POM*, or *Rahman*.  As discussed above, the Court has serious concerns regarding Plaintiffs'

23   ability to present a damages model that is sufficiently tied to their theory of liability.  The

24   severity and nature of the alleged misrepresentations changed and grew throughout the class

25   period.  Moreover, the information was disclosed at different times in multiple alleged corrective

26   disclosures issued at different times within the class period.  Additionally, there were multiple

27   alleged misrepresentations unfolding simultaneously—some of which may have been materially

28   misleading and some of which may not have been.

Nevertheless, this is not a case where Plaintiffs failed to put forth *any* admissible evidence establishing that it is possible to calculate the amount of damages tied to their theory of liability.  Here, Plaintiffs submit Torchio's testimony recounting various techniques that may generally be used to account for these considerations.  Torchio's primary fault is his failure to tie these techniques together into one model.  Plaintiffs thus fail to show that damages "could feasibly and efficiently be calculated once the common liability questions are adjudicated." *Leyva*, 716 F.3d at 514.  However, although his testimony is insufficient to satisfy Plaintiffs' burden of establishing predominance, it does indicate that it as possible to calculate damages for at least some of the class members—albeit on an individualized basis and possibly using laborious and difficult calculations.  Thus, while Plaintiffs fail to show that common issues predominate, their showing at this time is sufficient to allow the Court to conclude that resolution of the common issues would materially advance this case's disposition as a whole. *See Rahman*, 2014, WL 6815779, at *9.

In light of the foregoing, the Court GRANTS IN PART Plaintiffs' motion and CERTIFIES a liability-only Stockholder class under Rule 23(c)(4).  The class is certified only as to Plaintiffs' § 10(b) claim regarding Exide's stocks.

**VI.   ORDER**

1.  Pursuant to Rule 23(c)(4), the Court CERTIFIES a liability-only class of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired Exide's common stock during the period June 1, 2011 through May 24, 2013.  The Court only CERTIFIES the class as to Plaintiffs' § 10(b) claim, to the extent this claim arises from the purchase of Exide's common stock (as opposed to Exide's Notes).

2.  The Court APPOINTS Weitsman, Close, and Cassella as class representatives of the certified class.

3.  The Court APPOINTS as class counsel Federman & Sherwood.

//

//

//

41

4.  The Court DENIES WITHOUT PREJUDICE the motion for class certification in all other respects.

**IT IS SO ORDERED.**

Dated: July 21, 2015

_____
STEPHEN V. WILSON
United States District Judge