Exhibit 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID M. LORITZ, Individually and on Behalf of All Others Similarly Situated, | Master File Case No. 2:13-cv-02607-SVW-E |
| Plaintiff, | Consolidated Case Nos. 2:13-cv-03194-SVW-E 2:13-cv-03991-SVW-E |
| v. | |
| EXIDE TECHNOLOGIES, et al., | |
| Defendants. | |

EXPERT REPORT OF MICHAEL L. HARTZMARK, PH.D.

October 5, 2015

# TABLE OF CONTENTS

**Page**

I.      Scope of Engagement ..................................................................1

II.     Qualifications............................................................................3

III.    Summary of Opinions................................................................6

IV.     Bases for Opinions on Whether the Exide Note Traded in an Open, Developed and Efficient Market........................................................8

        A.      The Academic Definition of an Efficient Market ................................8

        B.      The Definition of an Efficient Market Generally Accepted By the Courts ....................................................................10

V.      Analysis of Operational Factors for the Exide Note ....................................16

        A.      The Operational Factors Describing Market Efficiency ....................16

                1.      Cammer Factor I – Weekly Trading Volume ..........................16

                2.      Cammer Factor II – Analyst Coverage ....................................26

                3.      Cammer Factor III – Market Makers........................................28

                4.      Cammer Factor IV – SEC Form S-3 Eligibility ......................29

        B.      Other Operational Factors to Weigh When Examining Market Efficiency ....................................................30

                1.      Market Value................................................................30

                2.      The Size of the Float ...................................................31

                3.      Institutional Holdings..................................................32

                4.      Bid-Ask Spread ..........................................................33

                5.      Dr. James is Wrong to Discount the Importance of the Operational Factors; Moreover, this Contradicts His Prior Testimony................................................................35

VI.    Cammer Factor Five - The Price-Related Factors Describing Market Efficiency.................................................................................37

     A.    Event Study Methodology for the Exide Note ...................40

     B.    Event Study Results ......................................................45

         1.    Cause-and-Effect Analysis Examining Corrective Disclosure Dates ................................................45

         2.    Examination of Cause-and-Effect and Changes in Credit Rating Downgrades................................49

         3.    Cause-and-Effect Analysis Examining Days with News versus Days without News – Background ................54

         4.    Cause and Effect Analysis Examining 8-K and Corrective Disclosure Days with Cashflow-Related News versus other Days without Cashflow-Related News ...............57

         5.    Cause and Effect Analysis Examining Autocorrelation ..........65

         6.    Return Volatility on Important Disclosure Dates ....................68

         7.    Statistical Properties of Event Studies Explain the Purported Inconsistencies Observed by Dr. James.................69

         8.    Summary ..................................................................70

     C.    Defendants have Failed to Demonstrate that there is No Price Impact from the Allegations.................................................71

VII.    Ability to Calculate Damages on a Class-Wide Basis ................................72

     A.    Calculating Damages for Violations of Section 10(b) Of the Exchange Act ................................................................73

     B.    How the Proposed Methodology Could Be Implemented .................76

     C.    Calculating Damages for Violations of Section 11 Of The Securities Act ................................................................85

VIII.    Conclusion ................................................................86

## I.   SCOPE OF ENGAGEMENT

1.     I have been asked by Federman & Sherwood, counsel for the Lead Plaintiffs for the putative Class (the "Class") in the above captioned matter to determine whether the 8-5/8% senior secured notes due February 1, 2018 (the "Note" or the "Exide Note")[1] issued by Exide Technologies ("Exide" or the "Company"), traded in an "open, developed, and efficient market"[2] from September 13, 2011 through May 24, 2013 (the "Note Class Period").[3] I have also been asked by counsel to opine on whether the calculation of damages on a class-wide basis is subject to a common methodology for all Class members in connection with their claims under: (1) Section 10(b) of the Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted

---

[1]   The Exide Note is designated with the CUSIP 302051AQ0.

[2]   *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197 (6th Cir. 1990) (citing *Peil v. Speiser*, 806 F.2d 1154, 1160 (3d Cir. 1986)). "The fraud on the market theory rests on the assumption that the price of an actively traded security in an open, developed, and efficient market reflects all the available information about the value of a company."

"The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations." *Peil,* 806 F.2d at 1160-61.

"One of the circumstances justifying a presumption of reliance arises when a plaintiff alleges that a defendant made material misrepresentations or omissions concerning a security that is actively traded on an efficient market, thereby establishing a fraud on the market." *Freeman*, 915 F.2d at 197 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988)).

[3]   The Note Class Period begins the date the Note exchange offer expired. *See* Exide Technologies, Inc. SEC Form 424B3, filed August 15, 2011.

- 1 -

thereunder (collectively, "Section 10(b)"); and (2) Section 11 of the Securities Act of 1933 (the "Securities Act").

2.     In preparation of this Report, I reviewed: the Second Amended Consolidated Complaint for Violations of the Federal Securities Laws, dated April 24, 2015 (the "Complaint"); Order Granting In Part Plaintiffs' Motion for Class Certification, Judge Stephen Wilson, dated July 21, 2015 ("Order"); the Expert Report of Frank C. Torchio, dated March 30, 2015, ("Torchio Report"); the Expert Report of Professor Christopher M. James, dated May 4, 2015 ("James Report"); and the Expert Rebuttal Report of Frank C. Torchio, dated May 26, 2015, ("Torchio Rebuttal"). I have, however, made no investigation of the facts surrounding underlying merits, liability, or loss causation in this case. My report applies economic, financial and statistical analyses to determine whether the Exide Note traded in an open, well-developed and efficient market, and whether the calculation of damages for the Exide Note can be computed commonly on a class-wide basis consistent with Lead Plaintiffs' theory of liability.

3.     My Report is organized as follows: In Section II, I present my qualifications as an expert. In Section III, I summarize my opinions. In Section IV, I briefly describe how I define market efficiency for the purposes of this Report. In Section V, I demonstrate that the Exide Note traded in an open, well-developed and

efficient market by examining the "operational" *Cammer* factors[4] and other operational factors that courts often consider.[5] In Section VI, I demonstrate that the Exide Note traded in an open, well-developed and efficient market by examining the "price-related" *Cammer* factor and other price-related factors that courts often consider.[6] In Section VII, I show for the Exide Note that the calculation of damages can be conducted on a class-wide basis subject to a common methodology consistent with Lead Plaintiffs' theory of liability. In Section VIII, I present my conclusions.

## II. QUALIFICATIONS

4.    I am President of Hartzmark Economics Litigation Practice, LLC and prior to this I was a Principal and Director at Navigant Economics (formerly dba Chicago Partners, LLC, a subsidiary of Navigant Consulting, Inc.). Both firms specialize in the application of economics and finance to legal, commercial and regulatory issues, including issues such as those addressed in this Report. I was also engaged as an independent contractor by the Office of the Attorney General of the State of New York to assist in investigations of the mortgage-backed securities market.[7]

---

[4]    *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[5]    *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

[6]    *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 266 (D. Mass. 2006).

[7]    Mortgage-backed securities are a type of bond that "represent economic interests in pools of mortgage loans," while corporate bonds, such as the Exide Note, represent economic interests in the cash flows of a corporation. Frank J. Fabozzi and Steven V. Mann, *The Handbook of*

5.      I have served as a testifying and consulting expert in numerous securities class action matters. In addition, I have published scholarly articles on a multitude of issues in financial economics, including those associated with securities class actions. I have spent much of my time as an economic consultant evaluating issues related to the certification of securities class actions. My primary focus has been on securities such as corporate bonds, mortgage-backed bonds, common stock, Treasury and energy futures, swaps, swaptions, options, and asset-backed securities. I wrote a series of reports cited in the district court's opinion granting class certification in *In re DVI, Inc. Securities Litigation*, 249 F.R.D. 196, 209 (E.D. Pa. 2008), which was affirmed by the Third Circuit, *In re DVI, Inc. Securities Litigation*, 639 F.3d 623 (3d Cir. 2011). I have recently co-authored three business law review articles discussing the commonly used empirical tests applicable for securities class actions.[8]

6.      I earned my B.A. in economics from the University of Michigan and my M.A. and Ph.D. in economics from the University of Chicago. I have taught

---

*Fixed Income Securities*, Eighth Edition (Kindle Locations 12943-44), McGraw-Hill Education Kindle Edition. ("*Handbook*").

[8]   *See Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market* (with Cindy A. Schipani and H. Nejat Seyhun), Columbia Business Law Review, Volume 2011, Number 3. *The Curious Incident of the Dog that Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation* (with H. Nejat Seyhun), Virginia Law & Business Review, Volume 6, Number 3, 2012. *Understanding the Efficiency of the Market for Preferred Stock* (with H. Nejat Seyhun), Virginia Law & Business Review, Volume 8, Number 2, Spring 2014.

economics and financial economics in the Department of Economics at the University of Chicago and jointly in the Michigan Business School (now the Ross School of Business) and the Department of Economics at the University of Michigan.

7.      At the University of Michigan, I created and taught courses on financial and commodity futures markets. While an Assistant Professor at the University of Michigan, I received a research grant from the University of Chicago Center for the Study of Futures Prices, as well as the John M. Olin Faculty Fellowship to further my research in financial markets. In addition, I published articles in peer-reviewed journals related to financial markets.

8.      Prior to my tenure track appointment at the University of Michigan, I was employed as a Financial Economist at the Commodity Futures Trading Commission ("CFTC"), Division of Economics and Education. I have been a holder of the Series 7 and 63 registered representative licenses and have served as a Financial Advisor at Fahnestock & Co., Inc. (now Oppenheimer & Co., Inc.). I was also founder and President of DARMA, LLC, a wealth and asset advisory company affiliated with Oppenheimer & Co., Inc.

9.      My qualifications, publications and expert engagements are summarized in greater detail in my *curriculum vitae*, which is attached to this Report as **Appendix A**. Hartzmark Economics Litigation Practice, LLC is being

compensated at a rate of $625 per hour for my work in this matter. Payment for my work is in no way contingent on the opinions I express or the outcome of this matter.

### III.   SUMMARY OF OPINIONS

10.   Based on my analysis to date, I have formed the following opinions:

**OPINION I:  It is my opinion that throughout the Note Class Period, the Exide Note traded in an open, well-developed and efficient market. This opinion is based on the following supporting evidence:**

(1)   The relatively high average weekly turnover of the Exide Note;

(2)   The continuous coverage of Exide by analysts, investment professionals, public press, credit rating agencies and financial institutions, along with regular and frequent disclosures by the Company in the form of press releases, teleconference earnings calls and SEC filings, as well as the disclosures by the bankruptcy Trustees and regulatory authorities;

(3)   The fact that the Exide Note was traded by 162 market makers (262 market participants);

(4)   The relatively large market value of the Exide Note;

(5)   The relatively large proportion of institutional holdings of the Exide Note;

(6)   The relatively narrow bid-ask spread of the Exide Note;

(7)   The contemporaneous price movements of the Exide Note associated with the disclosure of news;

(8)   The greater magnitude of the average absolute values of the abnormal returns of the Exide Note on eight "news" dates (*i.e.,* the three dates when there were corrective disclosures plus the dates when there were cashflow-related disclosures) as compared to the average of the absolute values of the abnormal returns on all other dates; and

(9)   The rapid price reaction of the Exide Note to new, valuation-relevant information about the Company.

**OPINION II: The calculations of damages on a class-wide basis for violations of Section 10(b) of the Exchange Act (and SEC Rule 10b-5) and Section 11 of the Securities Act are subject to common methodologies. This opinion is based on the following:**

(1)   For violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5, the common methodology begins with the same type of event study I describe and present in Section VI of this Report.

(2)   Using the results of an event study (such as that presented herein) along with firm-specific information, the level of inflation for the Exide Note caused by the Defendants' alleged omissions and misrepresentations would then be calculated.

(3)   The daily levels of the Note price inflation would be calculated throughout the Note Class Period.

(4)    Using this information, along with the Class member's actual purchase and sale activity, individual losses would be calculated from the inflation caused by the alleged omissions or misrepresentations – applying a single common formula for all class members, consistent with Lead Plaintiffs' theory of liability, namely, that Defendants' misrepresentations and omissions artificially inflated the Exide Note's price and that this artificial inflation dissipated following the alleged corrective disclosures, which caused the price to fall and in turn caused investor losses.

(5)   For violations of Section 11 of the Securities Act, the methods to calculate damages are specified in the statute.[9]

---

[9]   "The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought." 15 U.S.C. § 77k(e).

(6)    For violations of Section 11, for the Exide Note issued during the Note Class Period, the damages are based on the purchase price (not to exceed the offering price) of the Exide Note less the appropriate sale price as specified in the statute.[10]

11.    In reaching these opinions, I have relied upon various materials, which are listed in **Appendix B**. The research and analysis upon which my opinions are based have been conducted by me with the assistance of personnel working under my direction and supervision. My conclusions are based on information available to me as of the date of this Report. I understand that discovery is ongoing, and I will review, evaluate and analyze relevant material that becomes available to me. If I receive additional information, I reserve the right to modify my conclusions.

## IV.    BASES FOR OPINIONS ON WHETHER THE EXIDE NOTE TRADED IN AN OPEN, DEVELOPED AND EFFICIENT MARKET

### A.    The Academic Definition of an Efficient Market

12.    A market is defined as being informationally efficient if prices of securities traded in that market reflect all material, publicly available information.[11] Further, informational efficiency means that prices of securities rapidly change to reflect new, unanticipated, material, public information. The notion behind efficient

---

[10]    *Id.*

[11]    *See* Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin., 383 (1970) (A market in which prices fully reflect available information is called efficient). Also, "I take the market efficiency hypothesis to be the simple statement that security prices fully reflect all available information." Eugene F. Fama, *Efficient Capital Markets: II*, 46 J. Fin., 1575 (1991).

markets is that the competition among investors to discover new profit opportunities
pushes security prices to reflect all material, publicly available information.

13. The weight of the evidence in the finance literature supports the concept
of market efficiency. The father of modern finance and recent Nobel Prize winner,
Eugene Fama, wrote, "We shall conclude that, with but a few exceptions, the
efficient markets model stands up well,"[12] and, "[i]n short, the evidence in support
of the efficient markets model is extensive, and (somewhat uniquely in economics)
contradictory evidence is sparse."[13] In 1991, Fama updated his analysis and wrote,
"The empirical literature on efficiency and asset-pricing models passes the acid test
of scientific usefulness."[14] Fama also wrote, "precise inferences about the degree of
market efficiency are likely to remain impossible. Nevertheless, judged on how it
has improved our understanding of the behavior of security returns, the past research
on market efficiency is among the most successful in empirical economics, with
good prospects to remain so in the future."[15]

---

[12] Fama, *Efficient Capital Markets*, 25 J. Fin., at 383.

[13] *Id*. at 416.

[14] Fama, *Efficient Capital Markets: II*, 46 J. Fin., at 1576.

[15] *Id.* at 1576. *See also* Eugene Fama, *Market Efficiency, Long-Term Returns, and Behavioral Finance*, 49 J. Fin. Econ., 283, 283-306 (1998); G. William Schwert, *Anomalies and Market Efficiency*, in Handbook of the Econ. of Fin. (2003); and Burton G. Malkiel, *The Efficient Market Hypothesis and Its Critics*, 17 J. Econ. Perspectives, 59 (2003).

B.   **The Definition of an Efficient Market Generally Accepted By the Courts**

14.    The factors used historically by courts to determine whether a market is "efficient" were articulated by the court in *Cammer*, and have subsequently been expanded and modified by the courts. The courts have expanded the analysis to examine whether a security trades in an open and well-developed market, as well as an efficient market.

15.    I separate into two general categories the factors commonly used by courts to evaluate whether the security trades in an open, well-developed and efficient market. These are the "operational factors" and the "price-related factors." *Using the operational factors, the courts have focused on the question of whether the security trades in an open and well-developed market.*[16] The operational factors examine the trading activity in the market, with the clear understanding that: (a) an *open capital market* is one in which anyone can buy and sell securities; (b) a *developed capital market* is one that has a high level of trading activity, and for which trading information is readily available; and (c) a *developed capital market* can be characterized as a liquid market that can absorb a reasonable amount of

---

[16]   "A developed market is one which has a relatively high level of activity and frequency, and for which trading information (*e.g.*, price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes)." *Cammer*, 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, §8.6 (Aug. 1988) ("Bromberg").

trading volume at relatively low trading costs.[17] As a result, the operational factors are primarily used to examine whether there is sufficient liquidity and arbitrage activity, along with widespread information dissemination, such that it can reasonably be expected that the market price for the security rapidly reflects new information.[18]

16.     The operational factors include a determination of whether:

(1)     there is high average weekly turnover of the Note;[19]

(2)     there is continuous coverage of the Company and the Note by investment professionals, along with regular disclosures by the company;[20]

---

[17]   Economists often suggest that, "The common metrics of liquidity are turnover, bid-ask spread, and transactional size." This is also consistent with the operational *Cammer* factors. *Handbook*. Kindle Locations 7729-30.

[18]   "In an open and developed market, the dissemination of material misrepresentations or withholding of material information typically affects the price of the stock, and purchasers generally rely on the price of the stock as a reflection of its value." *Peil*, 806 F.2d at 1161.

"Indeed, nearly every court that has considered the proposition has concluded that where materially misleading statements have been disseminated into an impersonal, developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Basic*, 485 U.S. at 247.

[19]   "[A]verage weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1286 (citing Bromberg, *supra*, at §8.6). Furthermore, "weekly trading volume has been called possibly 'one of the most important' of the *Cammer* factors." *PolyMedica*, 453 F. Supp. 2d at 266 (quoting *Krogman*, 202 F.R.D. at 474).

[20]   "Second, it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period." *Cammer*, 711 F. Supp. at 1286. *See also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 205 (2d Cir. 2008) (quoting *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514 (1st Cir. 2005) ("[T]he greater the number of securities analysts following and reporting on a company's

(3)    there is a relatively high number of market makers or dealers of the Note, along with arbitrageurs;[21]

(4)    the issuer is eligible to register its securities on U.S. Securities and Exchange Commission ("SEC") Form S-3;[22]

(5)    there is a relatively large market capitalization of the Note;[23]

(6)    there is a relatively large proportion of institutional holdings of the Note;[24]

---

stock, the greater the likelihood that information released by a company is being relied upon by investors.")).

[21]    "Third, it could be alleged the stock had numerous market makers. The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. *See also PolyMedica*, 453 F. Supp. 2d at 267-68 (same).

[22]    "Fourth, as discussed, it would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met." *Cammer*, 711 F. Supp. at 1287. *See also id.* at 1271 n.5 ("Generally speaking, it is the largest and most well-known companies which register equity securities on Form S-3"); *id.* at 1284 (quoting Reproposal of Comprehensive Revision to System for Registration of Securities Offerings, Securities Act Release No. 33-6331, 23 SEC Docket 288 (Aug. 6, 1981)) ("This form [S-3] is predicated on the Commission's belief that the market operates efficiently for these companies, *i.e.*, that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place.") (Emphasis omitted).

[23]    In *Krogman*, the court suggested that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. This was also alluded to by the *Cammer* court: "Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." *Cammer*, 711 F. Supp. at 1287.

[24]    For example, in *Enron,* the court decided that the Enron bonds traded in efficient markets partially based on "data on institutional holdings…. [T]here was active trading … during the Class Period, [and] there were a substantial number of institutional investors." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 756 (S.D. Tex. 2006).

(7) there are opportunities for arbitrage;[25]

(8) there is a reasonably small bid-ask price spread;[26] and

(9) there is a sufficiently large float of the Note (*i.e.*, the amount of outstanding Notes not held by insiders of the corporation).[27]

17. On the other hand, the price-related factors are primarily used to directly examine whether the market price for the security rapidly reflects the disclosure of unanticipated information about the issuer as would be expected in what economists and the courts generally refer to as an "efficient market."[28] Price-related factors include a determination of:

(1) whether there is a price reaction to new information relevant to the valuation of the Note;[29] and,

---

[25] *See PolyMedica*, 453 F. Supp. 2d at 273 ("This Court rejects the assertion that arbitrage is the *only* mechanism of information[al] efficiency, but accepts that the significant role of arbitrageurs toward that end is widely acknowledged in academic commentary—including sources cited by the First Circuit in *PolyMedica*.").

[26] *See Krogman*, 202 F.R.D. at 478 ("A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade.").

[27] Insiders cannot freely trade in the stock of their firm based on their privileged, nonpublic information. They are subject to both trading restrictions (blackout periods, and restrictions of Rule 10b-5 and Exchange Act Sections 16(b) and 16(c)) and the reporting requirements of Section 16(a). 17 C.F.R. §240.10b-5 (2011); 15 U.S.C. §§78p(b), 78p(c), 78p(a) (2011).

[28] In determining "whether it [is] proper ... to apply a rebuttable presumption of reliance, supported in part by the fraud-on-the-market theory[,] … the plaintiff 'must allege and prove ... that the shares were traded on an efficient market' before a trial court may invoke the presumption." *Cammer*, 711 F. Supp. at 1290 (quoting *Basic*, 485 U.S. at 242, 248 n.27).

"An efficient market is one which rapidly reflects new information in price. These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one." *Cammer*, 711 F. Supp. at 1276 n.17 (citing Bromberg, *supra*, at §8.6).

[29] "Finally, it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events

(2)    whether there are certain statistical properties associated with Note price movements, such as the lack of autocorrelation.[30]

18.    In forming my opinion in this matter that the Exide Note traded in an open, well-developed and efficient market, throughout the Note Class Period, I have considered these operational and price-related factors. Further, I have considered the special features of corporate bonds that sometimes make it more difficult to understand and evaluate whether the markets for these securities are open, well-developed and efficient. As will be shown below, to undertake an appropriate analysis of whether the debt security trades in an open, well-developed and efficient market, the analyses and pricing models need to be properly adjusted to account for features that distinguish common stock from debt securities.

19.    Finally, although I will show in this Report that there is overwhelming evidence that the Exide Note traded in an open, well-developed and efficient market,

---

or financial releases and an immediate response in the stock price. This, after all, is the essence of an efficient market and the foundation for the fraud on the market theory." *Cammer*, 711 F. Supp. at 1287.

[30]   "Autocorrelation is usually found in time-series data. Economic time series often display a 'memory' in that variation around the regression function is not independent from one period to the next." William H. Greene, *Econometric Analysis*, 192 (5th ed. 2003).

In other words, autocorrelation is the measurement of the relationship between the security return at the time and the return of the same security at some fixed time in the past. First-order autocorrelation would be found when there is a statistically significant relationship between the common stock return today and the common stock return yesterday. Another way of looking at this concept is that if an observer can use the return from yesterday to predict with some level of certainty the return today, there exists autocorrelation. *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 506 n.20 (S.D. Tex. 2004) (noting that both parties' experts agreed on the helpfulness of autocorrelation); *PolyMedica*, 453 F. Supp. 2d at 276-78.

I note that the empirical analyses go well beyond what the Supreme Court has required plaintiffs to demonstrate in *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*"). There, the Court first reaffirmed *Basic*:

> The Court in *Basic* acknowledged, however, the debate among economists about the efficiency of capital markets and refused to endorse 'any particular theory of how quickly and completely publicly available information is reflected in market price.' The Court instead based the presumption of reliance on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.' Moreover, in making the presumption rebuttable, *Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof.[31]

20.     The Court also held in *Halliburton II* that "defendants must be afforded an opportunity before class certification to defeat the presumption [of reliance] through evidence that an alleged misrepresentation did not actually affect the market price of the stock."[32] As will be demonstrated below, there is no evidence of a lack of price impact when one examines the price reactions of the Exide Note to the alleged corrective disclosures.

---

[31]   *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), at 2403 (quoting *Basic*, 485 U.S. at 247 n.4 & 248).

[32]   *Id*. at 2417.

V.    ANALYSIS OF OPERATIONAL FACTORS FOR THE EXIDE NOTE

    A.    **The Operational Factors Describing Market Efficiency**

        1.    ***Cammer Factor I – Weekly Trading Volume***

        **i. Average Weekly Turnover**

21.    In his report, Mr. Torchio determined that the Exide Note's average weekly trading volume as a percentage of the par amount outstanding was 4.3%,[33] which is greater than the 2% threshold necessary to justify a "strong presumption of market efficiency" for the Exide Note. The *Exide* Court agreed that this supports a finding of market efficiency for the Note after September 13, 2011 (*i.e.,* commencing on the first day of the Note Class Period and continuing throughout the Note Class Period).[34]

22.    In his report, Dr. James did not present any evidence that the average weekly turnover of the Note was below the 2% threshold the *Cammer* Court established as indicative for a strong presumption of market efficiency.[35]

23.    I also computed the average weekly turnover for the Exide Note during the Note Class Period. I used the raw transaction data produced by Mr. Torchio,

---

[33]   Torchio Report, ¶189.

[34]   Order, p. 27.

[35]   Defendants' expert does not dispute the average weekly trading volume (S*ee*, James Report, ¶53).

which he obtained from FINRA's TRACE data service.[36] After filtering the data to account for transactions that required removal, such as canceled or reversed trades (*See* **Appendix C**),[37] I calculated average weekly turnover during the Note Class Period, which is equal to the average of the ratio of weekly volume divided by the amount of the Note outstanding for that week. Consistent with Mr. Torchio's findings, I determined that the average weekly turnover for the Exide Note during the Note Class Period was 4.5%, which is also greater than the 2% threshold accepted by courts as being indicative of market efficiency for common stock. This relatively high average weekly turnover in the Exide Note is presented in **Exhibit** 1.

---

[36]  The Trade Reporting and Compliance Engine (TRACE) is a FINRA system that facilitates the mandatory reporting of over-the-counter (OTC) secondary market transactions in eligible fixed income securities. The system consolidates and disseminates information on secondary market transactions in publicly traded TRACE-eligible securities, including investment-grade, high-yield and convertible corporate debt. This information represents all OTC activity in these bonds.    http://www.finra.org/Industry/Compliance/MarketTransparency    /TRACE/. [TORCHIO 000002].

[37]  For the purposes of calculating average weekly turnover, there are a few data treatments that I undertook to account for certain indicators in the records, as well as certain adjustments I made to ensure only bona fide transactions were used in the analysis. First, reversed trades, cancelled trades, trades marked as "to be corrected," and trades not disseminated to the public were removed from the database. Second, for the purposes of evaluating turnover, as well as estimating bid-ask spreads, I identified what I call "market making" transactions within the remaining records. Once identified, I removed one side of the transaction to avoid double-counting volume. In essence, in these transactions I kept only the buy-side or sell-side, but not both. For more information on my treatment of the TRACE data see **Appendix C**.

24.     This high level of turnover, especially for corporate bonds, is far above that found to support a "substantial presumption" that the Exide Note trades in an open, well-developed and efficient market.[38]

### ii. Transaction Size and Frequency

25.     Corporate bonds commonly trade less frequently than stocks because of their different characteristics:

> Corporate bonds will likely trade less frequently than stocks because outside macro-economic and internal financial factors generally both have smaller effects on bond pricing than on stock pricing. Unlike common stocks, corporate bonds have predictable cash flows, predictable terminal values, fixed upside opportunities—namely, redemption at par value or $100 in our example—and priority on the corporation's assets. As such, many corporate bonds are close substitutes for one another. On the other hand, corporate equity does not have predictable cash flows, predictable terminal values, fixed upside opportunities, or priority on the corporate assets.[39]

---

[38]  "[A]verage weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1286. *See also PolyMedica,* 453 F. Supp. 2d at 7 (quoting *Krogman*, 202 F.R.D. at 474) ("weekly trading volume has been called possibly 'one of the most important' of the *Cammer* factors").

[39]  Michael L. Hartzmark, Cindy A. Schipani and H. Nejat Seyhun, *Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market*, Columbia Business Law Review, Volume 2011, Number 3.

26.    Therefore, given the risk-return payoffs of corporate bonds and the structure of the corporate bond market, it is not uncommon for corporate bonds to trade far less frequently than every day.[40]

27.    In his report, Mr. Torchio found that in 2011 the Note traded on approximately 76% of possible trading days (74 out of 98 days), while in 2012, and 2013, the Exide Note traded on 100% of possible trading days (351 out of 351 days).[41] In other words, Mr. Torchio found that the Exide Note traded on 425 of the 449 days, or 94.7% of possible trading days.[42] Because of this remarkably large frequency of trading activity, the *Exide* Court concluded that this factor favors a finding of efficiency for the Exide Note after September 13, 2011.[43]

28.    Dr. James does not dispute Mr. Torchio's finding that the Exide Note traded relatively frequently.[44]

---

[40]   Sriketan Mahanti, et al., *Latent Liquidity: A New Measure of Liquidity, with an Application to Corporate Bonds*, Journal of Financial Economics, Vol. 88, Issue 2, (May 2008), pp. 272-98 ("Mahanti Paper").

[41]   Mr. Torchio also found that the number of days between successive trades in the Exide Note ranges from 0.00 to 8.05, with an average of 0.05 and a median of 0.003 days. Torchio Report, ¶192.

[42]   Torchio Report, ¶192.

[43]   Order, at p. 27.

[44]   James Report, footnote 84.

29.     I found that during the Note Class Period the Exide Note traded on approximately 97.4% of possible trading days.[45] The Exide Note traded on approximately 86.7% of possible trading days in 2011 (65 out of 75 days), 99.6% of possible trading days in 2012 (248 out of 249 days) and 100% of possible trading days in 2013 (100 out of 100 days).[46] This frequency of trading for the Exide Note is high relative to the frequency of trading of most other corporate bond issues, as presented in The Mahanti Paper.[47] In **Exhibit 2**, I present the trade distribution by frequency of trading of the Exide Note in relation to the findings of The Mahanti Paper and I present the percentile distribution of trades by time elapsed between successive trading days in relation to the findings of The Mahanti Paper in **Exhibit 3**. The number of days between successive trades for the Exide Note is high relative to the findings presented in the Mahanti Paper. In fact, the Exide Note ranks in the 1st percentile as compared the findings in the Mahanti Paper.[48]

---

[45]   Calculated as the 413 days on which the Exide Note traded divided by the 424 possible trading days in the Note Class Period.

[46]   Possible trading days is defined as all days on which the U.S. bond market is open. The percentage of possible trading days that the Exide Note traded on for 2011, 2012 and 2013 is computed using the periods September 13, 2011 to December 31, 2011, January 1, 2012 to December 31, 2012 and January 1, 2013 to May 24, 2013, respectively. I considered October 29, 2012 and November 12, 2012 as non-trading days, as the stock market or bond market, respectively, were closed due to Hurricane Sandy and Veterans Day, respectively.

[47]   Sriketan Mahanti, Amrut Nashikkar, Marti G. Subrahmanyam, George Chacko, and Gaurav Mallik, *Latent Liquidity: A new measure of liquidity, with an application to corporate bonds*, Journal of Financial Economics, 88 (2008) 272-298.

[48]   *Id.*

30.     Finally, compared to the *Just for Feet* ("*JFF*") unregistered bonds, *Enron* bonds, and *DVI* bonds, which were all found to have traded in efficient markets, the Exide Note had much higher trading volume and trading frequency. [49] This supports the conclusion that the Note traded in an open, well-developed and efficient market.

---

[49] The *JFF* court concluded: "The market for these bonds was informationally efficient notwithstanding that on some days the trading volume was low and on others, there was no trading at all." *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 684-85 (N.D. Ala. 2005). This was partially based on the following facts: "The trading volume of the JFF high yield bonds *was not thin.* They traded on at least 75 of the 140 days between the initial offering and the Chapter 11 bankruptcy filing on November 3, 1999. Excluding the first week of trading, the average daily trading amount of JFF bonds was $3,245,107.... The total face amount purchased by investors over the 140 days was $138,205,000, and the total sales were $316,110,000." *Id.* at 685 n.9.

The *Enron* court noted: "The investment bank data reflect over 15,800 trades for Enron Registered Bonds throughout the Class Period. The number of transactions per issue throughout the Class Period ranged from 24 to 3,684 per issue, an average of 69, a median of 282. The percentage of days on which the trades occurred and the issue was outstanding falls between 1% (11 days) to 36% (132 days), with an average of 12.2% and a median of 9.71%." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2005 U.S. Dist. LEXIS 41240, at *91 (S.D. Tex. Dec. 22, 2005).

The *DVI* court noted: "Based on verifiable trade volume data, the Senior Notes had an average weekly trading volume during the Class Period of 1.25%." *In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 215 (E.D. Pa. 2008), *aff'd*, 639 F.3d 623 (3d Cir. 2011). In addition, the *DVI* court observed that "[t]he 1997 Notes were in the top 10% of all corporate bonds in terms of the fewest average days between trades, ranging between 1.92 to 4.63 days during the Class Period.... Though such trading volume would not likely support a finding of an efficient market for equities, it is sufficient to support such a finding for corporate bonds." *Id.* at 214.

