Edwin V. Woodsome, Jr. (SBN 56305)
David H. Kistenbroker (admitted pro hac vice)
Carl E. Volz (admitted pro hac vice)
DECHERT LLP
US Bank Tower
633 West 5th Street, 37th floor
Los Angeles, CA 90071-2103
Telephone: 213-808-5700
Facsimile:  213-808-5760
ed.woodsome@dechert.com
david.kistenbroker@dechert.com
carl.volz@dechert.com

*Attorneys for Defendants James R. Bolch, Phillip A.
Damaska, R. Paul Hirt, Louis E. Martinez, John P. Reilly,
Herbert F. Aspbury, Michael R. D'Appolonia, David S.
Ferguson, John O'Higgins, and Dominic J. Pileggi*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID M. LORITZ, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EXIDE TECHNOLOGIES, et al. <br><br> Defendants. | Master File Case No. 2:13-cv-02607-SVW-E <br><br> <u>CLASS ACTION</u> <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR CLASS CERTIFICATION** |

DECHERT LLP
ATTORNEYS AT LAW

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ......................................................................................................2

ARGUMENT ...........................................................................................................5

I.    PLAINTIFFS' SECOND MOTION RAISES NO NEW FACTS AND SHOULD BE DENIED ..........................................................................................5

II.   THE PROPOSED CLASS FAILS TO SATISFY THE PREDOMINANCE REQUIREMENT OF RULE 23(B)...............................8

    A.   Dr. Hartzmark's Report is Insufficient to Invoke the Basic Presumption of Class-Wide Reliance for the Exchange Act Note Class ..................................................................................................8

        1.   Indirect analyses do not establish that Notes traded in an efficient market........................................................................10

        2.   Unscientific and unreliable "cause and effect" analyses do not establish market efficiency...............................................12

            a.   Dr. Hartzmark's "event study" does not support market efficiency for Exide Notes...............................12

            b.   Dr. Hartzmark's analysis of Credit Downgrades does not support market efficiency for Exide Notes......14

            c.   Dr. Hartzmark's News vs. Non-News Analysis does not support market efficiency for Exide Notes......16

            d.   Dr. Hartzmark's Regression Model is Flawed...............18

        3.   Plaintiffs have not established that the market for Exide's Notes was efficient in 2011......................................................21

III.  THE COURT SHOULD NOT CERTIFY A DAMAGES CLASS BECAUSE PLAINTIFFS DO NOT DEMONSTRATE A METHOD TO CALCULATE CLASS-WIDE DAMAGES........................................22

CONCLUSION .....................................................................................................25

DECHERT LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

**CASES**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013) .................................................................................5

*Aranaz v. Catalyst Pharm. Partners, Inc.*,
302 F.R.D. 657 (S.D. Fla. 2014) ...............................................................14

*Barton v. RCI, LLC*,
No. 10-CV-03657 PGS, 2014 WL 5762214 (D.N.J. Nov. 5, 2014) ...................6

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .................................................................................8

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) ...................................................................24

*Binder v. Gillespie*,
184 F.3d 1059 (9th Cir. 1999) ..............................................................8, 21

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ........................................................................8, 22

*Curtis v. Extra Space Storage, Inc.*,
No. C 13-00319 WHA, 2013 WL 6073448 (N.D. Cal. Nov. 18, 2013) ...........24

*Daniel F. v. Blue Shield of Cal.*,
No. C 09-2037 PJH, 2015 WL 3866212 (N.D. Cal. June 22, 2015) .................6

*Doninger v. Pac. Nw. Bell, Inc.*,
564 F.2d 1304 (9th Cir. 1977) ...................................................................6

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ...................................................................21

*Fox Test Prep v. Facebook, Inc.*,
588 Fed. Appx. 733 (9th Cir. 2014) ..........................................................22

*Goolsby v. Cate*,
No. 1:13-CV-00119-GSA-PC, 2013 WL 2403385 (E.D. Cal. May 31,
2013) ....................................................................................................6

DECHERT LLP
ATTORNEYS AT LAW

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) ....................................................................................9

*Hartman v. United Bank Card, Inc.*,
   291 F.R.D. 591 (W.D. Wash. 2013) ................................................................6

*Hutton v. C.B. Accounts, Inc.,*
   No. 10-3052, 2010 WL 5463108 (C.D. Ill. Dec. 29, 2010) ..............................6

*In re BP p.l.c. Sec. Litig.*,
   No. 10-MD-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)...........22, 23, 24

*In re DVI Inc. Sec. Litig.*,
   249 F.R.D. 196 (E.D. Pa. 2008) .............................................................passim

*In re HealthSouth Corp. Sec. Litig.*,
   261 F.R.D. 616 (N.D. Ala. 2009) ...............................................................4, 14

*In re Med. Waste Servs. Antitrust Litig.*,
   No. 2:03MD1546 DAK, 2006 WL 538927 (D. Utah Mar. 3, 2006) ................25

*In re Methionine Antitrust Litig.*,
   No. 00-1311, 2003 WL 22048232 (N.D. Cal. Aug. 26, 2003).........................6

*In re PolyMedica Corp. Sec. Litig.*,
   453 F. Supp. 2d 260 (D. Mass. 2006)............................................................16

*In re POM Wonderful LLC*,
   No. ML 10-02199 DDP RZX, 2014 WL 1225184 (C.D. Cal. Mar. 25,
   2014) ............................................................................................................25

*Lanovaz v. Twinings North America, Inc.*,
   2014 WL 7204757 (N.D. Cal. Dec. 17, 2014)..............................................6, 7

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013)........................................................................22

*Litty v. Merrill Lynch & Co.,*
   No. CV 14-0425 PA, 2014 WL 5904907 (C.D. Cal. Aug. 4, 2014)...................9

*Loritz v. Exide Tech.*,
   No. 2:13-CV-2607-SVW-EX, 2014 WL 4058752 (C.D. Cal. Aug. 7,
   2014) (Wilson, J.) ...........................................................................................4

DECHERT LLP
ATTORNEYS AT LAW

iv

*Plumbers & Pipefitters Nat. Pension Fund v. Burns*,
  967 F. Supp. 2d 1143 (N.D. Ohio 2013) ........................................................14

