UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

DAVID M. LORITZ,               )
                               )
                               )
        PLAINTIFF,             )
                               )
        VS.                    ) CV 13-2607-SVW(EX)
                               )
                               )
EXIDE TECHNOLOGIES, ET AL.,    )
                               ) LOS ANGELES, CALIFORNIA
                               ) OCTOBER 16, 2015
        DEFENDANTS.            ) (2:01 P.M. TO 3:30 P.M.)
_____)

HEARING
BEFORE THE HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:              SEE NEXT PAGE

COURT REPORTER:           RECORDED; COURT SMART

COURTROOM DEPUTY:         STACEY PIERSON

TRANSCRIBER:              DOROTHY BABYKIN
                          COURTHOUSE SERVICES
                          1218 VALEBROOK PLACE
                          GLENDORA, CALIFORNIA  91740
                          (626) 963-0566

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

2

APPEARANCES:  (CONTINUED)
FOR THE PLAINTIFF DAVID M. LORITZ:

          FEDERMAN & SHERWOOD
          BY:  WILLIAM B. FEDERMAN
               AMANDA B. MURPHY
               ATTORNEYS AT LAW
          10205 NORTH PENNSYLVANIA AVENUE
          OKLAHOMA CITY, OKLAHOMA  73102


FOR THE DEFENDANT EXIDE TECHNOLOGIES, ET AL.:

          DECHERT LLP
          BY:  CARL E. VOLZ
               MELANIE C. MACKAY
               ATTORNEYS AT LAW
          35 WEST WACKER DRIVE
          SUITE 3400
          CHICAGO, ILLINOIS  60601

3

                              I N D E X

CASE NO. CV 13-2607-SVW(EX)                    OCTOBER 16, 2015

PROCEEDINGS:   PLAINTIFF'S MOTION TO COMPEL THE PRODUCTION OF
               DOCUMENTS

LOS ANGELES, CALIFORNIA; FRIDAY, OCTOBER 16, 2015; 2:01 P.M.

THE CLERK: THE HONORABLE CHARLES F. EICK, UNITED STATES MAGISTRATE JUDGE, PRESIDING.

CALLING CIVIL 13-2607-SVW(EX), DAVID M. LORITZ VERSUS EXIDE TECHNOLOGIES, ET AL.

APPEARANCES, PLEASE.

MR. FEDERMAN: WILLIAM B. FEDERMAN AND A. BROOKE MURPHY, FEDERMAN & SHERWOOD, ON BEHALF OF THE PLAINTIFFS, YOUR HONOR.

THE COURT: THANK YOU.

MR. VOLZ: GOOD AFTERNOON, JUDGE.

CARL VOLZ. AND MELANIE MACKAY, MY ASSOCIATE, WILL BE JOINING ME SHORTLY ON BEHALF OF THE DEFENDANTS.

THE COURT: THANK YOU.

THIS MATTER IS BEFORE THE COURT FOR A HEARING ON THE PLAINTIFF'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS. THE MOTION WAS FILED SEPTEMBER 22, 2015.

THE COURT HAS READ ALL THE PAPERS SUBMITTED IN CONNECTION WITH THIS MOTION BOTH IN SUPPORT AND IN OPPOSITION.

THE COURT IS NOW PREPARED TO HEAR ORAL ARGUMENT.

FOR THE MOVING PARTY, PLEASE -- PARTIES, WHO IS GOING TO ARGUE?

MS. MURPHY: I WILL, YOUR HONOR.

THE COURT: ALL RIGHT.

MS. MURPHY: GOOD AFTERNOON, YOUR HONOR.

5

MY NAME IS BROOKE MURPHY FOR THE PLAINTIFFS.

YOUR HONOR, THE NINTH CIRCUIT HAS RECOGNIZED THAT THE ATTORNEY-CLIENT PRIVILEGE MUST BE STRICTLY CONSTRUED BECAUSE IT IMPEDES THE FREE -- THE FULL AND FREE DISCOVERY OF THE TRUTH.

AS RECOGNIZED BY THE NORTHERN DISTRICT OF CALIFORNIA, THE VERY SAME LOGIC AND PRINCIPLES APPLY TO THE WORK-PRODUCT PROTECTION BECAUSE IT TOO CAN DEROGATE FROM THE -- FROM THE SEARCH FOR THE TRUTH.

PLAINTIFFS HAVE FILED THIS MOTION TO COMPEL ONLY AFTER HAVING EXHAUSTED MULTIPLE AVENUES OF COMMUNICATION WITH DEFENDANTS AND AFTER HAVING GIVEN DEFENDANTS OPPORTUNITIES TO REVISE THEIR PRIVILEGE CLAIMS.

DESPITE PLAINTIFF'S GOOD FAITH ATTEMPTS TO RESOLVE THESE ISSUES, WE ARE LEFT WITH THE OVERBROAD PRIVILEGE LOGS THAT HAVE BEEN FILED WITH THIS COURT.

THE COURT:  WITH REGARD TO YOUR EFFORTS TO RESOLVE THE DISPUTE, THE DEFENDANTS ARGUE IN THE SUPPLEMENTAL -- IN THEIR SUPPLEMENTAL MEMORANDUM THAT YOU FAILED TO MEET AND CONFER ON CERTAIN ISSUES THAT YOU LATER PRESENTED IN A JOINT STIPULATION, INCLUDING ISSUES CONCERNING THE 11 CONSULTANTS MENTIONED ON THE PRIVILEGE LOGS AND ISSUES CONCERNING THE ATTACHMENTS TO PRIVILEGED EMAIL COMMUNICATIONS.

IS THERE ANY VALIDITY TO THE DEFENDANTS' ARGUMENTS THAT YOU FAILED TO COMPLY WITH LOCAL RULE MEET AND CONFER PROCEDURES WITH REGARD TO THOSE ISSUES?

MS. MURPHY:  I WOULD SAY THERE IS NOT, YOUR HONOR.

THE COURT:  WHY NOT?

MS. MURPHY:  BECAUSE IN THE LETTER THAT WAS SUBMITTED TO DEFENSE COUNSEL ON JUNE 5TH, 2015 AND IN OTHER LETTERS AND IN CONVERSATIONS WE DISCUSSED THESE ISSUES.

NOW, IT IS TRUE THAT I MAY NOT HAVE NAMED THE SPECIFIC CONSULTANTS THAT WERE LATER SPECIFICALLY NAMED IN THE JOINT STIPULATION.  HOWEVER, I THINK THAT IS AN ISSUE OF SPECIFICITY AND CERTAINLY NOT AN ISSUE OF HAVING NOT RAISED THE CHALLENGE TO THEIR ASSERTION OF WORK-PRODUCT PRIVILEGE PROTECTION AND ATTORNEY-CLIENT PRIVILEGE.

THE COURT:  BY CHALLENGING THEIR ASSERTION OF ATTORNEY-CLIENT PRIVILEGE, DOES THAT YOU THINK RAISE FOR MEET-AND-CONFER PURPOSES THE ISSUE OF WHETHER THE PRIVILEGE IS DESTROYED BY THE INCLUSION OF THESE PARTICULAR CONSULTANTS IN THE COMMUNICATIONS LOOP?

MS. MURPHY:  I THINK THAT THAT IS PART OF THE CHALLENGE.  AND WE CERTAINLY CHALLENGE THE SUFFICIENCY OF THEIR LOGS TO PROVE THAT IT WAS, IN FACT, ATTORNEY-CLIENT PRIVILEGED COMMUNICATION.  THAT INCLUDES A CONFIDENTIAL COMMUNICATION THAT WAS KEPT IN CONFIDENCE THAT WAS NOT WAIVED.  AND THAT WAS MADE FOR THE PURPOSE OF SEEKING LEGAL ADVICE.

WE RAISED THAT ISSUE IN LETTERS.  I THINK THE MOST DESCRIPTIVE LETTER IS THE JUNE 5TH, 2015 LETTER WHICH WAS ATTACHED AS EXHIBIT 18 TO MY ORIGINAL DECLARATION.  BUT IT WAS

ALSO DISCUSSED DURING PHONE CALLS, THE MEET AND CONFERS THAT WE HAD WITH DEFENSE COUNSEL.

YOUR HONOR --

THE COURT:  WHAT ABOUT THE ISSUE REGARDING ATTACHMENTS?

MS. MURPHY:  WELL, THE ATTACHMENTS, I THINK THAT IS SOMETHING THAT CAME MORE AS A RESULT OF THEIR REVISIONS WHICH CAME AFTER WE HAD A MEET AND CONFER.  IT WAS AFTER THE SECOND ROUND OF LETTER EXCHANGES HAD TAKEN PLACE.  WE ENDED ONE OF THESE DISCUSSIONS -- ONE OF THE TELEPHONIC MEET AND CONFERS WITH THE JOINT UNDERSTANDING THAT WE WERE PROBABLY GOING TO BE HEADING TOWARDS A MOTION TO COMPEL AND THE JOINT STIPULATION.

DEFENSE COUNSEL SUGGESTED THAT THEY WOULD LIKE AN OPPORTUNITY TO GO BACK, REVIEW THEIR PRIVILEGE CLAIMS.  THEY DID SO.  THEY MADE REVISIONS.  THEY ADDED ATTORNEY-CLIENT PRIVILEGE ASSERTIONS TO NUMEROUS ENTRIES AND/OR REMOVED WORK-PRODUCT PRIVILEGE FROM CERTAIN ENTRIES WHICH CHANGED THE CALCULUS TO SOME DEGREE.

WHAT HAD PREVIOUSLY BEEN AN ATTACHMENT THAT HAD A WORK-PRODUCT PRIVILEGE CLAIM WITH IT IN SOME INSTANCES NO LONGER HAD THAT.  OR IN SOME INSTANCES ATTORNEY-CLIENT PRIVILEGE WAS ADDED TO AN ATTACHMENT.  SO, THAT ISSUE WAS DEFINITELY FLUSHED OUT MORE IN THE JOINT STIPULATION BECAUSE IT WAS AN ISSUE THAT AROSE FOLLOWING SEVERAL OPPORTUNITIES OF MEET AND CONFER AND THEIR DECISION TO REVISE THE PRIVILEGE LOGS

BEFORE I FILED -- WE ENDED UP FILING THE JOINT STIPULATION.

THE COURT: WELL, LET'S TALK ABOUT THAT ISSUE FOR A MOMENT.

THEY SEEM TO ARGUE THAT THE ATTACHMENTS OR MANY OF THEM HAVE BEEN PRODUCED IN SEPARATE FORM SO THAT THE ISSUE OF WHETHER THE ATTACHMENT DOCUMENTS ARE PRIVILEGED AS PART OF THE COMMUNICATION TO WHICH THEY ARE ATTACHED IS A LARGELY ACADEMIC ISSUE.

ARE THEY RIGHT ABOUT THAT?

MS. MURPHY: I WOULD SAY NO, YOUR HONOR.

THE COURT: WHY NOT?

MS. MURPHY: BECAUSE WE HAVE NOT SEEN ALL OF THOSE DOCUMENTS IN OUR PRODUCTION.

THEY HAVE AGREED TO PRODUCE SOME ADDITIONAL DOCUMENTS FROM AQMD AND DTSC, WHICH WERE SOME OF THE DOCUMENTS THAT WERE PROTECTED BY THE ATTACHMENT CLAIMS THAT THEY ARE MAKING. THEY RECOGNIZED THAT THOSE ARE THIRD-PARTY DOCUMENTS. TO THE EXTENT THEY HAVE NOT ALREADY PRODUCED THOSE DOCUMENTS, THEY ARE GOING TO PRODUCE THEM AND PRESUMABLY HAVE PRODUCED ALL OF THEM TO US.

IT'S UNCLEAR -- AND I THINK ACTUALLY IT IS THE CASE THAT THAT'S WHERE THE ADDITIONAL PRODUCTION ENDS.

WITH RESPECT TO DOCUMENTS THAT WERE ATTACHED, THEY MAY HAVE BEEN CREATED BY OTHER THIRD PARTY -- THIRD PARTIES WHO -- WHEREIN THERE IS NO INDEPENDENT CLAIM OF ATTORNEY-CLIENT PRIVILEGE. I DON'T BELIEVE THAT THOSE -- THAT EVERY DOCUMENT

HAS BEEN PRODUCED OR IS GOING TO BE PRODUCED BY DEFENDANTS.

SO, IT IS STILL THEIR BURDEN TO DEMONSTRATE THAT EACH DOCUMENT, EVEN THE ATTACHMENTS, ARE PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE.  AND THAT'S RECOGNIZED CERTAINLY BY UPJOHN AND SEVERAL OTHER CASES THAT WE CITE IN OUR BRIEFS.

THE COURT:  WELL, THERE ARE CASES THAT SAY THAT DOCUMENTS DO NOT BECOME PRIVILEGED MERELY BY THEIR ASSOCIATION WITH PRIVILEGED DOCUMENTS.  AND THERE ARE ALSO CASES THAT SAY THAT THE -- THAT A DOCUMENT THAT IS ATTACHED TO A PRIVILEGED COMMUNICATION FOR PURPOSES OF SEEKING OR GIVING LEGAL ADVICE IS ITSELF PRIVILEGED AS A PART OF THE ENTIRE COMMUNICATION.

LET ME ASK YOU.  WHY IS IT -- WELL, STRIKE THAT.

ISN'T IT TRUE THAT IF A CLIENT, FOR EXAMPLE, COMMUNICATES TO A LAWYER SEEKING LEGAL ADVICE AND SAYS I SAW THIS ARTICLE ON A WEBSITE TODAY.  AND I THINK THE ARTICLE IS DEFAMATORY.  CAN WE -- OR SHOULD WE SUE.  AND THE CLIENT DESCRIBES THE ALLEGEDLY DEFAMATORY ARTICLE.

THE ARTICLE ITSELF SEPARATELY IS OBVIOUSLY NOT PRIVILEGED.  BUT THE CLIENT'S DESCRIPTION -- RECITATION, RECOUNT OF WHAT'S IN THE ARTICLE -- AND, FRANKLY, THE CLIENT HANDING THE ARTICLE TO THE LAWYER IF THE CLIENT AND THE LAWYER ARE IN THE SAME ROOM WOULD BE PRIVILEGED AS PART OF THE ENTIRE COMMUNICATION.  YOU WOULD NOT PARSE THE CONSULTATION SUCH THAT YOU WOULD ORDER DISCLOSED THAT WHICH WAS SAID ABOUT THE ARTICLE AND ALLOW THE WITHHOLDING OF EVERYTHING ELSE.

ISN'T THAT WHAT WE HAVE HERE?

MS. MURPHY:  IF THAT IS WHAT WE HAVE I WOULD NOT DISPUTE IT.

IF WE HAVE THE INFORMATION, THE UNDERLYING DOCUMENT THAT WOULD HAVE BEEN THE ATTACHMENT -- IN YOUR SCENARIO THE ARTICLE IN QUESTION, THEN, WE WOULD NOT BE RAISING THE CLAIM.

AND IF THAT IS THE DEFENDANTS' INTENT TO PRODUCE EVERY ATTACHMENT THAT IS NOT INDEPENDENTLY PROTECTED BY ATTORNEY-CLIENT PRIVILEGE, THEN, I DON'T THINK WE'LL HAVE AN ISSUE WITH THAT.

THEY HAVE EXPLAINED IN A LETTER WHICH WAS SENT AFTER THE SUPPLEMENTAL BRIEFING WAS SUBMITTED -- IT'S DATED OCTOBER 1ST, 2015.  IT WAS SENT TO ME ON OCTOBER 2ND, 2015 BY EMAIL.  I HAVE THAT IF YOU'D LIKE TO SEE IT.

AFTER WE HAD ALREADY SUBMITTED THE SUPPLEMENTAL MEMORANDUM -- AND IN THAT LETTER BY MR. VOLZ HE DOES EXPLAIN THAT CERTAIN ATTACHMENTS HAD HANDWRITING NOTATIONS ON THEM.  I UNDERSTAND THAT THOSE ARE PROTECTED BY ATTORNEY-CLIENT PRIVILEGE TO THE EXTENT THAT THEY WERE COMMUNICATED TO AN ATTORNEY IN THE PROCESS OF SEEKING LEGAL ADVICE.  WE WILL NOT DISPUTE THAT.

