GREEN & NOBLIN, P.C.
Robert S. Green
700 Larkspur Landing Circle, Suite 275
Larkspur, California 94939
Tel: (415) 477-6700
Fax: (415) 477-6710
-and-
4500 East Pacific Coast Highway
Fourth Floor
Long Beach, California 90804
Tel: (562) 391-2487
rsg@classcounsel.com
*Liaison Counsel for Plaintiffs*

William B. Federman (admitted *pro hac vice*)
A. Brooke Murphy (admitted *pro hac vice*)
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone:  405-235-1560
Facsimile:  405-239-2112
wbf@federmanlaw.com
*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID M. LORITZ, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EXIDE TECHNOLOGIES, et al., <br><br> Defendants. | Master File No.  2:13-cv-02607-SVW-E <br><br> **CLASS ACTION** <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR CLASS CERTIFICATION** <br><br> Judge:  Hon. Stephen V. Wilson <br> Date:    November 16, 2015 <br> Time:   1:30 p.m. <br> Place:   Courtroom 6 |

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     DEFENDANTS' ATTEMPT TO DEFEAT CERTIFICATION ON PROCEDURAL GROUNDS SHOULD BE REJECTED......................................1

III.    EMPIRICAL EVIDENCE DEMONSTRATES CAUSE AND EFFECT ............2

    A.    The Three Corrective Disclosure/Event Dates .................................................3

    B.    The Rating Agencies' Actions..........................................................................5

    C.    News Versus No News Days .............................................................................6

    D.    Dr. Hartzmark's Regression Specification.......................................................7

    E.    The Alleged Inconsistencies Between the Stock and Note Do Not Demonstrate Inefficiency .............................................................................10

IV.     DR. GOMPERS' CRITICISMS OF THE PROPOSED DAMAGES METHODOLOGY ARE UNCONVINCING ......................................................11

V.      CONCLUSION ...................................................................................................17

## TABLE OF AUTHORITIES

**CASES**

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,*
   133 S. Ct. 1184 (2013) ........................................................................13

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
   2015 WL 5000849 (S.D.N.Y. Aug. 20, 2015) ....................................2, 14

*Chavez v. Blue Sky Natural Beverage Co.,*
   268 F.R.D. 365 (N.D. Cal. 2010) .......................................................17

*Comcast v. Behrend,*
   133 S. Ct. 1426 (2013) ..................................................................12, 16

*Dei Rossi v. Whirlpool Corp.,*
   2015 WL 1932484 n.1 (E.D. Cal. Apr. 28, 2015).................................13

*Dial Corp. v. News Corp.,*
   2015 WL 4104624 (S.D.N.Y. June 18, 2015) .....................................15

*Dunbar v. Google, Inc.,*
   2012 WL 6202797 (N.D. Cal. Dec. 12, 2012) .......................................2

*Erica P. John Fund, Inc. v. Halliburton Co.,*
   131 S. Ct. 2179 (2011) ......................................................................13

*First Data Merch. Servs. Corp. v. Security Metrics, Inc.,*
   2014 WL 6871581 n. 27 (D.Md. Dec. 3, 2014).....................................17

*Halliburton Co. v. Erica P. John Fund, Inc.,*
   134 S.Ct. 2398 (2014) ............................................................... 2, 5, 11

*Hernandez v. Guglielmo,*
   2013 WL 5788659 (D. Nev. Oct. 25, 2013).............................................2

*In re BP p.l.c. Sec. Litig.,*
   2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)............................................15

*In re Cathode Ray Tube Antitrust Litig.,*
   2013 WL 5429718 (N.D. Cal. June 20, 2013)............................................13

*In re Daou Sys., Inc.,*
   411 F.3d 1006 (9th Cir. 2005)...................................................................13

*In re Diamond Foods Inc., Sec. Litig.,*
295 F.R.D. 240 (N.D. Cal. 2013) ............................................................................3, 4

*In re Goldman Sachs Group, Inc. Sec. Litig.,*
2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015) .......................................................5, 14

*In re Groupon Sec. Litig.,*
2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ...................................................... 3, 4, 11

*In re Scotts EZ Seed Litig.,*
304 F.R.D. 397 (S.D.N.Y. 2015) ...............................................................................13

*In re St. Jude Med. Inc. Sec. Litig.,*
2014 WL 6908434 (D. Minn. Dec. 8, 2014) ..............................................................15

*Levya v. Medline Indns., Inc.,*
716 F.3d 510 (9th Cir. 2013).................................................................................12, 13

*Liberty Media Corp. v. Vivendi Universal, S.A.,*
923 F. Supp. 2d 511 (S.D.N.Y. 2013).......................................................................15

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.,*
762 F.3d 1248 (11th Cir. 2014) ...................................................................................5

*Lumen v. Anderson,*
280 F.R.D. 451 (W.D. Mo. 2012) .........................................................................3, 11

*Petrie v. Elec. Game Card, Inc.,*
308 F.R.D. 336 (C.D. Cal. 2015).............................................................................1, 2

*Roach v. T.L. Cannon Corp.,*
778 F.3d 401 (2d Cir. 2015)........................................................................................16

*Spann v. J.C. Penney Corp.,*
307 F.R.D. 508 (C.D. Cal. 2015)................................................................................17

*Yokoyama v. Midland National Life Insurance Co.,*
594 F.3d 1087 (9th Cir.2010)......................................................................................12

**STATUTES**

15 U.S.C. § 77k(e) .........................................................................................................12

iii

## I.   INTRODUCTION

Plaintiffs submit this Memorandum of Points and Authorities in Reply to Defendants' Opposition to Plaintiffs' Second Motion for Class Certification.