*In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 280–82 (N.D. Ala. 2009) at 634. The court noted that "The comparisons Professor Seyhun made to the trading activity of other bonds are particularly helpful in that regard."

### iii. Transparency

31.    Corporate bond markets do not have the same pre-trade and post-trade dissemination of pricing information that is often found in exchange-traded common stock or even over-the-counter common stock. Information availability has been enhanced with the introduction of FINRA's TRACE system which disseminates information on bond transactions. Even so, it would be wrong to conclude based on this institutional feature alone, that all corporate bonds trade in inefficient markets. This issue is often referred to as "transparency":

> Transparency means that price and volume information is readily available to potential traders at a relatively low cost. For exchange traded securities, exchanges collect and disseminate this information at a minimal cost to all interested parties. For over-the-counter traded bonds, price and volume information are not available at zero cost. At any given moment, however, this does not mean that interested investors are not communicating, or do not or cannot generate transparency (price and volume information for recently completed transactions or for future potential trades).... [A]n efficient market does not require that price and volume information be available at zero cost. Emails or a simple telephone call, or, for that matter, twenty simultaneous emails or telephone calls from the trading floor or web access to the buy/sell offers on the Bloomberg Terminal[50] will supply sufficient transparency.[51]

---

[50]   The Bloomberg Terminal is a computer system provided by Bloomberg L.P. that enables financial professionals to access the Bloomberg Professional service through which users can monitor and analyze real-time financial market data movements and place trades. *See* http://www.bloomberg.com/professional/.

[51]   Michael L. Hartzmark, Cindy A. Schipani and H. Nejat Seyhun, *Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market*, Columbia Business Law Review, Vol. 2011, Number 3.

32.   Competition among over 162 market makers[52] of Exide Note – who,
minute-by-minute, day-by-day, risk their own capital and utilize the most advanced
information technology and sophisticated research teams – led to an efficient market
for the Exide Note. There were at least an additional 100 market participants who
traded in the Exide Note during the Note Class Period, bringing the total number of
market participants to 262. In addition, as shown in **Exhibit 4**, the Note's average of
the daily dollar amount traded was $5.8 million. Likewise, **Exhibit 5** demonstrates
that the average dollar value of each separate transaction of the Exide Note for each
year is higher than the annual average trade size of total TRACE High Yield bond
trades obtained through the MarketAxess database.[53] Hence, the cost of sending an
email or text, using one of the many electronic systems now available, making a few
or even twenty telephone calls relative to the dollar volume of these typical trades is
minuscule. To claim that it is too costly for bond traders to generate sufficient pricing
information about the Exide Note by contacting the dealers is just not credible.

33.   One might also argue that there can be no transparency in a marketplace
without transactions or disseminated price and volume information. In other words,

---

[52]   *See* Appendix C for a description of the methodology used to compute the number of market
makers for the Exide Note during the Note Class Period. *See* Exhibit 6 for a list of the unique
market makers identified using this methodology.

[53]   *TRACE     High     Yield     Trade     Count*,     MarketAxess,     accessed     at
http://www.marketaxess.com/research/market-insights/bonds_by_size_hy.php  on  September
28, 2015.

because bonds trade less often than common stock and thus there are days without observable transaction prices, the market is less transparent and thus inefficient. However, this argument fails to account for the distinction between the ability to trade a security and an actual trade in that security. Even when a bond does not trade, interested investors can examine data from TRACE, simply contact bond dealers and learn about dealers' buying and selling (bid and ask) prices and quantities. The fact that there may be no trade on a given minute, hour or day does not mean that interested investors are not communicating or do not or cannot generate transparency. Furthermore, an efficient market does not require that there be trades every day, or every hour, or every minute. Unlike common stocks, corporate bonds have predictable cash flows, predictable terminal values, and fixed upside opportunities. Thus, many corporate bonds are close substitutes for each other. These critical differences in certain characteristics of these securities and the differential influence of firm-specific and external economic factors suggest there might be differences in the frequency of trades between common stocks and corporate bonds.

34.     The courts have long recognized that the over-the-counter corporate bond markets lack some of the elements of transparency found in centralized exchanges, and that *this particular shortcoming is insufficient* to find that the trading markets for corporate bonds are per se inefficient. This was clearly the case in the *Enron* matter, where the court stated that "no-cost efficiency, or for that matter

- 24 -

transparency, has not been established as the standard for an informationally efficient, over-the-counter bond market. Obviously 'transparency' is relative, involving consideration of numerous factors. No standard of requisite transparency has been established by the courts."[54] In *HealthSouth*, the court went even further and suggested it was illogical to conclude that the market for corporate bonds was not transparent.[55]

---

[54]   *In re Enron*, 2005 U.S. Dist. LEXIS 41240, at 169.

[55]   *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 638-39 (N.D. Ala. 2009) ("The Defendants then argue that, unlike stock, bonds do not trade on a formal, impersonal, centralized exchange, like the NYSE; that over-the-counter transactions are conducted over the phone or by computer; that an investor has to seek out a dealer to get a quote on a bond and may in fact receive different quotes from different dealers; and that an investor would thus have difficulty determining the prevailing price for a specific corporate bond.... In effect, the Defendants argue that the market for *all* bonds is inefficient because it does not function like the stock market. If the court were to accept these challenges, it would be '[d]enying application of fraud on the market to the bond market because it does not operate in the same way as a national exchange or trade in the same volume, frequency, or manner as equity on those exchanges [and would be like] throwing out oranges because they are not apples. The Court finds that the issue is not whether the market for equity is more efficient than the market for debt securities, but whether the market for debt securities is adequately informationally efficient (whether the price reflect[s] all publicly available information) to trigger the fraud-on-the-market presumption of reliance.' Bond traders at large institutions who make transactions of six figures or more simply do not trade on insufficient information, or information perceived to be unreliable, or on less than all publicly available information. To argue that the investors in HealthSouth bonds did not have sufficient publicly available information in making their decisions about buying and/or selling HealthSouth bonds, and what would be a reasonable price for those bonds, defies logic and ignores the realities of the bond market in which billions of dollars trade hands.") (internal citations omitted). *See also In re HealthSouth*, 261 F.R.D. at 639 ("Transparency has not to date been recognized as a requirement for an efficient market. In any event, transparency is relative and relative matters should be compared like to like. In terms of the bond market the court, therefore, concludes that the HealthSouth bond market traded on all the publicly available information and thus meets the test for informational efficiency."); *In re DVI*, *supra*.

35.     In fact, in my opinion, courts have rightly determined that the measurable *Cammer* factors are appropriate benchmarks for both over-the-counter common stocks and corporate bonds because no requisite measure of transparency has been established by either judicial precedent or academic research to define when a security trades in an efficient market.

#### iv. Summary and Conclusion

36.     Thus, the relatively high frequency of trading of the Exide Note, the high average weekly turnover, the large amount traded on each day and the large average transaction size constitute substantial evidence justifying a strong presumption that the Exide Note traded in an open, well-developed and efficient market throughout the Note Class Period.

### 2.     *Cammer Factor II – Analyst Coverage*

37.     In his report, Mr. Torchio determined that there were numerous analysts following, analyzing, and issuing research reports about Exide common stock during the Class Period.[56] While these reports were focused on Exide common stock, Mr. Torchio noted that the information and analysis these analysts provided was relevant to the efficient pricing of the Exide Note.[57]

---

[56]   Torchio Report, ¶¶85-86.

[57]   Torchio Report, ¶197. In *HealthSouth* (p. 33) the Court concluded, "The coverage by analysts of HealthSouth's equities also provided information of interest to the bond market when concerned with the overall financial health of the issuing firm. "While positive equity reports

38.     Mr. Torchio also noted that the Exide Note was rated by the two major ratings agencies: Moody's and S&P.[58] The *Exide* Court found "that this factor favors efficiency."[59]

39.     In addition to the analyst reports cited in the Torchio Report, I was able to obtain research reports published by Deutsche Bank[60] and R.W. Pressprich[61] that focused specifically on the Exide Note. In *DVI*, only three analysts provided continuous coverage, issuing over eighty reports, yet the Court found this was

---

do not necessarily imply higher prices for the Notes, negative equity reports could imply lower prices" as a warning sign of a deterioration in the financial health of the company.

[58]   Torchio Report, ¶199.

In *HealthSout*h (pp. 40-41) the Court concluded, "Credit rating agencies provide an important source of information relied on by the bond market in assessing an issuer's creditworthiness and consequently the value of the bonds. Credit rating agencies are independent entities that analyze issuers and their debt securities; investors use credit ratings and other information from these agencies to help assess value, including the riskiness of debt."

"The fact that credit rating agencies processed financial information concerning the creditworthiness of HealthSouth bonds, made the information available to the public, and reacted to the publicly-available information as to HealthSouth's financial condition provides further evidence that the market for HealthSouth bonds was efficient throughout the class period. The publicly available financial information affected the credit rating for HealthSouth bonds in much the same way information affects the price of stock in an efficient market for stock; and the credit ratings – along with other publicly available information – likewise affected the price of the HealthSouth bonds."

This would also apply to the Exide Note.

[59]   Order, at pp. 27-28.

[60]   *See*, "Initiating Coverage - Buy," *Deutsche Bank*, credit analyst report, October 13, 2011; and "Shifting Focus," *Deutsche Bank*, credit analyst report, November 13, 2012.

[61]   *See*, "Exide Hits A Bump in the Road," *R.W. Pressprich*, credit analyst report, April 8, 2013; and "Awaiting March-Quarter Numbers," *R.W. Pressprich*, credit analyst report, May 16, 2013.

sufficient to support a conclusion that the DVI Notes traded in an open, well-developed and efficient market.[62] Overall, the fact that the Exide Note was covered by two rating agencies and numerous analysts, supports the conclusion that the Exide Note traded in an open, well-developed and efficient market throughout the Note Class Period.

3.   ***Cammer Factor III – Market Makers***

40.   The presence of many dealers or market makers is another factor that supports the conclusion that securities trade in efficient markets. These professional traders have significant advantages over small individual investors in terms of the cost of gathering, processing and trading on information.

41.   In his report, Mr. Torchio found that there were "266 unique Market Participant Identifiers that made at least one trade with an investor during the Class Period." The *Exide* Court found that this "factor favors market efficiency."[63]

42.   Nowhere in the James Report does Dr. James dispute Mr. Torchio's finding that at least 266 market participants made trades during the Class Period.

43.   I examined the number of market participants and the number of market makers during the Note Class Period. For the Note Class Period, I found that there were 262 unique market participants. Based on my review of the TRACE data as

---

[62]   *In re DVI*, 249 F.R.D. at 196.

[63]   Order, at pp. 28-29.

outlined in **Appendix C**, I show in **Exhibit 6** that I found that there were 162 separately identified reporting market makers for the Exide Note throughout the Note Class Period. This is a substantial number of market makers as compared to other matters where securities were deemed to have traded in an efficient market. For instance, in the *China MediaExpress Holdings, Inc. Shareholder Litigation*, in which an investor class was certified, only 20 market makers were identified. Moreover, the *China MediaExpress* court also cited to two other cases where the securities were deemed to have traded efficiently wherein only 6 and 10 market makers were observed.[64]

44.    In conclusion, the participation of this relatively large number of dealers, standing ready to buy or sell, made an active market in the Exide Note. In combination with the large number of unique market participants I observed for the Exide Note, the evidence supports my conclusion that the Exide Note traded in an open, well-developed and efficient market throughout the Note Class Period.

### 4.    *Cammer Factor IV – SEC Form S-3 Eligibility*

45.    The fact that Exide was eligible to file an SEC Form S-3, and actually did use this form just prior to the Note Class Period by exchanging the Exide Note based on a shelf registration statement supports my conclusion that the Exide Note

---

[64]    *In re China MediaExpress Holdings, Inc. S'holder Litig.*, Decision and Order, August 15, 2014 (S.D.N.Y.) (Marrero, J.).

traded in an open, well-developed and efficient market during the Note Class Period.[65] Thus, I also agree with the *Exide* Court that, "For the same reasons discussed with respect to Exide's common stock, this factor favors finding that the Exide Note traded on an efficient market – at least as to the 96% of trading days during which Exide was eligible to file SEC Form S-3."[66]

### B.   Other Operational Factors to Weigh When Examining Market Efficiency

#### 1.   *Market Value*

46.     The *Krogman* court suggested, "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[67] In my opinion, all else constant, the same "incentive ... to invest in more highly capitalized corporations" applies with equal force to bondholders. In general, all else constant, the larger the size of the security, the more attention it will receive from brokers, analysts, individuals, institutions

---

[65] "We are offering to exchange a new issue of 85/8% senior secured notes due 2018, which we refer to as the new notes, for our outstanding old notes. We sometimes refer to the old notes and the new notes in this prospectus together as the notes. Our offer to exchange old notes for new notes will be open until 5:00 p.m., New York City time, on September 13, 2011, unless extended." Exide Technologies Form 424B3, dated 15 August 2011.

[66] Order, at p. 28.

[67] *Krogman*, 202 F.R.D. at 478.

(especially if they have investment-size requirements), money managers, hedge funds and other financial entities.

47.     In his report, Mr. Torchio found that the market value of the outstanding Exide Note ranged from $443.7 million to $677.9 million during the Note Class Period.[68]

48.     I found that the market value of the Note ranged between $442.5 million and $677.9 million during the Note Class Period. Therefore, even at its lowest market value the Exide Note exceeded the par values of the bonds in *DVI* and *JFF*, which were only $155.0 million and $200.0 million, respectively; both bonds which were found to have traded in open, well-developed and efficient markets.[69]

### 2.   *The Size of the Float*

49.     The float refers to the amount of outstanding securities that are not held by insiders of the corporation.[70] While insiders are subject to trading restrictions and disclosure requirements with respect to their *stock* trades, there are no such

---

[68]   Torchio Report, ¶200.

[69]   "[DVI] issued two tranches of 9 7/8% senior notes: the first, issued in 1997, totaled $100 million; the second, issued in 1998, totaled $55 million." *In re DVI*, 249 F.R.D. at 215.

"On April 14, 1999, the Company completed the private placement of $200.0 million, 11.0% senior subordinated notes." *Just for Feet*, SEC Form 10-K for the period ended January 30, 1999.

[70]   Insiders cannot freely trade in the stock of their firm based on their privileged, nonpublic information. They are subject to both trading restrictions (blackout periods, and restrictions under Exchange Act Sections 10(b), 16(b) and 16(c)) and reporting requirements of Section 16(a).

restrictions or requirement on insiders with respect to publicly traded, non-convertible debt issues (other than Section 10(b) and Rule 10b-5).

50.    The facts that the Exide Note was unrestricted to freely trade, that there were no reported insider transactions in the Exide Note, and that the float is equal to the outstanding amount of the Exide Note support my conclusion that the Exide Note traded in an open, well-developed and efficient market throughout the Note Class Period.

### 3.   *Institutional Holdings*

51.    The corporate bond market is dominated by large, sophisticated institutions. Indeed, a recent paper by staff economists at the Board of Governors of the Federal Reserve stated the following:

> The market for the U.S. corporate bonds is large and dominated by institutional investors. As of the end of 2010, *institutional investors held about three quarters of the $7.5 trillion (sic) outstanding corporate bonds issued by U.S. firms.* In addition, institutional trades account for most of the dollar trading volume of corporate bonds.[71]

52.    Recent U.S. Census data also suggest the same. For instance, a 2009-2010 statistical abstract regarding the types of holders for corporate debt suggests that the vast majority is, indeed, owned by different types of institutions as shown in

---

[71]   Fang Cai, Song Han, and Dan Li, *Institutional Herding in the Corporate Bond Market*, Board of Governors of the Federal Reserve System, International Finance Discussion Papers, Number 1071, December 2012. (Emphasis Added.)

**Exhibit 7**, which lists U.S. Census data on corporate and foreign bond holdings by type of investor.

53.     In his report, Mr. Torchio found that at least 88 different institutional investors held, on average, 47% of the outstanding face value of the Exide Note.[72] The *Exide* Court found that this weighted in favor of a finding of market efficiency for the Exide Note.[73]

54.     Dr. James does not dispute Mr. Torchio's finding with respect to the levels of institutional holdings in the Exide Note.

55.     During the Note Class Period, I found that at least 85 different institutional investors held, on average, 49.6% of the outstanding face value of the Exide Note.[74] The fact that 49.6% of the Exide Note was held by institutions, on average, further supports my conclusion that the Exide Note traded in an open, well-developed and efficient market throughout the Note Class Period.

### 4.     *Bid-Ask Spread*

56.     The Torchio Report did not examine the bid-ask spread for the Exide Note. Understanding that the size of the bid-ask spread in the market is an indication of the liquidity in the market, and is sometimes considered a factor in determining

---

[72]   Torchio Report, ¶30.

[73]   Order, at pp. 28-29.

[74]   Institutional ownership data obtained from Bloomberg.

whether the security trades in an efficient market, I have included such an analysis in my report. In *Krogman*, the court suggested, "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[75]

57.    In corporate bond markets, there are no reported bid-ask spreads. I employ a technique used by researchers in finance whereby I examine all *customer* trades with reporting dealers using the TRACE database.[76] The trades I use include transaction prices when a particular dealer *first bought* the Note from a customer and the transaction prices when the same dealer *subsequently sold* the Note to a customer within a 15 minute time interval. Because these transactions are: a) confined to a reasonably narrow timeframe, b) confined to a single dealer, and c) confined to transactions only with customers (as opposed to other dealers), this approach computes a conservative estimate of the bid-ask spread.

58.    The results in **Exhibit 8** show that for trades between dealers and non-dealer customers, who are non-dealers, the average dollar bid-ask spread per $100 par value is $0.32.[77] The median bid-ask spread per $100 par value is $0.25. Given

---

[75]    *Krogman*, 202 F.R.D. at 478.

[76]    *See*, for instance, Paul Schultz, *Corporate Bond Trading Costs: A Peek Behind the Curtain*, J. Fin., 56, 677-98 (2001), who also uses a regression analysis to estimate the bid-ask spread.

[77]    These dollar bid-ask spreads are based on $100 par value, which is fixed, as opposed to a variable percentage spread that accounts for changes in the market value of the Note, which would include the impact of changing prices.

that the average is at or below $0.65, and the median is at or below $0.50, I reasonably conclude that these spreads are lower than to the typical spreads described in academic research.[78] This conclusion is conservative because I have eliminated dealer-to-dealer trades, which likely would be completed at substantially lower bid-ask spreads. In addition, large transactions generally have substantially lower bid-ask spreads than the average and I have not broken down the bid-ask spreads by transaction size.

59.    The relatively narrow bid-ask spread, suggesting that the Exide Note traded in liquid markets, supports my conclusion that the Exide Note traded in an open, well-developed and efficient market throughout the Note Class Period.

### 5.    *Dr. James is Wrong to Discount the Importance of the Operational Factors; Moreover, this Contradicts His Prior Testimony*

60.    In his report, Dr. James argues that these operational factors are "indirect" analyses that do not "actually demonstrate market efficiency. Mr. Torchio's 'indirect' analyses may provide evidence consistent with what is generally

---

[78]    *See*, for example, Table 6, panel C in Michael A. Goldstein, Edith S. Hotchkiss and Erik R. Sirri, *Transparency and Liquidity: A Controlled Experiment on Corporate Bonds*, The Review of Financial Studies, 20, no. 2, (2007), pp. 235-273. A one percent bid-ask spread is relatively narrow.

observed for efficiently traded securities, but they do not themselves *prove* efficiency."[79]

61.   Not only is Dr. James' opinion wrong, but it is contrary to Judge Wilson's Order, the academic literature, the *Cammer* court, the *Krogman* court, and numerous other courts,[80] but it is also inconsistent with his prior opinions. For example, in his expert report in the *In re Superior Offshore International, Inc.* Dr. James analyzed trading volume and the number of analysts covering the security and concluded that these factors were "important" to demonstrating market efficiency.[81] In the *In re Adams Golf, Inc.* case, Dr. James stated that the first four *Cammer* factors are "indicative for [sic] economic conditions of a well-developed market that supports market efficiency."[82]

---

[79]   James Report, ¶51 (*emphasis* in original).

[80]   For example, based on a similarly flawed argument by the Defendants' experts the *HealthSouth* Court (p. 40) agreed with me that one must evaluate all the factors, not just the fifth *Cammer* Factor. HealthSouth: "In the absence of any guidance from the Circuit, and without a better test for bond market efficiency, the court finds that the *Cammer/Bell/Unger* factors, plus the additional factor suggested by Professor Ronen, are appropriate factors to evaluate the efficiency of the HealthSouth bond market while taking into account the differences in the trading of bonds from stocks." *Id.*

[81]   Expert Report of Professor Christopher M. James, *In re Superior Offshore International, Inc.*, Case No. H-11-3130 (S.D. Tex.), dated June 15, 2012, ¶¶118-119.

[82]   Expert Report of Christopher M. James, *In re Adams Golf, Inc. Sec. Litig.*, Case No. 99-371-KAJ (D. Del.), dated July 14, 2006, ¶39.

## VI.  CAMMER FACTOR FIVE - THE PRICE-RELATED FACTORS DESCRIBING MARKET EFFICIENCY

62.  The fifth *Cammer* factor is "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[83] As the *Krogman* court noted, "in an efficient market, a stock's price remains relatively stable in the absence of news, and changes very rapidly as the market receives new and unexpected information."[84] To begin one must understand that sometimes the bond and stock move up in tandem, sometimes they move in opposite directions and sometimes only one of the securities moves, while the impact is neutral for the other. This is consistent with the finance literature and previous court decisions, the *Exide* Court correctly observed "… that debt and equity securities may respond differently to some types of news."[85] In my published article, I stated:

> Understanding cause and effect for a particular bond price is not intuitive and it can be a source of confusion. First, establishing *a priori* the market expectations is difficult for any security market, let alone for a bond. What is generally considered to be good news for a particular stock may be neutral or even bad news for a related bond. Similarly, what is generally considered to be bad news for a particular stock may again be neutral or even good news for the related bond. Moreover, for a given event the courts have understood bond price reaction will

---

[83]  *Cammer*, 711 F. Supp. at 1287.

[84]  *Krogman*, 202 F.R.D. at 477.

[85]  Order, at p. 26. *See In re HealthSouth Corp. Sec. Litig.,* 261 F.R.D. 616, 631 (N.D. Ala. 2009) (after evaluating the differences between stocks and bonds, the court was "led to the conclusion that certainly some of those differences [in stocks] must be considered when evaluating the efficiency of a bond market").

generally be less responsive than stock price reaction and may depend on the content and importance of the event.[86]

For example, in *HealthSouth,* the court found that "[t]he price of bonds reacts differently to unexpected new information than does the price of stocks. Information that may be material to a stock price, such as the announcement of a dividend, may not be material for a bond investor whose fixed return would not be affected. In contrast, the price of bonds may be affected by general, non-company specific information, such as changes in risk-free interest rates that would not affect stock prices."[87]

---

[86] *See DVI*, 249 F.R.D. at 216 ("Lead Plaintiffs have established a sufficient cause and effect relationship to support a finding that the release of new public information affected the price of the Senior Notes. This finding is strengthened by the fact that, though debt securities are typically less responsive to new public information, there exists a high level of correlation between the Senior Notes' price changes and identifiable news events."). *See also* Jonathan R. Macey & Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market-Theory*, 42 Stan. L. Rev. 1059, 1085 (1990) (noting that "not all corporate information will affect all securities of a given issuer in the same way. Debt securities will be more insulated from the shocks associated with bad news than will equity securities.").

[87] *HealthSouth,* 261 F.R.D. at 635. *See* Robert C. Merton, *On the Pricing of Corporate Debt: The Risk Structure of Interest Rates*, 29 J. Fin. 449 (1974). The key element to stock and bond pricing theory is that both common stock and bonds may be viewed as options on the underlying assets of the corporation. Given limited liability, common shareholders have the option to default or pay off the bondholders in full when debt becomes due. If, when the debt matures, the value of the assets is less than the payment required to the bondholders, then shareholders will prefer to default and leave the assets to the bondholders. Otherwise, the shareholders will prefer to pay off the bondholders (by repaying the principal amount of the debt) and 'purchase' the assets from the bondholders. Hence, we can view the common shareholders' claims on the firm as a call option on the assets with an exercise price equal to the face value of the bonds (i.e., the amount it takes to repay the principal amount of the debt). Similarly, the value of the bonds can be viewed as the value of the assets minus a call option on the assets. Viewed from this perspective, stock prices and bond prices need not move in the same direction. As stated by Moody's, which has commercialized Dr. Merton's model, this theory suggests that "the default probability of the firm determines the default probability for all of the firm's debt or counterparty obligations. However, the loss in the event of default for each of the classes of obligations can vary widely depending on their nature (security, collateral, seniority, etc.)." *See* Peter Crosbie and Jeff Bohn, *Modeling Default Risk: Modeling Methodology*, (Moody's KMV Company 2003), available at http://www.macs.hw.ac.uk/~mcneil/F79CR/Crosbie_Bohn.pdf.

63.    In an efficient market for common stock and bonds, different factors may influence the respective price movements of the financial instruments. Therefore, it is important to evaluate each individually.[88] Every day there are both internal and external factors that affect the business risk and prospects of a firm. Depending on the relative impacts, stock and bond returns might move in tandem or inversely.[89]

---

[88]  For example, Simon Kwan has explained why a company's stock and bond prices may move in opposite directions in response to new company-specific information: "[I]n an informationally efficient market, the stock and bonds of a firm usually react to firm-specific news in a consistent fashion. Depending on the type of firm-specific information disseminated over time, individual stocks and bonds can be either positively or negatively correlated. Information about the mean value of the firm's underlying assets affects the values of the firm's stocks and bonds in similar directions, resulting in a negative [positive] relationship between individual stock returns and changes in individual bond yield [price]. On the other hand, if we view equity as similar to a call option on the firm's underlying assets, then information about the variance of the firm's asset return has opposite effects on the values of the firm's stocks and bonds, resulting in a positive [negative] relationship between individual stock returns and bond yield [price] changes. Hence, examining the correlation between individual stocks and bonds can reveal the dominant type of firm-specific information that drives these investments. Simon H. Kwan, *Firm-Specific Information and the Correlation between Individual Stocks and Bonds*, 40 J. Fin. Econ. 63, 64 (1996) (internal citations omitted).

[89]  In addition to the widely accepted theory of the relationship between stock and bond returns being a function of the nature of the information, "[t]he wealth redistribution hypothesis, which stems from the conflict of interests between bondholders and stockholders, differs from the information content hypothesis by stating that an increase (decrease) in the equity market value is accompanied by a decrease (increase) in the debt market value. Indeed, wealth can be redistributed from bondholders to stockholders by increasing the risk of the outstanding bonds. Higher bond risk can result from increasing the variance of the firm's possible future values." George Handjinicolaou and Avner Kalay, *Wealth Redistributions or Changes in Firm Value: an Analysis of Returns to Bondholders and Stockholders around Dividend Announcements*, 13 J. Fin. Econ. 35, 38 (1984) (internal citations omitted).

Thus, "the wealth redistribution hypothesis predicts offsetting changes in the values of individual classes of securities and no change in firm value." This means that stock and bond returns will be inversely related. Ronald W. Masulis, *The Effects of Capital Structure Change on Security Prices*, 8 J. Fin. Econ. 139, 143 (1980).

A. **Event Study Methodology for the Exide Note**

64.     To detect whether the price of the Note reacted in a reasonable and timely fashion to disclosures of unanticipated information, I ran a series of empirical tests using the results from my traditional event study. Event studies are widely used in academia, litigation matters and investment practices, and have been a standard statistical procedure used by financial economists for over thirty years. They are generally used to measure the reaction of market participants (and thus the security price) to the disclosure of new information.

65.     The regression specification, which I have used in prior reports implements a "Fama-French" specification and thus is used in a manner that is consistent with and basically an extension of the regression used to examine whether Exide common stock traded in an efficient market throughout its Class Period. Thus, the Exide Note regression specification is a *commonly utilized extension of the regression specification used for the Exide common stock*, as I simply add two additional terms to the regression specification. The specification and additional variables are based on academic theories of bond pricing – namely credit and maturity variables – described below.

66.     To perform an event study, one begins by separating the impact on security price movements of market- and industry-wide factors from the impact of firm-specific factors. For bonds, an event study uses the same approach as the

common stock with a slightly different specification of the empirical model to account for the differences between the exogenous factors that influence the prices of stocks and bonds. The specification I utilize extends the commonly used market model for common stock, by partitioning a company's bond price movement on each trading day into various components. For common stock, price movements are separated into three parts: the movement caused by market-wide factors, or the "market effect"; the movement caused by industry-wide factors, or the "industry effect"; and the movement caused by the "firm-specific effect." For bonds, price movements are separated into the same three components, along with two additional factors: the credit-risk effect and the time-to-maturity effect.

67.     Once the price movements are partitioned, as with common stock returns, the firm-specific price movements are isolated and used to determine if the bond price reacts as expected to disclosures. The event study methodology then provides empirical evidence showing whether the firm-specific abnormal returns, or returns in excess of what is predicted by the statistical model, are statistically significantly different from zero (hereinafter referred to as "significant returns").[90]

68.     Bond-pricing theory tells us that changes in prices will take place based on discounted cash flows. Thus in general, the daily bond price movements are a

---

[90]   This is the case when the *t*-statistic associated with the daily abnormal return is greater than or equal to 1.97 in absolute value.

function of the two factors below, plus the same factors that influence the price movements of common stock:

(1)     The expected rate of return on similar maturity, riskless debt (*i.e.*, U.S. government bonds); and

(2)     The default risk, or the probability that the company will be unable to satisfy some or all of the indenture requirements given current and expected future economic conditions.

69.     Therefore, to run the bond market model one adds explanatory variables to the common stock market model that account for these two additional exogenous factors. Thus, for bonds the appropriate specification is as follows:

$$N_t = \beta + \beta_1(Rm_t) + \beta_2(INDUSTRY_t) + \beta_3(CREDIT_t) + \beta_4(MATURITY_t) + e_t.$$

70.     In this equation, the $\beta$'s are called regression parameters or beta coefficients,[91] $N_t$ is the daily return to the Note, $Rm_t$ is a proxy for the daily market return, $INDUSTRY_t$ is a proxy for the daily industry return, $CREDIT_t$ is the daily return of an index of comparably risky bonds, and $MATURITY_t$ is the daily return of a treasury security with the same time-to-maturity as the Exide Note. For the Exide Note regression, the explanatory variables are:

---

[91]   $\beta$ represents the constant or trend in the regression; $\beta_1$ represents the estimate of the percentage change of the return to the Exide Note caused by percentage changes in the MARKET return (when all other variables are held constant). For $\beta_2$, $\beta_3$ and $\beta_4$.respectively, these represent the estimates of the percentage changes in the Exide Note caused by a percentage changes in the INDUSTRY, CREDIT and MATURITY returns (when all other variables are held constant).

Rm$_t$: the S&P 500 Total Return Index return, which accounts for changes in the activity in the general economy and the impact on the returns to the Exide Note;[92]

INDUSTRY$_t$: a market-cap weighted peer index ("Industry Index") consisting of 10 of the 22 companies identified by Exide as peers, which accounts for changes in the activity within the industry that Exide competes in and the impact on the returns to the Exide Note;[93]

CREDIT$_t$: a combination of the Barclays US Aggregate Credit Corporate Index (B) and Barclays US Aggregate Credit Corporate Index (CAA), which accounts for changes in the credit risk in the economy and the impact on the returns to the Exide Note;[94]

MATURITY$_t$: the return of a Treasury Note due February 15, 2018, which accounts for changes in risk-less interest rates and the impact on the returns to Exide Note.[95]

e$_t$: is the daily residual derived from the regression or the firm-specific component that emerges from the regression.

71.     The returns for INDUSTRY$_t$, are net of the S&P 500 Total Return, while the returns to the CREDIT$_t$, are net of the MATURITY$_t$ returns.

---

[92]  The S&P 500 Total Return Index is commonly used as a proxy for the overall stock market in regression and event study analysis. *See*, for example A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature, March 1997, p. 15.

[93]  I use this to remain consistent with the specification of the market model in the Torchio Report, with the exception of weighting the constituents by market capitalization, not equally.

[94]  Prior to March 12, 2013, the Barclays US Aggregate Credit Corporate Index (B) return is used for CREDIT$_t$. After this date, 67% of the Barclays US Aggregate Credit Corporate Index (B) return and 33% of the Barclays US Aggregate Credit Corporate Index (CAA) return was used for CREDIT$_t$ to reflect the Moody's Investor Service downgrade to Caa1. That is, the CREDIT variable was computed by pricing a hypothetical benchmark bond each day of the Note Class Period that had the same coupon and maturity as the Exide Note, but had a market index yield-to-maturity.