*Rahman v. Mott's LLP*,
  No. 13-CV-03482-SI, 2014 WL 6815779 (N.D. Cal. Dec. 3, 2014)...................9

*Turnbow v. Life Partners, Inc.*,
  No. 3:11-CV-1030-M, 2013 WL 3479884 (N.D. Tex. July 9, 2013)................23

*Vasquez v. First Student, Inc.*,
  No. 2:14-CV-06760-ODW EX, 2015 WL 1125643, at *4 (C.D. Cal. Mar.
  12, 2015)...........................................................................................................5

*Wal–Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011)........................................................................................5

*Werdebaugh v. Blue Diamond Growers*,
  No. 12-CV-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ..........25

*Zinser v. Accufix Research Inst.*,
  253 F.3d 1180 (9th Cir. 2001)............................................................................9

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ......................................................................................5, 8, 9

Michael L. Hartzmark, H. Nejat Seyhun,  *The Curious Incident of the Dog
that Didn't Bark and Establishing Cause-and-Effect in Class Action
Securities Litigation*, 6 Va. L. & Bus. Rev. 415, 429 (2012) . ...............................13

DECHERT LLP
ATTORNEYS AT LAW

v

Defendants James R. Bolch, Phillip A. Damaska, R. Paul Hirt, Louis E. Martinez, John P. Reilly, Herbert F. Aspbury, Michael R. D'Appolonia, David S. Ferguson, John O'Higgins, and Dominic J. Pileggi ("Defendants"), by their attorneys, for their Opposition to Plaintiffs' Second Motion for Class Certification state as follows:

## PRELIMINARY STATEMENT

In their Second Motion for Class Certification, Plaintiffs purport to address the deficiencies in their First Motion for Class Certification that led the Court to deny significant portions of that motion.[1] *See* July 21, 2015 Order ("Order") (Dkt. # 129.) The only real difference between the two Motions, though, is that this time around Plaintiffs have replaced their old expert, Mr. Frank Torchio, with a new expert, Dr. Michael Hartzmark. But when the two experts and their respective reports and testimony are carefully examined, it becomes clear that Dr. Hartzmark's report is as flawed as Mr. Torchio's, partly because Dr. Hartzmark blindly – and inexplicably – adopts several of the erroneous assumptions underlying Mr. Torchio's reports. Since Dr. Hartzmark's report is nothing more than "old wine in a new bottle" and Plaintiffs do not – and cannot – point to any new facts or changed circumstances to support their Second Motion, it should suffer the same fate as the first. Accordingly, Defendants respectfully request that the Second Motion be denied *with prejudice*.

---

[1] Plaintiffs' Motion for Class Certification shall hereinafter be referred to as "First Motion"; Plaintiffs' Second Motion for Class Certification shall be referred to as "Second Motion" or "Pls. 2nd Mem. at __".

DECHERT LLP
ATTORNEYS AT LAW

## **BACKGROUND**

On March 30, 2015 Plaintiffs filed their First Motion, in which they sought to certify a class of shareholders bringing suit under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and a class of noteholders bringing suit under Sections 10(b), 20(a), 11, and 15 of the Exchange Act and the Securities Act of 1933. In support of their First Motion, Plaintiffs submitted two reports by their expert, Mr. Frank Torchio. Torchio Rep. (Dkt. # 95-1), Torchio Rebuttal (Dkt. # 116-6).  In opposition, Defendants submitted a report by their expert, Dr. Chris James.  James Rep. (Dkt. # 107-7).  The parties conducted class certification-specific discovery, completed briefing on the First Motion and the Court heard oral argument on June 29, 2015.  On July 21, 2015, the Court granted in part and denied in part Plaintiffs' motion.  *See* Order at 41-42.

Specifically, the Court certified Plaintiffs' stock class, for liability only, and denied the First Motion with respect to the note holders because it found Plaintiffs were unable to establish that the Notes traded in an efficient market. *Id.*  First, the Court observed that indirect factors that are commonly found to support efficiency, like trading volume and analyst coverage, were weaker for Exide Notes than Exide Stock. *Id.* at 27-29, 35.  Next, the Court found that the market model which Mr. Torchio used to show a "causal relationship" between price changes and new information was flawed, in part, because he failed to explain his selection of inputs. *Id.* at 31-32. The Court rejected Mr. Torchio's use of a "news vs. non-news" study

because he failed to consider credit downgrades as newsworthy events and because his explanations for failing to do so were "speculative" and "unsupported by academic authority." *Id.* at 32-33.  The Court also rejected Mr. Torchio's use of a "reverse event study," citing the criticisms leveled by Defendants' expert, Professor Chris James, who pointed out "internal inconsistencies" in Mr. Torchio's work.  *Id.* at 33-34.

The Court refused to certify either class with regard to damages because it found Mr. Torchio's generic reference to the types of damage models typically used in securities fraud cases insufficient to establish that Plaintiffs' alleged damages are capable of measurement on a class-wide basis or that Plaintiffs' damage model is tied to their theory of liability.  *Id.* at 37-39.  Accordingly, the Court found that at least with respect to the Stock class, the "resolution of common issues would materially advance" the case as far as liability was concerned, but not with respect to damages. *Id.*  The Court denied the remainder of the First Motion without prejudice.

More than two months later, on October 5, 2015, Plaintiffs finally filed the Second Motion.  But instead of introducing new evidence or even new arguments in favor of class certification, the Second Motion simply repeats and restates the evidence and arguments presented – and rejected by the Court – in the First Motion.  There are two relevant changes, though.  First, Plaintiffs have slightly modified their Proposed Class.  Plaintiffs now seek certification of a class comprised of three sub-classes of investors, two of which this Court already rejected: (a) those who purchased or otherwise acquired in the aftermarket Exide's $8^{5/8}\%$ senior secured notes ("Exide

Notes") from September 13, 2011 through May 24, 2013 and bring claims under Sections 10(b) and/or 20(a) of the Securities Exchange Act (the "Exchange Act Note Class"); (b) those who purchased or otherwise acquired in the aftermarket Exide Notes from August 12, 2011 through November 9, 2012 and bring claims under Sections 11 and/or 15 of the Securities Act (the "Securities Act Note Class")[2]; and (c) those who purchased or otherwise acquired Exide common stock from June 1, 2011 through May 24, 2013 and bring claims under Sections 10(b) and/or 20(a) (the "Stock Class").