HOWEVER, IF IT IS SIMPLY AN ATTACHMENT THAT IS -- THE ATTACHMENT ITSELF ABSENT THE NOTATIONS OR SPECIFIC DESCRIPTIONS THAT ARE GOING IN FURTHERANCE OF THE SEEKING OF LEGAL ADVICE I THINK WOULD BE PRODUCIBLE AND IS PRODUCIBLE.  IT DOES NOT HAVE

11

TO BE DESIGNATED AS THIS WAS THE EMAIL THAT CORRESPONDS WITH THIS ARTICLE.  HOWEVER, THE ARTICLE ITSELF ABSENT DESCRIPTIONS OR NOTES SHOULD BE PRODUCED.

THE COURT:  I'D LIKE TO TALK ABOUT ONE OF YOUR THRESHOLD OR ONE OF YOUR INITIAL ARGUMENTS WHICH IS ALL OF THESE PRIVILEGES HAVE BEEN WAIVED BECAUSE OF THE TARDINESS OF THE DEFENDANTS' RESPONSE, THE LATENESS OF THEIR SUBMISSION OF PRIVILEGE LOGS AND THE LIKE.

AS I READ NINTH CIRCUIT LAW, I'M SUPPOSED TO ENGAGE IN A HOLISTIC REASONABLENESS ANALYSIS CONSIDERING A NUMBER OF FACTORS INCLUDING THE MAGNITUDE OF THE PRODUCTION.

IT APPEARS HERE THE MAGNITUDE OF THE PRODUCTION IS IMMENSE.  SO, YOU MUST BE ARGUING, I TAKE IT, THAT THE OTHER FACTORS IN THE HOLISTIC REASONABLENESS ANALYSIS MILITATE IN FAVOR OF DISCERNING A WAIVER.

MS. MURPHY:  THAT IS CORRECT, YOUR HONOR.  AND THAT IS WHAT WE SAY.

WE DO NOT DISPUTE THAT THE MAGNITUDE IS LARGE. HOWEVER, THE LENGTH OF THE DELAY, THE INSUFFICIENCY OF THE PRIVILEGE CLAIMS THAT ARE MADE IN THE LOGS, AND THE FACT THAT THEY WERE ALSO RESPONDING TO SIMILAR CLAIMS, THOSE FACTORS NEGATE TOWARDS WAIVER.

THE COURT:  HOW DOES THE RESPONSE TO SIMILAR CLAIMS APPLY HERE?  I KNOW THAT IT APPLIED IN BURLINGTON.

MS. MURPHY:  I THINK DEFENDANTS WILL CERTAINLY

DISPUTE THIS, BUT MY UNDERSTANDING -- WHICH COULD BE WRONG --
BUT MY UNDERSTANDING IS THAT THEY -- THEY BEING EXIDE -- EXIDE
IS ENGAGED IN VARIOUS OTHER MATTERS -- IN OTHER ACTIONS,
ACTIONS WITH THE REGULATORS.

AQMD, FOR EXAMPLE, HAS A SUIT AGAINST EXIDE.  AND MY
UNDERSTANDING IS THAT THEY HAVE TO PRODUCE DOCUMENTS AND
PRIVILEGE LOGS AS PART OF THAT ACTION.

SO, THE FACT THAT THEY HAVE THE DOCUMENTS, THAT
THEY'RE MAKING PRIVILEGE CLAIMS AND REVIEWS FOR ANOTHER PARTY
WOULD SUGGEST THAT PERHAPS IT -- IT WOULD NOT HAVE BEEN
UNREASONABLE FOR THEM TO PRODUCE THEIR PRIVILEGE LOGS EARLIER.
EIGHT MONTHS IS A LONG TIME.

THE COURT:  DO YOU HAVE ANY IDEA THE EXTENT TO WHICH
THE PRODUCTION IN THIS CASE OVERLAPS WITH THE PRODUCTION IN ANY
OTHER RELATED CASE?

MS. MURPHY:  I DO NOT.  AND THAT'S WHY I GAVE THE
CAVEAT OF I COULD BE WRONG.  AND IF I AM, THEN, WE'LL CONCEDE
THAT PERHAPS THAT FACTOR DOES NOT MILITATE TOWARD WAIVER.

THE COURT:  YOU HAVE A PROBLEM WITH SUFFICIENCY OF
THE DESCRIPTIONS OF DOCUMENTS ON THE PRIVILEGE LOG.

IS THAT FAIR TO SAY?

MS. MURPHY:  IT IS.

THE COURT:  THE CASE LAW OFTEN SAYS THAT THE
DESCRIPTIONS ON A PRIVILEGE LOG ARE SUPPOSED TO BE SUFFICIENTLY
DETAILED SO THAT OPPOSING COUNSEL CAN READILY ASSESS THE CLAIM

OF PRIVILEGE.  SOME CASES DON'T SAY EXACTLY THAT.

IN PRACTICE IF THE DESCRIPTIONS ON A PRIVILEGE LOG ARE REALLY SUFFICIENTLY SPECIFIC TO ALLOW OPPOSING COUNSEL TO READILY ASSESS THE CLAIM OF PRIVILEGE, AND THE DESCRIPTIONS ON THE PRIVILEGE LOG MAY WELL BE RUNNING THE RISK OF WAIVER BY PARTIAL DISCLOSURE OF THE CONTENT OF THE DOCUMENT, SO, ISN'T IT TRUE THAT IN PRACTICE THE DESCRIPTIONS ON PRIVILEGE LOGS HAVE TO BE FAIRLY UNSPECIFIC IN ORDER TO AVOID WAIVER.  AND, THUS, THE DESCRIPTIONS ON PRIVILEGE LOGS OFTEN LEAVE OPPOSING COUNSEL GUESSING TO SOME EXTENT AS TO WHETHER THE CLAIMED PRIVILEGE IS APPLICABLE OR NOT.

MS. MURPHY:  THERE IS CERTAINLY SOME TRUTH TO THAT. WE DON'T EXPECT THEM TO GIVE US A LENGTHY DESCRIPTION OF THE DOCUMENTS.  HOWEVER, SOME OF THE DOCUMENTS AS WE POINT OUT, THE DESCRIPTIONS APPEAR TO BE QUESTIONABLE AND/OR INCORRECT OR AT LEAST TOO VAGUE TO REALLY DISCERN WHETHER OR NOT THE PRIVILEGE CLAIM IS PROPER.

THE COURT:  ARE YOU THINKING OF THE DESCRIPTIONS OF DOCUMENTS RELATING TO THE PUBLIC RELATIONS CONSULTANTS AS APPEARING TO BE WRONG?

MS. MURPHY:  THAT IS ONE OF THE CATEGORIES OF DOCUMENTS, YES.  THOSE -- ALSO THOSE THAT ARE RELATING TO THE AUDITORS.

DEFENDANTS ARGUE THAT WE SIMPLY MISUNDERSTAND THE ROLES OF THESE THIRD-PARTY CONSULTANTS.  HOWEVER, THEY DO NOT

14

SUFFICIENTLY EXPLAIN WHY THE AUDITORS OR THE P.R./COMMUNICATIONS CONSULTANTS WERE INVOLVED IN COMMUNICATIONS PREPARED BY OR AT THE REQUEST OF COUNSEL REGARDING STRATEGIES OR ANALYSES RELATING TO TESTING EQUIPMENT OR RESOLVING POTENTIAL ENVIRONMENTAL ISSUES.

EITHER --

THE COURT:  WELL, THEY CLAIM -- THEY CLAIM TO EXPLAIN THAT IN THE CORRESPONDENCE.

YOU DON'T THINK THE EXPLANATION IN THE CORRESPONDENCE IS SUFFICIENTLY SPECIFIC?

MS. MURPHY:  I REALLY DO NOT, YOUR HONOR.  I DON'T FIND IT SUFFICIENTLY SPECIFIC.

I STILL DON'T UNDERSTAND HOW IT -- I MEAN, THEY HAVE EXPLAINED THAT CERTAINLY THE AUDITOR WOULD BE INTERESTED IN ENVIRONMENTAL ISSUES AND THE RESOLUTION OF THOSE ISSUES.

I THINK PART OF THE PROBLEM FOR ME IS HOW THAT RELATES TO A COMMUNICATION THAT IS PREPARED BY OR AT THE REQUEST OF COUNSEL.  FOR ONE, I DON'T FULLY UNDERSTAND THAT. THERE ARE ENTRIES IN WHICH WE HAVE THIRD-PARTY CONSULTANTS -- BE THEY AUDITORS OR P.R. CONSULTANTS -- COMMUNICATING DIRECTLY WITH EXIDE EMPLOYEES.  THERE'S NO ATTORNEY INVOLVED IN THE COMMUNICATION.

AND THE DESCRIPTION IS DISCUSSING STRATEGIES AND ANALYSES RELATING TO TESTING EQUIPMENT OR RESOLVING POTENTIAL ENVIRONMENTAL ISSUES.

EITHER THE DESCRIPTIONS ARE SIMPLY TOO VAGUE, WHICH RENDERS THEM EFFECTIVELY MEANINGLESS, OR THE PRIVILEGE LOGS INCLUDE INCORRECT ENTRIES.  AND THAT'S THE CHALLENGE FOR US.

AND WE HAVE NOTED SOME QUESTIONABLE ENTRIES.  FOR SOME OF THOSE DEFENDANTS HAVE TO THEIR CREDIT ACKNOWLEDGED ISSUES AND DEFICIENCIES OR MISTAKES.  AND WE CERTAINLY APPRECIATE THAT ACKNOWLEDGMENT.

IT DOES NOT NECESSARILY MAKE ME THINK THAT THEIR PRIVILEGE -- THEIR OTHER PRIVILEGE CLAIMS ARE CREDIBLE, THOUGH. TO SOME EXTENT IT MAKES ME QUESTION THE REMAINDER OF THE PRIVILEGE LOG EVEN MORE.

WE'RE DEALING WITH A HUGE PRIVILEGE LOG.  IT'S INCREDIBLY DIFFICULT TO ACTUALLY LOOK THROUGH AND COMB THROUGH EVERY SINGLE ENTRY TO FIND EVERY ONE THAT LOOKS JUST ON ITS FACE BASED OFF OF THE LARGELY BOILER-PLATE DESCRIPTIONS THAT WE HAVE IN TRYING TO ASSESS WHETHER OR NOT IT'S A PROPER PRIVILEGE CLAIM OR A PROPER WORK-PRODUCT -- WORK-PRODUCT DOCTRINE CLAIM.

THE COURT:  WELL, YOU CONCEDE AS I TAKE IT THAT OUTSIDE EXPERTS WHO ARE CONSULTED BY COUNSEL TO LEND THEIR EXPERTISE TO THE PROCESS OF RENDERING LEGAL ADVICE DO NOT NECESSARILY DESTROY THE ATTORNEY-CLIENT PRIVILEGE APPLICABLE TO THE RENDERING OF THE LEGAL ADVICE.

YOU AGREE TO THAT.

MS. MURPHY:  I AGREED TO THAT TO AN EXTENT.  THERE'S CERTAINLY CASE LAW -- THE CHEVRON CASE IN PARTICULAR -- WHICH

16

EXPLAINS A STANDARD UNDER WHICH THAT THIRD-PARTY'S INVOLVEMENT IN THE COMMUNICATION HAS TO BE INDISPENSABLE.  AND THEY DESCRIBE THAT INDISPENSABLE ROLE --

THE COURT:  WELL --

MS. MURPHY: -- AS SOMETHING AKIN TO A TRANSLATOR.

THE COURT:  SOME CASES TALK IN TERMS OF IT BEING HIGHLY USEFUL.  SOME SAY INDISPENSABLE.  SOME USE THE TRANSLATOR ANALOGY.  SOME DON'T.  SOME SEEM TO MAKE IT MORE BROADLY APPLICABLE.

BUT YOU THINK INDISPENSABLE IS THE APPROPRIATE STANDARD?

MS. MURPHY:  I DO THINK THAT BEING INDISPENSABLE TO THE RENDERING OF LEGAL ADVICE IS THE STANDARD.  SO, NOT SIMPLY AN INDISPENSABLE ADVISOR.  THAT'S -- THERE ARE INSTANCES IN WHICH THAT'S THE LANGUAGE USED BY DEFENDANTS IS THAT THESE THIRD-PARTY CONSULTANTS ARE INDISPENSABLE ADVISORS TO EXIDE AND TO DEFENDANTS.  I DON'T BELIEVE THAT'S THE STANDARD.  THEY HAVE TO BE INDISPENSABLE TO THE RENDERING OF LEGAL ADVICE.  AND IF THEY CAN PROVE THAT, THEN, I THINK IT'S AN APPROPRIATE CLAIM.

THE COURT:  WELL, LET'S USE AS MAYBE THE BEST EXAMPLE -- CONSULTANT EXAMPLE FOR YOUR ARGUMENT THE PUBLIC RELATIONS ENTITIES.

AND I HATE TO DO THIS BUT DECADES AGO WHEN I WAS PRACTICING LAW PUBLIC RELATIONS IN LITIGATION TYPICALLY CONSISTED OF SAYING "NO COMMENT" WHEN THE PRESS CONTACTED THE

LAWYER -- CONTACTED THE LAWYER ABOUT THE CASE OR MAKING ONESELF UNAVAILABLE FOR COMMENT.  THAT WAS THE EXTENT OF PUBLIC RELATIONS WORK.  THAT WAS OLD SCHOOL, I GUESS.

SO, INDISPENSABLE, IS IT EVER INDISPENSABLE TO HAVE A PUBLIC RELATIONS ENTITY INVOLVED IN THE RENDERING OF LEGAL ADVICE TO A CLIENT OR THE PREPARATION WORK DONE IN ANTICIPATION OF LITIGATION.  SOME MIGHT SAY NO.  BUT THERE ARE CASES THAT UPHOLD THE PRIVILEGE AS APPLIED TO PUBLIC RELATIONS CONSULTANTS SUCH AS IN RE GRAND JURY SUBPOENAS, 265 F.SUPP 2D 321.

SO, I SEE CASES LIKE THAT.  AND I UNDERSTAND THERE ARE OTHER CASES THAT TAKE A DIFFERENT APPROACH.  I'M NOT SURE THAT INDISPENSABILITY IS THE CORRECT STANDARD FOR ANALYZING WHETHER THE PRIVILEGE IS MAINTAINED OR LOST.

SO, HOW DO YOU RESPOND TO THAT?

MS. MURPHY:  I WOULD JUST REITERATE THAT THE COMMUNICATION NEEDS TO BE IN FURTHERANCE OF LEGAL ADVICE.

IF IT'S SIMPLY A COMMUNICATION IN WHICH THE ATTORNEY IS INVOLVED, IT'S NOT PRIVILEGED.  IF IT IS ACTUALLY PART OF THE ATTORNEY RENDERING LEGAL ADVICE WITH A CLIENT TALKING WITH THE ATTORNEY ABOUT LEGAL ADVICE, WE'RE NOT TRYING TO PIERCE THAT PROTECTION.  WE REALLY TRUTHFULLY JUST WANT DOCUMENTS THAT WE THINK ARE NOT PROPERLY PRIVILEGED OR ARE NOT PROPERLY PROTECTED UNDER THE WORK-PRODUCT DOCTRINE.

AND, YOU KNOW, WE'VE ACTUALLY BEEN FAIRLY REASONABLE IN THIS.  WE'VE GIVEN DEFENDANTS OPPORTUNITIES TO REVISE THEIR

18

PRIVILEGE LOGS.  WE HAVE RAISED CHALLENGES.  WE ARE NOT ASKING FOR SANCTIONS.  WE'RE NOT ASKING FOR FEES.  WE TRUTHFULLY JUST WANT DOCUMENTS THAT WE THINK WE'RE ENTITLED TO.  SO, IF IT IS A SITUATION IN WHICH EVEN A P.R. CONSULTANT IS INVOLVED IN A LEGITIMATE COMMUNICATION THAT IS RESULTS TO SEEKING -- THAT IS REGARDING LEGAL ADVICE, THE GIVING OR SEEKING OF LEGAL ADVICE, THEN, I WOULD NOT DISPUTE THE PRIVILEGE ON THAT.

THE COURT:  THOSE CONSULTANTS THAT ARE JUST THERE IN ORDER TO FIND OFTEN TECHNICAL FACTS AND SUPPLY THOSE FACTS TO THE LAWYER AND CLIENT FOR PURPOSES OF DEVISING LEGAL STRATEGY, WOULDN'T -- UNDER UPJOHN WOULDN'T THOSE MATTERS BE PRIVILEGED, THE FACT-FINDING THAT'S NECESSARY FOR LEGAL ADVICE?