Submitted with the instant Memorandum is the Declaration of William B. Federman in Further Support of Plaintiffs' Second Motion for Class Certification (the "Federman Reply Decl.") and the Exhibits attached thereto.  In further support of this Motion, attached as Exhibit 1 to the Federman Reply Decl. is the Expert Rebuttal Report of Michael L. Hartzmark, Ph.D. (the "Hatzmark Rebuttal" or "Rebuttal Report").

Defendants offer no substantive opposition to certification of the "Securities Act Note Class" and, therefore, such class should be certified without further discussion. Instead, Defendants challenge the efficiency of the market for the Exide Notes (an issue not relevant to Plaintiffs' Section 11 claims) and Plaintiffs' showing that individualized issues of damages will not defeat predominance.  To support their efforts Defendants submit the Expert Report of Paul A. Gompers, Ph.D. (the "Gompers Report").  Dr. Gompers offers criticisms of Dr. Hartzmark's analysis, but he does not perform an independent analysis or opine that the market for Exide Notes was inefficient during the Class Period.  Nor does he demonstrate Dr. Hartzmark's damages methodology is incapable of being applied on a classwide basis.  Ultimately, Dr. Gompers' criticisms, and Defendants' arguments, add little to the discussion.  By a preponderance of the evidence, Plaintiffs have demonstrated that the market for Exide Notes was efficient and that common questions of law and fact will predominate over individual issues. *See Petrie v. Elec. Game Card, Inc.,* 308 F.R.D. 336, 348 (C.D. Cal. 2015) (preponderance of the evidence standard applies to Rule 23).  Thus, each of the three proposed classes should be certified.

## II.   DEFENDANTS' ATTEMPT TO DEFEAT CERTIFICATION ON PROCEDURAL GROUNDS SHOULD BE REJECTED

Defendants urge that Plaintiffs' second motion for class certification should be judged by the standards typically used for a motion for reconsideration.  Def. Opp. at 5-7. Plaintiffs submit that such standards do not apply in this instance.

1

Here, the Court granted part of the motion for class certification and denied the remainder, "without prejudice" and without fully exploring the merits of those parts denied. Implicitly, if not explicitly, was the fact that the Court would later revisit those parts it denied "without prejudice." *See* Order (Dkt. No. 129). Under these facts, the "new evidence" requirement used for motions to reconsider is inapposite. Ample authority exists for this proposition. In *Hernandez v. Guglielmo*, 2013 WL 5788659, *1 (D. Nev. Oct. 25, 2013), the court undertook the merits of a second motion for class certification and held it was "inclined to find that plaintiffs have satisfied all the requirements of class certification." *Id.* A review of the *Hernandez* case's docket shows that the initial motion for class certification was "denied without prejudice to its reinstatement at plaintiffs' request." *See* Case No. 09–cv–00830–LDG–GWF, ECF Docket # 45, slip. op. at 2 (D. Nev. Sept. 24, 2010). Similarly, in *Dunbar v. Google, Inc.,* 2012 WL 6202797 (N.D. Cal. Dec. 12, 2012), the court allowed a second motion for class certification after the first motion was denied without prejudice when the plaintiff had proposed new class definitions (as Plaintiffs have done here) to address the concerns initially raised by the court in denying the first motion. No showing of the reconsideration elements was required by the *Dunbar* court when the second class certification motion was brought. *See id.* at *4-5.

Plaintiffs' Motion, as now presented, is properly before the Court and Defendants' attempt to defeat certification on procedural grounds should be rejected.

## III.   EMPIRICAL EVIDENCE DEMONSTRATES CAUSE AND EFFECT

"[I]n making the presumption [of reliance] rebuttable, *Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,* 2015 WL 5000849 at *5 (S.D.N.Y. Aug. 20, 2015) (citing *Halliburton Co. v. Erica P. John Fund, Inc.,* 134 S.Ct. 2398, 2410 (2014) ("Halliburton II")). That proof is by a preponderance of the evidence. *Petrie v. Elec. Game Card, Inc.,* 308 F.R.D. 336, 348 (C.D. Cal. 2015); Plaintiffs have met that burden here.

Dr. Gompers' opposing arguments and criticisms fall short. *See* Hartzmark Rebuttal at ¶¶68-69, 76, 219, and *generally.* Significantly, courts have recognized and rejected what

2

Dr. Gompers has done here, which is to largely advocate a state of economics and law that does not exist while failing to present convincing evidence of inefficiency. *See Lumen v. Anderson,* 280 F.R.D. 451, 460 (W.D. Mo. 2012) ("Defendants (and their expert [Dr. Gompers]) often describe a different conception of an efficient market than is used by the law."); *In re Groupon Sec. Litig.,* 2015 WL 1043321 at *11 (N.D. Ill. Mar. 5, 2015) (same). Here, he has done so with limited or incomplete analyses. *See* Hartzmark Rebuttal, generally. Indeed, Dr. Gompers, notably, does not perform his own regression analysis or offer an opinion on market efficiency. Gompers Dep. Transcript at 61-62. Instead, he attacks each segment of Dr. Hartzmark's cause and effect analysis as independently insufficient to demonstrate market efficiency. *See In re Diamond Foods Inc., Sec. Litig.,* 295 F.R.D. 240, 249 (N.D. Cal. 2013) (finding facial criticisms without analysis unconvincing). Contrary to Dr. Gompers' view, and as the Court correctly recognized, the evidence concerning market efficiency must be considered as a whole. Rebuttal Report at 11; Order at 21 ("Even if James is correct that this study is not alone sufficient to prove market efficiency, it is still capable of showing that a stock's price behaves in a manner consistent with market efficiency. Moreover, this study is offered alongside several other causation studies and with evidence that each of the other *Cammer* factors is satisfied.").