[95]  For the MATURITY$_t$ variable I used returns of a 10 year Treasury with the CUSIP 912833KQ2 because this Treasury instrument matures at a similar date as the Exide Note.

72.     In the first step, econometric regression methods are used to estimate the parameters or coefficients in the equation above, namely $\beta$, $\beta_1$, $\beta_2$, $\beta_3$ and $\beta_4$. Because the Exide Note was issued just prior to the beginning of the Note Class Period and exchanged at the start of the Note Class Period, to estimate the parameters of the market model for the Note, I use data within the Note Class Period and include "dummy" variables to account for possible anomalous price reactions on dates when there are the alleged corrective disclosures occurring on April 4, 2013, April 25, 2013 and May 24, 2014;[96] along with cashflow-related announcements on November 7, 2011, February 9, 2012, June 7, 2012, August 2, 2012, and February 6, 2013.[97]

73.     The second step uses the regression parameters or the estimated coefficients, namely $\beta$, $\beta_1$, $\beta_2$, $\beta_3$ and $\beta_4$. And multiplies them by the actual daily return measures for their respective explanatory variables. On each day during the Note Class Period, the products of these multiplications are summed to calculate the

---

[96]   Because the Company's announcement on April 24, 2013 occurred after 4:00 PM, the close of trading in the US stock market, the effective event test date is the next trading day.

[97]   Because all of the Company's earnings announcements occurred after 4:00 PM, the close of trading in the US stock market, the effective event test date is the next trading day. There is one additional earnings date during the Notes Class Period: November 9, 2012 (Friday). However, as the effective date of the information released on that day would have been November 12, 2012, a bond market holiday, I excluded the date from my selection of cashflow-related announcements. For the definition of a cashflow-related announcement see paragraph 101.

predicted daily return. On each date, the abnormal return is then calculated by subtracting the predicted daily return from the actual daily return.[98]

74. In the third step, statistical tests are employed to assess the statistical significance of the abnormal return for each date or, in other words, to determine whether the abnormal return is significantly different from zero with a specified degree of certainty. In this case, as I mentioned above I use a 5% significance level.

75. Finally, in the class certification process, as in a normal event study, there is an examination of the relationship between the abnormal returns, the statistical significance of those abnormal returns, and the information content found in specified news releases.

B. **Event Study Results**

1. *Cause-and-Effect Analysis Examining Corrective Disclosure Dates*

76. The results of the market model for the Exide Note are shown in **Exhibit 9**, while **Appendix E** shows the daily statistics for the Note for the alleged corrective disclosure dates.[99] Meanwhile, the full daily price, volume, abnormal return, and *t*-stats for the Note Class Period are detailed in **Appendix D**.

---

[98] As discussed in paragraph 192 of the Torchio Report, the Note traded almost every day of the Note Class Period. For those dates without prices, I calculate multi-day returns for both the Note and related explanatory variables. By multi-day returns, I mean if there are four days between two records the return is a four-day return, as are the comparable variables used in the analysis.

[99] In this case, the parameter estimates and statistical significance of the dummy variables are reported for the three alleged corrective disclosure dates.

77.     Using the specification of the market model, I estimate a set of parameters for the Exide Note. The Adjusted R-Square is 0.491, suggesting the specification explains roughly 49.1% of the Exide Note return variation. All three of the alleged corrective disclosure events had significant negative abnormal returns with t-stats ranging from -6.83 to -9.28, easily exceeding the -1.97 threshold for statistical significance. In fact, given these high levels of statistical significance, these empirical results demonstrating cause-and-effect strongly support that the Exide Note traded in an efficient market.

78.     A summary of the Company-specific news and Note price reaction on each of the three corrective disclosures is presented below.

### i. April 4, 2013

79.     On April 4, 2013, *Debtwire* reported that Exide hired Lazard and Akin Gump Strauss Hauer & Feld to advise the Company on restructuring alternatives due to capital issues.[100] After the stock market close on April 4, 2013, the Company largely confirmed the *Debtwire* report.[101]

> Exide Technologies (Nasdaq: XIDE) dropped in mid-day trading on Thursday. Reports from Los Angeles say the city counsel [*sic*] expressed fury about recent arsenic emission from a battery-recycle plant in Vernon, which could pose a danger to 110,000 residents. Attorneys in L.A. are looking into possible legal action. Update:

---

[100]  *Exide Tumbles 56% as Debtwire Reports Restructuring Plan*, Bloomberg News, April 4, 2013.

[101]  *Exide Retains Lazard to Advise on Financing Options*, Dow Jones News Service, April 4, 2013.

> Reports from Debtwire say traditional refinancing efforts stalled, citing people familiar with the matter. The company will now seek alternative restructuring.[102]

> Exide Technologies, a maker of lead- acid batteries, dropped the most in almost nine years after *Debtwire* reported it hired Lazard and Akin Gump Strauss Hauer & Feld LLP to advise on a restructuring.[103]

80.     This was accepted as negative news by market participants and there was a statistically significant price decline at greater than the 5% significance level for the Exide Note that day. Thus, the empirical results demonstrating cause-and-effect on April 4, 2013 support the conclusion that the Exide Note traded in an open, well-developed and efficient market.

### ii. April 25, 2013

81.     On April 24, 2013 after the stock market closed, Exide issued a press release that announced it had received an order "from the California Department of Toxic Substances Control ('DTSC') requiring the Company to suspend operations at its Vernon, California secondary lead recycling facility."[104] Exide also stated that it intended to comply with the order and was unable to determine how long the suspension would last or the impact it would have.

---

[102] *UPDATE: Exide Technologies (XIDE) Drops in Mid-Day Trading*, StreetInsider.com, April 4, 2013.

[103] *Exide Tumbles 56% as Debtwire Reports Restructuring Plan*, Bloomberg News, April 4, 2013.

[104] Exide Technologies, Inc. SEC Form 8-K filed April 25, 2013. According to EDGAR, this filing was accepted by the SEC at 6:48 PM on April 24, 2013.

82.    On April 25, 2013 the Exide Note fell by a statistically significant amount at greater than the 5% significance level and market participants accepted the Company's announcement as negative news:

> Exide Technologies said it has suspended operations at a battery recycling plant in California after receiving an order from the state government alleging that the facility was releasing hazardous waste into the air and soil. Shares of Exide, which produces and recycles lead-acid batteries, fell as much as 27 percent to a life-low of 98 cents on the Nasdaq on Thursday.[105]

83.    Thus, the empirical results demonstrating cause-and-effect on April 25, 2013 support the conclusion that the Exide Note traded in an open, well-developed and efficient market.

### iii. May 24, 2013

84.    On May 24, 2013, *Debtwire* reported that Exide was seeking a $200 million debtor in possession ("DIP") loan to fund the Company through its bankruptcy proceedings. As evidenced below, the news was accepted as negative by market participants:

> According to Bloomberg, Debtwire has reported that Exide Technologies (XIDE) is in talks with bankers to arrange a DIP loan, expected to be around $200M, to fund the company through Chapter 11. Exide shares are down about 49% to 40c in morning trading.[106]

---

[105] *Exide Suspends Operations at Calif. Lead Recycling Plant, Share Plunge*, Reuters News, April 25, 2013, 1:23 PM.

[106] *Polypore down 2.5% to $39.58, weakness attributed to Exide relationship*, TheFlyonthewall.com, 24 May 2013.

85.    That day, the price of the Exide Note fell by a statistically significant

amount at greater than the 5% significance level. Thus, the empirical results

demonstrating cause-and-effect on May 24, 2013 support the conclusion that the

Exide Note traded in an open, well-developed and efficient market.

86.    Moreover, the empirical results in this section also support that there

was significant price impact from the revelation of the alleged omissions and

misrepresentations. Therefore, there is no "evidence of a lack of price impact" from

the revelations that took place on the three corrective disclosure dates: April 4, 2013;

April 25, 2013, and May 24, 2013. Thus, consistent with *Halliburton II*, there is no

evidence to rebut the presumption of reliance.

2.    ***Examination of Cause-and-Effect and Changes in Credit
Rating Downgrades***

87.    In certain circumstances, changes in credit ratings may offer the market

new, unanticipated information. For example, if a credit rating change is predicated

on nonpublic company-specific information, such that the ratings change reasonably

disseminates new, unexpected valuation-relevant information, then in an efficient

market one might expect there to be a statistically significant price response to the

rating change. Conversely, when a credit rating change simply follows a company's

earnings announcement, and/or other analyst recommendations or their estimated

changes in financial performance it would not be expected in an efficient market that

one would reasonably observe a statistically significant bond price movement

because the rating change does not alter the total mix of information. Indeed, not all ratings actions are expected, in an efficient market, to offer evidence of cause-and-effect because of a significant price movement.[107]

88.     During the Note Class Period there were three ratings downgrades[108], two by S&P and one by Moody's.[109] As shown below, all three ratings downgrades occurred in a reasonably proximate time period to an important Company disclosure, and were based on "old news" in that the financial information presented as the rationale for the rating change were in line with analyst consensus. In this case, in an efficient market the information disclosed in the credit rating changes would have already been reflected in the market price for the Exide Note and thus would not be expected to influence the Exide Note price sufficiently to induce a statistically significant price reaction.

### i. February 28, 2013

89.     On February 28, 2013, S&P downgraded Exide to B- from B, citing the Company's "weaker-than-expected credit metrics for fiscal 2013 (ended March 31)

---

[107] An efficient market is one in which a security's price adjusts rapidly to new information. *See*, Fama, Eugene F., Lawrence Fisher, Michael Jenson, and Richard Roll, *The Adjustment of Stock Prices to New Information*, International Economic Review, 10, (1969), pp. 1–21.

[108] *See* **Exhibit 10**

[109] There were additional dates on which each rating agency adjusted their outlook for Exide and/or the Exide Note.

and 2014," including leverage of 6.0x to 7.0x over the next two years.[110] However, this downgrade happened 22 days after Exide announced its financial results for the quarter ended December 31, 2012 on February 6, 2013 (after the close of the stock market) and provided financial guidance, including estimates of free cash flow and capital expenditures.[111] Following the Company's announcement the price of the Note declined by a statistically significant amount on February 7, 2013. Therefore, the valuation impact of the Company's poor performance and lower outlook, which was cited as the basis for S&P's downgrade on February 28, would have already been incorporated into the Exide Note price well in advance of the credit rating downgrade.[112]

90.     Therefore, the metrics considered by S&P in their downgrade were not new, nor were their projections outside of analyst consensus estimates. As such, the insignificant price response of the Exide Note to this downgrade is what would be expected to be observed in an efficient market, which had already processed the information.

---

[110] *Exide Technologies Downgraded To 'B-' On Continued Erosion Of Credit Measures And Execution Risks; Outlook Negative*, S&P Credit Research, February 28, 2013.

[111] *XIDEQ - Q3 2013 Exide Earnings Conference Call*, Thomson Reuters, February 7, 2013.

[112] For example, after Exide announced financial results for Q3 2013 and updated guidance for Q4 2013 and FY 2014, analyst consensus estimates for the Company's FY 2015 leverage ratio (Net Debt / EBITDA) rose to 6.7x from 3.7x. From February 7, 2013 to February 28, 2013, analysts' consensus FY 2015 leverage ratio estimates remained 6.7x. Consensus Net Debt and EBITDA estimates for FY 2015 obtained from FactSet.

### ii. March 12, 2013

91.     On March 12, 2013, Moody's downgraded the Exide Note from B2 to B3. Moody's cited the Company's poor financial results for the "period ending December 31, 2012" and management's lower than expected free cash flow estimate, as the reason for the downgrade.[113] As described above, in response to the Company's earnings announcement, the price of the Note had already declined by a statistically significant amount on February 7, 2013. Furthermore, Moody's downgrade was identical to the downgrade issued eight business days earlier by S&P.[114] In fact, this follow-on credit downgrade was "old news." Therefore, the insignificant price response of the Exide Note to this downgrade is what would be expected to be observed in an efficient market, which had already processed the information.

### iii. May 3, 2013

92.     On May 3, 2013, S&P Downgraded Exide from B- to CCC+. S&P cited the Company's "recently announced" suspension of Exide's Vernon facility, which had created "a further headwind to Exide's operational and financial flexibility."[115]

---

[113] *Moody's Lowers Exide's Ratings to Caa1, Outlook Remains Negative*, Moody's Investor Service, March 12, 2013.

[114] An S&P rating of "B" is comparable to a Moody's rating of "B2," while an S&P rating of "B-" is comparable to a Moody's rating of "B3."

[115] *Exide Technologies Downgraded To 'CCC+' On Further Headwinds To Financial Flexibility; Ratings Remain On Watch Negative*, S&P Credit Research, May 3, 2013.

Nine days <u>earlier,</u> on April 24, 2013 (after the close of the stock market) Exide had already announced the suspension of its Vernon Facility. As would be expected in an efficient market, on April 25, 2013, the first trading day following the Company's announcement, the Note price rapidly reacted and declined by a statistically significant amount. Given the fact that S&P's downgrade came nine days following Exide's own disclosure of the plant shutdown and its basis for the downgrade had been revealed by the Company at an earlier date, the insignificant price response of the Exide Note to this downgrade is what would be expected to be observed in an efficient market, which had already processed the information immediately after it was disclosed on April 24, 2013.

93.   In summary, in an efficient market one would not expect the credit rating news disclosed by the agencies on February 28, 2013, March 12, 2013, and May 3, 2013 to elicit statistically significant Note price reactions. Thus, these empirical results are consistent with (no)cause-and-(no)effect on these three dates and support the conclusion that the Exide Note traded in an open, well-developed and efficient market.

### 3.    *Cause-and-Effect Analysis Examining Days with News versus Days without News – Background[116]*

94.    In an efficient market, it is expected that there will be some price movements with no news, and conversely, it is expected in an efficient market that there will be news without large price movements. In securities litigation, where the focus is on a single security with its own idiosyncrasies, the event study inevitably examines a confluence of different types of information that is disseminated. It is not unusual that over a class period the corporation will announce earnings, dividends, discoveries, new products, management changes, new issues, lawsuits it files, lawsuits filed against it, projections, regulatory changes that impact its business, and more. In an efficient market, each one of these releases of information or different types of news events will be expected to have a different and possibly material impact on the security price. Further, if the company's business as reflected in its earnings is predictable (or possibly engineered to be predictable or possibly unchanging because bad news is omitted), then earnings announcements (other than the corrective disclosure) will be anticipated by investors. Thus, for example, in an efficient market, there are many instances when it is expected that there will be no relationship between earnings announcements and price reactions. This is why the

---

[116] A more in-depth discussion of the topics, techniques and issues in this and the following subsection can be found in Michael L. Hartzmark, H. Nejat Seyhun, *The Curious Incident of the Dog that Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, 6 Va. L. & Bus. Rev. 415, 415-65 (2012).

*Cammer* court concluded, "Finally, it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between **unexpected** corporate events or financial releases and an immediate response in the stock price. This, after all, is the essence of an efficient market and the foundation for the fraud on the market theory."[117] *The key is that the material news must be unanticipated.*

95.     Furthermore, there are unobserved factors that might lead to significant price movements without news. These factors include, among others, unobserved changes in the market's expectations, imperfections in the statistical methods employed to evaluate systematic cause-and-effect relationships, and private trading activity—for example, insider trading or portfolio rebalancing. These all might drive a large price response without an observed cause.

96.     Therefore, in addition to the examination above of the general relationship between price reactions associated with the alleged corrective disclosures, I examine the overall relationship between news and price reactions for all the dates in the Note Class Period.

97.     All the dates within the Note Class Period can be categorized based on the observed relationships between the statistical significance of the abnormal returns and the news. The four categories, as shown below, include:

---

[117]   *Cammer*, 711 F. Supp. at 1287 (emphasis added).

    (1)     No news and no statistically significant abnormal return;

    (2)     News and statistically significant abnormal return;

    (3)     No news and statistically significant abnormal return; and

    (4)     News and no statistically significant abnormal return.

| OBSERVATION ON A DATE | No News | News |
|---|---|---|
| No Statistically Significant Abnormal Return | Efficient Market | Inefficient Market (?) |
| Statistically Significant Abnormal Return | Inefficient Market (?) | Efficient Market |

98.    One will find that on most dates, the observed relationship is that of no news and no statistically significant abnormal return, which is consistent with market efficiency and supports the fifth *Cammer* factor. On fewer dates, one will find a statistically significant abnormal return and related news, a finding that is also consistent with market efficiency and supports the fifth *Cammer* factor. It is in the other two categories above with the question marks ("?") where there is potential disagreement as to whether the security trades in an efficient market. Thus, the following two questions emerge:

    (1)     If there is a significant return, but no news, does this indicate that the security trades in an inefficient market?

    (2)     If there is news, but no significant return, does this indicate that the security trades in an inefficient market?

99.    To show that for the Exide Note the answers to these questions are "No," I implement a statistical test utilizing all information about Exide cashflow-

related news and significant returns throughout the Note Class Period to populate

the cells indicated in the table above. I use this statistical test to determine whether

there is empirical support for the conclusion that Exide Note traded in an efficient

market.

### 4. *Cause and Effect Analysis Examining 8-K and Corrective Disclosure Days with Cashflow-Related News versus other Days without Cashflow-Related News*

100.   My scientific statistical methodology to test cause-and-effect for the

Exide Note was applied in *DVI*.[118] Using this approach, I calculate the number and

percentage of days in each cell based on cashflow-related news releases and the

abnormal returns derived from the regression results in **Exhibit 9**. I then employ a

scientific method to establish a lower bound number (or percentage) of observed

days with significant returns that would be expected to be observed if there is no

relationship between cashflow-related news and abnormal returns.

101.   I began my analysis by reviewing all 18 of the Company 8-Ks filed

during the Note Class Period.[119] Therefore, the total number of potential news dates

is 20 (equal to the 18 dates on which the Company filed an 8-K plus the two

---

[118]   *In re DVI*, 249 F.R.D. at 210-12.

[119]   The 18 8-K dates during the Note Class Period are: September 20, 2011; October 11, 2011; October 19, 2011; October 31, 2011; November 8, 2011; February 9, 2012; February 10, 2012; March 30, 2012; June 7, 2012; June 14, 2012; August 2, 2012; September 7, 2012; September 24, 2012; November 9, 2012; December 7, 2012; February 6, 2013; April 1, 2013; and April 25, 2013.

additional disclosure events that were not 8-K dates). I then removed from this sample 11 dates where there was no contemporaneous analyst response, *i.e.*, an analyst report discussing and evaluating the subject matter in the 8-K announcement or the disclosure. I also removed the earnings press release on November 9, 2012 because the effective date of the news was on a bond market holiday. For each of the eight remaining days, I reviewed each of the announcements to determine whether the disclosures contained relevant cashflow related information. For testing purposes, I used these eight cashflow-related dates on which the Company filed an 8-K or there was a corrective disclosure (hereafter these dates are referred to as the "cashflow-related news" dates).[120] I then determined whether the releases were issued before or after the close of trading by examining their time-stamps.

102.   Based on this approach, there were eight days with cashflow-related news dates out of the 413 days in the Note Class Period.[121] In other terms, out of the 413-day Note Class Period, 1.9% (=8/413) of the days have cashflow-related news releases. I do not attempt to measure what were market expectations at the time of the news. Thus, I do not attempt to determine whether the cashflow-related news is

---

[120]  Of these eight dates, five were associated with earnings announcements.

[121]  The eight cashflow-related news dates tested are: November 8, 2011, February 10, 2012, June 8, 2012, August 3, 2012, February 7, 2013; April 4, 2013, April 25, 2013, and May 24, 2013.

unanticipated.[122] In **Appendix D** I identified 27 dates with statistically significant abnormal returns. Therefore, 6.5% (=27/413) of the days have statistically significant abnormal returns. The information is summarized in **Exhibit 11,** which shows that out of the 413 days in the Note Class Period, there were 7 days with significant returns and cashflow-related news, 20 days with significant returns and no cashflow-related news, one day with an insignificant return and cashflow-related news, and 385 days with insignificant returns and no cashflow-related news.

103.   To begin the analysis, I estimate the statistical properties of the cause-and-effect relationship between Note returns and cashflow-related news in a hypothetical world where I assume there is <u>no link between price reactions and cashflow-related news</u>. In other words, I assume daily Note prices do not reflect full information and that significant returns are *not* associated with the disclosure of information. It then logically follows that if this hypothetical world is descriptive of the actual Exide world, then we expect there to be no relationship between significant returns and Exide cashflow-related news. Therefore, I would expect to

---

[122] I assume the price reaction from news will be observed in the very next trading session, generally the same date as the release. However, I have not evaluated whether a period of greater than one trading session is the appropriate length of time. Nor have the courts established a fixed length of time to define a rapid price reaction. Indeed, "by accepting [the fraud-on-the-market] presumption, we do not intend conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28. Further, "[t]here is no conclusive threshold regarding 'how quickly and completely publicly available information' must be reflected in the market's price in order for the market to be considered efficient." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y 2013) (quoting *Basic*, 485 U.S. at 248 n.28).

observe that: (a) Exide daily returns are determined arbitrarily or in a random fashion, and (b) there will be no link between cashflow-related news and significant returns. In other words, Exide cashflow-related news and significant returns are randomly distributed.

104.   To test whether this hypothesis is a reasonable description of the actual world, I use a statistical method employing a generally-accepted statistical approach called "bootstrap testing."[123] The bootstrap approach was used in *DVI* and has been used in others to evaluate whether the DVI bonds traded in open, well-developed and efficient markets. Using this method, I have created test statistics to determine whether the observed relationships between the Note's significant returns and cashflow-related news are likely to have been generated in a random fashion. If cashflow-related news is not linked to significant returns, then I would not expect there to be a statistically significant relationship that distinguishes those days when there is or is not cashflow-related news from those days when there are or are not significant returns. In other words, there would be no cause-and-effect correlation

---

[123] This "bootstrap testing" analysis is much like running any type of game of chance, and is similar to the type of process used by state lotteries with multi-colored balls to determine the odds of winning and the payouts. The calculations can also be completed using other statistical tests. I find this example easiest to explain and understand. *See* Bradley Efron & Robert J. Tibshirani, *An Introduction to the Bootstrap* (CRC Press LLC, 2d ed. 1998) (1993) ("The bootstrap is a recently developed technique for making certain kinds of statistical inference.").

because the distributions of significant returns and cashflow-related news are both random events.

105.   My approach utilizes traditional principles of statistical inference, as well as information about trading activity, abnormal returns, and disclosures throughout the Note Class Period. To determine whether the number of days I observe (namely 7 days) with significant returns and cashflow-related news is a number above or below the number of days that would be observed if the relationship between cashflow-related news and significant returns is random, I calculate the number of days based on a game of chance to establish a *randomness* benchmark. In this game I take two urns and fill each of them with a total of 413 maize and navy balls (these represent the 413 days in the Note Class Period). In the "News Urn" I have eight navy balls (representing the eight days when there is cashflow-related news) and 405 maize balls (representing the 405 days when there is *no cashflow-related news*). In the "Abnormal Return Urn" I have 27 navy balls (representing the 27 days when there are significant returns) and 386 maize balls (representing the 386 days when there are insignificant returns). I then simultaneously draw a ball from each of the two urns 413 times and count the number of times when navy balls are simultaneously drawn from both of the urns (representing the days when there is both a significant return and cashflow-related news).[124] After I draw all 413 balls

---

[124]  I also calculate the expected numbers in the three other cells.

from each urn and count the number of times I simultaneously pull navy balls from the two urns, I replace all 413 of the balls in each urn, mix everything up, and go through this process again; repeating it ten million times.

106.   Using this bootstrap method (*i.e.*, drawing the 413 navy and maize balls 100,000 times) I am able to calculate the likelihood of observing seven or more of eight days where the navy balls are pulled at the same time (representing days when there are both significant returns and cashflow-related news). In fact, after the 4.13 billion (=413 times 10,000,000) draws from the urns 0% resulted in the matching of two navy balls seven or more times for each 100,000 simultaneous pulls from the two urns.

107.   The results generated from this probabilistic model or game related to the *Exide* matter clearly demonstrate that if one puts forth the "null" hypothesis that cashflow-related news and significant returns are unrelated (*i.e.*, a randomness benchmark), there is virtually no chance of observing 7 or more draws (or days) when navy balls are simultaneously drawn from each urn Thus, using traditional statistical confidence levels, I can say that there is more than a 99% likelihood that Exide cashflow-related news and large price movements of Exide Note during the Note Class Period were related and not generated by some random relationship.

108.   An alternative approach for testing whether there was a statistically significant difference between the observed proportions of abnormal returns on days

with cashflow-related news relative to days without cashflow-related news shows there is a statistically significant difference. On 20 of 405 (or 4.9%) days with no cashflow-related news the abnormal returns are significant, while on 7 of 8 (or 87.5%) days with cashflow-related news the abnormal returns are significant. These percentages differ by over 17 times, and from a statistical point-of-view, there is over a 99% likelihood that these two measures differ by a statistically significant percentage; or in other words there is virtually zero probability that the difference is due purely to chance. Thus, this measurement also provides support for the robustness of the test I discuss above in paragraphs 104-106.

109.   Overall, when examining the impact of cashflow-related news, my findings for the Exide Note are superior to those observed in a number of other cases where the courts found that the bonds traded in open, well-developed and efficient

markets.[125] For example, in *DVI*,[126] the matching of news and significance was only

65%, in *First Solar* it was 81.25%,[127] in *Lumen* it was 65%,[128] and in *Petrie* it was

---

[125] There is substantial academic support for finding that less than 50% of the significant returns are associated with news. *See* Frank Fehle & Vladimir Zdorovtsov, *Large Price Declines, News, Liquidity, and Trading Strategies: An Intraday Analysis* 11 (Undated Working Paper) (on file with the Virginia Law and Business Review) ("For approximately 24% of our events, we were able to locate at least one news release . . . ."); Larson & Madura, *supra* note 55, at 119 ("In the sample, 46% of the losers are explained by announcements in the *WSJ*, whereas only 28% of the winners are explained by announcements in the *WSJ*."); Savor, *supra* note 81, at 14 ("There are substantially more no-information price events than information-based ones, with the ratio of the former to the latter being close to 4:1.").

Approximately one-third of the events had public announcements. The non-availability of public announcements for the remaining events may be due to non-reporting of news related to small firms, or the large price change may have been caused by other factors such as significant changes in macroeconomic or industry-wide factors, communication between financial analysts or advisors and their clients that is not made public, or trading by agents based on private information. Finally, the large price changes could also occur through liquidity trades. *See* Mahesh Pritamani & Vijay Singal, *Return Predictability Following Large Price Changes and Information Releases*, J. BANKING & FIN. 631, 635 (2001).

In a 2002 study of the general stock market, Professor Ray C. Fair observed that in the 4,417 trading days for the S&P 500 Index, there were 220 days with abnormal returns. Of these days with significant returns, only sixty-nine days had identifiable events or news. Thus, only 31.4% of the days had identifiable news, while 68.6% had no identifiable event or news. Notably, Professor Fair did not conclude that the S&P 500 stocks traded in inefficient markets. However, based on their 60% benchmark, the defendants' experts in the *DVI* matter would have concluded that the S&P 500 stocks trade in inefficient markets. Ray C. Fair, *Events That Shook the Market*, 75 J. BUS. 713, 713, 716 (2002).

*See* Richard Roll, *R2*, 43 J. FIN. 541 (1988). Even with hindsight, the ability to explain stock price changes is modest. *R2*s were calculated for the returns of large stocks as explained by systematic economic influences, by the returns on other stocks in the same industry, and by public firm-specific news events. The average *R2* is only about .35 with monthly data and .20 with daily data.

[126] Here, the District Court found causal relationships between disclosures about DVI and its securities' prices. In analyzing DVI's common stock, the court examined an event study conducted by plaintiffs' expert, which found that, of the 34 days during the class period when DVI's common stock saw significant price changes, 20 of those days coincided with news releases. *See DVI*, 249 F.R.D. at 211. The court held this percentage established a sufficient causal relationship weighing in favor of market efficiency. *See id.* at 211-12. In analyzing DVI's Notes, the court referenced plaintiffs' event study that employed the Option Adjusted Spread, which subtracts the risk-free interest yield from the yield of the Notes, and found that

only 50%.[129] Therefore, I have demonstrated that empirical evidence of the

relationship between the Exide Note returns on days with cashflow-related news

versus days with no cashflow-related news strongly supports the conclusion that the

Exide Note traded in an open, well-developed and efficient market throughout the

Note Class Period.

5. *Cause and Effect Analysis Examining Autocorrelation*

110. I also conduct a statistical test using the residuals from the market

model to determine whether the daily abnormal returns of the Exide Note exhibit

_____

on 17 of the 26 days (or 65% of the time) when the Notes' yield experienced a significant price change, a news disclosure also occurred within two days. *See id.* at 215-16. The court found this factor supported a finding of market efficiency for both the stock and the Notes. The District Court credited two studies offered by plaintiffs, which found that on average "only about one-third of statistically significant changes in the stock price of publicly traded companies are actually associated with identifiable news or events." DVI, 249 F.R.D. at 212. Here, the correlation was at least twice as high. The District Court's factual findings that 60% and 65% correlations between news releases and price changes in DVI stock and Notes weigh in favor of market efficiency were not clearly erroneous. in *In re DVI, Inc. Securities Litigation*, 249 F.R.D. 196, 209 (E.D. Pa. 2008), which was affirmed by the Third Circuit, *In re DVI, Inc. Securities Litigation*, 639 F.3d 623 (3d Cir. 2011).

[127] *Smilovits v. First Solar, Inc.*, 2012 U.S. Dist. LEXIS 178802 (D. Ariz., Dec. 17, 2012)

[128] *Lumen v. Anderson*, 2011 U.S. Dist. LEXIS 94492 (W.D. Mo., Aug. 24, 2011)

[129] *Petrie V. Electronic Game Card, Inc.,* 308 F.R.D. 336, 353 (C.D. Cal. 2015): "With regard to Test 1, Defendants point out that, on **10 (50%) of those 20 days, the large price movement was not associated with any news whatsoever** and can be discounted as 'noise.' Opp'n at 17. This argument is not persuasive, as Plaintiffs have provided evidence that only a third of abnormally large stock price movements are typically associated with news events." *See* Mulcahey Decl. I at 29 n.68; S*ee also DVI II*, 639 F.3d at 635 (affirming district court's factual finding that 60–65% correlation between news events and price changes in light of two studies offered by plaintiffs which found that approximately one-third of statistically significant stock price changes were associated with identifiable news events), *abrogated on other grounds by Amgen*, —— U.S. ——, 133 S.Ct. 1184, 185 L.Ed.2d 308." *Petrie v. Elec. Game Card, Inc.,* 308 F.R.D. 336, 353 (C.D. Cal. 2015). (Emphasis added.)

autocorrelation using returns and lagged returns.[130] Autocorrelation is a statistical

property of the series of returns of a security wherein tomorrow's security price

movement can be systematically predicted with a reasonable degree of statistical

certainty based solely on the security price movement today (or some period in the

past). The presence of autocorrelation suggests the possibility that investors might

have unexploited profit opportunities from naïve trading strategies (*i.e.*, either

buying and holding the security or shorting and holding a short position) that are

greater than the transaction costs. Persistent statistically significant autocorrelation

measures the empirical relation between stock returns over consecutive days (*e.g.*,

the return today will enable an investor to predict the return tomorrow). Some have

argued that persistent significant autocorrelation in the returns might indicate a

violation of market efficiency in that it suggests that the security price does not react

quickly, making available profit opportunities from naïve trading strategies that are

sustained over time.

---

[130] "Autocorrelation is usually found in time-series data. Economic time series often display a 'memory' in that variation is not independent from one period to the next." William H. Greene, *Econometric Analysis*, 192 (5th ed. 2003). In other words, autocorrelation is the measurement of the relationship between the security return at time t and the return of the same security at some fixed time in the past. First-order autocorrelation would be found when there is a statistically significant relationship between the Note return today and the Note return yesterday. Another way of looking at this concept is that if an observer can use the return from yesterday to predict with some level of certainty the return today, there exists autocorrelation. *See Lehocky*, 220 F.R.D. at 506 n.20 (noting that both parties' experts agreed on the helpfulness of autocorrelation); *PolyMedica*, 453 F. Supp. 2d at 276–78.

111.  My statistical analysis of the abnormal Note returns for the 413 days of the Note Class Period shows there is no statistically significant autocorrelation. I run a standard statistical model by regressing each trading day's abnormal return on the abnormal return from the prior trading day. From this model I estimate a coefficient of -0.09139 representing the measurement of the relationship between the abnormal current (*i.e.*, today) and lagged returns (*i.e.*, yesterday) and a *t*-statistic of -1.81,[131] which in absolute value is below the 1.97 significance level commonly used to demonstrate whether there is a statistically significant relationship between yesterday's and today's abnormal returns. Thus, I conclude that there is no statistically significant autocorrelation of abnormal Note returns during the Note Class Period. *See* **Exhibit 12**.