Second, they have cast aside their previous expert, Mr. Torchio, and hired Dr. Hartzmark in his place. But as explained below and in the report of Defendants' expert, Professor Paul Gompers[3] ("Gompers Rep." (Ex. 1)[4]), Dr. Hartzmark's analysis is just a retread of some of the same analyses rejected by the Court in its July 21 Order. Plaintiffs still rely on the same weak indirect factors of market efficiency and the same "news vs. non news" analysis which failed to explain why, in a supposedly efficient

---

[2] Plaintiffs apparently conceded in their First Reply that Qualified Investment Buyers ("QIBs") who purchased Exide's notes in a private offering and later exchanged those notes for registered notes have no standing to assert claims under the Securities Act (Dkt. # 115 at 1; *see also* Order at 27), and indeed, they now limit the proposed Securities Act Note Class to those who purchased in the aftermarket. Defendants request that in the event the Court certifies any part of the Securities Act Note Class, that the class definition explicitly exclude the QIBs. *See In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 651 (N.D. Ala. 2009); *see generally Loritz v. Exide Tech.*, No. 2:13-CV-2607-SVW-EX, 2014 WL 4058752, at *14 (C.D. Cal. Aug. 7, 2014) (Wilson, J.).

[3] Due to unforeseeable and irresolvable scheduling conflicts, Professor Chris James was unable to reprise his role as Defendants' expert in connection with Defendants' Opposition to Plaintiffs' Second Motion. Professor Gompers has reviewed and takes no issue with Professor James' previous Report or testimony in this matter.

[4] Exhibits referenced herein are contained in the annexed Declaration of Carl E. Volz in Support of Defendants' Opposition to Plaintiffs' Second Motion for Class Certification

DECHERT LLP
ATTORNEYS AT LAW

4

market, the price of the Notes did not react to obviously important events.  Plaintiffs' damage methodology is still a hodgepodge of potential tools and off-the-shelf models that fail to show how damages can be calculated in this case on a class-wide basis.  In short, Plaintiffs' speculative and unsubstantiated arguments were rejected by this Court once, and Plaintiffs have brought nothing new to the table to cause the Court to revisit its original well-reasoned decision.

## ARGUMENT

"Rule 23 does not set forth a mere pleading standard." *Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  Rather, as this Court noted previously, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  Order at 6 (*citing id.*).  Accordingly, "a trial court is expected to engage in 'rigorous analysis' to determine if the moving party has discharged its burden." *Id.*  "Ultimately the decision to certify a class reposes within the district court's discretion." *Vasquez v. First Student, Inc.*, No. 2:14-CV-06760-ODW EX, 2015 WL 1125643, at *4 (C.D. Cal. Mar. 12, 2015).[5]

## I.   PLAINTIFFS' SECOND MOTION RAISES NO NEW FACTS AND SHOULD BE DENIED.

Generally, courts have discretion in deciding whether to revisit a prior order on

---

[5] Citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013), Plaintiffs say this Court need not analyze the merits of the case at the class certification stage of the case. But *Amgen* requires consideration of the merits to the extent "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

DECHERT LLP
ATTORNEYS AT LAW

5

class certification. *See In re Methionine Antitrust Litig.*, No. 00-1311, 2003 WL 22048232, at *3 (N.D. Cal. Aug. 26, 2003) ("Once a district court certifies a class, it continues to possess the authority and discretion to determine whether the certification should be amended or vacated in its entirety.") (citations omitted); s*ee also Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977) ("A class action determination … is one of a trial court's considered discretion."). In exercising this discretion, courts in the Ninth Circuit routinely deny second motions for certification where the motion was not based on new facts. *See, e.g., Goolsby v. Cate*, No. 1:13-CV-00119-GSA-PC, 2013 WL 2403385, at *1 (E.D. Cal. May 31, 2013) (plaintiffs could not merely "ask the court to rethink what it ha[d] already thought"); *Daniel F. v. Blue Shield of Cal.*, No. C 09-2037 PJH, 2015 WL 3866212, at *4 (N.D. Cal. June 22, 2015) (denying motion where "by and large, plaintiffs simply repeat[ed] certain arguments they previously made in support of the original motion"); *see also Lanovaz v. Twinings North America, Inc.*, 2014 WL 7204757, at *2 (N.D. Cal. Dec. 17, 2014).[6] In *Lanovaz*, the court rejected plaintiff's proposition that "multiple motions for class certification are routinely allowed." 2014 WL 7204757, at *1 (citations omitted). In holding that the plaintiff

---

[6] *See also Hutton v. C.B. Accounts, Inc.,* No. 10-3052, 2010 WL 5463108, at *4 (C.D. Ill. Dec. 29, 2010) (denying plaintiff's motion to reconsider where it was "nothing more than an attempt to cure a defect" in her original motion for certification); *Hartman v. United Bank Card, Inc.,* 291 F.R.D. 591, 597 (W.D. Wash. 2013) (denying plaintiffs' motion for leave to file a second motion for class certification where plaintiffs "have identified no changed circumstances that would warrant a second motion for class certification"); *Barton v. RCI, LLC,* No. 10-CV-03657 PGS, 2014 WL 5762214, at *2 (D.N.J. Nov. 5, 2014) (denying plaintiffs' second motion for certification where no new facts were disclosed).

was not justified in bringing a second motion on the basis of asserting a "new" damages theory not previously proposed, the court noted that the information needed to support the "new" damages theory "was available to plaintiff or was accessible through a subpoena to third parties at the time of the original motion for class certification." *Id.* at *3.