MS. MURPHY:  I'D SAY THAT IT DEPENDS.

THE COURT:  WHAT DOES IT DEPEND ON?

MS. MURPHY:  SURE.

U.S. VERSUS RITCHIE EXPLAINS THAT IF THE ACTUAL OBJECTIVE IS SOMETHING -- IS A BUSINESS CONCERN, IF THE INTEREST IS RELATED TO BUSINESS AND IT'S NOT ACTUALLY PART OF THE RENDERING OF LEGAL ADVICE, THEN, IT'S NOT PROTECTED.  THEY HAVE TO DEMONSTRATE THAT THE PRIMARY PURPOSE ACCORDING TO RITCHIE IS THE RENDERING OF LEGAL ADVICE.

AND WITH REGARD TO WORK-PRODUCT DOCUMENTS, DOCUMENTS WHICH THEY CLAIM ARE PROTECTED BY WORK PRODUCT, THEY HAVE TO DEMONSTRATE THAT IT WOULD NOT HAVE BEEN CREATED IN A SUBSTANTIALLY SIMILAR FORM ABSENT THE ANTICIPATION OF

LITIGATION.  AND WE CHALLENGE THAT.

WE CHALLENGE, FIRST, THAT THERE WAS A CONCRETE ANTICIPATION OF LITIGATION -- NOT SOMETHING THAT'S SIMPLY, YOU KNOW, THERE'S -- THEY USE THE PHRASE "THERE ARE A MYRIAD OF POSSIBLE LEGAL ACTIONS."  I DON'T THINK THAT'S SPECIFIC ENOUGH TO BE IN ANTICIPATION OF LITIGATION, NUMBER ONE.  AND I DON'T THINK THEY'VE DEMONSTRATED THAT THE DOCUMENTS WOULD NOT HAVE BEEN CREATED IN SUBSTANTIALLY SIMILAR FORM ABSENT THE POSSIBILITY OF LITIGATION.

THE COURT:  WELL, LET'S TALK ABOUT THE ANTICIPATION OF LITIGATION.

A CYNIC MIGHT SUGGEST THAT IN THIS LITIGIOUS SOCIETY IF INFORMATION ABOUT ENVIRONMENTAL CONTAMINATION CAME TO A CORPORATION, THE CORPORATION COULDN'T HELP BUT ANTICIPATE LITIGATION.

AND YOU SAY, WELL, THE ANTICIPATION OF LITIGATION CAN'T BE THE ANTICIPATION OF REMOTE LITIGATION, WHICH LEADS US TO ANALYZE HOW NON-REMOTE MUST BE THE ANTICIPATION FOR THE WORK-PRODUCT PROTECTION TO BEGIN.

YOU CITED A CASE OUT OF THIS COURT -- ANOTHER JUDGE OF THIS COURT IN WHICH THE WORD "IMMINENT" WAS USED -- THAT THE WORK-PRODUCT PROTECTION APPLIES ONLY WHEN ANTICIPATION OF LITIGATION IS IMMINENT.  THAT'S ARFA VERSUS ZIONIST ORGANIZATION OF AMERICA, 2014 WESTLAW 815496.

I READ THAT CASE.  AND IT CITES FOR THAT PROPOSITION

A CASE OUT OF THE NORTHERN DISTRICT, FOX VERSUS CALIFORNIA SIERRA FINANCIAL SERVICES, 120 F.R.D. 520.

AND THAT CASE, THE NORTHERN DISTRICT CASE, IT DOESN'T SAY ANYTHING ABOUT IMMINENT.  IT DOESN'T USE THE TERM.

NOW, MAYBE THE TERM IS BEING USED IN THE CENTRAL DISTRICT CASE JUST TO DIFFERENTIATE BETWEEN REMOTE AND NON-REMOTE.  MAYBE IT'S TWO POINTS ON A SPECTRUM.  I'M NOT SURE.

I ALSO DON'T KNOW WHY FROM A POLICY STANDPOINT THE PROTECTION OF WORK PRODUCT OUGHT TO TURN ON WHETHER THE LITIGATION IS REALISTICALLY ANTICIPATED TO BREAK ONE MONTH FROM NOW, SIX MONTHS FROM NOW, OR TWO YEARS FROM NOW.

SO, I DON'T KNOW WHAT I'M ASKING.  BUT THOSE ARE SOME OF THE THOUGHTS I HAVE IN THIS AREA.

MS. MURPHY:  IF I MAY, I UNDERSTAND YOUR CONCERNS ON THAT.  WHAT I WOULD SAY IS THAT I THINK THAT THAT HAS TO BE LOOKED AT IN TANDEM WITH THE QUESTION OF WHETHER IT'S CREATED BECAUSE OF LITIGATION.  I THINK THOSE TWO SORT OF --

THE COURT:  WELL, THERE'S PROBABLY A DUAL PURPOSE --

MS. MURPHY:  UH-HUM.

THE COURT:  -- HERE.

AND, SO, THEN WE GET TO THE "BECAUSE OF" STANDARD.  AND YOU'RE TALKING ABOUT SUBSTANTIALLY SIMILAR FORM.  THAT'S WHAT THE CASES TALK ABOUT.

SO, YOU'RE SAYING MAYBE ANY -- YOU'RE PROBABLY NOT

SAYING IT THIS WAY, BUT MAYBE ANY CORPORATION WOULD ANTICIPATE LITIGATION AT SOME POINT.  BUT ANY CORPORATION ALSO WOULD INVESTIGATE FOR ITS OWN PURPOSES UNRELATED TO LITIGATION.  AND THAT'S WHAT HAPPENED HERE.  AND WHATEVER CAME OUT OF IT ISN'T NECESSARILY IN LITIGATION-RELATED MODE.

MS. MURPHY:  THAT IS PRECISELY WHAT I'M SAYING, YOUR HONOR.  AND THAT'S THE CONCERN BECAUSE WE ARE NOT TALKING ABOUT ANY DOCUMENTS.

THE INVESTIGATION INTO THE ENVIRONMENTAL ISSUES THAT ARE AT THE HEART OF OUR CASE ARE EXTREMELY -- EXTREMELY RELEVANT.  AND TO HAVE THOSE COMPLETELY WITHHELD WHEN IT IS VERY QUESTIONABLE AS TO WHETHER THERE WAS AN ANTICIPATION OF LITIGATION THAT WAS NOT REMOTE -- AND WHEN IT'S VERY QUESTIONABLE AS TO WHETHER THEY WOULD NOT HAVE BEEN INVESTIGATING THESE ISSUES BUT/FOR THE ANTICIPATION OF LITIGATION.

I URGE THE COURT TO ALLOW US TO SEE THOSE DOCUMENTS. OR AT LEAST I'D HAVE TO SEE A BETTER SHOWING OF WHY THEY ARE PROTECTED.

THE COURT:  YOU CONTEND THAT EVEN IF THEY'RE PROTECTED AS WORK PRODUCT, THAT YOU HAVE A SUBSTANTIAL NEED FOR THE DOCUMENTS TO PREPARE YOUR CASE.  AND THAT YOU CANNOT WITHOUT UNDUE HARDSHIP OBTAIN THEIR SUBSTANTIAL EQUIVALENT BY OTHER MEANS.

IS THAT RIGHT?

22

MS. MURPHY:  THAT IS RIGHT.

THE COURT:  YOU'RE ARGUING THAT.

MS. MURPHY:  YES.

THE COURT:  THEY SUGGEST THAT YOU HAVEN'T SHOWN SUFFICIENT NEED BECAUSE AMONG OTHER THINGS -- ACCORDING TO THE DEFENDANTS -- THE SAME INFORMATION, QUOTE,

CAN BE EASILY GLEANED FROM THE LARGE NUMBER OF DOCUMENTS PRODUCED ON BEHALF OF THE NUMEROUS LOWER-LEVEL VERNON EMPLOYEES AND NON-PRIVILEGED DOCUMENTS PRODUCED ON BEHALF OF THE MORE SENIOR EMPLOYEES OF VERNON AND THE COMPANY'S HEADQUARTERS IN ATLANTA, END QUOTE, AS WELL AS THROUGH INFORMATION AVAILABLE FROM THE DTSC AND THE AQMD.

DO THEY HAVE A POINT THERE?  OR IS THEIR POINT NOT WELL TAKEN AND YOU STILL HAVE A SUBSTANTIAL NEED?

MS. MURPHY:  I DO NOT THINK THEY HAVE A STRONG POINT THERE.

AS THEY DESCRIBE THE DOCUMENTS, THE DOCUMENTS ARE INTERNAL DOCUMENTS IN WHICH THEY ARE INVESTIGATING AND TRYING TO LOOK INTO THE CAUSES OF THE ENVIRONMENTAL ISSUES WHICH WE ARE TRYING TO LEARN ABOUT.

THEIR INTERNAL INVESTIGATION INTO THE ISSUES IS ABSOLUTELY NECESSARY FOR US TO SEE.  I MEAN, WHAT WE'RE ALLEGING IS THAT DEFENDANTS KNOWINGLY ISSUED MATERIALLY FALSE OR MISLEADING STATEMENTS.  THEY DID SO EITHER KNOWINGLY OR WITH

EXTREME RECKLESSNESS.  THAT IS A VERY HARD BURDEN TO PROVE WITHOUT SEEING WHAT WAS BEING DONE INTERNALLY.  IF THOSE DOCUMENTS ARE BEING WITHHELD THAT MAKES OUR JOB IMPOSSIBLE TO SOME EXTENT.

NOW, I'M NOT GOING TO SAY THAT WE DON'T HAVE ANY DOCUMENTS.  I'M NOT RIDICULOUS ENOUGH TO CLAIM THAT WE HAVE NOT RECEIVED A DOCUMENT IN THIS CASE.  WE'VE RECEIVED SEVERAL HUNDRED THOUSAND DOCUMENTS.  MANY OF THEM ARE DUPLICATES, BUT THAT'S FINE.

THE PROBLEM IS IT'S NOT THE MAGNITUDE OF THE DOCUMENTS THAT THEY'VE PRODUCED IF THEY ARE, IN FACT, WITHHOLDING VERY KEY DOCUMENTS FROM PRODUCTION.  THERE'S NO CASE LAW TO SUGGEST THAT THERE'S SOMEHOW A COMPARISON BETWEEN, WELL, LOOK AT HOW MANY DOCUMENTS THEY'VE PRODUCED.  SURELY YOU DON'T NEED THESE DOCUMENTS THAT THEY SAY ARE PRIVILEGED OR THAT ARE PROTECTED BY WORK PRODUCT, RATHER.  IT'S SIMPLY -- I HAVEN'T SEEN A CASE TO SAY THAT.  I DON'T BELIEVE THEY CITE TO A CASE THAT SAY THAT.  AND WE CHALLENGE IT BECAUSE EVERY COURT INCLUDING THE NINTH CIRCUIT HAS REPEATEDLY RECOGNIZED THAT WORK-PRODUCT DOCTRINE AND ATTORNEY-CLIENT PRIVILEGE HAVE TO BE STRICTLY CONSTRUED BECAUSE IT PREVENTS THE TRUTH-SEEKING.  AND THAT'S ALL WE'RE LOOKING TO DO.

WE JUST WANT ACCESS TO DOCUMENTS THAT ARE AT THE HEART OF OUR CLAIM THAT WE HONESTLY BELIEVE HAVE NOT -- DEFENDANTS HAVE NOT DEMONSTRATED TO BE PROTECTED EITHER THROUGH

24

PRIVILEGE OR THROUGH WORK-PRODUCT DOCTRINE, WHICH IS SPECIFICALLY WHAT WE'RE TALKING ABOUT HERE WITH REGARD TO SUBSTANTIAL NEED.

AND, YOU KNOW, WE DID ISSUE SUBPOENAS TO THIRD PARTIES.  AND WHAT WE GOT BACK WERE A SLEW OF PRIVILEGE CLAIMS.  THAT HAPPENED WITH REGARD TO ENVIRON AND ADVANCED GEOSERVICES.  I DON'T KNOW WHERE ELSE WE'RE GOING TO GET THESE DOCUMENTS.  THEY'RE NOT AVAILABLE IN THE PUBLIC DOMAIN.  THE IDEA THAT THEY'LL BE AVAILABLE IN AQMD OR THROUGH DTSC IS NOT ACCURATE.  WE ARE TALKING ABOUT INTERNAL INVESTIGATIVE DOCUMENTS.  WE SHOULD BE ENTITLED TO THOSE.

THE COURT:  THE IN RE GRAND JURY SUBPOENA TORF CASE OUT OF THE NINTH CIRCUIT, WHICH IS 375 F.3D 900, THAT WAS A CASE IN WHICH AN OUTSIDE ENVIRONMENTAL CONSULTANT WAS USED TO HELP COUNSEL ADVISE A CLIENT REGARDING ANTICIPATED ENVIRONMENTAL LITIGATION.

WHY IS THAT -- WHY IS THE PRESENT CASE SO DIFFERENT FROM THAT CASE?

MS. MURPHY:  IN THAT CASE THEY HAD RECEIVED NOTICE BY THE REGULATOR THAT THEY WERE LOOKING -- THEY WERE INVESTIGATING.  AND THEY WERE LOOKING INTO BRINGING A LEGAL ACTION, NUMBER ONE.

NUMBER TWO, THE CONSULTANT WAS HIRED BY THE ATTORNEY AND WAS -- IT APPEARS -- AT LEAST THE COURT FOUND THAT THE CONSULTANT'S MAIN PURPOSE WAS TO AID THE ATTORNEY IN, YOU KNOW,

ADMINISTERING LEGAL ADVICE.

THAT IS NOT THE CASE HERE.  THERE'S NO --

THE COURT:  WELL, THEY CLAIM IT TO BE THE CASE HERE --

MS. MURPHY:  THEY DO.

THE COURT:  -- IN THE CORRESPONDENCE.  AND THEY CLAIM THAT INSIDE COUNSEL OR OUTSIDE COUNSEL RETAINED THESE CONSULTANTS FOR PURPOSES OF THE RENDERING OF LEGAL ADVICE IN PREPARATION OF MATTERS FOR IN ANTICIPATION OF LITIGATION.

DO YOU THINK I SHOULD DISBELIEVE THAT?

MS. MURPHY:  I GUESS I -- PERHAPS, I MISSED IT.  I -- I DIDN'T SEE THAT.  I DON'T KNOW IF THEY MADE THE CLAIM.  I DIDN'T THEY DID, BUT I COULD JUST SIMPLY BE WRONG.  BUT I DID NOT THINK THAT THEY MADE THE CLAIM THAT THESE CONSULTANTS WERE HIRED FOR THE PURPOSE OF PROVIDING LEGAL ADVICE.

THERE IS NO QUESTION THAT THESE CONSULTANTS WERE ALSO HELPING TO INVESTIGATE THE ISSUES SO THAT THE COMPANY COULD REMEDIATE THE ISSUES.  THAT'S -- AND I DON'T THINK DEFENDANTS WILL DISPUTE THAT.

AND WHAT WE CHALLENGE IS WHETHER OR NOT THE MAIN OBJECTIVE OR, AT LEAST, A LARGE PART OF THE OBJECTIVE BEHIND THESE CONSULTANTS AND THE DOCUMENTS THAT THEY CREATED WAS -- WAS A BUSINESS OBJECTIVE.

IT WAS -- IF IT WAS A BUSINESS OBJECTIVE, THEN, THEY HAVE TO DEMONSTRATE THAT THE DOCUMENT WOULD NOT HAVE BEEN

CREATED IN SUBSTANTIALLY SIMILAR FORM BUT/FOR THE ANTICIPATION OF LITIGATION.

AND THAT'S WHERE WE FEEL THAT DEFENDANTS HAVE NOT SATISFIED THEIR BURDEN.  I MEAN, WE ALSO RAISE THAT AT OTHER PLACES WHERE I FEEL I HAVEN'T -- BUT THERE MOST OF ALL I WOULD SAY.

THE COURT:  ALL RIGHT.  THANK YOU.

I HAVE BEEN ASKING YOU A LOT OF QUESTIONS.  I HAVEN'T LET YOU ARGUE OTHER MATTERS YOU MIGHT WISH TO ARGUE.