## A.     The Three Corrective Disclosure/Event Dates

Dr. Gompers concludes that the statistically significant returns following the three corrective disclosure dates, April 4, April 25, and May 24, 2013, occurred "at the tail end of the Note Class Period…[and] [a]s such…are <u>not necessarily</u> indicative of efficiency <u>for earlier portions of the Note Class Period</u>…." Gompers' Report at ¶21. As Dr. Hartzmark explains, these criticisms miss the mark. Hartzmark Rebuttal at ¶¶34-36. First, it is common that most corrective disclosures occur towards the end of a class period. *Id.* at ¶34. And, among the reasons courts require experts to examine the *Cammer/Kroger* factors, as Dr. Hartzmark has here,[1] is "to determine whether the security traded in an open, well-

---

[1]     The *Cammer/Kroger* factors strongly support a finding of efficiency in Exide Notes. *See* Hartzmark Report at ¶¶21-120; Hartzmark Rebuttal at ¶¶9-33 and *generally.*

3

developed and efficient market <u>throughout the class period.</u>" Hartzmark Rebuttal at ¶36 (emphasis in original). Further, Dr. Hartzmark does not only rely on these three disclosure dates for his cause and effect analysis, but also on his news/no news analysis and his regression analysis. *Id.* at ¶¶43-115 and *generally.*

While Dr. Gompers mischaracterizes Dr. Hartzmark's writings in a 2012 law review article to suggest the sample size in this case is too small to provide reliable evidence of efficiency, Gompers Report at ¶22, what Dr. Hartzmark was referencing in the 2012 article was the "compari[son] of one earnings date to another five." Hartzmark Rebuttal at ¶37. That is not our case. Here, for example, if Dr. Hartmark "want[s] to answer the question of whether the announcement about closing down a plant causes a price decline of the Exide Note [and he does], [Hartzmark] can use the excess return on that single date to support the conclusion. Why? Because [he is] comparing it to a large number of other dates all other 412 days in the Note Class Period when there was no plant closing."[2] *Id.*

Next, Dr. Gompers and Defendants claim, the "selection of these three corrective disclosure days is circular and <u>potentially</u> biased." Gompers Report at 23 (emphasis added); Def. Opp. at 11. However, Dr. Gompers does not affirmatively state that Dr. Hartzmark's selection was inappropriate. Courts frequently base event studies on the corrective disclosures or fewer than three dates, and these three dates could be used as sole support for cause and effect.[3] Rebuttal Report at ¶38; *See, e.g., In re Groupon Sec. Litig.*, 2015 WL

---

[2]    Moreover, Dr. Gompers acknowledged that in the same 2012 article, Dr. Hartzmark "proposes a 'bootstrap' analysis similar to the 'news vs. non-news day' analysis he conducts in this matter to remedy this problem." Gompers Report at 22. But, according to Dr. Gompers, "such a methodology is not an accepted test of efficiency." *Id.* at ¶22. Dr. Hartzmark cites both case law and academic literature to support the use of this method of drawing statistical inferences. Hartzmark Report at ¶104 and n. 123. In fact Gompers <u>did not say</u> the "boot-strap" method could not be used in connection with other tests (such as those conducted by Dr. Hartzmark) to demonstrate efficiency. And in fact the Court already accepted the similar news/no news analysis performed by Torchio. Order at 21-24.

[3]    These dates were in fact not chosen by Dr. Hartzmark in advance of his empirical analysis, but *a priori* from the Complaint. Hartzmark Rebuttal at ¶39.

4

1043321 at *5-6 (N.D. Ill. Mar. 5, 2015) (that regression analysis used only two news days which bookended class period, did not invalidate results or "alter the finding that empirical facts demonstrated a cause-and-effect relationship" especially where returns on these dates were statistically significant at the 99% confidence level). "[A]ll three of the alleged ["most critical"] corrective disclosure events had statistically significant negative abnormal returns with t-statistics ranging from -6.83 to -9.28, easily exceeding the -1.97 threshold for statistical significance." Hartzmark Rebuttal at ¶¶39-40.  With "these high levels of statistical significance, these empirical results demonstrating cause-and-effect strongly support the conclusion that the Exide Note traded . . . in an efficient market." *Id.* at ¶40.

Finally, neither Dr. Gompers nor Defendants have disputed the price impact of the alleged misrepresentations and omissions on the price of the Exide Notes.  "Price impact 'can be shown by a stock price reaction either at the time of the statement or at the time of the corrective disclosure, [and] analysis of price impact usually focuses on stock price movement at the time the truth is disclosed,'…and so the fact that there was no stock price increase when the statements were made does not suggest a lack of price impact." *In re Goldman Sachs Group, Inc. Sec. Litig.,* 2015 WL 5613150 at *6 (S.D.N.Y. Sept. 24, 2015); *In Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.,* 762 F.3d 1248 (11th Cir. 2014).  Dr. Hartzmark "clearly demonstrated in the Hartzmark Report that there were statistically significant price declines on the three alleged corrective disclosure dates." Hartzmark Rebuttal at ¶¶42, 114.  Hartzmark Report at ¶¶76-86, 120-121.  The highly statistically significant *t*-statistic values of the negative abnormal returns on these dates demonstrate this. *See* Hartzmark Rebuttal at ¶¶40, 42.  This, in and of itself, relieves Plaintiffs of the burden of proving reliance. *See Halliburton II,* 134 S.Ct. at 2411, 2415-16; Pltf. Mem. at 12-13 and n.9.