112.  In summary, the statistical test I perform shows no statistically significant autocorrelation for the Exide Note's abnormal returns at the five percent level of statistical confidence, which is consistent with the conclusion that the Exide Note reacts quickly to news and trades in an efficient market.

---

[131]  I performed the same test on the Note's observed returns, for this I estimate a coefficient of -0.05616 representing the measurement of the relationship between the current (*i.e.*, today) and lagged returns (*i.e.*, yesterday) and a *t*-statistic of -1.11, which in absolute value is below the 1.97 level commonly used to demonstrate whether there is a statistically significant relationship between yesterday's and today's abnormal returns.

6.     ***Return Volatility on Important Disclosure Dates***

113.   Finally, another way to examine cause-and-effect for the Exide Note is by comparing the absolute value of the abnormal returns for the dates with corrective disclosures or cashflow-related announcements versus all other the days. A large difference in volatility (*i.e.*, absolute returns) between news dates and all other dates is another way to demonstrate both a cause-and-effect relationship between unexpected news and a rapid price reaction, as well as price impact of the corrective disclosures.

114.   On the cashflow-related news days (which includes earnings announcements and the corrective disclosures), the average of the absolute abnormal returns for the Note was 7.58%. This percentage compares to the average of the absolute abnormal returns for all other days of 0.87%. The fact that the absolute abnormal returns on the cashflow-related news days are more than 8 times larger than the other 405 days; and the fact that the difference is statistically significant[132] supports a finding of a cause-and-effect relationship between unexpected news and a rapid price reaction, which further supports the conclusion that the Exide Note traded in an open, well-developed and efficient market throughout the Note Class Period.

---

[132]  Based on a *t*-test to determine whether there is a significant difference between two means.

7.   ***Statistical Properties of Event Studies Explain the Purported***
     ***Inconsistencies Observed by Dr. James***

115.   I understand that in the James Report, Dr. James noted that Mr.
Torchio's empirical results had shown nine days with statistically significant price
movements in the Exide Note that were asymmetric with Exide common stock.[133]
Dr. James concluded that this lack of correlation is evidence against the equity buffer
provided by the common stock for corporate bonds.[134] Dr. James' conclusion is
flawed as it does not consider the basic statistical properties of a regression model
used in an event study.

116.   When establishing the statistical test based on a 95% confidence level,
which Dr. James, Mr. Torchio and I all utilize, a statistician (or economist) expects
to observe that approximately 5% of the sample tested will be statistically
significant. That Dr. James found nine days when the Exide Note reacted by a
statistically significant amount he cannot explain is not surprising. For example, for
the Note Class Period, Dr. James' nine days represents only 2.2% of the total number
of days in the period, or less than half of the number of days one would expect from
a statistical test performed at the 95% confidence level.[135] Consequently, one cannot

---

[133]  James Report, ¶76.

[134]  James Report, ¶76.

[135]  "Statisticians use the Greek letter alpha (α) to denote the significance level; α gives the chance
       of getting a significant result, assuming that the null hypothesis is true. Thus, α represents the
       chance of a false rejection of the null hypothesis (also called a false positive, a false alarm, or

conclude using generally-accepted principles of statistics that when one identifies nine days when the returns are statistically significant in Mr. Torchio's empirical results that were not reflective of the Exide common stock, it is scientific-based evidence of an absence of the equity buffer. In fact, it is a symptom found in any test where a confidence level is established.

117.    Moreover, Dr. James failed to mention that for each of the seven largest statistically significant Exide Note price movements (when accounting for the exogenous factors in the market model), there were associated large and statistically significant common stock price movements in the same direction. Corresponding to this, I also observed that for the six largest statistically significant negative stock price declines (accounting for the exogenous factors in the market model), there were associated large and statistically Exide Note price movements in the same direction.

### 8.    *Summary*

118.    Overall, the empirical evidence presented in the sections above offer strong support for the fifth *Cammer* factor, "[a] cause and effect relationship between unexpected corporate events or financial releases and an immediate

---

a Type I error). For example, suppose α = 5%. If investigators do many studies, and the null hypothesis happens to be true in each case, then about 5% of the time they would obtain significant results—and falsely reject the null hypothesis." *Reference Manual on Scientific Evidence*, published by the Federal Judicial Center, 3rd edition, 2011, p. 251.

response in the [Note] price."[136] Furthermore, given the volatility of the prices following the corrective disclosures, the price movements are consistent with the *Krogman* court's conclusion that "in an efficient market, a stock's price remains relatively stable in the absence of news, and changes very rapidly as the market receives new and unexpected information."[137] Overall, these empirical tests of the price-related factors clearly support that the Exide Note traded in an open, well-developed and efficient market throughout the Note Class Period.

### C. Defendants have Failed to Demonstrate that there is No Price Impact from the Allegations

119.   I have shown in this Report that there is overwhelming evidence that the Exide Note traded in an open, well-developed and efficient market. I also note that the empirical analyses I presented go well beyond what the Supreme Court has required plaintiffs to demonstrate in *Halliburton II*. There, the Court first reaffirmed *Basic*:

> The Court in *Basic* acknowledged, however, the debate among economists about the efficiency of capital markets and refused to endorse 'any particular theory of how quickly and completely publicly available information is reflected in market price.' The Court instead based the presumption of reliance on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.' Moreover, in making the presumption rebuttable, *Basic*

---

[136]   *Cammer*, 711 F. Supp. at 1287.

[137]   *Krogman*, 202 F.R.D. at 477.

recognized that market efficiency is a matter of degree and accordingly made it a matter of proof.[138]

120.   The Court also held in *Halliburton II* that "defendants must be afforded an opportunity before class certification to defeat the presumption [of reliance] through evidence that an alleged misrepresentation did not actually affect the market price of the stock."[139] The analysis above supports that there was significant price impact from the revelation of the omissions and misrepresentations. Therefore, there is no "evidence of a lack of price impact" from the revelations of the alleged omissions and misrepresentations that took place on April 4, 2013, April 25, 2013 and May 24, 2013. Thus, consistent with *Halliburton II*, there is no evidence to rebut the presumption of reliance.

## VII.   ABILITY TO CALCULATE DAMAGES ON A CLASS-WIDE BASIS

121.   As I showed, there is ample evidence of a price impact when one examines the reaction of the Exide Note's prices to corrective disclosures. Further, there is nothing in the record demonstrating that "alleged misrepresentation[s] did not actually affect the market price of the [Exide Note]."[140]

122.   It is my understanding that "plaintiffs are not required either to demonstrate loss causation or calculate damages for purposes of class certification.

---

[138]  *Halliburton II*, at 2403 (quoting *Basic*, 485 U.S. at 247 n.4 & 248).

[139]  *Id*. at 2417.

[140]  *Id*. at 2417.

In other words, whether plaintiffs will be able to prove loss causation or measure price impact – in this case, the inflationary impact of the [allegations] – are questions that go to the merits and not whether common issues predominate."[141] Even so, Lead Plaintiffs' counsel asked that I opine on whether per share (bond) damages could be calculated for each Class member under Section 10(b) of the Exchange Act and under Section 11 of the Securities Act by applying a *single common methodology on a class-wide basis* and to provide a hypothetical application of my common damages methodology that could be applied in this case based on Counsel being able to prove liability and an expert's ability to "prove loss causation or measure price impact" of the allegations.[142]

A.   **Calculating Damages for Violations of Section 10(b) Of the Exchange Act**

123.   Assuming Lead Plaintiffs' allegations are proven true, the calculation of damages on a class-wide basis for violations of Section 10(b) and 20(a) of the Exchange Act is subject to a common methodology.

124.   Valuation tools, including an event study (like that presented herein), a careful analysis of firm-specific news and information, the application of financial and statistical principles, and the implementation of other empirical analyses if

---

[141]   *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 2015 U.S. Dist. LEXIS 110382, at *89-90 (S.D.N.Y. Aug. 20, 2015). (internal citations omitted).

[142]   *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 2015 U.S. Dist. LEXIS 110382, at *89 (S.D.N.Y. Aug. 20, 2015).

necessary, can be used to establish whether the corrective disclosures caused the price of Exide's securities to decline significantly; and what is the appropriate magnitude of the decline to apply to damages. This analysis, after controlling for potentially non-allegation related information, including movements in the overall stock market, the Company's industry sector, the Company's credit market and interest rates, separates the portion of the price decline that is associated with "truths" from the decline associated with "untruths;" the latter being the damages per-share component.

125.   This empirical analysis can demonstrate that the alleged omissions and misrepresentations caused the price of Exide's common stock and Note to be artificially inflated, that the alleged corrective disclosures caused the inflation in each to dissipate and by how much. Typically, the amount of artificial inflation in a security's price immediately prior to a corrective disclosure is equal to the allegation-related price reaction to the disclosure(s) correcting the alleged omissions and misrepresentations, plus the inflation that remained after and dissipated later. Crew, et al., [2012] write about how this methodology is generally-accepted and widely used:

> The share price declines on these curative disclosure dates serve as a basis for measuring the inflation earlier in the class period. The logic of the argument is that when the company disclosed the corrective information on the curative disclosure dates, the share price declined by an amount of X dollars or Y percent, which indicates the decline that

would have occurred had the market known the information earlier in the class period.[143]

126.   Using these common stock and Exide Note price declines observed on the corrective disclosure dates, an inflation ribbon can be constructed, to measure the level of inflation in the price of Exide's securities on each day during the respective Class Periods that was caused by the defendants' alleged omissions and misrepresentations. That is, an inflation ribbon can be constructed utilizing scientific principles and all necessary generally-accepted valuation tools to assess the amount of artificial inflation on each day of the Stock and Note Class Periods.

127.   Finally, these daily levels of inflation along with the actual trading activity of Class members can be used to calculate individual damages.[144] This sequence represents a common methodology that can be applied class-wide.

128.   It is important to note that in the current case, Dr. James' does not dispute that there exists a common damages methodology, like that described above, that can be applied on a class-wide basis. In fact, Dr. James does not disagree that a properly constructed inflation ribbon can be used to compute damages for all class

---

[143]  *See*, "Federal Securities Acts and Areas of Expert Analysis," by Nicholas I. Crew, et al., in Chapter 24 of the *Litigation Services Handbook*; *The Role of the Financial Expert*, 5th ed., edited by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, John Wiley & Sons, Inc., 2012, p. 24.11.

[144]  In addition, the 90-day period following the end of the Stock and Note Class Periods would also need to be examined. Under the Private Securities Litigation Reform Act of 1995, a plaintiff may not recover more than the difference between the purchase price and the mean trading price of the security during the 90-day look-back period. 15 U.S.C. §78u-4.

members. Rather, the James Report focuses on a *straw man argument* created by Dr. James – that is, that Mr. Torchio failed to construct the <u>actual</u> inflation ribbon that incorporates the case specific factors, many of which are yet to be discovered or evaluated; and others that would require a full-blown loss causation analysis. I find this surprising because it is my understanding that this would force the Lead Plaintiffs' expert at the class certification stage to demonstrate loss causation and price impact – both of which, as discussed above, the Supreme Court has ruled are unnecessary at the current stage.

### B.    How the Proposed Methodology Could Be Implemented

129.   It is my understanding that Counsel anticipates it will show at trial that:

> "…Exide Technologies, Inc. ("Exide") [was] failing to disclose its battery recycling facility's noncompliance with environmental regulations or its related financial liquidity issues. Plaintiffs allege that Exide withheld or misrepresented this information until shortly before the company announced its intention to file for bankruptcy. Plaintiffs assert that Exide's misrepresentations or omissions polluted the market's information channels, resulting in artificially inflated Exide securities prices."[145]

130.   Given that the above methodology is widely used and generally-accepted to compute damages under Section 10(b) consistently on a class-wide basis in securities litigation and that I have implemented an event study in Section VI, at the direction of Counsel, I demonstrate that the damages methodology described in

---

[145]  Order Granting in Part Plaintiffs' Motion for Class Certification, entered on July 21, 2015.

the previous section can be implemented based on the following two assumptions,
which Counsel has asked for me to assume: (1) that Lead Plaintiffs will prove the
merits of their case; and (2) that Lead Plaintiffs will prove that the losses I calculate
based on the results from my event study on the alleged corrective disclosure dates
are attributable to the Defendants' alleged misrepresentations.[146]

131.  As I demonstrated in **Appendix E**, the Exide Note price declined by
statistically significant amounts on each of the three alleged corrective disclosure
dates.[147] Under Lead Plaintiffs' theory, had analysts and investors been aware of the
misrepresented and undisclosed facts at the start of the Stock or Note Class Periods,
they would have incorporated this information into their expectations of the
Company's future financial performance and adjusted their valuations of the Exide
common stock and Note accordingly. In other words, according to Lead Plaintiffs,
had analysts and investors been apprised of this information at the start of the Note
Class Period, rather than learning it at the end of the Note Class Period, they would
have known of (a) the environmental problems and associated risks, including the
risk of adverse action from environmental regulatory agencies, and (b) Exide's
liquidity problems, including problems funding environmental upgrades at its

---

[146] The same analysis can be undertaken using the information on common stock prices presented
in the Torchio Report.

[147] Mr. Torchio (Torchio Report, Exhibits 6 and 16) agrees that the price of Exide's common stock
and Note declined in a statistically significant fashion on all three dates. Dr. James (James
Report, Exhibit 4) does not dispute Mr. Torchio's finding.

facilities and the increased likelihood for bankruptcy. Accordingly, the later realization of cashflows and events would have been consistent with analysts' and investors' forecasts at the start of the Note Class Period and the Note price would have reflected the valuation impact of this information and would not have reacted to that same information disclosed on the alleged corrective disclosure dates at the end of the Note Class Period.

132. Below, and in **Exhibit 13**, I use the results from **Appendix D** to illustrate how one could calculate a hypothetical inflation ribbon for the Exide Note. This represents an example using actual market data of how the implementation of such a damages methodology would look under these assumptions when applied to Exide's Note. Though the example utilizes Exide's Note, the same common methodology could be applied to Exide's common stock; the only difference would be the prices and levels of the residual price inflation.

### i. April 4, 2013

133. In the evening of April 3, 2013, (the article appeared in the print edition on the morning of April 4, 2013), the *Los Angeles Times* published an article, titled: "Anger over arsenic emissions a health report on a battery-recycling plant in Vernon draws L.A. City Council ire." Also, on April 4, 2013, at approximately 2:00 p.m. *Debtwire* reported that Exide had hired Lazard and Akin Gump Strauss Hauer &

- 78 -

Feld to advise the Company on restructuring alternatives due to capital issues.[148] After the stock market close on April 4, 2013, the Company largely confirmed the *Debtwire* report.[149]

134.   Based on my event study the actual price of the Exide Note fell by $9.05 per $100 of par value on April 4, 2013, with a statistically significant excess return of -10.40%. In **Exhibit 13**, I calculate the excess price decline (the decline after adjusting for market, industry, credit and interest rate effect) was $8.88 per $100 of par value based on the *volume weighted average price* or *VWAP* price on April 3, 2013 of $85.36 per $100 of par value.[150] I understand that Lead Plaintiffs' theory of liability is that Exide's environmental problems and associated risks were interconnected with the Company's liquidity and solvency problems. If Lead Plaintiffs are successful in proving this theory and in proving loss causation on this date, the inflationary damages related to the allegations could be $8.88 per $100 of par value.

---

[148]   Exide Technologies, a maker of lead- acid batteries, dropped the most in almost nine years after *Debtwire* reported it hired Lazard and Akin Gump Strauss Hauer & Feld LLP to advise on a restructuring. *Exide Tumbles 56% as Debtwire Reports Restructuring Plan*, Bloomberg News, April 4, 2013.

[149]   *Exide Retains Lazard to Advise on Financing Options*, Dow Jones News Service, April 4, 2013.

[150]   For the common stock, the excess price decline on April 4, 2013 was $1.22 per share based on Mr. Torchio's analysis.

135.   However, should the finder of fact require that the losses associated with the *Los Angeles Times* article and those associated with the restructuring disclosure be separated, there are valuation methods to partition the decline. If it is determined that Exide is liable only for misrepresenting or omitting information related to its liquidity and solvency, one might apportion the decline in the note price following the disclosure of the liquidity related news. For example, on April 3, 2013 the last price (prior to the close of trading on the stock market), was $88.23 per $100 of par value, the last price of the Exide Note immediately prior to 2:00 p.m. (approximately the time the news that Exide had engaged a bankruptcy firm was publicized) on April 4, 2013 was $84.25 per $100 of par value, and the last price (prior to the close of trading on the stock market) on April 4, 2013 was $77.38 per $100 of par value. Therefore, the decline following the restructuring news could be calculated as 63.3% of the total abnormal price decline of the Exide Note price.[151] It would follow then that 36.7% of the decline on April 4, 2013 represents the percentage of the decline attributable to the news of the air pollution at the Vernon plant. Applying these percentages to the Exide Note's residual price decline of $8.88 per $100 of par value, shows that $5.62 per $100 of par value would be attributable

---

[151]   Equal to the $6.87 per $100 of par value (the decline that occurred after 2:00 p.m. on April 4, 2013), divided by $10.85 per $100 of par value (the decline in the Exide Note price from April 3, 2013 to April 4, 2013).

to the restructuring news. The remaining portion of the April 4, 2013 decline would

represent the amount associated with the air quality at the Vernon plant.[152]

136.   Therefore, one can conclude based on the assumptions above that the

hypothetical inflation in the Exide Note price associated with the air quality would

be approximately $3.26 per $100 of par value and the hypothetical inflation

associated with the financial condition of Exide would be approximately $5.62 per

$100 of par value. In combination they would be equal to the excess price decline of

$8.88 per $100 of par value on April 4, 2013.

### ii. April 25, 2013

137.   On April 24, 2013 after the stock market close, Exide issued a press

release that announced it had received an order "from the California Department of

Toxic Substances Control ('DTSC') requiring the Company to suspend operations

at its Vernon, California secondary lead recycling facility."[153] Exide also stated that

it intended to comply with the order and was unable to determine how long the

suspension would last or what impact it would have.

138.   Based on my event study the Exide Note price fell by $8.99 per $100

of par on April 25, 2013 from $79.24 to $70.25, with a statistically significant excess

---

[152]  This represents approximately 36.7% of the abnormal decline on April 4, 2013.

[153]  Exide Technologies, Inc. SEC Form 8-K filed April 25, 2013. According to EDGAR, this filing
        was accepted by the SEC at 6:48 PM on April 24, 2013.

return of -11.63%. Therefore, as shown in **Exhibit 13** the excess price decline was $9.22 per $100 of par.[154] Should the trier of fact determine that Exide is liable for the allegations that it misrepresented the environmental issues at the plant;[155] and if a full expert loss causation analysis is submitted that shows that the full amount of the abnormal price decline of $9.22 per $100 of par represents the inflation attributable to Defendants' alleged misrepresentations; then this amount could represent the per-share damage attributable to Defendants' alleged misrepresentations.

### iii. May 24, 2013

139.   On May 24, 2013, *Debtwire* reported that Exide was seeking a $200 million DIP loan to fund the Company through its bankruptcy proceedings.[156] Based on my event study the Exide Note price fell by $6.25 per $100 of par value on May 24, 2013, with a statistically significant excess return of -8.57%. Therefore, in

---

[154] For the common stock, the excess price decline on April 25, 2013 was $0.34 per share based on Mr. Torchio's analysis.

[155] Exide Technologies said it has suspended operations at a battery recycling plant in California after receiving an order from the state government alleging that the facility was releasing hazardous waste into the air and soil. Shares of Exide, which produces and recycles lead-acid batteries, fell as much as 27 percent to a life-low of 98 cents on the Nasdaq on Thursday. *Exide Suspends Operations at Calif. Lead Recycling Plant, Share Plunge*, Reuters News, April 25, 2013, 1:23 PM.

[156] According to Bloomberg, Debtwire has reported that Exide Technologies (XIDE) is in talks with bankers to arrange a DIP loan, expected to be around $200M, to fund the company through Chapter 11. Exide shares are down about 49% to 40c in morning trading. *Polypore down 2.5% to $39.58, weakness attributed to Exide relationship*, TheFlyontheWall.com, 24 May 2013.

**Exhibit 13** I show the abnormal price decline was $6.18 per $100 of par. [157] Assuming that Exide is found liable for misrepresenting its financial condition; and that after the completion of expert discovery and a full expert loss causation analysis it is determined that the decline from $72.17 (the VWAP price on May 23, 2015) to $65.93 (the VWAP price on May 24, 2013) – both adjusted for market, industry, credit and interest rate effects – is attributable to Defendants' alleged misrepresentations, then the inflationary damages could be $6.18 per $100 of par. Because there appears to be no confounding information in this announcement, it could be applied to inflation associated with the alleged misrepresentations of the financial condition of Exide.

140.   Overall should the trier of fact determine that Exide is found liable for the allegations that it misrepresented the environmental issues at the plant as well as determine that the alleged misrepresentations about the financial conditions and the plant violations are inextricably bound and thus Exide is liable to investors because it "fail[ed] to disclose its related financial liquidity issues," then after fact discovery and a full expert loss causation report, then I have demonstrated how it might be found that the per-share damage or inflation is $24.28 per $100 of par, which is the

---

[157] For the common stock, the excess price decline on May 24, 2013 was $0.33 per share based on Mr. Torchio's analysis.

sum of the hypothetical inflation amounts calculated on the three days with the alleged corrective disclosures.[158]

141.  If after fact discovery and an expert loss causation report, the finder of fact determines that Lead Plaintiffs are able to demonstrate that at the start of the Note Class Period the Company (a) concealed that there was some probability of the plant being shutdown, say hypothetically it was 75%, and (b) concealed the "related financial liquidity issues;" then after fact discovery and an expert loss causation report if it is found that this probability did not change during the Note Class Period the inflation could be calculated as $24.28 per $100 of par based on the assumptions stated above. [159] Furthermore, my damages methodology is flexible enough to incorporate changing probabilities of the plant closure. For example, should the finder of fact determine that during the Note Class Period the increase in probability of the plant being shutdown changed from 75% to 100%, then the level of inflation or the inflation ribbon could be adjusted accordingly throughout the Note Class Period to account for the increase in probability of the plant shutdown. ***Working backwards*** and assuming the amount of artificial inflation in the Exide Note is

---

[158] For the common stock, the inflation at the beginning of the Class Period would be $1.89 per share based on Mr. Torchio's analysis.

[159] An alternative way of showing that inflation would have been reflected in the market price at the beginning of the Note Class Period, is to determine what would have been the price of the same Exide Note had it been rated by S&P as CCC+ instead of B.  It then would have remained at the same credit rating throughout the Note Class Period.

$24.28 per $100 of par, as described above in the hypothetical example, then the inflation would have remained a constant $24.28 per $100 of par until immediately prior to when the Company knew that the probability of a shutdown was 100% and withheld that information. At this date the inflation would be reduced to 75% of $24.28 or $18.21 per $100 of par.

## C.   Calculating Damages for Violations of Section 11 Of The Securities Act

142.   The calculation of damages on a class-wide basis for violations of Section 11 of the Securities Act is also subject to a common methodology. Damage calculations for investors that have standing under Section 11 are based on the statute stating:

> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.[160]

143.   Thus, Section 11 damage calculations are fairly straightforward in that the damages are based on the investor's purchase price (not to exceed the offering

---

[160]  15 U.S.C. §77k(e).

price) less (1) the investor's sale price, if sold prior to the filing date of the lawsuit; and (2) the price on the filing date if sold thereafter; with a cap of actual losses based on the actual sale price, if sold at a price higher than the price on the filing date. The cap is based on using the highest price by comparing the price on the filing date and the actual sales price.

144. Damage calculations for investors that have standing under Section 11 are also based on the part of the statute stating:

> *Provided*, That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.[161]

145. Should the Defendants prove that a portion of the damages represents other than the depreciation in value of the security resulting from the false part of the registration statement, the damages calculation would likely incorporate the use of a market model, possibly the same market model as described above in Section VI, to adjust the prices to account for the portion of the price decline that was not associated with the alleged wrongdoing. This would also apply on a class-wide basis.

## VIII. CONCLUSION

146. In this Report, I have demonstrated that there is:

---

[161] 15 U.S.C. §77k(e).

- High average weekly turnover of the Exide Note;

- The continuous coverage of Exide by analysts, investment professionals, public press, the credit rating agencies and financial institutions, along with regular and frequent disclosures by the Company in the form of press releases, teleconference earnings calls and SEC filings, as well as the disclosures by the bankruptcy Trustees and regulatory authorities;

- A large number of market makers dealing the Exide Note;

- Relatively large market capitalization of the Exide Note;

- Large proportions of institutional holdings of the Exide Note;

- Relatively narrow bid-ask spreads for the Exide Note;

- Statistically significant relationships between the returns of the Exide Note on days when corrective disclosures were disseminated;

- A lack of persistent, pervasive and predictable autocorrelation between past and current returns of the Exide Note; and

- Rapid price reactions to new information of the Exide Note.

147.   Based on my thorough examination of commonly evaluated operational and price-related factors that describe the market in which the Exide Note traded during the Note Class Period, it is my opinion that the Exide Note traded in an open, well-developed and efficient market throughout the Note Class Period

148.   Moreover, it is my opinion that the calculation of damages on a class-wide basis is subject to a common methodology for violations of Section 10(b) of the Exchange Act. It is also my opinion that the calculation of damages on a class-wide basis is subject to common methodologies for violations of Section 11 of the Securities Act.

\*          \*          \*

149.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

RESPECTFULLY SUBMITTED AND EXECUTED THIS 5TH DAY OF OCTOBER 2015

_____

Michael L. Hartzmark, Ph.D.

# MICHAEL L. HARTZMARK, PH.D.

4950 S. Chicago Beach Drive, Suite 6A
Chicago, IL 60615
(312) 718-9699
mhartzmark@HELP-Econ.com

## PRESENT POSITION

HARTZMARK ECONOMICS LITIGATION PRACTICE, LLC
    President (2013 - present)
    Specializing in the application of economic, financial and accounting principles to securities, complex commercial, investment, intellectual property, antitrust and automotive litigation and regulatory matters
CRA INTERNATIONAL, INC.
    Independent Contractor (2015 - present)

## PROFESSIONAL EXPERIENCE

NAVIGANT ECONOMICS (FORMERLY CHICAGO PARTNERS, LLC)
    Academic Affiliate (2012 - 2013)
    Principal/Director (2008 - 2012)
    Vice President (2004 - 2007)
FINRA (fka NATIONAL ASSOCIATION OF SECURITY DEALERS) Dispute Resolution
    Member Arbitrator (2005 - Present)
DARMA, LLC
    President (2005 - 2008)
PACIFIC BIOMETRICS, INC.
    Interim Chief Financial Officer (2004 - 2006)
CRAGAR INDUSTRIES, INC.
    Chairman, CEO, President and Treasurer (1993 - 2004)
MDA FINANCIAL, INC.
    President (1981 - present)
FAHNESTOCK & Co., Inc. (now Oppenheimer & Co., Inc.)
    Financial Consultant (Series 7 and Series 63) (2001 - 2003)
ECONOHIO CORPORATION
    President (1989 - 1992)
LEXECON INC.
    Senior Economist (1987 - 1989)
UNIVERSITY OF CHICAGO, Center for the Study of the Economy and the State, and the Graduate School of Business (now the Chicago Booth School of Business)
    John M. Olin Visiting Scholar (1986 - 1987)
UNIVERSITY OF MICHIGAN, Joint with Michigan Business School (now the Stephen M. Ross School of Business) and Department of Economics
    Assistant Professor (1984 - 1988)
    Lecturer (1984)
COMMODITY FUTURES TRADING COMMISSION, Division of Economics and Education, Washington, D.C.
    Financial Economist (1982 -1983)
UNIVERSITY OF CHICAGO, Department of Economics
    Instructor for Economic Analysis (1981)
    Research Assistant for A. C. Harberger (1982)
    Research Assistant for Sam Peltzman (1981 - 1982)
U. S. DEPARTMENT OF THE TREASURY, Office of Tax Analysis, Washington, D.C.
    Research Assistant (1981)

A-1

## EDUCATION

Ph.D.       Department of Economics, the University of Chicago, 1984,
            (Doctoral Exams in Industrial Organization and Regulation; Public Finance)
M.A.        Department of Economics, the University of Chicago, 1982
B.A.        The University of Michigan (Economics, High Honors and Phi Beta Kappa, 1978

## ACADEMIC HONORS AND FELLOWSHIPS

*John M. Olin Faculty Fellowship*, (George Stigler, Director) (1986 - 1987)
*PEW Teaching Fellow*, the University of Chicago (1980 - 1981)
*Phi Beta Kappa,* the University of Michigan (1978)
*Parker Prize,* in Labor Economics, University of Michigan (1978) -- Given for the best graduate or undergraduate paper in Labor Economics

## SELECTED PUBLICATIONS

"Understanding the Efficiency of the Market for Preferred Stock," (with H. Nejat Seyhun), <u>Virginia Law & Business Review</u>, Volume 8, Number 2, Spring 2014.
"An Economist's View of Amgen," Law360, May 2, 2013. http://www.law360.com/articles/438303/an-economist-s-view-of-amgen.
"The Curious Incident of the Dog that Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation," (with H. Nejat Seyhun), <u>Virginia Law & Business Review</u>, Volume 6, Number 3, 2012.
"Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market," (with Cindy A. Schipani and H. Nejat Seyhun), <u>Columbia Business Law Review</u>, Number 3, Volume 2011.
"Luck Versus Forecast Ability: Determinants of Trader Performance in Futures Markets," <u>Journal of Business</u>, January 1991. Also reprinted in <u>Classic Futures: Lessons from the Past for the Electronic Age</u>, by Lester Telser, Risk Books, March 2000.
"Business Valuations for the Personal Lawyer," <u>Law and Fact</u>, September 1991.
"Is Risk Aversion a Theoretical Diversion?" <u>The Review of Futures Markets</u>, Volume 7, Number 1, 1988.
"Returns to Individual Traders of Futures: Aggregate Results," <u>Journal of Political Economy</u>, December 1987.
"Regulating Futures Margin Requirements," <u>Review of Research on Futures Markets</u>, Volume 5, Number 3, 1986.
"The Effects of Changing Margin Levels on Futures Market Activity, the Composition of Traders in the Market, and Price Performance," <u>Journal of Business</u>, April 1986.
"Individual Income Taxation, 1947-1979," (with Eugene Steuerle), <u>National Tax Journal</u>, June 1981.

## GRANTS

Grant from the University of Chicago (1984).  Center for the Study of Futures Prices: grant to analyze margin regulation for the Chicago Board of Trade Studies.

## BOARDS

POWHATAN BUILDING CORPORATION, Director, Treasurer, (2010 - present)
MIDTOWN EDUCATIONAL FOUNDATION, Auxiliary Board Member, (2009 - 2013)
GLOBAL ENTERTAINMENT CORPORATION (Formerly AMEX: GEE, currently not listed),
            Director, Audit Committee Member (2004 - 2008)
THE BOARD INSTITUTE (private software company), Financial Advisory Board (2004 - 2006)
SHAKER INVESTMENTS, Financial Advisory Board (1992 - 2005)
PACIFIC BIOMETRICS, INC. (OTC BB: PBMC),
            Director and Chairman of Audit Committee (2002 - 2004)
CRAGAR INDUSTRIES, INC. (Formerly OTC BB: CRGR, company sold),
            Director and Chairman of the Board (1993 - 2004)

**EXPERT REPORTS, DECLARATIONS AND DISCLOSURES PAST FOUR YEARS**

Ronald Bayer v. Panduit Corporation, Garbe Iron Works, Inc., Tylk Gustafson Reckers Wilson Andrews LLC
Circuit Court of Cook County, Illinois; Report (1/9/2012); Deposition 5/29/2012 and 7/31/2012);
did not testify at trial, per parties' stipulation to admit my damage calculations (11/9/2012).

In Re Dynex Securities Litigation U.S. District Court for the Southern District of New
York; Declaration (2/8/2012).

In Re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation
U.S. District Court for the Southern District of New York; Declaration (8/6/2012).

Maine State Retirement System v. Countrywide Financial, et al.
U.S. District Court for the Central District of California; Report (9/24/2012).

J. T. Waite and Wendy Pace v. The Dun & Bradstreet Corporation.
U.S. District Court for the Northern District of Illinois Eastern Division; Report (12/5/2012).