Here, the Court partially denied the First Motion without prejudice presumably because discovery in the case was ongoing and it wanted to give Plaintiffs every opportunity to develop new facts that might support class certification, not simply to find another expert who might do a better job. But that is precisely what Plaintiffs have done here. Dr. Hartzmark admitted as much, stating in his deposition that he did not "recall any specific facts that might have changed" since Mr. Torchio submitted his report. Hartzmark Dep. at 145:19-146:3 (Ex. 2); *see also id.* at 59:4-12 (explaining that he used the same industry proxy that Mr. Torchio used because he wanted "to be consistent"). Dr. Hartzmark's Report confirms that he considered no new information. Hartzmark Report ("Hartzmark Rep.") (Dkt. # 149-1) ¶¶ 21, 23, 27, 37-38, 73 n.98, 130 n.146, 131 n.147, 134 n.150, 138 n.154, 139 n.157, 140 n.158 (relying on Torchio's facts and analyses). Plaintiffs have offered no reason why they should be given another chance to put a new spin on facts that were not only *available* to them the first time around but were actually *addressed* in the briefs filed in support of the First Motion. *See, e.g.*, *Lanovaz*, 2014 WL 7204757, at *3. Accordingly this Court should deny Plaintiffs' Second Motion without even reaching the merits of their

arguments, and Defendants request that it do so, with prejudice.

## II.    THE PROPOSED CLASS FAILS TO SATISFY THE PREDOMINANCE REQUIREMENT OF RULE 23(B).[7]

Even if the Court chooses to consider Plaintiffs' Second Motion, it should find that Plaintiffs still fail to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members" as required under Rule 23(b)(3).  First, Plaintiffs cannot establish class-wide reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) because they have failed to prove that the market for Exide Notes was efficient.  Second, Plaintiffs have failed to demonstrate that they can establish class-wide proof of damages as required under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).

### A.    Dr. Hartzmark's Report is Insufficient to Invoke the *Basic* Presumption of Class-Wide Reliance for the Exchange Act Note Class.

Just like last time, Plaintiffs try to satisfy Rule 23(b)'s predominance requirement by invoking the fraud-on-the-market theory of reliance under *Basic*.  In order for that presumption to apply, *Basic* requires class plaintiffs to prove that the securities at issue were traded in an efficient market.  *See Basic,* 485 U.S. at 248 n. 27; *see also Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999) ("[T]he presumption of reliance is

---

[7] The Court appointed Weitsman, Close, and Cassella as class representatives of the limited class previously certified.  Order at 41.  And while the Court declined to certify any class with respect to Exide's Notes, it did find Steamfitters to be an adequate and typical class representative.  *Id.* at 11, 14.  Defendants maintain that no class should have been certified, and that the appointed class representatives are inadequate and atypical, for the reasons set out in their Opposition to Plaintiffs' First Motion (Dkt. # 106).

available only when a plaintiff alleges that a defendant made material misrepresentations or omissions concerning a security that is actively traded in an 'efficient market,' thereby establishing a 'fraud on the market.'") (citation omitted). "[W]ithout the presumption of reliance, a Rule 10b–5 suit cannot proceed as a class action: Each plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2416 (2014).

Plaintiffs accordingly bear the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met. *See Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001); *Litty v. Merrill Lynch & Co.,* No. CV 14-0425 PA (PJWx), 2014 WL 5904907, at *2 (C.D. Cal. Aug. 4, 2014). Moreover, Plaintiffs "must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Rahman v. Mott's LLP*, No. 13-CV-03482-SI, 2014 WL 6815779, at *2 (N.D. Cal. Dec. 3, 2014) (internal quotation marks and citation omitted).

In its July 21 Order, the Court found that Plaintiffs failed to carry their burden of showing that Exide Notes traded in an efficient market during the Class Period and thus could not rely on the fraud-on the market presumption for purposes of their claims. Order at 35. Now, armed with the Report and testimony of their new expert, Plaintiffs ask the Court to reach the opposite conclusion. But while their expert may be new, his opinions and the facts on which they are based are not. Rather, Dr.

DECHERT LLP
ATTORNEYS AT LAW

9

Hartzmark's Report relies heavily on Mr. Torchio's Report and Rebuttal Report. *See* Hartzmark Rep. ¶¶ 21, 23, 27, 37-38 (relying on Torchio analysis for first *Cammer* factors); *id.* ¶ 70 n.93 (in setting up "Industry Index" looks only at 10 of 22 competitors identified by Exide "to remain consistent with the specification of the market model in the Torchio Report"); *id.* ¶ 73 n.98 (relying on Torchio analysis of trading data); *id.* ¶¶ 130 n.146, 131 n.147, 134 n.150, 138 n.154, 139 n.157, 140 n.158 (relying on Torchio's analysis with respect to damage calculations).

It's not surprising, then, that neither Plaintiffs' Second Motion nor the Hartzmark Report provide any new evidence or arguments that might support a reversal of the Court's July 21 Order. Rather, as explained more fully below and in Professor Gompers' Report, Dr. Hartzmark's report is fatally flawed because he uses unreliable, unscientific methods to test market efficiency and because he does not present an actual – as opposed to purely theoretical – model for proving class-wide damages for Exide Stock or Notes. Gompers Rep. ¶ 9. In other words, the Hartzmark Report suffers the same flaws as the Torchio Report and so the result of the Second Motion should be the same as the first.

## 1. Indirect analyses do not establish that Notes traded in an efficient market.

To establish an efficient market, Plaintiffs must show that the price of Exide's securities "rapidly change to reflect new, unanticipated, material, public information." Hartzmark Rep. ¶ 12; *see also* Torchio Rep. ¶ 59; Gompers Rep. ¶ 11. Previously, the Court found that Plaintiffs and their expert failed to show that such a market existed

for Exide Notes. Order at 31-35. The flaws in the First Motion on which the Court based that finding have not been cured in Plaintiffs' Second Motion.

In its July 21 Order, the Court found that the first four *Cammer* factors favored a finding of efficiency, though it had several significant reservations.[8] Order at 27-29. For example, the Court noted that: (1) trading volume in 2011 was sparse (*id.* at 27); (2) "the lack of debt analyst coverage weighs against market efficiency" (*id.* at 28); (3) Exide was ineligible to file SEC Form S-3 during a portion of the class period (*id.*); and (4) the amount of "institutional ownership [of Exide Notes] is far less convincing" than in *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196 (E.D. Pa. 2008). In short, the Court found that the evidence of market efficiency adduced in support of the Notes was weaker than for the Stock. Order at 35.