BEFORE I HEAR FROM COUNSEL FOR THE DEFENDANTS, IS THERE ANYTHING ELSE YOU WISH TO ARGUE?

MS. MURPHY:  YES.

WITH REGARD TO THE ATTORNEY-CLIENT PRIVILEGE CLAIMS, WE STILL FEEL THAT DEFENDANTS, AT LEAST FOR CERTAIN OF THOSE -- OR SOME OF THOSE ENTRIES HAVE FAILED TO DEMONSTRATE THAT THE PRIMARY PURPOSE OF THE LITIGATION WAS TO PROVIDE LEGAL ADVICE AND NOT -- SIMILAR TO THE WORK-PRODUCT DOCTRINE NOT RELATED TO BUSINESS OPERATIONS.  IN MANY OF THE ENTRIES THE ATTORNEYS ARE VERY FAR DOWN ON THE LIST OF RECIPIENTS.  AND THERE ARE EMAIL EXCHANGES BETWEEN EXIDE EMPLOYEES OR EXIDE EMPLOYEE ON ONE SIDE AND A CONSULTANT ON THE OTHER SIDE.  AND IT DOESN'T APPEAR THAT IT'S NECESSARILY RELATED TO THE RENDERING OF LEGAL ADVICE.  AND THAT'S SOMETHING THAT WE TAKE ISSUE WITH.  AND WE DON'T KNOW THAT DEFENDANTS HAVE ADEQUATELY DEMONSTRATED THEIR BURDEN ON THAT.

WE ALSO THINK THAT COMMUNICATIONS THAT ARE EXCLUSIVE -- EXCLUSIVELY BETWEEN EXIDE -- SO, ONE EXIDE EMPLOYEE AND ANOTHER EXIDE EMPLOYEE -- BUT MORE SPECIFICALLY BETWEEN EXIDE AND ONE OF EXIDE'S CONSULTANTS IN WHICH THERE IS NO ATTORNEY PRESENT.  FOR SOME OF THOSE COMMUNICATIONS THEY SAY THAT IT'S AN EMAIL SEEKING LEGAL ADVICE REGARDING STRATEGIES AND/OR ANALYSES RELATING TO THE NOTICE OF ALLEGED ENVIRONMENTAL LIABILITY, ET CETERA.

I STILL DON'T UNDERSTAND -- I SAID THIS IN THE STIPULATION.  AND I DON'T THINK I'VE SEEN AN ANSWER.  MAYBE I MISSED IT, BUT I DON'T THINK I'VE SEEN AN ANSWER TO HOW IT IS THAT AN EXIDE EMPLOYEE SOUGHT LEGAL ADVICE FROM A THIRD-PARTY CONSULTANT.  IT'S UNCLEAR TO ME HOW THAT'S POSSIBLE.

NOW, DEFENDANTS SAID THAT THEY WERE GOING TO RECONSIDER SOME OF THOSE ENTRIES.  HOWEVER, I'VE NOT SEEN ANYTHING TO SUGGEST THAT THEY HAVE OR THAT THEY INTEND TO PRODUCE SOME OF THOSE DOCUMENTS.

WHAT DEFENDANTS HAVE SAID THEY WILL PRODUCE AND HAVE STARTED PRODUCING ARE DOCUMENTS THAT WERE CREATED BY AQMD OR DTSC AND THEN SOME DOCUMENTS FROM ALMEGA, WHICH WAS ONE OF THE THIRD-PARTY CONSULTANTS THAT DID SOME SOURCE TESTING FOR EXIDE. AND I'M NOT SURE.  THERE MIGHT BE MAYBE A HUNDRED OTHER DOCUMENTS THAT ARE GOING TO BE PRODUCED -- BUT DEFINITELY NOT THOSE DOCUMENTS -- I DON'T BELIEVE -- IN WHICH THERE'S NO ATTORNEY PRESENT.  THEY'RE SAYING IT'S TO SEEK LEGAL ADVICE.

AND IT'S A COMMUNICATION BETWEEN EXIDE AND A CONSULTANT.

YOU KNOW, I THINK THAT'S -- THAT'S REALLY ALL THAT I HAVE, YOUR HONOR.

THE COURT:  ALL RIGHT.

MS. MURPHY:  I WOULD JUST LEAVE BY SAYING THAT IT IS THE DEFENDANTS' BURDEN TO MAKE A SUFFICIENT SHOWING OF PRIVILEGE.  AND WE SIMPLY ASK THAT WE HAVE ACCESS TO THE DOCUMENTS THAT WE FEEL DEFENDANTS HAVE NOT MET THAT BURDEN ON.

THANK YOU.

THE COURT:  THANK YOU.

ARGUMENT FOR THE DEFENDANTS, PLEASE.

MR. VOLZ.

MR. VOLZ:  GOOD AFTERNOON, YOUR HONOR.

THE COURT:  GOOD AFTERNOON.

MR. VOLZ:  WELL, THERE WERE A WHOLE LOT OF ISSUES WHICH WERE RAISED DURING MS. MURPHY'S COMMENTS.  AND FIRST I'D LIKE TO ADDRESS THOSE KIND OF SERIATIM, IF I COULD, AND THEN GO BACK WHERE APPROPRIATE.

FIRST OF ALL, WITH REGARD TO THE TIMELINESS OF THE PRODUCTION, I WOULD SAY THERE ARE -- THERE ARE TWO ISSUES, THE PRODUCTION BOTH OF THE DOCUMENTS AND OF THE PRIVILEGE LOGS.

BUT I AGREE WITH YOUR HONOR THAT THE NINTH CIRCUIT LAW REQUIRES A HOLISTIC APPROACH.  IT IS TRUE THAT THE MAGNITUDE OF PRODUCTION HERE WAS IMMENSE.

THE OTHER FACTOR THAT I THINK GETS LOST HERE --

THE COURT: AND THAT THE DELAY WAS IMMENSE.

MR. VOLZ: IT WAS, YOUR HONOR. AND THERE'S NO QUESTION ABOUT THAT. I MEAN, PLAINTIFF'S COUNSEL THEMSELVES SAID THAT THE DELAY WAS NOT ANYONE'S FAULT. THAT THIS WAS -- EVERYONE WAS DILIGENT IN THEIR EFFORTS. THAT WAS IN THE MOTION TO CONTINUE THE TRIAL DATE, WHICH WAS MADE JUST A FEW WEEKS AGO.

THERE WERE IMMENSE COMPLICATIONS WITH THE PRODUCTION IN THIS CASE. THERE'S NO QUESTION ABOUT THAT. WE'VE BEEN VERY UPFRONT ABOUT THAT. AND WE'VE TRIED TO BE VERY CANDID ABOUT IT.

BUT THE OTHER FACTOR THAT COMES INTO THIS IS THAT WE DID HAVE AN AGREEMENT TO DO A ROLLING PRODUCTION. THAT AGREEMENT NECESSARILY ENVISIONED BEING -- HAVING THOSE PRIVILEGE LOGS PRODUCED PAST OUR DEADLINE. AND, SO, IT SORT OF TAKES IT OUT OF THE REALM OF THE NORMAL ANALYSIS FOR TIMELINESS.

HERE, WE HAD AGREED THAT WE WERE GOING TO DO THIS. AND ADMITTEDLY -- AND I'VE ADMITTED TO MS. MURPHY AND MR. FEDERMAN MORE TIMES THAN I CAN COUNT THAT WE'VE HAD DELAYS OCCASIONED BY THE COMPANY'S BANKRUPTCY, BY ALL THE LITIGATIONS AND THE PENDING INVESTIGATIONS THAT HAVE MADE IT EXTREMELY DIFFICULT TO GET IN TO BE ABLE TO COLLECT DOCUMENTS AND REVIEW AND PRODUCE THOSE DOCUMENTS.

THE PRIVILEGE CLAIMS THAT WE'VE MADE IN THIS CASE

HAVE ALSO COMPLICATED OUR EFFORTS TO MAKE THE PRODUCTIONS IN A TIMELY WAY.

BUT FOR THE OTHER POINT, JUDGE, THAT MS. MURPHY RAISES IS THE ISSUE OF WHETHER WE ARE ENGAGED IN VARIOUS OTHER LITIGATIONS OR IF THERE WAS OVERLAP BETWEEN THOSE LITIGATIONS.

I CAN SAY, JUDGE, THAT THE LITIGATION WHICH SHE REFERENCED, WHICH IS THE AQMD LITIGATION, WHICH IS A CIVIL PROCEEDING FOR PENALTIES, THERE HAVE BEEN NO PRODUCTIONS IN THAT CASE.  THEY'VE BEEN STAYED BECAUSE THERE'S BEEN MOTIONS TO TRY TO -- BY THE COMPANY TO TRY TO ARGUE THAT THE BANKRUPTCY DISCHARGE DISCHARGES THE ALLEGATIONS OR THE CLAIMS MADE BY AQMD.

SO, THE PRODUCTIONS HAVE BEEN -- SOME COLLECTIONS IN A LIMITED SENSE HAVE BEEN STARTED, BUT THEY HAVE NOT BEEN PRODUCED.  AND THAT WAS -- AND, IN FACT, THAT'S JUST BEEN GOING ON IN THE PAST COUPLE OF MONTHS.

THE OTHER LITIGATIONS THAT HAVE BEEN GOING ON, THERE WAS AN ONGOING CIVIL LITIGATION WITH DTSC, WHICH WAS AN ADMINISTRATIVE PROCEEDING AFTER THE CLOSURE ORDER WAS ENTERED BACK IN APRIL OF 2013.

AGAIN, NO DOCUMENTS PRODUCED IN THAT INSTANCE.  AND THEN THERE WAS AN INVESTIGATION BY THE U.S. ATTORNEY WHICH RESULTED IN A NONPROSECUTION AGREEMENT WHICH ULTIMATELY RESULTED IN THE PERMANENT CLOSURE OF THE PLANT.

THAT WAS A GRAND JURY PROCEEDING.  THERE WAS SOME

INVESTIGATION BY THE U.S. ATTORNEY.  THE DOCUMENTS -- FROM MY UNDERSTANDING, YOUR HONOR, AND I DON'T HAVE PERFECT UNDERSTANDING OF IT, BUT MY UNDERSTANDING IS THAT THE DOCUMENTS RELATED TO THE ISSUES WHICH WERE IDENTIFIED IN THE NONPROS AGREEMENT WHICH RELATED TO CONDUCT BY THE COMPANY BACK IN THE EARLY OUGHTS AND ALL THE WAY BACK INTO THE '90'S RELATING TO PLASTIC RECYCLING CHIPS.

THIS COMPLAINT HAS NOTHING TO DO WITH THAT.

SO, WE WERE THE SOLE PARTIES GOING OUT AND TRYING TO GET THESE DOCUMENTS IN THE MIDST OF THIS MAELSTROM OF ALL THESE OTHER LITIGATIONS AND THE BANKRUPTCY PROCEEDINGS AND EVERYTHING ELSE.

SO, ABSOLUTELY, JUDGE, WE WOULD READILY CONCEDE THINGS DID NOT GO AS QUICKLY AS WE WOULD HAVE LIKED.  WE MADE EVERY EFFORT ON AN ONGOING BASIS TO KEEP THE PLAINTIFFS APPRISED OF THAT.  BUT THERE'S NO QUESTION HERE THAT FROM THE HOLISTIC-ANALYSIS CONSIDERATION, WE ACTED IN GOOD FAITH, THAT THE COURT SHOULD NOT FIND A WAIVER.  BUT ON TOP OF EVERYTHING ELSE, JUDGE, WE AGREED THAT WE WERE GOING TO PRODUCE ON A ROLLING BASIS -- SOMETHING THAT'S NOT TYPICALLY DONE IN CASES I'VE BEEN INVOLVED IN.  TYPICALLY AT THE END OF THE PRODUCTION WE WOULD PRODUCE THE ENTIRE PRIVILEGE LOG.

BUT TO TRY TO ACCOMMODATE THE PLAINTIFFS HERE WE AGREED TO A ROLLING LOG.  AND ADMITTEDLY IT DIDN'T GO AS WELL AS WE WOULD LIKE, BUT WE DID EVERYTHING WE POSSIBLY COULD TO

32

COMPLY.

AND, FRANKLY, TO TALK ABOUT THAT ISSUE OF ACCOMMODATION, IT'S SOMETHING WE'VE TRIED TO DO THROUGHOUT THIS LITIGATION.  AND MS. MURPHY'S CORRECT THAT, YOU KNOW, I THINK WE BOTH WORKED VERY COOPERATIVELY AND DONE OUR BEST TO TRY TO BE CIVIL IN OUR -- ALL THE PROCEEDINGS HERE.

THE CONCERNS THAT WE'VE HAD THROUGHOUT AND THE ISSUE THAT WE'VE HAD THROUGHOUT IS THE PLAINTIFFS HAVE JUST SORT OF EXPRESSED A VIEW THAT THE LOG IS TOO LONG AND THAT THE LOG IS TOO LATE.  AND NOT REALLY SAYING MUCH MORE THAN THAT.

AND IT'S NOT A MATTER OF TRYING TO SHIFT THE BURDEN TO THEM TO SAY YOU HAVE TO TELL ME WHAT'S WRONG WITH THE LOG. IT'S A MATTER OF TRYING TO ACCOMMODATE THEIR CONCERNS AND FIND OUT WHAT WOULD SATISFY THEM.

AND, SO, WHEN WE SAY AS WE DO IN THE BRIEF THAT THESE ARE CONCERNS WHICH ARE RAISED LATE IN THE GAME, AND MS. MURPHY REFERS TO A JUNE LETTER -- IT IS TRUE THAT THE JUNE LETTER SAYS AGAIN THAT YOUR DESCRIPTIONS ARE INADEQUATE.  BUT AS WE -- AS WE POINT UP IN OUR BRIEFS, AND AS WE'VE SAID REPEATEDLY IN NUMEROUS DISCUSSIONS, WE NEED TO KNOW WHAT YOU NEED.  WE'LL TRY OUR BEST TO PROVIDE AS MUCH INFORMATION AS WE CAN WITHOUT CROSSING THAT LINE TO WHERE WE'RE ACTUALLY GIVING YOU THE PRIVILEGE COMMUNICATIONS, WHICH MAY WELL BE WHAT YOU'D LIKE, BUT WE'RE NOT GOING TO DO THAT.

SO, WE WOULD LIKE TO KNOW WHAT WOULD SATISFY YOU.

INSTEAD OF BETTING AGAINST OURSELVES AND JUST CONTINUALLY TRYING TO UPGRADE OUR DESCRIPTIONS UNTIL WE GET TO A POINT WHERE WE'RE POTENTIALLY VIOLATING THE PRIVILEGE AND WAIVING. AND THAT'S WHERE WE BECAME FRUSTRATED, AND THAT'S WHERE WE'RE UNABLE TO REACH AGREEMENT.  AND I THINK THAT'S PART OF THE REASON THAT WE'RE HERE.

THE OTHER THING, JUDGE, AND SOMETHING THAT WAS REPEATED THROUGHOUT MS. MURPHY'S COMMENTS AND I THINK IN THE BRIEFS AS WELL IS THE SORT OF IMPLICATION THAT ALL THE RELEVANT DOCUMENTS OR ALL THE IMPORTANT DOCUMENTS ARE BEING WITHHELD BY EXIDE.  THAT, YOU KNOW, THIS PRIVILEGE LOG IS SO LARGE. THERE'S SOME 36,000 DOCUMENTS ON IT I THINK -- SORRY, 32,000. 32,381 DOCUMENTS.

WE PRODUCED OVER 900,000 DOCUMENTS.  IN EACH CATEGORY THAT THE PLAINTIFFS COMPLAINED ABOUT HERE, WHETHER IT'S THE ENVIRON DOCUMENTS, WHETHER IT'S THE ADVANCED GEOSERVICES DOCUMENTS, ANY OF THE OTHER 12 CONSULTANTS THAT THEY WERE CONCERNED ABOUT, THE PRODUCTION SET WAS FAR LARGER -- IN MOST CASES BY A FACTOR OF 10 OR 20 THAN THE SET THAT WAS BEING WITHHELD.

SO, WE WEREN'T OUT THERE SAYING ANYTHING THAT TOUCHES ENVIRON IS SOMETHING THAT'S GOING TO BE A PRIVILEGE DOCUMENT. WE'RE NOT GOING TO PRODUCE IT -- OR A WORK-PRODUCT DOCUMENT AND NOT PRODUCE IT.