**B.     The Rating Agencies' Actions**

Dr. Gompers does not dispute Dr. Hartzmark's opinion that the three credit rating downgrades were based on "old" news and this explains the market's muted response to same. *See* Gompers Report at ¶25-26.  Nor does he claim such opinion is unsound or lacks

5

support in the academic literature. *Id.* He cannot. The pillar of the efficient market hypothesis is that in efficient markets prices are only expected to react to new and unanticipated information. *See* Hartzmark Report at ¶87, n. 107 (citing Fama, Eugene F., Lawrence Fisher, Michael Jenson, and Richard Roll, The Adjustment of Stock Prices to New Information, International Economic Review, 10 (1969), pp. 1-21); Gompers Report at ¶11 ("[T]o reliably demonstrate market efficiency from the perspective of a financial economist, one must establish a cause-and effect relationship between new value-relevant information and a corresponding security price reaction." (emphasis added)). Instead, Dr. Gompers claims that while this is not supportive of an inefficient market, it "is [similarly] not dispositive of market efficiency." Gompers Report at ¶ 26. But, Dr. Hartzmark does not suggest this is dispositive, only that the "empirical results are consistent with (no)cause-and-(no)effect on these three dates and support the conclusion that the Exide Note traded in an open, well-developed and efficient market." Hartzmark Report at ¶93; Hartzmark Rebuttal at ¶141. Dr. Gompers offers nothing to question Dr. Hartzmark's conclusion. *See id.* at ¶140. Dr. Hartzmark's conclusions are not speculative; they are supported by specific factual analysis and data. Hartzmark Report at ¶¶87-93.

### C.     News Versus No News Days

Dr. Gompers attacks Dr. Hartzmark's "news versus no-news" analysis by largely rehashing the criticisms leveled by Dr. James' at Torchio's "news versus no-news" analysis. Gompers Report at ¶¶27-28. Specifically, Dr. Gompers claims Dr. Hartmark's "determination of what represents a 'news' day is arbitrary and unscientific," yet neither Dr. Hartzmark nor Dr. James made any attempt to define an alternative approach. Hartzmark Rebuttal at pp. 4 (Opinion III.); *id.* at ¶¶45-46, 56-57. These criticisms have already been rightly rejected by this Court and others and should be rejected here. *See* Order at 21-24 (collecting cases); *see also* Hartzmark Rebuttal at ¶¶68-73 and nn. 66, 68. Moreover, Dr. Hartzmark has thoroughly addressed and rebutted Dr. Gompers' criticisms, explaining why they lack merit. Hartzmark Rebuttal at ¶¶47-57. Dr. Hartzmark has explained the appropriate selection process for choosing "news days" and that the

procedure he followed was objective and consistent with same. *Id.* at ¶¶47-57. ("[T]he key issue in choosing News dates is not whether or not the expert is able to find each and every 'news' date, but that the expert can objectively choose a sample of dates that is representative of the population of likely 'news' dates."). That Dr. Hartzmark's methodology can be independently replicated and Dr. Gompers has done so demonstrates its objectivity. *Id.* at ¶¶56-57. Thus, Defendants' contention that Dr. Hartzmark's method of selecting news days is "so convoluted and counterintuitive that it begs the question whether the methodology was designed to ensure a pre-determined outcome," Def. Opp. at 17, is totally off base.[4]

Moreover, Defendants and Dr. Gompers' criticism that Dr. Hartzmark's "news versus no news" analysis is not academically accepted because "it only tests if there was a statistically significant market response to news *on average,*" Def. Opp. at 16, plainly ignores the academic literature.[5] Hartzmark Rebuttal at ¶¶60-61, nn. 62-64. In any event, using a careful analysis like Dr. Gompers used in the *Goldman* case (but did not utilize here), Dr. Hartzmark has demonstrated that on most of the eight disclosure dates, returns move in the right direction. *Id.* at ¶¶73-115. Dr. Gompers' opinion that Dr. Hartzmark's event study shows no "systematic" relationship between "unexpected" news and a corresponding Note price reaction is simply wrong. *Id.* at ¶¶73-76, 115; *see id.*, ¶¶73-115.

### D. Dr. Hartzmark's Regression Specification

True to form, Dr. Gompers criticizes Dr. Hartzmark's regression specification, without offering his own. These criticisms essentially boil down to two issues: (1) Dr. Hartzmark's specification of the Exide Note market model and the use of the same two equity factors Mr. Torchio uses; and (2) whether the observed volatility of the returns

---

[4] In fact, as explained by Dr. Hartzmark, "the approach I have taken is actually quite conservative in that if anything it biases the choice of news dates toward finding no price impact." Hartzmark Rebuttal at ¶51.

[5] Dr. Gompers offers a comparison of Dr. Hartzmark's identified "news" days with Torhco's identified "news" days. Gompers Report at ¶38. Of course, Dr. Gompers does not opine these days contain new value-relevant news.

requires some type of adjustment. Hartzmark Rebuttal at ¶179. These criticisms, as Dr. Hartzmark explains, are "much to do about nothing." *Id. See, also, id.* at ¶¶174-97.