Kathleen Hager as Special Administratrix of the Estate of Kenneth Hager, Deceased v.
Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Alza Corporation. Circuit Court of Cook
County; Deposition (12/17/2013).

Policeman's Annuity and Benefit Fund of the City of Chicago, et al v. Bank of America and U.S. Bank National
Association. U.S. District Court for the Southern District of New York; Report (1/17/2014);
Deposition (3/11/2014); Rebuttal Report (4/17/2014); Deposition (4/29/2014).

William D. Wallace, et al. v. IntraLinks Holdings, Inc., et al.
U.S. District Court for the Southern District of New York; Report (2/18/2014); Rebuttal Report
(7/18/2014).

New Jersey Carpenters Health Fund, et al v. Residential Capital, LLC.
U.S. District Court for the Southern District of New York; Report (3/17/2014); Deposition
(4/24/2014); Declaration (6/18/2015).

New Jersey Carpenters Health Fund, et al v. DLJ Mortgage Capital, Inc., Credit Suisse Management, et al.  U.S.
District Court for the Southern District of New York; Report (6/13/2014); Deposition
(11/11/2014); Declaration (6/29/2015; Second Declaration (7/29/2015).

Oklahoma Police Pension & Retirement System v. U.S. Bank National Association.
U.S. District Court for the Southern District of New York; Report (8/1/2014).

Northstar Lottery Group, LLC and Illinois Department of the Lottery.
Third-Party Dispute Resolution; Report (8/13/2014).

In Re MF Global Holdings Limited Securities Litigation.
U.S. District Court for the Southern District of New York; Report (9/15/2014); Damages Report
(8/21/2015); Reply Report (9/21/2015).

New Jersey Carpenters Vacation Fund, et al. v. The Royal Bank of Scotland Group, plc.
U.S. District Court for the Southern District of New York; Declaration (9/29/2014).

In Re ITT Educational Services, Inc. Securities Litigation.
U.S. District Court for the Southern District of New York; Report (3/27/2015); Deposition
(5/29/2015).

Darren and Kim Kasparian v. Draper and Kramer, Inc. Wheaton Center LLC., Wiss, Janney, Elstner Associates,
Inc. and Thyssenkrupp Safeway, Inc. Circuit Court of Cook County; Report (4/3/2015);
Deposition (7/21/2015).

Louisiana Firefighters' Retirement System, et al. v. Northern Trust Investments, N.A., and Northern Trust
Company. U.S. District Court for the Northern District of Illinois; Report (6/8/2015); Deposition
(7/14/2015).

New Jersey Carpenters Health Fund, et al v. Novastar Mortgage, Inc., et al.
U.S. District Court for the Southern District of New York; Report (6/13/2015).

**Appendix B**

**Documents Relied Upon**

**Court Documents**

- Expert Report of Frank C. Torchio, dated March 30, 2015.
- Second Amended Consolidated Complaint for Violations of the Federal Securities Laws, dated April 24, 2015.
- Expert Report of Professor Christopher M. James, dated May 4, 2015.
- Expert Rebuttal Report of Frank C. Torchio, dated May 26, 2015.
- Order Granting In Part Plaintiffs' Motion for Class Certification, Judge Stephen Wilson, dated July 21, 2015.

**Court Decisions and Securities Law**

- 15 U.S.C. § 77*l*(a)(2).
- 15 U.S.C. § 77k(e).
- 15 U.S.C. §§ 78p(b), 78p(c), 78p(a).
- 15 U.S.C. § 78c(a)(38).
- 15 U.S.C. § 78(u)(4).
- 17 C.F.R. § 240.10b-5 (2011).
- *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 684-85 (N.D. Ala. 2005).
- *Amgen*, 133 S.Ct. 1184, 185 L.Ed.2d 308.
- *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).
- Bromberg & Lowenfels, *Securities Fraud and Commodities Fraud*, §8.6 (Aug. 1988).
- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 2015 U.S. Dist. LEXIS 110382, at *89-90 (S.D.N.Y. Aug. 20, 2015).
- *In re China MediaExpress Holdings, Inc. S'holder Litig.*, Decision and Order, August 15, 2014 (S.D.N.Y.) (Marrero, J.).
- *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197 (6th Cir. 1990).
- *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2005 U.S. Dist. LEXIS 41240 (S.D. Tex. Dec. 22, 2005).
- *In re DVI, Inc. Securities Litigation*, 249 F.R.D. 196, 209 (E.D. Pa. 2008).
- *In re DVI, Inc. Securities Litigation*, 639 F.3d 623 (3d Cir. 2011).
- *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644 (S.D. Tex. 2006).
- *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014).
- *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 280–82 (N.D. Ala. 2009).
- *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 266 (D. Mass. 2006).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

**Appendix B**

**Documents Relied Upon**

- *Lehocky v. Tidel Techs., Inc*., 220 F.R.D. 491, 506 n.20 (S.D. Tex. 2004).
- *Lumen v. Anderson*, 2011 U.S. Dist. LEXIS 94492 (W.D. Mo., Aug. 24, 2011)
- *Peil v. Speiser*, 806 F.2d 1154 (3d Cir. 1986).
- *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 353 (C.D. Cal. 2015).
- *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 205 (2d Cir. 2008).
- *Smilovits v. First Solar, Inc.*, 2012 U.S. Dist. LEXIS 178802 (D. Ariz., Dec. 17, 2012).
- *Speiser*, 806 F.2d 1154, 1160 (3d Cir. 1986).
- *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y 2013) .
- *In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005).
- Private Securities Litigation Reform Act of 1995.
- SEC Securities Act Release No. 6235, 45 Fed. Reg. 63, 693 (1980).
- SEC Securities Act Release No. 6331 (Aug. 13, 1981).
- SEC, "Form S-3, Registration Statement under the Securities Act of 1933, General Instructions," updated September 2011.
- U.S. Securities and Exchange Commission: Division of Investment Management: Frequently Asked Questions About Form 13F, *available at* http://www.sec.gov/divisions/investment/13ffaq.htm (last visited Feb. 17, 2014).


**SEC Filings/Forms**

- Exide Technologies Form 10-KA for the Fiscal Year Ended 31 December 2010, filed 7 January 2011.
- Exide Technologies Form 10-Q for the Quarter Ended 31 March 2011, filed 7 February 2011.
- Exide Technologies Form 25-NSE, filed 5 May 2011.
- Exide Technologies Form 10-K for the Fiscal Year Ended 31 December 2010, filed 1 June 2011.
- Exide Technologies Form S-4, filed 6 June 2011.
- Exide Technologies Form DEF 14A, filed 28 July 2011.
- Exide Technologies Form DEFA14A, filed 28 July 2011.
- Exide Technologies Form 8-K, filed 4 August 2011.
- Exide Technologies Form 10-Q for the Quarter Ended 30 June 2011, filed 4 August 2011.
- Exide Technologies Form S-4A, filed 5 August 2011.
- Exide Technologies Form 424B3, filed 15 August 2011.
- Exide Technologies Form 8-K, filed 20 September 2011.
- Exide Technologies Form 8-K, filed 19 October 2011.
- Exide Technologies Form 8-K, filed 31 October 2011.
- Exide Technologies Form 8-KA, filed 4 November 2011.

**Appendix B**

**Documents Relied Upon**

- Exide Technologies Form 8-K, filed 8 November 2011.
- Exide Technologies Form 10-Q for the Quarter Ended 30 September 2011, filed 9 November 2011.
- Exide Technologies Form 8-K, filed 9 February 2012.
- Exide Technologies Form 10-Q for the Quarter Ended 31 March 2012, filed 9 February 2012.
- Exide Technologies Form 8-K, filed 10 February 2012.
- Exide Technologies Form 8-K, filed 30 March 2012.
- Exide Technologies Form 8-K, filed 7 June 2012.
- Exide Technologies Form 10-K for the Fiscal Year Ended 31 December 2011, filed 7 June 2012.
- Exide Technologies Form 8-K, filed 14 June 2012.
- Exide Technologies Form DEF 14A, filed 27 July 2012.
- Exide Technologies Form DEFA14A, filed 27 July 2012.
- Exide Technologies Form 8-K, filed 2 August 2012.
- Exide Technologies Form 10-Q for the Quarter Ended 30 June 2012, filed 2 August 2012.
- Exide Technologies Form 8-K, filed 24 September 2012.
- Exide Technologies Form 8-K, filed 9 November 2012.
- Exide Technologies Form 10-Q for the Quarter Ended 30 September 2012, filed 9 November 2012.
- Exide Technologies Form 8-K, filed 7 December 2012.
- Exide Technologies Form 8-K, filed 6 February 2013.
- Exide Technologies Form 10-Q for the Quarter Ended 31 March 2013, filed 6 February 2013.
- Exide Technologies Form 8-K, filed 1 April 2013.
- Exide Technologies Form 8-K, filed 25 April 2013.
- Exide Technologies Form 8-K, filed 4 June 2013.
- Exide Technologies Form 8-K, filed 10 June 2013.
- Exide Technologies Form 10-K for the Fiscal Year Ended 31 December 2012, filed 14 June 2013.
- Exide Technologies Form 10-KA for the Fiscal Year Ended 31 December 2012, filed 17 June 2013.
- Exide Technologies Form 8-K, filed 18 June 2013.
- Exide Technologies Form 8-K, filed 18 July 2013.
- Exide Technologies Form 8-K, filed 19 July 2013.
- Exide Technologies Form 25-NSE, filed 19 July 2013.
- Exide Technologies Form 8-K, filed 26 July 2013.
- Exide Technologies Form 10-Q for the Quarter Ended 30 June 2013, filed 9 August 2013.
- Exide Technologies Form 8-K, filed 21 August 2013.

**Appendix B**

**Documents Relied Upon**

- Exide Technologies Form 8-K, filed 23 September 2013.
- Exide Technologies Form 8-K, filed 15 October 2013.
- Exide Technologies Form 10-Q for the Quarter Ended 30 September 2013, filed 8 November 2013.

## Security Data

- Historical data for the Exide Note, Insider Holdings and Institutional Holdings obtain from Torchio's production (FINRA TRACE data service). [TORCHIO 000001-3] and [TORCHIO 001095-9].
- Historical data for the S&P 500 Total Return Index obtained from Bloomberg.
- Historical data for Barclays US Aggregate Credit Corporate Index (B) and Barclays US Aggregate Credit Corporate Index (CAA) obtained from Factset.
- Historical data for the Industry Index obtained from CRSP.
- Historical data for the Treasury Note obtained from Bloomberg.

## Exide News and Press Releases

- Exide news headlines and select articles downloaded from Factiva using a search for "all sources" with the company field identified as "Exide" for the period September 13, 2011 through May 24, 2013.
- Select news articles from Factiva or Bloomberg.
- News articles, including but not limited to:

  o *Exide Technologies Downgraded To 'B-' On Continued Erosion Of Credit Measures And Execution Risks; Outlook Negative*, S&P Credit Research, February 28, 2013.
  o *Moody's Lowers Exide's Ratings to Caa1, Outlook Remains Negative*, Moody's Investor Services, March 12, 2013.
  o *UPDATE: Exide Technologies (XIDE) Drops in Mid-Day Trading*, StreetInsider,com, April 4, 2013.
  o *Exide Retains Lazard to Advise on Financing Options*, Dow Jones News Service, April 4, 2013.
  o *Exide Tumbles 56% as Debtwire Reports Restructuring Plan*, Bloomberg News, April 4, 2013.
  o *Exide Suspends Operations at Calif. Lead Recycling Plant, Share Plunge*, Reuters News, April 25, 2013.

Appendix B

## Documents Relied Upon

- o *Exide Technologies Downgraded To 'CCC+' On Further Headwinds To Financial Flexibility; Ratings Remain On Watch Negative*, S&P Credit Research, May 3, 2013.
- o *Polypore down 2.5% to $39.58, weakness attributed to Exide relationship*, TheFlyontheWall.com, 24 May 2013.

### Exide Analyst Reports

All analyst reports obtained through Thomson One for the period from September 13, 2011 through May 24, 2013, including, but not limited to:

- o "Initiating Coverage - Buy," *Deutsche Bank*, credit analyst report, October 13, 2011.
- o "Shifting Focus," *Deutsche Bank*, credit analyst report, November 13, 2012.
- o "Exide Hits A Bump in the Road," *R.W. Pressprich*, credit analyst report, April 8, 2013.
- o "Awaiting March-Quarter Numbers," *R.W. Pressprich*, credit analyst report, May 16, 2013.

### Academic Articles/Texts

- Crew, Nicholas I., et al., "Federal Securities Acts and Areas of Expert Analysis," in Chapter 24 of the *Litigation Services Handbook*; *The Role of the Financial Expert*, 5th ed., edited by Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, John Wiley & Sons, Inc., 2012.

- Crosbie, Peter and Jeff Bohn, Modeling Default Risk: Modeling Methodology (Moody's KMV Company 2003), available at http://www.macs.hw.ac.uk/~mcneil/F79CR/Crosbie_Bohn.pdf.

- Efron, Bradley & Robert J. Tibshirani, *An Introduction to the Bootstrap* (CRC Press LLC, 2d ed. 1998) (1993).

- Fama, Eugene F., Lawrence Fisher, Michael Jenson, and Richard Roll, *The Adjustment of Stock Prices to New Information*, 10 International Economic Review (1969).

- Fama, Eugene F., *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin., 383 (1970).

**Appendix B**

**Documents Relied Upon**

- Fama, Eugene F. *Efficient Capital Markets: II*, 46 J. Fin., 1575 (1991).

- Fama, Eugene F. and Kenneth R. French, *Common Risk Factors in the Returns on Stocks and Bonds*, 33 J. Fin. Econ. 3-56 (1993).

- Fama, Eugene F. *Market Efficiency, Long-Term Returns, and Behavioral Finance*, 49 J. Fin. Econ., 283, 283-306 (1998).

- Fabozzi, Frank J. and Steven V. Mann, *The Handbook of Fixed Income Securities*, Eighth Edition (Kindle Locations 12943-44), McGraw-Hill Education Kindle Edition.

- Fair, Ray C. *Events That Shook the Market*, 75 J. BUS. 713, 713, 716 (2002).

- Fang Cai, Song Han, and Dan Li, *Institutional Herding in the Corporate Bond Market*, Board of Governors of the Federal Reserve System, International Finance Discussion Papers, Number 1071, December 2012.

- Frank Fehle, Frank & Vladimir Zdorovtsov, *Large Price Declines, News, Liquidity, and Trading Strategies: An Intraday Analysis* 11 (Undated Working Paper) (on file with the Virginia Law and Business Review).

- Ferrillo, Paul A., Frederick C. Dunbar and David Tabak, *The "Less Than"' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases*, 78 St. John's L. Rev. 81, 119-22 (2004).

- Goldstein, Michael A., Edith S. Hotchkiss and Erik R. Sirri, *Transparency and Liquidity: A Controlled Experiment on Corporate Bonds*, The Review of Financial Studies, 20, no. 2, (2007).

- Greene, William H., *Econometric Analysis*, 192 (5th ed. 2003).

- Handjinicolaou and Avner Kalay, *Wealth Redistributions or Changes in Firm Value: an Analysis of Returns to Bondholders and Stockholders around Dividend Announcements*, 13 J. Fin. Econ. 35, 38 (1984).

- Hartzmark, Michael L., Cindy A. Schipani and H. Nejat Seyhun, *Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market*, Columbia Business Law Review, Volume 2011, Number 3.

**Appendix B**

**Documents Relied Upon**

- Hartzmark, Michael L., H. Nejat Seyhun, *The Curious Incident of the Dog that Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, 6 Va. L. & Bus. Rev. 415, 415-65 (2012).

- Hartzmark, Michael L. and H. Nejat Seyhun, *Understanding the Efficiency of the Market for Preferred Stock*, Virginia Law & Business Review, Volume 8, Number 2, Spring 2014.

- Kwan, Simon H., *Firm-Specific Information and the Correlation between Individual Stocks and Bonds*, 40 J. Fin. Econ. 63, 64 (1996).

- Macey, Jonathan R. and Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market-Theory,* 42 STAN. L. REV. 1059, 1085 (1990).

- Mahanti, Sriketan, et al., *Latent Liquidity: A New Measure of Liquidity, with an Application to Corporate Bonds*, Journal of Financial Economics, Vol. 88, Issue 2, (May 2008).

- Malkiel, Burton G., *The Efficient Market Hypothesis and Its Critics*, 17 J. Econ. Perspectives, 59 (2003).

- Masulis, Ronald W., *The Effects of Capital Structure Change on Security Prices*, 8 J. Fin. Econ. 139, 143 (1980).

- Merton, Robert C., *On the Pricing of Corporate Debt: The Risk Structure of Interest Rates,* 29 J. FIN. 449 (1974).

- Pritamani, Mahesh & Vijay Singal, Return Predictability Following Large Price Changes and Information Releases, J. BANKING & FIN. 631, 635 (2001).

- *Reference Manual on Scientific Evidence*, published by the Federal Judicial Center, 3rd edition, 2011.

- Roll, Richard, *R2*, 43 J. FIN. 541 (1988).

- Schultz, Paul, *Corporate Bond Trading Costs: A Peek Behind the Curtain*, J. Fin., 56, 677-98 (2001).

- Schwert, G. William, *Anomalies and Market Efficiency*, in *Handbook of the Econ. of Fin.* (2003).

**Appendix B**

**Documents Relied Upon**

**<u>Other</u>**

- [TORCHIO 000001]- [TORCHIO 001116]
- Expert Report of Professor Christopher M. James, *In re Superior Offshore International, Inc.*, Case No. H-11-3130 (S.D. Tex.), dated June 15, 2012.
- Expert Report of Christopher M. James, *In re Adams Golf, Inc. Sec. Litig.*, Case No. 99-371-KAJ (D. Del.), dated July 14, 2006.
- http://www.bloomberg.com/professional/
- http://www.finra.org/Industry/Compliance/MarketTransparency/TRACE/
- http://www.marketaxess.com/research/market-insights/bonds_by_size_hy.php
- http://online.wsj.com

## Appendix C

### Methodology to Modify TRACE data for use in Event Studies,
### Calculations of Average Weekly Turnover and Estimates of the Bid-Ask Spreads

1.　　TRACE is an over-the-counter real-time price dissemination service for the fixed income market owned and operated by the Financial Industry Regulatory Authority ("FINRA"). I relied upon TRACE data in several analyses of the Exide Note, including the event study, calculation of average weekly turnover and estimating bid-ask spread.[1]

2.　　Staff, at my direction, closely examined, evaluated and modified the original TRACE records as described below.  Staff then organized the TRACE file to limit the dataset to include only those trade records that are relevant in determining whether the Exide Note traded in an open, developed and efficient market.

3.　　To determine which records might require modification I relied upon a TRACE file[2] with data field definitions produced by defendants in this matter.

### A.  Procedures Employed for the BOSS Dataset

4.　　The TRACE data includes the field or variable called "RVRSL_CD" that identifies whether a record is a reversal of a prior trade. Records with the code RVRSL_CD= "R" are entries identifying transactions that were reversed. I have removed both the record that identified the prior trade as being "reversed," as well as the original record.

5.　　The TRACE data includes the field or variable called "TRC_ST" that indicates the *status* of entered transactions. Records have the following *status* codes:

1) C = Cancelled trade

2) N = Trade to be corrected

---

[1] The dataset I relied upon in my analysis was two Microsoft Excel files produced by FINRA in response to a subpoena: "TRACE Data Jan132011 through Feb032012 (BOSS).xlsx" and "TRACE Data Feb062012 through May242013 (MPPR).xlsx."

[2] The file with the data field definitions I relied upon was a Microsoft Excel file produced FINRA in response to a subpoena: "Trade Data Fields and Definitions for Corporate and Agency Bonds Trade Details (MPPR) Jul022014.xlsx"

3) T = Regular trade

4) W = Corrected Trade

6.      I have only included records with status codes of "Regular" and "Corrected" trades (i.e., observations where TRC_ST= "T" or TRC_ST = "W"). Furthermore, the TRACE data includes the field or variable called "NO_WAS_CD" that identifies which component of the record is to be corrected (e.g., price, time, quantity, etc.). This field can have the following codes:

1)   N = NO component; this is the record that is being corrected.

2)   W = WAS component; this contains the corrections.

3)   Space = Record was not corrected and not a correction.

7.      I have removed from the data correction entries (observations where NO_WAS_CD= "N").

8.      The data field "TRD_RPT1_FL" identifies whether or not trade entries in the TRACE system are disseminated to the public. There are two possible codes for this field, "Y" meaning Yes the entry is reported to the public and "N" meaning the transaction is not reported. FINRA only disseminates one side of a trade when both parties report their transaction to TRACE. I have removed trades not disseminated to the public from my event studies and Average Weekly Turnover analysis (i.e., records where TRD_RPT1_FL = "N").

9.      The TRACE data includes the field "EXCTN_TM" that identifies the transaction execution time. I have eliminated from my analyses all trades that were executed outside of normal trading hours (i.e., after 4:00 P.M. Eastern time or before 9:30 A.M. Eastern Time).

10.      I separately calculate a price each day for the Note.  The daily price is the volume weighted average prices after making all of the adjustments described above.

### B. Procedures Employed for the MPPR Dataset

11. For this dataset, I employed the same procedures applied by Mr. Torchio and also excluded from my analyses all trades that were executed outside of normal trading hours.[3]

### C. Procedures Employed for both Datasets

12. I made an additional modification to the Trace data for my calculation of Average Weekly Turnover. After reviewing the data, it was apparent that there were entries in the system where a trader acted as an intermediary between two separate counterparties seeking to execute a trade ("market making transactions"). Market making transactions consist of a trader buying notes from one counterparty and selling an identical set of notes to a different counterparty within a short timeframe in order to facilitate a trade between the two counterparties.[4] I have removed one side of a market making transaction from my analysis to avoid double-counting transaction volume.

13. The TRACE system does not provide a reliable data field identifying true market making transactions.  Because of this limitation I carefully examined the TRACE data to detect records that appeared to be market making transactions. I used the following fields and conditions in the TRACE system to identify market making transactions:

1) TRD_EXCTN_DT = The trade date when the trade entry was made

2) CUSIP_ID = The CUSIP identifier of the issue that is the subject of the entry

3) RPT_SIDE_CD = The position of the market participant reporting the trade ("Buy" or "Sell")

4) EXCTN_TM = The trade execution time

5) RPTG_SIDE_EXCTG_MP_ID = The alphabetic identifier of the reporting dealer which reported the transaction

---

[3] Torchio Report, Appendix C, ¶¶12-19.
[4] See U.S. Securities and Exchange Commissions, "Market Maker," http://www.sec.gov/answers/mktmaker htm. A market making transaction can also consist first of a trade selling notes followed by a purchase of an identical set of notes from a different counterparty within a short period of time.

14.      Two records in the TRACE system were considered two sides of a market making transaction if they met the following criteria: the two entries had the same (a) CUSIP, and (b) market participant, while the two records also had (a) opposite buy/sell positions and (b) were executed close in time. The SEC describes market makers as traders that stand ready to buy securities on a "continuous basis."[5] To be conservative, I considered entries that met the above criteria and were transacted within 15 minutes of each other as two sides of a market making transaction. If two trades meet the conditions described above, I assume they are related in a market making transaction and I use the maximum volume across both trades rather than the sum of the separate volumes in my analysis of Average Weekly Turnover (i.e., if a purchase of 100 notes is made within 15 minutes of a sale 50 notes, I use a volume of 100 notes in my Average Weekly Turnover analysis rather than 150 notes).

15.      I also use this market making transaction definition to identify relevant observations to calculate the bid-ask spread of the Note. (See Appendix E for a description of this calculation). I also add the condition that a dealer must first purchase a Note from a customer and subsequently sell a Note to a customer within 15 minutes. The field "DISS_RPTG_SIDE_CD" identifies the reporting obligations of the trade's counterparties. This field can have the following codes:

1) B = Dealer buy (customer sell)

2) D = Dealer trades

3) S = Dealer sell (customer buy)

I have removed observations where DISS_RPTG_SIDE_CD="D" to confine the bid-ask spread analysis to transactions between dealers and customers.

---

[5] U.S. Securities and Exchange Commissions, "Market Maker," http://www.sec.gov/answers/mktmaker.htm

**Appendix D**
**Exide Note Detailed Statistics**

| Date | Price | Volume | Abnormal Return | Abnormal T-Stat | Significant Date |
|------|-------|--------|-----------------|-----------------|------------------|
| 9/13/2011 | $94.47 | 2,377 | -4.10% | -3.270 | * |
| 9/14/2011 | $96.93 | 400 | 2.31% | 1.843 | |
| 9/16/2011 | $95.78 | 60 | -1.56% | -1.246 | |
| 9/19/2011 | $100.00 | 5 | 4.75% | 3.788 | * |
| 9/20/2011 | $97.10 | 150 | -2.87% | -2.289 | * |
| 9/21/2011 | $94.89 | 16,104 | -2.19% | -1.746 | |
| 9/22/2011 | $93.71 | 2,770 | 0.31% | 0.246 | |
| 9/23/2011 | $92.90 | 5,000 | -0.42% | -0.339 | |
| 9/26/2011 | $93.53 | 1,030 | 1.50% | 1.199 | |
| 9/27/2011 | $93.46 | 4,050 | -0.32% | -0.257 | |
| 9/28/2011 | $95.40 | 14 | 2.63% | 2.094 | * |
| 9/29/2011 | $92.50 | 250 | -2.46% | -1.965 | |
| 9/30/2011 | $95.01 | 60 | 4.01% | 3.196 | * |
| 10/4/2011 | $92.57 | 30 | 1.79% | 1.427 | |
| 10/5/2011 | $87.90 | 970 | -5.16% | -4.116 | * |
| 10/6/2011 | $89.02 | 3,036 | -0.40% | -0.323 | |
| 10/7/2011 | $91.85 | 50 | 1.85% | 1.472 | |
| 10/11/2011 | $90.50 | 150 | -2.46% | -1.962 | |
| 10/12/2011 | $94.85 | 195 | 3.31% | 2.641 | * |
| 10/13/2011 | $93.38 | 6,400 | -1.94% | -1.549 | |
| 10/14/2011 | $93.97 | 2,000 | 0.18% | 0.142 | |
| 10/18/2011 | $93.57 | 6,530 | -0.85% | -0.678 | |
| 10/19/2011 | $94.02 | 8,398 | -0.57% | -0.451 | |
| 10/20/2011 | $93.83 | 3,000 | -0.64% | -0.514 | |
| 10/21/2011 | $94.68 | 1,575 | -0.15% | -0.117 | |
| 10/24/2011 | $96.52 | 2,200 | 0.99% | 0.793 | |
| 10/25/2011 | $97.20 | 275 | 0.12% | 0.094 | |
| 10/26/2011 | $97.72 | 1,235 | 0.34% | 0.274 | |
| 10/27/2011 | $100.47 | 16,525 | 1.30% | 1.037 | |
| 10/28/2011 | $100.52 | 275 | -0.08% | -0.065 | |
| 10/31/2011 | $100.14 | 2,024 | 0.17% | 0.133 | |
| 11/1/2011 | $100.06 | 700 | 1.18% | 0.943 | |
| 11/3/2011 | $100.00 | 15 | -0.63% | -0.503 | |
| 11/4/2011 | $100.29 | 875 | 0.15% | 0.121 | |
| 11/8/2011 | $88.34 | 48,427 | -11.39% | -9.084 | * |
| 11/9/2011 | $88.00 | 20 | 0.50% | 0.398 | |
| 11/10/2011 | $86.09 | 2,040 | -1.97% | -1.570 | |
| 11/14/2011 | $86.58 | 262 | 0.74% | 0.589 | |
| 11/15/2011 | $85.27 | 450 | -0.93% | -0.739 | |
| 11/16/2011 | $84.62 | 2,155 | -0.71% | -0.568 | |

**Appendix D**
**Exide Note Detailed Statistics**

| Date | Price | Volume | Abnormal Return | Abnormal T-Stat | Significant Date |
|---|---|---|---|---|---|
| 11/17/2011 | $84.39 | 345 | -0.08% | -0.067 | |
| 11/18/2011 | $84.57 | 121 | 0.42% | 0.333 | |
| 11/22/2011 | $82.31 | 2,250 | -1.23% | -0.980 | |
| 11/23/2011 | $81.31 | 2,000 | -0.71% | -0.563 | |
| 11/28/2011 | $82.75 | 170 | 1.75% | 1.394 | |
| 11/29/2011 | $81.05 | 6,712 | -2.14% | -1.706 | |
| 11/30/2011 | $80.30 | 17,192 | -1.57% | -1.248 | |
| 12/1/2011 | $82.50 | 150 | 2.10% | 1.675 | |
| 12/2/2011 | $83.82 | 68 | 1.02% | 0.815 | |
| 12/5/2011 | $84.50 | 308 | 0.20% | 0.157 | |
| 12/6/2011 | $81.37 | 830 | -3.99% | -3.185 | * |
| 12/7/2011 | $80.50 | 1,600 | -1.03% | -0.819 | |
| 12/8/2011 | $81.88 | 120 | 1.61% | 1.286 | |
| 12/9/2011 | $81.11 | 379 | -0.84% | -0.668 | |
| 12/13/2011 | $80.13 | 5,809 | -0.90% | -0.716 | |
| 12/14/2011 | $81.75 | 20 | 2.23% | 1.779 | |
| 12/15/2011 | $81.51 | 6 | -0.22% | -0.176 | |
| 12/16/2011 | $78.55 | 11,280 | -3.53% | -2.819 | * |
| 12/19/2011 | $78.81 | 1,574 | 0.06% | 0.050 | |
| 12/20/2011 | $77.93 | 316 | -1.12% | -0.894 | |
| 12/22/2011 | $78.10 | 6,920 | -0.25% | -0.196 | |
| 12/27/2011 | $77.75 | 2,469 | -0.67% | -0.532 | |
| 12/28/2011 | $79.90 | 148 | 2.60% | 2.077 | * |
| 12/29/2011 | $79.06 | 200 | -1.02% | -0.817 | |
| 12/30/2011 | $77.50 | 250 | -2.40% | -1.915 | |
| 1/3/2012 | $77.62 | 3,900 | -0.57% | -0.451 | |
| 1/4/2012 | $77.73 | 17,488 | -0.25% | -0.203 | |
| 1/5/2012 | $77.81 | 6,345 | -0.04% | -0.033 | |
| 1/6/2012 | $77.79 | 23,095 | -0.12% | -0.096 | |
| 1/9/2012 | $79.19 | 7,985 | 1.75% | 1.397 | |
| 1/10/2012 | $80.44 | 8,707 | 1.05% | 0.839 | |
| 1/11/2012 | $81.94 | 809 | 2.00% | 1.595 | |
| 1/12/2012 | $80.30 | 8,463 | -2.17% | -1.735 | |
| 1/13/2012 | $80.54 | 4,100 | 0.62% | 0.493 | |
| 1/17/2012 | $81.46 | 456 | 1.11% | 0.888 | |
| 1/18/2012 | $81.40 | 3,180 | -0.19% | -0.149 | |
| 1/19/2012 | $81.09 | 20,370 | -1.13% | -0.899 | |
| 1/20/2012 | $81.21 | 9,209 | -0.10% | -0.077 | |
| 1/23/2012 | $81.68 | 21,072 | 0.10% | 0.082 | |
| 1/24/2012 | $82.27 | 7,170 | 0.54% | 0.433 | |