Plaintiffs hope that Dr. Hartzmark's analysis of the first four *Cammer* factors will allay the Court's concerns. But Dr. Hartzmark's modest tweaks to Mr. Torchio's analysis will give the Court no comfort. First, Dr. Hartzmark simply does not address the paucity of trading in the Notes in 2011. Hartzmark Rep. ¶¶ 21, 27, 29. Second, Dr. Hartzmark's attempt to address the lack of analyst coverage on Exide Notes is unavailing. He points to four analyst reports that relate specifically to Exide's Notes and inexplicably claims that these four reports provide even more evidence of efficiency than the *80* analyst reports cited by the court in *In re DVI*. *Id.* ¶ 39; *see also*

---

[8] As explained at length in Defendants' Opposition to Plaintiffs' First Motion, and in Professor Gompers' Report, these factors do not actually establish efficiency. *See* Defs.' 1st Opp. at 15-16; Gompers Rep. ¶¶ 14-15.

249 F.R.D. at 209.[9]  Finally, Dr. Hartzmark simply concedes that Exide was not entitled to file a Form S-3 during a portion of the Class Period and that institutional ownership of the Notes was low.  Hartzmark Rep. ¶¶ 45, 55.  Thus, Dr. Hartzmark adds nothing to the Court's analysis of the first four *Cammer* factors.

### 2.  Unscientific and unreliable "cause and effect" analyses do not establish market efficiency.

In contrast to its findings on the first four *Cammer* factors, the Court concluded that "Torchio's analysis of the fifth and most important *Cammer* factor—causal relationship" did not support a finding that the Notes traded in an efficient market.  Order at 29, 35.  Dr. Hartzmark attempts to address the Court's critiques of Mr. Torchio's analyses by using "price-related" factors to test whether the Notes traded in an efficient market.  But Dr. Hartzmark's analyses fail, in part, because he relies on several of Mr. Torchio's unsupported methodologies and uses others that are methodologically unsound, unsupported, and inconsistent.

### a.  Dr. Hartzmark's "event study" does not support market efficiency for Exide Notes.

Dr. Hartzmark purports to run an event study looking at the three "disclosure dates" identified by Plaintiffs.  Hartzmark Rep. ¶¶ 79-85.  His analysis is deficient,

---

[9] Dr. Hartzmark, like Mr. Torchio, claims that coverage of the Notes by two debt rating agencies supports a finding of market efficiency.  Hartzmark Rep. ¶ 38.  Since both experts argue in other places in their Reports that the rating agencies provided no new information to the market (Hartzmark Rep. ¶¶ 87-93; *see* Order 33), it is unclear how they can simultaneously contend that the agency coverage "implies that the market rapidly and fully incorporates information into the stock price because analyst reports would likely be closely reviewed by investment professionals."  Order at 17.

though, and provides no support for a finding of market efficiency.

The first and most obvious weakness in Dr. Hartzmark's event study is that he uses only the three corrective disclosure dates at the end of the Class Period – the very dates on which Plaintiffs claim that the price of the Notes dropped in response to the revelation of supposed "truths" allegedly concealed by Defendants during the Class Period. *See* Gompers Rep. ¶¶ 20-24. Using only these dates is circular and patently biased. Dr. Hartzmark could not help but find the news on these three days caused movement in the price of Exide Notes; that movement is what caused the filing of the securities lawsuits in the first place. *Id.* ¶ 23. Second, looking at just three of the 413 trading days in the Notes Class Period is far too small a sample to reliably demonstrate efficiency throughout the entire Class Period. *See Id.* ¶ 22. In his 2012 law review article Dr. Hartzmark opined that a sample proportionally far greater than the three out of 413 at issue here was "hardly a large enough sample to reliably test whether there exist any systematic relationships between earnings disclosures and price movements."[10] Third, looking at dates clustered at the very end of the Notes Class says little or nothing about whether the market was efficient in the beginning or

---

[10] *See* Michael L. Hartzmark, H. Nejat Seyhun, *The Curious Incident of the Dog that Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, 6 Va. L. & Bus. Rev. 415, 429 (2012). In this article Dr. Hartzmark suggests that a "bootstrapping analysis" can be used to show a market is efficient where a sample is otherwise too small to demonstrate efficiency on its own. *See also* Hartzmark Rep. ¶¶ 105-106. However this "bootstrapping analysis" is not an accepted test of efficiency. Gompers Rep. ¶ 28. In fact other than Dr. Hartzmark's own law review article, there doesn't appear to be any support in any journal—peer-reviewed or otherwise—for the use of his "bootstrapping analysis" to demonstrate efficiency.

DECHERT LLP
ATTORNEYS AT LAW

13

middle of that period. *Id.* ¶ 21.

Plaintiffs argue that Dr. Hartzmark's flawed "event study" provides "strong empirical evidence of market efficiency." Pls. 2d Mem. at 12. But the cases on which they rely for this proposition are readily distinguishable. In *Plumbers & Pipefitters National Pension Fund v. Burns*, 967 F. Supp. 2d 1143 (N.D. Ohio 2013), the court only accepted plaintiffs' view that the precipitous drops at the end of the class period based on "cataclysmic" events supported market efficiency where "defendants have not identified any other event that [plaintiffs' expert] should have studied—let alone an event that should have correlated, but did not correlate, with a statistically-significant return." *Id.* at 1159. Here, there were numerous other dates that Plaintiffs' expert should have studied, including the dates on which significant environmental news about the Vernon facility was disclosed. *See, e.g.*, James Rep. ¶ 37-40, 67. In *In re Healthsouth*, 261 F.R.D. at 635, the disclosure dates were separated by nearly seven months, giving a better indication of the efficiency over the class period. And in *Aranaz v. Catalyst Pharm. Partners, Inc.*, 302 F.R.D. 657 (S.D. Fla. 2014), defendants did not even challenge a finding of efficiency.