WHAT WE DID IS MAKE A VERY CAREFUL ANALYSIS OF THE

ISSUES WE'VE BEEN TALKING ABOUT. ARE THESE BUSINESS ISSUES OR ARE THESE DOCUMENTS WHICH ARE BEING CREATED IN ANTICIPATION OF WHETHER IT'S IMMINENT LITIGATION OR WHETHER IT'S JUST A REASONABLE BELIEF THAT THERE'S GOING TO BE LITIGATION COMING DOWN THE PIKE.

AND THAT WAS DONE WITH REGARD TO ALL THE CONSULTANTS, WHETHER IT WAS THE P.R. CONSULTANTS, THE CONSULTANTS RELATED TO OUR ENVIRONMENTAL ISSUES, OR BUSINESS CONSULTANTS ALONG THE LINES OF -- I SHOULDN'T SAY BUSINESS, BUT CONSULTANTS ALONG THE LINES OF OUR --

(BRIEF PAUSE IN PROCEEDINGS.)

MR. VOLZ: TRYING TO THINK OF OUR -- AUDITORS.

THE COURT: WHEN DID EXIDE FIRST ANTICIPATE LITIGATION?

MR. VOLZ: THIS IS PART OF WHAT WE'VE BEEN DISCUSSING FOR A LONG TIME WITH PLAINTIFFS. THE PLAINTIFF'S COMPLAINT ITSELF LAYS OUT NUMEROUS INSTANCES IN WHICH THE REGULATORS ISSUED VIOLATIONS TO EXIDE. THE NOTICES THEMSELVES MIGHT BE CONSIDERED AKIN TO A TRAFFIC TICKET. I DON'T MEAN TO BELITTLE THEM. THEY'RE VERY SIGNIFICANT AND IMPORTANT OBVIOUSLY. BUT THEY'RE THE FIRST INITIATION OF A NOTICE THAT THE COMPANY HAS VIOLATED SOME REGULATION.

AND, JUDGE, I WOULD SAY WITH EVERY INSTANCE OF AN NOV, WHICH IS LAID OUT VERY CLEARLY IN THEIR COMPLAINT -- THAT'S PART OF THE BASIS OF THEIR CLAIM IS WE KNEW THAT THESE

35

REGULATORS WERE SORT OF OUT TO GET US.  EVERY TIME THERE'S AN NOV I WOULD SAY THAT IS ACTUALLY LITIGATION.  IT IS CERTAINLY THE INITIATION OF LITIGATION AS HAS BEEN EVIDENCED BY THE FACT THAT THE AQMD IS NOW INCORPORATING ALL OF THOSE NOVS INTO THEIR CIVIL LITIGATION.

BUT ONCE THAT NOTICE COMES AND SAYS, YOU ARE IN VIOLATION OF A REGULATION OR A STATUTE, THAT IS CERTAINLY AN INSTANCE WHERE THAT LITIGATION IS NOT -- IF NOT IMMINENT, IT IS ACTUALLY INCIPIENT.  IT'S HAPPENING.

THE COURT:  SO, WHEN YOU RECEIVED THE FIRST NOTICE OF A VIOLATION OF A REGULATION OR A STATUTE IN CONNECTION WITH THESE ENVIRONMENTAL ISSUES, THAT WAS WHEN EXIDE FIRST ANTICIPATED LITIGATION?

MR. VOLZ:  YOUR HONOR, I WOULD SAY THAT WOULD BE THE ABSOLUTE LOCK, JUDGE.

AND, THEN, FROM OUR PERSPECTIVE IT WAS TRYING TO FIGURE OUT THE OTHER INSTANCES WHERE THERE WERE COMMUNICATIONS WITH THE REGULATORS WHICH CROSSED THAT LINE INTO A THREAT THAT THERE WOULD BE EITHER AN NOV OR OTHER ENFORCEMENT ACTION --

THE COURT:  SO, YOU'RE SAYING THAT THE ANTICIPATION OCCURRED NO LATER THAN THE FIRST NOTICE, BUT IT ALSO OCCURRED PRIOR TO THE FIRST NOTICE?

MR. VOLZ:  YES, YOUR HONOR.  I WOULD SAY THAT.

THE COURT:  WHAT, IF ANYTHING, TRIGGERED THE FIRST ANTICIPATION?

MR. VOLZ:  THE FIRST ANTICIPATION IS TRIGGERED BY THE COMMUNICATIONS BY THE REGULATORS OF A CONDITION WHICH COULD RESULT IN EITHER AN NOV OR OTHER ACTION -- OTHER REGULATORY ACTION BY THE REGULATOR.  SO, IT COULD BE A FINE.  IT COULD BE A CURTAILMENT -- AS WE WERE IN A DEPOSITION TODAY LEARNING ABOUT CURTAILMENT BY THE AQMD IN 2012 REQUIRING THEM TO REDUCE THE AMOUNT OF FEED THAT THEY PUT IN THEIR -- INTO THE SMELTERS.

WHEN A WARNING LIKE THAT COMES ACROSS, IT'S A SHOT ACROSS THE BOW.  AND THE REGULATORS WERE TELLING THE COMPANY IF YOU DON'T DO SOMETHING, WE'RE GOING TO TAKE ACTION.  SO, LET'S WORK -- AND THEN THE PROCESS OF WORKING TOGETHER COOPERATIVELY TO TRY TO RESOLVE THE CONDITION.

BUT IF THAT FALLS APART, YOUR HONOR, THEN THE THREAT OF LITIGATION IS EVER PRESENT.

THE COURT:  AND THE FIRST ANTICIPATION WAS WHEN? 2010?  2011?

MR. VOLZ:  YOUR HONOR, I WOULD SAY IT'S 2010.

THE COURT:  UH-HUH.

MR. VOLZ:  IT'S SET FORTH IN THE COMPLAINT PRETTY CLEARLY.  WHEN EXIDE DETECTED ELEVATED LEVELS OF ARSENIC IN 2010, NOTIFIED THE AQMD, AND AS PLAINTIFFS HAVE POINTED OUT, AND I'M SURE WILL POINT OUT WHEN WE FILE OUR MOTION FOR SUMMARY JUDGMENT, THE INITIATION OF THAT PROCESS STARTED WHERE WE INFORMED THE AQMD THAT WE HAD A HIGHER LEVEL OF ARSENIC THAN WE HAD ANTICIPATED.  IT WAS OUTSIDE THE REALM OF THE REGULATIONS.

37

AND THAT WE WERE GOING TO TAKE STEPS TO CORRECT THAT.

FROM THAT POINT FORWARD THE DISCUSSIONS WITH THE AQMD WERE AROUND THE PROVISIONS WHICH REQUIRE US TO PROVIDE A HEALTH RISK ASSESSMENT.  AND THE ULTIMATE END-GAME IN A HEALTH RISK ASSESSMENT IS EITHER WE TAKE THE STEPS TO CORRECT THE CONDITION AND POTENTIALLY, IF NECESSARY, GIVE PUBLIC NOTICE TO THE CONDITION, OR THE AQMD CAN TAKE REGULATORY ACTION AGAINST US.

AND, SO, FROM THE TIME THAT WE FIRST INITIATED THE COMMUNICATIONS WITH THE AQMD ABOUT THE HEIGHTENED ARSENIC LEVELS IN 2010, WITH REGARD TO THAT ISSUE, JUDGE -- AND I DON'T WANT TO BE OVERBROAD HERE -- WITH REGARD TO THAT ISSUE WE WOULD SAY THAT THERE WAS A REASONABLE ANTICIPATION -- AND I WOULD SAY OF IMMINENT LITIGATION -- WHETHER THAT'S AN APPROPRIATE MEASURE OR NOT, JUDGE.

BUT EVEN THEN -- SO, I WOULD -- A LOT OF THE COMMUNICATIONS THAT WE WITHHELD DOCUMENTS ON WERE FROM ENVIRON, LATER ON FROM ADVANCED GEOSERVICES.  ENVIRON IS INTIMATELY INVOLVED WITH THE COMPANY HELPING THEM TO RESPOND TO THE ISSUES RELATED TO THOSE ELEVATED ARSENIC LEVELS.

AT THE SAME TIME ENVIRON IS A VALUED BUSINESS CONSULTANT AS WELL.  I'M NOT GOING TO HIDE FROM THAT OR I'M GOING TO DISABUSE THE COURT OF ANY NOTION THAT THEY'RE SOLELY --

THE COURT:  WELL, WHY --

MR. VOLZ:  -- RELATED TO LITIGATION.

THE COURT:  WHY SHOULDN'T THE COURT CONCLUDE THAT THE DOCUMENTS WITHHELD WOULD HAVE BEEN CREATED FOR A BUSINESS PURPOSE IN SUBSTANTIALLY SIMILAR FORM EVEN WITHOUT THE PROSPECT OF LITIGATION WITHIN THE MEANING OF THE RITCHIE CASE FOR EXAMPLE?

MR. VOLZ:  YOUR HONOR, I -- THAT'S CERTAINLY A DIFFICULT QUESTION, AND WE WOULD ANSWER IT THIS WAY.

FROM THE POINT AT WHICH THERE WAS A THREAT OF LITIGATION, THERE WERE ADDITIONAL RESOURCES BROUGHT TO BEAR. AND THE EXPERTS IN THE AREA WERE ENLISTED -- THAT BEING ENVIRON IN THIS CASE.  AND CERTAINLY THERE WERE OTHER CONSULTANTS AS WELL -- TO MOUNT A DEFENSE, TO BE ABLE TO COME UP WITH THE MOST EFFECTIVE WAY TO BOTH ADDRESS THE UNDERLYING ENVIRONMENTAL ISSUE IN A WAY THAT WOULD AVOID THE LITIGATION.

ENVIRON REGULARLY CONSULTED ON OTHER MATTERS.  AND WE PRODUCED THOSE DOCUMENTS, BOTH THE DOCUMENTS DIRECTLY FROM ENVIRON -- THERE'S APPROXIMATELY 60 PERCENT OF THE DOCUMENTS FROM ENVIRON THAT WERE ACTUALLY PRODUCED AND THOSE THAT CAME FROM THE COMPANY THEMSELVES.  THERE WERE TENS OF THOUSANDS OF DOCUMENTS THAT WERE PRODUCED WITH ENVIRON'S -- FROM ENVIRON OR TO ENVIRON THAT HAD NOTHING TO DO WITH ANY PRIVILEGE ISSUES.

WE DREW THOSE LINES AS CAREFULLY AS WE COULD -- IMPRECISE, I'M SURE, JUDGE.  AND IMPERFECT, ABSOLUTELY.  BUT WE DID OUR VERY BEST TO BE ABLE TO DELINEATE IN WHAT CIRCUMSTANCES THERE WAS A REASONABLE ANTICIPATION OF LITIGATION.  AND, SO,

39

WHEN WE STARTED DOWN THE PATH OF THE AQMD BEING INVOLVED IN DETERMINING WHETHER WE WERE SUFFICIENTLY RESPONDING TO THE THREAT FROM THE ARSENIC, THERE WAS A THREAT OF LITIGATION EVERY DAY.  IF WE DIDN'T COMPLY WITH WHAT THEY HAD INSISTED HAD TO BE DONE, IF WE HAD DISPUTES ABOUT WHAT HAD TO BE DONE, IF WE REFUSED TO DO WHAT THEY CLAIMED HAD TO BE DONE, EITHER BECAUSE IT WAS TOO EXPENSIVE OR WE COULDN'T DO IT OR WE JUST DIDN'T WANT TO, THERE WAS ALWAYS THE THREAT THAT THEY WOULD BE ABLE TO FILE AN ACTION TO POTENTIALLY CLOSE US DOWN OR TO TAKE OTHER LEGAL ACTION, INCLUDING FINES.

AND, SO, ENVIRON'S INVOLVEMENT IN THAT SORT OF PATH IN RELATION TO THAT SPECIFIC ISSUE, THEY WERE PERFORMING AN INVALUABLE SERVICE OF PROVIDING INFORMATION THAT ALLOWED THE LAWYERS TO INTERACT WITH THE REGULATORS AND TO ADVISE THE COMPANY ON HOW TO INTERACT WITH THE REGULATORS.

AND IT'S TRUE, JUDGE, AT THE SAME TIME THEY WERE ALSO, YOU KNOW, AT A PLANT MAYBE IN READING, PENNSYLVANIA OR SOMEPLACE ELSE AROUND THE COUNTRY DOING OTHER THINGS FOR THE COMPANY.  AND IN THOSE INSTANCES WHERE THERE WERE ACTIONS WHICH WERE UNRELATED TO THE POTENTIAL LITIGATION, WE DREW THAT LINE AND SAID OUT OF AN ABUNDANCE OF CAUTION WE'RE GOING TO -- WE'RE GOING TO PRODUCE THOSE DOCUMENTS BECAUSE WE THINK IT'S FAIR. BUT NOT IN INSTANCES WHERE WE THINK THERE'S -- IT RELATES DIRECTLY TO THE ISSUES AROUND THE THREATENED LITIGATION.

AND THE ARSENIC THING IS ONE THING.  AND THAT'S ONE

KIND OF PATH OR ROUTE I THINK ON THE WORK PRODUCT.  THERE WERE OTHER ISSUES RELATED TO SPECIFIC NOVS.  SO, WE HAD AN NOV. AND, IN FACT, AGAIN, WE WERE TALKING ABOUT IT TODAY IN A DEPOSITION FOR A MINOR EXCEEDANCE ON LEAD.  SO, THEY HAD -- THE COMPANY HAD BEEN IN COMPLIANCE WITH THE LEAD STANDARDS PUT IN PLACE IN 2012.  AND OCCASIONALLY THERE WOULD BE A READING WHICH SUGGESTED THAT THEY WERE SLIGHTLY OVER THE LEAD LEVELS THAT WERE PERMISSIBLE UNDER NAAQS, N-A-A-Q-S.

IN THOSE INSTANCES THAT'S AKIN TO HAVING THE TRAFFIC TICKET ISSUED TO YOU.  THAT WOULD BE SOMETHING WHERE THE COMPANY HAS TO GO BACK AND EVENTUALLY WORK WITH THE AQMD TO RESOLVE THE ISSUE SO THAT THEY COULD AVOID THE PENALTIES.  IN SOME CASES THEY JUST HAVE TO PAY THE PENALTIES.

BUT IN THOSE INSTANCES A -- AND ENVIRON WOULD BE INVOLVED AGAIN, CALLED UPON FOR THIS SPECIFIC PURPOSE TO HELP ADDRESS THE VERY SPECIFIC ISSUE THAT'S BEEN IDENTIFIED BY THE REGULATORS TO FIND A RESOLUTION TO THE SITUATION, TO ADVISE THE LAWYERS ON HOW TO TALK ABOUT THAT, ON HOW TO BE ABLE TO ADVISE THE COMPANY ABOUT THAT AND, THEN, ULTIMATELY HOW TO PRESENT THE BEST ARGUMENT TO AQMD TO AVOID THE SANCTION THAT AQMD HAD ALREADY INDICATED IT WAS LIKELY TO IMPOSE THROUGH ITS ISSUANCE OF THE NOV.

SO, THOSE INSTANCES I THINK THEY'RE VERY CLEARLY LAID OUT IN THE PLAINTIFF'S COMPLAINT.  AND THEY'VE CERTAINLY SEEN IT EVEN IN THE FIRST TWO DEPOSITIONS THAT WE'VE BEEN TAKING.

41

THEY KNOW THAT THERE ARE THESE IMMINENT THREATS OF LITIGATION ON AN ONGOING BASIS, ESPECIALLY BY AQMD.

NOW, THE SECOND ISSUE, JUDGE, IS WITH REGARD TO THE DTSC.  THERE WERE INSTANCES OF NOTICES OF VIOLATION WHICH WERE ISSUED BY THE DTSC.  AND, AGAIN, WE TALKED ABOUT THEM IN A DEPOSITION TODAY.  SO, PLAINTIFFS ARE WELL AWARE OF THOSE. THEY'RE LAID OUT IN THEIR COMPLAINT AS WELL.

THE COMPANY WAS ALSO IN THE PROCESS OF PUTTING TOGETHER AN APPLICATION FOR A PERMANENT PERMIT BECAUSE IT WAS OPERATING UNDER AN INTERIM PERMIT AT THE TIME.  AND, SO, THERE WERE INTERACTIONS ALONG THOSE LINES WHICH HAD -- IN SOME CASES IT WAS ADVANCED GEOSERVICES.  IN SOME CASES IT WAS OTHER VENDORS OR OTHER CONSULTANTS WHO WERE ADVISING.