Defendants and Dr. Gompers complain that Dr. Hartzmark's "inclusion of a stock industry factor is not well supported in the literature [of course Dr. Gompers cites no academic literature rejecting it]. This raises the concern that Dr. Hartzmark's model is not properly specified, which would bias his results." Gompers Report at ¶49. They claim that Dr. Hartzmark should have used Dr. Gompers two-factor market model, excluding the stock industry indices. In fact Dr. Gompers is clearly wrong when he suggests that there is a set of established procedures to implement a market model, particularly with a single issued by a single firm security, like the Exide Note. Hartzmark Rebuttal ¶¶182-84. There are many different models that are appropriate, including the one used by Dr. Hartzmark. *Id.* at ¶184-87 (J. C. Campbell, A. W. Lo and A. C. MacKinlay (1997), The Econometrics of Financial Markets (CLM), New Jersey: Princeton University Press, p. 155). Dr. Hartzmark chose the multifactor model he did to reliably eliminate as much of the influence of exogenous factors as possible *Id.* at ¶186.

> Fama-French starts with the idea that "five factors seem to explain average returns on stocks and bonds." In other words, "The notion is that if markets are integrated, there is probably some overlap between the return processes for bonds and stocks." With this claim and a series of empirical tests they then conclude, "At a minimum, our results show that five factors do a good job explaining (a) common variation in bond and stock returns…" In other words, "There are at least five common factors in returns. Three stock-market factors produce common variation in stock returns. Except for low-grade corporate bonds, the stock-market factors have little role in returns on government and corporate bonds."

*Id.* at ¶189 (quoting Fama-French at pp. 3-4, 51-53). "Quite simply, the Fama-French research suggests that for bonds like the Exide Note, along with the two additional factors or bond market variables – CREDIT AND MATURITY – one should incorporate the same stock market factors into the regression specification to estimate the excess returns to the Exide Note, as are used for the regression to estimate the excess returns to the Exide common stock." *Id.* at ¶190.

8

Dr. Gompers unequivocally states that "Dr. Hartzmark has presented no evidence that it is appropriate to model the Exide Note price behavior based on the S&P 500 stock index and an industry factor based on 'peer' stock returns." *Id.* at ¶191 (quoting Gompers Report at ¶50).  According to Dr. Hartzmark this is "nonsense." *Id.* at ¶192.

> Why would the fact that the same factor has a differential influence mean that that factor should be removed from the regression?  Just because stock and bond prices might move in different directions at different times does not mean that one should arbitrarily eliminate the important stock-related factors from the estimation process. For example assume hypothetically that when the Industry stock market index rose, the Exide stock price fell (on average) and the bond price rose (on average).  In this case, the influence of the Industry stock market index must be removed (via the regression) from the return of the Exide Note to calculate the excess return of the Exide Note even though it is opposite in influence when compared to the stock.  "By arbitrarily excluding this important and obviously related factor one would have what econometricians call the "omitted variable bias."[6]

*Id.* at ¶192-93 and nn. 183-84.

Dr. Hartzmark constructed Dr. Gompers' suggested specification, re-ran the regression, and obtained the results. *Id.* at ¶¶194-96. The results confirmed that Dr. Hartzmark's four factor model is superior to Dr. Gompers' two market model.[7] *Id.* at ¶¶194-97 and Appendix C.  This explains why Dr. Gompers chose not to disclose his results, but instead level vague, unsupported and misleading criticisms.  *See id.*

---

[6]    As a matter of pure statistics, including additional regressors raises the R-square or goodness of fit or explanatory power of the regression.  Thus, excluding the industry and/or S&P 500 Index will raise the standard error of the regression and reduce the number of dates with statistical significance and the number of inconsistencies. *Id.* at ¶193, n. 183. All else equal, it will tend to make t-tests of individual residuals $e\{t\}$ less likely to reject the null hypothesis.  *Id.*

[7]    Dr. Hartzmark analyzed and debunked–by applying financial and statistical analysis Dr. Gompers failed to perform–Dr. Gompers' claim that during the Class Period the Exide Note demonstrated persistent autocorrelation.  Hartzmark Rebuttal at ¶¶116-128.

9

#### E.   The Alleged Inconsistencies Between the Stock and Note Do Not Demonstrate Inefficiency

Although, barely mentioned by Defendants, Def. Opp. at 18 n.15, both Dr. Gompers and Dr. James claim there are too many purported inconsistencies between the Exide stock-to-bond returns to support a conclusion that the Exide Note traded in an open, well-developed and efficient market. Gompers Report at ¶¶ 39-43.  Dr. Gompers' and Dr. James' claims and criticisms are nothing more than speculation; neither offer any method, procedure or test to scientifically determine whether what they simply speculate about (in this case the number of purported inconsistencies) exceeds an objective scientific, academic-based standard, benchmark or metric.  *Id.;* Hartzmark Rebuttal at ¶¶135-40. Consequently, their alleged inconsistency analyses are unscientific and unreliable. Hartzmark Rebuttal at ¶140.  In any event, Dr. Gompers and Dr. James' claims and criticisms lack merit.  *Id.* at ¶¶135-73.  In fact, as explained by Dr. Hartzmark, "given the facts and data presented in this Exide matter there are <u>actually fewer inconsistencies</u> than would be expected." *Id.* at ¶137.  Because Dr. Gompers and James failed to construct a benchmark against which to measure their claimed inconsistencies, Dr. Hartzmark has constructed one for them using the 95% confidence level and nine news dates.  *Id.* at ¶¶141-50 (explaining how the benchmark was constructed). That benchmark is 22 days. *Id.*  The number of inconsistencies (18) noted by Dr. Gompers and Dr. James does not exceed that number.  *Id.* at ¶¶148-50.  It is what is expected.  Moreover, not only has Dr. Hartzmark explained that there are unobserved factors that might also lead to what appear to be inconsistencies, but Dr. Hartzmark also has explained a number of these inconsistencies (making the number even smaller.) *Id.* at ¶¶165-73.