**Appendix D**
**Exide Note Detailed Statistics**

| Date | Price | Volume | Abnormal Return | Abnormal T-Stat | Significant Date |
|---|---|---|---|---|---|
| 1/25/2012 | $82.63 | 4,000 | 0.61% | 0.488 | |
| 1/26/2012 | $84.53 | 124 | 1.79% | 1.427 | |
| 1/27/2012 | $84.11 | 309 | -0.63% | -0.501 | |
| 1/30/2012 | $82.96 | 2,220 | -0.99% | -0.786 | |
| 1/31/2012 | $82.89 | 4,515 | -0.16% | -0.131 | |
| 2/1/2012 | $83.20 | 9,925 | 0.16% | 0.129 | |
| 2/2/2012 | $83.13 | 5,760 | -0.03% | -0.022 | |
| 2/3/2012 | $83.95 | 13,790 | 0.28% | 0.223 | |
| 2/6/2012 | $84.83 | 9,014 | 0.63% | 0.502 | |
| 2/7/2012 | $84.65 | 10,629 | -0.47% | -0.374 | |
| 2/8/2012 | $85.11 | 10,002 | 0.27% | 0.213 | |
| 2/9/2012 | $86.53 | 7,223 | 1.50% | 1.196 | |
| 2/10/2012 | $79.41 | 67,268 | -7.89% | -6.292 | * |
| 2/13/2012 | $79.76 | 19,487 | 0.24% | 0.190 | |
| 2/14/2012 | $78.16 | 22,376 | -2.00% | -1.595 | |
| 2/15/2012 | $76.99 | 10,895 | -1.56% | -1.241 | |
| 2/16/2012 | $77.83 | 9,365 | 1.18% | 0.945 | |
| 2/17/2012 | $78.70 | 492 | 0.88% | 0.700 | |
| 2/21/2012 | $78.59 | 1,100 | -0.42% | -0.335 | |
| 2/22/2012 | $76.61 | 14,795 | -2.54% | -2.027 | * |
| 2/23/2012 | $76.63 | 23,812 | -0.07% | -0.060 | |
| 2/24/2012 | $76.84 | 11,603 | -0.26% | -0.207 | |
| 2/27/2012 | $76.71 | 10,875 | -0.07% | -0.059 | |
| 2/28/2012 | $77.16 | 2,699 | 0.52% | 0.416 | |
| 2/29/2012 | $78.03 | 7,647 | 0.89% | 0.712 | |
| 3/1/2012 | $78.34 | 4,304 | 0.31% | 0.243 | |
| 3/2/2012 | $79.43 | 1,649 | 1.53% | 1.223 | |
| 3/5/2012 | $79.56 | 3,196 | 0.49% | 0.394 | |
| 3/6/2012 | $78.00 | 8,612 | -0.88% | -0.704 | |
| 3/7/2012 | $78.98 | 4,226 | 1.15% | 0.916 | |
| 3/8/2012 | $79.68 | 8,937 | 0.60% | 0.475 | |
| 3/9/2012 | $80.95 | 5,730 | 1.49% | 1.191 | |
| 3/12/2012 | $81.30 | 5,066 | 0.45% | 0.362 | |
| 3/13/2012 | $81.33 | 19,706 | -0.30% | -0.242 | |
| 3/14/2012 | $82.95 | 3,714 | 1.38% | 1.102 | |
| 3/15/2012 | $83.39 | 6,669 | 0.80% | 0.641 | |
| 3/16/2012 | $83.76 | 12,345 | 0.39% | 0.308 | |
| 3/19/2012 | $84.08 | 6,291 | 0.17% | 0.138 | |
| 3/20/2012 | $83.59 | 14,841 | -0.26% | -0.211 | |
| 3/21/2012 | $84.23 | 11,622 | 0.82% | 0.657 | |

**Appendix D**
**Exide Note Detailed Statistics**

| Date | Price | Volume | Abnormal Return | Abnormal T-Stat | Significant Date |
|---|---|---|---|---|---|
| 3/22/2012 | $84.19 | 3,648 | 0.10% | 0.079 | |
| 3/23/2012 | $84.74 | 3,137 | 0.85% | 0.679 | |
| 3/26/2012 | $84.61 | 1,776 | -0.02% | -0.019 | |
| 3/27/2012 | $84.34 | 3,109 | -0.23% | -0.184 | |
| 3/28/2012 | $83.90 | 18,433 | -0.82% | -0.658 | |
| 3/29/2012 | $83.74 | 2,954 | 0.12% | 0.093 | |
| 3/30/2012 | $84.50 | 7,121 | 0.71% | 0.570 | |
| 4/2/2012 | $83.47 | 5,766 | -1.14% | -0.912 | |
| 4/3/2012 | $84.08 | 1,392 | 0.23% | 0.180 | |
| 4/4/2012 | $82.64 | 854 | -1.38% | -1.103 | |
| 4/5/2012 | $83.10 | 2,005 | 0.67% | 0.531 | |
| 4/9/2012 | $82.29 | 3,262 | -0.17% | -0.136 | |
| 4/10/2012 | $80.84 | 6,698 | -1.56% | -1.247 | |
| 4/11/2012 | $80.79 | 5,269 | 0.03% | 0.023 | |
| 4/12/2012 | $81.01 | 1,482 | 0.12% | 0.097 | |
| 4/13/2012 | $82.82 | 1,013 | 2.13% | 1.702 | |
| 4/16/2012 | $81.23 | 2,128 | -1.93% | -1.536 | |
| 4/17/2012 | $81.08 | 1,693 | -0.28% | -0.221 | |
| 4/18/2012 | $79.69 | 8,151 | -1.84% | -1.471 | |
| 4/19/2012 | $79.53 | 1,384 | -0.22% | -0.174 | |
| 4/20/2012 | $82.01 | 900 | 3.07% | 2.445 | * |
| 4/23/2012 | $79.30 | 6,487 | -3.17% | -2.526 | * |
| 4/24/2012 | $80.91 | 2,452 | 1.81% | 1.447 | |
| 4/25/2012 | $81.03 | 7,405 | -0.21% | -0.167 | |
| 4/26/2012 | $81.37 | 875 | 0.55% | 0.442 | |
| 4/27/2012 | $81.98 | 903 | 0.50% | 0.400 | |
| 4/30/2012 | $81.34 | 13,748 | -0.85% | -0.680 | |
| 5/1/2012 | $82.66 | 2,414 | 1.24% | 0.989 | |
| 5/2/2012 | $82.84 | 3,321 | 0.07% | 0.059 | |
| 5/3/2012 | $83.06 | 7,704 | 0.04% | 0.034 | |
| 5/4/2012 | $82.41 | 2,248 | -1.08% | -0.864 | |
| 5/7/2012 | $82.64 | 1,184 | 0.45% | 0.360 | |
| 5/8/2012 | $82.33 | 3,153 | -0.35% | -0.281 | |
| 5/9/2012 | $82.34 | 1,168 | 0.16% | 0.125 | |
| 5/10/2012 | $81.43 | 1,486 | -1.21% | -0.969 | |
| 5/11/2012 | $82.31 | 1,698 | 1.07% | 0.851 | |
| 5/14/2012 | $81.48 | 202 | -0.70% | -0.560 | |
| 5/15/2012 | $80.65 | 1,709 | -0.87% | -0.692 | |
| 5/16/2012 | $79.81 | 855 | -0.64% | -0.510 | |
| 5/17/2012 | $77.43 | 12,524 | -1.12% | -0.897 | |

**Appendix D**
**Exide Note Detailed Statistics**

| Date | Price | Volume | Abnormal Return | Abnormal T-Stat | Significant Date |
|------|-------|--------|-----------------|-----------------|------------------|
| 5/18/2012 | $77.88 | 447 | 1.04% | 0.827 | |
| 5/21/2012 | $75.04 | 16,449 | -2.86% | -2.279 | * |
| 5/22/2012 | $75.36 | 4,336 | 0.04% | 0.034 | |
| 5/23/2012 | $74.00 | 4,778 | -1.22% | -0.974 | |
| 5/24/2012 | $74.02 | 12,927 | -0.06% | -0.046 | |
| 5/25/2012 | $75.36 | 456 | 1.89% | 1.510 | |
| 5/29/2012 | $75.14 | 815 | -0.49% | -0.393 | |
| 5/30/2012 | $74.21 | 11,682 | -0.85% | -0.676 | |
| 5/31/2012 | $74.45 | 10,456 | 0.62% | 0.494 | |
| 6/1/2012 | $73.41 | 15,805 | -0.60% | -0.481 | |
| 6/4/2012 | $73.43 | 1,373 | 0.35% | 0.280 | |
| 6/5/2012 | $73.34 | 5,283 | 0.24% | 0.195 | |
| 6/6/2012 | $74.10 | 3,566 | 0.50% | 0.398 | |
| 6/7/2012 | $75.48 | 3,433 | 1.29% | 1.027 | |
| 6/8/2012 | $79.84 | 17,983 | 5.70% | 4.547 | * |
| 6/11/2012 | $79.08 | 5,770 | -1.25% | -0.995 | |
| 6/12/2012 | $77.16 | 9,546 | -2.21% | -1.763 | |
| 6/13/2012 | $76.71 | 5,973 | -0.64% | -0.513 | |
| 6/14/2012 | $75.59 | 980 | -1.42% | -1.136 | |
| 6/15/2012 | $76.30 | 2,369 | 1.02% | 0.812 | |
| 6/18/2012 | $76.48 | 10,125 | 0.03% | 0.026 | |
| 6/19/2012 | $78.18 | 3,800 | 1.48% | 1.182 | |
| 6/20/2012 | $78.67 | 758 | -0.08% | -0.067 | |
| 6/21/2012 | $79.71 | 529 | 0.98% | 0.780 | |
| 6/22/2012 | $78.68 | 2,818 | -1.32% | -1.056 | |
| 6/25/2012 | $79.13 | 526 | 0.83% | 0.664 | |
| 6/26/2012 | $79.33 | 1,320 | 0.22% | 0.175 | |
| 6/27/2012 | $79.01 | 3,387 | -0.40% | -0.319 | |
| 6/28/2012 | $78.41 | 9,021 | -0.93% | -0.744 | |
| 6/29/2012 | $79.78 | 1,683 | 1.34% | 1.073 | |
| 7/2/2012 | $79.81 | 2,665 | -0.41% | -0.329 | |
| 7/3/2012 | $79.58 | 6,256 | -0.67% | -0.531 | |
| 7/5/2012 | $80.54 | 3,862 | 1.07% | 0.850 | |
| 7/6/2012 | $82.53 | 1,008 | 2.49% | 1.982 | * |
| 7/9/2012 | $81.24 | 1,190 | -1.49% | -1.187 | |
| 7/10/2012 | $81.10 | 8,734 | -0.41% | -0.329 | |
| 7/11/2012 | $81.84 | 11,727 | 0.71% | 0.570 | |
| 7/12/2012 | $82.08 | 4,075 | 0.45% | 0.355 | |
| 7/13/2012 | $83.07 | 2,002 | 1.42% | 1.135 | |
| 7/16/2012 | $82.50 | 3,577 | -0.62% | -0.491 | |

**Appendix D**
**Exide Note Detailed Statistics**

| Date | Price | Volume | Abnormal Return | Abnormal T-Stat | Significant Date |
|---|---|---|---|---|---|
| 7/17/2012 | $82.94 | 19,696 | 0.42% | 0.339 | |
| 7/18/2012 | $83.54 | 8,762 | 0.59% | 0.471 | |
| 7/19/2012 | $82.41 | 32,131 | -1.70% | -1.359 | |
| 7/20/2012 | $81.95 | 7,579 | -0.75% | -0.597 | |
| 7/23/2012 | $81.29 | 754 | -0.52% | -0.412 | |
| 7/24/2012 | $81.66 | 1,064 | 0.52% | 0.412 | |
| 7/25/2012 | $79.98 | 4,940 | -2.08% | -1.661 | |
| 7/26/2012 | $80.70 | 798 | 0.62% | 0.495 | |
| 7/27/2012 | $80.48 | 1,639 | -0.58% | -0.462 | |
| 7/30/2012 | $80.70 | 322 | 0.07% | 0.059 | |
| 7/31/2012 | $79.92 | 3,332 | -1.29% | -1.031 | |
| 8/1/2012 | $80.51 | 919 | 0.53% | 0.424 | |
| 8/2/2012 | $79.56 | 2,135 | -1.16% | -0.928 | |
| 8/3/2012 | $77.82 | 11,449 | -2.37% | -1.887 | |
| 8/6/2012 | $79.82 | 3,075 | 2.32% | 1.851 | |
| 8/7/2012 | $80.61 | 5,706 | 0.63% | 0.500 | |
| 8/8/2012 | $81.26 | 473 | 0.73% | 0.582 | |
| 8/9/2012 | $81.96 | 3,839 | 0.90% | 0.717 | |
| 8/10/2012 | $81.10 | 4,945 | -0.87% | -0.691 | |
| 8/13/2012 | $81.57 | 2,918 | 0.49% | 0.388 | |
| 8/14/2012 | $81.71 | 2,923 | 0.08% | 0.061 | |
| 8/15/2012 | $81.69 | 2,900 | -0.09% | -0.074 | |
| 8/16/2012 | $81.21 | 11,796 | -0.57% | -0.454 | |
| 8/17/2012 | $81.24 | 13,308 | 0.00% | 0.003 | |
| 8/20/2012 | $82.48 | 823 | 1.54% | 1.224 | |
| 8/21/2012 | $82.15 | 4,341 | -0.65% | -0.519 | |
| 8/22/2012 | $81.97 | 4,493 | -0.04% | -0.030 | |
| 8/23/2012 | $82.66 | 821 | 0.70% | 0.558 | |
| 8/24/2012 | $82.53 | 315 | -0.09% | -0.069 | |
| 8/27/2012 | $82.22 | 3,184 | -0.36% | -0.289 | |
| 8/28/2012 | $82.30 | 2,686 | 0.10% | 0.079 | |
| 8/29/2012 | $82.51 | 1,017 | 0.14% | 0.108 | |
| 8/30/2012 | $82.14 | 864 | -0.48% | -0.384 | |
| 8/31/2012 | $82.77 | 562 | 0.66% | 0.528 | |
| 9/4/2012 | $82.52 | 2,602 | -0.37% | -0.297 | |
| 9/5/2012 | $82.48 | 7,011 | -0.22% | -0.176 | |
| 9/6/2012 | $83.71 | 2,389 | 1.21% | 0.965 | |
| 9/7/2012 | $84.08 | 546 | -0.27% | -0.215 | |
| 9/10/2012 | $83.97 | 11,482 | -0.40% | -0.319 | |
| 9/11/2012 | $85.36 | 21,042 | 1.30% | 1.037 | |

**Appendix D**
**Exide Note Detailed Statistics**

| Date | Price | Volume | Abnormal Return | Abnormal T-Stat | Significant Date |
|------|-------|--------|-----------------|-----------------|------------------|
| 9/12/2012 | $86.51 | 8,301 | 0.80% | 0.638 | |
| 9/13/2012 | $85.86 | 6,375 | -0.63% | -0.501 | |
| 9/14/2012 | $87.11 | 2,969 | 0.56% | 0.444 | |
| 9/17/2012 | $86.71 | 5,551 | -0.46% | -0.365 | |
| 9/18/2012 | $87.03 | 5,567 | 0.43% | 0.340 | |
| 9/19/2012 | $86.64 | 9,422 | -0.39% | -0.310 | |
| 9/20/2012 | $86.53 | 6,315 | 0.10% | 0.076 | |
| 9/21/2012 | $86.94 | 12,496 | 0.63% | 0.505 | |
| 9/24/2012 | $87.00 | 9,376 | 0.45% | 0.360 | |
| 9/25/2012 | $87.42 | 8,920 | 0.69% | 0.548 | |
| 9/26/2012 | $86.42 | 5,627 | -0.19% | -0.155 | |
| 9/27/2012 | $87.15 | 10,600 | 0.65% | 0.522 | |
| 9/28/2012 | $86.73 | 10,019 | -0.63% | -0.501 | |
| 10/1/2012 | $87.13 | 5,570 | 0.32% | 0.258 | |
| 10/2/2012 | $87.04 | 12,788 | -0.19% | -0.148 | |
| 10/3/2012 | $87.53 | 11,597 | 0.79% | 0.626 | |
| 10/4/2012 | $87.85 | 8,005 | -0.02% | -0.020 | |
| 10/5/2012 | $88.10 | 13,191 | -0.04% | -0.031 | |
| 10/9/2012 | $88.43 | 11,651 | 0.40% | 0.316 | |
| 10/10/2012 | $87.08 | 3,059 | -1.31% | -1.045 | |
| 10/11/2012 | $87.79 | 2,816 | 0.46% | 0.366 | |
| 10/12/2012 | $87.48 | 4,202 | -0.40% | -0.320 | |
| 10/15/2012 | $87.43 | 3,267 | -0.15% | -0.123 | |
| 10/16/2012 | $87.45 | 2,986 | -0.17% | -0.139 | |
| 10/17/2012 | $87.25 | 2,973 | -0.73% | -0.579 | |
| 10/18/2012 | $86.75 | 2,262 | -0.74% | -0.589 | |
| 10/19/2012 | $85.84 | 5,095 | -1.07% | -0.855 | |
| 10/22/2012 | $85.07 | 1,682 | -0.94% | -0.748 | |
| 10/23/2012 | $83.31 | 8,476 | -1.62% | -1.293 | |
| 10/24/2012 | $83.32 | 782 | -0.13% | -0.107 | |
| 10/25/2012 | $83.21 | 5,498 | -0.19% | -0.149 | |
| 10/26/2012 | $81.89 | 7,115 | -1.20% | -0.954 | |
| 10/31/2012 | $81.52 | 3,587 | 0.79% | 0.633 | |
| 11/1/2012 | $82.04 | 542 | 0.43% | 0.345 | |
| 11/2/2012 | $81.95 | 5,227 | -0.41% | -0.327 | |
| 11/5/2012 | $82.32 | 1,170 | 0.46% | 0.366 | |
| 11/6/2012 | $82.03 | 6,817 | -0.60% | -0.480 | |
| 11/7/2012 | $81.17 | 1,786 | -1.03% | -0.822 | |
| 11/8/2012 | $81.51 | 180 | 0.53% | 0.424 | |
| 11/9/2012 | $79.21 | 2,700 | -2.46% | -1.964 | |

**Appendix D**
**Exide Note Detailed Statistics**

| Date | Price | Volume | Abnormal Return | Abnormal T-Stat | Significant Date |
|---|---|---|---|---|---|
| 11/13/2012 | $78.51 | 26,356 | -0.61% | -0.487 | |
| 11/14/2012 | $78.87 | 13,433 | 0.43% | 0.345 | |
| 11/15/2012 | $78.42 | 2,802 | 0.00% | 0.003 | |
| 11/16/2012 | $79.04 | 865 | 1.06% | 0.846 | |
| 11/19/2012 | $78.43 | 334 | -0.97% | -0.777 | |
| 11/20/2012 | $79.05 | 7,661 | 0.42% | 0.339 | |
| 11/21/2012 | $79.72 | 5,135 | 0.72% | 0.574 | |
| 11/23/2012 | $80.70 | 94 | 1.22% | 0.971 | |
| 11/26/2012 | $79.96 | 2,597 | -0.99% | -0.790 | |
| 11/27/2012 | $80.66 | 621 | 0.53% | 0.424 | |
| 11/28/2012 | $81.77 | 250 | 1.49% | 1.185 | |
| 11/29/2012 | $82.61 | 1,407 | 0.68% | 0.540 | |
| 11/30/2012 | $82.85 | 267 | 0.04% | 0.032 | |
| 12/3/2012 | $82.31 | 13,947 | -0.87% | -0.697 | |
| 12/4/2012 | $83.28 | 1,420 | 0.93% | 0.742 | |
| 12/5/2012 | $84.20 | 5,389 | 0.77% | 0.613 | |
| 12/6/2012 | $84.99 | 2,836 | 0.85% | 0.676 | |
| 12/7/2012 | $85.03 | 1,680 | -0.04% | -0.031 | |
| 12/10/2012 | $85.23 | 804 | 0.07% | 0.055 | |
| 12/11/2012 | $85.71 | 5,927 | 0.41% | 0.327 | |
| 12/12/2012 | $85.74 | 3,025 | -0.18% | -0.146 | |
| 12/13/2012 | $85.92 | 827 | 0.04% | 0.029 | |
| 12/14/2012 | $85.63 | 2,778 | -0.31% | -0.245 | |
| 12/17/2012 | $87.16 | 265 | 1.84% | 1.471 | |
| 12/18/2012 | $85.94 | 3,371 | -1.45% | -1.160 | |
| 12/19/2012 | $85.69 | 15,534 | -0.56% | -0.447 | |
| 12/20/2012 | $86.71 | 1,751 | 1.19% | 0.953 | |
| 12/21/2012 | $85.15 | 1,849 | -1.75% | -1.392 | |
| 12/24/2012 | $84.83 | 217 | -0.42% | -0.334 | |
| 12/26/2012 | $85.64 | 720 | 0.88% | 0.699 | |
| 12/27/2012 | $85.87 | 100 | 0.28% | 0.220 | |
| 12/28/2012 | $84.96 | 147 | -1.12% | -0.897 | |
| 12/31/2012 | $85.23 | 714 | 0.48% | 0.383 | |
| 1/2/2013 | $86.90 | 720 | 1.67% | 1.335 | |
| 1/3/2013 | $86.82 | 4,836 | -0.55% | -0.436 | |
| 1/4/2013 | $86.96 | 3,041 | 0.22% | 0.173 | |
| 1/7/2013 | $87.42 | 12,393 | 0.32% | 0.253 | |
| 1/8/2013 | $88.37 | 13,135 | 1.05% | 0.836 | |
| 1/9/2013 | $88.35 | 11,180 | 0.41% | 0.324 | |
| 1/10/2013 | $88.20 | 21,884 | -0.24% | -0.188 | |

## Appendix D
### Exide Note Detailed Statistics

| Date | Price | Volume | Abnormal Return | Abnormal T-Stat | Significant Date |
|------|-------|--------|-----------------|-----------------|------------------|
| 1/11/2013 | $88.14 | 14,913 | -0.01% | -0.009 | |
| 1/14/2013 | $88.75 | 8,248 | 0.67% | 0.536 | |
| 1/15/2013 | $89.21 | 30,720 | 0.64% | 0.514 | |
| 1/16/2013 | $88.47 | 16,948 | -0.79% | -0.632 | |
| 1/17/2013 | $88.65 | 3,869 | 0.01% | 0.010 | |
| 1/18/2013 | $86.94 | 20,172 | -1.81% | -1.441 | |
| 1/22/2013 | $86.76 | 16,646 | -0.20% | -0.159 | |
| 1/23/2013 | $87.31 | 4,378 | 0.54% | 0.433 | |
| 1/24/2013 | $87.79 | 4,012 | 0.31% | 0.246 | |
| 1/25/2013 | $87.42 | 3,296 | -0.66% | -0.524 | |
| 1/28/2013 | $87.29 | 7,442 | -0.06% | -0.045 | |
| 1/29/2013 | $87.33 | 2,286 | 0.38% | 0.307 | |
| 1/30/2013 | $88.13 | 591 | 1.42% | 1.136 | |
| 1/31/2013 | $86.64 | 6,806 | -1.32% | -1.053 | |
| 2/1/2013 | $86.95 | 798 | 0.53% | 0.419 | |
| 2/4/2013 | $85.64 | 2,192 | -1.24% | -0.990 | |
| 2/5/2013 | $85.60 | 5,832 | 0.10% | 0.081 | |
| 2/6/2013 | $86.20 | 2,695 | 0.80% | 0.636 | |
| 2/7/2013 | $83.74 | 44,623 | -2.69% | -2.149 | * |
| 2/8/2013 | $83.50 | 9,803 | -0.25% | -0.196 | |
| 2/11/2013 | $82.35 | 5,372 | -1.52% | -1.213 | |
| 2/12/2013 | $82.00 | 15,516 | -0.47% | -0.378 | |
| 2/13/2013 | $82.50 | 1,572 | 0.29% | 0.230 | |
| 2/14/2013 | $82.74 | 3,697 | 0.35% | 0.282 | |
| 2/15/2013 | $82.74 | 3,196 | -0.19% | -0.151 | |
| 2/19/2013 | $82.44 | 13,964 | -0.42% | -0.337 | |
| 2/20/2013 | $82.42 | 13,047 | -0.20% | -0.162 | |
| 2/21/2013 | $82.41 | 4,816 | 0.23% | 0.183 | |
| 2/22/2013 | $83.45 | 1,626 | 1.40% | 1.115 | |
| 2/25/2013 | $83.46 | 1,382 | -0.20% | -0.163 | |
| 2/26/2013 | $83.26 | 2,749 | -0.04% | -0.031 | |
| 2/27/2013 | $83.23 | 5,699 | -0.08% | -0.065 | |
| 2/28/2013 | $83.76 | 7,259 | 0.59% | 0.468 | |
| 3/1/2013 | $83.47 | 2,274 | -0.42% | -0.336 | |
| 3/4/2013 | $85.32 | 3,160 | 2.27% | 1.813 | |
| 3/5/2013 | $86.38 | 13,378 | 1.05% | 0.838 | |
| 3/6/2013 | $87.02 | 2,455 | 0.48% | 0.384 | |
| 3/7/2013 | $87.15 | 1,952 | -0.13% | -0.102 | |
| 3/8/2013 | $87.40 | 3,162 | 0.17% | 0.134 | |
| 3/11/2013 | $86.70 | 2,921 | -0.80% | -0.636 | |

**Appendix D**
**Exide Note Detailed Statistics**

| Date | Price | Volume | Abnormal Return | Abnormal T-Stat | Significant Date |
|---|---|---|---|---|---|
| 3/12/2013 | $87.07 | 1,475 | 0.36% | 0.286 | |
| 3/13/2013 | $86.24 | 5,876 | -0.99% | -0.792 | |
| 3/14/2013 | $86.17 | 3,070 | -0.14% | -0.109 | |
| 3/15/2013 | $86.49 | 1,495 | 0.32% | 0.255 | |
| 3/18/2013 | $86.20 | 1,389 | -0.20% | -0.160 | |
| 3/19/2013 | $85.97 | 7,727 | -0.26% | -0.207 | |
| 3/20/2013 | $85.97 | 2,713 | -0.04% | -0.034 | |
| 3/21/2013 | $86.58 | 1,724 | 0.63% | 0.504 | |
| 3/22/2013 | $86.11 | 5,917 | -0.41% | -0.323 | |
| 3/25/2013 | $85.77 | 6,007 | -0.54% | -0.427 | |
| 3/26/2013 | $85.85 | 9,017 | 0.22% | 0.173 | |
| 3/27/2013 | $85.74 | 2,504 | 0.04% | 0.032 | |
| 3/28/2013 | $86.14 | 2,450 | 0.56% | 0.446 | |
| 4/1/2013 | $85.66 | 1,367 | -0.58% | -0.460 | |
| 4/2/2013 | $86.31 | 1,366 | 0.78% | 0.622 | |
| 4/3/2013 | $85.36 | 3,464 | -1.12% | -0.896 | |
| 4/4/2013 | $76.32 | 83,803 | -10.40% | -8.295 | * |
| 4/5/2013 | $80.02 | 49,911 | 4.95% | 3.945 | * |
| 4/8/2013 | $76.11 | 30,544 | -5.07% | -4.043 | * |
| 4/9/2013 | $75.31 | 24,336 | -1.12% | -0.896 | |
| 4/10/2013 | $76.39 | 34,218 | 1.20% | 0.961 | |
| 4/11/2013 | $76.38 | 24,681 | -0.23% | -0.185 | |
| 4/12/2013 | $75.60 | 3,987 | -0.99% | -0.791 | |
| 4/15/2013 | $75.40 | 10,668 | -0.31% | -0.245 | |
| 4/16/2013 | $75.09 | 14,343 | -0.30% | -0.243 | |
| 4/17/2013 | $75.22 | 3,962 | 0.15% | 0.118 | |
| 4/18/2013 | $75.54 | 9,052 | 0.34% | 0.267 | |
| 4/19/2013 | $76.92 | 23,701 | 1.86% | 1.481 | |
| 4/22/2013 | $77.62 | 4,356 | 0.89% | 0.712 | |
| 4/23/2013 | $78.74 | 26,558 | 1.41% | 1.127 | |
| 4/24/2013 | $79.24 | 28,076 | 0.31% | 0.248 | |
| 4/25/2013 | $70.25 | 63,043 | -11.63% | -9.279 | * |
| 4/26/2013 | $65.62 | 80,791 | -6.79% | -5.412 | * |
| 4/29/2013 | $66.40 | 31,387 | 1.03% | 0.824 | |
| 4/30/2013 | $66.93 | 22,152 | 0.60% | 0.481 | |
| 5/1/2013 | $66.65 | 8,672 | -0.62% | -0.496 | |
| 5/2/2013 | $67.62 | 32,850 | 1.36% | 1.087 | |
| 5/3/2013 | $69.20 | 33,262 | 1.89% | 1.506 | |
| 5/6/2013 | $68.99 | 7,620 | -0.35% | -0.279 | |
| 5/7/2013 | $69.11 | 12,500 | -0.05% | -0.044 | |

**Appendix D**
**Exide Note Detailed Statistics**

| Date | Price | Volume | Abnormal Return | Abnormal T-Stat | Significant Date |
|---|---|---|---|---|---|
| 5/8/2013 | $69.23 | 5,681 | 0.13% | 0.104 | |
| 5/9/2013 | $69.40 | 25,656 | 0.11% | 0.086 | |
| 5/10/2013 | $69.59 | 16,379 | 0.39% | 0.307 | |
| 5/13/2013 | $71.06 | 13,505 | 2.51% | 2.003 | * |
| 5/14/2013 | $73.02 | 6,104 | 2.90% | 2.312 | * |
| 5/15/2013 | $73.11 | 16,282 | 0.34% | 0.273 | |
| 5/16/2013 | $72.85 | 6,264 | -0.29% | -0.231 | |
| 5/17/2013 | $72.34 | 7,057 | -0.71% | -0.563 | |
| 5/20/2013 | $71.84 | 2,094 | -0.83% | -0.659 | |
| 5/21/2013 | $72.76 | 9,115 | 1.37% | 1.090 | |
| 5/22/2013 | $73.21 | 11,158 | 0.31% | 0.248 | |
| 5/23/2013 | $72.17 | 972 | -0.89% | -0.713 | |
| 5/24/2013 | $65.93 | 72,424 | -8.57% | -6.834 | * |

Note:

* Indicates a date in which the corresponding t-Stat is greater than 1.97 or less than -1.97

**Appendix E**
**Exide Note Alleged Corrective Disclosures Statistics**

| Date | Price | Volume | Abnormal Return | Abnormal $t$-Stat | Significant Date |
|------|-------|--------|-----------------|-------------------|------------------|
| 4/4/2013 | $76.32 | 83,803 | -10.40% | -8.295 | * |
| 4/25/2013 | $70.25 | 63,043 | -11.63% | -9.279 | * |
| 5/24/2013 | $65.93 | 72,424 | -8.57% | -6.834 | * |

Note:

* Indicates date in which the corresponding $t$-Stat is greater than 1.97 or less than -1.97



**Exhibit 1**
**Exide Note Average Weekly Trading Volume**
**As a Percentage of Notes Outstanding**
**9/13/2011 – 5/24/2013**

Sources: FINRA TRACE Data

**Exhibit 2**
**Trade Distribution by Frequency**

This table presents statistics for the distribution of issues by frequency of trade, of US corporate dollar denominated bonds in the State Street Corporation custody trades database during the period from January 2003 to December 2005  The frequency of trading of an issue is defined as the number of distinct trading days in a given year  The data show the number of issues corresponding to a particular trading frequency in each year  For example, in 2003, five issues traded more than 200 days and 42 issues traded between 150 and 200 days
(Mahanti et al , p  279)

| Frequency of trading - Days | 2003 | 2004 | 2005 |
|---|---|---|---|
| > 200 days in year | 5 | 3 | 6 |
| 150-200 days in year | 42 | 25 | 14 |
| 100-150 days in year | 146 | 149 | 116 |
| 50-100 days in year | 786 | 730 | 739 |
| 30-50 days in year | 940 | 1007 | 961 |
| 10-30 days in year | 2439 | 2722 | 2672 |
| 5-10 days in year | 1754 | 1742 | 1580 |
| At least 1 day and at most 5 days in year | 5006 | 4786 | 4335 |
| No trade in year | 8262 | 8397 | 8693 |
| Total issue | 19380 | 19561 | 19116 |

| Frequency of trading - Percentage | 2003 | 2004 | 2005 |
|---|---|---|---|
| > 200 days in year | 0 03% | 0 02% | 0 03% |
| 150-200 days in year | 0 22% | 0 13% | 0 07% |
| 100-150 days in year | 0 75% | 0 76% | 0 61% |
| 50-100 days in year | 4 06% | 3 73% | 3 87% |
| 30-50 days in year | 4 85% | 5 15% | 5 03% |
| 10-30 days in year | 12 59% | 13 92% | 13 98% |
| 5-10 days in year | 9 05% | 8 91% | 8 27% |
| At least 1 day and at most 5 days in year | 25 83% | 24 47% | 22 68% |
| No trade in year | 42 63% | 42 93% | 45 47% |
| Total issue | 100 00% | 100 00% | 100 00% |

### Exide - Frequency of Trading Days by Year

| Note Name | 2011* | 2012 | 2013** |
|---|---|---|---|
| 8.625% Note due 2018 | 65 | 248 | 100 |

Sources: FINRA TRACE Data; Sriketani Mahanti, Amrut Nashikkar, Marti Subrahmanyam, George Chacko & Gaurav Mallik, *Latent liquidity  A new measure of liquidity, with an application to corporate bonds* , Journal of Financial Economics, Volume 88, Issue 2, pp. 272–298 (May 2008).

Notes:

*TRACE Bond data only includes days on or after the start of the Note Class Period (9/13/11), and therefore this 2011 analysis only covers trading between 9/13/2011 and 12/31/2011. The 8.625% Note was exchanged at the start of the Note Class Period. Therefore the analysis of these 2011 figures for the Note run from the date that Exchange offer expired to 12/31/2011.