### b.   Dr. Hartzmark's analysis of Credit Downgrades does not support market efficiency for Exide Notes.

In the July 21 Order, the Court noted that Mr. Torchio considered credit downgrades to be significant events. Order at 32-33. Further, the Court found that there were three credit downgrades during the Note Class but that there was no corresponding significant price movement in the Notes, which weighed against a

DECHERT LLP
ATTORNEYS AT LAW

14

finding of market efficiency.  *Id.*  In so finding, the Court dismissed Mr. Torchio's attempts to explain away this issue, finding his comments were "unsupported by academic authority and amount[ed] to little more than speculation."  *Id.*

In light of the significant impact of these findings on Plaintiffs' First Motion, Dr. Hartzmark also argues that the Notes did not react because the downgrades were "old news" and, thus, that the failure to react does not militate against a finding of market efficiency.  But like Mr. Torchio, Dr. Hartzmark's explanation is circular and unscientific, amounting to "little more than speculation."  Order at 32; *see also* Gompers Rep. ¶¶ 25-26.

And indeed, Dr. Hartzmark's attempted explanation here is at odds with his opinions in other engagements.  In *In re DVI*, a case which Dr. Hartzmark served as an expert on market efficiency on behalf of investor plaintiffs.  *See* Expert Report of Dr. M. Hartzmark, Ph.D at ¶ 1, *In re DVI Sec. Litig.*, 2:03-cv-05336-LDD (E.D. Pa., Dec. 04, 2006) (Ex. 3).  In his Report in that case, Dr. Hartzmark considered credit downgrades to be significant events, even when based on so-called "stale" week-old news.  For example, he found that a June 4, 2003 resignation by a company's auditor was significant.  *Id.* at Ex. XIV and App'x F at 198.  He also found that a credit rating downgrade, which came on June 10, 2003 was a significant event, despite being *based on that same resignation*.  *Id.* at 203-05; s*ee also* Hartzmark Dep. at 120:9-16.[11]  Thus, just

---

[11] In his deposition, Dr. Hartzmark tried to explain this contradiction by saying that he did not know all the news that the downgrade was based on, and yet the Appendix (which he produced) contains the entire text of the relevant press releases.  His failure

like Mr. Torchio, Dr. Hartzmark's analysis of credit downgrades is both illogical and internally contradictory.

So just as it did with Mr. Torchio, the Court should reject Dr. Hartzmark's efforts to ignore the obvious and conclude, once again, that the failure of the Notes to react to the downgrades supports the Court's original finding that the market for the Notes was not efficient.[12]

### c. Dr. Hartzmark's News vs. Non-News Analysis does not support market efficiency for Exide Notes.

The centerpiece of Dr. Hartzmark's Report is his "news vs. non-news" study. Hartzmark Rep. ¶¶ 94-109. As a preliminary matter, this is not an academically accepted methodology for establishing efficiency, as it only tests if there was a statistically significant market response to news *on average.* Such a study does not analyze the market's response to news on individual news days or examine whether that response was directionally consistent with the unexpected news (if any). Gompers Rep. ¶ 35, n.52; *see also* James Rep. ¶¶ 33-39, 64. This method can be used to show *in*efficiency, but it is not a reliable scientific method to show efficiency. *See* James Rep. ¶ 33; Gompers Rep. ¶¶ 30-33; *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 269 (D. Mass. 2006)(using news vs. no news analysis to show inefficiency).

---

to identify any new "news" is telling. *See* Hartzmark Dep. at 120-24.

[12] Even if there were some basis for Dr. Hartzmark's claim that the Notes did not react because the downgrades were "old news," this does not establish that the market was efficient. By his own definition, efficiency requires a showing that the market reacted to "unexpected" events, not that it failed to react to supposedly expected news. *See* Hartzmark Rep. ¶ 94; Gompers Rep. ¶ 26.

DECHERT LLP
ATTORNEYS AT LAW

The utility of a news vs. no-news study – limited though it is – is dependent on whether the news days have been reliably selected. Gompers Rep. ¶ 34. Here, Dr. Hartzmark selected his news days using a method so convoluted and counterintuitive that it begs the question whether the methodology was designed to ensure a pre-determined outcome. He starts by looking at all 18 of the Form 8-Ks filed by Exide during the Notes Class Period, plus the three alleged corrective disclosure dates.[13] From this set he excluded 11 days "where there was no contemporaneous analyst response," and one day when "the effective date of the news was on a bond market holiday."[14] He then reviewed each of the remaining announcements "to determine whether the disclosures contained relevant cashflow related information," and determined that all eight contained cashflow related information. Hartzmark Rep. ¶¶ 101–02. There are several problems with this approach.

In other parts of his Report and in other of his reports and articles, Dr. Hartzmark emphasizes that finding market efficiency requires showing a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id.* ¶ 62; *see also* Gompers Rep. ¶ 35. Here, though, he states "I do not attempt to measure what were market expectations at the time of the news. Thus, I do not attempt to determine whether the cashflow-related

---

[13] One of the three alleged corrective disclosure dates coincides with an 8-K release, for a total of 20 unique days considered.

[14] When Dr. Hartzmark was asked at his deposition why he did not simply consider the next day the bond market was open, he could offer no cogent explanation. Tellingly, on the next trading day there was no significant bond return. *See* Hartzmark Dep. at 91:23-92:15, 93:16-23; *see also* Gompers Rep. ¶ 37.

news is unanticipated." Hartzmark Rep. ¶ 102. But by his own definition, his news vs. no-news study cannot support a finding of market efficiency unless he analyzes whether news was unanticipated. Gompers Rep. ¶ 36. This is particularly important where his news days are correlated with either no reaction, or a reaction that is opposite to what would have been anticipated. *Id.*

Further undermining Dr. Hartzmark's news vs. no-news study is the fact that his method for determining news days inexplicably differs from Mr. Torchio's. *Compare* Torchio Rep. ¶¶ 139-40, 212 (25 news days) *with* Hartzmark Rep. ¶¶ 101-02 (8 "cashflow-related news days"). If he had used the same news days as Mr. Torchio, it would have resulted in a smaller proportion of "news" days with significant returns. Gompers Rep. ¶ 38.[15]

### d.     Dr. Hartzmark's Regression Model is Flawed.

As demonstrated in Professor Gompers' Report, Dr. Hartzmark's regression model suffers serious flaws too numerous and complex to fairly address them all in this memorandum. *See* Gompers Rep. ¶¶ 44-52. One of these flaws, however, is particularly telling and worthy of further discussion here.