WHEN IT RELATED PURELY TO BUSINESS, RELATED PURELY TO EVERY-DAY ACTIVITIES ON THE OPERATION OF THE PLANT, THOSE DOCUMENTS WERE PRODUCED.  IN THE CASE OF ADVANCED GEOSERVICES, JUDGE, WE WITHHELD 11 PERCENT OF THOSE DOCUMENTS AND PRODUCED 89 PERCENT OF THOSE DOCUMENTS TO THE TUNE OF 39,000 DOCUMENTS PURELY FROM ADVANCED GEOSERVICES.  THAT DOESN'T EVEN COUNT THE TENS OF THOUSANDS OF DOCUMENTS WHICH WERE PRODUCED FROM THE COMPANY ITSELF THAT HAD ADVANCED GEOSERVICES' NAME ON THEM.  IT EITHER CAME TO -- FROM THEM OR TO THEM THAT WERE THE KIND OF REGULAR MEAT AND POTATOES DAY-TO-DAY OPERATIONS.

BUT WHEN THE DTSC ISSUED A NOTICE OF VIOLATION, OR WHEN THE DTSC STARTED TO THREATEN LEGAL ACTION AROUND

42

REQUIRING, FOR EXAMPLE, ADDITIONAL INSPECTIONS, OR INDICATING THAT THERE WAS A PROBLEM -- A VERY SPECIFIC PROBLEM THAT THE COMPANY WAS IN VIOLATION FOR, YOU KNOW, NOT HAVING A PROPER LINER ON A SUMP OR GETTING A HIGH READING OF LEAD IN THE SLUDGE THAT COLLECTED IN THE SUMP.

THOSE ARE POTENTIALLY VIOLATIONS OF REGULATIONS. THEY'RE EITHER BEING ADVISED EXPLICITLY YOU HAVE VIOLATED AND WE NEED TO TALK ABOUT THIS, OR THEY'RE JUST BEING ADVISED OF A CONDITION WHICH THE COMPANY WOULD RECOGNIZE OR ITS LAWYERS WOULD RECOGNIZE COULD POTENTIALLY RESULT IN A VIOLATION.  AND IN THOSE INSTANCES THOSE DOCUMENTS WERE WITHHELD ON THE BASIS OF ATTORNEY-CLIENT OR ATTORNEY WORK-PRODUCT PRIVILEGES.

AGAIN, THOUGH, AT THE SAME TIME THIS IS GOING ON, THE COMPANY IS STILL TRYING TO OPERATE AND THE COMPANY IS STILL TRYING TO DO ITS BUSINESS ON A DAY-TO-DAY BUSINESS -- OR A DAY-TO-DAY BASIS.

AND, SO, WHEN ADVANCED GEOSERVICES IS HELPING THEM IN SOME OTHER CAPACITY OTHER THAN WHAT IS BEING DONE TO ADDRESS THE SPECIFIC ISSUES RAISED BY DTSC IN A THREATENING LETTER OR IN A COMMUNICATION THAT MIGHT ACCOMPANY AN NOV, THOSE DOCUMENTS ARE BEING PRODUCED.  AND THOSE DOCUMENTS AS A GENERAL MATTER ARE BEING PRODUCED.

SO, LET'S SAY THE OVER- -- NOT EVEN THE OVERWHELMING MAJORITY, I WOULD SAY SOMEWHERE ON THE LINE OF 90 TO 95 PERCENT OF THE DOCUMENTS FROM THOSE CONSULTANTS ACROSS THE BOARD WERE

ACTUALLY PRODUCED.  BUT A SMALL PERCENTAGE OF THOSE DOCUMENTS WERE BEING WITHHELD.

AND THEY WERE BEING WITHHELD BASED ON AN ANALYSIS WHICH WAS BEST EFFORTS OF THE PARTIES DONE IN CONSULTATION BOTH WITH THE LAWYERS WHO WERE ACTUALLY DOING THE ADVICE OR DOING THE ADVISING, IN SOME CASES THE CONSULTANTS, AND IN SOME CASES THE MEMBERS OF THE COMPANY.  SO THAT WE COULD UNDERSTAND WHO THESE PEOPLE WERE, WHAT ROLE THEY WERE PLAYING.  AND JUST -- IT JUST TAKES LOOKING AT THE PRODUCTION ITSELF TO RECOGNIZE THAT WE WERE NOT IN ANY WAY TRYING TO INSTITUTE A BLANKET PROPHYLACTIC BLOCK ON ANY SORT OF DOCUMENTS RELATING TO THESE CONSULTANTS OR TO THESE ISSUES.

PLAINTIFFS GOT FRANKLY FAR MORE THAN I THINK MOST LAWYERS AND LAW FIRMS WOULD ACTUALLY PRODUCE IN THIS CASE BECAUSE WE REALLY WANTED TO SHOW GOOD FAITH.  WE WANTED -- WE RECOGNIZE THAT THIS -- THERE WAS GOING TO BE CLOSE CALLS HERE, AND THAT WE WANTED TO PRODUCE THOSE DOCUMENTS WHENEVER AND WHEREVER WE COULD BECAUSE WE DON'T THINK WE HAVE ANYTHING TO HIDE.  AND SO -- BUT WE OBVIOUSLY HAVE AN OBLIGATION TO OUR CLIENTS AND UNDER THE ETHICAL RULES TO MAKE SURE THAT WE MAKE CLAIMS OF PRIVILEGE WHICH ARE APPROPRIATE SO THAT WE DON'T WAIVE AND POTENTIALLY SEVERELY DAMAGE OUR CLIENTS.

SO, I THINK THAT THE PAPERS CERTAINLY LAY THAT OUT.

I JUST WANT TO POINT OUT, TOO, WHAT WE'VE DONE.  AND THIS HAS REALLY BEEN A PROCESS, JUDGE, WHERE -- WHERE

44

PLAINTIFFS MAY RAISE AN ISSUE.  AND WE REALLY DO OUR BEST TO GO BACK AND RE-EXAMINE WHAT WE'VE DONE.  AS I THINK MS. MURPHY ACKNOWLEDGED, WHEN THERE WERE MISTAKES MADE, WE WOULD READILY EXCEED -- ACCEDE TO THOSE MISTAKES AND TRY TO CORRECT THEM.  AND THIS HAS BEEN AN ONGOING PROCESS OF QUALITY CONTROL TO TRY TO MAKE SURE THAT THESE CALLS ARE CORRECT.

AND WHEN THERE ARE INSTANCES -- AND ONE I'LL DESCRIBE RIGHT NOW -- WHERE WE HAD MADE A PRIVILEGE CLAIM -- WHICH WE BELIEVE IS VALID.  AND AS I SIT HERE TODAY I BELIEVE IT'S VALID -- I SOUGHT A WAY TO ACCOMMODATE THE PLAINTIFF'S CONCERNS, TO ADDRESS THEM WITHOUT WAIVING THE PRIVILEGE, AND PROVIDING THAT INFORMATION SO THAT THEY COULD PROCEED WITH THEIR CLAIMS AND NOT BE PREJUDICED BUT AT THE SAME TIME TRYING TO MAINTAIN MY PRIVILEGE.  AND THAT'S THE INSTANCE OF THESE DOCUMENTS WHICH WERE ON THE PRIVILEGE LOG WHICH ARE ATTACHMENTS TO THE EMAILS OF LAWYERS OR TO THE EMAILS OF EXIDE EMPLOYEES, WHICH IF YOU LOOK AT THE LOG, YOUR HONOR, YOU WOULD SEE THERE ARE MANY INSTANCES IN WHICH THERE ARE FAMILIES OF DOCUMENTS.  THE FIRST DOCUMENT MIGHT BE AN EMAIL.  IT MIGHT BE FIVE EMAILS AFTERWARDS OR IN A COLLECTION, OR IT MIGHT BE ATTACHMENTS TO THE DOCUMENT.

IT'S OUR VIEW, JUDGE, THAT REVEALING ANY OF THOSE DOCUMENTS WOULD POTENTIALLY REVEAL THE SUBSTANCE OF THE UNDERLYING COMMUNICATION WITH THE LAWYERS.  SO, EVEN IF IT'S NOT A COMMUNICATION DIRECTLY FROM A LAWYER OR INVOLVING A LAWYER THAT'S ATTACHED TO THE EMAIL THAT'S BEING SENT TO THIS

45

LAWYER, I THINK --

THE COURT:  WHY NOT SEPARATE THOSE DOCUMENTS FROM THE CHAIN AND PRODUCE THEM SEPARATELY WITHOUT REFERENCE TO THE EMAILS TO WHICH THEY WERE ATTACHED?

MR. VOLZ:  YOUR HONOR, THAT'S EXACTLY WHAT WE DID WITH REGARD TO DOCUMENTS FROM AQMD AND DTSC.

THE COURT:  WHY NOT DO IT FOR ALL OF THEM.

MR. VOLZ:  IN MANY INSTANCES, JUDGE, THEY ARE ALREADY PRODUCED.

AND IT'S OUR VIEW THAT -- IN CASES, FOR EXAMPLE, AND JUST TO GIVE AN EXAMPLE WHICH MAY OR MAY NOT BE HYPOTHETICAL -- AN EMAIL OR A COMMUNICATION COMES IN FROM DTSC OR AQMD, WHETHER IT'S A NOTICE OF VIOLATION OR IT'S SOME OTHER DOCUMENT.  EVEN IN TODAY'S DEPOSITION THERE WERE NUMEROUS DOCUMENTS PUT BEFORE THE WITNESS WHICH SAID THIS IS FROM THE AQMD.  OBVIOUSLY, WE DIDN'T MAKE A CLAIM OF PRIVILEGE ON THAT DOCUMENT.  IF THAT DOCUMENT IS PART OF A COMMUNICATION -- SO THAT FIRST PERSON TAKES IT IN AND SAYS, OH, MY GOODNESS, A NOTICE FROM THE AQMD. WE NEED TO GET THIS TO OUR LAWYERS RIGHT AWAY -- WHICH IS SOMETHING THAT HAPPENS ALL THE TIME.  I THINK YOUR HONOR EVEN REFERENCED SOMETHING LIKE IT WITH REGARD TO THE POSSIBILITY OF ANOTHER CIVIL CASE.

THAT COMMUNICATION FROM THE INDIVIDUAL TO HIS LAWYER SENDING THE DTSC LETTER OR THE AQMD LETTER SAYING WHAT CAN WE DO ABOUT THIS.  WE NEED HELP WITH THIS.  PLEASE CALL ME RIGHT

46

AWAY.

CUTTING OFF THAT SECOND DOCUMENT OR THE ATTACHMENTS AND HANDING THOSE OVER INDEPENDENTLY WOULD NOT BE A PROBLEM. BUT WHEN THAT DOCUMENT FIRST APPEARS IN A DATABASE OR IT COMES IN THROUGH A HARD-COPY DOCUMENT THAT DOCUMENT WAS PRODUCED. THERE'S NO TWO WAYS ABOUT THAT.  WHEN IT'S ATTACHED TO THE EMAIL TO THE LAWYER WE WITHHELD THAT DOCUMENT.

THE COURT:  ARE THERE ANY ATTACHMENTS THAT HAVE NOT BEEN SEPARATELY PRODUCED THAT YOU'RE WITHHOLDING UNDER CLAIM OF PRIVILEGE ONLY BECAUSE THEY ARE ATTACHED TO COMMUNICATIONS YOU ARGUE ARE PRIVILEGED?

MR. VOLZ:  PART OF WHAT WE TRIED TO DO, JUDGE, IN RESPONSE TO THE PLAINTIFF'S CONCERNS AS EXPRESSED IN THE STIPULATION AND IN OTHER CONVERSATIONS AS WELL WAS TO GO BACK AND TRY TO IDENTIFY ALL THE ATTACHMENTS ON THE 36- -- THE 32,000-DOCUMENT LOG AND SEE WHETHER WE COULD IDENTIFY BY TECHNICAL MEANS, BY COMPUTER SEARCHING, WHERE THOSE DOCUMENTS HAD BEEN PRODUCED OTHERWISE.

AFTER A WEEK WITH OUR VENDORS DRIVING THEM CRAZY AND SPENDING A TON OF MONEY WE CONCLUDED THAT THAT WASN'T POSSIBLE OR WASN'T FEASIBLE, I SHOULD SAY.  IT MAY WELL BE POSSIBLE. BUT THE NUMBER OF HOURS AND TREASURE SPENT WOULD BE --

THE COURT:  YOU'RE SAYING IT'S NOT PARTICULARLY --

MR. VOLZ:  -- PROHIBITIVE.

THE COURT: -- FEASIBLE TO IDENTIFY WHERE IF YOU DID

YOU PRODUCED THE ATTACHED DOCUMENTS SEPARATELY.

MR. VOLZ:  RIGHT, YOUR HONOR.

I WOULD SAY AS A MATTER OF COURSE --

THE COURT:  UH-HUM.

MR. VOLZ:  -- AND AS A MATTER OF OUR POLICY AND OUR PROTOCOL IN ESTABLISHING THESE -- THE PRODUCTIONS.

AND THE DIRECTIVE THAT WENT OUT TO OUR LAWYERS WAS WHEN YOU'RE REVIEWING DOCUMENTS, IF IT'S ATTACHED TO A LEGAL DOCUMENT, IF IT'S ATTACHED TO AN EMAIL TO A LAWYER OR A LETTER TO A LAWYER, THAT GOES IN THE PRIVILEGE PILE FOR FURTHER REVIEW.

IF IT'S THAT DOCUMENT INDEPENDENT -- EVEN IF YOU KNOW THAT IT'S BEEN PRODUCED, IF THAT DOCUMENT IS NOT EXPLICITLY ATTACHED, EXPLICITLY ATTACHED TO AN EMAIL OR A LETTER TO A LAWYER, THAT DOCUMENT GETS PRODUCED.

SO, I KNEW -- OR I STRONGLY BELIEVED, LET ME SAY -- THAT IN EVERY INSTANCE IN WHICH THERE WAS A COMMUNICATION FROM AQMD OR DTSC THAT WAS ATTACHED TO A DOCUMENT THAT WENT TO THE LAWYER -- AND WE MADE A PRIVILEGE CLAIM ON THAT -- I STRONGLY BELIEVE THAT THAT DOCUMENT WOULD HAVE BEEN PRODUCED OTHERWISE.

BUT I CAN SAY, JUDGE, THAT BECAUSE WE REACHED THAT CONCLUSION ABOUT THE UNFEASIBILITY OF OR INFEASIBILITY OF BEING ABLE TO SEARCH OUT EVERY DOCUMENT AND MATCH IT UP WITH ITS PAIR OR PAIRS THAT EXISTED IN THE DATABASE -- IN THE PRODUCTION

DATABASE -- WE WENT BACK AND SAID, OKAY, BECAUSE PLAINTIFF IS VERY CONCERNED ABOUT THESE COMMUNICATIONS FROM AQMD AND DTSC, AND BECAUSE I BELIEVE THEY'VE BEEN PRODUCED OTHERWISE -- AND THIS IS MY -- YOU KNOW, MY OWN INTUITION AND THE WORK THAT'S BEEN DONE BY OUR ENTIRE TEAM -- WE SAID FINE.  WE'LL CUT OFF ALL THOSE DOCUMENTS FROM AQMD AND DTSC -- WHICH PLAINTIFFS ARE COMPLAINING ABOUT IN THE LOGS -- AND WE'LL PRODUCE THEM EN MASSE.  AND WE PRODUCED APPROXIMATELY 1500 DOCUMENTS AFTER WE GOT THE STIPULATION.

THE COURT:  WHY DON'T YOU DO THE SAME FOR THE OTHER ATTACHMENTS?