In summation, Dr. Gompers' insistent advocacy for a requirement of "fundamental" market efficiency, *see, e.g., id.* at ¶¶68-69, 76, 219, is contrary to the Supreme Court's pronouncements in *Halliburton II* and this Court (Order at 22). He has attempted to advocate the same unavailing argument in other cases and has failed. Thus, in *In re Groupon Sec. Litig.*, the court stated:

10

> Dr. Gompers'…attempts to undermine Dr. Feinstein's opinions were not persuasive. Defendants' arguments suggest that the fraud-on-the-market presumption requires a *perfectly* efficient market. But this argument was squarely rejected by the *Halliburton* Court. 134 S.Ct. at 2410. . .
>
> * * *
>
> Dr. Gompers was unable to contradict Dr. Feinstein's opinions that alleged false statements affected the price of Groupon stock and caused losses. As another district court observed in rejecting a similar argument made by Dr. Gompers, Defendants "rely on factors that are not legally relevant." *Lumen v. Anderson,* 280 F.R.D. 451, 460 (W.D. Mo. 2012). . . . Defendants (and their expert) often describe a different conception of an efficient market than is used by the law."

2015 WL 1043321 at *11 (N.D. Ill. Mar. 5, 2015).

Plaintiffs submit that the Court should do as other courts have and reject Dr. Gompers' unrealistic and insufficient criticisms.[8]

## IV.  DR. GOMPERS' CRITICISMS OF THE PROPOSED DAMAGES METHODOLOGY ARE UNCONVINCING

Defendants apparently abandon their previous argument that individual issues of damages defeat class certification as a whole; instead, they contest certification of a damages class.  For support, Defendants adopt the criticisms of Dr. Gompers who finds Dr. Hartzmark's proffered damages methodology insufficient.  However, a careful reading of Dr. Gompers' report demonstrates that his criticisms are that Dr. Hartzmark's damages methodology will face challenges in *calculating* damages and/or establishing *loss causation.* Critically, Dr. Gompers does not sufficiently challenge the ability of Dr. Hartzmark's damages methodology to be applied on a classwide basis while remaining tied to Plaintiffs' theory of liability, which is all that is required to be demonstrated at the class certification stage.  As the Ninth Circuit specifically recognized in *Pulaski & Middleman, LLC v. Google, Inc.,* plaintiffs must simply "be able to show that their damages stemmed from the

---

[8]  Defendants contention that the Class Period should be shortened to eliminate that portion which is in 2011 is without merit.  As Dr. Hartzmark Report and Rebuttal Report demonstrate the market for the Exide Note was efficient through the Class Period.

defendant's actions that created the legal liability." 802 F.3d 979, 987 (9th Cir. 2015) (quoting *Levya v. Medline Indns., Inc.,* 716 F.3d 510, 514 (9th Cir. 2013).[9]

Plaintiffs have done so here. For Plaintiffs' Section 10(b) claims,[10] Dr. Hartzmark presented a damages methodology that could be applied in this case on a classwide basis. Under Dr. Hartzmark's proposed damages methodology, he would: (1) apply an event study to determine whether certain identified disclosures caused the stock price to fall significantly; (2) use the event study results and valuation tools to create an "inflation ribbon" that measures how much the alleged misrepresentations and omissions inflated the price of Exide's securities on each day of the Class Period; and (3) apply the inflation ribbon to determine the per share damages computation, where damages would take into account any change in artificial inflation and the change in prices over each investor's holding period. Hartzmark Report ¶¶124-27; Hartzmark Rebuttal ¶209. Thus, the proposed damages methodology is tied to Plaintiffs' theory of liability.

Dr. Gompers does not challenge that Dr. Hartzmark's methodology is workable on a classwide basis. *See* Gompers Dep. at 134. Rather, the tactic of Dr. Gompers is to present a hypothetical parade of horribles, which he argues could create "challenges to *calculating* damages." Gompers Report ¶62. Indeed, in Dr. Gompers' view, demonstrating the existence of an acceptable damages methodology at the class certification stage would require a full-blown trial on the merits.[11] This is neither consistent with United States

---

[9]    Defendants tellingly fail to address the recent Ninth Circuit case of *Pulaski,* cited by Plaintiffs, Plfs' Mem. at 18, in which the Court specifically rejected the district court's finding that *Comcast v. Behrend,* 133 S. Ct. 1426, 1433 (2013) changed the Circuit's holding in *Yokoyama v. Midland National Life Insurance Co.,* 594 F.3d 1087 (9th Cir.2010), that "damage calculations alone cannot defeat certification." 802 F.3d at 986.

[10]    Computation of damages for Plaintiffs' § 11 claims are purely statutory, which Defendants do not challenge. Hartzmark Rebuttal at pp. 7, n.12 (Opinion X); 15 U.S.C. § 77k(e). Thus, even if the Court declines to certify a damages class for Plaintiffs' Section 10(b) claims, the Court should still certify a damages class for Plaintiffs' § 11 claims.