** Since the Note Class Period ended 5/24/2013, the 2013 analysis only covers trading between the first trading day of 2013 and 5/24/2013.

## Exhibit 3
## Percentile Distribution of Trades by Time Elapsed Between Successive Trades

This table presents the distribution of time elapsed between trades (in days) of trades in dollar-denominated US corporate bonds in the State Street Corporation custody trades database during the period from January 2003 to December 2005. The time elapsed is defined as the number of days between successive trades of a given bond. Bonds that trade in a given year are sorted in the order of increasing time elapsed and the decile cutoff values are computed. The values shown are the average time elapsed of the bond for the given percentile range. For example, the data shows that the median trade had an elapsed time of 13 days in 2003 between successive trades and 12 days in 2005. (Mahanti et al., p. 282).

| Percentile | 2003 | 2004 | 2005 |
|---|---|---|---|
| 10 | 1 | 1 | 1 |
| 20 | 2 | 2 | 2 |
| 30 | 4 | 4 | 4 |
| 40 | 7 | 8 | 8 |
| 50 | 13 | 13 | 12 |
| 60 | 24 | 23 | 21 |
| 70 | 42 | 40 | 39 |
| 80 | 82 | 79 | 78 |
| 90 | 184 | 187 | 188 |

## Average Days Elapsed Between Successive Trades for Exide Notes

| Note Name | 2011* | 2012 | 2013** |
|---|---|---|---|
| 8.625% Note due 2018 | 0.05 | 0.01 | 0.004 |

Sources: FINRA TRACE Data; Sriketani Mahanti, Amrut Nashikkar, Marti Subrahmanyam, George Chacko & Gaurav Mallik, "Latent liquidity: A new measure of liquidity, with an application to corporate bonds," Journal of Financial Economics , Volume 88, Issue 2, pp. 272–298 (May 2008).

Notes:

*TRACE Bond data only includes days on or after the start of the Note Class Period (9/13/11), and therefore this 2011 analysis only covers trading between 9/13/2011 and 12/31/2011. The 8.625% Note was exchanged at the start of the Note Class Period. Therefore the analysis of these 2011 figures for the Note runs from the Note's issue date to 12/31/2011.

** Since the Note Class Period ended 5/24/2013, the 2013 analysis only covers trading between the first trading day of 2013 and 5/24/2013.

**Exhibit 4**
**Market Efficiency Statistics for Exide Note**

| Trading Dates | Daily Volume[1] | Price[2] | Daily Trade Size [3] | Total Amount Exchange (No. of Bonds)[4] | Market Value of Notes Outstanding[5] |
|---|---|---|---|---|---|
| 9/13/2011 | 2,377 | $94.47 | $2,245,438 | 674,450 | $637,120,455 |
| 9/14/2011 | 400 | $96.93 | $387,700 | 674,450 | $653,710,663 |
| 9/16/2011 | 60 | $95.78 | $57,465 | 674,450 | $645,954,488 |
| 9/19/2011 | 5 | $100.00 | $5,000 | 674,450 | $674,450,000 |
| 9/20/2011 | 150 | $97.10 | $145,650 | 674,450 | $654,890,950 |
| 9/21/2011 | 16,104 | $94.89 | $15,280,905 | 674,450 | $639,978,041 |
| 9/22/2011 | 2,770 | $93.71 | $2,595,673 | 674,450 | $632,004,208 |
| 9/23/2011 | 5,000 | $92.90 | $4,645,000 | 674,450 | $626,564,050 |
| 9/26/2011 | 1,030 | $93.53 | $963,350 | 674,450 | $630,807,192 |
| 9/27/2011 | 4,050 | $93.46 | $3,785,313 | 674,450 | $630,371,362 |
| 9/28/2011 | 14 | $95.40 | $13,356 | 674,450 | $643,425,300 |
| 9/29/2011 | 250 | $92.50 | $231,250 | 674,450 | $623,866,250 |
| 9/30/2011 | 60 | $95.01 | $57,007 | 674,450 | $640,807,310 |
| 10/4/2011 | 30 | $92.57 | $27,770 | 674,450 | $624,315,883 |
| 10/5/2011 | 970 | $87.90 | $852,620 | 674,450 | $592,834,597 |
| 10/6/2011 | 3,036 | $89.02 | $2,702,679 | 674,450 | $600,402,454 |
| 10/7/2011 | 50 | $91.85 | $45,925 | 674,450 | $619,482,325 |
| 10/11/2011 | 150 | $90.50 | $135,750 | 674,450 | $610,377,250 |
| 10/12/2011 | 195 | $94.85 | $184,958 | 674,450 | $639,715,825 |
| 10/13/2011 | 6,400 | $93.38 | $5,976,000 | 674,450 | $629,767,688 |
| 10/14/2011 | 2,000 | $93.97 | $1,879,375 | 674,450 | $633,772,234 |
| 10/18/2011 | 6,530 | $93.57 | $6,110,083 | 674,450 | $631,078,889 |
| 10/19/2011 | 8,398 | $94.02 | $7,895,637 | 674,450 | $634,104,831 |
| 10/20/2011 | 3,000 | $93.83 | $2,815,000 | 674,450 | $632,858,917 |
| 10/21/2011 | 1,575 | $94.68 | $1,491,238 | 674,450 | $638,581,250 |
| 10/24/2011 | 2,200 | $96.52 | $2,123,500 | 674,450 | $650,997,534 |
| 10/25/2011 | 275 | $97.20 | $267,313 | 674,450 | $655,596,057 |
| 10/26/2011 | 1,235 | $97.72 | $1,206,850 | 674,450 | $659,076,909 |
| 10/27/2011 | 16,525 | $100.47 | $16,602,000 | 674,450 | $677,592,672 |
| 10/28/2011 | 275 | $100.52 | $276,425 | 674,450 | $677,944,877 |
| 10/31/2011 | 2,024 | $100.14 | $2,026,766 | 674,450 | $675,371,624 |
| 11/1/2011 | 700 | $100.06 | $700,438 | 674,450 | $674,871,531 |
| 11/3/2011 | 15 | $100.00 | $15,000 | 674,450 | $674,450,000 |
| 11/4/2011 | 875 | $100.29 | $877,562 | 674,450 | $676,425,175 |
| 11/8/2011 | 48,427 | $88.34 | $42,782,519 | 674,450 | $595,838,481 |
| 11/9/2011 | 20 | $88.00 | $17,600 | 674,450 | $593,516,000 |
| 11/10/2011 | 2,040 | $86.09 | $1,756,328 | 674,450 | $580,664,322 |
| 11/14/2011 | 262 | $86.58 | $226,850 | 674,450 | $583,966,097 |
| 11/15/2011 | 450 | $85.27 | $383,715 | 674,450 | $575,103,515 |
| 11/16/2011 | 2,155 | $84.62 | $1,823,503 | 674,450 | $570,701,281 |
| 11/17/2011 | 345 | $84.39 | $291,135 | 674,450 | $569,147,828 |
| 11/18/2011 | 121 | $84.57 | $102,335 | 674,450 | $570,411,907 |
| 11/22/2011 | 2,250 | $82.31 | $1,851,875 | 674,450 | $555,109,819 |
| 11/23/2011 | 2,000 | $81.31 | $1,626,250 | 674,450 | $548,412,156 |
| 11/28/2011 | 170 | $82.75 | $140,675 | 674,450 | $558,107,375 |
| 11/29/2011 | 6,712 | $81.05 | $5,440,350 | 674,450 | $546,669,258 |
| 11/30/2011 | 17,192 | $80.30 | $13,805,783 | 674,450 | $541,607,163 |
| 12/1/2011 | 150 | $82.50 | $123,750 | 674,450 | $556,421,250 |
| 12/2/2011 | 68 | $83.82 | $56,995 | 674,450 | $565,298,202 |

**Exhibit 4**
**Market Efficiency Statistics for Exide Note**

| Trading Dates | Daily Volume[1] | Price[2] | Daily Trade Size [3] | Total Amount Exchange (No. of Bonds)[4] | Market Value of Notes Outstanding[5] |
|---|---|---|---|---|---|
| 12/5/2011 | 308 | $84.50 | $260,258 | 674,450 | $569,906,308 |
| 12/6/2011 | 830 | $81.37 | $675,410 | 674,450 | $548,831,656 |
| 12/7/2011 | 1,600 | $80.50 | $1,288,000 | 674,450 | $542,932,250 |
| 12/8/2011 | 120 | $81.88 | $98,250 | 674,450 | $552,205,938 |
| 12/9/2011 | 379 | $81.11 | $307,388 | 674,450 | $547,012,939 |
| 12/13/2011 | 5,809 | $80.13 | $4,654,950 | 674,450 | $540,459,808 |
| 12/14/2011 | 20 | $81.75 | $16,350 | 674,450 | $551,362,875 |
| 12/15/2011 | 6 | $81.51 | $4,891 | 674,450 | $549,732,954 |
| 12/16/2011 | 11,280 | $78.55 | $8,860,830 | 674,450 | $529,803,794 |
| 12/19/2011 | 1,574 | $78.81 | $1,240,440 | 674,450 | $531,521,234 |
| 12/20/2011 | 316 | $77.93 | $246,274 | 674,450 | $525,631,327 |
| 12/22/2011 | 6,920 | $78.10 | $5,404,855 | 674,450 | $526,778,096 |
| 12/27/2011 | 2,469 | $77.75 | $1,919,693 | 674,450 | $524,397,168 |
| 12/28/2011 | 148 | $79.90 | $118,252 | 674,450 | $538,883,363 |
| 12/29/2011 | 200 | $79.06 | $158,125 | 674,450 | $533,237,031 |
| 12/30/2011 | 250 | $77.50 | $193,750 | 674,450 | $522,698,750 |
| 1/3/2012 | 3,900 | $77.62 | $3,027,175 | 674,450 | $523,507,225 |
| 1/4/2012 | 17,488 | $77.73 | $13,593,075 | 674,450 | $524,236,587 |
| 1/5/2012 | 6,345 | $77.81 | $4,936,768 | 674,450 | $524,760,101 |
| 1/6/2012 | 23,095 | $77.79 | $17,965,960 | 674,450 | $524,665,168 |
| 1/9/2012 | 7,985 | $79.19 | $6,323,425 | 674,450 | $534,105,697 |
| 1/10/2012 | 8,707 | $80.44 | $7,003,509 | 674,450 | $542,496,478 |
| 1/11/2012 | 809 | $81.94 | $662,878 | 674,450 | $552,630,699 |
| 1/12/2012 | 8,463 | $80.30 | $6,795,615 | 674,450 | $541,569,463 |
| 1/13/2012 | 4,100 | $80.54 | $3,302,005 | 674,450 | $543,179,814 |
| 1/17/2012 | 456 | $81.46 | $371,435 | 674,450 | $549,373,543 |
| 1/18/2012 | 3,180 | $81.40 | $2,588,600 | 674,450 | $549,019,331 |
| 1/19/2012 | 20,370 | $81.09 | $16,517,578 | 674,450 | $546,896,440 |
| 1/20/2012 | 9,209 | $81.21 | $7,478,768 | 674,450 | $547,730,996 |
| 1/23/2012 | 21,072 | $81.68 | $17,211,922 | 674,450 | $550,900,759 |
| 1/24/2012 | 7,170 | $82.27 | $5,898,820 | 674,450 | $554,875,753 |
| 1/25/2012 | 4,000 | $82.63 | $3,305,000 | 674,450 | $557,264,313 |
| 1/26/2012 | 124 | $84.53 | $104,822 | 674,450 | $570,138,693 |
| 1/27/2012 | 309 | $84.11 | $259,897 | 674,450 | $567,273,020 |
| 1/30/2012 | 2,220 | $82.96 | $1,841,630 | 674,450 | $559,498,808 |
| 1/31/2012 | 4,515 | $82.89 | $3,742,563 | 674,450 | $559,063,406 |
| 2/1/2012 | 9,925 | $83.20 | $8,257,546 | 674,450 | $561,138,747 |
| 2/2/2012 | 5,760 | $83.13 | $4,788,400 | 674,450 | $560,683,399 |
| 2/3/2012 | 13,790 | $83.95 | $11,576,196 | 674,450 | $566,175,881 |
| 2/6/2012 | 9,014 | $84.83 | $7,646,903 | 674,450 | $572,160,366 |
| 2/7/2012 | 10,629 | $84.65 | $8,997,830 | 674,450 | $570,946,134 |
| 2/8/2012 | 10,002 | $85.11 | $8,513,096 | 674,450 | $574,050,950 |
| 2/9/2012 | 7,223 | $86.53 | $6,249,830 | 674,450 | $583,579,931 |
| 2/10/2012 | 67,268 | $79.41 | $53,417,174 | 674,450 | $535,577,288 |
| 2/13/2012 | 19,487 | $79.76 | $15,542,306 | 674,450 | $537,923,125 |
| 2/14/2012 | 22,376 | $78.16 | $17,488,162 | 674,450 | $527,122,409 |
| 2/15/2012 | 10,895 | $76.99 | $8,387,782 | 674,450 | $519,241,796 |
| 2/16/2012 | 9,365 | $77.83 | $7,288,752 | 674,450 | $524,922,454 |
| 2/17/2012 | 492 | $78.70 | $387,197 | 674,450 | $530,783,130 |

**Exhibit 4**
**Market Efficiency Statistics for Exide Note**

| Trading Dates | Daily Volume[1] | Price[2] | Daily Trade Size [3] | Total Amount Exchange (No. of Bonds)[4] | Market Value of Notes Outstanding[5] |
|---|---|---|---|---|---|
| 2/21/2012 | 1,100 | $78.59 | $864,544 | 674,450 | $530,083,364 |
| 2/22/2012 | 14,795 | $76.61 | $11,334,975 | 674,450 | $516,720,114 |
| 2/23/2012 | 23,812 | $76.63 | $18,246,508 | 674,450 | $516,813,253 |
| 2/24/2012 | 11,603 | $76.84 | $8,915,612 | 674,450 | $518,239,637 |
| 2/27/2012 | 10,875 | $76.71 | $8,341,727 | 674,450 | $517,340,510 |
| 2/28/2012 | 2,699 | $77.16 | $2,082,438 | 674,450 | $520,378,032 |
| 2/29/2012 | 7,647 | $78.03 | $5,967,024 | 674,450 | $526,279,476 |
| 3/1/2012 | 4,304 | $78.34 | $3,371,886 | 674,450 | $528,384,932 |
| 3/2/2012 | 1,649 | $79.43 | $1,309,848 | 674,450 | $535,735,059 |
| 3/5/2012 | 3,196 | $79.56 | $2,542,896 | 674,450 | $536,625,845 |
| 3/6/2012 | 8,612 | $78.00 | $6,717,586 | 674,450 | $526,088,680 |
| 3/7/2012 | 4,226 | $78.98 | $3,337,888 | 674,450 | $532,711,370 |
| 3/8/2012 | 8,937 | $79.68 | $7,120,716 | 674,450 | $537,380,188 |
| 3/9/2012 | 5,730 | $80.95 | $4,638,396 | 674,450 | $545,962,737 |
| 3/12/2012 | 5,066 | $81.30 | $4,118,865 | 674,450 | $548,355,366 |
| 3/13/2012 | 19,706 | $81.33 | $16,027,246 | 674,450 | $548,542,376 |
| 3/14/2012 | 3,714 | $82.95 | $3,080,615 | 674,450 | $559,429,399 |
| 3/15/2012 | 6,669 | $83.39 | $5,561,545 | 674,450 | $562,450,746 |
| 3/16/2012 | 12,345 | $83.76 | $10,340,444 | 674,450 | $564,934,180 |
| 3/19/2012 | 6,291 | $84.08 | $5,289,588 | 674,450 | $567,089,932 |
| 3/20/2012 | 14,841 | $83.59 | $12,405,236 | 674,450 | $563,756,581 |
| 3/21/2012 | 11,622 | $84.23 | $9,789,057 | 674,450 | $568,080,298 |
| 3/22/2012 | 3,648 | $84.19 | $3,071,406 | 674,450 | $567,848,097 |
| 3/23/2012 | 3,137 | $84.74 | $2,658,174 | 674,450 | $571,503,141 |
| 3/26/2012 | 1,776 | $84.61 | $1,502,725 | 674,450 | $570,671,638 |
| 3/27/2012 | 3,109 | $84.34 | $2,622,189 | 674,450 | $568,843,799 |
| 3/28/2012 | 18,433 | $83.90 | $15,464,552 | 674,450 | $565,836,639 |
| 3/29/2012 | 2,954 | $83.74 | $2,473,533 | 674,450 | $564,750,844 |
| 3/30/2012 | 7,121 | $84.50 | $6,017,347 | 674,450 | $569,919,934 |
| 4/2/2012 | 5,766 | $83.47 | $4,812,926 | 674,450 | $562,968,720 |
| 4/3/2012 | 1,392 | $84.08 | $1,170,425 | 674,450 | $567,092,847 |
| 4/4/2012 | 854 | $82.64 | $705,770 | 674,450 | $557,384,355 |
| 4/5/2012 | 2,005 | $83.10 | $1,666,175 | 674,450 | $560,474,594 |
| 4/9/2012 | 3,262 | $82.29 | $2,684,395 | 674,450 | $555,024,547 |
| 4/10/2012 | 6,698 | $80.84 | $5,414,639 | 674,450 | $545,222,951 |
| 4/11/2012 | 5,269 | $80.79 | $4,256,655 | 674,450 | $544,866,318 |
| 4/12/2012 | 1,482 | $81.01 | $1,200,510 | 674,450 | $546,345,458 |
| 4/13/2012 | 1,013 | $82.82 | $838,941 | 674,450 | $558,562,446 |
| 4/16/2012 | 2,128 | $81.23 | $1,728,569 | 674,450 | $547,853,951 |
| 4/17/2012 | 1,693 | $81.08 | $1,372,768 | 674,450 | $546,877,265 |
| 4/18/2012 | 8,151 | $79.69 | $6,495,715 | 674,450 | $537,484,314 |
| 4/19/2012 | 1,384 | $79.53 | $1,100,627 | 674,450 | $536,356,752 |
| 4/20/2012 | 900 | $82.01 | $738,087 | 674,450 | $553,114,197 |
| 4/23/2012 | 6,487 | $79.30 | $5,143,968 | 674,450 | $534,815,613 |
| 4/24/2012 | 2,452 | $80.91 | $1,983,952 | 674,450 | $545,708,085 |
| 4/25/2012 | 7,405 | $81.03 | $5,999,926 | 674,450 | $546,475,355 |
| 4/26/2012 | 875 | $81.37 | $711,988 | 674,450 | $548,800,435 |
| 4/27/2012 | 903 | $81.98 | $740,255 | 674,450 | $552,895,811 |
| 4/30/2012 | 13,748 | $81.34 | $11,182,486 | 674,450 | $548,590,891 |

**Exhibit 4**
**Market Efficiency Statistics for Exide Note**

| Trading Dates | Daily Volume[1] | Price[2] | Daily Trade Size [3] | Total Amount Exchange (No. of Bonds)[4] | Market Value of Notes Outstanding[5] |
|---|---|---|---|---|---|
| 5/1/2012 | 2,414 | $82.66 | $1,995,424 | 674,450 | $557,503,681 |
| 5/2/2012 | 3,321 | $82.84 | $2,751,275 | 674,450 | $558,746,648 |
| 5/3/2012 | 7,704 | $83.06 | $6,398,875 | 674,450 | $560,192,248 |
| 5/4/2012 | 2,248 | $82.41 | $1,852,648 | 674,450 | $555,835,607 |
| 5/7/2012 | 1,184 | $82.64 | $978,436 | 674,450 | $557,353,318 |
| 5/8/2012 | 3,153 | $82.33 | $2,595,983 | 674,450 | $555,299,947 |
| 5/9/2012 | 1,168 | $82.34 | $961,727 | 674,450 | $555,339,936 |
| 5/10/2012 | 1,486 | $81.43 | $1,210,083 | 674,450 | $549,219,613 |
| 5/11/2012 | 1,698 | $82.31 | $1,397,569 | 674,450 | $555,118,068 |
| 5/14/2012 | 202 | $81.48 | $164,585 | 674,450 | $549,525,500 |
| 5/15/2012 | 1,709 | $80.65 | $1,378,265 | 674,450 | $543,926,659 |
| 5/16/2012 | 855 | $79.81 | $682,353 | 674,450 | $538,260,836 |
| 5/17/2012 | 12,524 | $77.43 | $9,697,632 | 674,450 | $522,242,748 |
| 5/18/2012 | 447 | $77.88 | $348,120 | 674,450 | $525,256,907 |
| 5/21/2012 | 16,449 | $75.04 | $12,344,079 | 674,450 | $506,138,022 |
| 5/22/2012 | 4,336 | $75.36 | $3,267,658 | 674,450 | $508,273,087 |
| 5/23/2012 | 4,778 | $74.00 | $3,535,567 | 674,450 | $499,071,389 |
| 5/24/2012 | 12,927 | $74.02 | $9,568,754 | 674,450 | $499,237,740 |
| 5/25/2012 | 456 | $75.36 | $343,632 | 674,450 | $508,251,469 |
| 5/29/2012 | 815 | $75.14 | $612,368 | 674,450 | $506,762,614 |
| 5/30/2012 | 11,682 | $74.21 | $8,668,883 | 674,450 | $500,490,342 |
| 5/31/2012 | 10,456 | $74.45 | $7,784,078 | 674,450 | $502,101,327 |
| 6/1/2012 | 15,805 | $73.41 | $11,601,855 | 674,450 | $495,088,312 |
| 6/4/2012 | 1,373 | $73.43 | $1,008,157 | 674,450 | $495,230,514 |
| 6/5/2012 | 5,283 | $73.34 | $3,874,371 | 674,450 | $494,618,510 |
| 6/6/2012 | 3,566 | $74.10 | $2,642,261 | 674,450 | $499,739,978 |
| 6/7/2012 | 3,433 | $75.48 | $2,591,153 | 674,450 | $509,059,998 |
| 6/8/2012 | 17,983 | $79.84 | $14,357,606 | 674,450 | $538,480,071 |
| 6/11/2012 | 5,770 | $79.08 | $4,562,709 | 674,450 | $533,330,817 |
| 6/12/2012 | 9,546 | $77.16 | $7,365,567 | 674,450 | $520,396,697 |
| 6/13/2012 | 5,973 | $76.71 | $4,581,868 | 674,450 | $517,368,297 |
| 6/14/2012 | 980 | $75.59 | $740,819 | 674,450 | $509,842,219 |
| 6/15/2012 | 2,369 | $76.30 | $1,807,618 | 674,450 | $514,625,564 |
| 6/18/2012 | 10,125 | $76.48 | $7,743,390 | 674,450 | $515,805,385 |
| 6/19/2012 | 3,800 | $78.18 | $2,970,659 | 674,450 | $527,252,885 |
| 6/20/2012 | 758 | $78.67 | $596,352 | 674,450 | $530,619,756 |
| 6/21/2012 | 529 | $79.71 | $421,691 | 674,450 | $537,636,415 |
| 6/22/2012 | 2,818 | $78.68 | $2,217,315 | 674,450 | $530,684,137 |
| 6/25/2012 | 526 | $79.13 | $416,215 | 674,450 | $533,680,617 |
| 6/26/2012 | 1,320 | $79.33 | $1,047,107 | 674,450 | $535,016,097 |
| 6/27/2012 | 3,387 | $79.01 | $2,676,101 | 674,450 | $532,889,377 |
| 6/28/2012 | 9,021 | $78.41 | $7,073,100 | 674,450 | $528,816,320 |
| 6/29/2012 | 1,683 | $79.78 | $1,342,678 | 674,450 | $538,068,375 |
| 7/2/2012 | 2,665 | $79.81 | $2,126,936 | 674,450 | $538,278,393 |
| 7/3/2012 | 6,256 | $79.58 | $4,978,225 | 674,450 | $536,694,989 |
| 7/5/2012 | 3,862 | $80.54 | $3,110,276 | 674,450 | $543,170,805 |
| 7/6/2012 | 1,008 | $82.53 | $831,951 | 674,450 | $556,656,036 |
| 7/9/2012 | 1,190 | $81.24 | $966,778 | 674,450 | $547,935,479 |
| 7/10/2012 | 8,734 | $81.10 | $7,083,088 | 674,450 | $546,964,595 |

**Exhibit 4**
**Market Efficiency Statistics for Exide Note**

| Trading Dates | Daily Volume[1] | Price[2] | Daily Trade Size [3] | Total Amount Exchange (No. of Bonds)[4] | Market Value of Notes Outstanding[5] |
|---|---|---|---|---|---|
| 7/11/2012 | 11,727 | $81.84 | $9,596,967 | 674,450 | $551,946,318 |
| 7/12/2012 | 4,075 | $82.08 | $3,344,914 | 674,450 | $553,614,044 |
| 7/13/2012 | 2,002 | $83.07 | $1,662,986 | 674,450 | $560,240,204 |
| 7/16/2012 | 3,577 | $82.50 | $2,950,948 | 674,450 | $556,406,694 |
| 7/17/2012 | 19,696 | $82.94 | $16,336,208 | 674,450 | $559,400,680 |
| 7/18/2012 | 8,762 | $83.54 | $7,319,721 | 674,450 | $563,431,389 |
| 7/19/2012 | 32,131 | $82.41 | $26,479,066 | 674,450 | $555,812,328 |
| 7/20/2012 | 7,579 | $81.95 | $6,211,307 | 674,450 | $552,739,916 |
| 7/23/2012 | 754 | $81.29 | $612,942 | 674,450 | $548,273,881 |
| 7/24/2012 | 1,064 | $81.66 | $868,905 | 674,450 | $550,782,556 |
| 7/25/2012 | 4,940 | $79.98 | $3,951,150 | 674,450 | $539,443,937 |
| 7/26/2012 | 798 | $80.70 | $644,024 | 674,450 | $544,312,929 |
| 7/27/2012 | 1,639 | $80.48 | $1,319,111 | 674,450 | $542,815,501 |
| 7/30/2012 | 322 | $80.70 | $259,856 | 674,450 | $544,285,549 |
| 7/31/2012 | 3,332 | $79.92 | $2,663,088 | 674,450 | $539,051,470 |
| 8/1/2012 | 919 | $80.51 | $739,850 | 674,450 | $542,972,761 |
| 8/2/2012 | 2,135 | $79.56 | $1,698,665 | 674,450 | $536,611,137 |
| 8/3/2012 | 11,449 | $77.82 | $8,909,199 | 674,450 | $524,832,696 |
| 8/6/2012 | 3,075 | $79.82 | $2,454,398 | 674,450 | $538,331,240 |
| 8/7/2012 | 5,706 | $80.61 | $4,599,631 | 674,450 | $543,677,008 |
| 8/8/2012 | 473 | $81.26 | $384,356 | 674,450 | $548,053,151 |
| 8/9/2012 | 3,839 | $81.96 | $3,146,471 | 674,450 | $552,783,867 |
| 8/10/2012 | 4,945 | $81.10 | $4,010,274 | 674,450 | $546,962,388 |
| 8/13/2012 | 2,918 | $81.57 | $2,380,229 | 674,450 | $550,152,656 |
| 8/14/2012 | 2,923 | $81.71 | $2,388,328 | 674,450 | $551,080,273 |
| 8/15/2012 | 2,900 | $81.69 | $2,368,909 | 674,450 | $550,934,699 |
| 8/16/2012 | 11,796 | $81.21 | $9,579,703 | 674,450 | $547,730,616 |
| 8/17/2012 | 13,308 | $81.24 | $10,811,797 | 674,450 | $547,942,315 |
| 8/20/2012 | 823 | $82.48 | $678,820 | 674,450 | $556,294,235 |
| 8/21/2012 | 4,341 | $82.15 | $3,565,950 | 674,450 | $554,032,463 |
| 8/22/2012 | 4,493 | $81.97 | $3,682,876 | 674,450 | $552,841,219 |
| 8/23/2012 | 821 | $82.66 | $678,606 | 674,450 | $557,473,178 |
| 8/24/2012 | 315 | $82.53 | $259,982 | 674,450 | $556,650,413 |
| 8/27/2012 | 3,184 | $82.22 | $2,617,997 | 674,450 | $554,556,459 |
| 8/28/2012 | 2,686 | $82.30 | $2,210,712 | 674,450 | $555,105,872 |
| 8/29/2012 | 1,017 | $82.51 | $839,133 | 674,450 | $556,492,939 |
| 8/30/2012 | 864 | $82.14 | $709,657 | 674,450 | $553,967,407 |
| 8/31/2012 | 562 | $82.77 | $465,157 | 674,450 | $558,230,240 |
| 9/4/2012 | 2,602 | $82.52 | $2,147,256 | 674,450 | $556,578,356 |
| 9/5/2012 | 7,011 | $82.48 | $5,782,679 | 674,450 | $556,286,942 |
| 9/6/2012 | 2,389 | $83.71 | $1,999,737 | 674,450 | $564,555,173 |
| 9/7/2012 | 546 | $84.08 | $459,077 | 674,450 | $567,077,498 |
| 9/10/2012 | 11,482 | $83.97 | $9,641,974 | 674,450 | $566,367,293 |
| 9/11/2012 | 21,042 | $85.36 | $17,960,981 | 674,450 | $575,695,455 |
| 9/12/2012 | 8,301 | $86.51 | $7,180,816 | 674,450 | $583,435,883 |
| 9/13/2012 | 6,375 | $85.86 | $5,473,722 | 674,450 | $579,098,341 |
| 9/14/2012 | 2,969 | $87.11 | $2,586,269 | 674,450 | $587,507,375 |
| 9/17/2012 | 5,551 | $86.71 | $4,813,390 | 674,450 | $584,829,868 |
| 9/18/2012 | 5,567 | $87.03 | $4,845,132 | 674,450 | $586,994,692 |

**Exhibit 4**
**Market Efficiency Statistics for Exide Note**

| Trading Dates | Daily Volume[1] | Price[2] | Daily Trade Size [3] | Total Amount Exchange (No. of Bonds)[4] | Market Value of Notes Outstanding[5] |
|---|---|---|---|---|---|
| 9/19/2012 | 9,422 | $86.64 | $8,163,437 | 674,450 | $584,358,981 |
| 9/20/2012 | 6,315 | $86.53 | $5,464,579 | 674,450 | $583,623,961 |
| 9/21/2012 | 12,496 | $86.94 | $10,863,888 | 674,450 | $586,359,565 |
| 9/24/2012 | 9,376 | $87.00 | $8,156,936 | 674,450 | $586,758,247 |
| 9/25/2012 | 8,920 | $87.42 | $7,797,953 | 674,450 | $589,610,951 |
| 9/26/2012 | 5,627 | $86.42 | $4,862,624 | 674,450 | $582,832,195 |
| 9/27/2012 | 10,600 | $87.15 | $9,238,360 | 674,450 | $587,812,441 |
| 9/28/2012 | 10,019 | $86.73 | $8,689,894 | 674,450 | $584,978,442 |
| 10/1/2012 | 5,570 | $87.13 | $4,853,271 | 674,450 | $587,664,056 |
| 10/2/2012 | 12,788 | $87.04 | $11,130,796 | 674,450 | $587,047,631 |
| 10/3/2012 | 11,597 | $87.53 | $10,150,775 | 674,450 | $590,341,512 |
| 10/4/2012 | 8,005 | $87.85 | $7,032,161 | 674,450 | $592,484,832 |
| 10/5/2012 | 13,191 | $88.10 | $11,621,722 | 674,450 | $594,213,521 |
| 10/9/2012 | 11,651 | $88.43 | $10,303,300 | 674,450 | $596,434,683 |
| 10/10/2012 | 3,059 | $87.08 | $2,663,694 | 674,450 | $587,292,778 |
| 10/11/2012 | 2,816 | $87.79 | $2,472,088 | 674,450 | $592,080,939 |
| 10/12/2012 | 4,202 | $87.48 | $3,675,724 | 674,450 | $589,979,134 |
| 10/15/2012 | 3,267 | $87.43 | $2,856,213 | 674,450 | $589,645,745 |
| 10/16/2012 | 2,986 | $87.45 | $2,611,121 | 674,450 | $589,775,881 |
| 10/17/2012 | 2,973 | $87.25 | $2,594,033 | 674,450 | $588,478,099 |
| 10/18/2012 | 2,262 | $86.75 | $1,962,377 | 674,450 | $585,112,836 |
| 10/19/2012 | 5,095 | $85.84 | $4,373,585 | 674,450 | $578,952,712 |
| 10/22/2012 | 1,682 | $85.07 | $1,430,891 | 674,450 | $573,760,008 |
| 10/23/2012 | 8,476 | $83.31 | $7,061,000 | 674,450 | $561,856,028 |
| 10/24/2012 | 782 | $83.32 | $651,564 | 674,450 | $561,953,336 |
| 10/25/2012 | 5,498 | $83.21 | $4,574,811 | 674,450 | $561,200,655 |
| 10/26/2012 | 7,115 | $81.89 | $5,826,483 | 674,450 | $552,308,016 |
| 10/31/2012 | 3,587 | $81.52 | $2,924,262 | 674,450 | $549,837,883 |
| 11/1/2012 | 542 | $82.04 | $444,641 | 674,450 | $553,298,770 |
| 11/2/2012 | 5,227 | $81.95 | $4,283,469 | 674,450 | $552,704,303 |
| 11/5/2012 | 1,170 | $82.32 | $963,181 | 674,450 | $555,228,338 |
| 11/6/2012 | 6,817 | $82.03 | $5,592,323 | 674,450 | $553,284,750 |
| 11/7/2012 | 1,786 | $81.17 | $1,449,631 | 674,450 | $547,426,530 |
| 11/8/2012 | 180 | $81.51 | $146,720 | 674,450 | $549,750,377 |
| 11/9/2012 | 2,700 | $79.21 | $2,138,783 | 674,450 | $534,260,196 |
| 11/13/2012 | 26,356 | $78.51 | $20,692,033 | 674,450 | $529,509,100 |
| 11/14/2012 | 13,433 | $78.87 | $10,594,382 | 674,450 | $531,927,414 |
| 11/15/2012 | 2,802 | $78.42 | $2,197,236 | 674,450 | $528,881,396 |
| 11/16/2012 | 865 | $79.04 | $683,676 | 674,450 | $533,069,857 |
| 11/19/2012 | 334 | $78.43 | $261,944 | 674,450 | $528,946,196 |
| 11/20/2012 | 7,661 | $79.05 | $6,055,741 | 674,450 | $533,128,119 |
| 11/21/2012 | 5,135 | $79.72 | $4,093,423 | 674,450 | $537,645,403 |
| 11/23/2012 | 94 | $80.70 | $75,861 | 674,450 | $544,302,675 |
| 11/26/2012 | 2,597 | $79.96 | $2,076,672 | 674,450 | $539,318,876 |
| 11/27/2012 | 621 | $80.66 | $500,912 | 674,450 | $544,026,249 |
| 11/28/2012 | 250 | $81.77 | $204,414 | 674,450 | $551,466,821 |
| 11/29/2012 | 1,407 | $82.61 | $1,162,270 | 674,450 | $557,138,027 |
| 11/30/2012 | 267 | $82.85 | $221,198 | 674,450 | $558,752,776 |
| 12/3/2012 | 13,947 | $82.31 | $11,479,824 | 674,450 | $555,142,112 |