In his Report, Dr. Hartzmark models the price return of the Exide Notes as a function of four explanatory factors: 1) a "market" factor represented by the return of the S&P 500 Total Return Index, 2) an "industry" factor represented by the return of a "peer index [] consisting of 10 of the 22 companies identified by Exide as peers," 3) a

---

[15] Dr. Hartzmark similarly has no valid explanation for the differences in the price reactions of Exide Stock and Notes. Gompers Rep. ¶¶ 39-43.

"credit" factor consisting of "a combination of the Barclays US Aggregate Credit Corporate Index (B) and Barclays US Aggregate Credit Corporate Index (CAA)", and 4) a "maturity" factor representing the return on a Treasury Note with "the same time-to-maturity as the Exide Note." Hartzmark Rep. ¶ 70. While there are flaws with each of these factors (Gompers Rep. ¶¶ 48-50), his use of the "industry factor" comprised of "10 of the 22 companies identified by Exide as peers" is particularly problematic. It has no academic support and Dr. Hartzmark admits in his Report that he used this unique proxy solely because he wanted to "remain consistent with" the Torchio Report. Hartzmark Rep. ¶ 70, n.93.[16] In his deposition Dr. Hartzmark revealed that he did not understand how or why the 10 companies were chosen (or even whether it was 10 or 11 companies), casting further doubt on the propriety of this proxy. Hartzmark Dep. at 60:18-62:17. When asked if he knew how the companies making up the industry factor were selected, he testified "I can tell you [] that I have worked closely with the people who – at Mr. Torchio's company and they're very careful, they are very reliable and therefore, I don't know myself." *Id.* at 76: 5-9; s*ee also id.* at 76:16-19 ("Q. If you know, tell us why any company was put in the battery bucket as opposed to the automotive bucket, please? A. That I don't know.").

---

[16] Apparently Dr. Hartzmark's desire for consistency is not so strong that he won't depart from Mr. Torchio when it serves his purposes. Mr. Torchio gave each of the 10 constituent companies equal weight in his analysis whereas Dr. Hartzmark weighted the companies based on market capitalization. *Id.* Moreover, this entire approach is inconsistent with what Dr. Hartzmark did in *In re DVI*, where he appears to have looked at all the company's identified peers, not a hand-selected subset of those peers. Hartzmark Rep. ¶ 30 n.13, *In re DVI*.

DECHERT LLP
ATTORNEYS AT LAW

19

Tellingly, Dr. Hartzmark claims that he may have used such an industry proxy before but fails to identify a single case where he did so. *Id.* at 79:18-80:6. Indeed, Dr. Hartzmark's use of this hand-picked industry proxy is at odds with what he has done in other cases, where he simply used publicly available market indices. *See id.* at 34:1-35:13; 43:24-45:3; 48:11-49:6.[17]

Dr. Hartzmark's (mis)use of the industry proxy here is emblematic of Plaintiffs' overall approach to the Second Motion. Like Dr. Hartzmark's practice of blithely cherry-picking the parts of Mr. Torchio's Report that will serve his purposes, Plaintiffs pick and choose the parts of the First Motion they think will help them on the Second Motion and cast the rest aside. But neither the facts nor the law have changed since Plaintiffs filed the First Motion six months ago; Plaintiffs are simply trying to repackage the facts and re-argue the law. Plaintiffs' desire to rewrite history and improve their advocacy is understandable but should not be countenanced by this Court. Defendants respectfully submit that the Court should reach the same conclusion with regard to Dr. Hartzmark's Report as it did with Mr. Torchio's: that it "fails to show that his methodology is soundly supported by academic authority or is a generally accepted approach to studying the efficiency of a company's debt securities' market" and it therefore cannot be relied on to establish efficiency. *See* Order at 34.

---

[17] *See, e.g.*, Expert Rep. of M. Hartzmark, Ph.D. at ¶ 160, *In re MF Global Holdings, Sec. Litig.*, 11-cv-07866-VM-JCF (S.D.N.Y. Sept. 15, 2014) (Ex. 4); Rep. of M. Hartzmark, Ph.D. at ¶ 70, *Wallace v. IntraLinks Holdings, Inc.*, 08-cv-08861-TPG (S.D.N.Y. Feb. 18, 2014) (Ex. 5); Rep. of M. Hartzmark, Ph.D. at ¶ 38, *In re ITT Educ. Servs., Inc. Sec. Litig.*, 13-cv-01620-JPO-JLC (S.D.N.Y. March, 27, 2015) (Ex. 6).

DECHERT LLP
ATTORNEYS AT LAW

20

### 3.    Plaintiffs have not established that the market for Exide's Notes was efficient in 2011.

As the foregoing demonstrates, Plaintiffs have not satisfied their burden to demonstrate that the market for Exide Notes was efficient throughout the class period.  As such, the Court should not certify the Securities Act Note Class.  But if the Court is inclined to conclude that Plaintiffs have established market efficiency for Exide Notes, Defendants respectfully submit that it should not reach the same conclusion with regard to the market for Exide Notes in 2011.  Plaintiffs' original expert, Mr. Torchio, conceded that the evidence for market efficiency in the Notes in 2011 is weaker than for the rest of the class period, and Dr. Hartzmark does not contradict that concession.  Where plaintiffs fail to show efficiency with respect to a particular time frame within the class period, the class period must exclude that time period.  *See Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999) (affirming decertification of class during portion of class period for which plaintiff had failed to establish market efficiency).

While Plaintiffs' new, shorter, Securities Act Note Class was apparently designed to address one of the weaknesses identified by the Court, the shorter period does not obviate the fact that there was no continuous trading of Exide Notes during the balance of 2011. Gompers Rep. ¶¶ 17-18.  Attempts by Mr. Torchio and Dr. Hartzmark to sweep this shortcoming under the rug are not the type of "rigorous analysis" called for on a motion for class certification, and are insufficient to establish market efficiency.  *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011);

James Rep ¶ 50. Accordingly, even if the Court is inclined to certify the Securities Act Note Class, Defendants submit that those who acquired or purchased Notes during 2011 must be excluded.

## III. THE COURT SHOULD NOT CERTIFY A DAMAGES CLASS BECAUSE PLAINTIFFS DO NOT DEMONSTRATE A METHOD TO CALCULATE CLASS-WIDE DAMAGES.