MR. VOLZ:  IF YOUR HONOR INSTRUCTS US, WE WILL, JUDGE.  IT'S JUST A MATTER OF FINDING -- BEING -- IT BEING VERY DIFFICULT --

THE COURT:  JUST WONDERING WHY YOU HAVEN'T DONE IT UP UNTIL NOW.  LET'S SAY YOU CAN'T FEASIBLY VERIFY THAT A PARTICULAR ATTACHMENT WAS PREVIOUSLY PRODUCED IN ANOTHER FORM, BUT YOU CERTAINLY CAN IDENTIFY THE ATTACHMENT IN THE FORM OF A DOCUMENT WITHHELD ONLY BECAUSE IT'S ATTACHED TO AN ALLEGEDLY PRIVILEGED COMMUNICATION, WHY NOT SEVER THOSE DOCUMENTS OFF AND PRODUCE THEM SEPARATELY.  YOU CAN SHUFFLE THEM FIRST TO MAKE SURE THAT THE DOCUMENTS CAN'T BE MATCHED UP WITH THE COMMUNICATIONS FROM WHICH THEY'VE BEEN SEVERED AND PRODUCE ALL OF THOSE.

MR. VOLZ:  TWO THINGS, YOUR HONOR.

FIRST OF ALL, WE BELIEVE IT'S VALID TO MAKE A CLAIM OF PRIVILEGE ON THOSE DOCUMENTS.  WE BELIEVE THAT THEY ARE ESSENTIALLY INCORPORATED INTO --

THE COURT:  BUT THE --

MR. VOLZ:  -- AND BECOME PART OF THE ORIGINAL COMMUNICATION.

THE COURT:  ONLY IF THEY ARE WITH THE COMMUNICATION.

AND WHAT I'M SUGGESTING IS ONCE THEY'RE SEVERED FROM THE COMMUNICATION, IF THEY'RE NOT THEMSELVES PRIVILEGED AND THEY CAN'T BE LINKED IN ANY WAY TO THE COMMUNICATION, THEN, THEY'RE NOT PRIVILEGED.

IN THE EXAMPLE I GAVE WHEN DISCUSSING THE MATTER WITH PLAINTIFF'S COUNSEL, IF YOU TOOK THE COPY OF THE INTERNET ARTICLE -- IT'S ALLEGEDLY DEFAMATORY -- AND YOU PRODUCED THAT SEPARATELY, THEN, THERE WOULD NOT BE A PROBLEM.

MR. VOLZ:  THAT MAY BE SO, JUDGE.  BUT IN THE CASE OF -- IN USING YOUR HYPOTHETICAL, IF THE PRIVILEGE LOG IN THAT CASE SAID ARTICLE FROM INTERNET SITE X OF WHATEVER DATE AUTHORED BY WHATEVER PERSON --

THE COURT:  UH-HUM.  YOU'RE SAYING THAT ONCE THEY GET IT SEPARATELY PRODUCED, THEY CAN LINK IT UP THROUGH THE PREVIOUSLY PRODUCED PRIVILEGE LOG AND FIND THE PRIVILEGED COMMUNICATION TO WHICH IT RELATES?

MR. VOLZ:  YES, JUDGE.

THE COURT:  UH-HUM.

MR. VOLZ:  NOT THAT THEY WOULD NECESSARILY DO THAT.

AND THAT'S PART OF THE REASON WE ARE WILLING TO PRODUCE THESE DOCUMENTS.  I ASSUME MOST OF THE DOCUMENTS THAT CAME FROM THE DTSC OR AQMD WERE EITHER OBTAINED BY PLAINTIFFS THROUGH THEIR FREEDOM OF INFORMATION ACT OR THEIR OPEN RECORDS ACT REQUESTS OR THAT -- OR THAT THEY'VE BEEN PRODUCED IN THE COURSE OF THE LITIGATION GENERALLY.

SO, IT'S NOT -- IT SHOULDN'T BE SURPRISING TO ANYONE THAT WHEN WE GET A NOTICE FROM THE DTSC OR THE AQMD THAT WE CONSULT OUR LAWYERS.

SO, AS LONG AS THE UNDERLYING DOCUMENT, THE EMAIL THAT ATTACHES THE LETTER FROM THE AQMD, AS LONG AS THAT REMAINS INVIOLATE, JUDGE, WE THINK OUR PRIVILEGE IS INTACT.  AND THAT'S OBVIOUSLY THE MOST IMPORTANT AND CONCERNING ISSUE FOR US.  THE ATTACHMENT ITSELF THAT COMES FROM AQMD, THEY EITHER HAVE OR IF WE -- AS WE DID DO, JUDGE, WE PRODUCED THESE 1500 OR SO DOCUMENTS AND SHUFFLED THEM UP AND JUST PROVIDED TO THEM WITH NEW BATES NUMBERS.

BUT I DON'T DOUBT THAT IF THEY CHOSE TO THEY COULD LINE THOSE DOCUMENTS UP AND SAY, OKAY, THIS IS THE LETTER FROM AQMD THAT, YOU KNOW, THE GENERAL COUNSEL WAS DISCUSSING ON APRIL 9TH OF 2013 AND COULD DRAW INFORMATION OR GLEAN SOME POTENTIAL LITIGATION STRATEGY FROM THOSE DOCUMENTS.

BUT WE DID IT OUT OF A DESIRE TO ACCOMMODATE AND A DESIRE TO AVOID CONFLICT AND OUT OF THE VERY FIRM BELIEF,

51

JUDGE, THAT THOSE DOCUMENTS HAVE BEEN PRODUCED IN OTHER FORMS THROUGHOUT -- THAT THEY PROBABLY HAVE MULTIPLE COPIES OF EVERY AQMD OR DTSC LETTER, COMMUNICATION, NOV, NOTICE OF DEFICIENCY, EITHER THROUGH THEIR PUBLIC RESOURCES THAT THEY'VE OBTAINED OR THROUGH OUR PRODUCTIONS.

THE COURT:  THEY QUESTION THE ACCURACY OF SOME OF THE DESCRIPTIONS ON YOUR PRIVILEGE LOG.

DO YOU WANT TO SPEAK TO THAT.

MR. VOLZ:  YES, YOUR HONOR.

WITH REGARD TO THE -- WITH PWC -- AND I THINK THERE WERE TWO INSTANCES IN WHICH THEY SORT OF IDENTIFIED AS EXAMPLES -- WITH REGARD TO PWC, WHICH ARE OUR AUDITORS, THEY HAD ERRONEOUSLY IDENTIFIED THEM AS HAVING BEEN JUST TAX ADVISORS WHEN, IN FACT, THE COMPANY'S OWN PUBLIC FILINGS RELATE THAT THEY ARE THE COMPANY'S AUDITORS AT THE TIME.  SO, THAT THEY WERE THE AUDITORS DURING THE COURSE OF THE ENTIRE CLASS PERIOD AND AFTER.

AND, SO, IN THAT INSTANCE, JUDGE, I THINK THAT IT WAS ACTUALLY THEIR ERROR.  AND WE CAN TALK ABOUT WHETHER IT'S VALID TO MAKE A CLAIM OF PRIVILEGE IN THAT INSTANCE.  BUT THAT OUR DESCRIPTION IN THE LOG WAS INACCURATE I THINK THEY'RE MISTAKEN IN THAT REGARD.

THE COURT:  WHAT ABOUT THE DESCRIPTIONS WITH REGARD TO THE PUBLIC RELATIONS CONSULTANTS?

MR. VOLZ:  I FRANKLY DON'T -- DIDN'T REALLY GET THEIR

52

ARGUMENTS IN THAT REGARD.

I THINK THEY JUST HAD A FUNDAMENTAL DISAGREEMENT WITH THE NOTION THAT WE COULD EVER BE INVOLVING OUR PUBLIC RELATIONS CONSULTANTS AND COMMUNICATIONS THAT WOULD REMAIN PRIVILEGED.

THE COURT:  WELL, THAT'S A SEPARATE ISSUE.

MR. VOLZ:  I BELIEVE IT IS, JUDGE.

THE COURT:  IS IT CORRECT TO SAY THAT THE PUBLIC-RELATIONS-RELATED DOCUMENTS WERE PROPERLY ACCURATELY DESCRIBED AS STRATEGIES OR ANALYSES RELATED TO TESTING EQUIPMENT, FOR EXAMPLE?

MR. VOLZ:  YES, YOUR HONOR.  THEY ARE.

I THINK ONE OF THE OTHER POINTS THAT MS. MURPHY RAISED -- NOT TO MAKE HER ARGUMENT FOR HER, BUT THAT THE -- THE NOTION THAT IN SOME INSTANCES IT LOOKED LIKE THERE WERE COMMUNICATIONS FROM NON-LAWYER TO NON-LAWYER WHICH SAID THAT IT WAS A PRIVILEGED -- OR REFLECTING REQUESTS FOR LEGAL ADVICE.

THERE'S TWO EXPLANATIONS FOR THAT, JUDGE.

FIRST OFF, IN MANY CASES THE INTERNAL ATTORNEYS OR INTERNAL EMPLOYEES ARE DISCUSSING ISSUES WHICH HAVE BEEN TALKED ABOUT WITH LAWYERS SO THAT THE COMMUNICATIONS REFLECT ATTORNEY COMMUNICATIONS OR ADVICE FROM ATTORNEYS.

SECOND, JUDGE, THERE ARE INSTANCES WHERE THE EMAIL CHAIN -- THE LAST EMAIL IN AN EMAIL CHAIN ONLY CONTAINS COMMUNICATIONS WITH THE TWO PEOPLE.  BUT UNDERNEATH THAT IT MAY HAVE THE ORIGINAL COMMUNICATION FROM THE LAWYER.  SO, THE

53

LAWYER SAYS SOMETHING.  IT'S KIND OF COMMUNICATED AROUND THE COMPANY AND UP THE CHAIN AND IN SOME CASES TO THE -- IN THIS CASE TO PUBLIC RELATIONS ADVISORS OR SOMETHING ALONG THOSE LINES.  SO, WE WOULD STILL STAND BY THOSE BEING ACCURATE.

OBVIOUSLY, WITH 32,000 ENTRIES AND THE SCOPE OF THE PRODUCTION IN THIS CASE, THEY'RE NOT PERFECT, JUDGE.  AND THAT'S WHAT WE'VE BEEN SAYING ALL ALONG.  IF THESE INSTANCES HAD BEEN RAISED -- EVEN A SPECIFIC INSTANCE LIKE THIS RAISED MONTHS AGO, WE WOULD HAVE THE OPPORTUNITY TO ADDRESS THEM. WE'VE BILLED HUNDREDS AND HUNDREDS OF HOURS ADDRESSING JUST THE ISSUES RAISED IN REGARD TO THE STIPULATION, ISSUES WHICH COULD HAVE BEEN ADDRESSED EARLIER ON AND WHICH COULD HAVE BEEN -- ANSWERS COULD HAVE BEEN PROVIDED OR POTENTIALLY CLARIFICATIONS MADE ON THE -- ON THE PRIVILEGE LOG.

BUT WE BELIEVE WE DID A VERY GOOD JOB OF GIVING ACCURATE DESCRIPTIONS -- AS ACCURATE AS WE COULD BE WITHOUT REVEALING THE SUBSTANCE OF THE PRIVILEGED COMMUNICATIONS.  AND THAT'S PARTLY WHAT I THINK THE PLAINTIFFS WOULD JUST PREFER IS THAT WE REVEAL THE PRIVILEGED COMMUNICATIONS SO THEY CAN TELL IF IT'S REALLY PRIVILEGED OR NOT.  I MEAN, THAT CAN'T BE THE RULE.  THERE'S GOT TO BE SOMETHING SOUTH OF THAT THAT PERMITS US TO DESCRIBE THE DOCUMENTS IN A MANNER WHICH IS SUFFICIENTLY DETAILED SO THEY CAN MAKE THE CHALLENGES -- AND THEY HAVE MADE THE CHALLENGES -- BUT DOESN'T REVEAL THE NATURE OF THE PRIVILEGED COMMUNICATIONS.

54

TO GET BACK TO SOME OF WHAT WE WERE TALKING ABOUT WITH MS. MURPHY -- LET ME TAKE A LOOK BACK.

THE COURT:  YOU MIGHT WANT TO ADDRESS THE ISSUE OF WHETHER THE CONSULTATION OF PUBLIC RELATIONS EXPERTS IS PROTECTED BY WORK PRODUCT OR ATTORNEY-CLIENT PRIVILEGE.

MR. VOLZ:  OKAY.  YOUR HONOR, ABSOLUTELY.

FIRST OFF I CAN SAY, AGAIN, AS WITH EVERYTHING ELSE, THE MAJORITY OF THE COMMUNICATIONS RELATED TO THOSE P.R. CONSULTANTS WERE ACTUALLY PRODUCED TO PLAINTIFFS -- THAT THE WITHHELD PORTION WERE THOSE DOCUMENTS WHICH WE -- BY THE SUBSTANCE OF THE DOCUMENTS WE DETERMINED THE P.R. CONSULTANTS WERE INTIMATELY INVOLVED IN PROVIDING AND HELPING PROVIDE THE LEGAL ADVICE THAT WAS NECESSARY TO GUIDE THE COMPANY THROUGH THESE DIFFICULT TIMES.

MANY OF THOSE DOCUMENTS COME FROM AFTER THE CLOSURE.

THE COURT:  THERE MAY BE A NECESSITY FOR A PUBLIC RELATIONS CONSULTANT TO GUIDE A COMPANY THROUGH DIFFICULT TIMES FROM A BUSINESS STANDPOINT, BUT WHY IS THERE EVER A NECESSITY OF CONSULTING A PUBLIC RELATIONS FIRM TO FORMULATE AND COMMUNICATE LEGAL ADVICE FROM THE STANDPOINT OF THE ATTORNEY-CLIENT PRIVILEGE OR TO PREPARE A DEFENSE IN ANTICIPATED LITIGATION.

MR. VOLZ:  YOUR HONOR, IN MANY INSTANCES THESE COMMUNICATIONS WERE PART OF A TEAM OF THOSE SEEKING TO DEFEND THE COMPANY AGAINST THE ATTACKS FROM EITHER AQMD OR DTSC.

55

THE -- I THINK AS YOUR HONOR MENTIONED EARLIER, IT USED TO BE THE CASE THAT EVERYONE WOULD SAY "NO COMMENT."  THAT ISN'T AN OPTION HERE FOR A COMPANY LIKE EXIDE DEALING WITH ITS REGULATORS.  SO, THE COMPANY HAS TO COMMUNICATE TO THE REGULATORS WHO MAY WELL BE EITHER SUING THEM ALREADY OR WHO MAY HAVE ALREADY TAKEN LEGAL ACTION AGAINST THEM AS IN THE CASE OF THE DTSC ISSUING THE CLOSURE ORDER.

SO, THE COMMUNICATIONS THAT ARE COMING FROM THE COMPANY TO THE REGULATORY AGENCY, WHATEVER -- WHETHER IT'S DTSC, AQMD, OR EVEN EPA OR OTHER REGULATORY AGENCIES, THE LAWYERS AND THE P.R. CONSULTANTS -- AND IN SOME CASES LOBBYISTS BECAUSE IT WASN'T JUST P.R. CONSULTANTS.  I THINK THEY WOULD CONCEDE THAT IT WAS LOBBYISTS AS WELL -- THAT THERE WAS SORT OF A CONCERTED EFFORT ON BEHALF OF ALL OF THE CONSULTANTS TO GET TOGETHER TO DETERMINE A LEGAL STRATEGY WHICH COULD BE PRESENTED TO THESE AGENCIES IN A WAY WHICH THEY WOULD FIND PALATABLE AND THEY WOULD BE WILLING TO ACCEPT TO AVOID THE ULTIMATE RESULT HERE, WHICH, UNFORTUNATELY, ENDED UP BEING THE PERMANENT CLOSURE OF THE VERNON FACILITY.

BUT AT EVERY STAGE THEY WERE TAKING STEPS IN ORDER TO TRY TO ADVISE -- THE CONSULTANTS WERE ADVISING THE LAWYERS ON WHAT -- WHAT WOULD POTENTIALLY BE PALATABLE, WHAT MIGHT NOT BE PALATABLE, WHICH PERSONALITIES TO APPROACH, WHICH OTHER AGENCIES MIGHT BE APPROACHED WITHIN THE GOVERNMENT.

AND THE LAWYERS WERE SAYING THESE -- YOU KNOW, THESE

ARE OUR STRATEGIES.  THIS IS WHAT WE LIKE TO DO.  AND THE P.R. CONSULTANTS IN MANY CASES ARE SAYING -- AND THIS IS AS EXAMPLES, JUDGE -- BUT I DON'T THINK IT'S SURPRISING TO SAY THAT THEY'RE SAYING, LOOK, THAT'S NEVER GOING TO FLY WITH THIS PERSON AT AQMD.  YOU HAVE TO BE ABLE TO MAKE THIS ARGUMENT. YOU HAVE TO BE ABLE TO GET THEM TO UNDERSTAND THIS ISSUE.