[11]    While Dr. Gompers claims this is not his position (Gompers Report at p. 41, ¶60), his criticisms demonstrate otherwise. For example, Dr. Gompers states:

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' SECOND MOTION FOR CLASS CERTIFICATION          MASTER FILE NO. 2:13-cv-02607-SVW-E

Supreme Court pronouncements, *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.") (proof of materiality not required); *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (*"Halliburton I"*) (proof of loss causation not required), nor those of most courts that have addressed the issue post-*Comcast.* Moreover, "the Ninth Circuit has held that at the class certification stage plaintiffs need only propose a valid method for calculating class wide damages, **not an actual calculation of damages**." *Dei Rossi v. Whirlpool Corp.,* 2015 WL 1932484, at *1 n.1 (E.D. Cal. Apr. 28, 2015) (emphasis added) (citing *Leyva,* 716 F.3d at 514); *In re Cathode Ray Tube Antitrust Litig.,* 2013 WL 5429718, at *22 (N.D. Cal. June 20, 2013) ("Courts 'have never required a precise mathematical calculation of damages before deeming a class worthy of certification'" and *Comcast* does not change this result), *report and recommendation adopted,* 2013 WL 5391159 (N.D. Cal. Sep. 24, 2013); *In re Scotts EZ Seed Litig.,* 304 F.R.D. 397, 414 (S.D.N.Y. 2015) (finding that "nothing in *Comcast* requires an expert to perform his analyses at the class certification stage") (citing cases).

Dr. Gompers' arguments regarding evolving risk (or time varying inflation) similarly seek to require proof of loss causation at the class certification stage. Gompers Report at 51-57. Indeed, his argument is that the alleged misstatements might not be sufficiently attributable to the corrective disclosures. This is loss causation. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005). And the Supreme Court has specifically held that challenges on loss causation are not an appropriate basis for denying class certification. *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).

> Dr. Hartzmark's hypothetical adjustment for a changing probability of shutdown is simply a computational exercise **demonstrating how he could scale damages once inflation over time has been determined and someone tells him the true likelihood of shutdown at various points within the class periods**. This approach ignores the central question of how one would **actually determine the level of inflation, how the inflation changed over time, or how the true likelihood of shutdown changed over time**."

Gompers Report at 47-48, ¶65 (emphasis added).

13

For the aforementioned reasons, courts have rejected these *Comcast* contrived arguments and criticisms when Dr. Gompers has made them in other cases. For instance, in *Carpenters Pension* the court specifically rejected Dr. Gompers' similar criticisms:

> Defendants argue that [plaintiffs' expert's] proposed method is flawed because plaintiffs have not shown "how purported price reactions in June 2012 provide an appropriate starting point for calculating damages on the claims still at issue"; **"how they will isolate the incremental impact of LIBOR-related statements on Barclays' ADS in light of other information relating to Barclays' borrowing costs"; or "how they will account for variations in inflationary impact over time."**
>
> **Plaintiffs' model survives the minimal scrutiny required under Comcast and Rule 23(b)(3)—their theory of liability matches their theory of damages and individualized damages issues will not predominate….** [P]laintiffs are not required to demonstrate either loss causation or damages for purposes of class certification. **In other words, whether plaintiffs will be able to prove loss causation or measure price impact—in this case, the inflationary impact of the false LIBOR disclosures and Diamond's statements—are questions that go to the merits and not whether common issues predominate.**

2015 WL 5000849 at *21 (emphasis added) (rejecting arguments set forth by Dr. Gompers).

Similarly, in *In re Goldman Sachs,* the court rejected Dr. Gompers' arguments, holding:

> But at the class certification stage, Plaintiffs must only show that their damages model "actually measure[s] damages that result from the class's asserted theory of injury." Plaintiffs' model does that. The possibility that Defendants could prove that some amount of the price decline is not attributable to Plaintiffs' theory of liability does not preclude class certification. *Comcast* speaks to measuring damages stemming from the accepted theory of liability, and **not the extent to which that liability can be proven**. Moreover, any failure of the methodology to "disaggregate the losses purportedly attributable to disclosures about government enforcement activities from those that Plaintiffs attribute to the challenged statements," would not defeat the class's predominance because it would affect all class members in the same manner.

2015 WL 5613150 at *4, 8 (emphasis added) (rejecting arguments made by Gompers).

14

Courts have also rejected similar arguments raised by other defense experts, including in securities class actions. *See, e.g., In re St. Jude Med. Inc. Sec. Litig.,* 2014 WL 6908434, at \*5-9 (D. Minn. Dec. 8, 2014) ("Defendants' criticisms of Dr. Sarin's methodology really go to the accuracy of his backcasting calculations and not to the appropriateness of the method's ability to determine damages on a class-wide basis. While Defendants may challenge Dr. Sarin's methodology through cross-examination at trial, their disagreement is not a valid reason for decertification."); *see also Dial Corp. v. News Corp.,* 2015 WL 4104624, at \*10 (S.D.N.Y. June 18, 2015) ("Although characterized as a dispute over the feasibility of Plaintiffs' damages model, News Corp. essentially argues that Plaintiffs' model does not prove what they claim it proves—class-wide damages. . . . To the extent that [defendant's expert] proposes an alternative damages model using different methodology…he is free to do so at the merits stage.").[12]  Even at the summary judgment and trial stages, **where loss causation is at issue**, courts impose a less exacting standard for proving up damages than that advocated by Dr. Gompers. *See, e.g., Liberty Media Corp. v. Vivendi Universal, S.A.,* 923 F. Supp. 2d 511, 519-20 (S.D.N.Y. 2013).[13]

---

[12]    *In re BP p.l.c. Sec. Litig.,* 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013), the only securities class action case cited by Defendants, is inapposite. First, in *BP,* the court found that "*Comcast* signals a significant shift in the scrutiny required for class certification," *id.* at \*17, which is directly contrary to the Ninth Circuit's holding in *Pulaski.*  Second, the damage formula that was proffered provided for a constant degree of fraudulent inflation, which was contrary to plaintiffs' claims of liability.  *Id.* In any event *In re BP* appears to be an outlier and is inconsistent with the multitude of cases that express a contrary view.