**Exhibit 4**
**Market Efficiency Statistics for Exide Note**

| Trading Dates | Daily Volume[1] | Price[2] | Daily Trade Size [3] | Total Amount Exchange (No. of Bonds)[4] | Market Value of Notes Outstanding[5] |
|---|---|---|---|---|---|
| 12/4/2012 | 1,420 | $83.28 | $1,182,615 | 674,450 | $561,700,512 |
| 12/5/2012 | 5,389 | $84.20 | $4,537,299 | 674,450 | $567,857,002 |
| 12/6/2012 | 2,836 | $84.99 | $2,410,211 | 674,450 | $573,189,941 |
| 12/7/2012 | 1,680 | $85.03 | $1,428,505 | 674,450 | $573,485,116 |
| 12/10/2012 | 804 | $85.23 | $685,221 | 674,450 | $574,810,331 |
| 12/11/2012 | 5,927 | $85.71 | $5,079,934 | 674,450 | $578,059,956 |
| 12/12/2012 | 3,025 | $85.74 | $2,593,771 | 674,450 | $578,303,797 |
| 12/13/2012 | 827 | $85.92 | $710,548 | 674,450 | $579,479,317 |
| 12/14/2012 | 2,778 | $85.63 | $2,378,765 | 674,450 | $577,522,717 |
| 12/17/2012 | 265 | $87.16 | $230,964 | 674,450 | $587,826,314 |
| 12/18/2012 | 3,371 | $85.94 | $2,897,010 | 674,450 | $579,616,858 |
| 12/19/2012 | 15,534 | $85.69 | $13,311,209 | 674,450 | $577,941,611 |
| 12/20/2012 | 1,751 | $86.71 | $1,518,257 | 674,450 | $584,801,937 |
| 12/21/2012 | 1,849 | $85.15 | $1,574,440 | 674,450 | $574,300,270 |
| 12/24/2012 | 217 | $84.83 | $184,079 | 674,450 | $572,128,165 |
| 12/26/2012 | 720 | $85.64 | $616,625 | 674,450 | $577,614,989 |
| 12/27/2012 | 100 | $85.87 | $85,867 | 674,450 | $579,129,982 |
| 12/28/2012 | 147 | $84.96 | $124,891 | 674,450 | $573,011,802 |
| 12/31/2012 | 714 | $85.23 | $608,541 | 674,450 | $574,832,318 |
| 1/2/2013 | 720 | $86.90 | $625,691 | 674,450 | $586,106,979 |
| 1/3/2013 | 4,836 | $86.82 | $4,198,747 | 674,450 | $585,575,922 |
| 1/4/2013 | 3,041 | $86.96 | $2,644,419 | 674,450 | $586,494,091 |
| 1/7/2013 | 12,393 | $87.42 | $10,834,040 | 674,450 | $589,608,538 |
| 1/8/2013 | 13,135 | $88.37 | $11,606,815 | 674,450 | $595,981,475 |
| 1/9/2013 | 11,180 | $88.35 | $9,877,714 | 674,450 | $595,887,660 |
| 1/10/2013 | 21,884 | $88.20 | $19,300,922 | 674,450 | $594,841,288 |
| 1/11/2013 | 14,913 | $88.14 | $13,144,295 | 674,450 | $594,459,160 |
| 1/14/2013 | 8,248 | $88.75 | $7,319,801 | 674,450 | $598,549,917 |
| 1/15/2013 | 30,720 | $89.21 | $27,406,710 | 674,450 | $601,707,533 |
| 1/16/2013 | 16,948 | $88.47 | $14,994,217 | 674,450 | $596,698,720 |
| 1/17/2013 | 3,869 | $88.65 | $3,429,985 | 674,450 | $597,920,301 |
| 1/18/2013 | 20,172 | $86.94 | $17,538,144 | 674,450 | $586,387,116 |
| 1/22/2013 | 16,646 | $86.76 | $14,441,664 | 674,450 | $585,136,385 |
| 1/23/2013 | 4,378 | $87.31 | $3,822,220 | 674,450 | $588,829,617 |
| 1/24/2013 | 4,012 | $87.79 | $3,522,216 | 674,450 | $592,113,263 |
| 1/25/2013 | 3,296 | $87.42 | $2,881,243 | 674,450 | $589,579,573 |
| 1/28/2013 | 7,442 | $87.29 | $6,496,256 | 674,450 | $588,739,546 |
| 1/29/2013 | 2,286 | $87.33 | $1,996,327 | 674,450 | $588,986,421 |
| 1/30/2013 | 591 | $88.13 | $520,823 | 674,450 | $594,364,141 |
| 1/31/2013 | 6,806 | $86.64 | $5,897,013 | 674,450 | $584,372,638 |
| 2/1/2013 | 798 | $86.95 | $693,887 | 674,450 | $586,456,216 |
| 2/4/2013 | 2,192 | $85.64 | $1,877,320 | 674,450 | $577,627,115 |
| 2/5/2013 | 5,832 | $85.60 | $4,992,047 | 674,450 | $577,312,443 |
| 2/6/2013 | 2,695 | $86.20 | $2,323,009 | 674,450 | $581,355,581 |
| 2/7/2013 | 44,623 | $83.74 | $37,366,074 | 674,450 | $564,765,892 |
| 2/8/2013 | 9,803 | $83.50 | $8,185,155 | 674,450 | $563,141,651 |
| 2/11/2013 | 5,372 | $82.35 | $4,423,840 | 674,450 | $555,409,274 |
| 2/12/2013 | 15,516 | $82.00 | $12,722,729 | 674,450 | $553,032,004 |
| 2/13/2013 | 1,572 | $82.50 | $1,296,839 | 674,450 | $556,395,096 |

**Exhibit 4**
**Market Efficiency Statistics for Exide Note**

| Trading Dates | Daily Volume[1] | Price[2] | Daily Trade Size [3] | Total Amount Exchange (No. of Bonds)[4] | Market Value of Notes Outstanding[5] |
|---|---|---|---|---|---|
| 2/14/2013 | 3,697 | $82.74 | $3,059,059 | 674,450 | $558,069,338 |
| 2/15/2013 | 3,196 | $82.74 | $2,644,308 | 674,450 | $558,026,745 |
| 2/19/2013 | 13,964 | $82.44 | $11,512,353 | 674,450 | $556,037,410 |
| 2/20/2013 | 13,047 | $82.42 | $10,753,027 | 674,450 | $555,865,640 |
| 2/21/2013 | 4,816 | $82.41 | $3,968,802 | 674,450 | $555,805,365 |
| 2/22/2013 | 1,626 | $83.45 | $1,356,835 | 674,450 | $562,802,692 |
| 2/25/2013 | 1,382 | $83.46 | $1,153,422 | 674,450 | $562,898,161 |
| 2/26/2013 | 2,749 | $83.26 | $2,288,726 | 674,450 | $561,524,714 |
| 2/27/2013 | 5,699 | $83.23 | $4,743,230 | 674,450 | $561,339,108 |
| 2/28/2013 | 7,259 | $83.76 | $6,080,491 | 674,450 | $564,952,034 |
| 3/1/2013 | 2,274 | $83.47 | $1,898,011 | 674,450 | $562,934,791 |
| 3/4/2013 | 3,160 | $85.32 | $2,696,009 | 674,450 | $575,418,799 |
| 3/5/2013 | 13,378 | $86.38 | $11,556,515 | 674,450 | $582,620,112 |
| 3/6/2013 | 2,455 | $87.02 | $2,136,428 | 674,450 | $586,930,426 |
| 3/7/2013 | 1,952 | $87.15 | $1,701,149 | 674,450 | $587,776,676 |
| 3/8/2013 | 3,162 | $87.40 | $2,763,642 | 674,450 | $589,480,901 |
| 3/11/2013 | 2,921 | $86.70 | $2,532,441 | 674,450 | $584,732,878 |
| 3/12/2013 | 1,475 | $87.07 | $1,284,286 | 674,450 | $587,245,042 |
| 3/13/2013 | 5,876 | $86.24 | $5,067,733 | 674,450 | $581,676,786 |
| 3/14/2013 | 3,070 | $86.17 | $2,645,515 | 674,450 | $581,194,605 |
| 3/15/2013 | 1,495 | $86.49 | $1,292,963 | 674,450 | $583,303,821 |
| 3/18/2013 | 1,389 | $86.20 | $1,197,347 | 674,450 | $581,389,981 |
| 3/19/2013 | 7,727 | $85.97 | $6,642,980 | 674,450 | $579,831,500 |
| 3/20/2013 | 2,713 | $85.97 | $2,332,488 | 674,450 | $579,854,857 |
| 3/21/2013 | 1,724 | $86.58 | $1,492,697 | 674,450 | $583,961,232 |
| 3/22/2013 | 5,917 | $86.11 | $5,095,290 | 674,450 | $580,787,266 |
| 3/25/2013 | 6,007 | $85.77 | $5,151,925 | 674,450 | $578,444,405 |
| 3/26/2013 | 9,017 | $85.85 | $7,741,287 | 674,450 | $579,029,707 |
| 3/27/2013 | 2,504 | $85.74 | $2,147,016 | 674,450 | $578,296,599 |
| 3/28/2013 | 2,450 | $86.14 | $2,110,413 | 674,450 | $580,966,454 |
| 4/1/2013 | 1,367 | $85.66 | $1,170,938 | 674,450 | $577,717,144 |
| 4/2/2013 | 1,366 | $86.31 | $1,179,033 | 674,450 | $582,136,597 |
| 4/3/2013 | 3,464 | $85.36 | $2,956,946 | 674,450 | $575,725,298 |
| 4/4/2013 | 83,803 | $76.32 | $63,955,806 | 674,450 | $514,718,962 |
| 4/5/2013 | 49,911 | $80.02 | $39,938,469 | 674,450 | $539,690,661 |
| 4/8/2013 | 30,544 | $76.11 | $23,245,878 | 674,450 | $513,298,270 |
| 4/9/2013 | 24,336 | $75.31 | $18,327,757 | 674,450 | $507,937,035 |
| 4/10/2013 | 34,218 | $76.39 | $26,138,611 | 674,450 | $515,202,123 |
| 4/11/2013 | 24,681 | $76.38 | $18,850,690 | 674,450 | $515,126,928 |
| 4/12/2013 | 3,987 | $75.60 | $3,014,103 | 674,450 | $509,872,521 |
| 4/15/2013 | 10,668 | $75.40 | $8,043,541 | 674,450 | $508,527,044 |
| 4/16/2013 | 14,343 | $75.09 | $10,770,172 | 674,450 | $506,445,143 |
| 4/17/2013 | 3,962 | $75.22 | $2,980,353 | 674,450 | $507,344,611 |
| 4/18/2013 | 9,052 | $75.54 | $6,837,508 | 674,450 | $509,451,725 |
| 4/19/2013 | 23,701 | $76.92 | $18,230,364 | 674,450 | $518,774,278 |
| 4/22/2013 | 4,356 | $77.62 | $3,381,048 | 674,450 | $523,495,773 |
| 4/23/2013 | 26,558 | $78.74 | $20,911,607 | 674,450 | $531,057,820 |
| 4/24/2013 | 28,076 | $79.24 | $22,247,516 | 674,450 | $534,436,420 |
| 4/25/2013 | 63,043 | $70.25 | $44,290,477 | 674,450 | $473,830,750 |

**Exhibit 4**

**Market Efficiency Statistics for Exide Note**

| Trading Dates | Daily Volume[1] | Price[2] | Daily Trade Size [3] | Total Amount Exchange (No. of Bonds)[4] | Market Value of Notes Outstanding[5] |
|---|---|---|---|---|---|
| 4/26/2013 | 80,791 | $65.62 | $53,011,016 | 674,450 | $442,540,378 |
| 4/29/2013 | 31,387 | $66.40 | $20,840,037 | 674,450 | $447,814,797 |
| 4/30/2013 | 22,152 | $66.93 | $14,826,852 | 674,450 | $451,425,177 |
| 5/1/2013 | 8,672 | $66.65 | $5,779,971 | 674,450 | $449,527,393 |
| 5/2/2013 | 32,850 | $67.62 | $22,212,114 | 674,450 | $456,041,408 |
| 5/3/2013 | 33,262 | $69.20 | $23,015,936 | 674,450 | $466,691,655 |
| 5/6/2013 | 7,620 | $68.99 | $5,257,013 | 674,450 | $465,300,832 |
| 5/7/2013 | 12,500 | $69.11 | $8,639,325 | 674,450 | $466,143,420 |
| 5/8/2013 | 5,681 | $69.23 | $3,932,779 | 674,450 | $466,900,722 |
| 5/9/2013 | 25,656 | $69.40 | $17,804,134 | 674,450 | $468,038,599 |
| 5/10/2013 | 16,379 | $69.59 | $11,398,792 | 674,450 | $469,376,362 |
| 5/13/2013 | 13,505 | $71.06 | $9,597,272 | 674,450 | $479,295,063 |
| 5/14/2013 | 6,104 | $73.02 | $4,457,200 | 674,450 | $492,489,905 |
| 5/15/2013 | 16,282 | $73.11 | $11,902,984 | 674,450 | $493,057,834 |
| 5/16/2013 | 6,264 | $72.85 | $4,563,135 | 674,450 | $491,316,454 |
| 5/17/2013 | 7,057 | $72.34 | $5,105,104 | 674,450 | $487,903,795 |
| 5/20/2013 | 2,094 | $71.84 | $1,504,264 | 674,450 | $484,503,799 |
| 5/21/2013 | 9,115 | $72.76 | $6,632,435 | 674,450 | $490,756,551 |
| 5/22/2013 | 11,158 | $73.21 | $8,169,155 | 674,450 | $493,788,032 |
| 5/23/2013 | 972 | $72.17 | $701,502 | 674,450 | $486,757,525 |
| 5/24/2013 | 72,424 | $65.93 | $47,745,760 | 674,450 | $444,633,381 |
| **Minimum** | | | | | **$442,540,378** |
| **Average** | | | **$5,765,581** | | |
| **Maximum** | | | | | **$677,944,877** |

Note:

[1] Daily Volume only includes trade between the hours of 9:30AM and 4:00PM.

[2] Calculated as the Volume Weighted Average Price (VWAP) between 9:30AM and 4:00PM, adjusting for non-public, cancelled, corrected and reversed trades.

[3] Calculated as ( **[1]** x **[2]** ) x **10**.

[4] Amount of CUSIP 302051AQ0 Notes issued.

[5] Calculated as **[2]** x **[4]**.

**Exhibit 5**
**Average Trade Size Comparison**

**Exide Note Average Trade Size (in $ Par)**

<u>All Trades</u>

| Note | 2011** | 2012 | 2013** |
|------|--------|------|--------|
| 8.625% Note due 2018 | $2,776,975 | $4,853,578 | $9,969,941 |

**Investment Grade Average Trade Size (in $ Par)***

| Note | 2011*** | 2012*** | 2013*** |
|------|---------|---------|---------|
| US High Yield Trade Size for All Trades | $266,962 | $262,567 | $270,793 |

Source: FINRA TEACE Data & MarketAxess

Notes:

* All average trade size figures are based off of monthly average trade size figures as this is the way average trade size figures are reported by MarketAxess. *See* , http://www.marketaxess.com/research/market-insights/bonds_by_size_hy.php

** Our TRACE Bond data only includes days on or after the start of the Note Class Period (9/13/2011), and therefore this 2011 analysis only covers trading between 9/13/2011 and 12/31/2010. Similarly, the Note Class Period ends 5/24/2013, and therefore this 2013 analysis only covers trading between 1/1/2013 and 5/24/2013.

*** For the purpose of this analysis, trades reported through MarketAxess with size ranges of <$100K, $100K - $1MM and $1MM+, I estimated as $100K, $500K and $1MM respectively.

**Exhibit 6**
**Market Makers at Some Point**
**During the Note Class Period\***

| # | Market Participant ID |
|---|---|
| 1 | ACBD |
| 2 | ACLP |
| 3 | AEFA |
| 4 | AGIS |
| 5 | AKCA |
| 6 | APFS |
| 7 | BARD |
| 8 | BBNT |
| 9 | BCAP |
| 10 | BDIR |
| 11 | BDTR |
| 12 | BFFI |
| 13 | BISH |
| 14 | BKRT |
| 15 | BNDS |
| 16 | BOFA |
| 17 | BOSC |
| 18 | BOYS |
| 19 | BPSG |
| 20 | BRGE |
| 21 | BTIS |
| 22 | BTSS |
| 23 | CALT |
| 24 | CANR |
| 25 | CAPM |
| 26 | CARC |
| 27 | CART |
| 28 | CBFG |
| 29 | CBOL |
| 30 | CFCO |
| 31 | CHAS |
| 32 | CISI |
| 33 | CITI |
| 34 | CNSI |
| 35 | CREF |
| 36 | CREW |
| 37 | CRTG |
| 38 | CRTS |
| 39 | CSCP |
| 40 | CSMI |
| 41 | CTWD |
| 42 | DADA |
| 43 | DBKS |

**Exhibit 6**
**Market Makers at Some Point**
**During the Note Class Period***

| # | Market Participant ID |
|---|---|
| 44 | DEAN |
| 45 | DOMK |
| 46 | DOTC |
| 47 | DRSC |
| 48 | EAMC |
| 49 | EDIF |
| 50 | EDJO |
| 51 | EFGC |
| 52 | EQTS |
| 53 | ETRS |
| 54 | EZOP |
| 55 | FBCO |
| 56 | FFEC |
| 57 | FFSI |
| 58 | FIBS |
| 59 | FMSI |
| 60 | FNET |
| 61 | FORE |
| 62 | FUND |
| 63 | GOLA |
| 64 | GSCO |
| 65 | HBCO |
| 66 | HFPC |
| 67 | IBCO |
| 68 | IBKR |
| 69 | ICCP |
| 70 | IMPC |
| 71 | INGS |
| 72 | INPR |
| 73 | INTA |
| 74 | ITCC |
| 75 | JANY |
| 76 | JEFF |
| 77 | JGUN |
| 78 | JHYT |
| 79 | JINS |
| 80 | JPMS |
| 81 | JPTC |
| 82 | KEYB |
| 83 | KOVP |
| 84 | KRTH |
| 85 | LAZA |
| 86 | LDLW |

**Exhibit 6**
**Market Makers at Some Point**
**During the Note Class Period\***

| # | Market Participant ID |
|---|---|
| 87 | LFRO |
| 88 | LIBE |
| 89 | LIIS |
| 90 | LISI |
| 91 | LNKS |
| 92 | LSSI |
| 93 | LTCO |
| 94 | MACC |
| 95 | MADV |
| 96 | MAXM |
| 97 | MBTS |
| 98 | MDEB |
| 99 | MHSI |
| 100 | MLCO |
| 101 | MLMA |
| 102 | MOKE |
| 103 | MORA |
| 104 | MSCO |
| 105 | MSSB |
| 106 | MTDB |
| 107 | MURF |
| 108 | MYLG |
| 109 | MYRS |
| 110 | NATL |
| 111 | NESC |
| 112 | NESS |
| 113 | NEXT |
| 114 | NFSC |
| 115 | NHFS |
| 116 | NMRA |
| 117 | NTRC |
| 118 | OPCO |
| 119 | OXPS |
| 120 | PERS |
| 121 | PICE |
| 122 | PRCO |
| 123 | PROE |
| 124 | PRPO |
| 125 | PWJC |
| 126 | RAJA |
| 127 | RBCD |
| 128 | RJFI |
| 129 | RJFS |

**Exhibit 6**
**Market Makers at Some Point**
**During the Note Class Period***

| # | Market Participant ID |
|---|---|
| 130 | RSSE |
| 131 | RWCI |
| 132 | RWPS |
| 133 | SALC |
| 134 | SALI |
| 135 | SBIL |
| 136 | SBRO |
| 137 | SCSI |
| 138 | SEEL |
| 139 | SPGS |
| 140 | SSGM |
| 141 | SSIC |
| 142 | SSIN |
| 143 | SSLL |
| 144 | STFL |
| 145 | STJT |
| 146 | SWST |
| 147 | TDAR |
| 148 | TIAD |
| 149 | TKNG |
| 150 | TSPI |
| 151 | UBSW |
| 152 | VABD |
| 153 | VGRD |
| 154 | VSRF |
| 155 | WCHV |
| 156 | WEDB |
| 157 | WPCC |
| 158 | WRET |
| 159 | WSCC |
| 160 | WUND |
| 161 | YLPL |
| 162 | ZDNF |

Source: FINRA.

**Note:**

* The Note Class Period is from September 13, 2011 through and including May 24, 2013.

**Exhibit 7**
**U.S. Census Corporate and Foreign Bond Holdings by Type of Investor**

| (Figures in $ Billions) | Holdings at Year End: | |
| --- | --- | --- |
| **Class of Investor** | 2009 | 2010 |
| Total Holdings | $11,434.42 | $11,440.36 |
| Rest of the World[1] | $2,467.93 | $ 2,429.86 |
| as % of Total Holdings | 21.58% | 21.24% |
| Life Insurance Companies | $1,914.68 | $2,022.69 |
| as % of Total Holdings | 16.74% | 17.68% |
| Households[2] | $2,080.96 | $1,918.57 |
| as % of Total Holdings | 18.20% | 16.77% |
| Mutual Funds | $1,106.09 | $1,255.02 |
| as % of Total Holdings | 9.67% | 10.97% |
| Funding Corporations | $710.25 | $760.10 |
| as % of Total Holdings | 6.21% | 6.64% |
| Commercial Banks | $868.33 | $749.61 |
| as % of Total Holdings | 7.59% | 6.55% |
| Private Pension Funds | $442.89 | $482.46 |
| as % of Total Holdings | 3.87% | 4.22% |
| State & Local Government Retirement Funds | $308.56 | $311.78 |
| as % of Total Holdings | 2.70% | 2.73% |
| Property-Casualty Insurance Companies | $298.30 | $299.17 |
| as % of Total Holdings | 2.61% | 2.62% |
| Government-Sponsored Enterprises | $310.80 | $295.64 |
| as % of Total Holdings | 2.72% | 2.58% |
| Brokers and Dealers | $171.28 | $185.61 |
| as % of Total Holdings | 1.50% | 1.62% |
| Finance Companies | $198.62 | $176.80 |
| as % of Total Holdings | 1.74% | 1.55% |
| State and Local Governments | $150.85 | $163.89 |
| as % of Total Holdings | 1.32% | 1.43% |
| Money Market Mutual Funds | $169.90 | $154.23 |
| as % of Total Holdings | 1.49% | 1.35% |
| Savings Institutions | $85.15 | $74.50 |
| as % of Total Holdings | 0.74% | 0.65% |
| Exchange-Traded Funds | $55.33 | $74.00 |
| as % of Total Holdings | 0.48% | 0.65% |
| Closed-End Funds | $54.71 | $59.33 |
| as % of Total Holdings | 0.48% | 0.52% |
| Real Estate Investment Trusts | $17.60 | $23.02 |
| as % of Total Holdings | 0.15% | 0.20% |
| Federal Government Retirement Funds | $2.99 | $3.20 |
| as % of Total Holdings | 0.03% | 0.03% |
| Federal Government | $0.56 | $0.88 |
| as % of Total Holdings | 0.00% | 0.01% |
| Credit Unions | $18.65 | $0.00 |
| as % of Total Holdings | 0.16% | 0.00% |

Source: United States Census Bureau

(See, https://www.census.gov/compendia/statab/cats/banking_finance_insurance/stocks_and_bonds_equity_ownership.html)

Notes:

(1) Holdings of U.S. issues by foreign residents

(2) Includes nonprofit organizations

**Exhibit 8**
**Exide Note**

**Time Period: 9/13/2011 - 5/24/2013**

| Statistic | Dollar Spread per $100 Par Value of the Note |
|---|---|
| Average - Weighted by Sell Price | $0.32 |
| Median | $0.25 |

Source: FINRA TRACE Data

**Exhibit 9**
**Exide Note Regression Summary**

| Exide Note | S&P 500 Coefficient | S&P 500 Coefficient T-Stat | Industry Index Coefficient | Industry Index T-Stat | Corporate Bond Index Coefficient | Corporate Bond Index T-Stat | Treasury Note Coefficient | Treasury Note T-Stat | RMSE | Adjusted R-Squared |
|---|---|---|---|---|---|---|---|---|---|---|
| Note Return | -0.109 | -1.33 | 0.061 | 0.86 | 1.653 | 6.12 | -1.118 | -3.04 | 0.013 | 0.491 |

Sources: FINRA TRACE Data

Notes:

(1) A t-statistic of greater than 1 97 or less than -1 97 indicated a statisically significant result at the 95% confidence level

(2) The regression model estimates the relationship between the Exide Note's returns with the returns of the S&P 500 Total Return Index, the Industry Index, a Corporate Bond Index, and a Treasury Note due February 2018  Prior to March 12, 2013, the Barclays US Aggregate Credit Corporate Index (B) return is used for the Coporate Bond Index  After this date, 67% of the Barclays US Aggregate Credit Corporate Index (B) return and 33% of the Barclays US Aggregate Credit Corporate Index (CAA) return was used for the Corporate Bond Index  The returns of the Corporate Bond Index are net of the Treasury Note returns  The Industry Index returns are net of the returns of the S&P 500 Total Return Index  All earnings dates and alleged corrective disclosure dates are removed from estimation  The estimation period of the regression is 9/13/2011 - 5/24/2013  The Exide Note prices are volume weighted average prices based on TRACE data

**Exhibit 10**
**Credit Rating Agency Downgrades of the Exide Note**
**During the Note Class Period**

| | Date | Rating Agency | Report |
|---|---|---|---|
| [1] | 2/28/2013 | S&P RATINGS | "Exide Technologies Downgraded To 'B-' On Continued Erosion Of Credit Measures And Execution Risks; Outlook Negative" |
| [2] | 3/12/2013 | MOODY'S RATINGS | "Moody's Lowers Exide's Ratings to Caa1, Outlook Remains Negative" |
| [3] | 5/3/2013 | S&P RATINGS | "Exide Technologies Downgraded To 'CCC+' On Further Headwinds To Financial Flexibility; Ratings Remain On Watch Negative" |

| Rating Agency | Total Downgrades During the Note Class Period |
|---|---|
| S&P RATINGS | 2 |
| MOODY'S RATINGS | 1 |

Note: The Note Class Period is from 9/13/2011 to 5/24/2013

**Exhibit 11**

**Analysis of the Relationship between Cashflow-Related News and Abnormal Returns**

| Observation on a Date | ACTUAL NUMBER OF DAYS | | EXPECTED NUMBER OF DAYS [A] | | RATIO OF ACTUAL TO EXPECTED NUMBER OF DAYS | | Total |
|---|---|---|---|---|---|---|---|
| | No News [B] | News [B] | No News [B] | News [B] | No News [B] | News [B] | |
| [1] Number of Days | 405 | 8 | 405 | 8 | 1 | 1 | 413 |
| [2] No Statistically Significant Abnormal Return | 385 | 1 | 384.75 | 7.6 | 1.0 | 0.1 | 386 |
| [3] Statistically Significant Abnormal Return | 20 | 7 | 20.25 | 0.4 | 1.0 | 17.5 | 27 |
| [4] Percentage of Statistically Significant Abnormal Return Days of Total Days | 4.8% | 87.5% | 5% | 5% | | | 7% |

**Notes:**

[A] Based on bootstrap results of 100,000 runs using Urn 1 and 8 "Cashflow-Related News" days and 405 "No News" days. Urn 2 with 27 significant abnormal return days and 386 insignificant abnormal return days.

[B] A "Cashflow-Related News" date is identified as a corrective disclosure date or a date on which Exide filed an 8-K and there was contemporaneous analysts coverage during the Note Class Period. The eight Cashflow-Related News dates include 3 corrective disclosures (one of which was disclosed in an 8-K) and 6 quarterly earnings announcements as events within the Note Class Period. As all 6 earnings announcements were made after the close of trading, the effective test date is the following trading date. However, one of the announcements, November 9, 2012 (after the close of trading on the stock market),was excluded as the effective test date was on a bond market holiday (Veteran's Day). Therefore, 5 out of the 6 identified earnings announcements were included in the "Cashflow-Related News" event selection.

[1] Number of trading days.

[2] Number of trading days without statistically significant abnormal returns. Source: Appendix D.

[3] Number of trading days with statistically significant abnormal returns. Source: Appendix D.

[4] = [3] / [1].

**Exhibit 12**
**Summary of Exide Note Autocorrelation Regression Results**

| Regression Estimation Period | Coefficient Value | t-stat |
|---|---|---|
| [1]   Note Class Period (Excess Returns) | -0.09139 | -1.81 |
| [1]   Note Class Period (Observed Returns) | -0.05616 | -1.11 |

**Exhibit 13**
**Inflation**

| Date | News | Actual Price Prior to Disclosure | Actual Price After Disclosure | Abnormal Return[1] | Abnormal Price Decline | Hypothetical Inflation at Date |
|---|---|---|---|---|---|---|
| **Prior to 4/4/2013** | * | * | * | * | * | $24.28 |
| 4/4/2013 Until 2PM | Anger over arsenic emissions a health report on a battery-recycling plant in Vernon draws L.A. City Council ire | $88.23 | $84.25 | -3.82% | -$3.26 | $21.02 |
| 4/4/2013 after 2PM | Exide hired Lazard and Aking Grump Strauss Hauer & Feld to advise the Company on a restructuring alternatives due to capital issues | $84.25 | $77.38 | -6.58% | -$5.62 | $15.40 |
| 4/24/2013 | Company to suspend operations at its Vernon, California secondary lead recycling facility | $79.24 | $70.25 | -11.63% | -$9.22 | $6.18 |
| 5/25/2013 | Exide was seeking a $200 million debtor in possession ("DIP") loan to fund the Company through its bankruptcy proceedings | $72.17 | $65.93 | -8.57% | -$6.18 | $0.00 |
| | **Total** | | | | **-$24.28** | |

Note:

[1] Abnormal price decline on April 4, 2013 is based on 36.7% for the environmental disclosure and 63.3% for the bankruptcy disclosure.