In their Second Motion, Plaintiffs again fail to meet their burden of "showing that damages can be measured on a class-wide basis consistent with their theories of liability," as required under *Comcast*. *In re BP p.l.c. Sec. Litig.*, No. 10-MD-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013). Under *Comcast*, plaintiffs bear the burden of showing "that their damages stemmed from the defendant's actions that created the legal liability." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *see also Fox Test Prep v. Facebook, Inc.*, 588 Fed. Appx. 733, 733-34 (9th Cir. 2014) (affirming district court's denial of class certification where plaintiffs failed to establish a uniform method for assessing their theory of liability, as required by *Comcast*).

In the July 21 Order, the Court rejected Plaintiffs' first attempt to show a damages theory tied to their theory of liability based on Mr. Torchio's discussion of "general techniques for computing damages" in part because he failed "to propose one model explaining how he would use these techniques in concert to calculate damages in this case." Order at 38-39. Despite the Court's guidance and the addition of Dr. Hartzmark, Plaintiffs still fail to comply with *Comcast*. Dr. Hartzmark's proposed damages methodology fails to address this Court's specific concerns because it does

DECHERT LLP
ATTORNEYS AT LAW

22

not disentangle the effect of various alleged misrepresentations and it does not account for changes in the alleged inflation in the price of Exide securities across the class period. *See* Gompers Rep. ¶¶ 57-59.

Dr. Hartzmark's proposed methodology provides no assurance that Plaintiffs or their experts are able to address the unique challenges of this case or the concerns discussed in the Court's Order, namely that 1) Plaintiffs allege multiple different misrepresentations whose impact must be disentangled, 2) to the extent the price of Exide's stock or Notes was inflated, that inflation could have changed throughout the putative class periods, and 3) the declines on the alleged corrective disclosure days include not only correction of an allegedly concealed risk, but also realization of that risk. Gompers Rep. ¶ 59. In the face of this daunting task list, Dr. Hartzmark provides only "a general description of how damages could be calculated and a 'hypothetical' damages implementation." Gompers Rep. ¶ 62. Such generic damage analyses do not pass muster under *Comcast*. *See, e.g.*, *In re BP*, 2013 WL 6388408, at *17 (plaintiffs failed to offer an adequate damages methodology where they could not provide a "more complete explication of how [p]laintiffs propose[d] to use an event study to calculate class members' damages, and how that event study [would] incorporate—and, if necessary, respond to—the various theories of liability"); *Turnbow v. Life Partners, Inc.*, No. 3:11-CV-1030-M, 2013 WL 3479884, at *17 (N.D. Tex. July 9, 2013) (denying certification where plaintiffs' "proposed damages model [did] not measure damages resulting from the particular injury on which [p]laintiffs' liability

action [was] premised").

As Professor Gompers explains, "Plaintiffs allege multiple types of misrepresentations, and thus any proposed damages methodology for this case must be able to disentangle the effect of each type of misrepresentation.  This is because, were the court to find Defendants liable for only a subset of the alleged types of misrepresentations, a damages methodology that could not disentangle the respective types of misrepresentations would not be tied to the operative liability theory." Gompers Rep. ¶ 66; *See In re BP*, 2013 WL 6388408, at *16-17 (an event study that will "provide options to the jury to disaggregate inflation by the type of misrepresentation" did not meet plaintiffs' burden of showing damages could be measured on a classwide basis consistent with theories of liability).  If Dr. Hartzmark's hypothetical suggestions were put into practice, the fact-finder would have to make multiple findings regarding nearly every day of the class period to determine the level of risk related to each of the various alleged misstatements and then calculate inflation on each day of the class period.  *See* Hartzmark Rep. ¶ 141; Gompers Rep. ¶¶ 82-83.  This is obviously unworkable.  *See Curtis v. Extra Space Storage, Inc.*, No. C 13-00319 WHA, 2013 WL 6073448, at *4 (N.D. Cal. Nov. 18, 2013) (denying certification where plaintiff failed to propose a "reliable" and "workable" method to compute damages class-wide); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) ("Class treatment, however, may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties

DECHERT LLP
ATTORNEYS AT LAW

24

propose to calculate individual damages is clearly inadequate."); *In re Med. Waste Servs. Antitrust Litig.*, No. 2:03MD1546 DAK, 2006 WL 538927, at \*8 (D. Utah Mar. 3, 2006) ("It is simply not enough that [p]laintiffs merely promise to develop in the future some unspecified workable damage formula. A concrete, workable formula must be described before certification is granted.").

Further, Dr. Hartzmark's methodology is unable to control for market and industry-wide factors, for contemporaneous disclosures of differing natures, or even for different types of disclosures. Gompers Rep. ¶ 70; *See Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724-LHK, 2014 WL 7148923, at \*12 (N.D. Cal. Dec. 15, 2014) (damages model failed where it did not control for other critical factors that would impact price); *In re POM Wonderful LLC*, No. ML 10-02199 DDP RZX, 2014 WL 1225184, at \*5 (C.D. Cal. Mar. 25, 2014) (damages model failed where it did not account for potential confounding factors). Because Plaintiffs have again failed to set forth a damages model tied to their theory of liability, class certification for a damages class is inappropriate and Plaintiffs' Second Motion should be denied.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Second Motion should be denied, with prejudice.

DECHERT LLP
ATTORNEYS AT LAW

25

Dated: October 30, 2015          /s/ Carl E. Volz

Edwin V. Woodsome, Jr. (CBN 56305)
ed.woodsome@dechert.com
David H. Kistenbroker (admitted *pro hac vice*)
david.kistenbroker@dechert.com
Carl E. Volz (admitted *pro hac vice*)
carl.volz@dechert.com
DECHERT LLP
US Bank Tower
633 West 5th Street, 37th Floor
Los Angeles, CA 90071-2103
Telephone: (213) 808-5700
Facsimile: (213) 808-5760

*Attorneys for Defendants James R. Bolch, Phillip A. Damaska, R. Paul Hirt, Louis E. Martinez, John P. Reilly, Herbert F. Aspbury, Michael R. D'Appolonia, David S. Ferguson, John O'Higgins, and Dominic J. Pileggi*

DECHERT LLP
ATTORNEYS AT LAW