AND, SO, IT'S PART OF A TEAM EFFORT THAT ALLOWS THE LAWYERS TO COME UP WITH THE BEST LEGAL STRATEGY WHICH ACCEPTS AND COMPLEMENTS THE P.R. STRATEGY IN SOME CASES AND VICE VERSA SO THAT THEY CAN COME TOGETHER AND WORK HAND AND GLOVE TO PRESENT THE LEGAL POSITION OF THE COMPANY IN A WAY THAT'S PALATABLE TO THE REGULATORS AND ACCEPTABLE TO THE REGULATORS WHO ARE IN SOME CASES POLITICAL BEINGS AS WELL AS REGULATORS. AND THAT HAS -- SOMETHING HAS TO BE ACCEPTABLE BOTH TO THOSE -- THE POLITICAL SIDE OF THE HOUSE AND ALSO TO THE REGULATORY OR THE LEGAL SIDE OF THE HOUSE.  SO, THAT'S WHERE THOSE COMMUNICATIONS COME TOGETHER.

AND I WOULD VENTURE TO SAY THAT IN MOST INSTANCES WHERE WE WITHHELD DOCUMENTS -- AND I WOULD SAY PROBABLY ALL INSTANCES WHERE WE WITHHELD DOCUMENTS -- THEY WERE THOSE SORTS OF COMMUNICATIONS WHERE IT WAS REALLY NECESSARY FOR LAWYERS WHO SOMETIMES HAVE BIG EGOS AND TIN EARS TO UNDERSTAND THAT THEIR VIEW MIGHT NOT BE THE RIGHT ONE.  IT MIGHT NOT BE SOMETHING WHICH CAN BE ACCEPTABLE BOTH TO A REGULATOR, TO A POLITICIAN, TO THE PUBLIC AT LARGE.

AND, SO, THOSE LAWYERS' DECISION-MAKING PROCESS WAS IN LARGE DEGREE TEMPERED BY AND COLORED BY THE ADVICE OF PEOPLE WHO KNEW PEOPLE BETTER AND WHO KNEW POLITICS BETTER AND WHO KNEW THE CALIFORNIA REGULATOR ENVIRONMENT BETTER THAN THESE LAWYERS DID WHO, YOU KNOW, HAVE THEIR NOSE IN THE BOOKS OR IN THE ENVIRONMENTAL REGULATIONS.

THE COURT:  ALL RIGHT.

ANYTHING FURTHER?

MR. VOLZ:  LET ME MAKE SURE, JUDGE.

JUST ON THE ISSUE OF NEED, JUDGE, I DON'T THINK IT'S -- IT'S BELITTLING OUR -- I DON'T THINK IT'S APPROPRIATE TO BELITTLE OUR POSITION THAT THEY HAVE ACCESS TO THESE DOCUMENTS THROUGH OTHER MEANS.

ALL THE COMMUNICATIONS WITH AQMD AND DTSC ARE PUBLIC. THEY HAVE ACCESS TO THE -- FORMAL COMMUNICATIONS, ALL THE OFFICIAL COMMUNICATIONS.  THE NON-PRIVILEGED COMMUNICATIONS, WHICH JUST WENT FROM COMPANY PEOPLE TO DTSC OR AQMD AND BACK, THOSE ARE ALL -- THOSE HAVE ALL BEEN PRODUCED.  THERE'S NO PRIVILEGE CLAIMS ON THOSE DOCUMENTS.  AND NOW THAT WE'VE PRODUCED THE OTHER DOCUMENTS AS ATTACHMENTS -- THAT WERE ATTACHMENTS THAT HAD THE AQMD OR DTSC COMMUNICATIONS, THEY HAVE THOSE NOW, TOO.

TO ADOPT PLAINTIFF'S POSITION, WHICH IS ESSENTIALLY THE INTERNAL INVESTIGATIONS RELATING TO THE ISSUES IN OUR CASE ARE REALLY INTERESTING.  AND WE'D REALLY, REALLY LIKE TO HAVE

THEM.  IT WOULD MAKE OUR JOB REALLY EASY.  I MEAN, THAT'S ESSENTIALLY THEIR POSITION.  THAT COULD BE TAKEN IN EVERY SINGLE SECURITIES CASE I'VE EVER BEEN INVOLVED WITH OR EVER READ ABOUT.  THERE HAS TO BE SOME LINE THAT THEY CAN'T CROSS.  AND IF NEED IS BASED ON SOLELY, YOU KNOW, JUST ESPOUSING THE VIEW THAT YOU CAN'T POSSIBLY FIND THESE THINGS OTHER PLACES, THERE'S NO DEFENSE TO THAT.  THERE'S NO WAY WE COULD POSSIBLY DEFEND AGAINST THAT NEED ARGUMENT.

I KNOW THAT MOST OF THE DOCUMENTS THAT THEY'RE TALKING ABOUT ARE ACTUALLY IN THE PRODUCTION SOMEWHERE.  BUT FOR THEM TO JUST COME IN AND SAY THAT, YOU KNOW, THERE'S NO WAY WE COULD POSSIBLY GET AROUND THIS, WELL, THEY'RE TAKING DEPOSITIONS.  THEY HAVE DOCUMENTS FROM -- FROM THE THIRD PARTIES, FROM ENVIRON, FROM ADVANCED GEOSERVICES.  THEY ALSO HAVE DOCUMENTS FROM -- IN FACT, INTERNAL COMMUNICATIONS THAT WERE PRODUCED TO THEM IN FREEDOM OF INFORMATION ACT OR OPEN RECORDS ACT REQUESTS FROM DTSC AND AQMD.

SO, THEY HAVE MORE THAN ENOUGH DOCUMENTS TO PROVE THEIR CASE IF THERE IS A CASE.  THE PROBLEM HERE IS THERE'S JUST NO THERE THERE.  AND BECAUSE THERE'S NO THERE THERE, THEY INSIST THAT IT MUST BE SOMEWHERE.  AND IT'S GOT TO BE IN THOSE DOCUMENTS WE CAN'T GET ACCESS TO.

BUT IF WE'RE FORCED TO PRODUCE DOCUMENTS RELATING TO OUR OWN INTERNAL INVESTIGATIONS THAT WERE NECESSARY FOR THE DETERMINATION OF OUR DEFENSE AND THE EFFECTUATION OF OUR

59

DEFENSE, THEN, JUDGE, THAT EVISCERATES THE RULE. IT JUST CAN'T BE THE CASE. THEY HAVE TO SHOW MORE THAN JUST WE REALLY WANT IT. AND, FRANKLY, JUDGE, I JUST THINK THAT'S WHAT THEY'VE PRODUCED HERE.

THE COURT: ALL RIGHT. THANK YOU.

ANY FURTHER ARGUMENT FOR THE PLAINTIFFS?

BRIEFLY, PLEASE.

MS. MURPHY: YES, YOUR HONOR. THANK YOU.

I'LL START WITH JUST THIS LAST POINT. I THINK IT'S WORTH NOTING THAT WE ARE NOT TALKING ABOUT COMMUNICATIONS THAT ARE RELATING TO THE STRATEGIES OF THE SECURITIES CLASS ACTION.

AS DEFENDANTS ACKNOWLEDGE, WHAT THESE ATTORNEYS WERE DOING -- THESE ARE ENVIRONMENTAL ATTORNEYS WHO ARE ADVISING EXIDE ON HOW TO INTERACT WITH REGULATORS -- AND THIS IS NOT A TRIAL STRATEGY THAT'S GOING TO GET SOME SECRET ABOUT HOW THEY'RE GOING TO DEFEND THIS CASE. WHAT WE ARE LOOKING AT ARE DOCUMENTS THAT WERE CREATED YEARS AGO THAT ARE RELATING TO THE TESTING OF EQUIPMENT BECAUSE THEY WERE ENVIRONMENTALLY NON-COMPLIANT.

THE COURT: BUT THE WORK-PRODUCT PRIVILEGE AND THE ATTORNEY-CLIENT PRIVILEGE ARE NOT CASE SPECIFIC SUCH THAT IF THE WORK PRODUCT WAS CREATED IN ANTICIPATION OF LITIGATION X, THAT DOESN'T MEAN THAT THE PLAINTIFF IN LITIGATION Y LATER ON CAN OBTAIN THE INFORMATION.

MS. MURPHY:  THAT IS TRUE, YOUR HONOR.

I STILL -- AND MAYBE I'M OVERLY INCREDULOUS.  I DON'T THINK I AM.  CLEARLY, DEFENSE COUNSEL THINKS OTHERWISE.  BUT TO QUOTE DEFENSE COUNSEL, THERE WAS ALWAYS THE THREAT OF LITIGATION.  THAT'S WHAT HE SAID JUST A FEW MOMENTS AGO.

WHAT NUMEROUS COURTS IN THIS CIRCUIT, INCLUDING DIAGNOSTIC SYSTEMS, INCLUDING THOUGHT VERSUS ORACLE, YOU CANNOT RELY ON THERE SIMPLY ALWAYS BEING A THREAT OF LITIGATION.  THEY WERE ALWAYS RECEIVING NOVS CONSTANTLY.  IT'S A TRAFFIC TICKET.  THAT'S HOW HE'S COMPARING IT.  THEY RECEIVED A LOT OF TRAFFIC TICKETS.  I MEAN, I'M NOT SURE THAT THAT RISES TO A LEVEL OF ANTICIPATION OF LITIGATION THAT'S CONCRETE ENOUGH TO MAKE IT SUCH THAT INVESTIGATORY -- LIKE INVESTIGATIVE DOCUMENTS NEED TO BE WITHHELD, ESPECIALLY WHEN I STILL HAVEN'T HEARD A COGENT ARGUMENT AS TO WHY THOSE DOCUMENTS WOULD NOT HAVE BEEN PRODUCED IN A SUBSTANTIALLY SIMILAR FORM BUT/FOR SOME -- BUT/FOR AN NOV, FOR EXAMPLE.

EXIDE NOTICED THAT THEY WERE EMITTING ELEVATED LEVELS OF ARSENIC INTO THE AIR.

I DON'T KNOW THAT THEY WOULD HAVE JUST SAT ON THEIR HANDS AND NOT DONE AN INVESTIGATION ABSENT SOME CONCERN ABOUT LITIGATION.  AND --

THE COURT:  BUT MAYBE THEY WOULDN'T HAVE BROUGHT IN PUBLIC RELATIONS FIRMS TO ADVISE THEM ON WHAT ARGUMENTS WOULD FLY AND WOULD NOT FLY WITH PARTICULAR REGULATORS.

MS. MURPHY:  THAT'S -- I THINK THAT'S ACTUALLY A BETTER ARGUMENT THAT THEY MAKE.  I THINK IT'S A WEAKER ARGUMENT WHEN WE'RE TALKING ABOUT THE CONSULTANTS SUCH AS ENVIRON, ADVANCED GEOSERVICES, PEOPLE WHICH, ACCORDING TO DEFENDANTS, THEY WERE THERE TO HELP THEM AS A BUSINESS CONSULTANT.  I'M GLAD THAT THEY ADMITTED THAT.  IT WAS -- IT'S HELPFUL.  IT'S HONEST.  AND WHAT THEY'RE --

THE COURT:  THEY SAY BOTH.

MS. MURPHY:  -- DESCRIBING --

THE COURT:  THEY SAY BOTH.

MS. MURPHY:  YES.  THEY DO SAY BOTH.

NO.  I DID NOT MEAN TO SUGGEST THAT THEY DON'T ALSO SAY THAT THEY HELPED WITH THE -- WITH THE ENVIRONMENTAL ATTORNEYS.  BUT I DO SEE A DIFFERENCE BETWEEN HELPING AN ENVIRONMENTAL ATTORNEY, ADVISING EXIDE ON HOW TO INTERACT WITH REGULATORS, WHICH IS WHAT -- PART OF WHAT DEFENDANT SAID -- AND HELPING AN ATTORNEY STRATEGIZE ABOUT A POTENTIAL LITIGATION.

IF THEY'RE INVESTIGATING SO THAT THEY CAN FIGURE OUT HOW THEY SHOULD INTERACT WITH REGULATORS, I DON'T KNOW HOW DIFFERENT THAT IS THAN THE CASES OF -- THAT ARE DESCRIBED IN OUR BRIEFS, WHEREIN THERE'S A PATENT INVESTIGATION THAT'S TAKING PLACE OR IN RITCHIE, YOU KNOW, WHEN IT'S -- WHEN IT'S TAX RELATED.

I MEAN, THERE ARE ALWAYS GOING TO BE SOME ELEMENT IN MANY INSTANCES IN WHICH THERE'S A REGULATION THAT IS OUT THERE

62

THAT NEEDS TO BE ANSWERED TO. I DON'T KNOW IF THAT RISES TO A LEVEL OF ANTICIPATION OF LITIGATION. I'M NOT SURE THAT IT DOES. I'LL LEAVE THAT TO YOUR HONOR OBVIOUSLY TO DECIDE THAT.

I ALSO WANT TO CHALLENGE THE NOTION -- DEFENDANTS REPEATEDLY SAY THAT WE AGREED TO ROLLING PRIVILEGE LOGS. AND WITH THAT IT'S SET OUT PRETTY CLEARLY IN THE EXHIBIT. WE AGREED THAT THOSE ROLLING PRIVILEGE LOGS WOULD TRAIL PRODUCTION BY ABOUT 21 DAYS.

THE COURT: UH-HUM.

MS. MURPHY: THEY STARTED PRODUCING DOCUMENTS BACK IN EARLY DECEMBER. IT WAS MID-MAY BEFORE WE SAW OUR FIRST PRIVILEGE LOG. AND THAT WAS AFTER REPEATEDLY ASKING IF THEY WERE GOING TO PRODUCE ANY.

ADDITIONALLY, WHILE THEY SAY THAT WE SAID THAT THEY WERE DILIGENT IN THEIR PRIVILEGE LOG, ACTUALLY, WHAT WE SAID WAS THEY WERE RELATIVELY DILIGENT IN THEIR PRODUCTION -- NOT IN THEIR PRODUCTION OF PRIVILEGE LOGS.

THAT SAID, I THINK I STILL QUESTION AS YOUR HONOR DID WHY NOT WITH REGARD TO PRODUCING THE ATTACHMENTS FOR EMAILS THAT ARE -- DO NOT HAVE AN INDEPENDENT PRIVILEGE CLAIM. CERTAINLY, THEY SAY THAT WE COULD LINK -- WE COULD DECIPHER WHAT'S GOING WHERE. I DON'T KNOW HOW THAT WOULD WORK IF THEY CAN'T -- THEY'RE NOT ABLE TO LINK IT BASED OFF OF WHAT'S ALREADY BEEN PRODUCED PROBABLY BECAUSE IT'S GOING TO BE A PRETTY BIG CHALLENGE.

63

WE HAVE TRIAL IN JANUARY.  I CAN TELL YOU THERE'S -- WE HAVE PLENTY MORE TO DO THAN TO BE SITTING AROUND AND TRYING TO LINK UP THOSE COMMUNICATIONS.

I THINK IT WOULD BE -- I DON'T THINK THAT IT WOULD DISRUPT OR WAIVE THE PRIVILEGE CLAIMS TO PRODUCE ATTACHMENTS THAT ARE NOT INDEPENDENTLY PRIVILEGED.  AND I THINK I'LL LEAVE IT AT THAT, YOUR HONOR.

THANK YOU.

THE COURT:  ALL RIGHT.  THANK YOU.

THANK YOU, ALL.

I'M GOING TO REFLECT FURTHER ON THE ISSUES IN LIGHT OF THE ARGUMENTS.

THE MATTER IS TAKEN UNDER SUBMISSION.

THANK YOU VERY MUCH FOR YOUR ARGUMENTS.

AND I ANTICIPATE I WILL RULE IN THIS MATTER SOMETIME EARLY NEXT WEEK.

THANK YOU.

MR. VOLZ:  THANK YOU, JUDGE.

(PROCEEDINGS ADJOURNED AT 3:30 P.M.)

64

C E R T I F I C A T E

        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

/S/ DOROTHY BABYKIN                          10/29/15

_____        _____

FEDERALLY CERTIFIED TRANSCRIBER            DATED

DOROTHY BABYKIN