[13]    Thus, in *Liberty Media Corp. v. Vivendi Universal, S.A.,* 923 F. Supp. 2d 511, (S.D.N.Y. 2013, one of handful of securities class action cases to be resolved by trial, defendants moved for judgment as a matter of law. Defendant Vivendi argued that plaintiffs' expert "Dr. Nye's disaggregation analysis was so flawed as to be legally insufficient to support the jury's verdict on loss causation and damages." *Id.* at 519.  The Court was not persuaded. *Id.* at 519-20.

15

Further, courts in antitrust cases—cases that involve unique circumstances calling for unique damages methodologies (Hartzmark Rebuttal ¶214)—have also rejected arguments similar to those raised by Dr. Gompers and Defendants.  For example, in *In re Processed Egg Products Antitrust Litig.*, the court held:

> Defendants would have it that Plaintiffs must, at this stage, disaggregate each alleged anticompetitive action and isolate its effect. . . . But Defendants are asking the Court to do more than ensure compliance with Rule 23— Defendants ask the Court to ensure that compliance with Rule 23 will withstand any possible development moving forward. That is not what *Comcast* required…. The Court would, under Defendants' reading of Rule 23, need to determine not just that common issues are likely to predominate over individual ones, but that Plaintiffs have indeed proven the merits of every aspect of their case, such that no development in the case could threaten the initial decision on certification of the class. Class certification is not such a free-ranging inquiry."

2015 WL 5610834, at *17 (E.D. Pa. Sept. 21, 2015).

Importantly, unlike in *Comcast*, nothing has disrupted Plaintiffs' theory of liability such that the proposed damages methodology is inextricably tied to other theories.  *See Comcast*, 133 S. Ct. at 1433. Defendants do not dispute that the proposed methodology is appropriate under the current state of the case.  Rather, they argue that "were the court to find Defendants liable for only a subset of the alleged types of misrepresentations a damages methodology that could not disentangle the respective types of misrepresentations would not be tied to the operative liability theory."  Def. Opp. at 24.  However, courts have repeatedly rejected this purely speculative view at the class certification stage because it ventures too close to a merits determination.  *See Roach v. T.L. Cannon Corp.,* 778 F.3d 401, 407-08 (2d Cir. 2015) ("Indeed, as the Court explained [in *Comcast*], if all four types of anticompetitive injury had been approved for certification by the district court, the plaintiff's damages methodology "might have been sound, and might have produced commonality of damages."); *In re Processed Egg,* 2015 WL 5610834, at *17-

16

19 (""[T]he Court must not engage in free-ranging merits inquiries at the class certification stage. Here, Defendants' proposed disaggregation requirement is based on hypotheticals that the Court has no basis to consider at this moment…."); *First Data Merch. Servs. Corp. v. Security Metrics, Inc.,* 2014 WL 6871581, at \*11 n. 27 (D.Md. Dec. 3, 2014) (distinguishing *Comcast* and rejecting argument that plaintiffs "failed to properly disaggregate the damages as they related to the various individual counterclaims," because "all of the relevant theories still remain at issue in the case"). Here, each of Plaintiffs' claims remain viable and the class certification stage is not the time to speculate on the ultimate determination of merits issues. Regardless, Dr. Hartzmark has proposed a methodology that will address such issues. Hartzmark Report ¶¶124-27; Hartzmark Rebuttal ¶¶210-224.

Ultimately, this case is not unlike most securities class actions; most involve multiple alleged misrepresentations and omissions over an extended period of time -- the nature of which can often differ -- and one or more corrective disclosures or events, often involving some confounding information. Financial experts have repeatedly been able to present well-accepted analytical models to disentangle confounding information and events and address these situations. *See* Hartzmark Rebuttal ¶¶211-13, 217, 221. Dr. Hartzmark, too, proposes a well-accepted methodology for determining damages in this case – a methodology that is connected to Plaintiffs' theory of liability. Hartzmark Report ¶¶123-45; Rebuttal Report ¶¶210-24. That is all that is required at the class certification stage, even after *Comcast. See Spann v. J.C. Penney Corp.,* 307 F.R.D. 508, 529 (C.D. Cal. 2015) (while plaintiff must present a valid method for determining class damages, "it is not necessary to show that [this] method will work with certainty at this time.") (quoting *Chavez v. Blue Sky Natural Beverage Co.,* 268 F.R.D. 365, 379 (N.D. Cal. 2010)).

## V.   CONCLUSION

Accordingly, Plaintiffs Motion for Class Certification should be granted.

17

Dated: November 9, 2015                      /s/William B. Federman
                                             William B. Federman (admitted *Pro Hac Vice*)
                                             A. Brooke Murphy (admitted *Pro Hac Vice*)
                                             FEDERMAN & SHERWOOD
                                             10205 North Pennsylvania Avenue
                                             Oklahoma City, Oklahoma 73120
                                             Telephone: (405) 235-1560
                                             Facsimile:  (405) 239-2112
                                             wbf@federmanlaw.com

                                             *Lead Counsel for Plaintiffs*

                                             Robert S. Green
                                             GREEN & NOBLIN, P.C.
                                             700 Larkspur Landing Circle, Suite 275
                                             Larkspur, California 94939
                                             Tel: (415) 477-6700
                                             Fax: (415) 477-6710
                                             -and-
                                             4500 East Pacific Coast Highway
                                             Fourth Floor
                                             Long Beach, CA 90804
                                             Tel: (562) 391-2487
                                             rsg@classcounsel.com

                                             *Liaison Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on Monday, November 9, 2015.

                                             /s/William B. Federman
                                             William B. Federman

18